Stephen Wood, USB No. 12403
QUINN EMANUEL URQUHART & SULLIVAN, LLP
2755 E. Cottonwood Parkway, Suite 430
Salt Lake City, Utah 84121
Telephone: 801-515-7300
stephenwood@quinnemanuel.com

*Counsel for Defendants Express Scripts, Inc.,*
*Express Scripts Administrators, LLC, ESI*
*Mail Pharmacy Service, Inc., Express Scripts*
*Pharmacy, Inc., ESI Mail Order Processing,*
*Inc., and Medco Health Solutions, Inc.*

---

## UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

| | |
|---|---|
| State of Utah and Division of Consumer Protection,<br><br>            Plaintiffs,<br><br>    v.<br><br>Express Scripts, Inc.; Express Scripts Administrators, LLC; ESI Mail Pharmacy Service, Inc.; Express Scripts Pharmacy, Inc.; ESI Mail Order Processing, Inc.; Medco Health Solutions, Inc.; UnitedHealth Group, Inc.; OptumRx, Inc.; OptumInsight Life Sciences, Inc.; and OptumInsight, Inc.,<br><br>            Defendants. | **JOINT NOTICE OF REMOVAL**<br><br>Case No.<br><br><br>**Jury Trial Requested**<br><br>Removed from: Third Judicial District in and for Summit County, State of Utah |

Defendants Express Scripts, Inc. (**Express Scripts PBM**), and Express Scripts Pharmacy,

Inc., and ESI Mail Pharmacy Service, Inc. (together, **ESI Mail Pharmacy**) (collectively with

Express Scripts PBM, **Express Scripts**), and OptumRx, Inc. (**OptumRx**, and, with Express

Scripts, the **Removing Defendants**)[1] hereby remove the civil action titled *State of Utah and Division of Consumer Protection v. Express Scripts, Inc., et al.*, Case No. 240500576, pending in the Third Judicial District in and for Summit County, Utah, to the U.S. District Court for the District of Utah. A copy of the operative complaint is attached as **Exhibit A**. A current copy of the state court docket sheet is attached as **Exhibit B**. A copy of all pleadings, process, motions, orders, and other relevant filings is attached as **Exhibit C**.

## INTRODUCTION

1.    The State of Utah and Division of Consumer Protection (**State**) sued Removing Defendants in state court for allegedly contributing to a public nuisance arising from prescription opioids. This case is one of thousands filed nationwide by government entities seeking to recoup costs allegedly incurred in addressing issues related to the opioid crisis. Most of those cases were filed in, or removed to, federal court and then centralized in a federal multi-district litigation in the Northern District of Ohio (**Opioid MDL**). The plaintiffs in those cases generally allege that manufacturers, distributors, and retail pharmacies created a fraudulent scheme to inflate the prescription opioid market by misleading doctors and the public about the addictive nature of prescription opioids.

2.    Removing Defendants are pharmacy benefit managers (**PBMs**) and mail order pharmacies. They contract with health plan sponsors—including federal agencies—to administer prescription-drug benefits and provide mail-order pharmacy services to plan members. Among other work, Removing Defendants assist the U.S. Department of Defense (**DoD**) in operating the

---

[1] By removing, the Removing Defendants do not waive any defense, including defenses based on personal jurisdiction. The State also named as defendants Express Scripts Administrators, LLC, ESI Mail Order Processing, Inc., Medco Health Solutions, Inc., UnitedHealth Group, Inc., OptumInsight Life Sciences, Inc., and OptumInsight, Inc. The Removing Defendants have consulted with those entities, and those entities consent to removal without waiving any defenses.

TRICARE program to provide healthcare to active-duty military service members and help the U.S. Department of Veterans Affairs provide healthcare to veterans.

3.    Removal is proper under the federal officer removal statute, 28 U.S.C. § 1442(a)(1), because the State seeks to hold the Removing Defendants liable for actions they performed at the direction of federal officers. Both the Fourth Circuit and the federal district court overseeing the Opioid MDL have held in related opioid cases that Express Scripts is entitled to remove such cases to federal court under the federal officer removal statute because of the work it performs for DoD and TRICARE. *County Bd. of Arlington County v. Express Scripts Pharmacy, Inc.*, 996 F.3d 243, 257 (4th Cir. 2021); *In re Nat'l Prescription Opiate Litig.*, MDL 2804, 2023 WL 166006, at *3–8 (N.D. Ohio Jan. 12, 2023). The reasoning of those decisions applies with equal force here.

4.    Although the State purports to disclaim relief in connection with the Removing Defendants' work for the federal government, *see* Ex. A, Compl. ¶¶ 361–76, that disclaimer is illusory and ineffective because the State's alleged injuries arising out of that federal work are inseparable from the remainder of the State's claims. The First Circuit and the Ninth Circuit recently held that similar disclaimers in cases against PBMs were ineffective to defeat removal under the federal officer removal statute. *Gov't of Puerto Rico v. Express Scripts, Inc.*, 119 F.4th 174, 188–94 (1st Cir. 2024); *California v. CaremarkPCS Health LLC*, 2024 WL 3770326, at *1 (9th Cir. Aug. 13, 2024).

## BACKGROUND

### A.    Procedural History

5.    On December 23, 2024, the State filed a complaint (**Complaint**) against Express Scripts, Inc., Express Scripts Administrators, LLC, ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc., ESI Mail Order Processing, Inc., Medco Health Solutions, Inc.,

UnitedHealth Group, Inc., OptumRx, Inc., OptumInsight Life Sciences, Inc., and OptumInsight, Inc., in the Third Judicial District in and for Summit County.

6.      The Complaint brings two counts against all Defendants for public nuisance pursuant to Utah Code Ann. §§ 78B-6-1101 and 76-10-803 and violations of the Utah Consumer Sales Practices Act (**CSPA**), Utah Code § 13-11-1 *et seq*. Ex. A, Compl. ¶¶ 377–423.

### B.    PBM Defendants

7.      Express Scripts PBM and OptumRx are pharmacy benefit managers, or PBMs. *See* Ex. A, Compl. ¶¶ 3, 125–30. PBMs are very different from the manufacturers, distributors, and retail pharmacies named as defendants in most other opioid lawsuits. Unlike those entities, PBMs do not manufacture, market, advertise, distribute, prescribe, or dispense opioid medications.

8.      Rather, PBMs enter into service agreements with their clients—sponsors of health insurance plans—to administer their prescription-drug benefits and to process prescription claims for medications approved by the U.S. Food and Drug Administration. *See* Ex. A, Compl. ¶ 125–26. "Generally speaking, PBMs serve as intermediaries between prescription-drug plans and the pharmacies that beneficiaries use." *Rutledge v. Pharm. Care Mgmt. Ass'n*, 592 U.S. 80, 83–84 (2020). "When a beneficiary of a prescription-drug plan goes to a pharmacy to fill a prescription, the pharmacy checks with a PBM to determine that person's coverage and copayment information." *Id.* at 84–85. "After the beneficiary leaves with his or her prescription, the PBM reimburses the pharmacy for the prescription, less the amount of the beneficiary's copayment. The prescription-drug plan, in turn, reimburses the PBM." *Id.* at 85.

9.      Express Scripts PBM and OptumRx offer options to assist their clients with managing prescription-drug benefits, but it is up to plan sponsors to choose what benefits to provide to their plan beneficiaries and how to structure those benefits. In particular, plan sponsors select which medications their plans will cover (*i.e.*, what drugs are on a plan's formulary) and

under what circumstances (*i.e.*, what utilization management and clinical programs, if any, are in place).

10.     Like most PBMs, Express Scripts PBM and OptumRx develop formularies, utilization management tools, and clinical programs that they offer to their clients. Some plan sponsors choose to adopt a PBM's offering, while others choose to customize a PBM offering or create their own. Either way, the plan sponsor controls the formulary, utilization management, and clinical programs applicable to each plan it sponsors. The role of the PBM is to implement the plan sponsor's choices and administer the plan sponsor's prescription benefit design for the plan beneficiaries.

11.     Express Scripts PBM and OptumRx also negotiate rebates (discounts) from pharmaceutical manufacturers on prescription drugs. The PBMs' clients can and do negotiate to receive some or all of those rebates, which allow the PBMs' clients to lower their prescription-drug costs.

## GROUNDS FOR FEDERAL OFFICER REMOVAL

12.     The federal officer removal statute permits any federal officer or "any person acting under that officer" who is sued "for or relating to any act under color of such office" to remove the case to federal court. 28 U.S.C. § 1442(a)(1).

13.     The Supreme Court has instructed that the federal officer removal statute is to be "liberally construed," *Watson v. Philip Morris Cos.*, 551 U.S. 142, 147 (2007) (citation omitted), and it has "rejected a 'narrow, grudging interpretation' of the statute." *Jefferson County v. Acker*, 527 U.S. 423, 431 (1999) (quoting *Willingham v. Morgan*, 395 U.S. 402, 407 (1969)).

14.     Defendants who are not themselves federal officers may remove under § 1442(a) by showing that "(1) they acted under the direction of a federal officer, (2) the claim has a

connection or association with government-directed conduct, and (3) they have a colorable federal defense to the claim or claims." *Bd. of County Commissioners of Boulder County v. Suncor Energy (U.S.A.) Inc.*, 25 F.4th 1238, 1251 (10th Cir. 2022).

15.    A defendant may remove under the federal officer removal statute without the consent of the other defendants. *Akin v. Ashland Chem. Co.*, 156 F.3d 1030, 1034 (10th Cir. 1998).

16.    Express Scripts and OptumRx each independently satisfy all three elements here.

**A.    The Removing Defendants Are "Persons" that "Acted Under a Federal Officer."**

17.    Each removing entity is a corporation, so each is a "person" under the federal officer removal statute. *See Bd. of County Commissioners*, 25 F.4th at 1251 ("[Section] 1442(a)(1) also allows removal by private corporations.").

18.    The "acting under" requirement contemplates a relationship in which the government exerts some "subjection, guidance, or control" over a private entity beyond mere compliance with the law. *Watson*, 551 U.S. at 151 (citation omitted). The central question is whether the private entity is helping a federal officer "fulfill other basic governmental tasks" that "in the absence of a contract with a private firm, the Government itself would have had to perform." *Id.* at 153–54.

19.    Courts broadly construe § 1442, particularly regarding private parties who claim to be "acting under" a federal officer. *Watson*, 551 U.S. at 147.

**1.    Express Scripts Acts Under a Federal Officer for TRICARE.**

20.    Here, as multiple courts have found, Express Scripts' provision of PBM and mail-order pharmacy services to TRICARE members helps the DoD fulfill basic governmental tasks that it would have to perform itself if it had not contracted with Express Scripts. *See Arlington County*, 996 F.3d at 253–54 ("[T]he ESI Defendants are assisting DOD in fulfilling 'basic

governmental tasks' that 'the Government itself would have had to perform' if it had not contracted

with a private firm.") (quoting *Watson*, 551 U.S. at 153–54); *In re Nat'l Prescription Opiate Litig.*,

2023 WL 166006, at *5 ("[P]roviding prescription drug benefits to military members and veterans

is a 'basic governmental task' assigned to the DoD by statute. *See* 10 U.S.C. § 1073a. The DoD

would have to administer the TRICARE program itself if the task was not delegated to [Express

Scripts] Defendants; this fact also strongly favors removal.").

21.     The DoD is required by law to enter into contracts to provide healthcare services to

TRICARE members. *See* 10 U.S.C. § 1073a(a). The DoD is also statutorily required to establish

an "effective, efficient, integrated pharmacy benefits program" for TRICARE. *Id*. § 1074g(a)(1).

22.     To satisfy these statutory mandates, the DoD contracted with Express Scripts to

provide pharmacy benefits and to administer the TRICARE Home Delivery/Mail Order Pharmacy

(**TMOP**) for members of TRICARE across the country, including in Utah. "The contract between

the DoD and ESI is substantial." *In re Nat'l Prescription Opiate Litig.*, 2023 WL 166006, at *2. It

"is memorialized in a lengthy 174-page Statement of Work ('SOW')." *Id.* at *3. A copy of the

publicly available contract between DoD and Express Scripts, Contract No. HT9402-14-D-0002

(**TRICARE Contract**), with certain redactions consistent with the Freedom of Information Act,

is attached as **Exhibit D**. Section C of the TRICARE Contract is the Statement of Work (**SOW**),

which specifies in comprehensive detail the services Express Scripts must provide the government.

23.     Through the TRICARE Contract, the DoD dictates nearly every aspect of Express

Scripts' responsibilities in supporting TRICARE. "Of particular importance here, the SOW

requires exclusive use of the DOD Uniform Formulary when acquiring drugs for federal

government employees." *In re Nat'l Prescription Opiate Litig.*, 2023 WL 166006, at *3; *see* Ex.

D, SOW §§ C.1.4, C.8.1. The DoD formulary is "managed by the DoD Pharmacy and Therapeutics

P&T Committee." SOW § C.1.4. "The DoD formulary specifies which drugs are authorized for TRICARE members and sets requirements for prior authorization and utilization reviews, to assure 'medical necessity, clinical appropriateness and/or cost-effectiveness.'" *In re Nat'l Prescription Opiate Litig.*, 2023 WL 166006, at *3 (quoting SOW § C.1.4).

24.    "The SOW also contains a 'Prescription Restriction Program' that requires [Express Scripts, Inc.,] to submit quarterly lists of patients for potential pharmacy benefit restrictions 'based upon the number of controlled medications filled, the number of physicians prescribing controlled medications and the number of pharmacies that fill these prescriptions.'" *In re Nat'l Prescription Opiate Litig.*, 2023 WL 166006, at *3  (citation omitted). "Once these lists are submitted, another entity determines if a restriction is appropriate and only then can the Express Scripts Defendants restrict a beneficiary's prescription benefits." *Id.*

25.    The TRICARE Contract also requires the use of "a tiered cost sharing structure, and a preference for generic over branded products." SOW § C.1.4. When it serves as a pharmacy benefit manager administering benefits at retail pharmacies, Express Scripts PBM serves in a capacity as a "fiscal intermediary on behalf of DoD to pay for all authorized pharmaceutical and supplies dispensed for eligible beneficiaries at retail pharmacies." *Id.* § C.1.6. Or as the TRICARE Contract puts it, "the Government will be acquiring covered drugs with Government funds for use by the Government" when a TRICARE prescription is dispensed at retail network pharmacies. *Id.* When Express Scripts causes any copayment to be charged to any TRICARE beneficiary for any medication, including prescription opioids, it does so in the manner and according to the directions carefully prescribed by the DoD. *See* SOW § C.8.1.1 ("The Contractor shall comply with the provisions of the DoD Uniform Formulary and its copayment structure.").

26.     Similarly, the TRICARE Contract dictates every aspect of the TMOP that ESI Mail Pharmacy operates on behalf of the DoD. *See* SOW § C.7; *Arlington County*, 996 F.3d at 252 ("[T]he SOW dictates how the ESI Defendants must operate the TMOP."); *In re Nat'l Prescription Opiate Litig.*, 2023 WL 166006, at *3 ("The [SOW] contract . . . requires ESI to operate the TRICARE Mail-Order Pharmacy.").

27.     "[W]hile the ESI [Mail Pharmacy entities] were not signatories to the DOD contract, they performed the day-to-day management of the TMOP under the terms of the contract and were subject to extensive oversight by the federal government." *Arlington County*, 996 F.3d at 252. ESI Mail Pharmacy is therefore "essentially acting as the statutorily authorized *alter ego* of the federal government, as the TRICARE statute requires the Secretary of Defense to contract out the administration of the TMOP program." *Id.* at 253–54 (citing 10 U.S.C. § 1073a).

28.     Simply put, the services Express Scripts provides to TRICARE are under the guidance and control of the DoD. As the district court overseeing the Opioid MDL aptly explained:

> By requiring exclusive use of its own Uniform Formulary—which is created and updated by the DoD Pharmacy and Therapeutics Committee—the DoD exercises guidance and control over the Express Scripts Defendants' performance. The formulary determines which pharmaceuticals are covered by TRICARE prescription benefit plans, and it contains cost-sharing tiers that determine the reimbursement amounts for various medications, including prescription opioids. Furthermore, the Uniform Formulary dictates which drugs are subject to prior authorization or utilization review requirements. . . . All prescription claims handled by the Express Scripts Defendants must be "processed according to the benefit design" and the restrictions contained in the Uniform Formulary.
>
> In addition, effectuating the Prescription Restriction Program requires ongoing, close coordination between the Express Scripts Defendants and the DoD. To prevent prescription drug abuse, the Express Scripts Defendants are required to use claims data to create a list of patients for potential prescription restriction, based on the number of controlled medications filled by the patient, the number of physicians prescribing these medications, and the number of pharmacies filling the prescriptions. However, the Express Scripts Defendants do not themselves have any authority to restrict a TRICARE member's prescriptions based on the lists they compile. Instead, the Defendants must send this data to a Military Treatment

Facility or a Managed Care Support Contractor, who alone can determine whether restricting a patient's prescription benefits is appropriate. If these entities decide to impose a restriction, ESI must then take one of only two available restrictive actions delineated in the DoD contract.

These contract terms leave the Express Scripts Defendants little, if any, room for discretion as they administer the TRICARE program. Indeed, the contract states that Defendants are to be paid fees for "performing administrative services under the contract." . . . A review of the contract reveals that this characterization is correct—the Defendants perform largely administrative tasks as they carry out the directives of the government.

In sum, the Express Scripts Defendants' relationship with the DoD is accurately described as one involving "subjection, guidance, or control" by the federal government, as outlined by the Supreme Court in *Watson*.

*In re Nat'l Prescription Opiate Litig.*, 2023 WL 166006, at \*4–5 (citations omitted).

29.    Thus, Express Scripts is "acting under" a federal officer when providing services for the TRICARE program. *See Arlington County*, 996 F.3d at 251–54; *In re Nat'l Prescription Opiate Litig.*, 2023 WL 166006, at \*4–5.

### 2.    Express Scripts PBM Acts Under a Federal Officer for FEHBA Plans.

30.    Similarly, Express Scripts PBM acts under the direction of a federal officer when it provides services for federal employees enrolled in plans under the Federal Employees Health Benefits Act of 1959 (**FEHBA**), 5 U.S.C. § 8901 *et seq*. In FEHBA, Congress empowered the Office of Personnel Management (**OPM**) "to contract with private carriers for federal employees' health insurance." *Coventry Health Care of Mo., Inc. v. Nevils*, 581 U.S. 87, 90 (2017).

31.    In administering pharmacy benefits for FEHBA plans, Express Scripts PBM is subject to the OPM's requirements, oversight, and control, including specific regulations the OPM established to govern PBM providers, as set forth in 48 C.F.R. §§ 1602.170-16(a), 1604.7201(a)-7202, 1646.201, 1652.204-74(a), 1652.204-70, and 1652.246-70, and specific guidelines the OPM issued to govern pharmacy benefits, including guidelines on formulary management, utilization management, and prescription opioids, among other topics. *See, e.g.*, FEHB Program Carrier Letter

2019-10, https://www.opm.gov/healthcare-insurance/healthcare/carriers/2019/2019-10.pdf. For example, "OPM's standard form contracts assume that PBMs will contract with FEHBA carriers and receive rebates." *Puerto Rico*, 119 F.4th at 182 (citing Fed. Emps. Health Benefits Program Standard Contract for Experience-Rated Health Maintenance Organization Carriers at I-18–I-20 (2019) (**FEHB Standard Contract**) (attached as **Exhibit E**)). The FEHB Standard Contract includes provisions requiring FEHBA carriers to impose certain controls on PBMs regarding rebates, including (i) quarterly and annual reporting on negotiated rebates, (ii) requirements that PBMs use "pass-through transparent pricing" to pass on the value of any rebates to plans, (iii) requirements that the value of all rebates be credited to plan carriers, and (iv) information sharing with OPM on request, including the sharing of PBM contracts with pharmacies and manufacturers. *Puerto Rico*, 119 F.4th at 182–83; Exhibit E at I-17–I-19.

32.    Many FEHBA plans adopt one of the national formularies that Express Scripts PBM offers to all its clients. The formularies a FEHBA plan uses are subject to OPM reporting requirements. *See* Ex. E at I-17, § 1.28(a)(5).

33.    FEHBA clients control what medications are on their formularies. Many FEHBA plans select standard formularies that Express Scripts PBM develops. They expect their PBM to negotiate with manufacturers to obtain rebates or other discounts to lower the net cost of those medications.

34.    During the years at issue in the Complaint, Express Scripts PBM conducted rebate negotiations for its entire commercial book of business, including both FEHBA and non-FEHBA plans, and none of the discounts or rebates that Express Scripts negotiated were exclusive to FEHBA plans.

35.     Express Scripts PBM does not have separate rebate agreements with opioid manufacturers for FEHBA and non-FEHBA plans. Rather, the rebate agreements it negotiates with manufacturers are structured to cover a range of different formulary possibilities, including standard and custom formularies. The same manufacturer-PBM contracts that governed rebates paid by manufacturers in connection with FEHBA plans also governed rebates paid in connection with non-FEHBA plans.

36.     The OPM closely monitors Express Scripts PBM's performance of its contractual tasks by auditing Express Scripts PBM's work. These audits include reviews of quarterly rebate guarantees, annual reconciliation and payments, actual billing and allocation of rebates, administrative fees, claim payments, fraud and abuse standards, performance guarantees, pharmacy rebates, and site visits.

37.     Thus, Express Scripts PBM is "acting under" a federal officer when providing services to FEHBA plans. *See Puerto Rico*, 119 F.4th at 190 (finding that PBM "was acting under federal authority" when servicing FEHBA plans for purposes of federal officer removal); *Hawaiʻi ex rel. Lopez v. CaremarkPCS Health, L.L.C.*, 2024 WL 1907396, at *6–9 (D. Haw. May 1, 2024) (same); *see also St. Charles Surgical Hosp., L.L.C. v. La. Health Serv. & Indem. Co.*, 935 F.3d 352, 354–55 (5th Cir. 2019) (collecting cases holding that administrators of benefits for FEHBA plans act under OPM for purposes of federal officer removal).

### 3.    OptumRx Has Acted Under a Federal Officer For the Veterans Health Administration.

38.     OptumRx has "acted under" the direction of a federal officer in providing PBM services to federal health plans, including the Veterans Health Administration (**VHA**).

39.     The U.S. Department of Veteran Affairs (**VA**) is a federal executive department. 38 U.S.C. § 301(a); *see also Vasquez v. Ayudando Guardians, Inc.*, 2018 U.S. Dist. Lexis 25068, at

*5 (D.N.M. Feb. 15, 2018) (*Bivens* claim against the VA was barred by sovereign immunity as a claim against "the United States and its agencies"). The VA, through the VHA, operates the largest integrated healthcare system in the United States.

40.    OptumRx has provided pharmacy benefit management services to the VHA since 2009. OptumRx serves as a third-party administrator, providing PBM services to assist the VHA in providing healthcare services to millions of veterans, their dependents, and their beneficiaries each year—including members in the State. *See* 38 U.S.C. § 301. OptumRx provides PBM services to the VHA under the detailed requirements of its contract and Performance Work Statement (the **VHA Contract**).

41.    The relationship between OptumRx and the VHA is an unusually close one involving detailed regulation, monitoring, and supervision. The VHA dictates nearly every aspect of its relationship with OptumRx.

42.    The VHA has its own Pharmacy & Therapeutics Committee (**P&T Committee**) and has complete control over and constructs its own formulary. OptumRx does not decide what prescription drugs are covered or not covered on the VHA's formulary, nor does OptumRx make recommendations regarding formulary design.

43.    The VHA maintains complete control of claim adjudication and pricing logic.

44.    The VHA Contract requires weekly communication between the VHA Office of Community Care (**OCC**), Contractor, and other appropriate parties. The VHA and an OptumRx representative communicate nearly every day and meet in person quarterly.

45.    The VHA appoints a Contracting Officer Technical Representative in connection with its contract with OptumRx. The Contracting Officer Technical Representative is responsible for (i) monitoring contract performance and immediately reporting all problems related to it to the

Contracting Officer, (ii) establishing and providing to the Contracting Officer a surveillance plan that will ensure receipt of the quantity and kinds of supplies or services required by the contract, (iii) ensuring that the Contractor complies with the defined Statement of Work or specifications included in the contract, and (iv) assisting the Contractor and Contracting Officer in interpreting technical requirements of the contract scope of work or specifications and submitting any differences of opinion on these matters to the Contracting Officer for resolution.

46.    The VHA subjects OptumRx to periodic inspections to evaluate outcomes.

47.    The U.S. Treasury pays OptumRx directly for the PBM services that OptumRx supplies to the VHA.

48.    OptumRx carries out functions that the VHA would otherwise have to perform itself under a contract that provides for unusually close oversight, involving detailed regulation, monitoring, and supervision from the VHA. OptumRx thus is "acting under" a federal officer when providing PBM services for the VHA. *See Arlington County*, 996 F.3d at 253 (removal on federal officer grounds is appropriate where defendants "are assisting DOD in fulfilling 'basic governmental tasks' that 'the Government itself would have had to perform' if it had not contracted with a private firm" (quoting *Watson*, 551 U.S. at 153–54)).

49.    In administering the formulary for the VHA and other federal plans, OptumRx at all times acted at the direction of the federal government.

**B.    The State's Claims Are For or Relating To the Removing Defendants' Actions Under Federal Officers.**

50.    Under the federal officer removal statute, a removing defendant must show that the charged conduct was "for or relating to any act under color" of the federal office. 28 U.S.C. § 1442(a)(1).

14

51.     Before 2011, the statute allowed removal "for any act under color" of the office, an already low hurdle. 28 U.S.C. § 1442(a)(1) (2010).

52.     In 2011, Congress lowered that hurdle even further with the Removal Clarification Act of 2011, Pub. L. No. 112-51, § 2, 125 Stat. 545. The Act added the words "or relating to" to § 1442(a)(1) so that a defendant could remove when the challenged conduct was "for *or relating to* any act under color" of federal office.

53.     Under this standard, a defendant may remove under § 1442(a)(1) if the plaintiff's claim has a "connection or association" with government-directed conduct. *Bd. of County Commissioners*, 25 F.4th at 1251; *see also Arlington County*, 996 F.3d at 256 ("[T]his 'connection or association' standard is broader than the old 'causal nexus' test that we abandoned after the Removal Clarification Act of 2011 . . . expanded § 1442(a)(1)."). This new test echoes how the Supreme Court has interpreted the phrase "relating to," which is a "broad" phrase meaning "to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992) (emphasis added) (citation omitted).

54.     When determining whether this connection requirement is met, courts must "credit Defendants' theory of the case." *Puerto Rico*, 119 F.4th at 184 (quoting *Jefferson County*, 527 U.S. at 432).

55.     The Removing Defendants easily satisfy the connection requirement.

56.     The State alleges harm from an "oversupply" of opioids. Ex. A, Compl. ¶ 339. It blames Removing Defendants for allegedly "colluding with [opioid] manufacturers to place opioid drugs on their national commercial formulary offerings with preferred status," and for "assisting in promoting and failing to disclose the real risks and appropriate, safe limits" and "failing to use

the wealth of data available . . . to identify and address signs of over-prescribing, illegitimate and dangerous use of opioids, misuse, abuse, and diversion." *Id.* ¶ 382. The State alleges that Removing Defendants' conduct contributed to this general "oversupply" of opioids in the State, *id.* ¶ 339, and further alleges that the "increased volume of opioid sales correlates directly to skyrocketing addiction, overdose, and death; illegal markets for diverted prescriptions opioids; and a concomitant rise in heroin and fentanyl abuse and misuse by individuals who can no longer legally acquire or simply cannot afford prescription opioids." *Id.* ¶ 18. The State's Complaint alleges that the "public health crisis" purportedly caused by Removing Defendants has been "far-reaching and severe," and includes the full volume of opioid prescriptions in the state, *id.* ¶¶ 17–19, as well as effects from the statewide use of "non-prescription opioids," and illicit drugs, *id.* ¶ 16, that it claims stem from the general oversupply of prescription opioids in the State. *Id.* ¶ 18. Those allegations necessarily include the thousands of prescription opioids dispensed to members of TRICARE, VHA, and FEHBA plans in Utah.

57.     The Fourth Circuit held that a similar opioid complaint against ESI Mail Pharmacy satisfied the "for or relating to" test for federal officer removal:

> Arlington's claim that the ESI Defendants "did nothing to stem the flow of excess opioids into Arlington County" necessarily includes activity that is directly connected to the DOD contract, as the ESI Defendants were required to act in conformity with that contract. In other words, Arlington faults the ESI Defendants for filling certain opioid prescriptions and causing a public nuisance, but the ESI Defendants were required to fill those prescriptions to comply with their duties under the DOD contract because they had no ability to modify the contract. That does not mean that the ESI Defendants will prevail in the case. But it does mean that Arlington's claims "relate to" the ESI Defendants' governmentally-directed conduct. That is sufficient to satisfy the federal officer removal statute.

*Arlington County*, 996 F.3d at 257 (citations omitted).

58.     Likewise, the district court overseeing the Opioid MDL concluded that Express Scripts satisfied the "for or relating to" test:

Plaintiffs themselves allege the Defendants flooded their community with opioids from 2014 to 2019 and opioid use increased by 160% during the period covered by the complaints. Plaintiffs' own theory of the case depends on the allegation that a significant number of the prescriptions dispensed by the Express Scripts Defendants were in fact for opioids and were filled in Plaintiffs' jurisdictions. Therefore, the Court finds that the Express Scripts Defendants have demonstrated a causal nexus between actions performed pursuant to the DoD contract and Plaintiffs' lawsuits.

*In re Nat'l Prescription Opiate Litig.*, 2023 WL 166006, at *5–6.

59.     Were that not enough, the State also alleges that "[b]y creating standard, national formularies and pharmacy-benefit plans, [Removing Defendants] structured which opioids would be available (or unavailable) to patient consumers," and that the Removing Defendants "colluded with Purdue Pharma and other opioid manufacturers to increase opioid sales by giving opioids preferred placement on [Removing] Defendants' national formularies in exchange for substantial rebates and fees." Ex. A, Compl. ¶¶ 5, 33. The State further alleges that Removing Defendants "[f]ail[ed] to offer meaningful prior authorization requirements or limits on the availability of opioids in exchange for rebates and other payments from opioid manufacturers." *Id.* ¶ 392. These allegations necessarily implicate Express Scripts' work for FEHBA plans and OptumRx's work for VHA plans because many benefits and PBM services they develop and offer to FEHBA and VHA plans are the same as the ones they offer to non-federal plans. The Complaint thus necessarily is for or relating to Removing Defendants' work for federal plans.

60.     The First Circuit agrees. In a recent federal officer removal case, the First Circuit found that Caremark, another PBM, acted under the direction of OPM in its negotiations for rebates because (i) Caremark's negotiation of rebates on behalf of FEHBA carriers "assists OPM in carrying out its official task of administering federal health benefits," and (ii) "OPM exercised detailed supervision and monitoring over Caremark's provision of PBM services to FEHBA carriers" through the provisions set out in its FEHB Standard Contract. *Puerto Rico*, 119 F.4th at

190. Because Caremark negotiated rebates for all its clients—both FEHBA and non-FEHBA—in a single negotiation, claims pertaining to non-FEHBA plans still related to work performed by Caremark "acting under" OPM. *Id.* at 190, 193–94. The First Circuit's well-reasoned opinion applies with equal weight to Express Scripts' work for FEHBA plans and to OptumRx, which—for most of the relevant time period—negotiated rebates across its books of business (including both VHA and non-VHA plans) at the same time.

61.     In an effort to evade those holdings, the State's Complaint includes a purported disclaimer. The disclaimer states in relevant part:

> The allegations in this Complaint do not include and specifically exclude Defendants' provision of PBM or mail-order pharmacy services under contracts with the Department of Defense, the Office of Personnel Management, the U.S. Department of Veteran Affairs, the Veterans Health Administration, or any other federal agency.

> The Complaint does not include and specifically excludes Defendants' provision of PBM or mail-order pharmacy services for Medicare plans to the extent preempted by federal law.

> The Complaint does not challenge the creation of custom formularies or administration or management of this type of formulary for or by a federal officer or federal agency, like the Federal Employees Health Benefits Act, Veterans Health Administration, or TRICARE governed health benefits plan, or any other federal health-benefit plan.

> The Complaint does not challenge the Defendants' conduct related to the provision of any services, including and not limited to formulary related services, rebate negotiation services, or pharmacy network negotiation services, under contracts with the Department of Defense, U.S. Department of Veteran Affairs, the Veterans Health Administration, the Office of Personnel Management, or any other federal agency.

> The Complaint does not challenge Defendants' provision of mail-order pharmacy services under contracts with the Department of Defense, the Office of Personnel Management, the Department of Veteran Affairs, or any other federal agency, and does not challenge the Defendants' administration or operation of the TRICARE Home Delivery/Mail Order Pharmacy.

Plaintiffs do not seek to recover money paid by the federal government under these types of plans, nor do Plaintiffs seek recovery of federally mandated co-pays that were paid by these types of plans' patients.

The Plaintiffs do not seek declaratory relief, injunctive relief, abatement relief, damages, civil penalties, or any other relief for the conduct of any PBM Defendant related to the provision of any service under contracts with the Department of Defense, the Office of Personnel Management, the U.S. Department of Veteran Affairs, the Veterans Health Administration, or any other federal agency.

Express Scripts has contended that they are agents of federal officers acting under color of federal office because they administer prescription drug claims on behalf of TRICARE and FEHBA. Express Scripts has admitted, no federal officer or agency directed them to simultaneously conduct rebate negotiations applicable to FEHBA or TRICARE plans with negotiations for non-FEHBA or non-TRICARE plans. In addition, no federal officer or agency directed Express Scripts to apply rebate negotiations for FEHBA plans or TRICARE plans to non-FEHBA or non-TRICARE plans. No federal officer or agency directed them to apply terms applicable to FEHBA plans or TRICARE plans to non-FEHBA or non-TRICARE plans. And Express Scripts processes rebates and pharmacy claims on a plan-by-plan basis.

Express Scripts can identify and separate rebates and pharmacy claims attributable to FEHBA plans and TRICARE plans from rebates and pharmacy claims attributable to non-federal plans.

Express Scripts' ability to do this is true nationally and for plans and operations in Utah.

The Office of Personnel Management ("OPM"), which oversees FEHBA plans, does not contract directly with the Defendants.

OPM's contracts with federal health care programs do not require federal health care programs to hire Defendants.

OPM regulations do not require or in any way place limits on how Defendants negotiate with pharmaceutical manufacturers or pharmacies.

OPM regulations impose modest limitations on Defendants and are unrelated to the claims made in this Complaint. OPM regulations require Defendants to pass any rebates obtained from manufacturers back to federal health plans and require Defendants to report information and permit audits of their books.

OPM does not set precise specifications concerning how the Defendants conduct negotiations with drug manufacturers, nor any specific requirements regarding the substance of any rebates negotiated.

Likewise, the Veteran's Health Administration does not direct Defendants to apply the terms of the Veteran's Health Administration contract or regulations to non-federal health plans. Nor does the Veteran's Health Administration direct Defendants to apply rebate or pharmacy negotiations for Veteran's Health Administration health plans to non-federal health plans or to engage in simultaneous rebate or pharmacy negotiations for Veteran's Health Administration plans and non-federal plans.

Ex. A, Compl. ¶¶ 361–376.

62.    The State's disclaimer is illusory and ineffective at eliminating federal officer removal jurisdiction for at least three reasons.

63.    *First*, the disclaimer is illusory because the State challenges indivisible federally-directed conduct—conduct that the Removing Defendants perform or performed on an undifferentiated basis for federal and non-federal clients alike.[2]

64.    The First Circuit's recent decision in *Puerto Rico* is instructive. There, Puerto Rico purportedly "disclaimed any 'relief relating to any federal program . . . or any contract related to a federal program.'" *Puerto Rico*, 119 F.4th at 189. Yet the court rejected this disclaimer. It held that because Caremark jointly negotiated rebates for both FEHBA and non-FEHBA plans "simultaneously," the claims against the PBM necessarily related to the PBM's work for a federal officer, notwithstanding the disclaimer. *Id.* at 191–92.

65.    The Ninth Circuit's recent ruling in *California v. CaremarkPCS Health LLC*, 2024 WL 3770326, at *1 , is similarly informative. In that case, Express Scripts and Caremark removed on federal officer grounds because the State of California's claims challenged the PBMs' provision of pharmacy benefit manager services like those at issue in this case—*i.e.*, formulary design and

---

[2]  For most if not all of the relevant time period, OptumRx conducted its rebate negotiations across its books of business that included both federal and non-federal plans alike.  None of the discounts or rebates that OptumRx negotiated were exclusive to VHA plans.

negotiations of rebates with prescription drug manufacturers—provided to TRICARE and to health plans operating under FEHBA. *Id.* The district court remanded, crediting California's purported disclaimer of recovery in connection with TRICARE and FEHBA. *Id.* The Ninth Circuit reversed the remand order, concluding that the PBMs' federal work "remain[ed] 'causally connected to the dispute'" despite the disclaimer because California's complaint challenged conduct that the PBMs performed for federal and non-federal clients alike. *Id.* (citation omitted). The concurring opinion went even further, explaining that "no disclaimer, however worded, can help California avoid a causal nexus between Caremark's conduct on behalf of the federal government and California's claims" because "Caremark's work for private clients cannot be disaggregated from its work for the federal government." *Id.* at *2; *see also id.* at n.1 ("The same analysis applies to Express Scripts.").

66.     The same analysis applies here. The Removing Defendants' rebate negotiations with prescription opioid manufacturers, which the State challenges, necessarily implicate their work for federal health plans.[3] *See, e.g.*, Ex. A, Compl. ¶ 33 (alleging that Removing Defendants "colluded with Purdue Pharma and other opioid manufacturers to increase opioid sales by giving opioids preferred placement on [Removing] Defendants' national formularies in exchange for substantial rebates and fees").

67.     "[T]he contracts that the PBMs have with FEHBA carriers usually require that rebates be passed on to the carrier." *Hawaiʻi*, 2024 WL 1907396, at *4. During the years at issue in the Complaint, Express Scripts PBM conducted rebate negotiations for its entire commercial book of business, including both FEHBA and non-FEHBA plans. None of the discounts or rebates that Express Scripts negotiated were exclusive to FEHBA plans. *Cf. id.* (crediting a PBM's

---

[3]    *See* Footnote 2, *supra*.

argument that it "negotiates rebates with drug manufacturers on behalf of FEHBA carrier clients as well as other clients, and no rebate is exclusive to FEHBA plans"). Likewise, for much if not all of the relevant time period, OptumRx negotiated rebates across its books of business that included both federal and non-federal plans alike. Thus, the State "necessarily challenges conduct that [Removing Defendants] engage[] in while acting under a federal officer." *Id.*; *see also Puerto Rico*, 119 F.4th at 191 (same).

68.    *Second*, the State's disclaimer is ineffective because it inherently contradicts the elements of the State's public nuisance claim. As the State acknowledges, such a claim requires showing interference with "rights common to the general public." Ex. A, Compl. ¶ 386; *see Solar Salt Co. v. S. Pac. Pac. Transp. Co*., 555 P.2d 286, 289 (Utah 1976) ("To be considered public, the nuisance must affect an interest common to the general public, rather than peculiar to one individual, or several." (citation omitted)). The State therefore cannot exclude certain members of the public—such as military service members, veterans, federal employees, and other members of federal health plans who received prescription opioids—from the scope of its public nuisance claim or the relief sought  just to escape federal jurisdiction.

69.    The disclaimer is irreconcilable with the State's many allegations that encompass prescription opioids dispensed to members of TRICARE, FEHBA plans, and the VHA. For example, the State generally alleges an "oversupply of opioids in Utah." Ex. A, Compl. ¶ 339. The State also repeatedly invokes statewide statistics about opioid use and abuse that encompass all who live in the State. *See, e.g., id.* ¶¶ 17–19. Those statewide allegations and statistics include prescription opioids dispensed to federal plan members. Similarly, the State faults the Removing Defendants for allegedly failing to use their clients' opioid utilization data to combat the opioid crisis. *See, e.g.*, *id.* ¶¶ 284–91. That utilization data necessarily encompasses thousands of

prescription opioids dispensed to military service members, federal employees, and other federal plan members that the Removing Defendants provided services to at the behest of the DoD, VHA, and FEHBA plan sponsors.

70.    The State's purported disclaimer also cannot be squared with the relief the State seeks. It seeks abatement and damages for the entire "opioid epidemic." Ex. A, Compl. ¶¶ 406–10. The alleged opioid epidemic includes alleged harms caused by prescription opioids dispensed to members of TRICARE, VHA, and FEHBA plans. The State alleges that "it has incurred and continues to incur substantial harms," including "expenditures for special programs to abate the nuisance that are over and above its ordinary public services." *Id.* ¶ 406. For example, the State alleges that "increased overdoses have led to more ambulance activity on public streets" and that "opioid addiction and misuse foreseeably result in an increase in emergency room visits, emergency responses, and emergency medical technicians' administration of naloxone[.]" *Id.* ¶¶ 357, 348. The State does not—and cannot—carve out social services costs, health systems costs, law enforcement costs, judicial costs, treatment facilities costs, and other costs connected to prescription opioids dispensed to members of federal plans. Nor does the State assert that military service members, federal employees, and other members of federal health plans will be unable to receive treatment under the abatement plan it seeks.

71.    Indeed, just like the State here, the plaintiffs in *Arlington County* and *In re National Prescription Opiate Litigation* argued that their public nuisance claims did not implicate Express Scripts' work for TRICARE. The Fourth Circuit and the district court overseeing the Opioid MDL rightly rejected that argument because the plaintiffs made sweeping allegations—just like the State does here—of an "oversupply" of opioids in their jurisdictions that necessarily included

prescriptions dispensed to TRICARE members. *Arlington County*, 996 F.3d at 256–57; *In re Nat'l Prescription Opiate Litig.*, 2023 WL 166006, at *5–6.

72.     *Third*, the disclaimer is ineffective because it would force the Removing Defendants to prove federal direction and federal defenses in state court. The State's arguments and allegations sweep so broadly and seek relief so all-encompassing that, if the case were remanded, a state court would have no choice but to resolve issues relating to the Removing Defendants' work for TRICARE, VHA, and FEHBA plans. For every harm the State alleges—such as each prescription opioid the State claims was wrongfully "diver[ted]" in Utah, Ex. A, Compl. ¶ 396—there is a question whether it involves a prescription opioid dispensed at the behest of the federal government to a member of a TRICARE, VHA, or FEHBA plan. Even asking a state court to try to police a disclaimer of the Removing Defendants' federal work would entangle the state court in federal questions that warrant a federal forum. The question of whether the acts at issue lie outside the scope of the Removing Defendants' duties, or whether the federal government directed the Removing Defendants to engage in these acts, should be "present[ed] . . . to a federal, not a state, court." *Willingham*, 395 U.S. at 409.

73.     The disclaimer is therefore ineffective at severing the connection between the State's claims and the Removing Defendants' work for the federal government. Were there any doubt, this Court must, for purposes of federal officer removal, "credit" the Removing Defendants' "theory of the case." *Jefferson County*, 527 U.S. at 432; *accord Puerto Rico*, 119 F.4th at 184.

74.     So, despite the purported disclaimer, the State's allegations are sufficiently connected to the Removing Defendants' federal work to support removal—as courts have found in both opioids and non-opioids cases challenging the same formulary design and rebate negotiation conduct at issue here. *See Puerto Rico*, 119 F.4th at 186–94; *Arlington County*, 996

F.3d at 256–57; *Hawaiʻi*, 2024 WL 1907396, at *11–12; *In re Nat'l Prescription Opiate Litig.*, 2023 WL 166006, at *5–6.

### C. The Removing Defendants Have Colorable Federal Defenses.

75.     A federal defense need only be colorable to support federal officer removal. *Jefferson County*, 527 U.S. at 431. "One of the primary purposes of the removal statute—as its history clearly demonstrates—was to have such defenses litigated in the federal courts." *Willingham*, 395 U.S. at 407. "A 'colorable federal defense' is merely an arguable defense and a court need not determine at the removal stage whether that defense will succeed at trial." *Brunson v. Adams*, 2021 WL 5403892, at *3 (D. Utah Oct. 19, 2021) (citation omitted), *report and recommendation adopted*, 2021 WL 5383788 (D. Utah Nov. 18, 2021). "In construing the colorable federal defense requirement, [the Supreme Court has] rejected a 'narrow, grudging interpretation' of the statute." *Jefferson County*, 527 U.S. at 431 (citation omitted).

76.     The Removing Defendants have at least two colorable federal defenses: a government contractor defense and a preemption defense. The Removing Defendants reserve the right to assert additional federal defenses, including those not stated in this Notice of Removal.

#### 1. Government Contractor Defense

77.     The federal government contractor defense applies when (1) "the United States approved reasonably precise specifications"; (2) the contractor's work product "conformed to those specifications"; and (3) the supplier warned the United States about the risks or exposures "in the use of the equipment that were known to the supplier but not to the United States." *Boyle v. United Techs. Corp.*, 487 U.S. 500, 512 (1988). The defense protects government contractors from state tort liability that may befall them should they carry out a federal contract. In other words, the defense "applies if a contractor's obligations to the government conflict with state law such

that the contractor may not comply with both." *Arlington County*, 996 F.3d at 255 (citation omitted).

78.     Here, the government contractor defense is available to the Removing Defendants.

79.     Express Scripts assisted the federal government by providing healthcare services pursuant to highly precise directives contained in the lengthy TRICARE Contract with the DoD and pursuant to contracts with FEHBA plans under OPM's specific requirements and supervision. Express Scripts' performance conformed to the specifications in the TRICARE Contract and FEHBA plan contracts. And Express Scripts did not have any greater awareness than the federal government did of the dangers of prescription opioids.

80.     Among other things, the TRICARE Contract required exclusive use of the DoD formulary and implementation of the government's Prescription Restriction Program, both of which conflict with the core state-law duties asserted by the State. There is a similar conflict between the asserted state-law duties and Express Scripts' obligations under its contracts with FEHBA plans under OPM supervision. Those conflicts make it impossible for Express Scripts to comply with the state-law duties alleged by the State while also fulfilling its obligations under its federal contracts. The Fourth Circuit and the federal district court overseeing the Opioid MDL have previously concluded that Express Scripts has a colorable government contractor defense in opioid cases that supports removal under the federal officer removal statute. *See Arlington County*, 996 F.3d at 255; *In re Nat'l Prescription Opiate Litig.*, 2023 WL 166006, at *7.

81.     Likewise, OptumRx can assert the federal contractor defense because the State's theory of liability is predicated on OptumRx's alleged failure to implement a specific formulary, specific opioid utilization limits, or specific restrictions on opioids different from those mandated by OptumRx's VHA contract.

82.    Based on the State's allegations, OptumRx cannot simultaneously comply with its obligations under its VHA contract and comply with the State's interpretation of Utah law, making a federal contractor defense colorable. *See Arlington County*, 996 F.3d at 255.

### 2.    Preemption

83.    Express Scripts also has a colorable preemption defense under at least two federal statutes: the TRICARE statute and FEHBA.

84.    The TRICARE statute provides the statutory authorization for the Secretary of Defense to enter into group health-insurance contracts. *See* 10 U.S.C. §§ 1071, 1072(7), 1073(a), 1074g. The statute expressly preempts any state laws to the extent that the Secretary of Defense determines that those laws are "inconsistent with a specific provision of the contract" or that "preemption . . . is necessary to implement or administer the provisions of the contract or to achieve any other important Federal interest." 10 U.S.C. § 1103(a). The Secretary has determined that such preemption is necessary. *See* 32 C.F.R. §§ 199.17(a)(7), 199.21(o).

85.    The State's theory of liability against Express Scripts is that it allegedly failed to implement specific formulary positioning for prescription opioids, specific utilization management rules for prescription opioids, specific controls on dispensing by the ESI Mail Pharmacy, and/or other restrictions on prescription opioids that differ from those that DoD mandated for the TRICARE program. Ex. A, Compl. ¶¶ 388–392, 417. In other words, the conduct complained of is conduct Express Scripts was required to carry out to comply with the language of the TRICARE Contract as well as the TRICARE statute, regulations, and policies.

86.    Multiple courts have previously concluded that those factual assertions are sufficient for Express Scripts to state a colorable preemption defense to support removal under the federal officer removal statute. *See Arlington County*, 996 F.3d at 256 ("[U]nder the well-established preemption doctrines applicable to such claims, it is plausible that the ESI Defendants

have a valid preemption defense."); *In re Nat'l Prescription Opiate Litig.*, 2023 WL 166006, at *8 ("[T]he Express Scripts Defendants have a colorable argument that the DoD contract preempts the Plaintiffs' state law claims."); *see also Grider Drug LLC v. Express Scripts, Inc.*, 2009 U.S. Dist. Lexis 107515, at *10 (W.D. Ky. Nov. 17, 2009) (holding in a non-opioid case that Express Scripts advanced a colorable preemption defense based on its TRICARE Contract).

87.    FEHBA also supports a preemption defense for Express Scripts PBM. It contains an express preemption provision displacing any state laws relating to coverage or benefits afforded by FEHBA plans. 5 U.S.C. § 8902(m)(1).

88.    Here, FEHBA preempts the State's claims against Express Scripts PBM because the State seeks to interfere with uniform FEHBA plan administration by trying to dictate the terms of FEHBA plans with respect to coverage of, and benefits afforded for, prescription opioids. *See Puerto Rico*, 119 F.4th at 190 (finding that PBM had colorable FEHBA preemption defense against claims based on its negotiation of rebates for FEHBA plans); *Hawai'i*, 2024 WL 1907396, at *13 (same).

## VENUE

89.    This Court is the proper venue for removal under 28 U.S.C. § 1442(a) because it sits in the federal judicial district and division embracing the Third Judicial District in and for Summit County, the court from which this case was removed. *See* 28 U.S.C. § 1442(a) ("A civil action . . . that is commenced in a State court . . . may be removed . . . to the district court of the United States for the district and division embracing the place wherein it is pending.").

## REMOVAL PROCEDURES

**A.    Notice of Removal Is Timely.**

90.    Removal notices are timely if filed within 30 days of the date the removing defendant was served with process. 28 U.S.C. § 1446(b)(1); *see also Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 356 (1999).

91.    The State served Express Scripts, Inc., Express Scripts Pharmacy, Inc., and ESI Mail Pharmacy Service, Inc., on January 10, 2025.

92.    The State served OptumRx, Inc., OptumInsight Life Sciences, Inc., and OptumInsight, Inc., in Utah on January 10, 2025. The State also served UnitedHealth Group in Delaware on January 10, 2025.

93.    This Notice of Removal has been filed within 30 days of January 10, 2025, and is therefore timely under 28 U.S.C. § 1446(b)(1).

**B.    Consent Not Required.**

94.    The federal officer removal statute does not require other defendants to consent to removal. *Akin*, 156 F.3d at 1034.

95.    In any event, all defendants do consent to removal.

**C.    Written Notice of Removal.**

96.    In accordance with 28 U.S.C. § 1446(d), the Removing Defendants will give written notice of the filing of this Notice of Removal to all adverse parties of record in this matter and will file a copy of this Notice with the clerk of the State court.

## NO WAIVER

97.    Nothing in this notice should be interpreted as a waiver or relinquishment of any of the Removing Defendants' rights to assert any and all defenses or objections.

98.    If there are any questions that arise as to the propriety of removal, the Removing Defendants respectfully request the opportunity to submit briefing, argument, and additional evidence as necessary to support removal.

99.    The Removing Defendants reserve the right to amend or supplement this Notice.

## CONCLUSION

For these reasons, the Removing Defendants give notice of removal of this case from the Third Judicial District in and for Summit County to the United States District Court for the District of Utah.

February 7, 2025

Respectfully submitted,

/s/ Stephen Wood
Stephen Wood, USB No. 12403
QUINN EMANUEL URQUHART & SULLIVAN, LLP
2755 E. Cottonwood Parkway, Suite 430
Salt Lake City, Utah 84121
Tel: 801-515-7300
stephenwood@quinnemanuel.com

Michael Lyle (*pro hac vice forthcoming*)
Jonathan G. Cooper (*pro hac vice forthcoming*)
QUINN EMANUEL URQUHART & SULLIVAN, LLP
1300 I St. NW, Suite 900
Washington, DC 20005
Tel: 202-538-8000
mikelyle@quinnemanuel.com
jonathancooper@quinnemanuel.com

*Counsel for Express Scripts, Inc., ESI Mail Pharmacy Service, Inc., and Express Scripts Pharmacy, Inc.*

/s/ Bentley J. Tolk
Bentley J. Tolk (6665)
Rodger M. Burge (8582)
PARR BROWN GEE & LOVELESS
101 South 200 East, Suite 700
Salt Lake City, UT 84111
Tel: (801) 532-7840
btolk@parrbrown.com
rburge@parrbrown.com

Brian D. Boone (*pro hac vice forthcoming*)
ALSTON & BIRD LLP
Vantage South End
1120 South Tryon Street, Suite 300
Charlotte, NC 28203
Tel: (704)-444-1000
brian.boone@alston.com

Matthew P. McGuire (*pro hac vice forthcoming*)
555 Fayetteville Street
Suite 600
Raleigh, NC 27601
Tel: (919) 862 2200
matt.mcguire@alston.com

*Counsel for UnitedHealth Group, Inc.,*
*OptumRx, Inc., OptumInsight Life Sciences,*
*Inc., and OptumInsight, Inc.*