# EXHIBIT A

SEAN D. REYES
UTAH ATTORNEY GENERAL
Douglas Crapo (14620)
Stevenson Smith (18546)
Kevin McLean (16101)
Peishen Zhou (18596)
Assistant Attorneys General
PO Box 140872
Salt Lake City, UT 84114-0872
(801) 366-0310
crapo@agutah.gov
scsmith@agutah.gov
kmclean@agutah.gov
peishenzhou@agutah.gov

(Additional counsel on signature page)

*Attorneys for Plaintiffs*

> If you do not respond to this document within applicable time limits, judgment could be entered against you as requested.

---

## IN THE DISTRICT COURT OF THE THIRD JUDICIAL DISTRICT IN AND FOR SUMMIT COUNTY, STATE OF UTAH

| | |
|---|---|
| **STATE OF UTAH** and **DIVISION OF CONSUMER PROTECTION** | **COMPLAINT AND JURY DEMAND** |
| *Plaintiffs,* | |
| v. | Case No. _____ |
| **EXPRESS SCRIPTS, INC.; EXPRESS SCRIPTS ADMINISTRATORS, LLC; ESI MAIL PHARMACY SERVICE, INC.; EXPRESS SCRIPTS PHARMACY, INC.; ESI MAIL ORDER PROCESSING, INC.; MEDCO HEALTH SOLUTIONS, INC.; UNITEDHEALTH GROUP, INC.; OPTUMRX INC.; OPTUMINSIGHT LIFE SCIENCES, INC.; and OPTUMINSIGHT, INC.** | Judge _____ |
| *Defendants.* | Tier III |

**COMPLAINT**

The Attorney General of the State of Utah and the Utah Division of Consumer Protection (the "Division") (referred to collectively as the "State of Utah" or "Utah") bring this action against Express Scripts, Inc., Express Scripts Administrators, LLC, Medco Health Solutions, ESI Mail Pharmacy Service, Inc., ESI Mail Order Processing, Inc., and Express Scripts Pharmacy, Inc., (collectively, "Express Scripts" or "ESI") and UnitedHealth Group, Inc., OptumRx, Inc., OptumInsight, Inc., and OptumInsight Life Sciences, Inc. (collectively "Optum"). Together, Express Scripts and Optum are referred to as "Defendants."

Plaintiffs allege as follows:

## I. INTRODUCTION

1. This litigation is part of Utah's ongoing effort to combat the worst human-made epidemic in modern medical history: opioid diversion, addiction, overdose, and death caused by an oversupply of opioids flooding communities due to powerful companies who sought to profit at the expense of the public.

2. It has now become clear that two of the nation's largest Pharmacy Benefit Managers—Defendants Express Scripts and Optum—played a central role in causing this epidemic. Through their powerful position of negotiating and building the financial framework between and among manufacturers, payers, physicians, pharmacies, and patients, Defendants substantially contributed to a *quadrupling* of the number of prescription opioids sold annually in the United States and a *tripling* of the number of Utahns who died from prescription opioid overdose.

3. Pharmacy Benefit Managers (or "PBMs") are third-party companies that manage prescription drug-benefit plans sponsored by health insurers, self-insured employers, and other payers. As PBMs, Defendants ESI and Optum offer national formularies and pharmacy-benefit

plans to their clients, provide mail-order pharmacy services, and contract with and monitor pharmacy networks (approximately 65,000 pharmacies nationwide) from where their members get prescriptions dispensed.

4.      As the Federal Trade Commission explains, "PBMs are at the center of the complex pharmaceutical distribution chain . . . [and] they wield enormous power and influence over patients' access to drugs and the prices they pay."[1]  With this special access and power, Defendants Express Scripts and Optum have **_had incredible knowledge and control over the flow of opioids into our communities_**, and maybe more than any other entities involved in the pharmaceutical distribution and payment chain.

5.      By creating standard, national formularies and pharmacy-benefit plans, Defendants structured:

    a.   Which opioids would be available (or unavailable) to patient consumers;

    b.   In what quantities the opioids could be dispensed to patient consumers;

    c.   What co-payment amount was required for an opioid to be dispensed to patient consumers;

    d.   What authorization(s) was required for the dispensing of opioids to a patient consumer; and

    e.   What less addictive pain treatments, beneficial drugs, or other treatments were available or unavailable to patient consumers.

6.      Moreover, by controlling prescription drug benefits for approximately 112 million Americans,[2] Defendants received access to unprecedented amounts of data on the use and

---

[1] Office of Policy Planning, Fed. Trade Comm'n, *Pharmacy Benefit Managers: The Powerful Middlemen Inflating Drug Costs and Squeezing Main Street Pharmacies*, Interim Staff Report (July, 2024), https://www.ftc.gov/system/files/ftc_gov/pdf/pharmacy-benefit-managers-staff-report.pdf.

[2] *Reimagining health services to make health care and people better*, Evernorth Health Services, https://www.express-scripts.com/corporate/about#:~:text=Express%20Scripts%20is%20a%20pharmacy,more%20than

distribution of opioids—a level of insight far exceeding that of any individual manufacturer, distributor, or pharmacy.

7.    Defendants collect, analyze, and track detailed claims data for approximately 1.5 billion prescriptions every year, including prescriptions for opioids.  For each prescription, Defendants know the doctor who prescribed it, and which pharmacy location dispensed it. Defendants know whether their members fill opioid prescriptions written by multiple prescribers and whether the members fill them at multiple pharmacies.

8.    Defendants know whether a member who was prescribed opioids is later treated for overdose or substance use disorder.  They know when a patient is filling prescriptions for opioids, benzodiazepines, and muscle relaxant at the same time.  They know how often an opioid prescription is refilled.

9.    As stated by an Optum executive:

> I have billions of claims, literally billions of claims.  Every claim that we go through goes through an algorithm.  This is all happening in realtime at the pharmacy.  When you go to the pharmacy, in microseconds, I know if my patients are on a concurrent [benzodiazepine].  I know what the dose is.  I know what the day's supply is.  I know what other drugs they're taking, and I can have realtime [point of sale] edits going through making sure everything is happening appropriately.

10.    Defendants tracked the opioid epidemic patient-by-patient and pill-by-pill as it unfolded over the past two decades.  They chronicled the opioid epidemic in real time. Through access to this data, Defendants **knew** that far greater quantities of prescription opioids

---

%20100%20million%20Americans.&text=Express%20Scripts%20Pharmacy%C2%AE%20delivers,smarter%20approach%20to%20pharmacy%20services.;
https://www.optum.com/content/dam/optum/resources/productSheets/5302_Data_Assets_Chart_Sheet_ISPOR.pdf.

had entered the market than could be legitimately, safely, or appropriately used for medical purposes.

11.    And instead of using this incredible knowledge to report illegitimate opioid prescriptions and sales, enact restrictions to limit their abuse, or otherwise slow the dangerous deluge of opioid prescribing, Defendants stood by and intentionally ignored the growing evidence of misuse, addiction, and diversion.

12.    Even worse, ***Defendants fueled the fire***.  Instead of using their role in crafting national formularies and benefit plans to place meaningful restrictions and safety conditions on opioids, Defendants gave opioids ***preferred*** status on their formularies with ***little to no limits*** on their use and consumption.  Defendants deliberately chose to facilitate the increased sale and consumption of opioids in exchange for payments from opioid manufacturers like Purdue Pharma, Mallinckrodt, and others.

13.    By now, most Americans have been affected by the opioid disaster. Communities across Utah and the nation are now swept up in what the CDC has called a public health epidemic and what the U.S. Surgeon General has deemed an urgent health crisis.[3]

14.    In 2016, pharmacies filled 289 million opioid prescriptions in the United States—enough to medicate every adult in America around the clock for a month.  Since the late 1990s, the death toll has climbed.  The CDC's National Center for Health Statistics provides provisional data on drug overdose deaths.  According to the data, there were an estimated 107,622 drug overdose deaths in the United States during 2021.  That is nearly a 15% increase from the

---

[3] CDC, *Examining the Growing Problems of Prescription Drug and Heroin Abuse* (Apr. 29, 2014), http://www.cdc.gov/washington/testimony/2014/t20140429.htm; Vivek H. Murthy, *Letter from the Surgeon General* (Aug. 2016), http://turnthetiderx.org.

estimated number of deaths in 2020.[4]  And CDC reported number of prior-12-month overdose deaths, in Utah from 2019 to 2024, has increased 32%.[5]

15.     The prescription opioids involved in these deaths include brand-name prescription medications like OxyContin, Opana ER, Vicodin, Subsys, Duragesic, and Ultram, as well as generics like oxycodone, hydrocodone, tramadol, and fentanyl.  The number of overdose deaths involving prescription opioids in 2021 was nearly five times the number in 1999.

16.     Many of the overdoses from non-prescription opioids are also directly related to prescription pills.  Many opioid users, having become addicted to but no longer able to obtain prescription opioids, have turned to street heroin and fentanyl.  According to the American Society of Addiction Medicine, and as acknowledged by Optum,[6] 80% of people who initiated heroin use in the past decade started with prescription painkillers—which, at the molecular level and in their effect, closely resemble heroin.  In fact, people who are addicted to prescription painkillers are 40 times more likely to become addicted to heroin.  Individuals who used prescription opioids and have since turned to heroin are now frequently exposed to illicit fentanyl, with even more lethal outcomes.

17.     Utah has experienced a surge of prescription opioids into its communities.  In 2014 alone, the volume of opioids sold in Utah (114,047,848 pills) would provide every state resident roughly 34 pills.

---

[4] CDC, *Drug Overdose Deaths in the U.S. Top 100,000 Annually* (Nov. 17, 2021), https://www.cdc.gov/nchs/pressroom/nchs_press_releases/2021/20211117.htm.

[5] Nat'l Ctr. For Health Stats., Nat'l Vital Stats. Sys., CDC, *Provisional Drug Overdose Death Counts*, https://www.cdc.gov/nchs/nvss/vsrr/drug-overdose-data.htm (last visited Dec. 21, 2024).

[6] See UnitedHealth Group, *Addressing the Opioid Crisis*, https://www.unitedhealthgroup.com/content/dam/UHG/PDF/2018/AddressingTheOpioidCrisis_UHG.pdf (admitting that "[f]our in five new heroin users start out by misusing prescription painkillers and turn to heroin when their prescriptions run out or become too expensive.").

18.     The increased volume of opioid sales correlates directly to skyrocketing addiction, overdose, and death; illegal markets for diverted prescriptions opioids; and a concomitant rise in heroin and fentanyl abuse and misuse by individuals who can no longer legally acquire or simply cannot afford prescription opioids.  Utah has experienced a steady increase in opioid-related deaths.  Drug overdose death rates increased from 19.5 per 100,000 in 2011 to 21.1 per 100,000 in 2021.[7]  In 2021, 603 Utahns died from drug overdose, with 67% of those deaths related to opioids.[8]  Between 2003 and 2022, over 4,500 Utahns died from prescription opioid overdoses.[9]  And between 2000 and 2022, approximately 11,400 Utahns died from drug overdose generally.

19.     The effects of this epidemic have heavily strained the State of Utah's public resources.  Costs and expenses borne by the State have skyrocketed as Utah has provided emergency public health services ranging from overdose response and addiction treatment to neonatal intensive care for opioid-dependent newborns.  More ambulances have been dispatched on public streets, families have been displaced, and public places have been decimated by drug use and discarded needles.  Meanwhile, criminal justice costs continue to rise as the State and its political subdivisions conduct necessary opioid-related investigations, arrests, adjudications, and incarcerations.  The consequences of this public health crisis have been far-reaching and severe—and they are still ongoing.

20.     All of this was a direct and foreseeable result of Defendants' conduct.

---

[7] KFF, *Mental Health and Substance Use State Fact Sheets*, https://www.kff.org/statedata/mental-health-and-substance-use-state-fact-sheets/utah.

[8] Utah Dep't of Health & Human Servs., Stop the Opidemic, https://opidemic.utah.gov.

[9] Utah Dep't of Health & Human Servs., *Health Indicator Report of Drug Overdose and Poisoning Incidents*, Public Health Indicator Based Information System (IBIS), https://ibis.utah.gov/ibisph-view/indicator/view/PoiDth.Opi.html.

21.     Through their unique combination of knowledge, power, and market position, Defendants had an extraordinary ability to control the supply of opioid pharmaceuticals in the United States and in Utah.  Nationally, a small number of PBMs dominate the market.  ESI and Optum are two of the giants.  As of 2020, ESI and Optum were two of the largest PBMs in the nation.  By 2012, ESI and Optum controlled roughly *half* of the commercial PBM market in Utah.  Both are members of large, vertically integrated companies.  ESI is the self-described manager of the pharmacy benefit for more than 100 million American lives, providing PBM services to its parent Cigna as well as to many other insurers and payers.  Optum provides PBM services to its parent, UnitedHealth Group (the largest commercial drug insurer in the United States), and to other insurers and payers throughout the nation and Utah.

22.     ESI and Optum are also two of the largest healthcare data, consulting, and analytics companies.  Moreover, ESI and Optum are among the largest pharmacies in the country and are owned by two of the largest insurance companies in the world.

23.     Defendants control pharmacy networks that include various retail pharmacies throughout the nation and Utah.  ESI's pharmacy-network participants include "nearly 64,000 pharmacies," which it contends provides the public with an available in-network retail pharmacy within a 15-minute drive of nearly every member's home.[10]  Optum controls a pharmacy network consisting of approximately 67,000 retail pharmacy locations nationwide.[11]  Defendants also dispense prescription opioids through their mail-order pharmacies, serving patients nationally and in Utah.

---

[10] *Building Purposeful Pharmacy Networks—PBMs build networks of pharmacies to provide consumers convenient access to prescriptions at discounted rates*, Evernorth Health Services, https://express-scriptsfacts.com/key-topics/building-purposeful-pharmacy-networks (last visited Dec. 14, 2024).

[11] OptumRx, *Broad Pharmacy Network—Chains and PSAOs* (2017), https://www.maricopa.gov/DocumentCenter/View/45684/Optum-RX_Pharmacy-Network.

24.     Defendants had the power to drive down opioid sales and prescriptions and to flag and halt improper and risky utilization.  Defendants could have done this through the national formularies they offer to pharmacy benefit plans and through the standard "utilization management" ("UM") rules they offer their clients.  Formularies, which are lists of drugs covered by a pharmacy benefit plan, control which drugs are available to the PBMs' covered members.  Formularies contain tiers, where drugs listed on higher tiers require larger copays, or as exclusionary formularies, where preferred brand drugs are included and nonpreferred drugs are not.  When a drug is excluded from the standard formulary, it means that the drug will not be paid for by the prescription plan.

25.     Standard UM programs include tools for managing access and use of particular drugs.  Examples of UM measures include step therapy (where a beneficiary is required to try a different drug first), quantity limits (where the dosage or days' supply of a particular drug are limited), and prior authorization ("PA") (which requires confirmation from a physician that a particular drug is therapeutically appropriate before the drug can be dispensed).  Data, including studies that Defendants themselves conducted, shows that disfavored formulary placement and the implementation of UM measures reduce inappropriate prescribing and dispensing by making certain drugs or drug quantities more difficult or expensive to obtain.

26.     Defendants and opioid manufacturers knew that disfavored formulary placement and UM rules would significantly reduce improper opioid use and inappropriate prescribing by making non-preferred, dangerous forms and quantities of pain treatment more difficult and costly to obtain.  Defendants also knew that formulary offerings that provided preferred formulary placement without UM restrictions would result in prescriptions being written and dispensed with ease and frequency, to the detriment of public health and safety.  Opioids receiving preferred formularies status by the Defendants have significantly greater sales than drugs that are

either excluded or disadvantaged.  Accordingly, Defendants acted as governors and gatekeepers to the opioid market.

27.    Given Defendants' dominant position in the market, their clients typically accepted the offered standard, national formularies, and UM programs without modification. While Defendants' clients had the option to elect whether to use a particular plan, any deviation from the offered formularies would result in significant financial penalties to the client. Moreover, customers generally hire PBMs specifically for their specialized knowledge of prescription-drug formularies and their privileged role in policing the pharmacy networks.  Thus, Defendants' national formularies effectively controlled what opioids would enter the marketplace and with what restrictions.

28.    Defendants represented to the public that they used their power, insight, and control over their national formularies to ensure safe prescribing and dispensing of drugs.  They represented to their clients and the public that they made formulary decisions and used UM controls to restrict inappropriate dispensing and to promote safe and effective pain treatment.[12] They represented further that they policed pharmacies within their networks to identify and address instances of over-prescribing and diversion.

29.    None of this turned out to be true.

30.    Cloaked behind these misrepresentations, Defendants' role in causing the opioid epidemic has, until now, been largely concealed from public view.  Defendants hid their misconduct through non-transparent business practices, which included requiring each entity with whom they conducted business to enter into confidentiality agreements or otherwise keep

---

[12] *E.g.*, Express Scripts Holding Company, 2017 Annual Report, SEC Form 10-K, at 11; United Health Group 2011 Annual Report to Shareholders, *Working Together to Make Health Care Better*, at 17, https://www.annualreports.com/HostedData/AnnualReportArchive/u/NYSE_UNH_2011.pdf.

their agreements secret. Defendants and their trade association, PCMA, even sued government entities to try to hide their business dealings—like their rebate agreements with manufacturers—from the public.[13]

31.     Allegations and evidence within complaints filed since March of 2023 in the National Opiate Multidistrict Litigation, *In re: National Prescription Opiate Litigation,* Case No. 1:17-md-2804-DAP (N.D. Ohio) ("Opioid MDL"), finally revealed that since the late 1990s Express Scripts, Optum, and their affiliated companies played a central role in recklessly and intentionally promoting, dispensing, and oversupplying opioids. Recent complaints were based on thousands of previously non-public documents produced by PBMs, Purdue Pharma ("Purdue"), and other opioid manufacturers. Utah was unaware of Defendants' opioid-related conduct described herein until after those complaints were filed.

32.     This newly-revealed evidence shows that, for no less than the last two decades, Defendants  facilitated the oversupply of opioids into our communities by intentionally looking the other way and ignoring potential safeguards—all to increase the prescribing, dispensing, sales, and consumption of prescription opioids. Defendants used their market power *not* to promote safe and effective pain treatment *but instead* to negotiate lucrative payments and incentives from opioid manufacturers.

33.     Defendants colluded with Purdue Pharma and other opioid manufacturers to increase opioid sales by giving opioids preferred placement on Defendants' national formularies in exchange for substantial rebates and fees. The rebates were conditioned on Defendants

---

[13] Robert King, *PCMA pulls lawsuit over rebate disclosure rule after reaching deal with Biden admin*, Fierce Healthcare (Dec. 1, 2021), https://www.fiercehealthcare.com/payer/pcma-pulls-lawsuit-over-rebate-disclosure-rule-after-reaching-deal-biden-admin.

lowering the copay requirements and eliminating safety restrictions like prior authorization requirements and usage limits.  To boost profits, Defendants willingly agreed.

34.    Moreover, Defendants *actively collaborated* with Purdue and other manufacturers to create, support, and propagate misleading marketing messages to alter perceptions of opioids and increase sales.  Defendants shared their data with opioid manufacturers to help refine and target their opioid marketing strategies.  Defendants partnered with manufacturers to study and develop data that would reinforce Purdue's and other manufacturers' deceptive messaging.  And Defendants helped Purdue and other manufacturers draft and disseminate deceptive marketing materials to the public and prescribers.

35.    All the while, Defendants' mail-order pharmacies filled prescriptions for opioids without adequate safeguards against diversion.

36.    Defendants did not encourage the best clinical outcomes for patients.  They encouraged the opposite.  Defendants are not bystanders in the opioid crisis; they fanned the flames.

37.    Express Scripts and Optum undertook and assumed a duty to create standard, national formulary offerings and UM rules based on the health and safety of the public and of the lives covered by their clients' benefit plans.

38.    Express Scripts and Optum told the public, as well as their clients, that their national formulary and UM offerings were based on promoting the health and safety of the public and the lives their clients insured.   In reality, they were doing the exact opposite and acting to maximize their own revenue in concert with the opioid manufacturers.

39.    Express Scripts and Optum knew, when they made these representations to the public and to their clients, that they would not base their national formulary and UM offerings on the health and safety of the covered lives nor the public.  And they knew they would make, and

were already making, formulary and UM actions and decisions designed solely or primarily to increase their own profits.

40.    As a result, the market for prescription opioids grew dangerously fast. Prescribing, dispensing, and sales increased, and Defendants collected the profits from their agreements and relationships with opioid manufacturers. Defendants raked in profits from the rebates and fees they negotiated with branded opioid manufacturers for making opioids easily available, and from pricing spreads and fees they received from selling generic opioids. They also profited by selling their amassed data about their covered lives, healthcare providers, and dispensing pharmacies. They even profited from their marketing agreements with opioid manufacturers.

41.    In sum, the Defendants are legally responsible for their role in causing, substantially contributing to, and maintaining the opioid epidemic because, among other things:

(a) their conduct in colluding with the opioid manufacturers to increase the supply and consumption of opioids through false and misleading misrepresentations was performed intentionally, knowingly, negligently, unreasonably, and unlawfully;

(b) their intentional, knowing, negligent, and unreasonable failure to offer formularies, UM protocols, and drug-utilization review measures that would ensure safe and appropriate use of opioid medications was wrongful because they undertook to do so—and represented that they would—and instead, worked to increase the supply of opioids without regard to the safety or appropriateness of the drugs;

(c) they intentionally, knowingly, negligently, and unreasonably decided, offered, and continued to offer only formularies, UM protocols, and drug-utilization measures that placed no meaningful limitations on the prescribing and use of opioids, despite knowing, through data at their fingertips, that

(i) unrestricted access to opioids was causing harm, and foreseeably would continue to cause harm—including the foreseeable harm resulting from diversion—to Utah and its communities, and

(ii) those harms could be addressed through measures that the Defendants intentionally chose not to offer or otherwise make available; and

(d) their conduct in dispensing opioids was intentional, knowing, negligent, and unreasonable because they failed to comply with the Utah Controlled Substances Act,

Utah Pharmacy Practices Act, and federal law, both in their own mail-order pharmacy dispensing and in their other activities that increased the risks of diversion.

42.    Defendants' conduct has had severe and far-reaching public health consequences, the costs of which are borne by the State of Utah.

43.    Defendants' conduct has created a public nuisance and a blight.  The State, and the services it provides the citizens of Utah, have been strained by this public health crisis.

44.    The State brings this suit to help address the devastating march of this epidemic and to hold Defendants responsible for the crisis they helped create.  This lawsuit relates to the Defendants' conduct in the non-federal market which resulted in the increased use, abuse, and diversion of opioids.

## II.    THE PARTIES

### A.  Plaintiffs

45.    The State of Utah brings this action through its Attorney General to protect the interests of the State and its citizens.  The Attorney General is authorized to initiate and maintain this action by statute and common law and does so under, *inter alia*, Utah Code section 67-5-1.

46.    The Utah Division of Consumer Protection is a state agency within the Utah Department of Commerce.  The Division enforces consumer protection laws in Utah, including, *inter alia*, the Consumer Sales Practices Act, Utah Code §§ 13-11-1, through -23, which prohibits deceptive and unconscionable acts and practices in connection with consumer transactions.  The Division is authorized to initiate and maintain this action by statute and does so under Utah Code section 13-11-17(1).

### B.  Express Scripts Defendants

47.    **Defendant Express Scripts, Inc.** is a Delaware corporation registered to do business in Utah with its principal place of business located at One Express Way, St. Louis, Missouri.

48.    Express Scripts, Inc. is registered to do business in Utah and may be served through its registered agent: Corporation Service Company, 15 West South Temple, Suite 600, Salt Lake City, Utah 84101.

49.    Express Scripts, Inc. holds a license with the Utah Department of Insurance.

50.    Express Scripts, Inc. is the immediate or indirect parent of pharmacy and PBM subsidiaries that operate throughout Utah that engaged in conduct that gave rise to this Complaint.

51.    During the relevant time, Express Scripts, Inc. was directly involved in PBM and mail order pharmacy services, as well as Express Scripts' data and research services, nationwide, including in Utah.

52.    **Defendant Express Scripts Administrators, LLC** (d/b/a Express Scripts, f/k/a Medco Health, LLC) is a Delaware limited liability company with its principal place of business located at One Express Way, St. Louis, Missouri.

53.    Express Scripts Administrators, LLC is registered to do business in Utah and can be served through its registered agent: Corporation Service Company, 15 West South Temple, Suite 600, Salt Lake City, Utah 84101.

54.    Express Scripts Administrators, LLC holds a license with the Utah Department of Insurance.

55.    During the relevant time, Express Scripts Administrators, LLC provided PBM services in Utah as discussed in this Complaint and engaged in conduct that gave rise to this Complaint.

56.    **Defendant Medco Health Solutions Inc.** (f/k/a Merck-Medco Managed Care LLC ("Medco")) is a Delaware corporation with its principal place of business located at One Express Way, St. Louis, Missouri.

57.     Medco Health Solutions Inc. is registered to do business in Utah and can be served through its registered agent: CT Corporation System, 1108 E. South Union Ave., Midvale, Utah 84047.

58.     Medco Health Solutions Inc. holds a license with the Utah Department of Insurance.

59.     Express Scripts acquired Medco in 2012 for approximately $29.1 billion.

60.     Before the merger, Express Scripts and Medco were two of the largest PBMs in the United States.  Medco provided PBM services to approximately 62 million members and provided mail-order, data-analytics, and research services to customers throughout the nation and Utah.

61.     Following the merger, the combined company continued under the name Express Scripts.  All of Medco's PBM, mail-order pharmacy, and data and research business were combined into Express Scripts, and all of Medco's customers became Express Scripts' customers.  Express Scripts, Inc. became the largest PBM in the nation, filling a combined 1.4 billion prescriptions for employers, insurers, and payers.

62.     As a result of the merger, Express Scripts Holding Company ("ESHC") was formed.  In 2018, Cigna Corp. purchased Express Scripts Holding Company for $54 billion.

63.     In October of 2020, Express Scripts Holding Company changed its name to Evernorth Health, Inc. ("Evernorth").  Evernorth is the indirect parent of Express Scripts, Inc., along with pharmacy, and research subsidiaries that operate throughout Utah.

64.     **Defendant ESI Mail Pharmacy Service, Inc.** is a Delaware corporation with its principal place of business located at One Express Way, St. Louis, Missouri.

65.     ESI Mail Pharmacy Service, Inc. is registered to do business in Utah and can be served through its registered agent: CT Corporation System, 1108 E. South Union Ave., Midvale, Utah 84047.

66.     ESI Mail Pharmacy Service, Inc. holds pharmacy licenses in Utah.

67.     ESI Mail Pharmacy Service, Inc. dispenses opioids nationwide and dispensed opioids into Utah during the relevant time period as a mail-order pharmacy.

68.     **Defendant ESI Mail Order Processing, Inc.** is a Delaware corporation with its principal place of business located at One Express Way, St. Louis, Missouri.

69.     ESI Mail Order Processing, Inc. is registered to do business in Utah and can be served through its registered agent: CT Corporation System, 1108 E. South Union Ave., Midvale, Utah 84047.

70.     ESI Mail Order Processing, Inc. held pharmacy licenses in Utah during the relevant time.

71.     ESI Mail Order Processing, Inc. provided and/or offered mail order pharmacy services in Utah during the relevant time period.

72.     **Defendant Express Scripts Pharmacy, Inc.** is a Delaware corporation with its principal place of business located at One Express Way, St. Louis, Missouri.

73.     Express Scripts Pharmacy, Inc. is registered to do business in Utah and can be served through its registered agent: CT Corporation System, 1108 E. South Union Ave., Midvale, Utah 84047.

74.     Express Scripts Pharmacy, Inc. holds pharmacy licenses in Utah.

75.     Express Scripts Pharmacy, Inc. provided and/or offered mail-order pharmacy services in Utah during the relevant time period.

76.     As a unit, ESI Mail Pharmacy Service, Inc., ESI Mail Order Processing, Inc., Express Scripts Pharmacy, Inc., and Medco Health Solutions are referred to herein as "Express Scripts Pharmacy," which was the third largest dispensing pharmacy in the United States for the 2006–2014 time period.

77.     From 2006–2014, Express Scripts Pharmacy bought over 22.9 billion Morphine Milligram Equivalents ("MMEs") of opioids spread over 1.1 billion opioid dosage units.

78.     Evernorth is the direct parent of and shares a physical address with Express Scripts, Express Scripts Administrators, LLC, ESI Mail Pharmacy Service, Inc., ESI Mail Order Processing, Inc., Express Scripts Pharmacy, Inc., and Medco Health Solutions and its website includes links to both Express Scripts "Pharmacy Benefits Management" and "Express Scripts Pharmacy." "Express Scripts Pharmacy" is described as providing home-delivery pharmacy services.

79.     Collectively, Defendants Express Scripts, Inc., Express Scripts Administrators, LLC, Medco Health Solutions, Inc., ESI Mail Pharmacy Service, Inc., ESI Mail Order Processing, Inc., and Express Scripts Pharmacy, Inc., including all predecessor and successor entities, are referred to as "Express Scripts" or "ESI."

80.     The consolidation of the Express Scripts entities over time are represented in this graphic.



81.    In 2022, Evernorth, in large part through Express Scripts' PBM and mail-order pharmacy business, generated revenue of $140.3 billion, contributing more than 75% of Cigna's 2022 revenue.

82.    Express Scripts Defendants are named for their conduct as:

- a PBM;

- a data, analytics, and research provider; and

- a mail-order pharmacy (i.e., a dispenser).

During the relevant time period, Express Scripts Defendants contracted with opioid manufacturers in each of these capacities.  At all relevant times, Express Scripts Defendants performed these activities in Utah and their conduct in doing so gave rise to this Complaint.

**C.  Optum Defendants**

83.    **Defendant UnitedHealth Group, Inc.** ("UnitedHealth Group" or "UHG") is a corporation organized under the laws of Delaware with its principal place of business at 9900 Bren Road East, Minnetonka, Minnesota, 55343.

84.    UnitedHealth Group may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

85.    UnitedHealth Group is a Fortune 5 diversified managed healthcare company.  In 2022, UnitedHealth Group listed revenue exceeds $324 billion.  UnitedHealth Group offers a spectrum of products and services including health-insurance plans and pharmacy benefits.

86.    UnitedHealth Group operates nationwide and in Utah through two connected divisions—Optum and UnitedHealthcare ("UHC").  As discussed in greater detail below, Optum provides PBM services, mail-order pharmacy services, and data, analytics, consulting, and research services.  UHC provides health insurance and health-benefit services.

87.     UnitedHealth Group, through its executives and employees, controls the enterprise-wide policies that inform both UHC and Optum's lines of business in order to maximize profits across the corporate family.  UnitedHealth Group's conduct has had a direct effect in Utah.

88.     UnitedHealth Group's executives have oversight of and direct involvement in its enterprise-wide formulary construction—including for UHC and OptumRx formularies—and the UM criteria that governs these formularies.

89.     Publicly available information demonstrates this control.  One document states,

> When clients work with UnitedHealthcare, they tap into the power of UnitedHealth Group.  The enterprise—entrusted to help provide health benefits and services to 250M+ members worldwide—includes Optum, a technology and data-enabled health care services company.  UnitedHealth Group has been a leader in the charge to transform health care for more than a decade, investing upwards of $5B annually in innovation, research and development and technology.  Its businesses, UnitedHealthcare and Optum, are both laser-focused on bringing solutions to market that help people live healthier lives and make the health system work better for everyone. . . .  Optum brings its clinical expertise, technology and data from serving as a pharmacy benefit manager (PBM) and health services administrator.

90.     With regard to opioids, UnitedHealth Group publicly claims on its website that it "is addressing the crisis . . . .  [a]pplying and coordinating capabilities, data and efforts across our companies, which span the spectrum of health services,"[14] which demonstrates UnitedHealth Group's role in directing the Optum Defendants' belated opioid response and controlling and coordinating its subsidiaries with regard to opioids.

---

[14] *Addressing the Opioid Epidemic*, UnitedHealth Group, https://www.unitedhealthgroup.com/newsroom/posts/opioid-epidemic.html (last visited Dec. 15, 2024).

91.     UnitedHealth Group further claims on its website that it is

> leveraging our data analytics capabilities to help minimize
> exposure to opioids and stop misuse before it starts by . . .
> [i]mproving adherence to Centers for Disease Control and
> Prevention (CDC) guidelines for opioid painkillers . . . [w]orking
> to keep opioids in the hands of the people they're prescribed for by
> watching for potentially fraudulent activities like prescription
> reselling and false medical claims . . . promot[ing] evidence-based
> treatment that gives individuals the best chance for recovery . . .
> [and] using advanced data analytics to monitor for dangerous
> prescribing and use patterns . . . .[15]

92.     UnitedHealth Group failed to implement an opioid management program until far too late, as discussed throughout the Complaint.

93.     UnitedHealth Group employees work among and move between its entities.  For example, current UnitedHealth Group CEO Andrew Witty also served as CEO for Optum.

94.     **Defendant OptumRx, Inc.** is a California corporation with its principal place of business at 2300 Main St., Irvine, California 92614.

95.     OptumRx, Inc. is registered to do business in Utah and may be served through CT Corporation System at 1108 E. South Union Avenue, Midvale, UT  84047.

96.     OptumRx provides PBM services and mail-order pharmacy services nationwide and in Utah.

97.     OptumRx is a subsidiary of UnitedHealth Group.

98.     Before 2011, OptumRx was known as Prescription Solutions. OptumRx was created out of a series of mergers and acquisitions.

99.     In 2012, SXC Health Solutions, another large PBM, purchased its rival, Catalyst Health Solutions Inc., in a roughly $4.1 billion deal.  SXC Health Solutions renamed the

---

[15] *Id.*

company Catamaran Corp.  After this, UnitedHealth Group bought Catamaran Corp in a $12.8 billion deal and merged Catamaran with OptumRx in 2015.

100.    Before merging with or being renamed to OptumRx, Prescription Health Solutions, Catalyst Health Solutions, Inc., and Catamaran Corp. engaged in the at-issue PBM and mail-order activities.

101.    The consolidation of the OptumRx entities over time are represented in this graphic.



102.    OptumRx and all its predecessors including, and not limited to, Prescription Health Solutions, Catalyst Health Solutions, Inc., SXC Health Solutions Corp., and Catamaran Corp. are referred to as "OptumRx" throughout the Complaint.

103.    OptumRx provides services to more than 129 million people through a network of more than 67,000 pharmacies.

104.    OptumRx's 2022 revenue was nearly $182.8 billion.[16]

105.    **Defendant OptumInsight, Inc.** is a Delaware corporation with its principal place of business located in Eden Prairie, Minnesota.

---

[16] UnitedHealth Gr., *UnitedHealth Group Reports 2022 Results*, at 4 (Jan. 13, 2023), https://www.unitedhealthgroup.com/content/dam/UHG/PDF/investors/2022/UNH-Q4-2022-Release.pdf.

106.    OptumInsight, Inc. is registered to do business in Utah and may be served through its registered agent, CT Corporation System, at 1108 E. South Union Avenue, Midvale, UT 84047.

107.    OptumInsight, Inc. was formerly known as Ingenix Pharmaceutical Services, Inc. and Ingenix, Inc. ("Ingenix").  UnitedHealth Group changed the name in 2011 after the New York State investigated Ingenix regarding a scheme to defraud consumers by manipulating reimbursement rates, resulting in a $50 million settlement with New York and giving rise to U.S. Congressional hearings.

108.    **Defendant OptumInsight Life Sciences, Inc.** is a Delaware corporation with its principal place of business located in Massachusetts.

109.    OptumInsight Life Sciences, Inc. is registered to do business in Utah and may be served at 1108 E. South Union Ave., Midvale, UT  84047.

110.    In 2012, UnitedHealth Group renamed QualityMetric, Inc. to OptumInsight Life Sciences, Inc.

111.    OptumInsight, Inc., OptumInsight Life Sciences, Inc., and their predecessors, successors, affiliates, including and not limited to Ingenix, Innovus, Innovus Research, i3, QualityMetric, Inc., Htanalytics, ChinaGate, and CanReg, are referred to as "OptumInsight" throughout the Complaint as described in the below graphic.



112.    OptumInsight emerged from a collection of entities UnitedHealth Group has

acquired over the years.  Those legacy entities include Innovus, QualityMetric, HTAnalysts,

ChinaGate, CanReg, Ingenix, the LewinGroup, and various "i3" entities.

113.    OptumRx, Inc. and OptumInsight are wholly owned subsidiaries of UnitedHealth

Group.

114.    OptumInsight provides data, analytics, research, consulting, technology, and

managed services to companies nationwide.  As is discussed below, OptumInsight worked with

opioid manufacturers to convince prescribers, patients, and the public, including in Utah, that

opioids were appropriate for long term use for the treatment of chronic pain conditions and were

not addictive.  OptumInsight used the UnitedHealth Group research database, which included

UHC and OptumRx claims data, to generate material to support the opioid manufacturers' efforts.

115.    The opioid manufacturers used their relationships with OptumInsight to deepen their ties to the overall Optum/UnitedHealth Group corporate family.

116.    OptumInsight was paid tens of millions of dollars by the opioid manufacturers during the relevant time period for its work to expand the opioid market.

117.    During the relevant time period, OptumInsight's data collection and analysis included prescription claim data from Utah patients' and health plans' opioid utilization, for use in its research and consulting efforts in coordination with the opioid manufacturers to expand the opioid market and increase opioid utilization.

118.    Collectively, UnitedHealth Group, OptumRx, and OptumInsight are referred to as "Optum" or "Optum Defendants."

119.    Optum Defendants are named for their conduct as:

- a PBM;

- a data, analytics, and research provider; and

- a mail order pharmacy (i.e. a dispenser).

120.    At all relevant times, Optum Defendants performed these services in Utah.

## III.  JURISDICTION AND VENUE

121.    This Court has subject matter jurisdiction over this matter under Utah Code subsection 78A-5-102(1).

122.    The Attorney General has authority to bring this action under Utah Code sections 67-5-1, 76-10-806, and 13-11-17(1).

123.    Personal jurisdiction over Defendants is proper under the Utah Long Arm Statute. Utah Code §§ 78B-3-201, 78B-3-205.  Each Defendant entity is, or was during the relevant

period, licensed to do business in Utah or transacted business in Utah.  Furthermore, Plaintiffs'

claims arise out of Defendants' PBM, mail-order pharmacy, and data-analytics, research, and

marketing business in or directed to Utah which caused injury to and in Utah.  Each Defendant

has sufficient contacts with Utah related to the allegations in this complaint to give rise to the

current action in Utah or has continuous and systematic contacts with Utah.  Because of each

Defendants' contacts with the State of Utah in their provision of PBM, mail-order pharmacy, and

data-analytics, research, and marketing services as described in this complaint, exercise of

personal jurisdiction in this forum would not offend traditional notions of fair play and

substantial justice.

124.    Venue is proper in Salt Lake County.  *Id.* § 78B-3-307(3).

## IV.  ALLEGATIONS

### A.  What PBMs are and how they operate.

125.    According to the PBMs' trade group Pharmaceutical Care Management

Association ("PCMA"), PBMs process prescriptions for the vast majority of Americans.

126.    PBMs review and authorize or instruct payers to pay or reimburse claims for

pharmaceuticals.  PBMs also claim to review and decide which medications are most effective

for each therapeutic use.

127.    PBMs offer national formularies that set the criteria and terms under which

pharmaceutical drugs are reimbursed.  PBMs also decide what, if any, UM limitations are

included in the national plans they offer.  PBMs commit to monitor their customers' drug plans

and monitor their customers' utilization, including through concurrent drug-utilization review

("Concurrent DUR" or "cDUR").

128.    Concurrent DUR involves the PBMs' real-time evaluation of drug therapy for

potential problems, including over-utilization and clinical abuse/misuse of prescribed drugs.

Express Scripts' and OptumRx's standard client contracts required Defendants to conduct Concurrent DUR at the point of sale for all prescriptions.

129.    Defendant ESI made these formulary offerings in Utah and served as a PBM for Utahns covered by insurance or plans that contracted with ESI.

130.    Defendant OptumRx also made these formulary offerings in Utah and served as a PBM for Utahns covered by insurance or plans that contracted with OptumRx.

131.    Defendants represent to their clients, patient consumers, and the public that they structure their national formularies and drug programs in a way that promotes safe use and appropriate prescribing of opioids.

132.    For example, ESI claims that its Pharmacy and Therapeutics Committee considers drug safety and efficacy and "fully compl[ies] with the . . . Committee's clinical recommendations regarding drugs that must be included or excluded from the formulary based on their assessment of safety and efficacy."[17]

133.    ESI also claims that it uses Concurrent DUR to "review prescriptions for safety and effectiveness, in real-time, electronically and systematically, when presented to . . . pharmacies" and that it will "alert the dispensing pharmacy to detected issues."[18]

134.    Additional examples of these types of statements are found in ESI's SEC filings and other statements:

    a.    Between 2000 and 2010, Express Scripts stated in its SEC filings that it "works with clients, manufacturers, pharmacists and physicians to . . . improve members' health outcomes and satisfaction."

    b.    ESI stated that it "is a company dedicated to making the use of prescription drugs safer . . . for plan sponsors and over 50 million members and their families."

---

[17] Express Scripts Holding Company, 2017 Annual Report, SEC Form 10-K at 11.

[18] *Id.*

    c.   Medco represented in its filings that it "capitalize[s] on our clinical expertise and advanced information technology infrastructure . . . to improve safety and the quality of care for patients . . . by developing action-oriented clinical programs and services based on clinical rationale."[19]

    d.   ESI's CIO stated that "by filling 1.4 billion prescriptions per year, we have over 10 petabytes of useful data from which we can gain insights and for which we can develop solutions . . . [to] improve the health of patients" and further stated that ESI "has researchers and scientists whose sole job is to interpret and analyze the data to identify opportunities to improve health outcomes" and "Everything we do every day focuses on health outcomes."[20]

135.    Similarly, in a September 2013 letter to the Pennsylvania House of Representatives Committee on Health, Express Scripts stated that "[o]ur company's mission is to make prescription drugs safer . . . ."[21]

136.    Optum and its predecessor companies have made similar claims.  For example:

    a.   In 2007 Prescription Solutions represented: "Our goal is to promote the appropriate use of prescription medications.  By focusing on clinical quality and total patient care, we help our clients and members improve outcomes."

    b.   In a 2008 Annual Report, Optum represented: "Beyond the data and technology, and beyond the numbers and networks, our businesses are made up of people who strive, every day, to fulfill our mission by helping people live healthier lives."

    c.   United Health Group stated in 2009 that OptumInsight's predecessor, Ingenix, was "committed to using the power of health information and analytics to help save lives, improve care and modernize the health care system."[22]

---

[19] Medco 2011 Annual Report, SEC Form 10-K.

[20] Peter High, *How Express Scripts Uses Analytics To Improve Patient Outcomes*, Forbes (July 13, 2013), https://www.forbes.com/sites/peterhigh/2013/07/29/94-billion-express-scripts-leverages-technology-and-analytics-to-improve-patient-outcomes/?sh=30571935fb4b.

[21] Letter from David Dederichs, Sr. Dir. Express Scripts to Matthew Baker, Pennsylvania House of Representatives, Comm. on Health, *Re Opposition to HB 746*, at 1 (Sep. 4, 2013) https://www.legis.state.pa.us/WU01/LI/TR/Transcripts/2013_0159_0011_TSTMNY.pdf.

[22] United Health Gr., *Modernizing Healthcare—2009 Summary Annual Report*, SEC Form 10-K, at 22, https://www.annualreports.com/HostedData/AnnualReportArchive/u/NYSE_UNH_2009.pdf.

     d.  UnitedHealth Group's 2011 Annual Report stated that "OptumRx is dedicated to helping people achieve optimal health . . . improving quality and safety, increasing compliance and adherence, and reducing fraud and waste."[23]

137.    In actuality, Defendants have (1) offered and entered into agreements with manufacturers to aid and develop marketing efforts designed to increase opioid prescribing to patient consumers; (2) refused to use their Concurrent DUR process to identify and control opioid misuse; and (3) fueled the opioid crisis while maximizing their profits at the expense of the patient consumers.

138.    While Defendants' national formularies made it easier for patient consumers to receive dangerous opioids, Defendants made it harder for patient consumers to receive addiction treatment.  A ProPublica/New York Times study found that insurers erected more hurdles to addiction treatment than they have for the addictive substances themselves.[24]  Only after public pressure did some insurers make it easier for patients to receive addiction treatment drugs.

**B.  PBM Defendants' Financial Incentives**

139.    PBMs—being uniquely positioned as an intermediary in the opioid supply chain with heavy influence on opioid pricing, access, and distribution—play a pivotal and key role in the availability of opioids.  Opioid manufacturers could not effectively influence drug prescribing and opioid utilization without the PBMs.

140.    PBMs take advantage of their unique market position to maximize their financial gain and do so with little to no transparency.

---

[23] United Health Gr., *Working Together to Make Health Care Better—2011 Annual Report to Shareholders*, SEC Form 10-K, at 17, https://www.annualreports.com/HostedData/AnnualReportArchive/u/NYSE_UNH_2011.pdf.

[24] Katie Thomas and Charles Ornstein, *Amid Opioid Crisis, Insurers Restrict Pricey, Less Addictive Painkillers—Drug companies and doctors have been accused of fueling the opioid crisis, but some question whether insurers have played a role, too*, ProPublica (Sept. 17, 2017), https://www.propublica.org/article/insurers-limit-coverage-of-pricey-less-addictive-painkillers.

141.    Express Scripts and Optum leverage their market power to require and receive incentives from manufacturers to keep certain drugs on and off their standard formularies.

142.    Express Scripts and Optum also receive incentives from manufacturers through rebates, administrative fees, and/or service fees.

143.    Drug manufacturers compete for placement on PBMs' standard, national formularies (preferred placement results in higher demand, more use, and greater profits). Manufacturers often pay PBMs incentives to avoid pre-authorization and other UM tools that would slow the flow of drug use, for example, quantity limits, refill limits, and step edits.  As a Mallinckrodt employee stated after restrictions were placed on a Mallinckrodt pain medication, "We need to remove the barrier to growth, and that will require us to 'pay to play.'"[25]  The ability of PBMs  to negotiate these financial incentives from drug manufacturers derives from their control over the factors driving utilization, including formulary offerings and plan structure.

144.    Generally, prescription-drug manufacturers pay higher rebates for preferred formulary placement on lower tiers (i.e., manufacturers prefer tier 2 status over tier 3 status). This is because prescribers are more likely to write prescriptions, and patient consumers are more likely to fill prescriptions, when the drugs have lower cost-share amounts.  If PBMs draft formularies that increase the demand for the manufacturer's product, the manufacturer will pay more rebates and fees to the PBMs.

145.    Higher-priced drugs will typically generate higher rebates.  This creates an incentive to have standard formulary offerings that provide favorable formulary placement to brand-name, higher-priced drugs like OxyContin, a frequently diverted opioid.

---

[25] Chris Hamby, *Giant Companies Took Secret Payments to Allow Free Flow of Opioids,* N.Y. Times (Dec. 17, 2024), https://www.nytimes.com/2024/12/17/business/pharmacy-benefit-managers-opioids.html.

146.    Under a traditional PBM pricing model, PBMs retain a portion of the payments they receive from prescription drug manufacturers and return the remainder to their third-party plan clients.  The amount of the payments passed on to clients has increased over time, particularly after PBMs and their profit mode received recent scrutiny.

147.    Between  2014 and 2019, the money PBMs receive from manufacturers to ensure a certain formulary placement has risen 16% per year.  Now, 40% or more of branded prescription drug cost goes to the PBMs.[26]

148.    The rebates PBMs negotiate are highly confidential, and, for the most part, the exact terms of the agreements between PBMs and drug manufacturers are unknown to others in the supply chain and their customers.  This creates a pricing black box.

149.    Additionally, Defendants obtain revenue through fees collected from maintaining pharmacy networks—whereby Defendants profit from the "spread" between what clients pay them for generic prescription drugs and the amounts the PBMs reimburse to pharmacies.

150.    In addition, retail pharmacies pay Defendants fees for every formulary opioid sold, and Defendants reimburse the pharmacies based on the lowest available published prices while paying their own mail order pharmacies based on higher published prices for the same drugs.  In other words, the more filled prescriptions a PBM administers, the more profit it earns.

151.    Defendants further increased their profits from generic opioids by choosing not to implement UM tools that would have reduced illegitimate use and diversion of opioids.  As the

---

[26] Emery P. Weinstein and Kevin Schulman, *Exploring Payments in the U.S. Pharmaceutical Market 2011–2019: Update on Pharmacy Benefit Manager Impact*, 227 Am. Heart J. 107 (Sept. 2020), https://doi.org/10.1016/j.ahj.2020.06.017; Susan Morse, *PBMs are driving up drug prices through fees, PhRMA report claims—Rebates and fees received by PBMs account for 42% of every dollar spent on brand medicines in the commercial market, report says*, Healthcare Finance (Sept. 18, 2023), https://www.healthcarefinancenews.com/news/pbms-are-driving-drug-prices-through-fees-phrma-report-claims.

market shifted from branded opioids to generics in the mid-2000s, ESI and OptumRx continued to provide generic opioids unrestricted preferred placement on their standard formularies because of the high profits generic drugs generated for the Defendants through spread pricing and other means. Optum acknowledged in 2013 that generic utilization was a "high driver of revenue and profit."

152.    While profiting from the increased sale of opioids, Defendants double dipped on profits from the sale of services ostensibly aimed at ensuring appropriate and safe opioid prescriptions. PBMs are paid by their payer clients to make safe and effective drug therapies available to their covered lives. And, as described below, drug manufacturers also pay PBMs to provide the greatest access to their opioids, to increase sales, with little to no regard for safety or efficacy. Defendants are paid by the pharmacies where the plan beneficiaries' prescriptions are filled to verify coverage and assist the pharmacy in ensuring that a prescription is appropriate. Thus, in any given transaction, Express Scripts and OptumRx may be receiving money from both the payer and the pharmacy to exercise independent judgment about whether to authorize payment for a prescription, while also receiving money from the manufacturer to ensure that the sale is made.

153.    Because Express Scripts and OptumRx are paid based on the volume of prescriptions, including opioids, that flow through their formularies, restricting this flow would cause Express Scripts and OptumRx to lose substantial revenue.

154.    Defendants resisted efforts to limit access to prescription opioids because of the revenue generated from the dispensing of opioids and concerns about decreasing the rebates opioid manufacturers paid to Defendants.

155.    It was only well after the opioid epidemic had reached its peak and public pressure had mounted that Defendants began to use their unique access to data to offer UM protocols to limit unfettered access to prescription opioids.

156.    Much of Defendants' prior activity was not transparent to anyone, including payers who, in good faith, hired Defendants to manage their benefits. Defendants used their position to silently collude with manufacturers, prioritizing their own profits over public health, welfare, and safety.

157.    With their unique intermediary role, Defendants also linked opioid manufacturers to prescribing physicians, pharmacists, clients, and consumers intending to fuel drug utilization and increase opioid prescription volumes to maximize profit in the forms of rebates and fees from manufacturers. Internal documents reveal that the services and products offered by PBMs "help drive [consumer] behaviors" by engaging in each link of the prescription drug distribution chain.

158.    As described below, Defendants offer services to assist manufacturers in the marketing of drugs through other means as part of Defendants' business model.

159.    Based on the pervasive reach of Defendants' profit scheme throughout the national healthcare industry; because the same PBMs, manufacturers, and payers that operate nationally also operate in Utah; and because there is no reason why the Defendants would act any differently in Utah, there is sufficient information and belief to conclude that Defendants engaged in all the aforementioned practices in Utah.

**C. Defendants chose not to try to slow the flow of opioids even while having data showing incredibly dangerous amounts of diversion, misuse, and abuse.**

160.    Defendants tracked pill-by-pill data by employing advanced data analytics collected from hundreds of millions of pharmacy claims. The data showed nearly every aspect of the pills' movement through the prescription drug distribution and payment systems.

- 33 -

161.    Armed with a wealth of information and data, Defendants knew or should have known of the dangerous opioid prescribing patterns that proved issues like diversion, misuse, abuse, doctor shopping, overdose, and outsized use in Utah.  Yet Defendants have not presented any evidence that they took steps to report or stop outlier prescribers or pharmacies—or to rein in otherwise the facially suspicious volume of opioids being dispensed in Utah or throughout the country.

162.    Instead, Defendants provided manufacturers with preferred formulary status without restrictions and aided their marketing efforts even though Defendants knew that dangerous numbers of opioids were being used in Utah and the nation and were causing an unprecedented crisis of addiction, overdose, and death.

163.    For the entire relevant time period, Defendants had access to extraordinary data, which they extensively reviewed and analyzed for various profit-making business objectives.

164.    ESI has publicly acknowledged its unique ability to collect data.  An ESI representative stated, "Because Express Scripts interacts with patients, pharmacies, prescribers, and payers, our company is uniquely situated to collect data when patients receive and fill a prescription for an opioid under pharmacy benefit."

165.    OptumInsight's predecessor, Ingenix, described itself as having "access to a proprietary Research Database containing data on ten million individuals dating back ten years with the opportunity to link pharmacy claims, medical claims, and clinical laboratory results. Underlying information is geographically diverse across the United States and is updated frequently."

166.    Defendants recognized the value of their data.  In a sales pitch to be chosen as Purdue's "partner" for health economics and outcomes research, OptumInsight asserted that "its claims database" was superior to other databases for multiple reasons and promoted its ability to

"link its data to many other data sources," including mortality data. ESI also has a "research arm" that performs health economics and outcomes research and/or drug utilization review using its "own database[]," including on behalf of Purdue.

167.    Even apart from their research arms, Defendants could monitor their clients' opioid utilization and the overall utilization of particular opioids. Defendants have extraordinary data across the opioid supply chain, including data showing: the volume, nature, dosage, and conditions for which healthcare providers are prescribing opioids to individual patients and on an aggregate basis; the volume of opioids obtained by individual patients and by geography; the pharmacies at which opioids were dispensed and the volume of opioids dispensed by geographic area, among other data. Defendants also track the number of opioids that move through their own mail-order pharmacies.

168.    At the individual level, Defendants could monitor their data to identify conduct commonly associated with opioid misuse, addiction, and diversion—for example, early refills, multiple prescriptions for one individual, dangerously high volumes or dosages, and doctor shopping.

169.    On the prescriber level, Defendants could identify problematic prescribers who were (1) prescribing dangerously high volumes of opioids to patients; (2) co-prescribing opioids with other dangerous drugs like benzodiazepines or the "Holy Trinity," (3) prescribing opioids outside the regular scope of their practice, and (4) prescribing the same dose and duration to all their patients. All these are classic signs of "pill mills" and Defendants could have helped shut them down before patients' lives were ruined or cut short.

170.    Thus, Defendants could see detailed information on individual prescribers, prescriptions, and pharmacies, and could also aggregate that data across manufacturers, patients, pharmacies, and payers. Their visibility was both uniquely granular and comprehensive.

171.    For example, in 2013, an OptumInsight Life Sciences consultant forwarded an article to Endo, an opioid manufacturer, indicating that CVS Caremark was cutting opioid access for "risky" prescribers and that OptumInsight could do the same: "Within our data, we can track the physicians, their # of prescriptions within the Optum database, their patients comorbidities and conditions (e.g., do their patients have pain issues?) . . . .  We can also track the pharmacies as well."

172.    Similarly in 2013, Catamaran, a PBM that later merged with OptumRx, touted its ability to identify "current as well as future at-risk patients and drive interventions in our clinical programming" based on a "dynamic rules engine that continuously scans patient data." Catamaran claimed it could identify these risks "in real time" based on just 30 days of prescription data.

173.    Optum's evaluation of its claims data in 2017 further proves the power and information Defendants had at their fingertips.  In a 2017 presentation entitled, *Confronting the Crisis we Brought Upon Ourselves: America's Opioid Abuse Epidemic*, Optum used its data to exhibit the severity of the epidemic and to show that the vast majority of the prescriptions it processed were noncompliant with the 2016 CDC Guidelines for Opioid Prescribing.

174.    Defendants had access to their wealth of data well before Utah and other states established their prescription-drug monitoring programs and Controlled Substance Database for the purpose of analyzing and stemming the tide of opioids flooding into our communities.

175.    Furthermore, by 2011 at the latest, Defendants were put on notice by the Centers for Medicare and Medicaid Services (CMS) that all actors involved in the delivery of healthcare in the country needed to take steps to address the overuse of prescription opioids, which was contributing significantly to the growing opioid crisis.  CMS advised that Medicare data showed

utilization rates that were "highly indicative of drug seeking behavior due to drug abuse or diversion."

176.    Defendants represented to the public and their clients that Defendants' data and analysis would identify potential fraud and abuse, giving rise to a net impression that Defendants were identifying and addressing over-prescribing, overutilization, and diversion.  In reality, Defendants chose to eliminate patient safeguards in exchange for more lucrative contracts with manufacturers and a boost to Defendants' profits.

177.    By at least 2002, ESI was fielding questions from customers concerned about OxyContin abuse and diversion.  A March 2002 Purdue email discusses how Medco requested an "overview of the abuse and diversion issue surrounding OxyContin" because it would help them "respond to their customers['] questions/concerns."  Defendants were acutely aware of the opioid epidemic; they failed to use their extensive data to combat it and instead helped foster the flow of opioids.

178.    In 2003, Medco's largest client, UHC, expressed concerns that "there were patients taking 960–1000 tabs of OxyContin per month" and stated that it wanted to take action "to reduce the abuse and diversion issues."  Following this, Medco and Purdue worked together to compile research and data to quiet this client's concerns.

179.    In 2003, an ESI employee presenting at a conference stated about OxyContin: "This is a narcotic.  All narcotics are addictive.  In addition, . . . when someone would crush it up and either ingest it or inject it there [is] . . . a potential for serious injury or even death."  And ESI's own data demonstrated these problems as well.

180.    ESI was involved in the administration of Purdue's Indigent Patient Assistance Program ("IPAP"), which included additional sources of prescribing and dispensing data about

Purdue opioids, including the monthly numbers of prescriptions and tablets dispensed, and more information about abuse and diversion.

181.    Purdue created the Indigent Patient Assistance Program to assure "that all patients for whom our oxycodone or morphine products are being prescribed not be denied the benefit of these products because of financial limitations," while reaping the "ancillary benefit" of "the goodwill of important physicians."  Although the data could have been readily used to detect potential addiction and misuse, the Purdue-ESI partnership was focused more on locking in the continued availability of Purdue's opioids to the public.

182.    In November 1994, ESI assumed operating responsibilities for the processing of Purdue prescriptions (OxyContin and MS Contin) through the IPAP program.  As of at least January 2001, ESI's mail-order pharmacy was the "fulfillment pharmacy" for all IPAP opioids.

183.    In October 1996, Purdue praised Express Scripts for its pivotal role in pushing opioids out through the IPAP mission.  Purdue representative said in emails from 1996 that "IPAP usage has sky rocketed since [Purdue] instituted the Express Script[s] policy" and that "Express Scripts has made it much easier to get the free product" while exclaiming that Purdue was "having difficulty getting retailers to participate in the program before Express Script."

184.    Through the IPAP program in particular, ESI had a courtside seat to, and an active role in, the earliest rounds of the opioid epidemic.  As early as 2000, Purdue's Vice President of Medical Affairs noted that, through the IPAP program, the ESI pharmacy was supplying large volumes of opioids, "supporting polypharmacy," and filling prescriptions for dosing more frequent than the 12-hour dosing Purdue marketed as a key selling point for OxyContin (including a prescriber writing for as many as 5 doses of OxyContin per day).

185.    For example, a doctor in Virginia was prescribing 900 tablets a month to a patient in the IPAP program.  An ESI representative allegedly commented to the doctor that IPAP

patients were "all on zillions of tablets."  There is no reason these excesses and dangerous facts were confined to only the IPAP program.  Quite the opposite, the prescribers writing these "zillions of tablets" for IPAP patients were doing the same for others.  Purdue noted that the "more active" prescribers in the IPAP were "also generally higher prescribers for the strong narcotic classes and usually for MS Contin/OxyContin in particular" and were a geographically diverse group that "share[d] the characteristic of generally being in the highest decile class of prescribing activity."

186.    By 2001, ESI was responsible for maintaining Purdue's prescription database.  In a 2001 letter to the FDA, Purdue described its IPAP program and Express Script's role, stating, "the patient is responsible for obtaining subsequent prescriptions from the practitioner and sending them to Express Scripts.  The medications are shipped directly to the patient's home. The prescription information is maintained in a database managed by Express Scripts."

187.    Both Purdue and ESI knew, based on their data, that the overprescribing of opioids was occurring.  In February 2001, the companies discussed implementing "additional controls" around the IPAP, though there is no indication that the controls were employed.  The concerns included "excessive dosing and quantities, off label prescriptions, shipping large quantities, lost shipments, education, grandfathered patients, Adverse Event Reporting, and the timeline of new policies."

188.    By 2002, ESI began administering the enrollment and eligibility of the IPAP, which means it had nearly all the data showing the harm to which it was contributing.

189.    ESI's disregard for the public and its patients failed to meet even Purdue's low standards.  In 2008, Purdue Corporate Security conducted an audit of the IPAP and "discovered a series of discrepancies in ESI's due diligence on patients accepted into IPAP.  The audit found many accepted applications from consumers who submitted fraudulent information.  Purdue

instituted new controls on the program. Purdue concluded that ESI's lack of due diligence during a 4-month period resulted in shipping 18,000 Oxy tablets to 39 people who falsified their applications.

190.    Outside of the IPAP program, ESI's own data capacities allowed the company to identify inappropriate use and prescribing of opioids, as seen in drug trends reports, research posters, and the 2014 ESI report *A Nation in Pain*.[27] The report discussed the results of ESI's review of 36 million opioid pharmacy claims, and detailed the indicia of the opioid epidemic that was apparent in the data. *A Nation in Pain* notes that the study found that 60% of patients using opioids were taking dangerous combinations of drugs that were potentially fatal, like benzo-diazepines with an opioid. A separate Express Scripts study analyzed ESI's data and found that 40% of opioid prescriptions for patients with employer-sponsored drug coverage between 2011 and 2012 were written by only 5% of prescribers.[28]

191.    This unique access alerting ESI to the problems with opioids, should have triggered a robust analysis of potential misuse, abuse, and diversion. This is particularly true, given ESI's knowledge of Purdue's improper marketing tactics. ESI knew, at least as of 2003, that part of the "high growth rate of OxyContin" appeared to be due to "improper detailing" by Purdue, which ESI was "looking at." At its 2003 annual conference, an ESI representative acknowledged this while presenting an OxyContin study it was undergoing for Georgia Medicaid. As part of its study, ESI looked "across the book of business at Express Scripts," not only at Georgia Medicaid but also other programs where it found "similar patterns," including a

---

[27] Express Scripts, *A Nation in Pain—Focusing on U.S. Opioid Trends for Treatment of Short-Term and Longer-Term Pain*, An Express Scripts Report (Dec. 2014), available at https://cbsnet.cbservices.org/EBS/ebsparticipants.nsf/c7418b5485fb49438625765f0043afd8/06d e49a841c6757c8625874d004ad2ff/$FILE/A%20Nation%20In%20Pain.002.pdf/A%20Nation%2 0In%20Pain.pdf.

[28] *Id.*

shift to higher doses.  Still, ESI continued reducing barriers to OxyContin use and promoted more opioid prescribing.

192.    While Defendants launched some programs aimed at identifying high narcotic usage among patients, those programs were limited in scope and availability.  At best, they were window dressing.  For example, ESI started using its data as part of a Fraud, Waste and Abuse program in the late 2000s, but the program was only employed for certain clients, and it was not widely known within the company.  In 2015, a director in the Fraud, Waste, and Abuse department at ESI sent an email to Andrew Behm, ESI Vice President, stating, "[w]e have been seeing way to [*sic*] many egregious drug seeking activity over the years . . . it is hard to defend how our system would allow 68 control scripts by 47 physicians, and 28 pharmacies in a year for one patient. This is one of many . . . examples . . . ."  Mr. Behm responded, "I think we'd all be supportive of shutting this down.  We don't really understand the FWA [Fraud Waste and Abuse] offering.  If you could provide some color there, it might help . . . to understand the existing gaps."

193.    Likewise, in 2016, the Optum Defendants began mailing notice letters to "outlier prescribers," identified based on an internal investigation of Optum's data.  But no prescribers were actually dismissed from the network as a result of the investigation, and Optum never conducted any follow-up analysis to determine whether the letters had any impact on prescribing.

194.    Defendants knew or should have known from their data that opioid abuse, overdose, and diversion were rising with the increasing amount of opioids being dispensed in Utah and its surrounding communities—yet Defendants failed to take any of a number of steps available to stop it.

195.    ESI was aware of and acknowledged internally its failures to use its data to reduce opioid misuse and diversion.  In a 2014 email chain, ESI employees discussed the company's

poor score in a survey regarding managing opioid misuse.  The employees noted that ESI had some monitoring programs in place for Medicare clients, but not for the commercial side of the business.  One employee stated, "That's unfortunate that what is available in Medicare is not fully available in Commercial, and we continue to just be okay with lacking in these areas."

196.    Optum admitted in a 2017 presentation that it failed to address the opioid crisis, stating that the PBMs brought the opioid abuse epidemic "on ourselves" because of their "delayed reaction in intervening as . . . our death toll rose substantially," and stating that "we can no longer sit idly by and watch."

197.    Defendants had the most access and the best ability to monitor opioid data and raise an alarm.  They looked the other way instead and failed to use their data to reduce opioid misuse and diversion.  Defendants continued to prioritize their profits.

**D.  Defendants worked directly with manufacturers to boost opioid sales and aid deceptive marketing.**

1.    <u>The manufacturers' deceptive marketing</u>

198.    As Purdue developed OxyContin in the mid-1990s, it knew that to expand its market and profits, it needed to change the perception of opioids from medications that were appropriate only for short-term acute pain or for palliative, end-of-life care to medications that could be used long-term for widespread chronic conditions, like back pain, migraines, and arthritis.  Purdue, together with other opioid manufacturers, like Teva, Janssen, and Endo, cultivated a narrative that pain was undertreated, that pain treatment should be a higher priority for healthcare providers, and that opioids were safe, effective, and appropriate for long-term use for chronic, routine pain conditions.  No studies supported the claim that opioids were appropriate for chronic pain, and the manufacturers failed to disclose this lack of evidence.  Purdue and other manufacturers misrepresented the risk of addiction for pain patients as modest, manageable, and outweighed by the benefits of opioid use.

199.    Purdue and other manufacturers spent hundreds of millions of dollars on promotional activities and materials that falsely denied or trivialized the risk of addiction and overstated the benefits of opioids.  The manufacturers deceptively marketed opioids to prescribers through advertising, websites, and in-person sales calls.  They also relied upon paid physician speaker programs, continuing medical education ("CME") seminars, non-credit education programs, treatment guidelines, mass mailings to physicians and patients, and other publications and programs they developed with patient advocacy groups, professional associations, paid physicians, and other third parties, including Defendants.

83. The misrepresentations included claims that:

   a.   patients receiving opioid prescriptions for pain generally would not become addicted, and that doctors could use screening tools to exclude patients who were prone to addiction;

   b.   patients who did appear addicted were not; they were instead "pseudoaddicted" and needed more opioids;

   c.   opioids relieved pain when used long-term and were appropriate for use for chronic pain conditions;

   d.   opioids could be taken in higher and higher doses (without disclosing the increased risk to patients);

   e.   OxyContin provided twelve hours of relief (when Purdue knew that, for many patients, it did not); and

   f.   opioids would improve patients' function and quality of life (while trivializing or omitting the many adverse effects of opioids that diminish patients' function and quality of life).

200.    Between the 1990s and 2011, prescriptions of oxycodone, an active ingredient in OxyContin and other opioid drugs, more than doubled in the United States.  During the same time, opioid prescriptions increased some 31% from approximately 1.6 million to approximately 2.2 million.  According to a U.S. Department of Health and Human Services Fact Sheet, "[i]n 2014, more than 240 million prescriptions were written for prescription opioids, which is more than enough to give every American adult their own bottle of pills."

201.    The manufacturers later faced substantial civil and criminal liability for their roles in contributing to the opioid public health crisis and have agreed to pay billions of dollars to address the devastation caused by their misleading marketing and other misdeeds.  For example:

     a.   In 2007, Purdue pled guilty and agreed to pay approximately $600 million in fines and other payments to resolve criminal and civil charges related to the company's misrepresentations regarding OxyContin's addiction and abuse risks, admitting that it had falsely "marketed and promoted OxyContin as less addictive, less subject to abuse and diversion and less likely to cause tolerance and withdrawal than other pain medications";

     b.   In October 2020, the Department of Justice announced that Purdue entered a federal settlement of more than $8 billion to resolve pending criminal and civil allegations related to its marketing of OxyContin;

     c.   In February 2022, the largest U.S. drug distributor and opioid manufacturer, Janssen, agreed to finalize a proposed $26 billion settlement resolving claims by states and local governments that it helped fuel the opioid epidemic;

     d.   In July 2022, Teva announced it would pay up to $4.25 billion as part of a nationwide settlement to end litigation over its role in the opioid crisis; and

     e.   In August 2022, Endo agreed to pay $450 million to states to resolve opioid lawsuits across the country.

    2.   <u>Defendants worked shoulder-to-shoulder with manufacturers to boost sales.</u>

202.    Armed with extensive data, Defendants actively collaborated with Purdue and other manufacturers to create, support, and propagate misleading marketing strategies to increase opioid sales.  Defendants shared data through portals to manufacturers that would help manufacturers refine and target their marketing messages and strategies.  Defendants partnered with manufacturers to study and develop data that would reinforce Purdue's and other manufacturers' deceptive messaging.  And Defendants helped Purdue and other manufacturers draft and disseminate their messages to prescribers through "educational" materials.  Even after Purdue's 2007 plea agreement, where the company acknowledged the falsity of its claims regarding the safety and efficacy of OxyContin (which also demonstrated the falsity of other manufacturers' similar claims), the Defendants continued to participate in marketing efforts and

otherwise aid Purdue and other manufacturers in disseminating the same misrepresentations about the safety and benefits of opioids.

203.    The collaboration between PBMs and manufacturers involved sophisticated tools. For instance, ESI touted its "Pharma Portal" as providing "pharmaceutical manufacturers concrete data on 40 million buyers spending $3 billion a year on prescription drugs."  "Armed with this intelligence," manufacturers could use ESI's "advanced tools" to, among other things, "[d]evelop marketing and sales strategies" and "monitor and evaluate their success."  To make sure manufacturers could take full advantage of these tools, ESI's website "also provides customer service and FAQs."

204.    ESI's Pharma Portal, among other things, allowed marketers to use this aggregate data to "compare results with [their] competitors and calculate market share" by "matching details about therapy classes, manufacturers, physicians and Express Scripts' clients" and to "produce countless graphs and online reports" to help them "expect success" in their efforts.

205.    ESI also offered "Encore" "Contract Pulse" and "Invoice Direct" "database products" for the benefit of Purdue and, given its relationship with all manufacturers, the offers extended to them, too.  Encore (Contract Pulse) served, among other things, to "[a]llow the manufacturer to . . . evaluate . . . promotional programs and "develop sales force strategies." Together, ESI estimated that its Pharma Portal and Encore had enough worth to manufacturers to provide a "fair market value" of "around $125,000 per quarter."  This meant that as of late 2002, the "current customers" were "big pharma only."

206.     Other manufacturers, like Endo, could receive market share data and other information from ESI and send its teams for training on ESI's databases.

207.    Endo appears to have found the pharma portal service as advertised.  Years later, an Endo "Executive Summary" on ESI included the following as among the manufacturer's

strategies: "utilize ESI's pharma portal to track and give all AE's, RD's and DM's feedback by the middle of the month." These initialisms likely refer to sales roles, like account executives. Endo also listed as a requirement: "[c]onsistent monitoring of ESI's monthly claims data to establish growth in the newly acquired business."

208.    ESI cooperated with Purdue and other manufacturers to pursue profits and increase opioid sales by collaborating in marketing efforts in other respects as well. As early as 2000, ESI and Purdue conferenced to discuss a range of "initiatives," including "internet opportunities" like placing a coupon on the web, a pharmacy preceptorship program that would "educate" clinical program managers regarding opioids, and "physician connectivity technology," as "Express Scripts demonstrated that technology can change prescribing behavior." Purdue also contemplated that Express Scripts might send out a piece related to "[o]pioid guidelines, NEJM [New England Journal of Medicine] quotes, and addiction terms" that Purdue's own legal department had said sales representatives could not use. The goal of this type of mailing "would be to educate the physician on the beneficial uses of OxyContin and the preferred formulary status."

209.    ESI developed a study for Purdue entitled, *Quantifying Patterns of Analgesic Use in Conditions with Non-Malignant Pain*, which used ESI's own data and, according to the study's summary, could "support [Purdue's] ongoing strategy to promote the effective use of OxyContin over other drugs and drug classes in the treatment of severe pain."

210.    As an example of ESI's collaboration to spread misrepresentations about opioids, an ESI 2001 letter to a Purdue Brand Manager offered to assist with "strategic initiatives where Express Scripts can support Purdue Pharma in your efforts to educate the market on the prescribing, administration and consumption of Oxycontin" and proposed "three communication efforts that can be rapidly deployed to select audiences." ESI provided a "more detailed

description of the suggested programs," which included targeting physicians, pharmacies, and patients with Purdue's materials like *Dispelling the Myths about Opioids*.  Among other misrepresentations, *Dispelling the Myths about Opioids* labeled the true statement that "opioid addiction . . . is an important clinical problem in patients with moderate to severe pain treated with opioids" as a "myth" and further stated that "addiction risk appears to be low."

211.    In addition, ESI offered Purdue the opportunity to present as an "expert[] in pain management" at a June 2001 advisory board that Express Scripts hosted, which would consist of "leading workers' compensation carriers from across the country."

212.    ESI and Purdue also coordinated a planned mailing to 1,900 physicians to promote OxyContin in April 2001.  Purdue suggested changes to the language about abuse and diversion, along with the addition of language on 12-hour dosing—a focal point of Purdue's deceptive marketing claims.

213.    An April 2001 Purdue memo explained the reasons Express Scripts was interested in sending a mailing to physicians at that time: "ESI has told us that this mailing is necessary so that they may squelch the anti-OxyContin pushback from their clients (Managed Care Organizations and Employer Groups) due in large part to the national media attention OxyContin is receiving."  And ESI directly contributed to Purdue's mailing campaigns.  An internal Express Scripts memo stated that a Purdue education mailing campaign targeting physicians would include "a written letter by Express Scripts' Medical Director."

214.    A 2011 email chain indicates that ESI allowed Purdue to edit its clinical guidance letter to ESI worker's compensation clients about the use of opioids, in which ESI removed a sentence that had appropriately stated: "Opioids appear to be no more effective than safer analgesics."  By removing this objectively true statement, ESI created the false impression that opioids are more effective than analgesics, even though ESI knew it was false.  This conduct,

and the other described conduct, aided Purdue's efforts to inflate the benefits of opioids while downplaying their dangers deceptively.

215.    In addition, to assist with the manufacturers' marketing efforts, Express Scripts has for years provided manufacturers with lists of their clients and their physicians participating in their provider networks.  The manufacturers used this information to target high-opioid prescribers with pull-through marketing, like formulary placement, trainings, articles, and influencer content.

216.    For example, Endo sales representatives were instructed to "[m]aximize pull-through with key managed care plans," "[d]rive brand awareness across top [Opana ER] prescribers," and promote favorable Opana ER formulary positioning.  Sales representatives were instructed to direct their attention on providers "that have the most potential" and not "waste time" on other physicians, and promoted Opana ER's formulary status to prescribers.

217.    In another example, after Endo had negotiated a favorable Tier 2 formulary deal with Optum in 2010, sales representatives were told to "present the great information" to prescribers and take advantage of the Opana ER "opportunity" for "pull through" sales.

> 4. Only when all this is done should you present the great information that now, OPANA ER is 2T, Lowest Branded Co-Pay for UHC Commercial (and Part D) patients!  Get commitment first that OPANA ER is the right choice...then show how easy it is to provide OPANA ER for these patients!

218.    Beginning in 2006, Express Scripts and Purdue formed an ongoing "Participating Manufacturer Agreement" where Express Scripts, in exchange for administrative fees, would provide many deliverables to Purdue that would enable Purdue to pull through its drugs' formulary status to physicians.  The administrative fees were tied to the number of Purdue's

opioids sold—i.e., the more opioids sold, the more Express Scripts made.  This agreement was strictly confidential, was renewed at least three times, and was in place until at least 2010.

219.    Documents produced by Purdue indicate that Optum promoted and/or carried out research projects designed not to serve its customers or public health, but to generate evidence to support the "aspirational value proposition"—in other words, marketing—of Purdue opioids for pain treatment.  Purdue noted Optum's "support [of] the Purdue pain franchise and specifically OxyContin tablets."

220.    In October of 2002, OptumInsight proposed a "Chronic Pain Management" study and education initiative to present a series of teleconferences to providers in the UnitedHealth Group and United Healthcare network.  The initiative's purpose was to "optimize patient care in the treatment of chronic pain."  The initiative's themes included that "[m]ost specialists in pain medicine and addiction agree that patients with prolonged opioid therapy . . . do not usually develop addictive behavior" and one of the purposes of the initiative was to convince providers that "[o]pioids are effective, have a low addiction potential, and may have fewer long term side effects than other pain treatments."  The initiative was approved by Purdue.

221.    In a 2003 email thread, Purdue employees discussed the value of partnering with Ingenix (OptumInsight) because "it is part of United Healthcare" and there would be a "ripple effect" caused by working with UnitedHealth Group's research arm because UHG also housed Optum and UHC.

222.    Purdue worked closely with OptumInsight, UHC, UnitedHealth Group, and OptumRx to "educate" physicians on using opioids for chronic pain treatments.  In February 2003, UHC and OptumInsight met with Purdue to give a presentation on "Managing Chronic Pain Associated with Lower Back Pain."  The goal of the presentation was to develop a comprehensive plan between Purdue, UHC, and OptumInsight to re-educate physicians on

opioid use for the treatment of chronic pain and low back pain. The program included "[t]argeting physicians not aligning with UHG clinical objectives [for treating chronic pain] to modify behavior."

223.    In 2004, OptumInsight and Purdue agreed to implement a program to "Identify and Educate Physicians Treating Patients with Sub-Optimally Treated Chronic Pain." OptumInsight identified target physicians treating patients with "sub-optimal managed pain" using an algorithm applied to its "proprietary research database" containing pharmacy-claims data. OptumInsight, with Purdue's assistance, developed educational materials (including the content and messaging of the meeting moderators), plan recruitment efforts, and "pull-through" follow up materials to reinforce the messages. The follow-up materials would consist of a newsletter or information packet to be distributed to the targeted physicians every 3 to 4 months. The objectives of the program included to "position appropriate use of OxyContin as a treatment option" for chronic pain patients.

224.    Optum provided research and material to Purdue to support the expansion of the opioid market and promotion of beneficial use of opioids for various treatments, including chronic pain, low back pain, and osteoarthritis. A few examples include:

a.  OptumInsight engaged in a multiphase project, pulling data from across the Unites States for Purdue to use in promoting the benefits of opioids for chronic, persistent pain.

b.  OptumInsight engaged in a Purdue study titled *Profiling the OxyContin Patient*. The study's purpose was to assist Purdue with formulary discussions and a financial perspective of Oxycontin "given the costs associated with the undermanagement of pain."

c.  In May 2003, Purdue contracted with OptumInsight to conduct *Utilization of Characteristics of Long-Acting Opioids*, a study on chronic pain. The study manuscript, which OptumInsight volunteered to help prepare, was accepted for publication by at least one national journal.

d.  OptumInsight conducted another study for Purdue titled *A Usual Care, Multicenter, Open-label, Randomized, 4-month Parallel Group Trial to*

*Compare the Impact of Therapy with OxyContin on Health Outcomes and Research Utilization in Subjects with Moderate to Severe Osteoarthritis Pain of the Hip or Knee.*  The study's purpose was to show "health-system decision-makers" the cost effectiveness of treating osteoarthritis with OxyContin.  According to a Purdue marketing plan from 2005, the reliance on the OptumInsight study would help "increase sales of the 10 mg, 20 mg, and 40 mg tablets" and "to maintain focus on non-cancer pain."

225.    Many of these studies were reverse engineered to support Purdue's marketing messages and increase sales of OxyContin.

226.    In addition, a 2012 Optum presentation to Purdue on the "OptumInsight and Purdue Partnership" promised to "develop clear, prioritized, and multi-year actionable plans for generating the evidence needed to support the value propositions for Intermezzo, Butrans, OxyContin, hydrocodone . . . to achieve the greatest likelihood of favorable treatment by payers" and to "effectively communicate the results of real-world effectiveness and safety studies showing the long-term benefit of OxyContin."  In other words, OptumInsight would work to develop evidence to support the "aspirational value propositions"—or marketing messages—for Purdue's products.  Thus, Optum had direct knowledge of evidence gaps that existed in Purdue's messaging regarding OxyContin and other opioids and worked to develop evidence to try to fill them.  The multi-phase project included, among other things, interviewing "experts" who were "aligned with Purdue" about issues related to pain management and OxyContin.

227.    During this time, Optum and Purdue had multiple hours-long meetings to discuss strategy and other issues, allowing Optum still further insight into Purdue.  OptumInsight conducted payer interviews to guide Purdue in its promotion of OxyContin.  OptumInsight's projects for Purdue also included conducting "database studies" analyzing claims data.

228.    Optum knew from its own data that opioid abuse, overdose, and diversion were rising with the increasing opioids that were being prescribed and dispensed.  This contradicted Purdue's marketing claims that OxyContin was appropriate for chronic pain patients because,

among other misrepresentations, addiction was unlikely. Yet Optum continued to partner with Purdue and other opioid manufacturers in their efforts to increase opioid use, continued to give OxyContin and other opioids preferred status on national formularies, and continued to resist the implementation of UM tools at the manufacturers' behest.

229.    Optum worked with other, non-Purdue opioid manufacturers as well. For example, in 2013, United Healthcare, OptumInsight, OptumInsight Life Sciences, and OptumRx conducted a Payer Insights Forum with Janssen to, among other things, "provide overview of Big Data available through OptumInsight/Janssen Strategic Data/Research alliance" and "identify opportunities for J&J to participate in shaping a plan for overcoming United Healthcare's challenges in pharmacy and medical device/diagnostics."

230.    Like ESI, Optum admittedly understands that deceptive marketing played a role in expanding opioid sales and use. In 2001, an executive of UnitedHealth wrote to Purdue to discuss the "whole OxyContin overuse issue . . . which has been brought about by the 'heightened marketing skills of Purdue.'" The executive stated, "I believe Purdue has acted irresponsibly in over-promoting the use of oxycodone . . . the activity has resulted in the overuse of morphine, an increase in the abuse of this narcotic, unnecessary and significant increases in pharmacy trend, and most importantly, an increase in patient morbidity and mortality." He went on to state, "Given that the bad word is leaking out in the press, you have bigger fish to fry than just worrying about what UnitedHealth Group is going to do to manage our trend in this class . . . I would be interested in knowing what Purdue is doing to solve the problem they created."

231.    Optum and UnitedHealth Group recognized that OxyContin was overused, improperly marketed, and killing people in increasing numbers by at least 2001, yet UnitedHealth Group did nothing meaningful to address the opioid "problem" until much later.

232.    Further, Optum drafted documents included language citing Purdue's $200 million marketing campaign and the efforts of other companies who took notice, to develop additional branded opioids.  The same internal document described the "damage" as "done" by 2012—a year in which there were enough opioid prescriptions to offer "every adult US citizen with their own 30-day (180 pill) supply of drug."  It further described the lack of clinical evidence to support this growth in use—a striking admission from within a company that presented "OptumInsight" as offering Purdue expertise in part due to Optum's familiarity with the "development and use of evidence" to support "market access and reimbursement strategies."

**E. Defendants encouraged opioid use through formulary and UM offerings.**

233.    Defendants exert significant control over the prescribing, use, and distribution of opioids throughout the nation and Utah.  As described above, Defendants determine what drugs are included on the national formularies and what drugs will be reimbursed.  In doing so, Defendants largely control what drugs pharmacies dispense and what drugs patient consumers purchase and use.  Manufacturers tout formulary status of their drugs when detailing prescribers, a fact that Defendants knew well.

234.    Express Scripts' and OptumRx's businesses are set up on a model of standardization and scale.  While clients have the option to design their own programs, most clients accept Express Scripts' and OptumRx's standard formularies and UM programs, such as step therapy, prior authorizations, and drug utilization review ("DUR") edits.  Thus, the way Express Scripts and OptumRx construct their standard formularies and programs (outside of any client interaction) has an enormous influence on drug utilization.  Express Scripts and OptumRx know their clients rely on them to perform these functions for their and their covered lives' benefit.

235.     The amount of influence that Express Scripts and OptumRx had over drug utilization was a frequent topic of discussion between the Defendants and the manufacturers. This influence was central in the parties' negotiations over rebates and administrative fees. The more a PBM can draw market demand to or from a drug by controlling formulary and UM decisions, the more a manufacturer will pay. Defendants understood their power and used it to increase opioid utilization to pursue more profit from manufacturers paying rebates and fees.

236.     In pursuit of these profits, Defendants intentionally disregarded their obligations to construct their standard formularies and UM programs in their clients' and patients' best interests: to the detriment of communities around the country and in Utah.

237.     But in the beginning, some Defendants did not prioritize their profits over patient safety. Express Scripts' predecessor, Medco, initially placed a strict quantity limit of 80mg/day on OxyContin when it was introduced in 1996, and Medco sent letters to prescribers informing them that it would not pay for OxyContin prescriptions for non-cancer pain treatment.

238.     OptumRx's predecessor, Prescription Solutions, initially refused to put OxyContin on its national commercial formularies out of concerns over abuse.

239.     At that time, opioids were prescribed infrequently and generally for only acute pain on a short-term basis or palliative care for end-of-life cancer patients. Defendants, or their predecessor companies, recognized the dangers of opioids and installed various routine controls on quantity and access.

240.     Purdue knew that this was a substantial threat to OxyContin's success and worked to change Defendants' policies and practices  In doing so, Purdue did not convince Defendants that OxyContin was safe and effective for the treatment of chronic, non-cancer pain. Instead, Purdue and the manufacturers convinced Defendants that they could make incredible amounts of money by supporting unrestricted access to opioids.

241.    In January of 1997, Purdue sales and marketing executive Michael Friedman sent an email to Purdue's President, Dr. Richard Sackler, stating,

> If we do not . . . [demonstrate the value of OxyContin], I can promise you that we will eventually be shut out . . . . This is a serious matter that we cannot ignore and that we must discuss . . . . We cannot go on ignoring the reality of [the PBMs'] economic proof requirements . . . . If we are to stay in business we need this proof of economic performance.

Purdue recognized that it needed to demonstrate to Medco and other PBMs the economic value of OxyContin use.  Notably, Purdue was not preparing evidence of the safety and health benefits of its product.

242.    In 1997 Medco was Purdue's largest customer.  Had Medco decided to exclude OxyContin from its national formularies or put in place UM measures to continue to restrict the use of OxyContin for non-cancer pain treatment, Medco would have had a substantial impact on the widespread use of OxyContin, possibly even driving it off the market.  Other companies, like Cigna, had excluded OxyContin from their formularies, as OptumRx's predecessor Prescription Solutions had done.

243.    However, Medco did not continue to restrict the sales of OxyContin for non-cancer pain, or to exclude it from its standard formulary offerings.  By May of 1997, Medco reversed course and had "become very interested in 'partnering with Purdue,'" seeing the potential to profit.

244.    The opioid manufacturers recognized early on that Express Scripts and Optum would willingly provide unrestricted formulary status on their standard formulary offerings in exchange for rebates and fees.  For example, in a February 15, 2000 email exchange, Purdue Managed Care Account Executive David Wallen explained that he could get Express Scripts "to steer [OxyContin] prescriptions" to retail pharmacies because of the rebates it received.  According to Wallen, "Express Scripts makes their money from the rebate, so they cannot make

any money on this account if they do not get rebates." In a later February 25, 2000 email, Wallen explained that Express Scripts pressured its clients to agree to formularies that include OxyContin without restrictions, stating "[Express Scripts] can put pressure on [their client] . . . because they make their money from rebates, and they do not get rebates if OxyContin is prior authorization only."

245.    Motivated by its own profits, Medco, later purchased by ESI, gave OxyContin preferred formulary status on its national formulary offerings and agreed to Purdue's request not to impose prior authorization or other limits on the use of OxyContin. Medco's early preferential treatment of OxyContin facilitated the widespread use and over-use of the drug nationally and in Utah, paving the way for the opioid epidemic.

246.    As an example, a 1996 memo describes Purdue offering a 10% rebate at OxyContin's launch for placement of the drug on Medco's standard formulary offerings. And beginning in at least 1997, ESI and Purdue had an agreement for ESI to receive rebates for opioids dispensed.

247.    According to a 2000 spreadsheet of invoices of $25,000 and over, Purdue paid over $3.7 million to Medco in accrued rebates, and nearly $500,000 to ESI for rebates in a single month. With Medco's help, OxyContin gained acceptance and use in the key early years after its launch and laid the foundation for the over-use, misuse, diversion, and other harms that followed—all because of Express Scripts prioritization of increasing profits over public safety.

248.    In exchange for lucrative rebates and fees, ESI gave OxyContin "Preferred Status" on its standard formulary offerings, sparking Purdue to push targeted marketing of "managed care organizations that utilize Express Scripts as their PBMs."

249.    Medco requested rebates from 17% to 20.25% on OxyContin in return for placing it on its preferred drug list (or "PDL") for the 11 million patient lives it covered, along with

United's "entire business."  Purdue's 2003 Business Plan for Medco acknowledges that Purdue gave "financial incentives" to increase OxyContin utilization and indicates that in 2001 Purdue generated $250 million in sales through Medco and paid Medco over $36 million in rebates.

250.    According to a 2005 OxyContin Marketing Plan document, Purdue rebates paid to MCOs ("Managed Care Organizations") and PBMs in 2003 were $193 million or an average of 17% of sales, demonstrating Purdue's recognition of the importance of these payments to its commercial success.

251.    A Purdue spreadsheet from 2011 shows that ESI was Purdue's largest vendor. Purdue paid ESI more than $56.5 million in rebates in 2011 alone.

252.    When ESI requested a higher rebate to maintain OxyContin's position on its standard formulary in 2014, Purdue agreed, noting that Medco was "20–25% of our total OxyContin gross business" and that "*the spillover effect of a negative move by ESI on OxyContin . . . cannot be underestimated . . . .*  Given the importance and impact of this customer on OxyContin sales . . . I approve [the decision to increase OxyContin rebate rates]."  ESI celebrated the increased rebate as a win, stating, "we got $20M in incremental from Purdue on OxyContin."

253.    Yet, ESI knew that its preferred placement of OxyContin on its national formulary offerings was a problem.  In 2012, an ESI executive acknowledged that "OxyContin use at [Medco] is out of control compared with our peers . . . patients are selecting [Medco] because [it has] OxyContin in a preferred position."  In 2013, another ESI executive commented that the company was "out of alignment with the rest of the PBM/Health Plans in actually putting [OxyContin] on a preferred tier . . . other organizations have leaned more towards taking a harder stance on this highly abused medication."  Nevertheless, ESI continued giving OxyContin a preferred placement.

254.    ESI misrepresented to the public the decision-making process for formulary offering approvals.  The main driving force behind approving drugs for ESI's formulary offerings was the manufactures' rebates and fees—contrary to ESI's public representation that it approved drugs for its formulary offerings through exhaustive clinical review of the drugs' efficacy, appropriateness, and cost.[29]  For instance, as late as 2014, ESI notified Purdue that it was reviewing its standard commercial formulary for opioids and "would require deeper discounts to retain OxyContin Preferred status."  The Purdue email summarizing negotiations with ESI noted the "importance and impact of this customer on OxyContin sales" and continued, "ESI made it clear that they would prefer not to make changes to OxyContin formulary status. However, they did state that their decision will be contingent on the level of rebate offered, and overall financial value in our bid in making their decision for 2015."

255.    To maximize financial gains, ESI made OxyContin more accessible to the public. ESI allowed Purdue to undermine ESI's policy for prior authorizations, as Purdue's enticing rebates were conditioned on the elimination or easing of requirements for prior authorization or other restrictions,[30] while also easing OxyContin availability by lowering copays.[31]  Thus, in sum and substance, ESI received payments from and actively worked in concert with Purdue to make OxyContin more available to patients.  As concerns over quantities prescribed grew, ESI again prioritized profits over the public's health, welfare, and safety.

[29] *E.g.*, Express Scripts, *White Paper: Formulary Development at Express Scripts* (Rev. Dec. 2020); https://www.express-scripts.com/aboutus/formularyinformation/development/formularyDevelopment.pdf.

[30] David Armstrong, *Drug maker thwarted plan to limit OxyContin prescriptions at dawn of opioid epidemic*, STAT (Oct. 26, 2016), https://www.statnews.com/2016/10/26/oxycontin-maker-thwarted-limits.

[31] Am. Soc'y. of Addiction Med., *America's Opioid Epidemic—Court released documents show drugmakers blocked efforts to curb prescribing*, Psychology Today (Oct. 28, 2016), https://www.psychologytoday.com/blog/side-effects/201610/america-s-opioid-epidemic.

256.    In its rebate relationships with PBMs, Purdue prioritized preventing the imposition of prior authorization and other requirements that would limit access to opioids. A former Purdue official responsible for ensuring favorable treatment for OxyContin explained, "We would negotiate a certain rebate percentage for keeping it on a certain tier related to copay or whether it has prior authorization.  We like to keep prior authorization off of any drug."[32]  The former Purdue official's relationship with Medco was especially important, so much so that, upon information and belief, Purdue moved the former official geographically to be closer to Medco's New Jersey headquarters.

257.    ESI's predecessor, Medco, also bowed to Purdue's wishes.  In 2001, State officials from West Virginia planned to require prior authorization for OxyContin after noticing a surge in deaths attributable to oxycodone.  Specifically, testimony from a 2004 deposition revealed that West Virginia officials contacted Medco, which managed the state's employee health plan, and asked the PBM to put in place a plan to limit OxyContin prescribing. "[B]asically they were refused."[33]  Another state official described similar resistance, testifying that the PBM "felt strongly, and [was] very, very reluctant or resistant."[34]

258.    Medco even used its large-scale data to aid its effort to avoid implementing restrictions, suggesting that in areas other than West Virginia "there were not that many prescriptions for OxyContin, it was not that much of problem."[35]

---

[32] Armstrong, *supra*, note 30.

[33] *Id.*

[34] *Id.*

[35] *Id.*

259.    Indeed, Medco's data provided tremendous help to Purdue in eliminating potential UM restrictions and further strengthening their lucrative partnership.  In a 2003 internal email, Purdue's Medco Account Representative, Bernadette Katsur, stated:

> I do see tremendous value in the data that [Medco] is willing to provide.  As he explained to me the large MCO's could be identified by number, and then he would be willing to discuss opportunities or concerns on a plan sponsor by plan sponsor basis. He would then be willing to work with me to develop individualized strategy for that account.  That would mean pulling in Medco Client Manager as well as the local account executive. This type of working relationship has proven to be extremely successful with AdvancePCS. *We have eliminated many attempts to [prior authorization] and place [quantity limits] on product through this type of process*.  We have not had that degree of intimacy with Medco, and I think that Ed [Adamcik] would be willing to take that leap with the understanding that the extra percentage is being paid for that purpose.

260.    Express Scripts provided unrestricted access to OxyContin because Express Scripts knew that it would not get rebates if Purdue's opioids were restricted, and their 2002 contract stated that requirement explicitly.  Likewise in 2009, Purdue would pay rebates only if its opioids were "unrestricted on the preferred brand tier."  Again in 2014, Purdue would pay rebates on only OxyContin if it was on "lowest preferred brand tier, without restrictions, including no prior authorization or step therapy."  Even as late as 2016, Express Scripts acknowledged that if it tried to put any restrictions on OxyContin (like restricting opioid use to acute pain, blocking opioids unless the use was for cancer or other approved uses, or requiring prior authorization) it would violate its Purdue rebate agreements and result in lost rebates.

261.    Even ESI employees recognized that ESI's endless pursuit of profit while disregarding public safety would have detrimental effects.  In a March 2017 internal ESI email, employees expressed regret that ESI did not target OxyContin with prior authorizations, stating "I would feel better if [this decision was] escalated . . . to ensure the rebate gain outweighs the

likely erosion of our reputation." Another employee responded by stating, "This is really sad, really disheartening" and made "[n]o clinical sense to say the least."

262.    Lucrative rebates drove not only placement and prior authorization requirements for national formularies but also quantity limits. PBMs determine criteria like the number of pills per prescription. But instead of imposing safe limits on opioid prescriptions, Medco became a "behind the scenes" partner working alongside Purdue to persuade payers and plans to accept its standard offerings without tighter limits.

263.    Medco initially implemented an 80 mg/day quantity limit at the release of OxyContin in 1996. Within five months of the drug's release and following further discussions with Purdue, Medco doubled the quantity limit to 160 mg/day by May of 1996. By 2001, Medco had again doubled the quantity limit and the "most restrictive [quantity limit] that Medco would recommend [was] for 320 mg/day as per [Purdue's] platform." Medco's 320 mg/day allowance is equivalent to 480 MME/day—over four times the limit that Medco originally placed on OxyContin upon its release, as well as over five times the limit that Express Scripts now imposes on the drug as part of its Advance Opioid Program.

264.    An August 2002 internal Purdue email chain notes that Purdue reached out to ESI with suggested talking points in an effort to convince one ESI client to loosen OxyContin quantity limits by reminding the client that it would lose rebates. The ESI representative later told Purdue that the client was "chang[ing] their initial thought regarding the quantity limits."

265.    Similarly, a 2003 Purdue email noted that a payer agreed to adopt a 124 pill-per-prescription limit, rather than 68, after ESI "demonstrate[d] the potential loss of rebates and plan impact." Purdue's email also noted that without ESI's "detailed analysis," the insurer had been prepared to move forward with a different choice. The same email also notes a different

"success" in which "Medco also got the PA [prior authorization] lifted" at a different health plan covering "192,000 lives" in Pennsylvania.

266.    Despite recognizing that quantity matters when it comes to the abuse and diversion of opioids, ESI continued to push to loosen quantity limits of opioids in exchange for rebates.  ESI has acknowledged the problem of excess supply, stating that six in ten patients had or expected to have leftover opioids.  Express Scrips acknowledged that, "[w]ith a 10-day supply of opioids, 1 in 5 become long-term users."  It further cited CDC information showing that 25% of long-term opioid users struggle with addiction, while one in thirty-two people with dosages above 200 MME per day die.

267.    ESI also acknowledged in 2017 that "rebate contract restrictions had previously prevented clients from obtaining any rebates if certain UM [utilization management] strategies were in place" and that these UM strategies, like prior authorization, have a "significant impact on the opioid market."

268.    ESI had long been aware of the effectiveness of UM tools, having done their own studies on UM measures.  For example, in 2003 ESI studied the effect of UM tools on opioid use in Medicaid patients in Georgia.  One ESI employee noted in 2003 that the deployment of a prior authorization process that included quantity limits significantly curtailed OxyContin use.  ESI found that "OxyContin went from ranked number seven to number 14 in drugs spent [sic] after the PA implementation."  Most significantly, ESI found that "patients who did not receive OxyContin did not have a greater use of medical services[,] so there was not an unintended medical consequence from this program."  In other words, the study showed that the UM measures worked, and there was no medical reason to prevent the implementation of appropriate steps to curtail the excessive use of opioids.  A 2006 Express Scripts study similarly found that prior authorization and quantity limits effectively reduced Oxycontin use without negative

effects.  Nonetheless, Express Scripts admitted in 2013, "we don't really have a standard OxyContin PA program."

269.    Despite ESI's knowledge of the nationwide opioid crisis, and despite ESI's knowledge of the impact that formulary offerings with preferred formulary placement and a lack of UM restrictions had on increasing opioid sales, ESI chose not to create or to offer a standard prior authorization or other UM protocol until 2017.  While ESI claimed to have put in place a step therapy policy on long-acting opioids (LAO) in order to combat opioid abuse in 2010, the policy was, in actuality, a cost containment measure.  ESI Clinical Director Amy Gross stated, "The [long acting opioid step therapy policy] has nothing to do with pain treatment guidelines. It is just generic before brand."  Of course, requiring a patient to start with a generic version of a long-acting opioid before a brand version did not combat opioid abuse, as generic opioids are just as addictive as the brand versions.

270.    Optum has also recognized that the volume of opioids dispensed is directly related to the levels of abuse and diversion in the community.  According to a "white paper" from the company, "[a]s opioids flooded the market, unused drugs became vulnerable to sale, theft or misuse."  As UnitedHealth Group put it, "[t]he unprecedented volume of prescription painkillers in the market and the leftover supply sitting in homes have triggered inappropriate use—a major contributor to overdose and a potential gateway to heroin."

271.    While OpumRx, through its predecessor entity Prescription Solutions, initially refused to put OxyContin on its national commercial formularies, it changed course by 2009. OptumRx entered into rebate arrangements with Purdue and other manufacturers and, because of its financial interests, made standard formulary offerings that provided favorable formulary status and chose not to impose reasonable restrictions on opioids that were subsequently prescribed, dispensed, and used in Utah.

272.     As of October 2011, Purdue described OptumRx as "the largest single 3rd party payer for OxyContin in any channel."  According to Purdue, OptumRx prescriptions had grown 22% in the prior year, and the PBM represented about $271 million in rebate eligible sales over the previous four quarters.

273.     Despite OptumRx's knowledge of misuse and diversion of prescription opioids, it encouraged the use of highly addictive opioids through its formulary offerings.  For example, in one case, OptumRx suggested that a member using a Butrans patch consider switching to lower cost but more highly diverted alternatives, like OxyContin or extended-release morphine.[36]

274.     Furthermore, the formulary for UnitedHealthcare, whose PBM is OptumRx, "places morphine on its lowest-cost drug coverage tier with no prior permission required, while in many cases excluding Butrans.  And it places Lyrica, a non-opioid, brand-name drug that treats nerve pain, on its most expensive tier, requiring patients to try other drugs first."[37]

275.     OptumRx's rebate contract with Purdue continuously allowed Purdue to minimize UM restrictions on OxyContin and other products in exchange for rebates, stating, "[i]n order to be eligible for Rebates . . . [the drug] must be listed on . . . formulary with Preferred status . . . without restriction (i.e. step therapy, clinical edits, prior authorization or other restrictions)."  It specifically noted that "all NDCs of OxyContin . . . are listed without restriction."  The contract contained a *minimum* quantity for rebate eligibility—four tablets a day for the maximum strength and most expensive 80mg Oxycontin, and two tablets a day for other strengths.

276.     Like ESI, OptumRx's rebate contract with Purdue allowed prior authorization for OxyContin only if prior authorization was implemented on all OxyContin's competing drugs. This provision, prohibiting a particular opioid from being "disadvantaged" as compared to other

---

[36] Thomas & Ornstein, *supra*, note 25.

[37] *Id.*

opioids, was a common fixture in Optum's and ESI's rebate contracts with Purdue and other opioid manufacturers. ESI's standard rebate agreements defined "disadvantage" as any time when the opioid manufacturer's product is "subject to prior authorization, NDC blocks, counter-detailing, co-pay differentials, or a step edit that negatively . . . affects the reimbursement and/or Formulary status of the Product as compared to other products in its designated [competitive product category] . . . ." Similar provisions prohibiting particular opioids from being "disadvantaged" were included in contracts between Express Scripts and Endo, OptumRx (then known as Prescription Solutions) and Johnson & Johnson regarding Nucynta, OptumRx and Teva regarding Fentora, and between these PBMs and other manufacturers.

277.    Because the financial impact of putting appropriate UM measures across the entire class of opioids was so significant for the Defendants, the parity terms ensured that every effort would be made to avoid the implementation of UM restrictions, even on a piecemeal basis. This normalized the restricted use of UM measures across the entire class of opioids and guaranteed that the overall market for prescription opioids would not diminish because of utilization management. The rebate agreements conditioned payment on each opioid manufacturer not being disadvantaged for applying UM measures unless the entire market basket of all competing drugs was treated the same. The opioid manufacturers knew that UM presented a slippery slope—if UM were tightened, it would lead to the adoption of restrictions across the entire class of drugs.

278.    This was a significant issue for Express Scripts and Optum who made significant amounts of money on opioids. For example, Express Scripts noted in 2016 that if it were

> to implement either the 7 day or the 10 limit on short acting
> opioids which are most profitable for us we are looking to lose
> $10–$20 Million in margin assuming 100% of patients get their
> first fill and then 50% of patients get their 2nd, 3rd, 4th fill. Based
> on the NY data we looked at since their state mandate went in 25%
> of members shifted from short acting to long acting opioids where

we make the least money on . . . . If we don't take any action in the next 1–3 years all states will move on this and we will lose this margin anyway with a lost opportunity to charge for it now.

279.    As late as 2017, OptumRx delayed implementation of UM measures to continue receiving rebates from Purdue.  An OptumRx employee states in an April 2017 email chain regarding implementation of MED (Morphine Equivalent Dosing), "based solely on the Purdue contract, I would highly suggest delaying the MED implementation on all clients until 1/1/2018 . . . so we have time to ensure we can protect rebates.  Purdue has a clause built into their agreement that mandates that ALL strengths be unrestricted . . . we cannot sacrifice rebates on only the 80mg strength . . . we would sacrifice rebates on *all* Oxycontin scripts." Under the direction of then OptumRx Chief Pharmacy Officer David Calabrese, implementation of the MED limit was delayed.

280.    Even when products like Opana ER were being withdrawn from the market because of safety concerns, Optum resisted putting a PA in place that would have prevented new patients from starting on the drug because it would "put [Optum's] rebates at risk."

281.    Defendants could have addressed the opioid crisis that they helped create but refused to do so because they wanted to protect their rebates and fees revenue stream.  Even after the federal government started requiring certain controls to be put in place in federal health plans, the PBM Defendants deliberately chose not to offer similar controls in their formulary offerings to the commercial clients, with the full knowledge that not doing so would lead to continued opioid oversupply, diversion, and death.

282.    Defendants and other PBMs also provided cash discount cards that allowed patients to access opioids that were not covered by insurance.  Filling a prescription using a cash discount card could avoid health-plan limits.

283.     Optum refused to place restrictions on the use of cash discount cards for opioid purchases.  At one point, an Optum executive proposed a change to stricter regulation and restriction on the purchase of opioids using cash discount cards.  The idea was scrapped as it would cost Optum millions of dollars in profits to enact the restrictions.

**F.  ESI and Optum chose not to use "drug utilization review" tools to address overuse.**

284.     In addition to choosing not to make national formulary and UM offerings that would have controlled the flow of opioids, ESI and Optum elected not to use their DUR programs to restrict access to opioids.  Rebates from opioid manufacturers directly impacted how ESI and Optum managed their obligations to monitor opioid dispensing on a real-time basis through concurrent drug utilization review ("Concurrent DUR" or "cDUR").

285.     Concurrent DUR includes screening at the point of sale for potential drug therapy problems due to therapeutic duplication, age- and gender-related contraindications, over- and under-utilization, drug-drug interactions, incorrect drug dosage or duration of drug therapy, drug-allergy contraindications, and clinical abuse/misuse.

286.     ESI and Optum refused to use cDUR to control opioid misuse because doing so would have impacted their receipt of rebates, the income generated from opioid dispensing, and other fees.  ESI and Optum chose not to deploy cDUR initiatives to ensure that only appropriate opioid prescriptions were being dispensed in pharmacies across the country, including in their own mail-order pharmacies.  This refusal permitted the dramatic increase in medically inappropriate prescribing and dispensing of prescription opioids that fueled the opioid epidemic.

287.     Express Scripts ignored federal guidance.  In 2013, when the FDA removed the indication for use of long-acting narcotics to treat moderate pain, Express Scripts did not change its cDUR program or other UM measures, stating that its OxyContin UM strategy was "more

focused on driving preferred products and managing quantities." One ESI employee at the time described the FDA change as "kind of a non-event."

288.    In 2016, when ESI tried to implement cDUR limits on Purdue's drugs, Purdue pushed back by reminding ESI that the cDUR limits, which would have restricted opioid use to acute pain, blocked opioids unless the use was for cancer or other approved uses, or required prior authorization for all opioids, would be in violation of its rebate agreement.

289.    Optum was also unwilling to implement meaningful cDUR restrictions because doing so would affect its ability to receive rebates. In 2017, when OptumRx tried to implement changes to use cDUR to control inappropriate opioid usage, there was internal pushback because it would mean lost rebates under existing contracts. In response to these concerns, on March 24, 2017, SVP Calabrese stated, "[i]f our opioid mfg industry partners can't appreciate the magnitude of the problem we are facing [and] the immediacy of the need for intervention[,] . . . I would question whether they are the right partner for us longer term."

290.    Later that day, OptumRx SVP of Industry Relations, Robert Lahman, responded that "I agree with you but you also have to be mindful of our contracts." Lahman warned Calabrese to "[s]top with the attitude and help us make sure we are compliant with our contracts."

291.    Calabrese, seemingly frustrated that OptumRx would delay the changes to its use of cDUR limits to address the "gross overprescribing and overpromotion of these medications . . . , and the countless deaths," later that day sent a response to Lahman stating, "Maybe you should be the one to take a step back and look at the bigger picture here. I need you on board with doing your job and convincing the [manufacturers] that we drive the ship here in terms of how their drugs get used, not them!"

**G. Defendants' publicity of belated efforts admits they could have acted sooner.**

292.    The belated steps that Defendants took demonstrate their ability to reduce the supply and demand of opioids through formulary offerings that included appropriate formulary management steps that could, and should, have been taken far earlier.  Even when the Defendants made these steps available, they were not put in place across the board and were offered to clients as an option for an extra charge.

293.    It was not until far too late, in 2017 at the 21st Annual Express Scripts Outcomes Symposium, that ESI announced a "solution" to lower the risks of opioids at each touchpoint of the care continuum "from safe disposal, to tools for physicians at the point of care and safety checks for dispensing pharmacies."[38]  By then, it was much too late for the many Utahns who were suffering and harmed by opioid addiction.

294.    ESI communicated in their 2017 Drug Trend Report that they made several efforts around the opioid epidemic including:

> [E]xtraordinary progress in reducing the amount of unnecessary and dangerous dispensing of opioids to our members through the launch of Advanced Opioid Management[SM] . . . .
>
> . . . .
>
> Average days' supply declined nearly 60% in just 90 days for patients in [the] program receiving a first-time opioid prescription[.]
>
> . . . .
>
> Among plans participating in our Advanced Opioid Management[SM] solution, launched in September 2017, we observed a 60% reduction in the average days' supply per initial fill, from 18.6 days to just 7.5 days.

---

[38] PPLPC016000310000; Express Scripts, Press Release, *Express Scripts Introduces Comprehensive Solution to Reduce Opioid Abuse* (June 7, 2017), https://www.prnewswire.com/news-releases/express-scripts-introduces-comprehensive-solution-to-reduce-opioid-abuse-300470233.html.

> Among commercial plans, the days' supply of opioids dispensed per person per year decreased 10.3%, while utilization of drugs to treat opioid dependence rose 8.5%.[39]

295.    It was not until 2018, soon after ESI released its Advanced Opioid Management (AOM) program, that ESI put covered patients in closer compliance with the CDC Guidelines.[40] Express Scripts' AOM program includes:

a.    First-time prescription-opioid users are limited to a seven-day supply of short-acting prescription opioids.

b.    Prior authorization is required for the first fill of a long-acting prescription opioid.

c.    Pharmacy intervention is triggered when patient dosage across all prescription opioids reaches a certain level based on MME per day.

d.    Through Express Scripts' proprietary clinical-rules engine, the PBM identifies and sends daily alerts to opioid prescribing physicians through their EHR/EMR to make them aware of duplicative therapy, misuse and abuse, medication interactions, use of multiple prescribers or pharmacies, or when their patient is approaching the MME thresholds.

296.    The Advanced Opioid Management programs use ESI's ongoing review of claims data that ESI always had the ability to employ.

297.    There is no legitimate reason this program, or similar programs, could not have been implemented long before 2018, especially because ESI knew early on about the dangerous amounts of opioid abuse and diversion.

298.    A 2017 ESI slide deck demonstrates the significance of ESI's delay. The presentation, *Comprehensive Opioid Solution: What Is Express Scripts Doing to Combat this*

---

[39] PPLPC014000367459; Express Scripts, *2017 Drug Trend Report*, at 3, 6 (2018), https://emacromall.com/reference/Express%20Scripts%202017%20DTR.pdf.

[40] Express Scripts' Advanced Opioid Management Solution (2018), https://www.managedhealthcareexecutive.com/view/four-pbm-programs-poised-rein-opioid-epidemic.

*Epidemic?*, included a slide detailing how many of its covered lives would die if ESI did not change its conduct.  The slide explained that 11,760 ESI beneficiaries would potentially die:



299.    ESI's ability to calculate the precise number of lives potentially lost going forward if it continued along its prior course highlights ESI's clear understanding of the crisis that it intentionally caused and chose not to correct.

300.    This demonstrates the significance of ESI's failure to take action to combat the epidemic in the past and the likely extent of lives lost caused by its actions.

301.    While ESI publicly asserts that efforts to curb opioid abuse and misuse remain its highest priorities, its 2018 standard formulary offering still afforded OxyContin, one of the most frequently diverted opioids, preferred alternative status over other long-acting opioids.[41]  ESI's decision likely was motivated by money and its craving for rebates.

302.    In 2019, ESI internal emails contained discussions of the opioid litigation as a tactic to sell their AOM program.  ESI's 2019 proposed AOM program sales document described a Johns Hopkins study regarding utilization management, in which ESI asked questions like "What devastation will it do to your plan when you're hit with a lawsuit claiming your plan contributed to the flow of opioids into the community causing overdoses, deaths and other severe consequences?" and "What if there was a way to truly stop the opioid crisis in its tracks and get in front of any potential litigation before you are at risk? . . .  Only Express Scripts' multi-faceted advanced opioid management program can solve this issue."

303.    In 2017, UnitedHealth Group and its subsidiaries similarly began implementing programs and measures that they could have, but refused to, introduce earlier to prevent the opioid crisis.  UnitedHealth Group boasts on its website that it is "addressing the opioid epidemic" and "taking a uniquely comprehensive approach to this complex crisis,"[42]   but for years it did nothing to address the opioid crisis, standing on the sidelines while the epidemic grew.

304.    OptumRx acknowledged in September 2017 that it is "[c]ritically imperative" for PBMs to address the opioid epidemic, as "[**n**]***o component of our health care system is in a*** ***better position to deliver more immediate and more impactful changes to the current course of***

---

[41] Express Scripts, *2018 National Preferred Formulary* (2017), https://www.express-scripts.com/art/pdf/npf2018.pdf.

[42] *Addressing the Opioid Epidemic*, UnitedHealth Group, https://www.unitedhealthgroup.com/newsroom/posts/opioid-epidemic.html.

*this crisis* than our nation's pharmacy benefit managers given their access to key stakeholders across the system."

305.    Its public statement recognized PBM's ability to "to deploy systems-based claims edits" and that "PBMs are uniquely positioned to connect and partner with physicians, pharmacists, patients, pharmaceutical manufacturers, health systems and other components of the industry, and therefore are better able to drive improvements in education surrounding the dangers of opioid therapy, as well as the various tools available for constituents to positively change the course of this epidemic."

306.    OptumRx launched an "Opioid Risk Management Program" (ORM) in 2017.  The program is advertised as having several components, including "applying evidence-based utilization management protocols after first fill to reduce excessive dosing, limit unnecessary extension of therapy duration, mitigate abuse and diversion, and decrease exposure to harmful drug combinations through real-time medication checks at the point of sale."[43]

307.    The program was tested for a year before the official launch, and, according to a draft press release, resulted in a "54% success rate in changing inappropriate opioid consumption behavior, translating to significant reductions in risk of adverse opioid events, hospitalizations, and opioid-related deaths."  The final press release quotes OptumRx's Chief Medical Officer Dr. Sumit Dutta: "OptumRx's program is showing early but meaningful potential to begin curbing the opioid epidemic in America."[44]

---

[43] OptumRx, Press Release, *OptumRx Opioid Risk Management Program Leads to Better Outcomes for Patients and Clients* (Aug. 22, 2017),
https://www.businesswire.com/news/home/20170822005151/en/OptumRx-Opioid-Risk-Management-Program-Leads-to-Better-Outcomes-for-Patients-and-Clients.

[44] *Id.*

308.    OptumRx's ORM program included various strategies, including prevention and education, minimizing early exposure, reducing inappropriate supply, treating at-risk and high-risk patients, and supporting chronic populations and those in recovery.

309.    Defendants had the capability to implement these programs long before 2017, but they traded the wellbeing of Utahns and their communities for rebates, fees, and profitable agreements with Purdue and other opioid manufacturers.  For years, Defendants gave opioids preferred status on their formulary offerings without implementing restrictions for their use, inevitably resulting in increased opioid utilization, increased opioid addiction, increased overdoses, and increased deaths.

310.    They chose to continue partnerships with Purdue and other manufacturers to develop research and provide analyses to assist in manufacturers' deceptive opioid marketing that they also disseminated.  By late 2017, when Defendants decided to change course, take action, and develop opioid programs, more than half a million people, including Utahns, had already died.

### H. Defendants disregarded their obligations under federal controlled substances act and Utah laws in selling opioids from their own pharmacies.

311.    Defendants are part of the closed system and are required to comply with the provisions of the Utah Controlled Substances Act, the Utah Pharmacy Practices Act, and the federal Controlled Substances Act and related regulations.  ESI operates one of the largest mail-order pharmacies, dispensing opioids to patients in Utah and throughout the nation. OptumRx also operates a mail-order pharmacy that dispenses opioids to patients throughout Utah.

312.    Defendants' statutory obligations included the responsibility to prevent the diversion of opioids.  21 C.F.R. § 1301.71(a); Utah Code §§ 58-17b-101 through -1007.  This includes an obligation to use the information available to them, like the vast amounts of prescription and prescriber data they maintained or could access, to prevent the diversion of

opioids.  Based on ESI and OptumRx conduct and evidence reviewed, it appears ESI and OptumRx failed to use their data to detect or guard against diversion, and otherwise failed to meet their CSA obligations.

313.    As dispensers of opioids, ESI and OptumRx were also required to ensure that adequate safeguards were in place to dispense opioids in a safe and effective manner, provide effective controls and procedures to deter and detect theft and diversion, and comply with federal and State controlled substances laws, like the requirement to maintain effective controls against diversion.  *E.g.*, Utah Code §§ 58-17b-601(1)(b), -618, Utah Admin. Code rr. R156-17b-502(6), (20), R156-37-502(4).  ESI and OptumRx failed to meet these obligations.

314.    Under the federal Controlled Substances Act and Utah law, a prescription is legally valid only if it is issued for "a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice."  21 CFR § 1306.04(a); Utah Code § 58-17b-601(1)(b); *see also id.* § 58-37-6(3)(a)(iii) ("maintain effective controls against diversion of controlled substances . . . into other than legitimate medical, scientific, or industrial channels.").  As a result, the "responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacies who fills the prescription."  21 CFR § 1306.04(a).

315.    ESI and OptumRx failed to meet their statutory obligations as pharmacists in its mail-order pharmacy operations.  A pharmacist may not fill a controlled substance prescription unless it has been issued for a legitimate medical purpose.  Consequently, a pharmacist is required to refuse to fill a prescription if he or she knows or has reason to know that the prescription was not written for a legitimate medical purpose.  *E.g.*, 21 C.F.R. §§ 1306.04, 1306.06.  The pharmacist has a legal duty to recognize "red flags" or warning signs that raise (or should raise) a reasonable suspicion that a prescription for a controlled substance is not

legitimate.  The existence of this indicium obligates the pharmacist to conduct a sufficient investigation to determine that the prescription is actually legitimate before dispensing.

316.    Instead, during the period for which ARCOS data is available (2006–2014), ESI shipped over 1.4 billion dosage units of opioids to individuals across the nation, and OptumRx's mail-order pharmacy was responsible for shipping more than 185 million dosage units.

317.    Further, as described above, Defendants shipped opioids to patients of high-volume prescribers being targeted with Purdue's deceptive and unconscionable marketing campaign.

318.    The volume of opioids dispensed by ESI and Optum Rx is not surprising, given how their mail-order pharmacies operated to push as many prescriptions as possible into the hands of consumers, with little or no attempts to identify or resolve red flags.

319.    For example, employees at ESI's mail-order pharmacy routinely complained of being under significant pressure to fill as many prescriptions as possible in as short amount of time as possible.  ESI instituted a point system that governed the prescription-filling process in its mail order facilities.  Under this system, employees were awarded points for each prescription processed, and were given daily, weekly, or monthly point targets to reach.  Employees were allowed to leave early if a daily point threshold was reached and were penalized if specific point targets were not reached.  A pattern of point shortfalls would result in employees being placed on a "termination plan" or other reprimands.

320.    This point system incentivized ESI pharmacists and technicians to fill as many opioid prescriptions as possible, as quickly as possible, despite the legal requirements to properly and adequately identify and address red flags.

321.    OptumRx's mail-order pharmacies had many of the same problems.  For example, pharmacists and technicians had to meet metric requirements that were so high that they could be

met only by constantly working overtime, making mistakes more likely and hindering pharmacists' ability to properly vet each prescription, as required by law.

322.    Defendants' mail-order pharmacies provided a vehicle for diversion to continue despite efforts to contain it.  Purdue's sales representatives noted, for example, that "mail order pharmacies [we]re filling in" what would otherwise have been "gaps in access to OxyContin and other meds" because of "monitoring or quota issues."

323.    In 2012, Express Scripts, Inc., and Express Scripts Pharmacy Services, Inc. agreed to pay the federal government $2.75 million to settle a case against the companies. A DEA inspection revealed that from 2002 through 2006, prescription-controlled substances were diverted into illicit channels at several ESI mail-order facilities located in Pennsylvania. The diversion included thefts by employees, inventory discrepancies, and failures to report to DEA losses that occurred during the mail-order delivery process.  Perhaps most disturbing, the DEA also found that ESI employees generated invalid DEA registration numbers where it lacked registration numbers from pharmacists, which should have been not only a red flag but also an absolute barrier to dispensing drugs.

324.    Medco agreed to a $155 million settlement to resolve claims with the federal government related to its mail-order pharmacy dispensing.  The government alleged that Medco mail-order pharmacies failed to conduct adequate cDUR in order to identify potential adverse interactions.  In order to meet Medco's steep quota requirements, its cDUR employees fabricated physician call records, completed physician calls without ever having pharmacists verify the information with the physician's office, changed prescriptions without a pharmacist's intervention, and/or falsified records to indicate cDUR calls were made to physicians when no call had, in fact, occurred.

325.    David Calabrese recognized that OptumRx's mail-order pharmacies' dispensing of opioids was a problem needing "Exec level attention."  In a 2017 email he stated, "We [are] dispensing 220k opioid Rx's out of our mail facilities annually at an average number of units per Rx of 187 . . . .  We are talking out of both sides of our mouths if we allow this to continue as it is.  We are only contributing to the worsening of the problem."

326.    OptumRx admitted in a presentation from 2018 that it was a "[c]hallenge for individual rphs [registered pharmacists] to identify controlled substance diversion in [a] mail order setting," and that, before implementing a drug of concern review in 2018, OptumRx's pharmacists had "no visibility of possible diversion indicators such as: Multiple patients with same shipping address [and] Multiple patients with same email address."  They also acknowledged, "[d]ue to lack of visibility diversion activity may occur repeatedly for an extended period of time."

327.    In June of 2024, OptumRx agreed to pay the federal government $20 million to resolve allegations that it improperly filled opioid prescriptions in combination with other drugs in violation of the Controlled Substances Act.  The DEA alleged that, between 2013 and 2015, OptumRx's mail order pharmacy improperly filled opioid prescriptions in combination with benzodiazepines and muscle relaxers, a dangerous combination known as the "trinity."[45]  The trinity combination is a known red flag which pharmacies have a responsibility to resolve before filling the prescriptions.  According to the DEA, OptumRx filled the trinity prescriptions without always resolving the red flags.  In announcing the settlement with OptumRx, the DEA Assistant administrator stated,

---

[45] Drug Enforcement Admin., Press Release, *OptumRx Agrees to Pay $20M to Resolve Allegations that It Filled Opioid Prescriptions in Violation of the Controlled Substances Act* (June 27, 2024), https://www.dea.gov/press-releases/2024/06/27/optumrx-agrees-pay-20m-resolve-allegations-it-filled-opioid-prescriptions.

> DEA registrants have an obligation to protect the public, not help
> fuel the opioid epidemic . . . .  The trinity style prescription
> combination helped fuel the start of the opioid addiction crisis and
> raises a red flag, which this registrant should have recognized and
> reacted to rather than putting profits before patients' safety.[46]

328.    OptumRx is a single entity performing both PBM and mail-order pharmacy
services.  It must maintain effective controls against diversion.  And OptumRx's business
practices as a PBM intentionally, knowingly, unreasonably, and/or negligently ignored the risks
of diversion and even increased that risk.  OptumRx's failure to maintain effective controls
against diversion in all of its activities that affect opioid dispensing, whether as a mail-order
pharmacy, as a PBM, or otherwise, is a violation of Utah and federal law.

329.    Defendants failed to comply with their obligations under Utah and federal
controlled substance laws and failed to use reasonable care in the operation of their mail-order
pharmacies, permitting an untold number of opioid prescriptions to be filled and the opioids
mailed, even though the pills were likely to be diverted.

**I.  Defendants concealed their unlawful conduct.**

330.    Defendants' conduct described throughout the Complaint—colluding with
manufacturers deceptively marketing opioids, using evidence of misuse, addiction, and diversion
visible in their data to support manufacturers' opioid marketing rather than warn the public of the
harm that was occurring, placing opioids on national formularies with preferred status and
without restrictions for money, failing to maintain effective controls against diversion in their
mail-order pharmacy operations, and failing to report suspicious prescribers—was concealed
from the Plaintiffs and the public at large.

331.    Defendants intentionally concealed their conduct by falsely representing that they
promoted safe and effective use of and appropriate dispensing of opioids; by falsely claiming to

---

[46] *Id.*

be a victim of Purdue's misconduct when they were a willing and knowing participant; and by hiding from the public information that would have revealed the truth about their relationships with manufacturers and their profiting from the increased utilization of opioids.

332.    Defendants had in their possession and control information that opioids were addictive, data showing large amounts opioid diversion, and information that specific doctors and pharmacies were acting illegally.

333.    Defendants fraudulently hid the details of their relationships with opioid manufacturers.

334.    Plaintiffs did not and could not have known that the Defendants developed their national formularies based on profit and rebates, not based on the safety and efficacy of the medications as they claim.

335.    Plaintiffs did not know and could not have known that the Defendants were partnering with the opioid manufacturers in their deceptive and unconscionable marketing of opioids.

336.    Plaintiffs did not know and could not have known about the volume of opioids that Defendants shipped into Utah through their mail-order pharmacy business.

337.    Plaintiffs did not and could not have discovered through a diligent investigation information demonstrating that the Defendants were engaged in the misconduct described herein.

338.    Defendants did not disclose to the Plaintiffs the details of their financial incentives from Purdue or other manufactures or what they knew regarding problematic prescribers, diversion, and adverse consequences.  Defendants used their knowledge and scale for their own benefit, rather than their customers, causing injury to Utah.

J.  **Defendants substantially contributed a public health crisis in Utah by dramatically increasing the availability of opioids.**

339.    By conspiring and colluding with the opioid manufacturers, by facilitating the overuse of opioids, by ignoring evidence of the overuse, abuse, illegal use, and addictive qualities of opioids, and by failing to prevent diversion in their mail-order dispensing and pharmacy networks, Defendants substantially contributed to the oversupply of opioids in Utah.

340.    Defendants, who have portrayed themselves as champions of public health, were more motivated by financial incentives to sell more opioids, and prioritized profits over the welfare and health of their clients, the patient consumers, and the communities.

341.    According to the CDC, drug overdose deaths increased by nearly 30% from 2019 to 2020 and has quintupled since 1999.  Nearly 75% of the 91,799 drug-overdose deaths in 2020 involved an opioid.  From 1999 to 2020, more than 263,000 people died in the United States from overdoses involving prescription opioids.

342.    While drug-overdose deaths declined in the United States as a whole between 2023 and 2024, in Utah the number of deaths continues to rise.  The number of overdose deaths in Utah increased by 16.7% between April 1, 2023 and March 31, 2024.[47]

343.    Defendants' conduct substantially contributed to a range of foreseeable social problems. The overprescribing and oversupply of opioids resulting from Defendants' conduct increased (1) non-medical prescription-opioid use and (2) opioid initiation among household members, friends, and family who obtain opioids from medicine cabinets, nightstands, or other sources.  Widespread access to prescription opioids has foreseeably led to increased opioid addiction, overdose, and other adverse social outcomes like child neglect, family dysfunction,

---

[47] Hanna Seariac, *Fatal drug overdoses down in the U.S.—but not in Utah and the West*, Deseret News, (Sept. 19, 2024), https://www.deseret.com/utah/2024/09/19/fatal-overdoses-in-utah.

babies born addicted to opioids, criminal behavior, poverty, property damage, unemployment, and social despair.

344.    As a result, more and more of Utah's resources are devoted to addiction-related problems.  Meanwhile, the prescription opioid crisis diminishes Utah's available workforce, decreases productivity, increases poverty, and consequently requires greater State and local expenditures.

345.    From 2000 to 2015, Utah experienced a nearly 400% increase in deaths related to prescription drugs.  Utah was one of the ten states with the most overdose deaths over the course of a decade.  Between 2013 and 2015, Utah ranked seventh for drug-poisoning deaths, which have outpaced deaths from firearms, falls, and motor vehicle crashes.  Carbon and Emery counties have had rates of fatal overdoses 2.5 times the national average.

346.    In 2016, Utah was one of twenty-two states with an overdose rate higher than the national average.  In 2022, 74% of drug overdose deaths in Utah involved an opioid.[48]

347.    According to a 2020 study, between 2005 and 2014, opioids were the leading cause of death in new mothers and pregnant women in Utah.  Most of these deaths occurred after the babies were born.

348.    Opioid addiction and misuse foreseeably result in an increase in emergency room visits, emergency responses, and emergency medical technicians' administration of naloxone—an antidote to opioid overdose.

349.    Opioid-related in-patient hospitalizations foreseeably increased alongside the opioids distributed and sold in Utah.  Emergency room visits foreseeably increased.

---

[48] Utah Dep't of Health & Human Servs., *Utah Health status update—Fatal fentanyl facts—opioid health status report for Utah* (Aug. 2023), https://healthassessment.utah.gov/wp-content/uploads/2023/08/HSU_August2023.pdf.

350.     The oversupply of opioids and the foreseeable increase in opioid addiction injured Utahn and our communities in other respects, including through increases in the number of chronic Hepatitis C and diseases related to injection drug use.  Overall, the rate of injection-related infections is increasing, and Utah's rate is more than three times higher than the national average.

351.     Further, in 2013, more people in Utah were killed by impaired driving due to prescription pills than from collisions involving drunk drivers.

352.     Oversupply of opioids was foreseeably detrimental to Utah's children.  There has been a dramatic rise in the number of infants born dependent on opioids suffering from neonatal abstinence syndrome ("NAS"), also known as neonatal opioid withdrawal syndrome ("NOWS").  These infants suffer withdrawal immediately after birth.  They cry nonstop from the pain and stress.  They experience convulsions and tremors, have difficulty sleeping and feeding, and suffer from diarrhea, vomiting, and low weight gain.  The long-term developmental effects remain unknown, though research indicates continued, serious neurologic and cognitive effects, including hyperactivity, attention-deficit disorder, lack of impulse control, and a higher risk of future addiction.  When untreated, NAS can be life-threatening.  In Utah, the incidence of NAS more than doubled from 2008 to 2014 alone, increasing from 2.2 to 5.4 cases per 1,000 hospital births.

353.     Children are injured by the dislocation caused by opioid diversion, misuse, and addiction.  In 2016, 2,363 Utah children were placed in foster care in the State, and parental substance use was a factor in 56% of these placements.

354.     Nationally, opioids now outpace other sources of addiction in demand for substance use treatment.  Utah struggles to meet that need.  According to the American Academy of Pediatrics, nearly 85% of people suffering from drug dependence in Utah go untreated.

355.     As described above, because heroin is cheaper than prescription painkillers, many prescription opioid users migrate to heroin, which now sometimes comes laced with fentanyl.  In Utah, 147 people died of heroin in 2017, a dramatic increase from the 55 in 2010.

356.     The proliferation of opioid addiction has placed the public in danger.  For example, in Roosevelt, an eight-year old was stuck by a needle he found on his school's playground.  In Orem, a six-year-old girl picked up a used syringe on a school playground and was pricked by the needle.  In Salt Lake City, a man was pricked by a discarded needle in a city park.  Park groundskeepers have quit their jobs because of the dangers presented in the parks from drug use and discarded needles.  In Jefferson Park in Salt Lake City, community members have complained that they "frequently see drug deals, and drug overdoses" and that they "find needles next to human feces."  One neighbor stated that he "called dispatch almost 30 times in July . . . for visible drug use, dealing, and overdoses."

357.     Increased overdoses have led to more ambulance activity on public streets.  Jails and prisons are also affected.  Between 2013 and 2017, drug and/or alcohol intoxication was the third leading cause of deaths while detained in Utah jails.  Addiction is often associated with living unhoused and the use and sale of drugs in public spaces, including public parks and playgrounds.  These common areas are often littered with used syringes, which pose a threat to children, sanitation workers, and other users of these public areas.

358.     Rising opioid use and abuse have negative social and economic consequences far beyond overdoses.  According to a Princeton University economist, approximately one out of every three working-age men who are not in the labor force take daily prescription pain medication.  The same research finds that opioid prescribing alone accounted for 20% of the overall decline in the labor force participation for this group from 2014–2016 and 25% of the smaller decline in labor force participation among women.

359.     The abuse of opioids has caused additional medical conditions that have injured Utahns.  A growing number of people need medications aimed at treating secondary effects of opioids—including not only addiction and overdose but also side effects like constipation and sedation.  According to the Washington Post, working-aged women and men on opioids are much more likely to have four or more prescriptions (57% and 41%, respectively) than their counterparts who do not take opioids (14% and 9%, respectively).  These secondary-effect medications—essentially, drugs to treat the effects of opioids—generated at least $4.6 billion in spending nationally in 2015, on top of $9.57 billion in spending on opioids themselves.

360.     Absent the conduct of Defendants as described, the public health crisis caused by opioid misuse, abuse, and addiction in Utah would have been averted or much less severe.

## V.     SCOPE OF COMPLAINT

361.     The allegations in this Complaint do not include and specifically exclude Defendants' provision of PBM or mail-order pharmacy services under contracts with the Department of Defense, the Office of Personnel Management, the U.S. Department of Veteran Affairs, the Veterans Health Administration, or any other federal agency.

362.     The Complaint does not include and specifically excludes Defendants' provision of PBM or mail-order pharmacy services for Medicare plans to the extent preempted by federal law.

363.     The Complaint does not challenge the creation of custom formularies or administration or management of this type of formulary for or by a federal officer or federal agency, like the Federal Employees Health Benefits Act, Veterans Health Administration, or TRICARE governed health benefits plan, or any other federal health-benefit plan.

364.     The Complaint does not challenge the Defendants' conduct related to the provision of any services, including and not limited to formulary related services, rebate

negotiation services, or pharmacy network negotiation services, under contracts with the Department of Defense, U.S. Department of Veteran Affairs, the Veterans Health Administration, the Office of Personnel Management, or any other federal agency.

365.    The Complaint does not challenge Defendants' provision of mail-order pharmacy services under contracts with the Department of Defense, the Office of Personnel Management, the Department of Veteran Affairs, or any other federal agency, and does not challenge the Defendants' administration or operation of the TRICARE Home Delivery/Mail Order Pharmacy.

366.    Plaintiffs do not seek to recover money paid by the federal government under these types of plans, nor do Plaintiffs seek recovery of federally mandated co-pays that were paid by these types of plans' patients.

367.    The Plaintiffs do not seek declaratory relief, injunctive relief, abatement relief, damages, civil penalties, or any other relief for the conduct of any PBM Defendant related to the provision of any service under contracts with the Department of Defense, the Office of Personnel Management, the U.S. Department of Veteran Affairs, the Veterans Health Administration, or any other federal agency.

368.    Express Scripts has contended that they are agents of federal officers acting under color of federal office because they administer prescription drug claims on behalf of TRICARE and FEHBA.  Express Scripts has admitted, no federal officer or agency directed them to simultaneously conduct rebate negotiations applicable to FEHBA or TRICARE plans with negotiations for non-FEHBA or non-TRICARE plans.  In addition, no federal officer or agency directed Express Scripts to apply rebate negotiations for FEHBA plans or TRICARE plans to non-FEHBA or non-TRICARE plans.  No federal officer or agency directed them to apply terms applicable to FEHBA plans or TRICARE plans to non-FEHBA or non-TRICARE plans.  And Express Scripts processes rebates and pharmacy claims on a plan-by-plan basis.

369.    Express Scripts can identify and separate rebates and pharmacy claims attributable to FEHBA plans and TRICARE plans from rebates and pharmacy claims attributable to non-federal plans.

370.    Express Scripts' ability to do this is true nationally and for plans and operations in Utah.

371.    The Office of Personnel Management ("OPM"), which oversees FEHBA plans, does not contract directly with the Defendants.

372.    OPM's contracts with federal health care programs do not require federal health care programs to hire Defendants.

373.    OPM regulations do not require or in any way place limits on how Defendants negotiate with pharmaceutical manufacturers or pharmacies.

374.    OPM regulations impose modest limitations on Defendants and are unrelated to the claims made in this Complaint.  OPM regulations require Defendants to pass any rebates obtained from manufacturers back to federal health plans and require Defendants to report information and permit audits of their books.

375.    OPM does not set precise specifications concerning how the Defendants conduct negotiations with drug manufacturers, nor any specific requirements regarding the substance of any rebates negotiated.

376.    Likewise, the Veteran's Health Administration does not direct Defendants to apply the terms of the Veteran's Health Administration contract or regulations to non-federal health plans.  Nor does the Veteran's Health Administration direct Defendants to apply rebate or pharmacy negotiations for Veteran's Health Administration health plans to non-federal health plans or to engage in simultaneous rebate or pharmacy negotiations for Veteran's Health Administration plans and non-federal plans.

## VI.  CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Public Nuisance

377.    Plaintiffs repeats and incorporates all other allegations of the Complaint as if fully set forth here.

378.    "A nuisance is anything that is injurious to health, indecent, offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property."  Utah Code § 78B-6-1101.

379.    In addition:

> A public nuisance is a crime against the order and economy of the state and consists in unlawfully doing any act or omitting to perform any duty, which act or omission:
>
> (a) annoys, injures, or endangers the comfort, repose, health, or safety of three or more persons;
>
> (b) offends public decency;
>
> (c) unlawfully interferes with, obstructs, or tends to obstruct, or renders dangerous for passage, any lake, stream, canal, or basin, or any public park, square, street, or highway;
>
> (d) is a nuisance as described in Section 78B-6-1107; or
>
> (e) in any way renders three or more persons insecure in life or the use of property.

*Id.* § 76-10-803.

380.    The Attorney General is authorized to bring suit on behalf of the State and its citizens to abate a public nuisance.  *Id.* § 76-10-806.

381.    Defendants' conduct, as described in the Complaint, involves a significant interference with the public health, the public safety, the public peace, the public comfort, or the public convenience, and unreasonably interferes with a public right by creating a public health epidemic in Utah.

382.    Defendants have created and maintained a public nuisance through their ongoing unreasonable conduct of facilitating and encouraging the use of dangerously addictive opioids by:

      a.  colluding with manufacturers to place opioid drugs on their national commercial formulary offerings with preferred status;

      b.  declining to include UM offerings with meaningful limits;

      c.  assisting in promoting and failing to disclose the real risks and appropriate, safe limits;

      d.  failing to use the wealth of data available to them to identify and address signs of over-prescribing, illegitimate and dangerous use of opioids, misuse, abuse, and diversion; and

      e.  failing to comply with state and federal law in dispensing opioids through their mail order pharmacies.

383.    Their conduct caused prescriptions and sales of opioids to skyrocket, and Defendants failed to place limits on their approval for use, even as evidence of the epidemic mounted, including in Utah, flooding the State with opioids and facilitating and encouraging the flow and diversion of opioids into an illegal, secondary market, resulting in devastating consequences to Utah, its residents, and its communities.

384.    Defendants knew, or should have known, that their intentional, knowing, unreasonable, and/or unlawful conduct would and did cause opioids to be used and possessed illegally and that their conduct has produced an ongoing nuisance that has had, and will continue to have, a detrimental effect upon the public health, welfare, safety, peace, comfort, and convenience of Utah, its residents, and its communities.

385.    As the Restatement (Second) of Torts section 821B(2) explains, "[c]ircumstances that may sustain a holding that an interference with a public right is unreasonable include" conduct that "involves a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience," that "is proscribed by a statute,

ordinance or administrative regulation," or that "is of a continuing nature or has produced a permanent or long-lasting effect, and, as the actor knows or has reason to know, has a significant effect upon the public right."

386.    Defendants' conduct has created an ongoing, significant, unlawful, and unreasonable interference with rights common to the general public, including the public health, welfare, safety, peace, comfort, and convenience of the State, its residents, and its communities.

387.    The significant and unreasonable interference with rights common to the general public is described in detail throughout this Complaint and includes:

   a.    The creation and fostering of an illegal, secondary market for prescription opioids;

   b.    Easy access to prescription opioids by children and teenagers;

   c.    A staggering increase in opioid misuse, diversion, addiction, overdose, injuries, and deaths;

   d.    Infants being born addicted to opioids due to prenatal exposure, causing severe withdrawal symptoms and lasting developmental impacts;

   e.    Employers having lost the value of productive and healthy employees; and

   f.    Increased costs and expenses for the State relating to healthcare services, law enforcement, the criminal justice system, social services, and education systems.

388.    Defendants' activities have unreasonably interfered, are interfering, and will interfere with the common rights of the general public, including for example:

   a.    to be free from reasonable apprehension of danger to person and property to be free from the spread of disease within the community, including the disease of addiction and other diseases associated with widespread opioid supply, diversion, misuse, and addiction;

   b.    to be free from the negative health and safety effects of widespread illegal drug sales on premises in and around Utah;

   c.    to be free from blights on the community created by areas of illegal drug use and opioid sales; and

      d.  to live or work in a community in which community members are not subject to widespread use, addiction, diversion, and misuse of narcotics.

389.    Defendants' interference with these public rights has been, is, and will continue to be unreasonable and objectionable because it:

      a.  has harmed and will continue to harm the public health and public peace of Utah;

      b.  has harmed and will continue to harm Utah neighborhoods and communities by increasing crime, and thereby interfering with the rights of the community at large;

      c.  is proscribed by Utah statutes and regulations;

      d.  is of a continuing nature, and has produced long-lasting effects; and

      e.  is known to Defendants that its conduct has a significant effect upon the public rights of Utah citizens and the State.

390.    Defendants have created or assisted in the creation of a condition that is injurious to public health, public safety, public peace, public comfort and public convenience, and offends the moral standards of communities throughout the State and significantly harmed any considerable number of the State's residents.

391.    Defendants are liable for creating the public nuisance because the intentional and unreasonable and/or unlawful conduct of the Defendants was a substantial factor in producing the public nuisance and harm to the State.

392.    Defendants' intentional and unreasonable nuisance-creating conduct, for which the gravity of the harm outweighs the utility of the conduct, is described throughout this Complaint, and includes:

      a.  Facilitating the increased use of opioids through formulary offerings that gave opioids unwarranted preferred status in exchange for profiting from rebates and other payments from opioid manufacturers;

      b.  Failing to offer meaningful prior authorization requirements or limits on the availability of opioids in exchange for rebates and other payments from opioid manufacturers;

c.   Colluding with opioid manufacturers in deceptive marketing schemes that were designed to, and successfully did, change the perception of opioids and cause their prescribing and sales to skyrocket;

d.   Ignoring evidence of addiction, abuse, and illegitimate prescribing found in their own extensive data instead of using it to report suspicious prescribers or to enact policies to help address these issues;

e.   Failing to maintain adequate safeguards to dispense opioids in a safe and effective manner and to maintain effective controls against diversion of opioids through their mail order pharmacies; and

f.   Failing to report suspicious prescribers and pharmacies.

393.   Defendants' conduct is proscribed by statutes and regulations, including, without limitation, the CSPA, the Utah Controlled Substances Act, and the Utah Pharmacy Practice Act.

394.   Defendants violated the standard of conduct set forth in the Utah CSA by failing to identify, report, and reject suspicious opioid prescriptions and/or failing to maintain effective controls against diversion in their mail order pharmacy operations and by failing to report suspicious prescribers.

395.   Defendants violated the CSPA through their unconscionable and deceptive practices described in this Complaint, for example by colluding with manufacturers in deceptive marketing schemes and failing to offer meaningful prior authorization requirements or limits on the availability of opioids in exchange for rebates and other payments from opioid manufacturers.

396.   At all times relevant to this Complaint, Defendants knew that increasing the availability of opioids would increase the number of opioids that would be abused, misused, and diverted into the illegal, secondary market and would be obtained by persons with criminal purposes.  Defendants also knew that the marketing by manufacturers with which they colluded was deceptive and/or misleading and that Defendants' conduct served to increase opioid sales.

397.    At all times relevant to this Complaint, Defendants knew that opioids were dangerous because these drugs are defined under federal and state law as substances posing a high potential for abuse and addiction.

398.    Indeed, opioids are akin to medical grade heroin.  Defendants' wrongful and unreasonable conduct of pushing as many opioids onto the market as possible led directly to the public nuisance and harm to the State—exactly as would be expected when medical grade heroin in the form of prescription opioids flood the community and are diverted into an illegal, secondary market.

399.    It was objectively and subjectively foreseeable to Defendants that their conduct would unreasonably interfere with the public health, public safety, public peace, public comfort, and/or public convenience.

400.    Defendants' conduct is substantial, unreasonable, intentional, knowing, unlawful, reckless, or negligent.  It has caused and continues to cause significant harm to Utah and its residents, and the harm inflicted outweighs any offsetting benefit.

401.    All Defendants' actions were, at the very least, a substantial factor in opioids becoming widely available and widely used in Utah.  Because of Defendants' actions in using their unique position to increase the availability of opioids in the marketplace and inflate opioid sales, because of their collusion with manufacturers in the deceptive marketing of opioids, and because of Defendants' special position within and adjacent to the closed system of opioid distribution, without Defendants' actions, opioid use would not have become so widespread, and the enormous public health hazard of prescription opioid and heroin overuse, abuse, and addiction that now exists would have been averted.

402.    Defendants had control over their conduct in and affecting Utah as is described in this Complaint, and that conduct has had an adverse effect on the public.  Defendants had

sufficient control over, and responsibility for, the public nuisance they created. Defendants were in control of the "instrumentality" of the nuisance, namely the dissemination of prescription opioids, their collusion with manufacturers in promoting opioids, and their formulary and UM offerings that increased utilization of opioids as described herein.

403.    The State has suffered and continues to suffer special injuries distinguishable from those suffered by the general public. As discussed throughout, it has incurred and continues to incur substantial harms.

404.    The State has incurred and will incur expenditures for special programs to abate the nuisance that are over and above its ordinary public services.

405.    Defendants' misconduct alleged in this case does not concern a discrete event or discrete emergency of the sort a government would reasonably expect to occur and is not part of the normal and expected costs of a government's existence. The State alleges wrongful acts which are neither discrete nor of the type a government can reasonably expect.

406.    The public nuisance—i.e., the opioid epidemic—created, perpetuated, and maintained by Defendants can be abated and further recurrence of this harm and inconvenience can be abated.

407.    The nuisance has undermined, is undermining, and will continue to undermine Utah citizens' public health, quality of life, and safety. It has resulted in increased crime and property damage within Utah. It has resulted in high rates of addiction, overdoses, and dislocation within Utah families and entire communities.

408.    Public resources have been, are being, and will be consumed in efforts to address the opioid epidemic, thereby eliminating available resources which could be used to benefit the Utah public at large.

409.     The State is asserting its own right and interests, and its claims are not based upon or derivative of the rights of others.

410.     The State seeks legal and equitable relief as allowed by law for public nuisance, including inter alia injunctive relief, abatement, attorneys' fees and costs, pre- and post-judgment interest, and such other relief as this Court deems appropriate.

## SECOND CLAIM FOR RELIEF
### Utah Consumer Sales Practices Act

411.     Plaintiffs repeats and incorporates all other allegations of the Complaint as if fully set forth here.

412.     The Consumer Sales Practices Act ("CSPA"), Utah Code §§ 13-11-1 through -23, prohibits deceptive and unconscionable acts and practices in connection with consumer transactions.

413.     Under section 13-11-17, the Division of Consumer Protection may bring an action for injunctive relief and fines, among other remedies, for violations of the CSPA.

414.     Defendants are "persons" and "suppliers" within the meaning of, and subject to, the provisions of the CSPA.  *Id.* § 13-11-3(5)–(6).

415.     The business practices of Defendants fall within the definitions of "consumer transaction."  *Id.* § 13-11-3(2).

416.     Defendants have committed deceptive trade practices in connection with a consumer transaction within Utah as prohibited by the broad provisions of the CSPA, subsection 13-11-4(1) affecting and causing harm to Utah citizens and state agencies, as well as the specific provisions of subsection 13-11-4(2), including and not limited to knowingly made false representations as to the characteristics, benefits, and quality of goods and services, Utah Code § 13-11-4(2)(a), (b), in particular:

    a. Defendants misrepresented to the public and their clients that their formularies and utilization management strategies were designed to protect public health and safety when, in reality, they were structured to maximize profits in collaboration with opioid manufacturers;

    b. Defendants misrepresented their commitment to identify and address fraud, abuse, and diversion, thereby creating a false expectation that they were safeguarding against overprescribing and misuse while failing to act on available data;

    c. Defendants misrepresented the addiction risk and efficacy of opioids by, including and not limited to, distributing materials, and drafting marketing or strategic proposals that falsely label the risk of opioids addiction and opioids' efficacy.

    d. Defendants deceptively claimed they would identify and address fraud and abuse, but instead prioritized profits by removing patient safeguards to secure more lucrative contracts with manufacturers.

417. Defendants' conduct and practices are also unconscionable under the CSPA, Utah Code section 13-11-5, because the conduct and practices are likely to cause substantial injury, offend public policy, and are unethical.  In particular:

    a. Defendants failed to create and offer national formularies where opioid placement was based on safety and efficacy rather than the rebates and fees Defendants received from opioid manufacturers.

    b. Defendants ignored clear evidence of addiction, abuse, and illegitimate prescribing available in their data and failed to implement sufficient utilization management measures for opioids, prioritizing financial incentives from manufacturers instead.

    c. Defendants failed to maintain effective controls against the diversion of opioids through their mail-order pharmacies, in violation of state and federal controlled substance laws.

    d. Defendants withheld critical information and data on opioid diversion—data unavailable to government entities—from the State of Utah, its agents, and its employees, exacerbating harm to public health and finances.

418. Defendants' acts and practices substantially impacted the community of patients, health care providers, law enforcement, and other state government functions, and caused significant actual harm.

419.    As a result of Defendants' conduct, Utah consumers, including the State and its agencies, suffered and continue to suffer ascertainable injuries and losses.

420.    Defendants' conduct has caused substantial injury to the State—in lives lost to drug overdoses, addictions endured, emergency room visits, the creation of an illicit drug market and all its concomitant crime and costs, and broken lives, families, and homes.

421.    Each Defendants' acts and practices were motivated by a desire to retain and increase their profits.

422.    Defendants knew or should have known that they were committing unconscionable and deceptive acts in violation of Utah Code sections 13-11-4 and -5.

423.    Each deceptive and unconscionable act was a distinct violation of Utah Code sections 13-11-4 and -5.

## VII. PRAYER FOR RELIEF

Plaintiffs, State of Utah and Division of Consumer Protection, pray that this Court enter judgment in its favor against each Defendant and:

A.    Determine that all Defendants created a public nuisance;

B.    Order all Defendants to pay the expenses required to abate fully the nuisance they have caused;

C.    Determine that all Defendants engaged in unconscionable and deceptive acts in violation of Utah Code sections 13-11-4, and -5;

D.    Order disgorgement, fines, and all other legal and equitable monetary remedies available under the state laws set forth in this Complaint;

E.    Order an injunction permanently enjoining Defendants from engaging in the acts that violated Utah laws and for corrective action and programs;

F.      Order costs, filing fees, investigative fees, pre- and post-judgment interest, and attorney's fees; and

G.      Grant all other relief as the case may require and the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs request that all issues be tried by a jury except those that must be tried before the Court.

Respectfully submitted this December 23, 2024,

_____
**SEAN D. REYES**
UTAH ATTORNEY GENERAL
Douglas Crapo (USB No. 14620)
crapo@agutah.gov
Stevenson Smith (USB No. 18546)
scsmith@agutah.gov
Kevin M. McLean (USB No. 16101)
kmclean@agutah.gov
Peishen Zhou (USB No. 18596)
peishenzhou@agutah.gov
Assistant Attorneys General
Utah Office of the Attorney General
160 East 300 South, 5th Floor
Salt Lake City, Utah 84114

Linda Singer*
lsinger@motleyrice.com
Elizabeth Smith*
esmith@motleyrice.com
MOTLEY RICE LLC
401 9th Street, Suite 630
Washington, DC 20004

*Counsel for the Plaintiffs*

*\*Pro Hac Vice applications forthcoming*

IN THE DISTRICT COURT OF THE THIRD JUDICIAL DISTRICT IN AND FOR SUMMIT COUNTY, STATE OF UTAH

---

*State of Utah and Division of Consumer Protection*
    *Plaintiff(s)*

           *VS.*      Case No:240500576

*Express Scripts, Inc., et al.*
    *Defendant(s)*

---

### AFFIDAVIT OF SERVICE

*I, Lisa Rees, a Private Process Server, being duly sworn, depose and say:*

*That I have been duly authorized to make service of the Summons and Complaint in the above entitled case.*

*That I am over the age of eighteen years and not a party to or otherwise interested in this action.*

*That on 01/10/2025 at 10:27 AM I served ESI Mail Order Processing, Inc. c/o CT Corporation System, Registered Agent at 1108 East South Union Avenue, Midvale, Utah 84047 with the Summons and Complaint by serving Dani Snow, Agent, authorized to accept service on behalf of CT Corporation System.*

*Dani Snow is described herein as:*

*Gender: Female Race/Skin: Caucasian  Age: 32 Weight: 185   Height: 5'7"  Hair: Brown*

*I solemnly affirm under the penalties of perjury that the contents of this document are true to the best of my knowledge, information, and belief.*

*Executed on 01/22/2025*

*Subscribed and sworn to before me by the affiant who is personally known to me.*



_____       _____
                             *Lisa Rees, R112101*

01/22/2025  12/14/2026
Date    *Commission Expires*

                            *Client Ref Number: N/A*
                            *Job #:12477967*

NOTARY PUBLIC
WENDY NEFF
726003
MY COMMISSION EXPIRES
DECEMBER 14, 2026
STATE OF UTAH

---

**DEREK E. BROWN**
UTAH ATTORNEY GENERAL
Douglas Crapo (14620)
Stevenson Smith (18546)
Kevin McLean (16101)
Peishen Zhou (18596)
PO Box 140872
Salt Lake City, Utah 84114-0872
(801) 366-0310
crapo@agutah.gov
scsmith@agutah.gov
kmclean@agutah.gov
peishenzhou@agutah.gov

(Additional counsel on signature page)

*Attorneys for Plaintiffs*

---

**IN THE DISTRICT COURT OF THE THIRD JUDICIAL DISTRICT IN AND FOR
SUMMIT COUNTY, STATE OF UTAH**

| | |
|---|---|
| **STATE OF UTAH** and **DIVISION OF CONSUMER PROTECTION** | **SUMMONS TO DEFENDANT ESI MAIL ORDER PROCESSING, INC.** |
| *Plaintiffs*, | |
| v. | Case No. 240500576 |
| **EXPRESS SCRIPTS, INC.; EXPRESS SCRIPTS ADMINISTRATORS, LLC; ESI MAIL PHARMACY SERVICE, INC; EXPRESS SCRIPTS PHARMACY, INC.; ESI MAIL ORDER PROCESSING, INC.; MEDCO HEALTH SOLUTIONS, INC.; UNITEDHEALTH GROUP, INC.; OPTUMRX INC.; OPTUMINSIGHT LIFE SCIENCES, INC.; and OPTUMINSIGHT, INC.** | Judge: Hon. Richard Mrazik<br><br>Tier III |
| *Defendants*. | |

The State of Utah to:

**ESI Mail Order Processing, Inc.**
**One Express Way**
**Saint Louis, Missouri 63121.**

**CT Corporation System**
**1108 East South Union Avenue**
**Midvale, Utah 84047.**

You are summoned and required to answer the attached Complaint and Jury Demand (the "Complaint").

Within 21 days after service of this summons, you must file your written, signed answer with the clerk of the District Court for the Third Judicial District, Silver Summit, 6300 Justice Center Road, Ste. A, Park City, Utah 84098 in Summit County. The accompanying Complaint is on file with the Court. Within those 21 days, you must also email, mail, or hand deliver a copy of your answer to the Plaintiff's attorneys. If you fail to do so, judgment by default may be taken against you for the relief demanded in the Complaint.

Dated: January 6, 2025                    Respectfully submitted,

                                          */s/ Peishen Zhou*
                                          **DEREK E. BROWN**
                                          UTAH ATTORNEY GENERAL
                                          Douglas Crapo (USB No. 14620)
                                          crapo@agutah.gov
                                          Stevenson Smith (USB No. 18546)
                                          scsmith@agutah.gov
                                          Kevin M. McLean (USB No. 16101)
                                          kmclean@agutah.gov
                                          Peishen Zhou (USB No. 18596)
                                          peishenzhou@agutah.gov
                                          Assistant Attorneys General
                                          Utah Office of the Attorney General
                                          160 East 300 South, 5th Floor
                                          PO Box 140872
                                          Salt Lake City, Utah 84114-0872

- 2 -

Linda Singer*
lsinger@motleyrice.com
Elizabeth Smith*
esmith@motleyrice.com
MOTLEY RICE LLC
401 9th Street, NW, Suite 630
Washington, DC 20004

*Counsel for the Plaintiffs*

*\*Pro Hac Vice applications forthcoming*

Bilingual Notice to Responding Party for In-State Summons (for compliance with URCP 4)

| | |
|---|---|
| A lawsuit has been filed against you. You must respond in writing by the deadline for the court to consider your side. The written response is called an Answer. | Se ha presentado una demanda en su contra. Si desea que el juez considere su lado, deberá presentar una respuesta por escrito dentro del periodo de tiempo establecido. La respuesta por escrito es conocida como la Respuesta. |
| **Deadline!**<br>Your Answer must be filed with the court and served on the other party **within 21 days** of the date you were served with this Summons.<br><br>If you do not file and serve your Answer by the deadline, the other party can ask the court for a default judgment. A default judgment means the other party can get what they asked for, and you do not get the chance to tell your side of the story. | **¡Fecha límite para contestar!**<br>Su Respuesta debe ser presentada en el tribunal y también con la debida entrega formal a la otra parte **dentro de 21 días** a partir de la fecha en que usted recibió la entrega formal del Citatorio.<br><br>Si usted no presenta una respuesta ni hace la entrega formal dentro del plazo establecido, la otra parte podrá pedirle al juez que asiente un fallo por incumplimiento. Un fallo por incumplimiento significa que la otra parte recibe lo que pidió, y usted no tendrá la oportunidad de decir su versión de los hechos. |
| **Read the complaint/petition**<br>The Complaint or Petition has been filed with the court and explains what the other party is asking for in their lawsuit. Read it carefully. | **Lea la demanda o petición**<br>La demanda o petición fue presentada en el tribunal y ésta explica lo que la otra parte pide. Léala cuidadosamente. |
| **Answer the complaint/petition**<br>You must file your Answer in writing with the court **within 21 days** of the date you were served with this Summons. You can find an Answer form on the court's website: utcourts.gov/ans<br><br>Scan QR code to visit page | **Cómo responder a la demanda o petición**<br>Usted debe presentar su Respuesta por escrito en el tribunal **dentro de 21 días** a partir de la fecha en que usted recibió la entrega formal del Citatorio. Puede encontrar el formulario para la presentación de la Respuesta en la página del tribunal: utcourts.gov/ans-span<br><br>Para accesar esta página escanee el código QR |
| **Serve the Answer on the other party**<br>You must email, mail or hand deliver a | **Entrega formal de la respuesta a la otra parte** |

Bilingual Notice to Responding Party for In-State Summons (for compliance with URCP 4)

| | |
|---|---|
| copy of your Answer to the other party (or their attorney or licensed paralegal practitioner, if they have one) at the address shown at the top left corner of the first page of this Summons. | Usted deberá enviar por correo electrónico, correo o entregar personalmente una copia de su Respuesta a la otra parte (o a su abogado o asistente legal, si tiene) a la dirección localizada en la esquina izquierda superior de la primera hoja del citatorio. |
| **Finding help**<br>The court's Finding Legal Help web page (utcourts.gov/help) provides information about the ways you can get legal help, including the Self-Help Center, reduced-fee attorneys, limited legal help and free legal clinics.  Scan QR code to visit page | **Cómo encontrar ayuda legal**<br>Para información sobre maneras de obtener ayuda legal, vea nuestra página de Internet Cómo Encontrar Ayuda Legal. (utcourts.gov/help-span) Algunas maneras de obtener ayuda legal son por medio de una visita a un taller jurídico gratuito, o mediante el Centro de Ayuda. También hay ayuda legal a precios de descuento y consejo legal breve.  Para accesar esta página escanee el código QR |

 An Arabic version of this document is available on the court's website:
نسخة عربية من هذه الوثيقة على موقع المحكمة على الإنترنت:ت وجد
utcourts.gov/arabic

A Simplified Chinese version of this document is available on the court's website:
本文件的简体中文版可在法院网站上找到：
utcourts.gov/chinese  请扫描QR码访问网页

A Vietnamese version of this document is available on the court's website:
Một bản tiếng Việt của tài liệu này có sẵn trên trang web của tòa:
utcourts.gov/viet Xin vui lòng quét mã QR (Trả lời nhanh)để viếng trang