Bentley J. Tolk (6665)
Rodger M. Burge (8582)
PARR BROWN GEE & LOVELESS
101 South 200 East, Suite 700
Salt Lake City, UT 84111
T: (801) 532-7840
btolk@parrbrown.com
rburge@parrbrown.com

*Attorneys for OptumRx, Inc.*

---

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

---

| | |
|---|---|
| STATE OF UTAH and DIVISION OF CONSUMER PROTECTION,<br><br>Plaintiffs,<br><br>v.<br><br>EXPRESS SCRIPTS, INC., et al.,<br><br>Defendants. | **OPTUMRX, INC.'S MOTION TO DISQUALIFY MOTLEY RICE**<br><br>Case No. 2:25-cv-00088-DBB-DBP<br><br>District Judge David Barlow<br><br>Chief Magistrate Judge Dustin B. Pead |

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ......................................................................................... iii

SPECIFIC RELIEF SOUGHT AND GROUNDS FOR THE RELIEF ........................................1

INTRODUCTION ........................................................................................................1

RELEVANT FACTS ....................................................................................................4

    A.    Motley Rice used government subpoenas to investigate OptumRx on behalf of three governments. ...................................................................................4

    B.    Motley Rice is pursuing private litigation against OptumRx that overlaps with the issues in Motley Rice's government investigations. ..........................................7

    C.    OptumRx has moved to disqualify Motley Rice in other opioid cases ...................8

LEGAL STANDARD .................................................................................................9

ARGUMENT ...........................................................................................................10

I.    MOTLEY RICE'S REPRESENTATION OF THE STATE VIOLATES RULE 1.11(c). ..........................................................................................................10

    A.    Ethics rules have long forbidden lawyers' misuse of government power for private gain. .................................................................................................11

    B.    Motley Rice is in clear violation of Rule 1.11(c). ...............................................13

        1.    Motley Rice was a "public officer or employee" when it investigated OptumRx, and the State is the firm's "private client" here. .....................13

        2.    Motley Rice obtained "confidential government information" about OptumRx through the D.C., Hawaii, and Chicago investigations. ...........14

        3.    Motley Rice could use the confidential government information to OptumRx's "material disadvantage" in this case. .......................................18

II.    THE COURT SHOULD CONDUCT ITS OWN INDEPENDENT ANALYSIS OF THE FACTS AND LAW .................................................................................20

III.    THE FACTORS WEIGH IN FAVOR OF DISQUALIFICATION. ..................................24

CONCLUSION .......................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied Realty of St. Paul, Inc. v. Exch. Nat'l Bank of Chi.*,
283 F. Supp. 464 (D. Minn. 1968) ........................................................................11

*Allred v. Pacificorp*,
2015 WL 12866208 (D. Utah Oct. 19, 2015) .......................................................25

*Anne Arundel County v. Express Scripts, Inc.*,
2025 WL 254807 (D. Md. Jan. 21, 2025) ...................................................9, 13, 14

*Archuleta v. Turley*,
904 F. Supp. 2d 1185 (D. Utah 2012) ...................................................9, 10, 24, 25

*Camreta v. Greene*,
563 U.S. 692 (2011) ...............................................................................................20

*City of Boston v. Express Scripts, Inc.*,
No. 1:24-cv-10525 (D. Mass Oct. 18, 2024) (ECF No. 94) ...................................9

*Cole v. Ruidoso Mun. Schs.*,
43 F.3d 1373 (10th Cir. 1994) ................................................................................9

*Gen. Motors Corp. v. New York*,
501 F.2d 639 (2d Cir. 1974) ............................................................................12, 20

*Handelman v. Weiss*,
368 F. Supp. 258 (S.D.N.Y. 1973) ........................................................................12

*People ex rel. Harrison v. Express Scripts, Inc.* (*L.A. County*),
No. 23STCV20886 (Cal. Super. Ct. Nov. 14, 2024) ...................................9, 13, 21

*Hilo Metals Co. v. Learner Co.*,
258 F. Supp. 23 (D. Haw. 1966) ...........................................................................12

*Koch v. Koch Indus., Inc.*,
798 F. Supp. 1525 (D. Kan. 1992) .........................................................................10

*Kronberg v. LaRouche*,
2010 WL 1443934 (E.D. Va. Apr. 9, 2010) ...............................................14, 18, 22

*United States ex rel. Maxwell v. Kerr-McGree Oil & Gas Corp.*,
   540 F.3d 1180 (10th Cir. 2008) ...................................................................22

*In re Nat'l Prescription Opiate Litig.*,
   2019 WL 1274555 (N.D. Ohio Mar. 20, 2019) ................................17, 18, 20, 22

*In re Nat'l Prescription Opiate Litig.*,
   2024 WL 3387288 (N.D. Ohio Mar. 18, 2024) .......................................... *passim*

*Okla. Hosp. Ass'n v. Okla. Publ'g Co.*,
   748 F.2d 1421 (10th Cir. 1984) ...................................................................22

*In re OptumRx, Inc.*,
   2024 U.S. App. LEXIS 26695 (6th Cir. Oct. 22, 2024)...............................8, 9, 23

*Rubio v. BNSF Ry. Co.*,
   548 F. Supp. 2d 1220 (D.N.M. 2008) ..........................................................10

*Seattle Times Co. v. Rhinehart*,
   467 U.S. 20 (1984)...................................................................................22

*United States v. Villaspring*,
   2011 WL 5330790 (E.D. Ky. Nov. 7, 2011)......................................14, 17, 18, 22

**Statutes**

5 U.S.C. § 552.............................................................................................21

5 Ill. Comp. Stat. 140/7(g) ............................................................................16

Chi. Mun. Code § 2-25-090(a)........................................................................15

D.C. Code § 2-534(a)(1) ...............................................................................16

D.C. Code § 28-3910 ................................................................................5, 15

Haw. Rev. Stat. § 28-2.5 ...............................................................................15

Haw. Rev. Stat. § 480-18 ..............................................................................15

Haw. Rev. Stat. § 480-18(j) ...........................................................................16

Haw. Rev. Stat. § 661-22 ..............................................................................15

**Other Authorities**

5 C.F.R. § 2635.703(b) ...................................................................................21

ABA Comm. on Ethics & Prof. Resp., Formal Op. 509 (2024) ........................... *passim*

Canons of Prof. Ethics, Canon 36 (Am. Bar Ass'n 1928) ...............................11

DUCivR 83-1.1(d)(1) ..........................................................................................1

Editorial Bd., *Double Dipping in Opioid Lawsuits*, Wall. St. J. (Jan. 1, 2024),
    https://tinyurl.com/OpioidDoubleDipping ...................................................3

Editorial Bd., *The Tort Bar's Legal Double Dipping*, Wall St. J. (Dec. 9, 2022),
    https://tinyurl.com/LegalDoubleDipping ......................................................3

*Joe Rice Appointed Co-Lead for Opioid MDL*, Motley Rice (Jan. 5, 2018),
    https://www.motleyrice.com/news/opioid-mdl-joe-rice-appointed-co-lead ............................7

N.Y. State Bar Ass'n Comm. on Prof. Ethics, Op. 1169 (2019) ...................22

N.Y. State Bar Ass'n Comm. on Prof. Ethics, Op. 1187 (2020) ...........19, 22

Neb. Ethics Advisory Op. for Lawyers, Op. 22-01 (2022) .....................19, 22

O.H. Skinner, *States Hiring Outside Lawyers Need to Ask Who Else They
    Represent*, Bloomberg Law (Jan. 23, 2024),
    https://tinyurl.com/HiringOutsideLawyers ...............................................3

*Public Client Litigation Area*, Motley Rice, https://www.motleyrice.com/public-
    client (as of Nov. 9, 2024,
    https://web.archive.org/web/20241109091015/https://www.motleyrice.com/pu
    blic-client) ..................................................................................................7

Utah R. Prof. Conduct 1.11(c) ..................................................................... *passim*

Utah R. Prof. Conduct 1.11 cmt. 4...............................................................14

Utah R. Prof. Conduct 1.11 cmt. 8...............................................................18

## SPECIFIC RELIEF SOUGHT AND GROUNDS FOR THE RELIEF

In accordance with Utah Rule of Professional Conduct 1.11(c), DUCivR 83-1.1(d)(1), and the Court's inherent authority, Defendant OptumRx, Inc. respectfully moves the Court for an order disqualifying the law firm Motley Rice LLC and its attorneys from participating in this litigation. Motley Rice's lawyers obtained confidential government information about OptumRx while serving as government lawyers, and that information could be used to OptumRx's material disadvantage in this litigation. Under those facts, Rule 1.11(c) requires disqualification.

## INTRODUCTION

With increasing regularity, State Attorneys General and local governments are deputizing private lawyers as Special Assistant Attorneys General to investigate businesses. The arrangement allows the governments to transfer risk to private lawyers while retaining the opportunity to seek damages in cases that they would not otherwise pursue. The private lawyers, in turn, get to leverage government power without the limits on personal financial benefits that apply to full-time government prosecutors. But some private lawyers go even further and use the information gained from their government investigations in separate litigation for other clients. The Rules of Professional Conduct—here, Utah Rule of Professional Conduct 1.11(c)—prohibit this practice.

Rule 1.11(c) prohibits former or existing government lawyers from taking on private representations where they could use the confidential information that they learned during government service to the material disadvantage of an adverse party. The rule is designed to protect against abuses of government power and the erosion of the public trust. The concerns are so grave that the Rules prohibit a former government lawyer from taking on a representation in which they theoretically *could* use confidential government information to their opponent's material

disadvantage—even if they do not use the information at all. In doing so, Rule 1.11(c) imposes clear prohibitions designed not merely to protect litigants but even more critically to protect the sanctity of the role of government lawyers and the exercise of government power.

By agreeing to represent the State[1] in this case against OptumRx, Inc., Motley Rice has violated Rule 1.11(c) and should be disqualified. Three governments—the District of Columbia, the State of Hawaii, and the City of Chicago—deputized Motley Rice to lead investigations into OptumRx using investigatory subpoenas that demanded wide swaths of confidential business information. To comply with those government subpoenas, OptumRx engaged in meetings with Motley Rice and produced thousands of pages of confidential information directly to Motley Rice detailing how OptumRx operates its business, including information about how OptumRx develops the formularies (lists of drugs that a health plan can choose to cover) and clinical programs that it offers clients and how it negotiates with pharmaceutical manufacturers for discounts (rebates) off the price of prescription drugs. Motley Rice, in turn, compiled confidential reports, summarizing its investigations and synthesizing the information it obtained. Motley Rice undoubtedly gathered much additional information about OptumRx through those investigations. But, like virtually all government investigations, those details are shielded from public view.

Once Motley Rice obtained confidential information about OptumRx through those investigations, Rule 1.11(c) prohibited Motley Rice from taking on any private representation in which it could use that confidential information to OptumRx's material disadvantage. But instead, with that confidential information in hand as a roadmap, Motley Rice has turned to litigating opioid

---

[1] Here, the term "State" refers to both Plaintiffs in this case: The State of Utah and the Utah Division of Consumer Protection.

cases against OptumRx and other pharmacy benefit managers (**PBMs**) across the country, including in this case and in the national opioid multidistrict litigation in the Northern District of Ohio. The plaintiffs' legal theories in these opioid cases overlap with the topics on which Motley Rice obtained confidential information through its government service.

OptumRx does not challenge government authority to investigate, nor does it seek to intrude on any party's ability to select its counsel. But the ethics rules are clear: Motley Rice is not allowed to obtain confidential information about OptumRx by wielding government power and then, after obtaining the information, to represent other clients in private litigation against OptumRx where that same information could be used against OptumRx. *See* Declaration of Matthew Hooker (**Hooker Decl.**) Ex. A (**Montgomery/Muchman Rep.**) at 1–2, 17–51. These ethical violations do not turn on Motley Rice's intentions or on whether the firm's lawyers actually use the confidential information gathered in the government investigations. It is enough that Motley Rice *could* use that confidential information in other litigation against OptumRx.[2]

OptumRx has sought disqualification of Motley Rice in other opioid cases, including in the opioid MDL. So far, the courts that have ruled on the motions have denied them based on several legal and factual errors, all of which trace back to the MDL court's ruling. Each of those decisions

---

[2] OptumRx is not the only one troubled by Motley Rice's conduct. *E.g.*, Editorial Bd., *The Tort Bar's Legal Double Dipping*, Wall St. J. (Dec. 9, 2022), https://tinyurl.com/LegalDoubleDipping (criticizing "unholy alliance[s]" between State AGs and plaintiff's lawyers); Editorial Bd., *Double Dipping in Opioid Lawsuits*, Wall. St. J. (Jan. 1, 2024), https://tinyurl.com/OpioidDoubleDipping ("This double dipping would break the rules of professional conduct in nearly any industry, but it's an open scandal in the tort business."); O.H. Skinner, *States Hiring Outside Lawyers Need to Ask Who Else They Represent*, Bloomberg Law (Jan. 23, 2024), https://tinyurl.com/HiringOutsideLawyers ("I saw this firsthand in the Arizona Attorney General's Office. In that role, more than once, outside counsel seemed to see representation of a state as a gateway to increasing their return on investment in a related private action against the same defendants.").

was wrong. They placed inordinate emphasis on the MDL court's decision that some (but not all) of the investigation materials should be available in the MDL discovery repository. Compounding that legal error, the decisions failed to appreciate that the confidential information that Motley Rice has obtained through its investigations is not limited to documents available through discovery, but it also includes mental roadmaps and strategic insights about OptumRx, as well as the firm's attorney-client-privileged work product prepared during the investigations. Under a principled, straightforward application of Rule 1.11(c), disqualification of Motley Rice is required in this case.

## RELEVANT FACTS

**A.    Motley Rice used government subpoenas to investigate OptumRx on behalf of three governments.**

Motley Rice has investigated OptumRx on behalf of at least three governments—the District of Columbia, Hawaii, and the City of Chicago—using the state-law equivalent of a federal civil investigative demand. In December 2020, the District of Columbia Attorney General retained Motley Rice to assist with a government investigation into and potential litigation against PBMs for possible violations of consumer protection law and the False Claims Act. Hooker Decl. Ex. B (**D.C. Engagement Ltr.**). The firm's retainer agreement with D.C. required Motley Rice to submit "monthly or regular status reports" as part of its "legal services" for the D.C. Attorney General. *Id.*, Statement of Work § 4.1.5; *see also id.* § 4.1.3 (requiring Motley Rice to "[a]dvise OAG on the conduct of the case and on strategy and tactics for each phase of the case"). The same month, the D.C. Attorney General issued an investigative subpoena to OptumRx regarding "the negotiation of prescription drug rebates and the administration of prescription drug benefits." Hooker Decl. Ex. C (**D.C. Subpoena**) at 1. The subpoena required that OptumRx produce broad categories of information, including information about manufacturer payments, negotiations, and

formulary development and coverage. *Id.* at 9–12. It directed OptumRx "[p]ursuant to D.C. Code § 28-3910, and by the authority vested in the Attorney General for the District of Columbia" to produce its confidential documents "to the attention of: Linda Singer Motley Rice LLC." *Id.* at 1. Motley Rice served the subpoena on OptumRx. *Id.* (Motley Rice envelope).

Before responding to the subpoena, OptumRx negotiated a confidentiality agreement with D.C. *See* Declaration of Allison J. Caplis (**Caplis Decl.**) ¶ 8. The agreement prevented Motley Rice from using the confidential information that its lawyers obtained through the subpoena outside of the firm's work for D.C. *See* Hooker Decl. Ex. D (**D.C. Conf. Agmt.**) ¶ 2. Relying on that agreement, OptumRx produced confidential rebate information for various manufacturers directly to Motley Rice in July 2021. Hooker Decl. Ex. E; Caplis Decl. ¶ 13. Two months later, OptumRx produced more than 68,000 pages of unredacted, commercially sensitive information. Hooker Decl. Ex. F. The production contained OptumRx's confidential internal documents covering wide swaths of OptumRx's business operations. The documents covered, for instance, formulary development, rebate negotiations with drug manufacturers, and clinical and formulary offerings to clients. They included charters, policies, and other materials about business strategy, formulary placement committees, and other aspects of OptumRx's business. *See* Caplis Decl. ¶ 14; Hooker Decl. ¶¶ 5–9. In November 2021, OptumRx produced additional confidential materials, including commercially sensitive rebate-related data and consumer transaction-level data. Hooker Decl. Ex. G; Caplis Decl. ¶ 15. The vast majority of the information that OptumRx produced is nonpublic, sensitive commercial material. Caplis Decl. ¶ 16; Hooker Decl. ¶ 9.

Motley Rice's pre-litigation use of government power was not limited to the District of Columbia investigation. In April 2021, the Hawaii Attorney General appointed Motley Rice as

Special Deputy Attorney General to investigate PBMs including OptumRx. Hooker Decl. Ex. H (**Haw. Special AG Agmt.**). Hawaii's retainer required Motley Rice to "submit a report to the Attorney General of Hawai'i, as an attorney-client privilege/work-product communication" that would "recommend whether or not to sue" the PBMs and "set forth, at a minimum: (1) the facts or data considered in formulating the report; (2) a complete statement of investigative findings and the bases of such findings; [and] (3) an analysis of the propriety of the PBMs' billing practices[.]" *Id.* at A1-1 to -2. In October 2021, the Hawaii AG issued an investigative subpoena to OptumRx. The subpoena sought documents spanning at least a decade relating to various aspects of OptumRx's business including formulary development, rebate negotiations with manufacturers, and OptumRx's contractual relationships with manufacturers. Hooker Decl. Ex. I (**Haw. Subpoena**). It directed OptumRx to deliver the documents to "Special Deputy Attorney General Linda Singer, Motley Rice LLC." *Id.* at 1.

Before responding to the subpoena, OptumRx negotiated a confidentiality agreement with Hawaii. The State agreed that Motley Rice could not rely "on Confidential Material in pursuing information or claims in any other matters outside of its representation of the OAG." Hooker Decl. Ex. J (**Haw. Conf. Agmt.**) ¶ 2. As with the D.C. investigation, OptumRx produced confidential information directly to Motley Rice, including the same more-than 68,000 pages of documents produced to D.C., rebate-related data, and consumer transaction level data. Hooker Decl. Exs. K, L; Caplis Decl. ¶¶ 22–24; Hooker Decl. ¶¶ 5–9. With that information and the other fruits of Motley Rice's government investigation in hand (all of which would be detailed in Motley Rice's privileged investigation report—a report that is shielded from public view), Hawaii (still

represented by Motley Rice) sued OptumRx and two other PBMs in October 2023. *See Hawaii ex rel. Lopez v. CaremarkPCS Health, L.L.C.*, No. 1:23-cv-00464 (D. Haw.).

Motley Rice also investigated OptumRx on behalf of the City of Chicago. In November 2018, Chicago issued an investigative subpoena to OptumRx demanding information about various aspects of OptumRx's business including pharmacy and client contracts. Hooker Decl. Ex. M (**Chicago Subpoena**). OptumRx and Chicago negotiated a confidentiality agreement that Mimi Liu of Motley Rice executed as Chicago's "Special Assistant Corporation Counsel." Hooker Decl. Ex. N (**Chicago Conf. Agmt.**). In response, OptumRx produced confidential material including prescription claims data. *See* Declaration of Michelle S. Grant (**Grant Decl.**) ¶¶ 10–12.

### B. Motley Rice is pursuing private litigation against OptumRx that overlaps with the issues in Motley Rice's government investigations.

Motley Rice touts the firm's role as both an investigator and private plaintiffs' counsel, advertising that its "Public Client practice is dedicated to supporting public entities in investigations and litigation" and has "the resources and experience in complex litigation and resolutions to assist government lawyers."[3] Linda Singer, a member of Motley Rice, acts as co-chair of the opioid MDL's Manufacturer/Marketing Committee, and co-founder Joe Rice serves as co-lead counsel and a member of the opioid MDL Plaintiffs' Executive Committee.[4]

Motley Rice has litigated opioid-related lawsuits for years. But it was not until December 2022—after the firm investigated OptumRx on behalf of D.C. and Hawaii—that Motley Rice

---

[3] *Public Client Litigation Area*, Motley Rice, https://www.motleyrice.com/public-client (as of Nov. 9, 2024, https://web.archive.org/web/20241109091015/https://www.motleyrice.com/public-client).

[4] *Joe Rice Appointed Co-Lead for Opioid MDL*, Motley Rice (Jan. 5, 2018), https://www.motleyrice.com/news/opioid-mdl-joe-rice-appointed-co-lead.

began actively litigating opioid lawsuits against OptumRx. Motley Rice now represents plaintiffs suing OptumRx across the country, including the State here. The theories that Motley Rice presses against OptumRx in this case relate to the same aspects of OptumRx's business that the firm investigated as government lawyers. For instance, the complaint alleges that the formularies and clinical programs that OptumRx offered its clients should have placed additional limits on opioid prescriptions while also contending that OptumRx "colluded with Purdue Pharma and other opioid manufacturers to increase opioid sales." ECF No. 1-1 ¶ 33; *see also id.* ¶¶ 11, 140, 270–76. Those allegations are false, but in any case, the information that Motley Rice received through its government investigations relate to the same aspects of OptumRx's business—including formulary and clinical development, rebate negotiations, and client relationships.

### C.  OptumRx has moved to disqualify Motley Rice in other opioid cases.

In the opioid MDL, OptumRx moved to disqualify Motley Rice in December 2023, consistent with the MDL court's scheduling order. The MDL court "frown[ed] on" Motley Rice's actions but nevertheless spared the firm from disqualification. *In re Nat'l Prescription Opiate Litig.*, 2024 WL 3387288, at *16 (N.D. Ohio Mar. 18, 2024). The court misconstrued Rule 1.11(c) to conclude that certain documents that OptumRx produced in the investigations were not "confidential government information." The court then ordered OptumRx to produce those documents to all plaintiffs' counsel. *Id.* at *8–15. OptumRx petitioned the Sixth Circuit for a writ of mandamus. Hooker Decl. Ex. O. The Sixth Circuit denied the petition because "mandamus is not the appropriate avenue to challenge a district court's disqualification order." *In re OptumRx, Inc.*, 2024 U.S. App. LEXIS 26695, at *1–2 (6th Cir. Oct. 22, 2024). In dicta, the panel opined

that OptumRx would suffer no material disadvantage because the investigation documents "should have already been produced into the MDL discovery repository." *Id.* at *3.

OptumRx has also moved to disqualify Motley Rice in other opioid cases. The courts that have ruled on those motions have denied them for some combination of the same reasons articulated by the MDL court.[5] Now, in this case, Motley Rice lawyers have appeared on behalf of the State. *See* ECF Nos. 22; 23.

## **LEGAL STANDARD**

 "Judges have broad discretion, as part of their supervisory powers, to control and maintain their courtrooms and to determine which lawyers are allowed to appear before them." *Archuleta v. Turley*, 904 F. Supp. 2d 1185, 1191 (D. Utah 2012) (disqualifying attorney for violating Rule 1.12). In assessing a motion to disqualify, Utah federal court must both consider whether the attorney has violated the local rules on attorney conduct as well as apply the federal standard, which is "governed by the ethical rules announced by the national profession and considered in light of the public interest and the litigants' rights." *Id.* (citation modified). As to the former, attorneys practicing in this Court must adhere to the Utah Rules of Professional Conduct. *See* DUCivR 83-1.1(d)(1). As to the latter, the American Bar Association's Model Rule of Professional Conduct 1.11(c) is identical to the at-issue Utah Rule of Professional Conduct 1.11(c). *See Cole v. Ruidoso Mun. Schs.*, 43 F.3d 1373, 1383–84 (10th Cir. 1994) (the ABA Model Rules "reflect the

---

[5] *See City of Boston v. Express Scripts, Inc.*, No. 1:24-cv-10525 (D. Mass Oct. 18, 2024) (ECF No. 94) (Hooker Decl. Ex. P); *People ex rel. Harrison v. Express Scripts, Inc.* (*L.A. County*), No. 23STCV20886 (Cal. Super. Ct. Nov. 14, 2024), *appeal docketed*, No. B343828 (Cal. Ct. App. Feb. 5, 2025) (Hooker Decl. Ex. Q); *Anne Arundel County v. Express Scripts, Inc.*, 2025 WL 254807 (D. Md. Jan. 21, 2025). OptumRx has also moved to disqualify Motley Rice in *Kentucky ex rel. Coleman v. Express Scripts, Inc.*, No. 5:24-cv-00303 (E.D. Ky.). That motion is pending.

national standard to be used in ruling on disqualification motions"). When a court finds an ethical violation, it must then weigh factors including (1) the "the egregiousness of the violation," (2) "the presence or absence of prejudice to the other side," (3) "whether and to what extent there has been a diminution of effectiveness of counsel," and (4) "the stage of trial proceedings." *Archuleta*, 904 F. Supp. 2d at 1192. "Because the interests to be protected are critical to the judicial system, doubts are resolved in favor of disqualification." *Koch v. Koch Indus., Inc.*, 798 F. Supp. 1525, 1531 (D. Kan. 1992); *accord Rubio v. BNSF Ry. Co.*, 548 F. Supp. 2d 1220, 1224 (D.N.M. 2008).

## ARGUMENT

I.    **MOTLEY RICE'S REPRESENTATION OF THE STATE VIOLATES RULE 1.11(c).**

Utah Rule of Professional Conduct 1.11(c) states:

> Except as law may otherwise expressly permit, a lawyer having information that the lawyer knows is confidential government information about a person acquired when the lawyer was a public officer or employee may not represent a private client whose interests are adverse to that person in a matter in which the information could be used to the material disadvantage of that person. As used in this Rule, the term "confidential government information" means information that has been obtained under governmental authority and which at the time this Rule is applied, the government is prohibited by law from disclosing to the public or has a legal privilege not to disclose and which is not otherwise available to the public.

Rule 1.11(c) prohibits Motley Rice from pursuing claims against OptumRx on behalf of clients in private litigation when the firm potentially could use the confidential information that it acquired through government investigations to OptumRx's material disadvantage in the litigation. Because of the overlap between Motley Rice's investigations and the theories in this case, there is no question that Motley Rice *could* use the confidential government information to OptumRx's

material disadvantage here. Rule 1.11(c) prohibited Motley Rice from accepting the engagement to represent the State. The second that Motley Rice agreed to take this case, it violated Rule 1.11(c).

### A. Ethics rules have long forbidden lawyers' misuse of government power for private gain.

Rule 1.11 exists to facilitate ethical movement of lawyers between government service and private practice while protecting against abuses of government power and the erosion of public trust. It imposes rules for "*special*" conflicts of interests—conflicts *above* those that all lawyers must guard against. *See* Utah R. Prof. Conduct 1.11 (rule titled "*Special* Conflicts of Interest for Former and Current Government Employees" (emphasis added)). Subsection (c) does so by imposing a blanket prohibition on any private representation where information obtained through government service could be used against an adverse party in the private litigation. *See* ABA Comm. on Ethics & Prof. Resp., Formal Op. 509 at 2 (2024) ("The objective of [Rule 1.11(c)] is to prevent the lawyer's improper use of his or her official position and to protect others from the exploitation of confidential government information, acquired by the lawyer while serving as a public officer or employee." (citation and quotation marks omitted)).

From its first publication through today, the ABA Model Rules of Professional Conduct and their predecessors have precluded private lawyers from doing what Motley Rice attempts here. *E.g.*, Canons of Prof. Ethics, Canon 36 (Am. Bar Ass'n 1928) ("A lawyer, having once held office or having been in the public employ, should not after his retirement accept employment in connection with any matter which he has investigated or passed upon while in such office or employ."). The judiciary enforces those rules. *See, e.g.*, *Allied Realty of St. Paul, Inc. v. Exch. Nat'l Bank of Chi.*, 283 F. Supp. 464, 465, 467, 470 (D. Minn. 1968) (disqualifying former government lawyer from litigating against corporate executives whom the lawyer criminally

prosecuted as a "Special Assistant United States Attorney" because a lawyer may not "avail himself, after his government service, of a private legal retainer which involves . . . the use of his knowledge of a particular case or proceeding" obtained in government service), *aff'd*, 408 F.2d 1099 (8th Cir. 1969); *Hilo Metals Co. v. Learner Co.*, 258 F. Supp. 23, 25–27 (D. Haw. 1966) (disqualifying former DOJ lawyer in a private antitrust action against companies whom the lawyer investigated while with the DOJ); *Handelman v. Weiss*, 368 F. Supp. 258, 264 (S.D.N.Y. 1973) (explaining that without the disqualification rules, "[n]ot only would attorneys be tempted to subordinate their official duties to their private goals, but confidence in the integrity of the attorneys selected by [the government] would be destroyed"); *Gen. Motors Corp. v. New York*, 501 F.2d 639, 648–52 (2d Cir. 1974) (disqualifying lawyer in suit against GM when the lawyer previously investigated GM in similar matters because "the overlap of issues is so plain" and "the involvement while in Government employ [is] so direct").

Utah Rule 1.11(c) encapsulates and builds on the policy considerations underpinning these longstanding ethical principles. *See* Montgomery/Muchman Rep. at 20–22. The Rule forbids a former or existing government lawyer from taking on a representation in which they "could" use information learned during their government service to the material disadvantage of their adversary in the private litigation. The Rule applies the moment a potential engagement is considered. If the government lawyer *could* use confidential government information to the adverse party's material disadvantage in the civil litigation, then the lawyer *must* decline the representation. The potential for misuse is so acute and the concerns are so grave that the mere *possibility* that the attorney could use the information requires disqualification.

**B.**     **Motley Rice is in clear violation of Rule 1.11(c).**

Four elements establish a Rule 1.11(c) violation: (1) the lawyer is or was a "public officer or employee"; (2) while a public officer or employee, the lawyer acquired "confidential government information" about a party; (3) the lawyer is currently representing a "private client whose interests are adverse" to that party; and (4) the current private representation is "in a matter in which the information could be used to the material disadvantage of that" party. Utah R. Prof. Conduct 1.11(c). By agreeing to represent the State against OptumRx, Motley Rice violated Rule 1.11(c) because the State's claims overlap with Motley Rice's investigations.

        **1.**     **Motley Rice was a "public officer or employee" when it investigated OptumRx, and the State is the firm's "private client" here.**

Motley Rice easily meets both the "public officer or employee" and "private client" elements. *First*, Motley Rice was a "public officer or employee" when it investigated OptumRx on behalf of D.C., Hawaii, and Chicago. By investigating OptumRx on behalf of three governments, Motley Rice wielded government power to obtain nonpublic information about OptumRx. Rule 1.11(c) applies on those facts. In Formal Opinion 509, the ABA explained that Model Rule 1.11(c)—which is identical to Utah Rule 1.11(c)—"applies . . . to lawyers in private practice who are appointed to be special prosecutors and continue to represent private clients." ABA Formal Op. 509 at 8. Motley Rice exercised government power on behalf of three governments—power that it could not have wielded *but for* its special government appointments. *See also In re Nat'l Prescription Opiate Litig.*, 2024 WL 3387288, at *7 (concluding Motley Rice "was acting as a public officer or employee" when investigating OptumRx on behalf of Hawaii, D.C., and Chicago); *L.A. County*, order at 3–4; *Anne Arundel County*, 2025 WL 254807, at *8.

*Next*, the State is Motley Rice's "private client." "[P]rivate client" means *any* person or entity that a lawyer represents in a private capacity, "includ[ing] *public* entities and officials." ABA Formal Op. 509 at 8; *see also* Utah R. Prof. Conduct 1.11 cmt. 4 ("[W]here the successive clients are a government agency and another client, *public or private*, the risk exists that power or discretion vested in that agency might be used for the special benefit of the other client." (emphasis added)); *In re Nat'l Prescription Opiate Litig.*, 2024 WL 3387288, at *7–8 (holding that public-government bodies are "private clients"); *Anne Arundel County*, 2025 WL 254807, at *9.

## 2. Motley Rice obtained "confidential government information" about OptumRx through the D.C., Hawaii, and Chicago investigations.

Motley Rice obtained "confidential government information" about OptumRx. "Confidential government information" is information that (1) was "obtained under governmental authority," (2) "the government is prohibited by law from disclosing to the public or has a legal privilege not to disclose," and (3) "is not otherwise available to the public." Utah R. Prof. Conduct 1.11(c). "Information" is a broad term that includes not only tangible materials but also strategic insights, recollections, and mental impressions. *E.g.*, *United States v. Villaspring*, 2011 WL 5330790, at *6 (E.D. Ky. Nov. 7, 2011) ("strategic insights, such as [the lawyer's] knowledge of the strengths and weaknesses of the evidence compiled against [the investigated company]," are confidential government information that "[he] may not now use . . . to benefit his client" (citation omitted)); *Kronberg v. LaRouche*, 2010 WL 1443934, at *4 (E.D. Va. Apr. 9, 2010) ("At the very least, Markham surely has a mental roadmap concerning LaRouche and his activities that was shaped at least in part by his access to confidential government information."). And it includes information obtained *from* the adverse party as well as information obtained *about* the adverse party from any source. *See* Utah R. Prof. Conduct 1.11(c) ("information about a person").

Through its government investigations, Motley Rice obtained massive amounts of confidential information about OptumRx. The courts that have denied OptumRx's disqualification motions considered only the 68,000 documents that OptumRx produced to Motley Rice in those investigations. But Motley Rice obtained "information about" OptumRx beyond documents—for example, the memos and reports that Motley Rice drafted synthesizing what they learned from their investigations. *See, e.g.*, Haw. Special AG Agmt. at A1-1 to -2; D.C. Engagement Ltr., Statement of Work §§ 4.1.3, 4.1.5. It also includes information that Motley Rice gathered in meetings with OptumRx. Caplis Decl. ¶¶ 7, 18; Grant Decl. ¶ 7. And it includes any information about OptumRx that Motley Rice obtained from *other* investigation targets. All those types of information about OptumRx qualify as "confidential government information" under Rule 1.11(c).

*First*, Motley Rice obtained that information "under governmental authority." As discussed above, Motley Rice obtained information about OptumRx by wielding government power in its investigations for D.C., Hawaii, and Chicago. *See* Haw. Subpoena at 1; Haw. Rev. Stat. §§ 28-2.5, 480-18, 661-22; D.C. Subpoena at 1; D.C. Code § 28-3910; Chicago Subpoena at 1; Chi. Mun. Code § 2-25-090(a). Each investigatory subpoena was the state-law equivalent of a federal civil investigative demand—each used investigatory subpoena power that is uniquely vested in the government and exceeds the type of subpoena power available to private litigants. Absent government authority, Motley Rice would not have information from OptumRx through meet-and-confers, OptumRx and others would not have produced documents to Motley Rice, Motley Rice would not have developed strategies and impressions from the materials and investigations, and Motley Rice would not have compiled privileged memos for those governments.

15

*Second*, the governments are "prohibited by law from disclosing to the public" and have "a legal privilege not to disclose" the information obtained about OptumRx through the investigations.[6] *E.g.*, Haw. Rev. Stat. § 480-18(j); D.C. Code § 2-534(a)(1); 5 Ill. Comp. Stat. 140/7(g); *see* Montgomery/Muchman Rep. at 24–26, 33–38. The confidentiality agreements that Motley Rice executed confirm as much. The Hawaii agreement limits Motley Rice's disclosure of information to certain state and Motley Rice employees (Haw. Conf. Agmt. ¶ 4) and requires that they use that information "solely in connection with the Investigation and any litigation that may arise therefrom, not to use Confidential Information in connection with any other matter, and not to disclose any Confidential Information to any party or the public" (*id.* ¶ 2). Motley Rice also agreed "not to rely on Confidential Information in pursuing information or claims in any other matters outside of its representation of the State." *Id.* The D.C. and Chicago agreements include similar language. D.C. Conf. Agmt. ¶¶ 4, 8–10; Chicago Conf. Agmt. ¶¶ 3–4, 9, 11.

*Third*, the information is not "otherwise available to the public." The documents that OptumRx produced comprised a wide range of proprietary and nonpublic information, including information related to formulary development, business strategies, rebate negotiations and agreements, and financial data. Those materials are not available to the public. Hooker Decl. ¶¶ 5–9. Information from Motley Rice's meetings with OptumRx is not available to the public. Motley Rice's strategies and impressions from the investigations are not available to the public. And the privileged memos that Motley Rice prepared are not available to the public. In short, if OptumRx (or anyone else) subpoenaed Motley Rice for all information from the investigations (or requested

---

[6] Under Rule 1.11(c) *either* the fact that the government "is prohibited by law from disclosing to the public" *or* the fact that the government "has a legal privilege not to disclose" meets this second element of "confidential government information."

it from the governments under public records laws), Motley Rice and the governments would claim that laws or privileges prevent disclosure. Indeed, several governments have denied public-records requests for investigation-related materials about OptumRx on that very basis. For example, Wyoming—which has retained Motley Rice attorneys as "Special Assistant Attorneys General"—recently refused to produce investigation-related documents in response to a public-records request, claiming that such documents "are confidential under the attorney work product and/or attorney-client privileges" or that production "would be contrary to the public interest for several reasons." Hooker Decl. Ex. R. Likewise, Hawaii refused to produce information pertaining to its Motley Rice-led investigation in response to a public-records request, claiming that such records are exempt from disclosure under the state's public-records laws because the statute "exempts from disclosure records 'pertaining to the prosecution or defense' of any judicial action to which the State may be a party 'to the extent that *such records would not be discoverable*[,]' and records protected from disclosure pursuant to state law." Hooker Decl. Ex. S. The information about OptumRx that Motley Rice has been gathering through these many investigations over a period of years is not "otherwise available to the public."

In sum, Motley Rice obtained "confidential government information" about OptumRx through its investigations. That implicates Rule 1.11(c). *E.g.*, Montgomery/Muchman Rep. at 33–42; *In re Nat'l Prescription Opiate Litig.*, 2019 WL 1274555, at *4 (N.D. Ohio Mar. 20, 2019) ("information concern[ing] the inadequate staffing levels, funding deficiencies, strategies, initiatives, operations, and allocation of resources" constituted confidential government information); *Villaspring*, 2011 WL 5330790, at *6 ("strategic insights, such as [the disqualified lawyer's] knowledge of the strengths and weaknesses of the evidence compiled against [the

investigated company]," constitute confidential government information); *Kronberg*, 2010 WL 1443934, at *4. The Rule is concerned with both the free flow of *documents* between cases and the *use of knowledge* gleaned by a lawyer during their government service. *See* Utah R. Prof. Conduct 1.11 cmt. 8; *Kronberg*, 2010 WL 1443934, at *3.

### 3.    Motley Rice could use the confidential government information to OptumRx's "material disadvantage" in this case.

Finally, the confidential government information about OptumRx that Motley Rice obtained could be used to OptumRx's "material disadvantage" in this litigation. The "material disadvantage" standard focuses on what the law firm knew at the moment it accepted the private representation of the State. The MDL court recognized as much when it disqualified a defense lawyer because confidential information about two plaintiffs that the lawyer obtained through her government service was relevant to the lawyer's later private litigation adverse to those two plaintiffs. *See In re Nat'l Prescription Opiate Litig.*, 2019 WL 1274555, at *6 ("Nor is it necessary to try to determine whether Ms. Rendon has used any of this information in defending Endo, as Rule 1.11(c) prohibits representation when the information *could* be used to the material disadvantage of Cleveland or Cuyahoga County.").

The "material disadvantage" standard speaks to the relationship between the information and the representation. It turns on whether the information at issue is relevant to the private representation and could theoretically be used by the former government lawyer against the adverse party, *not* on how the information could be used by different lawyers. *See, e.g.*, *Kronberg*, 2010 WL 1443934, at *4 (material disadvantage inquiry "requires the Court to engage in informed conjecture as to what information will become relevant as the case progresses); *Villaspring*, 2011 WL 5330790, at *6 (finding material disadvantage when the plaintiff "is now using that

information to pursue the current action"); N.Y. State Bar Ass'n Comm. on Prof. Ethics, Op. 1187 at 3 (2020) (considering whether information could be used against a person "in plea negotiations or impeachment"); Neb. Ethics Advisory Op. for Lawyers, Op. 22-01 at 3150 (2022) (prohibiting representation when the information "could be used against an adverse party"). That other lawyers might also gain access to the "confidential government information" at some other point in time by other means is irrelevant. Rule 1.11(c) applies solely to the government lawyer—here, Motley Rice—at the point in time it considers undertaking a private representation.

The confidential government information about OptumRx that Motley Rice obtained is relevant to this litigation and "could be used to the material disadvantage of" OptumRx. The government investigations focused on OptumRx's rebate negotiations, formulary development and clinical analysis, and financial data related to rebates. *E.g.*, Haw. Subpoena, Requests 1, 5, 6, 12; D.C. Subpoena, Requests 1, 4, 5, 10. The State's liability theory in this case focuses on the same aspects of OptumRx's business. For example, the State's complaint alleges that OptumRx "offered and entered into agreements with manufacturers to aid and develop marketing efforts designed to increase opioid prescribing" and "actively collaborated with Purdue and other manufacturers to create, support, and propagate misleading marketing messages to alter perceptions of opioids and increase sales." ECF No. 1-1 ¶¶ 34, 137 (emphasis omitted). The information obtained about OptumRx from Motley Rice's government investigations is thus directly relevant to this case.

The confidential information about OptumRx that Motley Rice obtained in its government service provides the firm with a roadmap for litigating against OptumRx on those aspects of its business in this case. Through their work as government lawyers, Motley Rice learned confidential information about OptumRx's structure, committees, clinical and business processes, data,

negotiations with manufacturers, and interactions with clients. Motley Rice could use that knowledge against OptumRx here in any number of ways—including by refining liability theories and allegations and pressing for additional documents in targeted areas based on earlier learnings.[7] It is precisely this type of situation that Rule 1.11(c) is designed to prevent because the lawyer has "great potential for lucrative returns in following into private practice the course [it] already charted with the aid of governmental resources." *Gen. Motors Corp.*, 501 F.2d at 650. Indeed, that is why Rule 1.11(c) does not prohibit only the *use* of the information in later private litigation; it prohibits the *entire representation* as long as the information *could* be used.[8]

## II.    THE COURT SHOULD CONDUCT ITS OWN INDEPENDENT ANALYSIS OF THE FACTS AND LAW.

Motley Rice undoubtedly will point to other courts that have denied OptumRx's similar motions. But those decisions do not bind this Court. *See Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011). Further, those other courts misinterpreted Rule 1.11(c) and misapprehended the relevant facts. For example, the MDL court "frown[ed] on" Motley Rice's actions and acknowledged that Motley Rice's conduct "pose[d] a serious 'risk . . . that power or discretion vested in [Motley Rice] might be used for the special benefit of [their private] client,' or create a

---

[7] Indeed, in the opioid MDL, the Plaintiffs' Executive Committee—of which Motley Rice is a member—recently cited to documents produced to Motley Rice in the Hawaii and D.C. investigations in support of a motion to serve additional discovery in the MDL. *See* Pls.' Reply Supp. Mot. for Leave to Serve Suppl. Discovery on Optum Defs. at 5 n.7, 7 n.9, *In re Nat'l Prescription Opiate Litig.*, No. 1:17-md-2804 (N.D. Ohio Mar. 7, 2025), ECF No. 6003-1.

[8] Under Rule 1.11(c), "[a] firm with which that lawyer is associated may undertake or continue representation in the matter only if the disqualified lawyer is timely screened from any participation in the matter and is apportioned no part of the fee therefrom." Screening is not an option here because Motley Rice's entire Public Client group received the confidential government information and is suing OptumRx across the country. It is also far too late to implement an effective screen. *See In re Nat'l Prescription Opiate Litig.*, 2019 WL 1274555, at *5 (disqualifying firm "to the same extent" as lead lawyer).

conflict of interest." *In re Nat'l Prescription Opiate Litig.*, 2024 WL 3387288, at \*16. And it explained that Motley Rice "needs to adhere to all the same rules to which government lawyers are subject" and warned "Motley Rice and all other law firms [to] carefully take this into account going forward." *Id.* at \*8. But despite those findings and grave warnings, the MDL court concluded that Motley Rice had not *technically* violated Rule 1.11(c) based on the "unique facts" of the MDL. *Id.* at \*8 n.9. Other courts have made some combination of the MDL court's fundamental errors.

*First*, those courts eviscerated Rule 1.11(c)'s definition of "confidential government information" by holding that any information subject to civil discovery is not "confidential government information." *Id.* at \*8–11; *see also L.A. County*, order at 4–6. They did so in the face of numerous authorities to the contrary. The ABA has explained that the "conceptualization of 'confidential government information' [in Rule 1.11(c)] is analogous to the definition of 'nonpublic information' in 5 C.F.R. § 2635.703(b)," which "defines 'nonpublic information' as information that an employee obtains due to Federal employment and that he knows or reasonably should know: '(1) Is routinely exempt from disclosure under 5 U.S.C. [§] 552 [FOIA] or is protected from disclosure by statute, Executive order or regulation; (2) Is designated as confidential by an agency; or (3) has not actually been disseminated to the general public and is not authorized to be made available to the public on request.'" ABA Formal Op. 509 at 4 n.13. The information that Motley Rice acquired about OptumRx in those investigations is undisputedly exempt from FOIA (or the state-law equivalent) disclosure and is barred from public disclosure by the confidentiality agreements. That should end the inquiry.

But those courts held that if information—no matter how confidential or proprietary—can be requested and produced in "routine" civil discovery, it cannot be "confidential government

information." Such a holding completely and improperly rewrites Rule 1.11(c) out of existence. The definition of "confidential government information" turns on whether the information is "otherwise available to the public," not whether the information is obtainable through civil discovery. Documents are not "available to the public" simply because they may be produced in civil discovery. *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 33 (1984) (materials obtained through civil discovery are not "a traditionally public source of information"); *see also United States ex rel. Maxwell v. Kerr-McGree Oil & Gas Corp.*, 540 F.3d 1180, 1185–86 (10th Cir. 2008); *Okla. Hosp. Ass'n v. Okla. Publ'g Co.*, 748 F.2d 1421, 1425–26 (10th Cir. 1984). Under those courts' reading, nearly *everything* would be "available to the public." Rule 1.11(c) contains no "civil discovery" exception, and the ABA committee cited to numerous cases in which courts have disqualified counsel for having access to information that parties could obtain through discovery. *E.g.*, ABA Formal Op. at 4 nn.8–9, 5 nn.11–12, 5 n.14, 6 n.15, 7 n.25, 8 n.27.[9] Indeed, in the opioid MDL, the court disqualified a defense lawyer who, while in former government service, had access to "information concern[ing] the inadequate staffing levels, funding deficiencies, strategies, initiatives, operations, and allocation of resources"—all of which is obtainable through civil discovery. *In re Nat'l Prescription Opiate Litig.*, 2019 WL 1274555, at *4–5.

---

[9] *See also Villaspring*, 2011 WL 5330790, at *6 ("strategic insights" from "interviewing [the] facility's former employees"); *Kronberg*, 2010 WL 1443934, at *4 ("structure" of the business and "the role of other individuals" who worked); N.Y. Op. 1187 at 2–3 ("information" a lawyer, also a police officer, acquired that was "unfavorable employment reviews or non-public discipline"); N.Y. State Bar Ass'n Comm. on Prof. Ethics, Op. 1169 at 4 (2019) (information a lawyer acquired as a Town Supervisor); Neb. Op. 22-01 at 3149 (information that a government lawyer acquired from "a state-run database containing information . . . including (potentially) an individual's current financial information, location, prior employment and past earnings").

*Second*, those courts misread Rule 1.11(c)'s "material disadvantage" standard. The MDL court relied on prior discovery orders in the MDL to conclude that OptumRx should have already produced in the MDL the documents it produced to Motley Rice in the government investigations. The court ordered OptumRx to produce those documents into the MDL, and the other courts since have concluded that OptumRx can suffer no "material disadvantage" because all attorneys in the MDL now have access to those documents. The MDL court purported to cleanse Motley Rice of its ethical violations but recognized that "were it not for the standing Repository obligations . . . , the Court's discussion and analysis in this Order might have been different." *In re Nat'l Prescription Opiate Litig.*, 2024 WL 3387288, at *16. That decision was wrong. As already discussed, the "material disadvantage" standard simply assesses whether the information is relevant to the present litigation and could theoretically be used against the adverse party. Rule 1.11(c) does *not* consider the *relative* disadvantage to the adverse party depending on which lawyer is using the information. That the documents are now available in the opioid litigation to be used against OptumRx by lawyers who did *not* previously serve as government lawyers only underscores that Motley Rice likewise *could* use them to OptumRx's material disadvantage in the MDL and elsewhere.

*Third*, those courts all misapprehended the relevant facts. They focused solely on the 68,000-plus documents that OptumRx produced to Motley Rice in the investigations.[10] But even

---

[10] The MDL court and the Sixth Circuit also took issue with the timing of OptumRx's motion in the MDL, claiming that OptumRx should have raised the issue as far back as 2018. *See In re Nat'l Prescription Opiate Litig.*, 2024 WL 3387288, at *4–6; *In re OptumRx*, 2024 U.S. App. LEXIS 26695, at *4–5. But the D.C. and Hawaii investigations did not exist in 2018, so OptumRx could not have sought disqualification in 2018 based on them. Moreover, in 2018 Motley Rice was not "represent[ing] a private client whose interests [we]re adverse to" OptumRx in the opioid litigation. Utah R. Prof. Conduct 1.11(c). OptumRx promptly raised the ethical violation in March

accepting the faulty premise that the availability of those documents in discovery means they cannot be used to OptumRx's material disadvantage, those documents are not the only confidential government information at issue. As discussed, Motley Rice's "information about" OptumRx also includes (1) memos that Motley Rice drafted from its synthesis of the documents and its investigation as a whole (*e.g.*, Haw. Special AG Agmt. at A1-1 to -2; D.C. Engagement Ltr., Statement of Work §§ 4.1.3, 4.1.5), (2) information that Motley Rice obtained in meetings with OptumRx (Caplis Decl. ¶¶ 7, 18; Grant Decl. ¶ 7), and (3) any information about OptumRx that Motley Rice obtained from *other* sources. That is all "confidential government information" about OptumRx unaccounted for in those courts' orders.

## III.    THE FACTORS WEIGH IN FAVOR OF DISQUALIFICATION.

Not only is Motley Rice's ethical violation clear, but the applicable balancing factors strongly weigh in favor of disqualification. *See Archuleta*, 904 F. Supp. 2d at 1192. Simply put, this motion is not a litigation tactic. It is grounded in legitimate and clear-cut ethical concerns.

Egregiousness of the violation. The egregiousness of the offense is severe. Motley Rice violated the Utah Rules of Professional Conduct by agreeing to represent that State, knowing that its lawyers previously obtained confidential government information that the firm could use in this private lawsuit against OptumRx.

Prejudice. Given that this case is still at an early stage, disqualification presents no prejudice to the State. The State is ably represented by other non-conflicted attorneys. But there would be severe prejudice to OptumRx unless the Court disqualifies Motley Rice. Motley Rice

2023, shortly after Motley Rice began litigating against OptumRx in late 2022. Regardless, OptumRx has promptly moved for disqualification here.

can use confidential government information improperly against OptumRx in this private lawsuit. Absent disqualification, there is no effective remedy for Motley Rice's ethical violation.

Diminution of effectiveness of counsel. There has been a diminution of Motley Rice's effectiveness. Motley Rice's representation of the State is tainted by the firm's abuse of government power. Motley Rice's representation of the State distracts from resolution of the State's claims and undermines confidence in an ethical system of justice. *See Archuleta*, 904 F. Supp. 2d at 1193.

State of the proceedings. The stage of the proceeding favors disqualification. The only progress in this case to date is the briefing of the State's motion to remand. There has been no other motions practice, and discovery has not commenced. This case is in an early stage, which weighs in favor of disqualification. *See Allred v. Pacificorp*, 2015 WL 12866208, at *8 (D. Utah Oct. 19, 2015) ("[T]his litigation has only recently commenced in earnest. Thus, no party will suffer significant prejudice from Mr. Cline's disqualification at this stage of the litigation.").

## **CONCLUSION**

As OptumRx's two ethics experts—one of whom is on the ABA's Standing Committee on Ethics and Professional Responsibility—have explained, "[t]here can be no more obvious violation of Rule 1.11(c)" than Motley Rice's violation here. Muchman/Montgomery Report at 51; *see also id.* ("We do not believe that this is a close call."). The Court should disqualify Motley Rice.


Dated this 31st day of July, 2025.

_/s/ Bentley J. Tolk_
Bentley J. Tolk (6665)
Rodger M. Burge (8582)
PARR BROWN GEE & LOVELESS
101 South 200 East, Suite 700
Salt Lake City, UT 84111
T: (801) 532-7840
btolk@parrbrown.com
rburge@parrbrown.com

Matthew P. McGuire (_pro hac vice_)
ALSTON & BIRD LLP
555 Fayetteville Street, Suite 600
Raleigh, NC 27601
T: (919) 862-2200
F: (919) 862-2260
matt.mcguire@alston.com

_Attorneys for OptumRx, Inc._

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on this 31st day of July, 2025, the foregoing document was filed through the CM/ECF system and will be sent electronically to the registered participants on the Notice of Electronic Filing.

*/s/ Bentley J. Tolk*
Bentley J. Tolk