## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH
## CENTRAL DIVISION AT SALT LAKE CITY

STATE OF UTAH and DIVISION OF
CONSUMER PROTECTION,

        Plaintiffs,

    v.

EXPRESS SCRIPTS, INC., et al.,

        Defendants.

Case No. 2:25-cv-00088-DBB-DBP

## DECLARATION OF MATTHEW P. HOOKER IN SUPPORT OF
## <u>OPTUMRX, INC.'S MOTION TO DISQUALIFY MOTLEY RICE</u>

<u>**DECLARATION OF MATTHEW P. HOOKER**</u>

I, Matthew P. Hooker, declare as follows:

1.      I am over eighteen years old, of sound mind, and under no legal disability. I am an associate at Alston & Bird LLP.

2.      I submit this declaration in support of OptumRx's Motion to Disqualify Motley Rice.

3.      I have personal knowledge of the facts set forth in this declaration, and if called to testify in person about those facts, could competently do so under oath.

4.      The following exhibits are true and correct copies of the documents listed below:

a.      **Exhibit A** is a copy of the Expert Report and Opinion of Sari W. Montgomery and Wendy J. Muchman.

b.      **Exhibit B** is a copy of the District of Columbia's December 1, 2020 engagement letter with Motley Rice.

c.      **Exhibit C** is a copy of the District of Columbia's Office of the Attorney General's December 28, 2020 investigative subpoena to OptumRx.

d.      **Exhibit D** is a copy of the July 1, 2021 confidentiality agreement between OptumRx and the District of Columbia's Office of the Attorney General, executed by Linda Singer and Paige Boggs of Motley Rice.

e.      **Exhibit E** is a copy of OptumRx's July 13, 2021 production letter to the District of Columbia's Office of the Attorney General, addressed to Linda Singer and Paige Boggs at Motley Rice.

f.  **Exhibit F** is a copy of OptumRx's September 10, 2021 production letter to the District of Columbia's Office of the Attorney General, addressed to Linda Singer and Paige Boggs at Motley Rice.

g.  **Exhibit G** is a copy of OptumRx's November 24, 2021 production letter to the District of Columbia's Office of the Attorney General, addressed to Linda Singer and Paige Boggs at Motley Rice.

h.  **Exhibit H** is a copy of the State of Hawaii's April 29, 2021 Agreement for Special Deputy Attorney General Services with Motley Rice LLC and April 29, 2021 Supplemental Contract No. 1 with Motley Rice LLC.

i.  **Exhibit I** is a copy of the Hawaii Department of the Attorney General's October 15, 2021 investigative subpoena to OptumRx.

j.  **Exhibit J** is a copy of the May 18, 2022 confidentiality agreement between OptumRx and the Hawaii Department of the Attorney General, executed by Linda Singer and Paige Boggs of Motley Rice.

k.  **Exhibit K** is a copy of OptumRx's June 8, 2022 production letter to the Hawaii Department of the Attorney General, addressed to Linda Singer and Paige Boggs at Motley Rice.

l.  **Exhibit L** is a copy of OptumRx's September 1, 2022 production letter to the Hawaii Department of the Attorney General, addressed to Linda Singer and Paige Boggs at Motley Rice.

m.  **Exhibit M** is a copy of the City of Chicago's November 8, 2018 investigative subpoena to OptumRx.

n.  **Exhibit N** is a copy of the February 19, 2019 confidentiality agreement between
OptumRx and the City of Chicago, executed by Mimi Liu of Motley Rice.

o.  **Exhibit O** is a copy of OptumRx's *Petition for Writ of Mandamus* filed in the
U.S. Court of Appeals for the Sixth Circuit on May 7, 2024 in *In re OptumRx,
Inc.*, No. 24-3396.

p.  **Exhibit P** is a copy of the U.S. District Court for the District of Massachusetts's
October 18, 2024 order denying OptumRx's motion to disqualify Motley Rice
in *City of Boston v. Express Scripts, Inc.*, No. 1:24-cv-10525.

q.  **Exhibit Q** is a copy of the California Superior Court for Los Angeles County's
November 14, 2024 order denying OptumRx's motion to disqualify Motley
Rice in *People ex rel. Harrison v. Express Scripts, Inc.*, No. 23STCV20886.

r.  **Exhibit R** is a copy of a public-records request to the Wyoming Office of the
Attorney General dated January 24, 2025, and the Office of the Attorney
General's response, including documents produced, dated February 10, 2025.

s.  **Exhibit S** is a copy of a public-records request to the Hawaii Department of the
Attorney General dated February 18, 2025, and the Department of the Attorney
General's response dated March 4, 2025.

5.  I have reviewed and am familiar with the documents that OptumRx produced to the
Minnesota Attorney General's Office in accordance with a 2017 civil investigative demand that
are branded with the Bates-number range Optum-MNAG-0000000001 to Optum-MNAG-
0000068310 (the "Minnesota Documents").

6.  The Minnesota Documents consist of approximately 10,885 unredacted documents
(approximately 68,310 pages) of unredacted information that OptumRx marked "PROPRIETARY

AND CONFIDENTIAL." They contain OptumRx's confidential internal or commercially sensitive documents, including documents relating to opioid and non-opioid medications, covering various aspects of OptumRx's business operations. The documents cover formulary development, rebate negotiations with drug manufacturers, and clinical and formulary offerings to clients. They include charters, policies, and other materials from OptumRx's business strategy and formulary placement committees as well as emails from custodians relating to those and other aspects of OptumRx's business.

7.      Based on the December 18, 2024 Declaration of Allison J. Caplis as well as OptumRx's production letters dated September 10, 2021 and June 8, 2022 (Exhibits F and K), I understand that the Minnesota Documents were produced to (a) Motley Rice for the District of Columbia Attorney General on September 10, 2021 and (b) Motley Rice for the Hawaii Attorney General on June 8, 2022.

8.      Below are several more detailed (non-exhaustive) examples of the types of documents in the Minnesota Documents:

   a.      The Minnesota Documents include some of OptumRx's rebate agreements with various prescription drug manufacturers including Eli Lilly, Novo Nordisk, and Sanofi-Aventis (the three major manufacturers of insulin), as well as Bayer, Biogen, Boehringer Ingelheim, Bristol-Myers Squibb, AstraZeneca, Johnson & Johnson, Merck, Novartis, and Teva.[1] Some of the rebate agreements cover multiple drugs across various therapeutic classes. For example, the agreements with Eli Lilly, Novo Nordisk, and Sanofi-Aventis cover some non-insulin drugs in addition to insulin drugs. The agreements with Bayer, Biogen, Boehringer

---

[1] *E.g.*, Optum-MNAG-0000000001–1901; Optum-MNAG-0000004713–5163.

Ingelheim, Bristol-Myers Squibb, AstraZeneca, Johnson & Johnson, Merck, Novartis, and Teva cover non-insulin drugs. When OptumRx re-produced the same agreements in an insulin-related civil litigation naming OptumRx as a defendant, Mississippi ex rel. Fitch v. Eli Lilly & Co. et al., No. 3:21-cv-00674 (S.D. Miss.) (the "Mississippi Insulin Litigation"), it redacted all non-insulin information from the Eli Lilly, Novo Nordisk, and Sanofi-Aventis agreements and withheld the agreements with the other manufacturers as non-responsive. But the rebate agreements are unredacted in the Minnesota Documents and were therefore provided in their unredacted form to Motley Rice as part of its government investigations.

b.    The Minnesota Documents include slide decks for OptumRx's Business Implementation Committee (BIC) monthly meetings.[2] Among other things, the BIC approves changes to prescription drug lists (also known as formularies). The BIC slide decks walk through the analysis and decisions for numerous drugs, including opioids. Some of the BIC slide decks in the Minnesota Documents do not include or analyze insulin or anti-diabetes drugs. When OptumRx re-produced the same decks in the Mississippi Insulin Litigation, it redacted all slides that did not relate to insulin or anti-diabetes drugs. For some decks, that meant OptumRx redacted the entire slide deck or the vast majority

---

[2] *E.g.*, Optum-MNAG-0000005229; Optum-MNAG-0000005231; Optum-MNAG-0000005742; Optum-MNAG-0000006217; Optum-MNAG-0000008704; Optum-MNAG-0000014277; Optum-MNAG-0000014590; Optum-MNAG-0000014608; Optum-MNAG-0000014946; Optum-MNAG-0000017924; Optum-MNAG-0000018396; Optum-MNAG-0000019933; Optum-MNAG-0000021111; Optum-MNAG-0000021447; Optum-MNAG-0000021898; Optum-MNAG-0000022028; Optum-MNAG-0000022328; Optum-MNAG-0000023225; Optum-MNAG-0000023331; Optum-MNAG-0000023986; Optum-MNAG-0000024214; Optum-MNAG-0000024604; Optum-MNAG-0000025288; Optum-MNAG-0000025414; Optum-MNAG-0000025438; Optum-MNAG-0000029382; Optum-MNAG-0000029462; Optum-MNAG-0000035242; Optum-MNAG-0000035686; Optum-MNAG-0000035978; Optum-MNAG-0000045531; Optum-MNAG-0000046091.

of the deck because it overwhelmingly concerned non-insulin products. But the BIC slide decks are unredacted in the Minnesota Documents. Thus, Motley Rice, as part of its investigations, received the entire unredacted slide decks, including slides related to opioids.

c.     The Minnesota Documents include BIC output report grids and related emails.[3] The BIC grids are spreadsheets that contain detailed information about formulary placement for drugs and related internal recommendations and decisions. The grids and related emails reveal OptumRx's internal business strategies for changing and reviewing drug formulary placement. Each grid

---

[3] *E.g.*, Optum-MNAG-0000006365; Optum-MNAG-0000006366; Optum-MNAG-0000006367; Optum-MNAG-0000006368; Optum-MNAG-0000006399; Optum-MNAG-0000006411; Optum-MNAG-0000006631; Optum-MNAG-0000006633; Optum-MNAG-0000013732; Optum-MNAG-0000014278; Optum-MNAG-0000014279; Optum-MNAG-0000014577; Optum-MNAG-0000014599; Optum-MNAG-0000014600; Optum-MNAG-0000014642; Optum-MNAG-0000014643; Optum-MNAG-0000014644; Optum-MNAG-0000014645; Optum-MNAG-0000016225; Optum-MNAG-0000017651; Optum-MNAG-0000017720; Optum-MNAG-0000017920; Optum-MNAG-0000017921; Optum-MNAG-0000018398; Optum-MNAG-0000019451; Optum-MNAG-0000019452; Optum-MNAG-0000019891; Optum-MNAG-0000019901; Optum-MNAG-0000019935; Optum-MNAG-0000019957; Optum-MNAG-0000020917; Optum-MNAG-0000020919; Optum-MNAG-0000021059; Optum-MNAG-0000034598; Optum-MNAG-0000034599; Optum-MNAG-0000034669; Optum-MNAG-0000034676; Optum-MNAG-0000021112; Optum-MNAG-0000021116; Optum-MNAG-0000021455; Optum-MNAG-0000021456; Optum-MNAG-0000021895; Optum-MNAG-0000021896; Optum-MNAG-0000035210; Optum-MNAG-0000035211; Optum-MNAG-0000035243; Optum-MNAG-0000022031; Optum-MNAG-0000022034; Optum-MNAG-0000035244; Optum-MNAG-0000022077; Optum-MNAG-0000022078; Optum-MNAG-0000022304; Optum-MNAG-0000035665; Optum-MNAG-0000035666; Optum-MNAG-0000022329; Optum-MNAG-0000022330; Optum-MNAG-0000035682; Optum-MNAG-0000035683; Optum-MNAG-0000005209; Optum-MNAG-0000005211; Optum-MNAG-0000022920; Optum-MNAG-0000035950; Optum-MNAG-0000035951; Optum-MNAG-0000035972; Optum-MNAG-0000035980; Optum-MNAG-0000023220; Optum-MNAG-0000023229; Optum-MNAG-0000023332; Optum-MNAG-0000039492; Optum-MNAG-0000039493; Optum-MNAG-0000023980; Optum-MNAG-0000023983; Optum-MNAG-0000042851; Optum-MNAG-0000024216; Optum-MNAG-0000024217; Optum-MNAG-0000024498; Optum-MNAG-0000024504; Optum-MNAG-0000005227; Optum-MNAG-0000024605; Optum-MNAG-0000024606; Optum-MNAG-0000025287; Optum-MNAG-0000025289; Optum-MNAG-0000043108; Optum-MNAG-0000043182; Optum-MNAG-0000005743; Optum-MNAG-0000005744; Optum-MNAG-0000029432; Optum-MNAG-0000029433; Optum-MNAG-0000029438; Optum-MNAG-0000029447; Optum-MNAG-0000029448; Optum-MNAG-0000029449; Optum-MNAG-0000029450; Optum-MNAG-0000005228; Optum-MNAG-0000029454; Optum-MNAG-0000029455; Optum-MNAG-0000029456; Optum-MNAG-0000029459; Optum-MNAG-0000029460; Optum-MNAG-0000045084; Optum-MNAG-0000005232; Optum-MNAG-0000029463; Optum-MNAG-0000029464; Optum-MNAG-0000005233; Optum-MNAG-0000045496; Optum-MNAG-0000045516; Optum-MNAG-0000045553; Optum-MNAG-0000045554; Optum-MNAG-0000046013; Optum-MNAG-0000046092; Optum-MNAG-0000046129; Optum-MNAG-0000046159; Optum-MNAG-0000046348; Optum-MNAG-0000049764; Optum-MNAG-0000049767; Optum-MNAG-0000054063; Optum-MNAG-0000054064; Optum-MNAG-0000006220; Optum-MNAG-0000006235.

contains information and analysis about numerous drugs (including opioids), not just one drug per grid. The grids have hundreds of rows, with each row addressing a specific drug. OptumRx re-produced most of the same grids in the Mississippi Insulin Litigation; when it did, it redacted all rows that did not relate to insulin or anti-diabetes drugs. But the BIC grids are unredacted in the Minnesota Documents that were provided to Motley Rice, providing a comprehensive view into decisions and trends across myriad drugs and therapeutic classes.

d.    The Minnesota Documents include slide decks from OptumRx's Industry Relations team containing hundreds of slides analyzing formulary and rebate strategy for numerous drugs including insulins, opioids, and others.[4] The decks provide summaries of current formulary and rebate statuses as well as projected financial scenarios, possible changes to future formulary positions, expected developments and changes from prescription drug manufacturers (including new drug launches), and recommendations for future strategy. OptumRx reproduced many of the same decks in the Mississippi Insulin Litigation; when it did, it redacted all slides that did not relate to insulin or anti-diabetes drugs. But the decks are unredacted in the Minnesota Documents and were therefore provided in their unredacted form to Motley Rice as part of its government investigations.

---

[4] *E.g.*, Optum-MNAG-0000016959; Optum-MNAG-0000017638; Optum-MNAG-0000033537; Optum-MNAG-0000035253; Optum-MNAG-0000022083; Optum-MNAG-0000042894; Optum-MNAG-0000042896; Optum-MNAG-0000024650; Optum-MNAG-0000031581; Optum-MNAG-0000031582; Optum-MNAG-0000031583; Optum-MNAG-0000031584; Optum-MNAG-0000031585; Optum-MNAG-0000049413; Optum-MNAG-0000053047; Optum-MNAG-0000053893; Optum-MNAG-0000031833; Optum-MNAG-0000031834; Optum-MNAG-0000031835; Optum-MNAG-0000031858; Optum-MNAG-0000067101.

e.      The Minnesota Documents include OptumRx's intelligence sheets about prescription drug manufacturers for OptumRx's in-person meetings with those manufacturers.[5] The sheets contain meeting agendas, analysis of and notes on OptumRx's relationship with the manufacturers, financial information about yearly rebates and the manufacturers' value to OptumRx, potential issues or concerns between OptumRx and the manufacturers, and future opportunities for the business relationships. Intelligence sheets for multiple manufacturers (including opioid manufacturers like Purdue, Johnson & Johnson, and Teva, as well as manufacturers of insulins and other drugs) are grouped in a single file. OptumRx re-produced many of the same files in the Mississippi Insulin Litigation; when it did, it redacted all pages for non-insulin manufacturers or portions of pages for insulin manufacturers that did not relate to insulin or anti-diabetes drugs. But the files are unredacted in the Minnesota Documents and were therefore provided in their unredacted form to Motley Rice as part of its government investigations.

f.      The Minnesota Documents include other documents and slide decks relating to internal strategies across OptumRx's business. One deck,[6] for instance, outlines a discussion about OptumRx's strategic partnership with one of its clients. That deck walks through the nuts and bolts of OptumRx's business, including the company's rebate philosophy and approach, formulary management models, formulary offering options, utilization management bundles, and its annual

---

[5] *E.g.*, Optum-MNAG-0000006744; Optum-MNAG-0000014165; Optum-MNAG-0000016344; Optum-MNAG-0000035781; Optum-MNAG-0000024139; Optum-MNAG-0000005936; Optum-MNAG-0000005942; Optum-MNAG-0000053633.
[6] Optum-MNAG-0000003374.

timeline to create drug formularies through committee review. Another deck[7] comes from OptumRx's Industry Relations team and details the company's rebate initiatives and client formulary distribution, addresses specific organizational goals and milestones, and analyzes anticipated changes to contracts with manufacturers. Another deck[8] (also from the Industry Relations team) is an internal draft presentation for a client forum addressing OptumRx's approaches to contracting with prescription drug manufacturers, including price protection and lowest net-cost strategies, and other competitively sensitive information.

g.  The Minnesota Documents include copies of OptumRx's internal formal procedures. One procedure,[9] for instance, governs the clinical evaluation of drugs for prescription drug list (formulary) review. It is not drug specific and details how OptumRx's internal committees evaluate drugs and how those drugs will be categorized (or designated) for formulary placement purposes.

h.  The Minnesota Documents include slide decks for OptumRx's client and strategic partnership meetings to discuss drug rebates.[10] Those documents walk through the client or partner's drug rebates and utilization on a drug-by-drug basis.

i.  The majority of the Minnesota Documents are custodial emails and attachments that address internal business strategies including but not limited to negotiations

---

[7] Optum-MNAG-0000003594.
[8] Optum-MNAG-0000045687.
[9] Optum-MNAG-0000001902.
[10] *E.g.*, Optum-MNAG-0000008559; Optum-MNAG-0000008561; Optum-MNAG-0000008600; Optum-MNAG-0000008602; Optum-MNAG-0000009925; Optum-MNAG-0000009926.

with prescription drug manufacturers, formulary placement, and financial analysis.[11]

9.    The vast majority of the Minnesota Documents—and those types and categories of documents—are highly confidential and commercially sensitive to OptumRx and are not available to the public.

10.    The only documents in the Minnesota Documents that I understand to be publicly available as a regular part of OptumRx's business are 41 documents (0.38% of the total production) that constitute some of OptumRx's prescription drug list offerings (also known as formularies).[12]

[Signature page follows]

---

[11] Optum-MNAG-0000001902–4589; Optum-MNAG-0000004658–55673; Optum-MNAG-0000057112–68310.
[12] Optum-MNAG-0000055932–57111.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: July 31, 2025

_____

Matthew P. Hooker

# Exhibit A

to Declaration of Matthew Hooker

## ASSIGNMENT

Ms. Montgomery and Ms. Muchman were asked by OptumRx, Inc.'s counsel to prepare a report on the application of Utah Rule of Professional Conduct 1.11(c) to the proceedings against OptumRx in the opioid litigation captioned *Utah et al. v. Express Scripts, Inc. et al.*, No. 2:25-cv-00088, pending in the U.S. District Court for the District of Utah (hereinafter the "Utah Litigation").

## COMPENSATION

Both experts are being compensated at a rate of $500 an hour.

## SUMMARY OF OPINIONS

I.    Rule 1.11(c) applies to Motley Rice in this case. When attorneys are acting under government authority and obtain confidential information through that government service, Rule 1.11(c) protects that information about third parties and applies to those attorneys whether they are current or former government employees or serving in a full- or part-time position, and regardless of whether they served in a representational capacity.

II.   Motley Rice possessed confidential government information about OptumRx under Rule 1.11(c) because the rule protects confidential information about a third party acquired under government authority in the exact circumstances of this case—where Motley Rice obtained information pursuant to government investigative subpoenas that was both confidential and protected by confidentiality agreements.

A.    Federal regulations and statutes that have extensive protections for nonpublic information serve as the basis for the definition of "confidential government information" in Rule 1.11(c), and those regulations demonstrate that information about OptumRx obtained by Motley Rice is "confidential government information" obtained through government authority and is thus protected under Rule 1.11(c).

B.    Because Motley Rice obtained information about OptumRx while acting as government attorneys and pursuant to government subpoenas, the information meets all elements of the definition of confidential government information and is protected as confidential under Rule 1.11(c).

III.  Since the information at issue was obtained directly by Motley Rice while acting as government attorneys, and no screening was in place when the information was obtained, the firm has actual knowledge of the confidential government information and must be

1

disqualified. The protections afforded to that information under Rule 1.11(c) cannot be
waived.

IV.    Under Rule 1.11(c), OptumRx does not have to prove that Motley Rice *will* use or *has* used
the confidential government information that the firm obtained as government lawyers to
OptumRx's material disadvantage; OptumRx must show only that Motley Rice *could use*
that information to OptumRx's material disadvantage. Motley Rice *could use* the
information against OptumRx in this litigation because it is relevant to the litigation.
Disqualification is, therefore, appropriate.

V.    This is a clear conflict, and disqualification is the only remedy.

VI.    OptumRx's well-founded disqualification motion seeks to promote the important policy
concern of preventing the abuse of government authority, which has long been recognized
by this District Court.

## **PROFESSIONAL BACKGROUNDS**

### **Background of Sari W. Montgomery**

Ms. Montgomery has been licensed to practice law in Illinois since 1994 and is a partner

in the firm of Robinson, Stewart, Montgomery & Doppke LLC in Chicago, Illinois. Since 2010,

her private practice has focused on matters involving legal ethics and professional responsibility,

including defending lawyers in disciplinary investigations and prosecutions at trial and on appeal

before the Attorney Registration and Disciplinary Commission ("ARDC") and the Illinois

Supreme Court, representing judges in disciplinary actions before the Illinois Judicial Inquiry

Board, advising lawyers, law firms, government agencies, and law-related businesses on ethical

and risk management issues and obligations, representing bar applicants in Character and Fitness

proceedings, and providing expert witness services in legal malpractice, disqualification, and fee

litigation.

Previously, Ms. Montgomery served as Litigation Counsel and Senior Litigation Counsel

at the ARDC from 1994 to 2004. During her tenure at the ARDC, she investigated hundreds of

complaints filed against lawyers and prosecuted dozens of formal disciplinary cases before the

Hearing Board of the ARDC and the Illinois Supreme Court, including numerous cases involving conflicts of interest.

In Ms. Montgomery's current practice since 2010, she has represented hundreds of clients in ARDC investigations, including many involving conflicts of interest. In addition, she has advised dozens of lawyers, law firms, and government agencies on issues related to conflicts of interest. Over the past thirty years, Ms. Montgomery has also presented extensively on various conflict of interest and other topics.

In addition to serving as ARDC counsel and engaging in private practice, Ms. Montgomery is an Adjunct Professor of Legal Ethics at Northwestern University Pritzker School of Law and has lectured extensively on all manner of ethics and professional responsibility issues at local, state, national, and international levels including, but not limited to: ABA Lawyers Professional Liability National Conference on Legal Malpractice; ABA Labor and Employment Law Section National Annual Conference; Association of Professional Responsibility Lawyers (APRL); National Organization of Bar Counsel (NOBC); International Conference of Legal Regulators (ICLR); American Law Institute (ALI); National Association of Retail Collection Attorneys; the Illinois State Bar Association (ISBA); Illinois Institute of Continuing Legal Education (IICLE); Practicing Law Institute (PLI); New York State Bar Association; California State Bar Committee on Professional Responsibility and Conduct (COPRAC); National Academy of Continuing Legal Education (NACLE); Chicago Bar Association; Lake County Bar Association; and the Illinois Public Defender Association.

Ms. Montgomery has also authored and co-authored book chapters and articles on professional responsibility topics including: ethics of using social media in jury selection (ABA GP/Solo Magazine); systemic regulatory reform (Bloomberg); ethics in jury selection (IICLE); the

3

disciplinary process in Illinois (IICLE); in-house counsel admission (ISBA); and uniform standards for imposing lawyer sanctions (ABA). From 2022 through 2024, she published a quarterly ethics column in Business of Law Digest. She is also an appointed member of the Editorial Board for Law360 Legal Ethics.

Ms. Montgomery is the current Chair of the ABA Standing Committee on Professional Regulation and has served on that Committee since 2018. One of the services that Committee provides is to confidentially consult with the highest court of a requesting jurisdiction on how to improve the system of lawyer regulation in that jurisdiction. Ms. Montgomery has twice been selected to participate as part of a four-person team to perform such consultations.

Ms. Montgomery currently serves as the Secretary and elected member of the Board of Directors for the Association of Professional Responsibility Lawyers (APRL) and has previously served that organization as Treasurer, a member of the Programming Committee and as the liaison to the ABA Committee on Professional Regulation.

In 2024, Ms. Montgomery was appointed to the Illinois Supreme Court Committee on Professional Responsibility. In addition, since 2008, Ms. Montgomery has been appointed to serve as a member and past Chair of the ISBA Standing Committee on Professional Conduct, which is charged with drafting ethics opinions for the benefit of the Association's 28,000 members. She was recently appointed to serve on the ISBA's newly created Standing Committee on Artificial Intelligence and the Practice of Law and has also served on several other ethics-related special committees and task forces by appointment of the ISBA President. Additionally, she is a member of the Board of Managers of the Chicago Bar Association and also serves on its Finance Committee, and on its Committees on Professional Responsibility, and the Unauthorized Practice of Law and Multi-jurisdictional practice. Ms. Montgomery is a member of the Chicago Council of

Lawyers Access to Justice Committee, the Lake County Bar Association, and the Association of

Women Attorneys of Lake County.

Since 2018, Ms. Montgomery has been designated as a "Subject Matter Expert" for the

Multistate Professional Responsibility Exam (MPRE) by the National Conference of Bar

Examiners (NCBE). In that role, she has drafted and edited questions for the MPRE on behalf of

the NCBE related to the law of lawyering, legal malpractice, judicial ethics, and all aspects of the

Rules of Professional Conduct, including conflicts of interest. In 2023, Ms. Montgomery was

appointed to the Drafting Committee for the MPRE, which is charged with reviewing and editing

all potential test items and selecting items which will appear on the MPRE.

A copy of Ms. Montgomery's Curriculum Vitae is attached as **Appendix A**.

**Background of Wendy J. Muchman**

Ms. Muchman is a Professor of Practice at Northwestern University Pritzker School of

Law where she teaches and develops the law school's varied curriculum of ethics-related courses,

most of which are graduation requirements. The five different ethics courses she teaches include

the legal ethics class for the government and public sector lawyer and legal ethics in the trial

advocacy program. Each course devotes considerable focus to the area of conflicts of interest. She

has taught legal ethics at Northwestern since 2000. She has been licensed to practice law in Illinois

since 1981.

Between 1989 and 2019, she served as litigation counsel, including in multiple

management roles of increasing responsibility, at the Attorney Registration and Disciplinary

Commission of the Supreme Court of Illinois (ARDC). In 2010, she was promoted to Chief of

Litigation and Professional Education and held that position until leaving the office in 2019.

At the ARDC, she reviewed, investigated, prosecuted and argued appeals of professional misconduct allegations against Illinois lawyers. Among the innumerable matters she handled were many cases involving complex conflicts of interest.

At the ARDC, she also presented hundreds of continuing legal education programs to various lawyer groups, government agencies, bar associations, and judges, and she continues to do so to this date. Many of the presentations relate to conflicts of interest. She answered hundreds of calls as part of the ARDC Ethics Inquiry Program, responding to lawyers' questions about ethical issues posed as hypotheticals including on conflicts of interest.

She was among the leaders responsible for developing one of the first national Proactive Management-Based Regulation programs. This program was designed to help lawyers and law firms improve legal infrastructures and help lawyers and law firms avoid legal malpractice and discipline. She personally created several modules including the one on informed consent.

Active for decades in various National and State Bar Associations, she has served on committees with a focus on legal ethics and professional responsibility, including in leadership roles. She is currently an appointed member of the ABA Standing Committee on Ethics and Professional Responsibility (ABASCEPR). The ABASCEPR has the authority to advise and assist professional organizations and courts regarding the interpretation of statements of the ethical standards of the profession such as the Model Rules of Professional Conduct and to express and publish its opinions on proper professional conduct. In 2025 she was appointed as a member of the Editorial Board of the ABA/Bloomberg Law Lawyers' Manual on Professional Conduct. She is a past president of the National Organization of Bar Counsel (the national organization of lawyer regulators) and is a member of the Association of Professional Responsibility where she has served

on the conference planning Committee. Since 2020, she has served on the ABA National Conference on Professional Responsibility Planning Committee.

In addition to those appointments, other related bar association activities in which she has participated include: ABA Standing Committees (various years between 2016-2021); Standing Committee on Lawyer Regulation (formerly Committee on Professional Discipline); Standing Committee on Ethics and Professional Responsibility; Standing Committee on Professionalism; ABA Government and Public Lawyers Division Council (2018-2024, Chair 2023); ABA Working Group for Evaluation and Development of a Model Code for Judicial Law Clerks (2019-2024): Chicago Bar Association Task Force on the Sustainable Practice of Law & Innovation (2019-2020); Illinois Supreme Court Committee on Professional Responsibility (2019-2021); and the Chicago Bar Association Committee on Professional Responsibility (2009-2011).

Since 2018, she has been designated by the National Conference of Bar Examiners (NCBE) as a "Subject Matter Expert" for the Multistate Professional Responsibility Exam (MPRE). In that capacity, she has drafted and edited questions for the MPRE on behalf of the NCBE related to the law of lawyering, legal malpractice, judicial ethics and all aspects of the Rules of Professional Conduct, including conflicts of interest. In addition, she provides expert witness services in legal malpractice, disqualification (conflicts), fee litigation, and other issues of litigation practice. She has been an instructor for the National Institute for Trial Advocacy for at least 30 years and still presents the CLE ethics lectures to several of those programs.

A copy of Ms. Muchman's Curriculum Vitae is attached as **Appendix B**.

## **MATERIALS REVIEWED**

A list of the materials reviewed and relied upon as the basis for our opinion is attached as **Appendix C**.

## FACTS CONSIDERED

Motley Rice represents the State of Utah and the Utah Division of Consumer Protection (together, the "State" or "Utah") in *Utah v. Express Scripts, Inc.*, No. 2:25-cv-00088 (D. Utah) pending in the U.S. District Court for the District of Utah. (hereinafter the "Utah Litigation").

## City of Chicago Investigation

In 2018, the City of Chicago Law Department hired Motley Rice to investigate OptumRx and its practices. As part of its investigation, on November 8, 2018, Motley Rice, on behalf of the City of Chicago Law Department, served an investigative subpoena on OptumRx related to alleged consumer fraud and deceptive practices. Before responding to the subpoena, OptumRx negotiated a confidentiality agreement which was executed on behalf of the City of Chicago by Special Assistant Corporation Counsel Mimi Liu, an attorney with Motley Rice. *See* Confidentiality Agreement dated February 19, 2019, attached as Exhibit 1. The Confidentiality Agreement provided, in pertinent part, as follows:

> Both the Confidential Documents and the information contained therein shall be treated as confidential, shall not be disclosed except as provided in this Agreement, and shall not be made available to persons other than those described below.[1] All information produced or made available for inspection and copying by [OptumRx], including but not limited to information contained in documents or in correspondence between counsel, will be used solely in furtherance of the Investigation and any subsequent litigation brought by the City of Chicago against [OptumRx] that is directly related to this Investigation and *will be used for no other purpose whatsoever* without the prior written consent from [OptumRx] or by a court order or other applicable law.
>
> * * *
>
> *No Motley Rice LLC attorney, contractor, paralegal, or expert adverse to [OptumRx] in other matters shall have access to any Confidential Documents or information contained therein relating to this Investigation.* . .The City of Chicago

---

[1] As relevant here, the persons permitted to have access to the documents produced by OptumRx pursuant to the City of Chicago subpoena included the City of Chicago's Law Department and outside counsel in connection with the Investigation and any subsequent litigation directly related to the Investigation brought by the City of Chicago against [OptumRx], namely Motley Rice attorneys Linda Singer, Mimi Liu, and Paige Boggs, and other lawyers, contractors or paralegals working on the Investigation brought by the City of Chicago against [OptumRx]. *See* Exhibit 1, ¶3(a).

and its outside counsel in this Investigation shall not share, disclose, or discuss Confidential Documents or the information contained therein with any Motley Rice attorneys, paralegals, contractors, or experts adverse to [OptumRx] in another matter. (*Emphasis supplied*).

*See* Exhibit 1. In reliance on the confidentiality agreement, OptumRx produced its confidential material, including prescription claims data and related documents, to the City of Chicago Law Department through the City's counsel, Motley Rice.

**District of Columbia Investigation**

Subsequently, on or about December 1, 2020, the Office of the Attorney General of the District of Columbia ("DC OAG") engaged Motley Rice to assist the Public Advocacy Division with an investigation of, and potential litigation against, OptumRx and other Pharmacy Benefit Managers ("PBMs") regarding potential violations of consumer protection law and the False Claims Act related to the PBMs' alleged role in setting prices for prescription drugs. The agreement between Motley Rice and the DC OAG provided, in part, that Motley Rice agreed to provide legal services to the Government of the District of Columbia through the Office of the Attorney General. *See* Engagement Letter Agreement ("Engagement Letter") between Motley Rice and DC OAG dated December 1, 2020, attached as Exhibit 2. The services contemplated by the Engagement Letter encompassed "assist[ing] in all phases of these investigations and litigations," in particular and as relevant to this opinion: drafting and responding to discovery requests; tracking documents obtained in discovery; responding to FOIA requests; coordinating litigation with other states and the federal government to promote a unified approach to litigation; handling discovery disputes; and advising the DC OAG on the conduct of the case and on strategy and tactics for each phase of the case. *Id.* at pp. 5-6.

The Engagement Letter further provided, in pertinent part:

[Motley Rice recognizes that] in the performance of the contract [the firm] may receive certain information submitted to the District government on a proprietary

> basis by third parties, information which relates to potential or actual claims against the District government, or information which relates to matters in dispute or litigation. Unless the District consents to a particular disclosure, [Singer] shall use such information exclusively in the performance of the contract and shall forever hold inviolate and protect from disclosure all such information, except disclosures required by applicable law or court order. . . [T]o the extent [Motley Rice] is permitted to disclose such information, [the firm] will make such disclosures only to those individuals who need to know such information in order to perform required tasks in their official capacity and will restrict access to such information to such individuals.

*See* Exhibit 2 at p. 12.

On December 28, 2020, "[b]y the authority vested in the Attorney General for the District of Columbia," the DC OAG issued an investigative subpoena to OptumRx regarding "the negotiation of prescription drug rebates and the administration of prescription drug benefits" which required OptumRx to produce documents to "Linda Singer Motley Rice LLC" directly. *See* Government of the District of Columbia Office of the Attorney General Subpoena dated December 28, 2020, attached as Exhibit 3. The subpoena demanded that OptumRx produce broad categories of information, including a list of the manufacturers from whom OptumRx received the largest payments by various types, payments manufacturers made to OptumRx, documents related to payment negotiations, and documents related to formulary coverage. Exhibit 3.

Because the information demanded by the subpoena included highly confidential and trade secret information, OptumRx and the DC OAG entered into a confidentiality agreement that specifically prohibited Motley Rice from using any confidential information they obtained using government power outside of their work for the District of Columbia. *See* Confidentiality Agreement between DC OAG and OptumRx dated July 1, 2021, attached as Exhibit 4. Specifically, the Confidentiality Agreement defined "Confidential Information" as:

> [D]ocumentary and/or tangible information of any type, kind or character that contains (a) Information of a personal nature where the public disclosure thereof would constitute a clearly unwarranted invasion of personal privacy; or (b) trade

secret or commercial financial information, to the extent disclosure would result in substantial harm to the competitive position of the Company.

*See* Exhibit 4 at ¶2. In addition, the Confidentiality Agreement provided that OptumRx would designate any item or document containing Confidential Information as "Confidential" on the document or information produced to the District. *Id.* The Confidentiality Agreement further stated that:

> [A]ll persons and entities signing a copy of the Addendum [to the Confidentiality Agreement] agree to use Confidential Information solely in connection with the Investigation and any litigation that may arise therefrom, *not to use Confidential Information in connection with any other matter*, and not to disclose any Confidential Information to any party or the public, except as provided by this Agreement provided that the OAG agree[s] with the designation. OAG outside counsel [Singer and Motley Rice] further agrees not to rely on Confidential Material in pursuing information or claims *in any other matters outside of its representation of the OAG.* (*Emphasis supplied*).

*Id.* The Confidentiality Agreement was signed by Linda Singer of Motley Rice as "Counsel for the Attorney General for the District of Columbia." *Id.* at pp. 8-9.

In reliance on these provisions of the Confidentiality Agreement, OptumRx produced its properly marked Confidential Information to Motley Rice as directed by the subpoena, including its rebate totals from 2016 to 2020 for its "top ten" manufacturers, many of which are parties to the opioid MDL litigation currently pending in the U.S. District Court for the Northern District of Ohio. *See* Production letter from OptumRx's counsel, Michelle Kisloff, to Linda Singer dated July 13, 2021, attached as Exhibit 5. To date, counsel for the DC OAG has not challenged OptumRx's designation of the documents OptumRx marked as "Confidential" pursuant to the definition in the Confidentiality Agreement.

**State of Hawai'i Investigation**

In or before May of 2021, the Attorney General for the State of Hawai'i ("HI OAG") appointed Linda Singer of Motley Rice as a Special Deputy Attorney General for the State of

Hawai`i. On October 15, 2021, the HI OAG served an investigative subpoena on OptumRx related
to an investigation under the Hawai'i statute barring false claims and deceptive trade practices. *See*
HI OAG Subpoena Duces Tecum No. 2021-052 dated October 15, 2021, attached as Exhibit 6.
The subpoena's fifteen requests sought documents and communications relating to the
administration of pharmacy benefit services for Hawai'i consumers, and pharmaceutical copay
clawbacks, deductibles, coinsurance, or copays that affected Hawai'i consumers. *Id.* The subpoena
further required OptumRx to deliver the responsive documents directly to "Special Deputy
Attorney General Linda Singer, Motley Rice LLC." *Id.*

Before producing documents in response to the subpoena, OptumRx and the HI OAG
entered into a Confidentiality Agreement that contained the identical provisions enumerated above
with regard to the Confidentiality Agreement entered into between OptumRx and the DC OAG.
*See* Confidentiality Agreement between the State of Hawai'i Department of the Attorney General
and OptumRx ("HI Confidentiality Agreement") dated May 18, 2022, attached as Exhibit 7. The
HI Confidentiality Agreement was also signed by Linda Singer of Motley Rice as "Counsel for
the State of Hawai'i Department of the Attorney General."

Again, in reliance upon the HI Confidentiality Agreement, OptumRx began producing its
properly marked Confidential Information responsive to the subpoena to Motley Rice, as directed.
Specifically, on June 8, 2022, OptumRx produced 68,310 pages of unredacted, commercially
sensitive information. *See* Production letter from Counsel for OptumRx, Allison Caplis, to Linda
Singer at Motley Rice dated June 8, 2022, attached as Exhibit 8. The documents produced pursuant
to this subpoena contained OptumRx's highly sensitive internal documents, including its rebate
agreements and negotiations with drug manufacturers, as well as charters, policies, and meeting
minutes from OptumRx's business strategy committees.

In addition, on September 9, 2022, OptumRx, again relying on the HI Confidentiality Agreement, produced another round of Confidential Information to Motley Rice in their capacity as Special Deputy Attorney General for Hawai'i. *See* Production letter from OptumRx counsel, Allison Caplis, to Linda Singer dated September 1, 2022, attached as Exhibit 9.

The vast majority of the Confidential Information that OptumRx produced to both the DC and HI OAG is not available to the public because those materials are among OptumRx's most sensitive commercial documents which it would not have otherwise produced were it not compelled to do so by OAG subpoenas, and if the information was not protected by Confidentiality Agreements. As such, Motley Rice had access to Confidential Information to which they would not otherwise be entitled if not for Singer's and Motley Rice's status as Counsel for the City of Chicago, DC OAG and Special Deputy Attorney General for the State of Hawai'i.

On October 5, 2023, the State of Hawai'i, represented by Motley Rice, filed suit against OptumRx. *See State of Hawaii v. Caremark PCS Health LLC et al.,* No. 1:23-cv-00464 (D. Hawaii). The allegations contained in that suit derive directly from the Confidential Information OptumRx provided to Motley Rice.

## **MDL Opioid Cases**

In late 2022, Motley Rice began actively litigating bellwether cases against OptumRx in the opioid MDL on behalf of other clients whom they represent as private clients of Motley Rice LLC, and not in their capacity as government lawyers. Motley Rice serves as co-lead counsel for plaintiffs in the bellwether cases against OptumRx in the MDL. *See In re Nat'l Prescription Opiate Litig.*, No. 1:17-md-2804 (N.D. Ohio). Motley Rice also represents plaintiffs against OptumRx in opioid litigation outside of the MDL. *See, e.g.*, *People ex rel. Harrison v. Express Scripts, Inc.*, No. 23STCV20886 (Cal. Super. Ct.); *City of Boston v. Express Scripts, Inc.*, No. 1:24-cv-10525 (D. Mass Oct. 18, 2024); *Anne Arundel County v. Express Scripts, Inc.*, No. 1:24-cv-00090 (D.

Md.); *Kentucky ex. rel. Coleman v. Express Scripts, Inc.*, No. 5:24-cv-00393, (U.S. District Court E. D. Ky.); and *Utah v. Express Scripts, Inc.*, No. 2:25-cv-00088 (D. Utah).

OptumRx sought to disqualify Motley Rice in the MDL because the confidential information that Motley Rice obtained pursuant to government investigatory subpoenas in their role as government lawyers, and which is subject to confidentiality agreements, could be used against OptumRx in the MDL in which Motley Rice is now plaintiffs' counsel. In ruling on the motion to disqualify, the MDL court agreed with OptumRx that Motley Rice was acting as government lawyers and with government authority when compelling production of documents from OptumRx. MDL Order at 12. However, the court determined that Motley Rice need not be disqualified because it found that the documents produced by OptumRx constituted "routine discovery" and thus were not protected confidential government information. *Id.* at 14–19. The court was also concerned with the timing of the disqualification motion in that case. *Id.* at 7–10. The court ordered OptumRx to produce into the MDL repository the documents that OptumRx had produced to Motley Rice in the government investigations. OptumRx complied, although it filed a petition for writ of mandamus asking the Sixth Circuit to order the district court to disqualify Motley Rice. That petition was subsequently denied. *In re OptumRx, Inc.*, 2024 U.S. App. LEXIS 26695 (6th Cir. Oct. 22, 2024).

## Utah Litigation

Motley Rice is actively pursuing claims against OptumRx focused on the aspects of OptumRx's business that are discussed in the many confidential documents on topics including payments, financial arrangements, formularies placements and rebates that OptumRx produced pursuant to government subpoenas in the investigations by the City of Chicago, District of Columbia, and Hawai'i, and subject to confidentiality agreements prohibiting their use outside of those specific representations. The Utah Complaint significantly overlaps with the information

Motley Rice demanded and obtained through those government subpoenas. For example, the Utah

Complaint includes the following allegations:

- "Defendants colluded with Purdue Pharma and other opioid manufacturers to increase opioid sales by giving opioids preferred placement on Defendants' national formularies in exchange for substantial rebates and fees. The rebates were conditioned on Defendants lowering the copay requirements and eliminating safety restrictions like prior authorization requirements and usage limits. To boost profits, Defendants willingly agreed. Moreover, Defendants actively collaborated with Purdue and other manufacturers to create, support, and propagate misleading marketing messages to alter perceptions of opioids and increase sales. Defendants shared their data with opioid manufacturers to help refine and target their opioid marketing strategies. Defendants partnered with manufacturers to study and develop data that would reinforce Purdue's and other manufacturers' deceptive messaging. And Defendants helped Purdue and other manufacturers draft and disseminate deceptive marketing materials to the public and prescribers." Utah Compl. ¶ 33-34.

- "Through their unique combination of knowledge, power, and market position, Defendants had an extraordinary ability to control the supply of opioid pharmaceuticals in the United States and in Utah. . . ."Utah Compl ¶ 21.

- "Defendants colluded with Purdue Pharma and other opioid manufacturers to increase opioid sales by giving opioids preferred placement on Defendants' national formularies in exchange for substantial rebates and fees. The rebates were conditioned on Defendants lowering the copay requirements and eliminating safety restrictions like prior authorization requirements and usage limits. To boost profits, Defendants willingly agreed." Utah Compl. ¶ 33.

- "Express Scripts and Optum leverage their market power to require and receive incentives from manufacturers to keep certain drugs on and off their standard formularies." Utah Cmpl. ¶ 141.

- "Instead, Defendants provided manufacturers with preferred formulary status without restrictions and aided their marketing efforts even though Defendants knew that dangerous numbers of opioids were being used in Utah and the nation and were causing an unprecedented crisis of addiction, overdose, and death." Utah Compl. ¶ 162.

- "Defendants misrepresented to the public and their clients that their formularies and utilization management strategies were designed to protect public health and safety when, in reality, they were structured to maximize profits in collaboration with opioid manufacturers;" Utah Compl. ¶ 416(a).

- "Defendants represented to the public that they used their power, insight, and control over their national formularies to ensure safe prescribing and dispensing of drugs. They represented to their clients and the public that they made formulary decisions and used UM controls to restrict inappropriate dispensing and to promote safe and effective pain treatment. They represented further that they policed pharmacies within their networks to

identify and address instances of over-prescribing and diversion. None of this turned out
to be true." Utah Compl. ¶ 28-29.

- "Much of activity was not transparent to anyone, including payers who, in good faith, hired
  Defendants to manage their benefits. Defendants used their position to silently collude with
  manufacturers, prioritizing their own profits over public health, welfare, and safety." Utah
  Compl. ¶ 156.

- "Drug manufacturers compete for placement on PBMs' standard, national formularies
  (preferred placement results in higher demand, more use, and greater profits).
  Manufacturers often pay PBMs incentives to avoid pre-authorization and other UM tools
  that would slow the flow of drug use, for example, quantity limits, refill limits, and step
  edits." Utah Compl. ¶ 143.

The confidential documents that Motley Rice received from OptumRx while acting as

government lawyers relate to those allegations, including rebate agreements, custodial documents

negotiating drug rebates, and other documents related to OptumRx's internal formulary and

business processes.  And while some of those documents may not mention opioids specifically,

they provide Motley Rice with a roadmap of OptumRx's inner workings and are relevant to the

allegations against OptumRx in the Utah Litigation. As such, it is foreseeable that Motley Rice

could use (and likely has used) the information they obtained through their role as government

attorneys to the benefit of their private clients in the Utah Litigation.

## APPLICABLE RULE

Utah Rule of Professional Conduct 1.11(c), entitled Special Conflicts of Interest for Former

and Current Government Officers and Employees, provides:

> Except as law may otherwise expressly permit, a lawyer having information that
> the lawyer knows is confidential government information *about* a person
> acquired when the lawyer was a public officer or employee may not represent a
> private client whose interests are adverse to that person in a matter in which the
> information could be used to the material disadvantage of that person. As used
> in this Rule, the term "confidential government information" means information
> that has been obtained under governmental authority and which at the time the
> Rule is applied, the government is prohibited by law from disclosing to the
> public or has a legal privilege not to disclose and which is not otherwise available
> to the public. A firm with which that lawyer is associated may undertake or

continue representation in the matter only if the disqualified lawyer is screened from any participation in the matter and is apportioned no part of the fee therefrom. (Emphasis supplied.)[2]

The Utah Rule is nearly identical to the American Bar Association's Model Rule and has been adopted by the Utah District Courts.[3]

## OPINIONS

### Introduction

The title of Rule 1.11, "Special Conflicts of Interest for Former and Current Government Officials and Employees," signals that the Rule applies to both former and current government officers and employees. The conflict provisions of the Rule, paragraphs 1.11 (a), (b) and (d), by the specific language of those respective provisions, apply explicitly to lawyers who "*formerly served as public officials or employees of the government*"[4] and to lawyers who are "*currently serving as public officials or employees.*"[5] The Rule applies to lawyers who serve as part-time or full-time government officials or employees.[6]

The ABA Standing Committee on Ethics and Professional Responsibility issued Formal Ethics Opinion 509 (Feb. 28, 2024) to address "two areas of potential ambiguity" about Rule 1.11(c): (1) "whether the Rule applies to a current government lawyer representing a private

---

[2] Utah Rules of Prof'l Conduct Rule 1.11.

[3] https://www.utd.uscourts.gov/attorney-admissions

[4] Rule 1.11 (a) and (b).(Emphasis supplied.)

[5] Rule 1.11(d). (Emphasis supplied.)

[6] *See* ABA Comm. on Ethics & Prof'l Responsibility, Formal Op. 509 (p. 1, p. 5)(Rule 1.11(c) applies equally to full or part time lawyers who currently serve or formerly served as a government officers or employees when the lawyer (1) represents a private client outside of the lawyer's government employment and (2) possesses information, acquired when the lawyer was a government officer or employee, that the lawyer knows is confidential government information that could be used to the material disadvantage of a person whose interest are adverse to the lawyer's private client in a matter."); Oh. Adv. Op. 14-002, (8/8/2014)(p.3) (The Rule does not differentiate between part-time and full-time lawyers who are government officers and employees.); Rhode Island Supreme Court Ethics Advisory Panel ("EAP") Op. 2016-03 (4/28/2016)(Applying the rule in the context of a part-time municipal court judge who was also a lawyer in private practice.); Nebraska Ethics Advisory Opinion for Lawyers No. 22-01(Applying Rule 1.11(c) to a part-time county attorney and disqualifying him from representing clients in family law matters where child support was at issue due to his access to a state run database with information about individual's financial status and past earnings where the information was considered confidential under statute.).

client;" and (2) "the definition of 'private client.'"[7] The Opinion concluded that the Rule does apply to current government lawyers representing private clients, and that "the term 'private client' includes *public* entities and officials whom the lawyer represents in private practice."[8] Formal Op. 509 did not seek to define what constitutes "confidential government information."

## Rule 1.11(c)

The purpose of Rule 1.11(c) is to protect confidential information "*about* a person*,*"—that is, about a third party—obtained by lawyers serving as public officials and employees.[9] Except as permitted by law, Rule 1.11(c) prohibits lawyers from using knowledge, gained in confidence while a public employee, to benefit a client in their private practice, thereby protecting the justice system from even the appearance of government overreach.[10] Courts have long recognized the importance of this principle. For example, thirty years ago the Supreme Court of West Virginia recognized that lawyers should be "prevent[ed] … from exploiting public office for the advantage of a private client," and that "limitations must be placed upon a prosecutor who engages in private practice…"[11]

Comment 4 to Rule 1.11(c) recognizes the same principles. It reads, in pertinent part:

> This Rule represents a balancing of interests. On the one hand, where the successive clients are a government agency and another client, public or private, the risk exists that power or discretion vested in that agency might be used for the special benefit of the other client. A lawyer should not be in a position where benefit to the other client might affect performance of the lawyer's professional functions on behalf of the government. Also, unfair advantage could accrue to the other client by reason of access to

---

[7] ABA Comm. on Ethics & Prof'l Responsibility, Formal Op. 509, p.1.

[8] *Id at* pp. 1, 8. *See also*, MDL Order at 12. (The court rejected Motley Rice's argument that it was not an agent or employee of the government as "wrong," noting that their argument elevates "form over substance, glossing over the role Motley Rice really played and the powers it deployed" in serving government subpoenas and receiving documents, thus "gain[ing] access to information **pursuant to governmental authority**." The court held that Motley Rice's MDL clients are "both public entities *and* private clients." (Emphasis in original.))

[9] Rule 1.11(c) (emphasis supplied.) Rules 1.11(a), (b) and (d) are the conflict of interest provisions of Rule 1.11.

[10] *See* Robert H. Aronson, Washington Survey, *An Overview of the Law of Professional Responsibility: The Rules of Professional Conduct Annotated and Analyzed,* 61 Wash. L. Rev. 823, 853 (1986).

[11] *State ex rel. Bailey v. Facemire, et. al.,* 413 S.E. 2d 183,189 (W.Va. 1991).

> confidential government information about the client's adversary obtainable only through the lawyer's government service.[12]

As discussed below, in this case, the use of confidential government information is not allowed by law.

In the context of understanding Rule 1.11(c), it is important to realize that the rule functions as an *additional* protection of confidential information acquired by government attorneys—not the only protection. The breadth of confidentiality protections is wide, protecting "all information relating to the representation, whatever its source,"[13] "even if it is publicly available,"[14] and "it is not limited to communications protected by attorney client privilege."[15] The public policy reasons for these weighty protections of confidential information include the proper functioning of the judicial system, and the importance of trust between lawyers and their clients.[16]

Likewise in this case, the fact that others are privy to information produced pursuant to the force of government authority under confidentiality agreements cannot undo the protections provided by Rule 1.11(c) "which supplement[s] the [government] lawyer's duties of confidentiality under Rules 1.6 and 1.9(c)"[17] and related ethics codes that apply to government

---

[12] Utah R.P.C. 1.11 Comment 4 is identical to ABA M.R. 1.11 Comment 4.

[13] Utah R.P.C. 1.6(a) provides: "A lawyer shall not reveal information relating to representation of a client unless the client gives informed consent, the disclosure is impliedly authorized in order to carry out the representation, or the disclosure is permitted by paragraph (b)." *See also* Rule 1.6 cmt 3 "The confidentiality rule, for example, applies not only to matters communicated in confidence by the client but also to all information relating to the representation, whatever its source. A lawyer may not disclose such information except as authorized or required by the Rules of Professional Conduct or other law." *See also,* Model Rule 1.6 cmt [3]; ABA Comm. on Ethics & Prof'l Responsibility, Formal Op. 511 (May 8, 2024) (p.2, fn 5); *See* Restatement Third of the Law Governing Lawyers, § 59, cmt b, p 456.

[14] ABA Comm. on Ethics & Prof'l Responsibility, Formal Op. 511 (May 8, 2024) (p.2) *citing* to ABA Comm. on Ethics & Prof'l Responsibility, Formal Op. 04-433 (2004).

[15] *Supra.* fn. 11.

[16] *See* Utah R.P.C. 1.6, comments 1-3.

[17] ABA Annotated Model Rules, Bennett, Ellen, Gunnarsson, Helen W., Kisicki, Nancy G., 10th Edition, 2023, p. 234.

officials. These authorities also prohibit misuse of information obtained pursuant to the exercise of government power and are discussed later in this opinion.[18]

Government attorneys who wield the power of the government are not only bound by confidentiality obligations to their government-entity clients, they have an additional restriction on the use of "confidential government information" and must protect information acquired under government authority from *third parties, about third parties*.[19] Government attorneys must not abuse their power when obtaining confidential information about third parties, and the importance of protecting such "confidential government information" under Rule 1.11(c) cannot be overstated. There is no doubt that, while wielding government power, Motley Rice obtained confidential government information about OptumRx. That information includes not only the documents that OptumRx produced, but *information about* OptumRx such as memos describing what Motley Rice learned from the investigations, the reports that Motley Rice was required to submit to the Attorneys General in Hawaii and DC,[20] information Motley Rice gathered in meetings, as well as information from other sources.

### History of the Provision

Model Rule 1.11 was originally titled "Successive Government and Private Employment."[21] At first, the Rule limited its protections to former government attorneys and was adopted to address conflicts of interest arising out of the "revolving door" of attorneys moving between government service and private sector employment.[22] It is now well established that these policy concerns apply equally to part- and full-time, as well as current and former, attorneys

---

[18] *See* discussion of Utah Uniform Trade Secrets Act and Government Records Access and Management Act pp. 31-32.
[19] Supra. fn 9 & 10.
[20] *See* Exhibit 2, Statement of Work §§ 4.1.3, 4.1.5; Exhibit 10 at A1-1 to -2.
[21] Garwin, A Legislative History: The Development of the ABA Model Rules of Professional Conduct 1983-2013, p. 288 (2013).
[22] *Id.* at 279.

serving as government officers or employees.[23] The ABA Ethics 2000 Commission's expansion of the Rule's application reflects the importance the Commission placed on the even-handed application of the Rules. Specifically, the Ethics 2000 Commission recommended expanding the Rule's scope to address conflicts for attorneys *currently and formerly* representing the government, as well as those transitioning between government agencies, while maintaining the concerns about protecting information the current or former government attorney acquired using the power of government authority. Thus, at the recommendation of the Ethics 2000 Commission, the ABA House of Delegates adopted the Rule renamed as "Special Conflicts of Interest for Former and Current Government Officers and Employees."[24]

The public policy behind Rule 1.11(c) has long forbidden the exploitation of government power by attorneys who acquire information in their government role and then seek to use that information in their private capacity.[25] The term "private client" as used in the Rule means any client the attorney represents in a private capacity, rather than in the capacity of a government employee.[26] When attorneys abuse information acquired under government authority for the

---

[23] ABA Comm. on Ethics & Prof'l Responsibility, Formal Op. 509 (Feb. 28, 2024) (p. 1, 5) ("The Rule applies to lawyers currently serving and those who formerly served as public officers or employees.").

[24] Garwin, A Legislative History: The Development of the ABA Model Rules of Professional Conduct 1983-2013, p. 288 (2013).

[25] ABA Comm. on Ethics & Prof'l Responsibility, Formal Op. 509, p.2; SIMON'S NEW YORK RULES OF PROFESSIONAL CONDUCT ANNOTATED §1:11:28 "…the aim of Rule 1.11(c) is to prevent a former government lawyer from transforming government knowledge into private benefit."

[26] Although Motley Rice now represents public entities in their private practice, Rule 1.11(c) prohibits them from using information they previously obtained under government authority in this matter to represent W VA. *See* ABA Comm. on Ethics & Prof'l Responsibility, Formal Op. 509 (p. 8-9)("The term 'private client' also includes *public* entities and officials whom the lawyer represents in private practice, if those clients are not legally entitled to employ the confidential information."(citations omitted)); *See also* ABA Comm. on Ethics & Prof'l Responsibility, Formal Op. 342 (Nov. 24, 1975) (explaining that "'private employment' refers to employment as a private practitioner and noting that "this position is not in conflict with *General Motors Corp. v. City of New York*, 501 F.2d 639 (2d Cir. 1974), where the lawyer for the municipality was privately retained, and the appellate court held that this employment constituted 'private employment' within the meaning of DR 9-101(B)." *See also* MDL Order at 12 (The court rejected Motley Rice's argument that it was not an agent or employee of the government as "wrong," noting that their argument elevates "form over substance, glossing over the role Motley Rice really played and the powers it deployed" in serving government subpoenas and receiving documents thus "gain[ing] access to information **pursuant to governmental authority**." The court held that Motley Rice's MDL clients are "both public entities ***and*** private clients." (Emphasis in original.))

benefit of a private client, it disadvantages the adverse party both "economically and strategically."[27] It also contributes to an appearance of impropriety[28] when an attorney, who is a "[government official or employee], profits by information gained in the course of performance of his duties as a public official."[29]

The conflict of interest arises where a former government lawyer brings into a litigation on behalf of a *private client*[30] information and knowledge of facts and strategic insights related to a specific person or matter that the lawyer obtained through government service, rather than information regarding a government agency's general procedures and substantive law.[31] "[W]here successive clients are a public agency and another client, the risk exists that power or discretion vested in public authority might be used for the special benefit of the other client."[32] Once Motley Rice acquired knowledge about OptumRx using the power of "public authority," the risk that it could use the information to OptumRx's material disadvantage prohibited Motley Rice from serving as counsel in this litigation.

---

[27] *Allied Realty of St. Paul, Inc. v. Exchange Nat'l Bank,* 1968 U.S. Dist. Lexis 7832, **14.

[28] Courts have long been concerned to "avoid the manifest possibility that… [a former Government lawyer's] actions as a public legal official might be influenced (or open to the charge that [the lawyer] had been influenced) by the hope of later being employed privately to uphold or upset what [the lawyer] had done." *General Motors Corp. v New York,* 501 F. 2d. 639,649,650-653 (2nd Cir. 1974). For example, fifty years ago, a court disqualified a former Department of Justice Antitrust Division lawyer based upon his participation in the investigative and preparatory work in the same matter (based in part on the similarity of allegations in the complaint) and rejected counsel's arguments that he had merely switched sides to represent a different governmental entity. The court found that his lucrative contingent fee contract and use of information learned under government authority warranted disqualification on the grounds that it created an impermissible appearance of impropriety. *See, e.g., General Motors Corp. v New York,* 501 F. 2d. 639,649,650-653 (2nd Cir.1974); *see also,* ABA Formal Op. 342 (1975)(considering under the now superseded ABA Canons the disqualification issues of former government lawyers and balancing the need to attract lawyers to government service while "discouraging government lawyers from handling particular assignments in such a way as to encourage their own future employment in regard to those particular matters after leaving government service.")

[29] *See, e.g., Allied Realty of St. Paul, Inc. v. Exchange Bank,* 283 F. Supp. 464, *13 (1968); *General Motors Corp. v New York,* 501 F. 2d. 639, 649, 650-653. Although the language "appearance of impropriety" is no longer contained in the conflict rules, these cases still inform our opinion.

[30] Although Motley Rice represents public entities in their private practice, they are not government actors in that capacity, nor do they have the authority to wield the power of the government in that role. Thus, Rule 1.11(c) prohibits them from using information they previously obtained under government authority in this matter. *Supra,* fns. 22 & 24.

[31] *See, e.g., United States v. Villaspring Health Care Ctr., Inc., No. 3:11-43-DCR, 2011 WL 5330790, at *6 (E.D. Ky. Nov. 7, 2011), cited in ABA Formal Op. 509, supra note 5, at 4 n.14.*

[32] *See In re Nat'l Prescription Opiate Litig.,* 2019 WL 1274555*6 (3/20/2019. N.D. Ohio, E.D.).

**I.      Rule 1.11(c) applies to attorneys who are current or former government officers or employees as well as to attorneys currently serving in (or who formerly served in) part-time government positions.**

The rule reads, in part, "a lawyer who *was* a public official or employee and, during that employment, acquired information…" (Emphasis supplied). When viewed in the context of the Rule's title and purpose, that language is better explained as when the lawyer *is or was* a public officer or employee, since that reading is consistent with the purpose of the rule as well as the majority of interpretations.[33] Ethics opinions recognize that Paragraph (c) applies to any "lawyer having information that the lawyer knows is confidential government information *about a person* acquired when the lawyer was a public officer or employee."[34] Attorneys possessing "confidential government information" include those still employed, as well as those formerly employed by the government.[35] The need to restrict the misuse of confidential government information for the benefit of private clients exists whether the lawyer is currently or formerly employed by the government and even if the employment is part-time.[36] Rule 1.11(c) is not limited by its terms to either current or former government officers and employees, and thus clearly applies to both.[37]

---

[33] Utah R.P.C. 1.11, cmt. 4; *see also, e.g.,* ABA Comm. on Ethics & Prof'l Responsibility, Formal Op. 509 (p. 1, p.5)("The Rule applies to lawyers currently serving and those who formerly served as public officers or employees," and "equally to full or part time lawyers."); Rhode Island Supreme Court Ethics Advisory Panel ("EAP") Op. 2016-03 (4/28/2016)(Applying the rule in the context of a *part-time* municipal court judge who was also a lawyer in private practice, the opinion concludes that "the language of Rule 1.11 describes successive government and private employment, but the rationale of the Rule *applies as well to concurrent government and private employment*." (*Emphasis supplied*). This concept is not new. The 2016 opinion refers back to the same explanation of the rationale of Rule 1.11 in a 1996 EAP Op. 96-13 (7/11/1996). The fact that the Rhode Island EAP reached this conclusion using an earlier version of Rule 1.11 entitled "Successive Government and Private employment" is further evidence that the provision applies to both current and former public officers or employees, since the Rule's title is "Special Conflicts of Interest for *Former and Current* Government Officers and Employees." (*Emphasis supplied*). *See also,* Oh. Adv. Op. 14-002 (8/8/2014), 2014 WL 4084471(Also applying Rule 1.11 to part-time and full-time government officers or employees.).

[34] ABA Comm. on Ethics & Prof'l Responsibility, Formal Op. 509, p. 2, 3. (Emphasis supplied.)

[35] ABA Comm. on Ethics & Prof'l Responsibility, Formal Op. 509, p.5.

[36] ABA Comm. on Ethics & Prof'l Responsibility, Formal Op. 509, p.5.

[37] ABA Comm. on Ethics & Prof'l Responsibility, Formal Op. 509 (p.3,8, fn. 8), *See, e.g*., Nebraska Ethics Advisory Opinion for Lawyers No. 22-01 (Applying Rule 1.11(c) to  a part-time county attorney and disqualifying him from representing clients in family law matters where child support is at issue due to his access to a state run database with information about individual's financial status and past earnings where the information was considered confidential

Ethics opinions have long recognized the importance of not allowing attorneys to gain an improper advantage by reason of the lawyer's public office, and of preventing public suspicion about a private client gaining an improper advantage by virtue of the lawyer's role as a government employee.[38] As such, the Rule clearly applies to Motley Rice in this litigation in light of Motley Rice's investigation of OptumRx as government attorneys for the City of Chicago, D.C., and Hawai`i, and its subsequent representation of the State of Utah as a private client in the instant litigation.[39]

## II.    It is our opinion that Motley Rice possessed "confidential government information" within the meaning of Rule 1.11(c).

Rule 1.11(c) explains that restrictions on the use of third-party confidential government information applies to "information about a person acquired when the attorney was a public officer or employee" and states that, when a lawyer has that confidential government information, he "may not represent a private client whose interests are adverse to that person in a matter in which the information could be used to the material disadvantage of that person."[40] Here, Rule 1.11(c) protects a "person" (OptumRx) that is not, and has never been, Motley Rice's client. The Rule also protects public trust in the government by preventing misuse of government power. "The passage of time or the attorney's representation that he or she does not recall any confidential information does not relieve the attorney from disqualification."[41]

---

under statute.); N.Y. State Op. 1169 (2019), *citing,* N.Y.S. Op. 431 (1976); N.Y.S. Op. 1170 (2019)(Explaining that Rule 1.11(c) applies to a lawyer who wants to run for the position of Town Supervisor and might disqualify him from representing a person in any matter in which he gains confidential government information as a result of the Town Supervisor position, when that information could be used to a person's material disadvantage, even where he did not work on the matter and came across the information by happenstance. ¶¶ 16-17).

[38] *Supra.* fn 6.

[39] MDL Order at 12 (The court rejected Motley Rice's argument that it was not an agent or employee of the government as "wrong," noting that their argument elevates "form over substance, glossing over the role Motley Rice really played and the powers it deployed" in serving government subpoenas and receiving documents thus "gain[ing] access to information **pursuant to governmental authority**." [Emphasis in original].

[40] Utah RPC 1.11(c).

[41] *United States v. Kincaide*, 2016 U.S. Dist. Lexis 118150, * 6 (Nevada Dist. Ct.), citing to *Kronenberg v. LaRouche*, 2010 WL 1443934 *2 (E.D. Va. Apr. 9, 2010) (applying Rule 1.11(c)).

Rule 1.11(c) defines confidential government information as "information obtained under government authority, that, at the time this rule is applied, the government is prohibited by law from disclosing to the public, or has a legal privilege not to disclose, and that is not otherwise available to the public."[42] Obtaining information under government authority includes access to information produced "pursuant to a grand jury subpoena, a search warrant, a regulatory subpoena, or other government power."[43]

"Information" is not only documents. As explained below, it includes any information gathered by a lawyer acting in a position of government authority. "Information" is a broad term and includes "strategic insights, recollections, and mental impressions,[44] and "mental roadmaps."[45] The American Bar Association issued an opinion concerning conflict of interest concerns effectively caused by a prosecutor's possession of confidential information about a party.[46] That opinion is useful to understand that "information" includes more than just documents produced in discovery and extends to knowledge gained by the lawyer.[47]

Here, Motley Rice obtained "information about" OptumRx beyond the produced documents. The firm has reports that Motley Rice was required to submit to the Attorneys General of Hawaii and D.C. explaining what they learned from the investigations.[48] They also obtained

---

[42] *United States v. Kincaide*, 2016 U.S. Dist. Lexis 118150, * 6 (Nevada Dist. Ct.), citing to *Kronenberg v. LaRouche*, 2010 WL 1443934 *2 (E.D. Va. Apr. 9, 2010) (applying Rule 1.11(c)).

[43] ABA Comm. on Ethics & Prof'l Responsibility, Formal Op. 509 (p. 4).

[44] *United States v. Villaspring Health Care Ctr., Inc.*, 2011 WL 5330790, at *6 (E.D. Ky. Nov. 7, 2011) ("strategic insights, such as [the disqualified lawyer's] knowledge of the strengths and weaknesses of the evidence compiled against [the investigated company]," constituted confidential government information that "[he] may not now use . . . to benefit his client").

[45] *Kronberg v. LaRouche*, 2010 WL 1443934, at *4 (E.D. Va. Apr. 9, 2010) ("At the very least, Markham surely has a mental roadmap concerning LaRouche and his activities that was shaped at least in part by his access to confidential government information.").

[46] ABA Comm. on Professional Ethics, Informal Op. 922 (1966) (unethical to represent a party in a divorce when a member of the prosecutor's staff may later be required by law to represent the obligee in a spousal or child support action).

[47] Id.

[48] *See* Exhibit 2, Statement of Work §§ 4.1.3, 4.1.5; Exhibit 10 at A1-1 to -2.

information from meetings with OptumRx and information from other sources during the investigation. All this knowledge is *information* about OptumRx that qualifies as "confidential government information" under Rule 1.11(c).

*First*, Motley Rice obtained that information "under governmental authority." Motley Rice functioned as the government in its investigations for D.C., Hawaii, and Chicago when it issued subpoenas on behalf of each government, pursuant to its appointment power.[49] Each investigatory subpoena was the state-law equivalent of a federal civil investigative demand—each used investigatory subpoena power that is uniquely vested in the government and exceeds the type of subpoena power available to private litigants. Absent government authority, Motley Rice would not have the information about OptumRx that it gained through meetings with OptumRx while Motley Rice attorneys were serving as government officials. Similarly, OptumRx and others would not have produced documents to Motley Rice that allowed the firm to develop strategies and impressions from investigative information and materials not otherwise available to Motley Rice absent government subpoenas.

Attorneys who wield government power are not only bound by confidentiality obligations to their government-entity clients, they have an additional restriction on the use of "confidential government information" and must also protect information acquired about *third parties* under government authority.[50] Government attorneys must not abuse their power when obtaining confidential information about third parties, and the importance of protecting such "confidential government information" under Rule 1.11(c) cannot be overstated.

---

[49] *See* Hawaii Revised Statutes §§ 28-2.5, 480-18, & 661-22; D.C. Code § 28-3910; Chi. Mun. Code § 2-25-090(a).
[50] *Supra*. fn 9 & 10.

**A.    Federal regulations and statutes serve as the basis for the definition of "confidential government information" in Rule 1.11(c) and those regulations demonstrate that the materials produced by OptumRx are "confidential government information" obtained through government authority.**

The concept of what is protected "confidential government information" used in Rule 1.11(c) is broad[51] and includes anything exempt from production under FOIA.[52] Since lawyers are governed by the Rules of Professional Conduct of their states of licensure and other states where they may practice,[53] as well as court rules, federal statutes and administrative regulations,[54] courts can look to federal regulations in interpreting terms used in the Rules of Professional Conduct.[55] The definition of confidential government information originates from a federal regulation, namely 5 C.F.R. § 2635.703(b), entitled "Use of Nonpublic Information."[56] Specifically, the statute restricts government employees from improper use of nonpublic information to further their own private interests or those of another, and defines "nonpublic information" as:

> [I]nformation that the employee knows or reasonably should know:
>
> (1) Is routinely exempt from disclosure under 5 U.S.C. 552 [FOIA] or otherwise protected from disclosure by statute, Executive order or regulation;
>
> (2) Is designated as confidential by an agency; or
>
> (3) Has not actually been disseminated to the general public and is not authorized to be made available to the public on request.[57]

---

[51] *See e.g., Law of Lawyering,* Hazard, Hodes, Jarvis and Thompson, §16.11, 16.12; Or. Ethics Op. 2005-120(rev 2015) (Confidential government information under Rule 1.11(c) "may encompass information that would not otherwise constitute confidential client information under [Rule] 1.6.") (p.13).

[52] https://www.fincen.gov/foia-exemptions-and-exclusions#:~:text=The%20Freedom%20of%20Information%20Act,be%20found%20in%20the%20FOIA.

[53] Utah R.P.C. (5.5) and 8.5.

[54] *See, e.g.,* Professional Regulation, Examples and Explanations, Seventh Edition, W. Bradley Wendel, pp.6-8. (2024)

[55] *See e.g. United States v. Fisher,* 2017 U.S. Dist. Lexis 108114 *8 (D. Nev. July 12, 2017) (In considering a motion to disqualify under Rule 1.11, the Court examined the Code of Federal Regulation, 5 C.F.R. § 2641.201, as pertinent to the disqualification motion for its definitions of "personally and substantially" also used in Rule 1.11, Rule 1.9 and 18 U.S.C. §207. Although the Court denied the motion for disqualification, it was because counsel was not "personally and substantially" involved under a different subsection of Rule 1.11 as defined by the C.F.R.).

[56] ABA Comm. on Ethics & Prof'l Responsibility, Formal Op. 509 (p. 4) (fn. 13.).

[57] 5 C.F.R. Sec. 2635.703(b); *See also,* ABA Comm. on Ethics & Prof'l Responsibility, Formal Op. 509) (p. 4, fn. 13.)

Because the federal regulation incorporates by reference the Freedom of Information Act ("FOIA"), authorities interpreting what constitutes "confidential government information" have pointed to FOIA as the "statute" providing the parameters of what is protected confidential information in the Rule 1.11(c) context.[58] As such, the definition of confidential government information under Rule 1.11(c) is comprehensive, including basically everything *except* information that is *required* to be disclosed under the Freedom of Information Act.[59] In other words, information exempt from disclosure under FOIA is considered protected as confidential government information under 1.11(c).[60]

FOIA has nine exemptions and three exclusions,[61] and is *not* intended to assure that private citizens have access to all information in the government's possession. Rather, the central purpose of FOIA is to "ensure that the government's activities are open to scrutiny, *not* that information about private citizens that happens to be in the warehouse of the government be disclosed."[62] Thus, for example, "if the information is available on the internet, or in public archives or upon request at a government agency [only then] does it not satisfy this element" and does not qualify as confidential government information.[63]

In discussing whether government information is confidential, ABA Formal Opinion 509 suggests that it is a question of fact "whether [or not] government information is publicly available-

---

[58] 5 U.S.C. §552 Freedom of Information Act is referred to in 5 C.F.R. Sec. 2635.703(b). *See also* 1 Restatement (Third) of Law Governing Lawyers § 74, reporter's note to cmt. b, at 577-578 (2000) (Discussing the application of open-access statutes such as FOIA to government lawyers, recognizing that confidentiality protections such as attorney-client privilege and work product may exempt materials from production.)

[59] *Law of Lawyering,* Hazard, Hodes, Jarvis and Thompson, §16.12 (Fourth Edition, 2021-1 Supp. 2014); *see also Ohio Legal Ethics Law,* Schwarzbaugh, Marc and Greenbaum Arthur, (2023 edition) (1.11:310 p. 685-686).

[60] *Law of Lawyering,* Hazard, Hodes, Jarvis and Thompson, §16.12.

[61] FOIA Exemptions and Exclusions, https://www.fincen.gov/foia-exemptions-and-exclusions.

[62] Cate, Fred H., Fields, D Annette and McBain, James K., *The Right to Privacy and the Public's Right to Know: The Central Purpose of the Freedom of Information Act,"* (1994) (46 Admin. Law Rev. 41, 42) (citations omitted.) (emphasis supplied.)

[63] Simon's New York Rules of Prof. Conduct Annotated § 1.11:30, July 2023 Update, Roy D. Simon Jr.

-e.g. whether it can be obtained through routine discovery."[64] In ordinary circumstances, if and when it is produced in discovery pursuant to a protective order, such documents are not "routine" discovery material.[65] The plain-language meaning of "routine" is "unremarkable" or "conventional."[66] Routine discovery does *not* include information subject to a protective order, such as proprietary or trade secret information, nor does it include information produced pursuant to Confidentiality Agreements signed by government lawyers.

Further, the scope of "routine discovery" is not easily determined, is fact specific, and is subject to a variety of protections under FOIA and other applicable litigation privileges. For example, under FOIA Exemption 5,[67] "[t]he test … is whether the documents would be 'routinely' or 'normally' disclosed upon a showing of relevance"[68] and is akin to the work-product doctrine.[69] This is a high bar, and "[u]nder the current state of the law relating to the privilege, work-product materials are immune from discovery unless the one seeking discovery can show substantial need in connection with subsequent litigation. Such materials are thus not 'routinely' or 'normally' available to parties in litigation and hence are exempt under Exemption 5."[70] "Exemption 5 incorporates the privileges which the Government enjoys under the relevant statutory and *case*

---

[64] ABA Comm. on Ethics & Prof'l Responsibility, Formal Op. 509, p. 4.

[65] In the Opioid MDL, the court determined that the information at issue was not confidential government information because it was "routine" discovery under FRCP 26. However, the court also noted that Fed. R. Civ. P. 26(c)(1)(G) provides a mechanism to protect trade secrets and commercial information and did not analyze the impact of FOIA or the federal regulation definition of nonpublic information which is the basis for the definition of confidential government information in Rule 1.11(c). *See* MDL Order at 14–16.

[66] https://www.thesaurus.com/browse/routine.

[67] "The primary purpose of Exemption 5 was to enable the Government to benefit from 'frank discussion of legal or policy matters." *F.T.C. v. Grolier Inc.*, 462 U.S. 19, 103 S.Ct. 2209, 2212, 76 L.Ed.2d 387 (U.S.S.Ct. 1983) (citations omitted.)

[68] *F.T.C. v Grolier Inc.*, 103 S.Ct. 2209, 2214 (citing *NLRB v. Sears, Roebuck*, 421 U.S., at 148–149, 95 S.Ct., at 1515).

[69] "[While] the attorney's work-product immunity is a basic rule in the litigation context, but like many other rules, it is not self-defining and has been the subject of extensive litigation." *F.T.C. v Grolier Inc.*, 103 S.Ct. 2209, 2213.

[70] *F.T.C. v. Grolier Inc.*, 462 U.S. 19, 103 S.Ct. 2209, 2214, 76 L.Ed.2d 387.

*law* in the pretrial discovery context."[71] "Under this state of the work-product rule it cannot fairly
be said that work-product materials are 'routinely' available in subsequent litigation."[72]

In considering the meaning of the words "routine discovery" in the context of confidential
government information, the key phrase to focus on is "substantial need." Even though
information may sometimes be subject to discovery, it is only actually discoverable if there is a
"substantial need" to overcome FOIA's exemptions. In addition to Exemption 5, another FOIA
exemption preventing disclosure in response to a FOIA request for "[t]rade secrets and
commercial or financial information obtained from a person [that is] privileged or confidential."[73]
Trade secrets include information such as OptumRx's negotiations with manufacturers, rebate
information, and business processes. Because this information is exempt from production under
FOIA, it qualifies as confidential government information[74] and provides yet another reason why
the information is not "routine discovery."

In *Food Marketing Institute v. Argus Leader Media,* 139 S.Ct. 2356, 2361, 2366 (2019),
the United States Supreme Court held that when commercial or financial information that is both
customarily and actually treated as private by its owner and provided to the government under
assurance of privacy, the information is confidential commercial information that is exempt from
public disclosure under FOIA.[75] Noting that the FOIA statute does not define the word

---

[71] *F.T.C. v. Grolier Inc.*, 462 U.S. 19, 103 S.Ct. 2209, 2214, 76 L.Ed.2d 387.  (citations omitted.)
[72] *Id.*
[73] *See* 5 U.S.C. 552 (B)(4).
[74] *Id.* (citations omitted).
[75] *Food Marketing Institute v. Argus Leader Media*, 139 S.Ct. 2356, 2361, 2366 (2019) (Trade association representing
individual grocery retailers arguing that Supplemental Nutrition Assistance Program (SNAP) redemption data was
"confidential" commercial information exempt from disclosure under FOIA, sought review of orders requiring that
the information be disclosed. SCOTUS held that where commercial or financial information is both customarily and
actually treated as private by its owner and provided to the government under assurance of privacy, the information is
confidential commercial information that is exempt from public disclosure under FOIA.); *see also Fed. Trade Comm.
v. Thomas Jefferson Univ.*, Civ, A. No. 20-01113, 2020 WL 5519353, at *1 (E.D. Pa. Sept. 14, 2020) (granting motion
to seal exhibits "because they contain future financial and budget projections, future strategic plans, and other business
information that, if disclosed, might harm a Defendant's ability to compete.").

"confidential," the Court relied on the word's ordinary meaning, "private" or "secret," and further considered two factors, both of which are present here: first, that the party producing the information ordinarily considers it private, and second, that the party receiving the information imparts some assurance that it will remain secret.[76]

In addition to the protections afforded under FOIA, Utah has other statutory protections for trade secrets and commercial or nonindividual financial information. The Utah Uniform Trade Secrets Act defines trade secrets as follows: "Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process, that: (a) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (b) *is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.*" (Emphasis supplied.)[77] Under the Utah Government Records Access and Management Act ("GRAMA") both trade secrets and commercial or nonindividual financial

---

[76] *Id.,* at 2363 (citations omitted) ("The term 'confidential' meant then, as it does now, 'private' or 'secret.' Webster's Seventh New Collegiate Dictionary 174 (1963). Contemporary dictionaries suggest two conditions that might be required for information communicated to another to be considered confidential. In one sense, information communicated to another remains confidential whenever it is customarily kept private, or at least closely held, by the person imparting it. *See, e.g.*, Webster's Third New International Dictionary 476 (1961) ('known only to a limited few' or 'not publicly disseminated'); Black's Law Dictionary 370 (rev. 4th ed. 1968) ('intended to be held in confidence or kept secret'). In another sense, information might be considered confidential only if the party receiving it provides some assurance that it will remain secret. See, *e.g.*, 1 Oxford Universal Dictionary Illustrated 367 (3d ed. 1961) ('spoken or written in confidence'); Webster's New World Dictionary 158 (1960) ('told in confidence')").
[77] Utah Code Ann. § 13-24-2 (4).

information are protected[78] if the information is submitted to the governmental entity "subject to a written claim of business confidentiality."[79]

In this case, OptumRx considered the information it was compelled by the government to produce as private, as evidenced by the confidentiality agreements it negotiated with the government before turning over *any* information. Further, in each investigation, the government (through its agent, Motley Rice) gave assurances that the information would remain confidential as to other parties by entering into written confidentiality agreements. Thus, the information OptumRx produced to Motley Rice pursuant to Motley Rice's government authority meets the Supreme Court's definition of "confidential commercial information" for purposes of FOIA. It also meets the Utah definition of commercial or nonindividual financial information and was turned over subject to confidentiality agreements as enumerated by GRAMA.

Government lawyers cannot be allowed to use their government power to tip the scales of justice. There can be no doubt when reading the confidentiality agreements pursuant to which the materials at issue were produced, that the OptumRx information was protected as confidential

---

[78] Utah Code, Government Records Access and Management Act, (GRAMA) 63-G-2-305 (eff. 5/7/25) (U.C.A. 1953 § 63G-2-305; Formerly cited as UT ST § 63-2-304.)
The following records are protected if properly classified by a governmental entity:
    (1) trade secrets as defined in Section 13-24-2 if the person submitting the trade secret has provided the governmental entity with the information specified in Section 63G-2-309;
    (2) commercial information or nonindividual financial information obtained from a person if:
        (a) disclosure of the information could reasonably be expected to result in unfair competitive injury to the person submitting the information or would impair the ability of the governmental entity to obtain necessary information in the future;
        (b) the person submitting the information has a greater interest in prohibiting access than the public in obtaining access; and
        (c) the person submitting the information has provided the governmental entity with the information specified in Section 63G-2-309[.]
See also: § 63G-2-309. (U.C.A. 1953 § 63G-2-309; Formerly cited as UT ST § 63-2-308.)
(1)(a)(i) Any person who provides to a governmental entity a record that the person believes should be protected under Subsection 63G-2-305(1) or (2) or both Subsections 63G-2-305(1) and (2) shall provide with the record:
(A) a written claim of business confidentiality; and
(B) a concise statement of reasons supporting the claim of business confidentiality.
[79] GRAMA 63-G-2-309 (eff. 5/7/25).

when produced. The fact that the documents and information have now been produced in discovery pursuant to court order does not change the fact that Motley Rice's knowledge that the documents and information existed in the first place in their private representation of Utah was the result of their abuse of the government power they previously wielded, nor does it alleviate the conflict.

> **B.**      **The materials obtained by Motley Rice meet all the elements of confidential government information.**

The Rule protects information about the third party.[80] With that backdrop, the definition of confidential government information has three elements, all of which are satisfied in this case. First, that information must be gathered under "government authority," which includes obtaining information pursuant to "a grand jury subpoena, a search warrant, a regulatory subpoena, or other government power."[81] In the City of Chicago, DC and Hawaii investigative matters, Motley Rice issued subpoenas under the authority of the government pursuant to its appointment power.[82] The reach of these investigatory subpoenas is unique to the government and exceeds the subpoena power available to private litigants.[83] Second, the information produced is protected if the government is prohibited from making it available to outsiders because of a statutory or other legal prohibition against disclosure, or has a privilege not to disclose it,[84] including because it is exempt under FOIA, the Utah Uniform Trade Secrets Act, and GRAMA. Finally, the information must not be readily available to the public, such as tax or trade secret information.[85]

---

[80] *See* Utah Rule 1.11(c) ("confidential government information *about* a person" (emphasis added)).

[81] ABA Comm. on Ethics & Prof'l Responsibility, Formal Op. 509 (p. 4).

[82] *See* Hawaii Revised Statutes §§ 28-2.5, 480-18, & 661-22; D.C. Code § 28-3910; Chi. Mun. Code § 2-25-090(a).

[83] *Id.*

[84] *Id.*

[85] *Law of Lawyering,* Hazard, Hodes, Jarvis and Thompson, §16.12 (Fourth Edition, 2021-1 Supp. 2014); Wendel, W. Bradley, Professional Responsibility Examples & Explanations, 7th Ed., at p. 259 (Aspen Publishing 2024)("Probably the quintessential example is financial information from income tax returns, which is provided by taxpayers to the IRS and which must, by law, be kept confidential")

Information is not limited to documents. Courts have concluded that, for purposes of Rule 1.11(c), information also includes strategic insights, recollections and mental impressions.[86] In a similar situation, the opioid MDL court disqualified a private defense attorney who was formerly a government attorney, even though she was not directly responsible for managing the investigation on behalf of the government.[87] The court ruled that because of the attorney's role on the Opioid Task Force, she received nonpublic information at meetings related to the investigation in the "spirit of confidence and trust," which was a sufficient basis for disqualification under Rule 1.11(c).[88] Further, Utah courts have recognized the policy reasons to protect confidential information are to avoid either a "taint on the litigation," or an "unfair advantage," that can arise from a government lawyer's use of confidential information.[89] In considering a motion to disqualify under Utah Rule 1.12, the court in *Archuleta v. Turley,* noted that "lawyers themselves may not always be the best guardians of the confidential information they received in [government] positions,"[90] and that "the court should not have to second-guess what [the lawyer] knows…"[91] Although that opinion dealt with Utah Rule 1.12, rather than 1.11, the policy the court articulated is analogous, and the court referenced Rule 1.11 in formulating its opinion.[92]

In this matter, the confidential government information was produced in response to government subpoenas and was subject to the protection of the confidentiality agreements signed by Motley Rice, on behalf of the government, and OptumRx's attorneys, on OptumRx's behalf. The confidentiality agreements designated any information marked as Confidential by OptumRx

---

[86] *United States v. Villaspring Health Care Ctr., Inc.*, 2011 WL 5330790, at *6 (E.D. Ky. Nov. 7, 2011).
[87] *In re National Prescription Opiate Litig.,* 2019 WL 1274666 *5.
[88] *Id.*
[89] *Archuleta v. Turley,* 2012 U.S. Dist. Lexis 149965, *15 (U.S.D.C. District of Utah, Central Division, October 17, 2012.)(Citations omitted.)
[90] 2012 U.S. Dist. Lexis 149965, *16.
[91] *Id.*
[92] *Archuleta*, 2012 U.S. Dist. Lexis 149965, *7.

as protected under those agreements. For example, the D.C. Confidentiality Agreement provided in pertinent part that the parties agreed "*not to use* [the] *Confidential Information in connection with any other matter*, and not to disclose any Confidential Information to any party or the public, except as provided by this Agreement provided that the OAG agree[s] with the designation. OAG outside counsel [Linda Singer and Motley Rice] further agrees not to rely on Confidential Material in pursuing information or claims *in any other matters outside of its representation of the OAG."* (*Emphasis supplied*). These confidentiality agreements clearly demonstrate both that OptumRx considered the material "private" and that the government's lawyers receiving that material, namely Motley Rice, provided assurances that the material "would remain secret," thus meeting the exemption from production under FOIA, as articulated by the Supreme Court in *Food Marketing Institute v. Argus Leader Media*.[93]

Specifically, OptumRx responded to government subpoenas and produced information under the protection of confidentiality agreements. These confidentiality agreements reflect that, before OptumRx produced a single document, Motley Rice acknowledged that the vast majority of information OptumRx produced was considered confidential by the company. The confidential nature of the information and the agreements between the parties in three separate investigations cannot be, and has not been, altered by any discovery order[94] or argument made by Motley Rice. To allow Motley Rice to disregard its obligations under Rule 1.11(c), which in this case are buttressed by the signed confidentiality agreements, eviscerates the important policy protections afforded to "confidential government information" by Rule 1.11(c). Further, should Motley Rice be allowed to remain as counsel in this litigation despite its misuse of government power, third

---

[93] Supra fn. 74 & 75.
[94] MDL order at 14-19.

parties will be disincentivized from cooperating in government investigations, and the important protections to confidential government information imparted by Rule 1.11(c) will be nullified.

Motley Rice's representation of clients in its capacity as private attorneys in litigation, where the confidential government information that they previously acquired about OptumRx through their appointment as Special Assistant Attorneys General can be used to OptumRx's material disadvantage, directly contravenes the Rule. By representing clients in private litigation relating to the same issues that the firm investigated on behalf of the government, the firm *could* use the information acquired in their government capacity to their advantage and that of their private clients.[95] Specifically, the Amended Complaint in the instant case includes allegations relating to OptumRx's revenues, incentives, profits and formularies--information related to which was in the possession of Motley Rice as a result of OptumRx's production of the materials under government subpoenas and confidentiality agreements. *See, e.g.*, Utah Complaint ¶¶ 21, 28, 29, 33, 34, 141, 143, 162, 416. Much of this confidential information would not have been produced by OptumRx absent the compulsory nature of the government subpoenas issued and the assurances of confidentiality from Motley Rice acting in its role as a government attorney. *See* Exhibits 1, 4 and 7.

As another example, the Chicago confidentiality agreement specifically provides that the information produced by OptumRx "will be used for no other purpose whatsoever without the prior written consent from [OptumRx] or by a court order or other applicable law," and that the City of Chicago and its outside counsel (Motley Rice) "shall not share, disclose, or discuss Confidential Documents or the information contained therein with any Motley Rice attorneys, paralegals, contractors, or experts adverse to [OptumRx] in another matter." Exhibit 1. While a

---

[95] ABA Comm. on Ethics & Prof'l Responsibility, Formal Op. 509 (p. 4) (fn. 14).

court has now ordered production of those materials in a separate proceeding,[96] that order does not negate Motley Rice's conflict of interest, and neither the firm nor its private clients can be allowed to financially benefit from its unethical conduct.

Importantly, at no time has Motley Rice ever challenged any of the Confidentiality designations, nor has OptumRx consented to the use of the materials in any other matter aside from the original government investigations in which the materials were produced.[97] The Hawai'i and D.C. Confidentiality Agreements provided that information marked as Confidential was defined as: "*documentary and/or tangible information of any type, kind or character that contains (a) Information of a personal nature where the public disclosure thereof would constitute a clearly unwarranted invasion of personal privacy; (b) trade secret or commercial financial information, to the extent disclosure would result in substantial harm to the competitive position of the Company*." *See* Exhibits 4 & 7 (Emphasis supplied) ¶ 2.

The vast majority of the Confidential Information that OptumRx produced to Chicago, DC, and Hawai'i is not available to the public because those materials are some of OptumRx's most sensitive commercial documents. OptumRx would not have produced those materials had it not been compelled to do so by government subpoenas and had the materials not been protected by the Confidentiality Agreements. In light of the lengths to which OptumRx went to protect the information demanded by the government subpoenas, and the government's acquiescence to those protections, it is reasonable to conclude that the information at issue is not publicly available, rather it is proprietary and is generally not produced pursuant to routine discovery requests.

---

[96] MDL Order at 25.

[97] OptumRx's production of the materials in the opioid MDL litigation, as required under the court's order, was not an agreement that the information is not confidential but a Hobson's choice: produce the information or be held in contempt. OptumRx took an appropriate procedural remedy which was to produce the information and to pursue relief from the court's disqualification order by filing a petition for a Writ of Mandamus.

As such, the information OptumRx produced to Motley Rice when Motley Rice was acting as a government attorney using the authority of the government, constitutes confidential government information, as defined by Rule 1.11(c), including because it is exempt from disclosure under FOIA, which is the underlying statutory basis for Rule 1.11(c).[98] Thus, under the statutory interpretation of "confidential information," OptumRx's information is protected confidential government information for purposes of Rule 1.11(c).

Although certain documents may be requested and required to be produced in discovery, the standard of Rule 1.11(c) remains unchanged, and the production of the documents in discovery does not alter the character of the information. In other words, if information is confidential and qualifies as nonpublic information (like tax, commercial or nonindividual financial information or trade secrets,) or under a FOIA exemption so that it is protected confidential government information under Rule 1.11(c), the fact that it is later produced in discovery, whether or not pursuant to a protective order, does not change its essential character as confidential government information. Therefore, under Rule 1.11(c), the attorney [Motley Rice] who obtained the information under the auspices of government authority is *still* prohibited from using the information to benefit its private clients.[99] Motley Rice and its private clients should be prohibited from financially benefiting and using the confidential information Motley Rice obtained about OptumRx when acting as a government attorney.

---

[98] Supra fn. 57-59.

[99] The opioid MDL court's analysis about production of information in the MDL repository is misguided. MDL Order at 22–25. The issue is *not* that the information was produced in discovery, but rather that the information *is* confidential government information, obtained by Motley Rice under government authority.

### III.    It is undisputed that Motley Rice has actual knowledge of the confidential government information it received, and the protections afforded to that information under Rule 1.11(c) cannot be waived.

A.  Actual Knowledge

Rule 1.11(c) applies to disqualify a lawyer only when the attorney has actual knowledge of the information and does not apply when information merely could be imputed to the lawyer.[100] It is undisputed in this case that OptumRx's confidential information, produced pursuant to government subpoenas and confidentiality agreements, was produced directly to Motley Rice. Thus, the actual knowledge standard is met.[101] Motley Rice has actual knowledge of the information it received and further knows that the information was subject to confidentiality agreements.

In a similar matter cited above, the opioid MDL court disqualified a private defense attorney under Rule 1.11(c) because her receipt of non-public information relating to damages while she was employed by the government could materially prejudice the opponent's case.[102] The opioid MDL court's March 2019 opinion and order is instructive. In that case, plaintiffs' counsel, who were representing various government entities, filed a motion to disqualify the private defense counsel who was representing a pharmaceutical company. The defense counsel at issue was a former First Assistant U.S. Attorney, and then U.S. Attorney, who chaired the Heroin and Opioid Task Force. In that case, the plaintiffs argued that while defense counsel served as a government attorney, she had received confidential government information "in the spirit of confidence and

---

[100] Utah RPC Terminology, Rule 1(g): "'Knowingly,' 'known' or 'knows' denotes actual knowledge of the fact in question. A person's knowledge may be inferred from circumstances."

[101] The MDL court's order states: "A lawyer is in breach of Rule 1.11(c) only if the "lawyer ha[s] information that the lawyer **knows** is confidential government information. (emphasis in original)." *See* MDL Order at 14.  We point out that the court's emphasis on the word "knows" is misleading. In the Ohio Rules of Professional Conduct as published, words that are defined in the terminology section are emphasized in the text of the Rule. (See Ohio RPC Note: "Except for Latin terms, words and phrases that appear in italicized type in each rule denote terms that are defined in Rule 1.0.")

[102] *In re National Prescription Opiate Litig.,* 2019 WL 1274666 *5. (See fn. 86.)

trust" through her role as the head of the task force. Although defense counsel and her client denied those allegations, the court granted, in part, plaintiffs' motion to disqualify.[103]

In finding that the information provided by the Department of Justice and shared with the Task Force was confidential, the opioid MDL court considered that the information was provided "in a spirit of confidence and trust" and would not have been shared had counsel not been with the U.S. Attorney's Office.[104] The court further concluded that the confidential information may go to the heart of the plaintiffs' damages claims, and the information, if used by the defendant, would "materially prejudice" the plaintiffs. As such, the court disqualified counsel from all cases initiated by the City of Cleveland and Cuyahoga County. Likewise, the court disqualified defense counsel's firm from any litigation brought by those parties, finding that the conflict was imputed to the firm because timely screening was no longer available almost two years later.[105]

Other courts have disqualified former government attorneys who gained confidential information that provided strategic insights into the opponent's case. For example, in *United States v. Villaspring Health Care Ctr. Inc.*, Civ. No. 3:11-43-DCR, 2011 WL 5330790, 2011 BL 285930 (E.D. Ky. Nov 7, 2011), a former state assistant attorney general who went into private practice was disqualified from representing a health care facility in a federal False Claims Act case because, as a government attorney, he investigated, but did not charge, the same health care facility for criminal abuse and neglect. The court held that, while investigating the health care facility as an assistant attorney general, the lawyer gained "strategic insights such as the knowledge of the

---

[103] *In re National Prescription Opiate Litig.,* 2019 WL 1274666 *1.
[104] *Id.* at *5.
[105] *In re National Prescription Opiate Litig.,* 2019 WL 1274666 *5.

strengths and weaknesses of the evidence compiled against [the facility],"[106] which was confidential government information requiring his disqualification.[107]

Courts have also considered confidential government information that constitutes a "roadmap" to require disqualification.[108] Thus, even when twenty years had passed and the former government lawyer did not remember the information and would not rely on it, the lawyer's "lack of memory does not insulate him from the reach of Rule 1.11(c) and does not undo his actual knowledge." Although after twenty years some of the information was in the public record, because some was still classified, the court found, "[a]t the very least, the lawyer surely has a mental roadmap concerning the defendant and his activities that was shaped at least in part by his access to confidential government information."[109] The court further found that the lawyer's access to confidential government information "about a variety of relevant topics obtained as a result of his extended role in prosecuting the defendant. . . could be used to the material disadvantage" of one or more of the defendants and, therefore, disqualified counsel.[110] In so doing, the court considered the importance of the "overarching need to preserve the integrity of the judicial system" and "to avoid the appearance of impropriety that may compromise the public perception of the judicial process."[111]

Motley Rice received confidential government information through government subpoenas in connection with its appointment as government officers as follows:

- in 2018 in connection with its work on behalf of the City of Chicago Law Department;
- in 2020 in connection with its work as Attorney General for the District of Columbia; and

---

[106] *United States v. Villaspring Health Care Ctr. Inc.,* 2011 WL 5330790 *6.
[107] *Id.*
[108] *Kronenberg v. LaRouche,* 2010 WL 1443934, *4.
[109] *Kronenberg v. LaRouche,* 2010 WL 1443934, *4.
[110] *Kronenberg v. LaRouche,* 2010 WL 1443934, *5.
[111] *Id.*

- in 2021 in connection with its work as Special Deputy Attorney General for Hawai'i.

In each of these instances, Motley Rice, as government attorneys, directly received confidential information provided pursuant to a government subpoena and protected by confidentiality agreements. The standard for actual knowledge is clearly met. Perhaps Motley Rice could have avoided disqualification of the entire firm by availing itself of screening under Rule 1.11(c), but there is no evidence that Motley Rice took any steps to screen or otherwise avoid sharing the confidential information it received.[112]

B. No waiver of the confidentiality provisions.

Rule 1.11(c) does not allow the government, the client, or the person against whom the information might be used to waive the rule's protections.[113] Nor does the opioid MDL court's order requiring production of the confidential government information in discovery change the confidential character of the information that Motley Rice gathered about OptumRx under government authority, or cleanse Motley Rice of its ongoing conflict.[114] The court's decision in the opioid MDL to allow Motley Rice to proceed as plaintiffs' counsel harms the administration of justice. Allowing Motley Rice to continue to violate Rule 1.11(c) by representing the State of Utah or any other party in this litigation will exacerbate that harm.

---

[112] *See.e.g. State v. Cater*, 2014 UT App 207. Rule 1.11(c) states in pertinent part: "A firm with which that lawyer is associated may undertake or continue representation in the matter only if the disqualified lawyer is screened from any participation in the matter and is apportioned no part of the fee therefrom." Clearly neither requirement has been met and Motley Rice cannot now screen to avoid disqualification of the firm.

[113] ABA Comm. on Ethics & Prof'l Responsibility, Formal Op. 509, p. 6 (fn 24).

[114] *See, e.g., General Motors Corp. v City of New York,* 501 F. 2d 639 (2nd Cir 1974). The court granted General Motors's disqualification motion and disqualified a former Justice Department lawyer from representing the City of New York even though the DOJ had no objection to the representation. The court found that because the lawyer had major responsibility for prosecuting a federal antitrust action against the company, the lawyer could not later act as special counsel for a municipal corporation [City of New York] and file a lawsuit against the same company based on the same course of conduct while practicing with a private firm. The court in *General Motors* disqualified the lawyer in reliance upon the old Code of Professional Conduct and the general rule against "avoid[ing] even the appearance of impropriety." Rule 1.11(c) adopts the same position explicitly but under a more direct rubric.

42

IV.    **Motley Rice could use the confidential government information to OptumRx's
material disadvantage.**

The Rule requires only that the information *could be* used to the material disadvantage of

OptumRx. A review of the subpoenaed information and the allegations in Utah's complaint shows

the underlying facts and issues are similar to those in the investigations in which Motley Rice

subpoenaed information from OptumRx while acting as government lawyers, which could provide

a roadmap of OptumRx's business operations, to OptumRx's material disadvantage.

A comparison of the information obtained by government subpoena in the Chicago,

Hawai'i and D.C. matters, with the allegations in the complaint filed in the instant case, clearly

illustrates that Motley Rice collected information through its power as government officers and

could use that information in its capacity as a private law firm representing other clients against

OptumRx to OptumRx's material disadvantage.

For instance, as government attorneys for Hawai'i and D.C., Motley Rice subpoenaed

"Rebate payment data and information from manufacturers, including emails and communications,

and financial analyses." A review of the complaint in the instant matter illustrates how Motley

Rice *could* use the rebate payment data, financial analyses and other confidential government

information obtained to the material disadvantage of OptumRx. The Utah Complaint in this case,

*supra,* alleges that:

- "Defendants colluded with Purdue Pharma and other opioid manufacturers to increase
  opioid sales by giving opioids preferred placement on Defendants' national formularies in
  exchange for substantial rebates and fees. The rebates were conditioned on Defendants
  lowering the copay requirements and eliminating safety restrictions like prior authorization
  requirements and usage limits. To boost profits, Defendants willingly agreed. Moreover,
  Defendants actively collaborated with Purdue and other manufacturers to create, support,
  and propagate misleading marketing messages to alter perceptions of opioids and increase
  sales. Defendants shared their data with opioid manufacturers to help refine and target their
  opioid marketing strategies. Defendants partnered with manufacturers to study and develop
  data that would reinforce Purdue's and other manufacturers' deceptive messaging. And
  Defendants helped Purdue and other manufacturers draft and disseminate deceptive
  marketing materials to the public and prescribers." Utah Compl. ¶ 33-34.

- "Defendants colluded with Purdue Pharma and other opioid manufacturers to increase opioid sales by giving opioids preferred placement on Defendants' national formularies in exchange for substantial rebates and fees. The rebates were conditioned on Defendants lowering the copay requirements and eliminating safety restrictions like prior authorization requirements and usage limits. To boost profits, Defendants willingly agreed." Utah Compl. ¶ 33.

- "Express Scripts and Optum leverage their market power to require and receive incentives from manufacturers to keep certain drugs on and off their standard formularies." Utah Compl. ¶ 141.

Motley Rice is actively pursuing claims against OptumRx that are focused on the aspects of OptumRx's business discussed in the many confidential documents produced in the Chicago, Hawai`i, and District of Columbia, investigations. All of those documents were subject to the Confidentiality Agreements prohibiting their use outside of those specific investigations, and yet Motley Rice has clearly used that information in its representation of plaintiffs in its private practice. As another example, in the Hawai'i matter, the government, through Motley Rice, subpoenaed documents regarding the identity of the ten manufacturers from which OptumRx received the largest payments in the years 2010-2021. Correspondingly, Utah's Complaint alleges:

- "Defendants colluded with Purdue Pharma and other opioid manufacturers to increase opioid sales by giving opioids preferred placement on Defendants' national formularies in exchange for substantial rebates and fees. The rebates were conditioned on Defendants lowering the copay requirements and eliminating safety restrictions like prior authorization requirements and usage limits. To boost profits, Defendants willingly agreed." Utah Compl. ¶ 33.

- "Express Scripts and Optum leverage their market power to require and receive incentives from manufacturers to keep certain drugs on and off their standard formularies." Utah Compl. ¶ 141.

The standard under the Rule is only that the information *could be used.* OptumRx need not establish that the information actually has been used by Motley Rice. At minimum, however, the information demanded by the subpoenas issued under government authority and produced to

Motley Rice pursuant to that authority gave Motley Rice a roadmap and strategic insights that could assist them in representing the plaintiff in this litigation.[115]

The *LaRouche* case, *supra*, is an example of why this violates Rule 1.11(c). In that case, the court held that neither the lawyer's lack of memory caused by the passage of twenty years, nor his lack of access to the information at issue, was sufficient to ensure that the defendant would not be materially disadvantaged by the lawyer's mental roadmap resulting from his previous exposure to the defendant's confidential government information.[116]

In this case, the information was recently obtained by Motley Rice, unlike the passage of twenty years in the *LaRouche* case. Further, even if Motley Rice no longer has access to the documents obtained while working for the government, like the lawyer in *LaRouche,* it is still deemed to have knowledge of OptumRx's confidential information, which it obtained as government lawyers, because the confidential information was produced directly to Motley Rice. This abuse of confidential government information collected pursuant to government subpoena is exactly what Rule 1.11(c) is designed to prevent. Allowing Motley Rice to use the information it gained wielding the power of government authority to its own advantage and to the advantage of clients it now represents as a private law firm, could materially disadvantage OptumRx and, therefore, violates Rule 1.11(c).

## V.    Motley Rice possesses confidential government information, and disqualification is the only remedy.

In its March 18, 2024 order denying OptumRx's motion to disqualify, the opioid MDL court noted that ABA Formal Op. 509 does not define confidential government information and only "sheds some light on what it means for information to not otherwise be available to the

---

[115] *United States v. Villaspring Health Care Ctr. Inc.*, Civ. No. 3:11-43-DCR, 2011 WL 5330790, 2011 BL 285930.
[116] *Kronenberg v. LaRouche,* 2010 WL 1443934, *3, *4.

public."[117] As noted above, the ABA opinion was *not* promulgated to address the definition of confidential government information, but rather focused on to whom Rule 1.11(c) applies.[118] But footnote 13 of ABA Opinion 509 does note that the conceptualization of confidential government information arises from federal regulations as discussed earlier in this opinion.[119] Those federal regulations restrict federal government employees from engaging in financial transactions using nonpublic information acquired under government authority for their own private interests or those of another.[120] That is precisely what Motley Rice has done in the MDL and other cases, and will continue to do if permitted to represent the plaintiff in the instant litigation.

It is our opinion that the opioid MDL court erred in its determination that the information OptumRx produced to Motley Rice as government attorneys pursuant to government authority did not constitute confidential government information. Had the court considered the importance of the government statutes and regulations that are the foundation for those protections, instead of relying on only one word from the ABA opinion taken out of context, namely "routine" discovery, it likely would have reached a different conclusion. As noted above, the fact that information is later produced in discovery does not change the confidential character of the information for purposes of Rule 1.11(c), nor does the fact that Motley Rice obtained the confidential information under government authority and pursuant to protections of confidentiality agreements, and now seeks to use that information for its personal benefit and for that of its private clients. To the extent other courts have reached the same conclusion, the fact that the documents have been produced in discovery does not change the confidential nature of the information as it was produced pursuant to confidentiality agreements and is treated as confidential by OptumRx. The protections afforded

---

[117] MDL Order at 14.
[118] ABA Comm. on Ethics & Prof'l Responsibility, Formal Op. 509 (p.1); *see* p. 17 of this opinion.
[119] ABA Comm. on Ethics & Prof'l Responsibility, Formal Op. 509 (p.4, fn 13).
[120] Supra fn.54-56. ABA Formal Op. 509 (p. 4, fn 13).

to confidentiality are so engrained in the legal process that, even for former clients, the fact that information is a publicly available court record, does not negate the protections of confidentiality.[121]

Similarly, the fact that OptumRx faced a Hobson's choice and produced the documents to comply with the court's order does not diminish the validity of its objection to Motley Rice's conflicted representation.[122] The fact that client information might be available publicly has been rejected as a basis to find that information is not confidential.[123] The ethical duty of confidentiality is "serious"[124] and applies to all information relating to the representation "whatever its source,"[125] even if the source is public.

A broader look at the underlying statutes that afford protections to confidential government information make it clear that OptumRx's proprietary and commercial information is, in fact, protected by Rule 1.11(c), even more so given that the parties produced it pursuant to confidentiality agreements. As discussed above,[126] FOIA exempts from production both information protected by the work product privilege and commercial and financial information where the party producing the information ordinarily considers it private; and the party receiving the information imparts some assurance that it will remain confidential.[127]

Here, OptumRx produced confidential proprietary financial information under the protections of confidentiality agreements that Motley Rice (and the opioid MDL court's March 18

---

[121] *See* ABA Formal Op. 479 (Dec. 15, 2017)) pp 1-3. ("The 'generally known' exception to the duty of former-client confidentiality [enumerated in Rule 1.9] is limited…. Information is *not* generally known simply because it has been discussed in open court or is available in court records in libraries or other *public* repositories of information." (Citations omitted. Emphasis supplied.)
[122] Supra fn. 37-40.
[123] Supra fn. 38.
[124] *See, e.g.,* Utah Ethics Advisory Opinion Committee Opinion No. 21-01 Originally Issued April 13, 2021 Amended November 28, 2023.
[125] Utah R.P.C. 1.6, comment 3.
[126] *See* pp. 27-32 of this opinion.
[127] Supra fn. 60, 61, 91.

order) completely ignore. No discovery order can undo Motley Rice's conflict or the taint that the circumstances of production of these materials bring to this case. The point remains that however this information is characterized after it is produced in discovery, it remains confidential government information as to Motley Rice because Motley Rice obtained the information using government power. Motley Rice is, therefore, ethically and legally prohibited from using it on behalf of its private clients. If the determination of whether information is confidential government information and not publicly available (and thus protected by Rule 1.11(c)) turns on whether it could later be produced in discovery, it would lead to an absurd result. Under that analysis, a government attorney could *avoid all* obligations imposed by Rule 1.11(c) simply by later requesting the same information in discovery, about which it already knew, on behalf of its private client(s) in a later proceeding.

In addition, to succeed on its Motion to Disqualify, OptumRx is not required to show that it "*would* suffer a material disadvantage," only that it *could* suffer a material disadvantage. The distinction is significant. The fact that other courts have denied OptumRx's attempts to disqualify Motley Rice on the basis of Rule 1.11(c) [128] does not vitiate the important policy considerations that underly the Rule. Thus, the opioid MDL court's order requiring that OptumRx produce its confidential documents to all parties in the MDL does not absolve Motley Rice from the conflict it created by improperly suing OptumRx after gathering information about OptumRx while acting as a government attorney using government authority. The Preamble to the Utah Rules of Professional Conduct provides, "[A] lawyer … is a public citizen having special responsibility for the quality of justice."[129] "[I]t is also a lawyer's duty to uphold the legal process."[130] To allow

---

[128] *See, e.g.,* Case No. 23STCV20886, 11/14/2024.
[129] Utah R.P.C. Preamble 1.
[130] Utah R.P.C. Preamble 5.

Motley Rice and its client to benefit financially from the power Motley Rice held as government attorneys undermines the quality of justice and the legal process in this case. Motley Rice's conflict cannot be cured, and the taint of that conflict cannot be erased as long as they serve as counsel of record in this or any other matter in which the firm can use confidential information it learned in its role as government lawyers investigating OptumRx to OptumRx's material disadvantage.

## VI.    OptumRx's well-founded disqualification motion seeks to promote an important policy concern and prevent the abuse of government authority.

The longstanding policy concern of Rule 1.11 is to prevent misuse of government authority. As far back as 1975, ABA Formal Opinion 342 recognized the importance of these concerns: "If one underlying consideration is to avoid the situation where government lawyers may be tempted to handle assignments so as to encourage their own future employment in regard to those matters, the danger is that a lawyer may attempt to derive undue financial benefit from fees in connection with subsequent employment…"[131] When Rule 1.11 was amended, Comment 4 was added, expressly stating that, "[u]nfair advantage could accrue to the other client by reason of access to confidential information about the client's adversary only available through the lawyer's government service."[132]

Through the comments to its Rules of Professional Conduct, Utah has long recognized the importance of avoiding the risk that government power will be used for the special benefit of another client and not allowing any unfair advantage to accrue from government service.[133] "Judges have broad discretion, as part of their supervisory powers, to control and maintain their courtrooms and to determine which lawyers are allowed to appear before them."[134] Motions to

---

[131] ABA Formal Op. 509, p. 8, citing to ABA Formal Op. 342 (1975).
[132] ABA Model Rule 1.11, cmt. 4; *See also*, Utah Rule of Prof'l Conduct 1.11, cmt. 4.
[133] Utah R.P.C. 1.11 comment 4.
[134] *Archuleta,* 2012 U.S. Dist. Lexis 149965, *11. (Citations omitted.)

disqualify are "governed by the ethical rules announced by the national profession and considered in light of the public interest and the litigant's rights."[135] While motions to disqualify should be granted rarely, they should be granted where "an ethical violation has occurred that would taint the underlying trial."[136] "Such ethical violations typically fall into two categories: (1) a conflict of interest that prevents zealous advocacy or (2) the potential use of privileged or confidential information about one party that would give an unfair advantage to a present client."[137]

This is a clear case: If Motley Rice is allowed to remain of record the trial would be tainted. A taint is defined as "the potential use of privileged or confidential information about one party that gives an unfair advantage to a present client."[138] Here, it is beyond a "potential." Motley Rice's current client has an "unfair advantage" from the confidential information previously obtained by the firm. Disqualification is appropriate given the strong public policy concerns in protecting against government overreach.

In disqualifying a government attorney who was a former law clerk for the state, the Utah district court noted that the Attorney General's office would not be "unduly prejudiced,"[139] because they "undoubtedly had many other well-qualified lawyers who can assist … in representing the state's interests…"[140] Likewise, there will be no prejudice to the State if Motley Rice is disqualified.

Because the government investigations were confidential, and the information from those investigations are not publicly available (such as through FOIA), OptumRx cannot even know the extent of information gathered by Motley Rice beyond what Motley Rice itself might produce. In

---

[135] *Archuleta,* 2012 U.S. Dist. Lexis 149965, *11. (Citations omitted.)
[136] *Archuleta,* 2012 U.S. Dist. Lexis 149965, *13
[137] *Id.*
[138] *Id.*
[139] *Archuleta,* 2012 U.S. Dist. Lexis 149965, *16
[140] *Archuleta,* 2012 U.S. Dist. Lexis 149965, *16.

addition, Motley Rice has confidential government information in the form of its knowledge of the underlying investigation, similar to the situation in the *Archuleta* case. OptumRx's motion to disqualify is well grounded in the law as applied to these facts. Further, there would be no delay or prejudice if Motley Rice is disqualified as there are other qualified, non-conflicted counsel available to represent the State of Utah in this case.

In other opioid cases where OptumRx has moved to disqualify Motley Rice, the firm has pointed to the fact that OptumRx is the sole defendant moving for disqualification. But that is irrelevant. It was OptumRx's confidential information that was obtained by Motley Rice via government subpoenas, and that alone qualifies OptumRx to move for the relief requested. That other defendants opted not to pursue Motley Rice's disqualification does not change the fact that the motion is well-founded in fact and law.

The policy concerns behind Rule 1.11(c) are as valid today as they were in 1975. Corporate defendants have the same right as any other litigant to prevent abuses of government power. That OptumRx is the sole defendant pursuing a legitimate disqualification motion should have no bearing on this Court's decision.

## **CONCLUSION**

Motley Rice was a public officer or employee when it wielded government power and investigated OptumRx on behalf of Hawaii, D.C., and Chicago. It is now representing private clients in its private capacity in litigation seeking to financially benefit both itself and its private clients after spending years collecting confidential information from OptumRx by wielding the power of the government. This is exactly the harm that Rule 1.11(c) was promulgated to prevent— the abuse of government power. We do not believe that this is a close call. There can be no more obvious violation of Rule 1.11(c) than Motley Rice's.

Respectfully submitted,


/s/ Wendy J. Muchman

/s/Sari W. Montgomery

Dated: July 31, 2025

# Appendix A

# Sari W. Montgomery   |   Curriculum Vitae

33 N. Dearborn St., Ste. 1420, Chicago, IL 60602 | (847) 217-3524 | smontgomery@rsmdlaw.com

## Current Position

**Partner**                                                                                                          *2019 – Present*
**Of Counsel**                                                                                                       *2010-2018*

*Robinson, Stewart, Montgomery & Doppke LLC* (Formerly Robinson Law Group, LLC), Chicago, Illinois

- Represent attorneys in disciplinary investigations, hearings and appeals before the Attorney Registration and Disciplinary Commission of the Supreme Court of Illinois and the Illinois Supreme Court;
- Represent judges in investigations pending before the Illinois Judicial Inquiry Board;
- Represent bar applicants in admissions proceedings before the Illinois Board of Admissions to the Bar, the Committee on Character and Fitness, and the Illinois Supreme Court;
- Provide consulting services and opinion letters to law firms, attorneys, government agencies, and law related business in diverse practice areas regarding legal ethics and professional responsibility issues;
- Provide opinions as an expert witness regarding legal ethics and fee issues; and
- Manage day-to-day operations of law firm including human resources, benefits, payroll, and financial reporting.

**Adjunct Professor**                                                                                                *2023 - Present*
*Northwestern University Pritzker School of Law*, Chicago, Illinois
- Teach required course on legal ethics and professional responsibility.

## Prior Professional Experience

**Adjunct Professor**                                                                                                *2006 - 2011*
*Loyola University Chicago of Law*, Chicago, Illinois
- Taught a full-year course on legal writing and research to first-year law students.

**Litigation and Senior Litigation Counsel**                                                                         *1994 - 2004*
*Attorney Registration and Disciplinary Commission of the Supreme Court of Illinois (ARDC)*
- Conducted hundreds of investigations and prosecuted more than fifty disciplinary cases before the Hearing Board of the Attorney Registration and Disciplinary Commission.
- Extensive motion practice before the Hearing Board of the Attorney Registration and Disciplinary Commission and the Illinois Supreme Court.
- Supervised and trained designated counsel and support staff.

- Assisted Administrator in developing and implementing agency-wide strategy for prosecuting the first cases in Illinois involving the unauthorized practice of law in numerous practice settings.

**Contract Attorney**                                                                  *2005*
*Lake County Public Defender, Lake County, Illinois*
- Represented juveniles in misdemeanor and felony delinquency proceedings.
- Represented parents in DCFS proceedings.

## Education, Licenses, and Professional Memberships

**University of Chicago**, Chicago, Illinois, *BA in Public Policy Studies*                *1991*

**Loyola University Chicago School of Law**, Chicago, Illinois, *Juris Doctor*            *1994*

**Loyola University School of Law Program in International Law,** *Rome, Italy*           *1992*

**Illinois Supreme Court**, *Admitted*                                                   *1994*

**United States District Court for the Northern District of Illinois,** *Admitted, General Bar*   *1994*

**Illinois Supreme Court Committee on Professional Responsibility,** Appointed   *2025-Present*

**American Bar Association Center for Professional Responsibility**, *Member*   *2012 - Present*

*Chair, Standing Committee on Professional Regulation*                          *2024-2027*
*Special Advisor to Standing Committee on Professional Regulation*              *2022 -2024*
*Member, Standing Committee on Professional Regulation*                         *2019 - 2022*
- Selected to participate in consultations conducting 360° evaluations of state lawyer regulatory systems at the request of applicable state Supreme Courts.
- Member, Sub-Committee on Proactive Management Based Regulation (PMBR)
- Member, Joint Sub-Committee on Revisions to ABA Model Rule 1.2(d)
- Member, Working Group on Revisions to ABA Model Rule 1.14

**Association of Professional Responsibility Lawyers (APRL)**, *Member*         *2012 - Present*

- Secretary                                                                     **2024-2025**
- Treasurer                                                                     **2023-2024**
- Elected to Board of Directors                                                 ***2020 - Present***
- Conference Planning Committee                                                 ***2019 – 2020***
                                                                                ***2023-2025***
- Appointed as APRL Liaison to ABA Committee on Professional Regulation         ***2018 - 2019***

**Illinois State Bar Association (ISBA)**, *Member*                    *1994 - Present*
*Appointed to Committee on Professional Conduct*                    *2008 - Present*
- Past Chair, Committee on Professional Conduct                    *2014 - 2015*
- Participate in drafting new ethics opinions for benefit of 30,000 member association. Comment on legislation and rule proposals impacting professional conduct issues. Reviewed all pre-2010 ISBA ethics opinions for consistency with 2010 Illinois Rules of Professional Conduct.
- Member of Ethics 20/20 Sub-Committee which reviews all proposals from ABA Ethics 20/20 Committee and makes recommendations for adoption in Illinois.

*Appointed to Standing Committee on Artificial Intelligence and the Practice of Law*

*Appointed to President's Special Committee on Alternative Business Structures*

*Appointed to lead-generation working group to assess ethical implications of various lead-generation business models.*

*Appointed to President's Special Committee on the ARDC Matching Services Study*
- Review ARDC Matching Services Study and formulate recommendations to ISBA Board of Governors to be presented to ARDC and Illinois Supreme Court.

*Appointed to President's Special Committee on Collaborative Law*
- Draft proposed legislation and changes to Supreme Court Rules to facilitate the collaborative law process in a manner consistent with the Rules of Professional Conduct.

**Chicago Bar Association**, *Member*                    *1994 - Present*
- Board of Managers                    *2024-Present*
- Member, Committee on Professional Responsibility
- Member, Committee on Unauthorized Practice and Multidisciplinary Practice

**Chicago Council of Lawyers,** *Member*                    *2020 - Present*
- Member, Committee on Access to Justice

**Lake County Bar Association,** *Member*                    *2022-Present*
- Member, Outreach and Diversity Committee

**Association of Women Attorneys of Lake County,** *Member*                    *2022-Present*
- Member, Ethics Seminar Planning Committee

## Publications

Mary Robinson, Sari W. Montgomery, James A. Doppke, Jr., Stephanie Stewart, Ch. 13, Disciplinary Liability, ATTORNEY'S LEGAL LIABILITY (IICLE®, 2025).

Sari W. Montgomery, Legal Ethics: Navigating the Ethical Challenges of Advertising and Solicitation in the Digital Age (BridgeTower Media, December 3, 2024—ongoing ethics columnist).

Sari W. Montgomery, Legal Ethics: Ethical Challenges of Representing Clients with Diminished Capacity, Business of Law Digest (BridgeTower Media, August 27, 2024—ongoing ethics columnist).

Sari W. Montgomery, Legal Ethics: ABA Model Rule Banning Discrimination, Sexual Harassment Remains Controversial, Business of Law Digest (BridgeTower Media, June 25, 2024—ongoing ethics columnist).

Sari W. Montgomery, Legal Ethics: To Respond or Not Respond to Negative Online Reviews, Business of Law Digest (BridgeTower Media, March 26, 2024—ongoing ethics columnist).

Sari W. Montgomery, Legal Ethics: Unauthorized Practice or a Glimpse Into the Future, Business of Law Digest (BridgeTower Media, December 19, 2023—ongoing ethics columnist).

Sari W. Montgomery, Know When to 'Just Say No,' Business of Law Digest (BridgeTower Media, Sept. 26, 2023—ongoing ethics columnist).

Sari W. Montgomery, The Promise and Pitfalls of ChatGPT, Business of Law Digest (BridgeTower Media, July 5, 2023—ongoing ethics columnist).

Sari W. Montgomery, Legal Ethics: You Have Inadvertently Received Privileged Information from Opposing Counsel, Now What?, Business of Law Digest (BridgeTower Media, March 28, 2023—ongoing ethics columnist).

Lucian T. Pera, Mark Armitage, Lydia Lawless, Ronald Minkoff, Sari W. Montgomery, Wendy Muchman, Lynda Shely, Time to Renew America's Lawyer Discipline System, Bloomberg Lawyers' Manual on Professional Conduct (Bloomberg Law, Feb. 2023).

Sari W. Montgomery, The Dos and Don'ts of Using Social Media in Jury Selection, GP Solo, Volume 40, No. 1 (American Bar Association, Solo, Small Firm, General Practice Division, Jan./Feb. 2023).

Sari W. Montgomery, James A. Doppke, Jr., Stephanie Stewart, Ch. 7, Ethical Considerations in Jury Trials, Inside & Outside the Jury Box (IICLE®, 2023).

Sari W. Montgomery, Legal Ethics: How to Avoid Discipline When You've Made a Mistake, Business of Law Insider (BridgeTower Media, December 20, 2022—ongoing ethics columnist).

Mary Robinson, Sari W. Montgomery, James A. Doppke, Jr., Stephanie Stewart, Ch. 13, Disciplinary Liability, ATTORNEY'S LEGAL LIABILITY (IICLE®, 2021).

Sari Montgomery, Scott Kozlov, Nancy Vincent, A Cautionary Tale for In-house Counsel, Illinois Bar Journal, Volume 107, Number 7. (ISBA, 2019).

Contributing Author, Annotated Standards for Imposing Lawyer Sanctions, 2d Ed. (American Bar Association Center for Professional Responsibility, 2019).

Mary Robinson, Sari W. Montgomery, James A. Doppke, Jr., Ch. 9, Ethical Considerations in Jury Trials, Inside & Outside the Jury Box (IICLE®, 2019).

Mary Robinson, Sari W. Montgomery, James A. Doppke, Jr., Ch. 13, Disciplinary Liability, ATTORNEY'S LEGAL LIABILITY (IICLE®, 2018).

## Additional Professional Activities and Awards

Subject Matter Expert/Drafting Committee Member (2024-present), Multistate Professional Responsibility Examination (MPRE), National Conference of Bar Examiners, 2018-Present.
- Draft, edit, review, and select questions for the Multistate Professional Responsibility Examination

Editorial Advisory Board Member, Law360 Legal Ethics, 2022-2023, 2025-Present.

Fellow, American Bar Foundation, 2021-Present.

Outstanding Pro Bono Attorney Award (Individual and Firm), Cook County Public Guardian, 2024.

Pro Bono Service Award, Illinois Lawyers' Trust Fund of Illinois, 2019.

Provide informal ethics opinions as membership benefit to Illinois Creditors' Bar Association.

Trained Intervenor, Illinois Lawyers Assistance Program, 2003.

## Volunteer and Community Activities

**Deerfield Public Schools District 109 Board of Education**          *Elected 2013 - 2025*
Deerfield Public Schools is a Pre-K-8 District located in North Suburban Chicago with approximately 2,800 students, over 400 employees, $70 million annual budget, and seven facilities.

| | |
|---|---|
| *President, Board of Education* | *2021 - 2025* |
| *Secretary, Board of Education* | *2015 - 2021* |

*Chair,* Executive Development and Negotiations Committees; Past Chair, Finance Committee; Past Member, Policy Committee; Past Board Member Representative, COVID-19 Task Force.

**Township District 113 Caucus**                                          *2018 - 2022*
*Member,* Non-Partisan organization that vets candidates for local public high school district.

**Deerfield Public Schools District 109 Caucus**                          *2010 - 2012*
 *Member*, Non-Partisan organization that vets candidates for local Pre-K-8 public school district.

**Community Family Center, Highland Park, Illinois**                      *2009 - 2019*
*Secretary, Board of Directors*

*Member, Board of Directors*                                             *2006 - 2019*

**Highland Park Community Early Childhood Center, Highland Park, Illinois**    *2002 - 2010*
*Member, Treasurer, Vice-President, President, Board of Directors*            *2002 - 2010*

*Secretary Board of Directors*                                           *2013 – 2017*

## Presentations and Speaking Engagements

Co-Presenter, Generative AI in Legal Practice, Illinois Defense Counsel, June 2025.

Co-Presenter, Ethical Issues That Can Arise in Attorney Career Transitions, Practising Law Institute (PLI), May 2025.

Co-Presenter, Artificail Intelligence and its Impact on Trusts and Estates Practice, Illinois Institute of Continuing Legal Education (IICLE), Champaign, Illinois, April 2025; Chicago, Illinois, May 2025.

Panelist, Recent Rule Changes in Professional Responsibility, Chicago Bar Association, May 2025.

Moderator/Co-Presenter, Artificial Intelligence and Ethics, Illinois State Bar Association Allerton Conference, Champaign, Illinois, April 2025.

Co-Presenter, GenAI and Other Tips, Chicago Bar Association Civil Practice Seminar, February 2025.

Co-Presenter, Ethical Use of AI for LTF Providers, Lawyers Trust Fund of Illinois, February, 2025.

Moderator/Panelist, So You Want to Be an Expert Witness—the Ethics of Experting, ABA Center for Professional Responsibility, January 2025.

Speaker, Advertising, Solicitation, and Public Statements in the Digital Age, Lake County Bar Association, January 2025.

Panelist, Professional Rules v. Collection Practice: Know and Avoid the Conflicts, Illinois Institute of Continuing Legal Education (IICLE), December 2024.

Co-Presenter, The Ethics of Oops: How to Avoid Discipline When You've Made a Mistake, American Law Institute, November 2024.

Panelist, Advertising, Solicitation, and Public Statements in the Digital Age, ABA Section of Labor and Employment Law Annual Meeting, New York, NY, November 2024; Presented as a webinar for ABA Section of Labor and Employment, December 2024.

Panelist, AI Today and Tomorrow, International Conference of Legal Regulators, Melbourne, Australia, October 2024.

Panelist, Hot Topics in Ethics, NELA-IL Annual Seventh Circuit Conference, National Employment Lawyers Association-Illinois Chapter, September 2024.

Panelist, Practical Advice for Using AI Ethically, The Practice of Law in an AI World Conference, Loyola University Chicago School of Law and Northwestern Pritzker School of Law, September 2024.

Panelist, Surviving the Fireswamp: Ethical Pitfalls When Lawyers Wear Multiple Hats, International Cannabis Bar Association, Cannabis Law Institute, July 2024.

Speaker, Case Study: AI, Human Judgment, and Empathy, Paralegal AI Super User Certificate Course, NBI, July 2024.

Speaker, Ethics of the Virtual Office and Generative AI, Academy of Adoption and Assisted Reproduction Attorneys (AAAA) Annual Meeting, Milwaukee, WI, May 2024.

Speaker, Ethical Issues in Generative AI, Lake County Bar Association, April 2024.

Panelist, Generative AI in the Legal Profession, State Bar of California Committee on Professional Responsibility and Conduct (COPRAC) Annual Symposium, April 2024.

Speaker, Ethical Issues in Advanced Licensing Including Generative AI, Practising Law Institute, April 2024.

Moderator/Panelist, Lawyer as Therapist—Dealing with Clients in Crisis, Association of Professional Responsibility Lawyers Mid-Year Meeting, Louisville, KY, February 2024.

Moderator/Panelist, Legal Ethics and AI, LawDroid First Annual AI Conference, January 2024.

Panelist, Representing Clients with Diminished Capacity: Ethical Obligations and Best Practices, American Bar Association Standing Committee on Legal Aid and Indigent Defense and ABA Center for Professional Responsibility, January 2024

Co-Presenter, Ethics for New Attorneys, Illinois State Bar Association, January 2024.

Panelist, Hot Topics in Ethical Issues Including the Use of AI and the New Illinois Judicial Ethics Code, Chicago Bar Association Business Divorce and Complex Ownership Disputes Committee, December 2023.

Panelist, Special Industry Roundtable: Changing Rules for the Unauthorized Practice of Law and the Effect on the LPL Insurance Industry, American Bar Association National Legal Malpractice Conference, September 2023.

Facilitator, DePaul University School of Law Professionalism Orientation, Illinois Supreme Court Commission on Professionalism, September 2023.

Panelist, Generative AI and the Legal Profession: "Ask the Experts," Lemme Law firm Best Practices Forum, September 2023.

Panelist, Exploring the Next Frontier: Generative AI and the Challenges of New Technologies, Association of Professional Responsibility Lawyers Annual Meeting, August 2023, Denver, CO.

Panelist, Ethics Issues of Bots Practicing Law, Practising Law Institute, June 2023.

Panelist, Changing 5.5—In Our Lifetimes?, Chicago Bar Association Legal Ethics One-and-Done Professional Responsibility Overview, June 2023.

Speaker, Tips on What to Expect and How to Respond to an ARDC Inquiry, Lake County Bar Association, May 2023.

Panelist, Lawyer Mobility: Risks and Rewards, Joint Meeting of the Association of Professional Responsibility Lawyers and the Law Society of England and Wales, April 2023, Washington, D.C.

Speaker, Ethical Issues in Advanced Licensing, Practising Law Institute, April 2023.

Panelist, UPL: Anachronism or Necessary Regulation, American Bar Association National Legal Malpractice Conference, April 2023, San Juan, Puerto Rico.

Moderator, Bots Practicing Law: Where is the Line?, Association of Professional Responsibility Lawyers Mid-Year Meeting, February 2023, New Orleans, LA.

Moderator, Bots Practicing Law: Where is the Line?, American Bar Association UPL School, October 2022.

Facilitator, DePaul University School of Law Professionalism Orientation, Illinois Supreme Court Commission on Professionalism, August 2022.

Panelist, Changing 5.5—In Our Lifetimes? (Part 2 of 2), Association of Professional Responsibility Lawyers Annual Meeting, August 2022.

Panelist, First Amendment—Choose Your Own Adventure, National Organization of Bar Counsel Annual Meeting, August 2022.

Panelist, Ethics of Lawyer Transitions, Chicago Bar Association, June 2022.

Panelist, Regulating Lawyers: Will We See 5.5 Changes in this Decade? (Part 1 of 2), Association of Professional Responsibility Lawyers Mid-Year Meeting, February 2022.

Panelist, The Exhilarating World of Material Adversity and Other Adrenaline-Charged Conflict of Interest Discussions, National Organization of Bar Counsel Mid-Year Meeting, February 2022.

Facilitator, DePaul University School of Law Professionalism Orientation, Illinois Supreme Court Commission on Professionalism, August 2021.

Co-Presenter, Basic Skills Course, Illinois State Bar Association, June 2021.

Speaker, Advanced Licensing: IP Ethics Issues, Practising Law Institute, May 2021, April 2022.

Panelist, Technology and Ethics: What Every Lawyer Should Know, New York State Bar Association, April 2021.

Speaker, Landscape of Regulatory Innovation and Reform Efforts, ABA Bar Leadership Institute, March 2021.

Panelist, Guess What! Your Online Mediation is Not Confidential, ABA Section of Litigation, December 2020.

Panelist, 2020 Tech Summit: Pajamas & Professionalism: Standards and Ethics for New Surroundings, New Tech and New Social Media Users, New York State Bar Association Tech Summit, November 2020.

Panelist, Be Prepared: Practical Advice and Ethical Considerations for Succession Planning, Mergers and Acquisitions, Closures and Retirement, National Collectors Bar Association, September 2020.

Facilitator, UIC School of Law Professionalism Orientation, Illinois Supreme Court Commission on Professionalism, August 2020.

Co-Presenter, Ethical Issues Update; Defending/Avoiding Ethics Investigation; Ethics and Technology Use in Legal Practice, Practising Law Institute Ethics Marathon, July 2020.

Moderator, Social Media Issues: Addressing Negative Online Reviews, Geo-Fencing and More, Including What is Permitted vs. Practical, and the Malpractice Carrier's Perspective, Association of Professional Responsibility Lawyers Mid-Year Meeting, Austin, Texas, February 2020.

Co–Presenter, When Practice Collides with the Rules: Ethical Issues in the Collections Practice, Illinois Collections Bar Association, February 2020.

Panelist, Unauthorized Practice – Crossing Borders, Chicago Bar Association, November 2019.

Moderator, Why Do People Lie and Why Should We Care? The Movie, The Director, and Legal Ethics, Association of Professional Responsibility Lawyers Annual Meeting, San Francisco, CA, 2019.

Facilitator, DePaul University School of Law Professionalism Orientation, Illinois Supreme Court Commission on Professionalism, August 2019.

Panelist, Professional Responsibility Implications of Evolving Technology and Other Emerging Trends, ABA Lawyers' Professional Liability Young Professionals Event, 2019.

Speaker, Legal Ethics 101: Avoiding Common Mistakes and Conducting Your Practice with Honesty and Integrity, National Academy of Continuing Legal Education, 2019.

Panelist, Basic Skills for New Lawyers Series, Ethical Dilemmas for New Attorneys, Illinois State Bar Association, 2018.

Panelist, NOBC Ethics Roundtable (presented on Cryptocurrency, Email Tracking Software, and Of Counsel Relationships), National Organization of Bar Counsel Annual Meeting, Chicago, Illinois, 2018.

Speaker, Multijurisdictional Practice: How to Cross Borders Without Crossing Ethical Lines, Practising Law Institute Ethics Marathon, 2018.

Panelist, Secret of the Citation Act and Tips for Enforcing Judgments: Professional Rules v. Collection Practice: Know and Avoid the Conflicts, Illinois State Bar Association, 2018.

Panelist, Basic Enforcement of Judgments: Ethical Issues in Collection Practice, Illinois Institute of Continuing Legal Education, 2018.

Panelist, the Adjudicator's Perspective – A Peek Behind the Curtain, National Organization of Bar Counsel Mid-Year Meeting, Vancouver, British Columbia, 2018.

Speaker, The Ethical Defender: Conflict of Interest and Other "Hot Button" Ethical Issues in Public Defense, Illinois Public Defender Association Fall Meeting, 2017.

Panelist, Ethics of Limited Scope Representation, Chicago Bar Foundation Limited Scope Representation Seminar, 2017.

Panelist, Ethics and Technology, Illinois Legal Aid Advocates Conference, 2017.

Speaker, Limited Scope Representation: When Less is More, Illinois State Bar Association, 2016.

Panelist, Ethical Pitfalls for Attorneys Managing Multi-State Practices, National Association of Retail Collection Attorneys Annual Meeting, 2016.

Speaker, Tips on What to Expect and How to Respond to an ARDC Inquiry, North Suburban Bar
Association, 2015.

Speaker, Legal Ethics 2013: Hot Topics in Technology and Communication, Lorman Education Services,
2013.

Speaker, Ethical Issues in Collection Practice, Illinois Creditors' Bar Association, 2011.

Panelist, Ethical Issues in Collection Practice: Where Professional Rules Conflict with the Realities of the
Collection Process, National Association of Retail Collection Attorneys Annual Meeting, 2011.

Speaker, Illinois' New Rules of Professional Conduct: A Comprehensive Overview, Illinois State Bar
Association Mid-Year Meeting, 2009.

Speaker, Illinois' New Rules of Professional Conduct: An Initial Overview, Illinois State Bar Association,
2009.

Panelist, Sex, Death and Money: A Discussion of Self-dealing Conflicts of Interest, National Organization
of Bar Counsel Mid-Year Meeting, San Antonio, TX, 2004.

Panelist, Mentoring of Less Experienced or Newer Assistant Bar Counsel, National Organization of Bar
Counsel Mid-Year Meeting, San Diego, CA, 2001.

Panelist, Defending a Case Before the ARDC: From the "Letter" to the Final Order, Chicago Bar
Association, 1997.

## Expert Engagements

*Walston v. National Retail Solutions, Inc., D/B/A NRS Pay,* Case No. 24-cv-83, U.S. District Court,
Northern District of Illinois (Defense expert re: adequacy of class counsel—Report submitted,
matter pending).

*Ansur America Insurance Co. v. Borland, et. al.,* Case No. 3:21-CV-0059, U.S. District Court,
Southern District of Illinois (Plaintiff expert re: conflict of interest, competence,
communication—Disclosures/Report submitted, deposed, testified at jury trial, case settled
during jury deliberations).

*Confidential,* Disqualification matters re: former government lawyers—(Defense expert--
Reports submitted, matters pending).

*Confidential*, Pre-litigation disqualification matter involving government investigation into
industry. (Defense/target expert re: conflicts of interest—Report submitted, matter closed).

*Fredman v. Andrew David Bell, and Spain, Spain & Varnet, P.C.,* Case No. 2019L007867, Circuit Court of Cook County (Plaintiff expert re: conflicts of interest—Disclosures submitted, deposed, matter settled/dismissed).

*Guidish v. Guidish, et.al.,* Case No. 2018 CH 7270, Circuit Court of Cook County. (Plaintiff expert re: conflicts of interest—Report submitted, matter closed).

*John v. Wheaton College*, Case No. 2011L000995, Circuit Court of DuPage County. (Expert for Plaintiff/Counter-Defendant re: reasonableness of attorneys' fees claimed as discovery sanction—Report submitted, deposed, matter settled/dismissed).

*Basista, et.al. v. Alms,* Case No. 16 L 004795, Circuit Court of Cook County. (Plaintiff expert re: fiduciary duties owed by attorney for estate—Disclosures submitted, deposed, matter settled).

# Appendix B

# Wendy Muchman

Wendy Muchman is a Professor of Practice at Northwestern University Pritzker School of Law. Since 2000 she has developed and taught classes in Professional Responsibility, including the standard ABA required course in Legal Ethics. The courses she teaches include *Legal Ethics and Professional Responsibility, Legal Ethics for the Government and Public Sector Lawyer, Legal Ethics for the Business Lawyer, Legal for the Global Practitioner*, *ITA Ethics,* (an experiential class for students interested in litigation,) and a survey class in *Legal Ethics*. She also co-teaches other courses, *Professional Responsibility in Legal Writing*, *The Law of Whistleblowing*, and *Historical Perspectives on Ethical Lawyering*. She also teaches a course on *Ethics* in the MSL program at Northwestern and taught a course on *AI and Ethics*.

Teaching and other Awards:
The *Robert Childres Award* presented annually to the faculty member selected by the student body as the year's most outstanding teacher (2023-2024), (2019-2020), Outstanding Professor of a Small Class (2022-2023), *The Last Lecture,* an award presented to the faculty member selected by the graduating students (2021-2022) (2024-2025), and *Outstanding Professors of a Small Class* (2018-2019) with Professor Mary Foster. She was appointed the Harry. B. Reese Teaching Professor of Practice for the academic year 2020-2021.
AALS Section of Technology, Law, and Legal Education, recipient of the January 2025 Technology & Ethics Award.

Examples of CLE Presentations:
Ms. Muchman presents regularly on varied issues of Professional Responsibility for the ABA and other organizations.  Some recent examples include:
- Winter 2025: ABA Webinar: Rule 4.2 and Contact with Government Officials
- Fall 2024: ABA Webinar: Ethical Use of AI for Legal Aid Providers
- Fall 2024: ULA Midwest Regional Meeting: Laboring with Ethics-Issues of client identification and conflicts for lawyers representing entities.
- Fall 2024: Ethical Issues: Practicing Law in an AI Environment: Garrett Corporate and Securities Institute;
- Spring 2024: ABA Center for Professional Responsibility National Conference on Professional Responsibility: Government Conflicts: Special Circumstances Beyond Rule 1.11;
- Fall 2023: ABA Legal Malpractice Conference: Two's a Crowd: Issues in Multiple Client Representations;
- Fall 2023: Ethical Issues in AI: A Modern-Day Trojan Horse: Garrett Corporate Counsel Institute;
- Spring 2023: ABA National Conference on Professional Responsibility: Ethics in the Rear View Mirror;

1

- Fall 2022: 61st Annual Garrett Corporate Counsel Institute: Navigating Ethical Issues in the Wake of a Cyber Breach;
- Winter 2022: Regulating Lawyers. Will we see changes to Rule 5.5 in this Decade? Association of Professional Responsibility Lawyers Conference;
- Spring 2022: The 15th Annual Sedona Institute Conference: The Ethics of Virtual and Hybrid Practice;
- Summer 2021: National Organization of Bar Counsel Annual Meeting: Dissecting Communication Obligations in our Multicultural Multigenerational World;
- Fall 2020: Loyola Women in Law Conference (keynote speaker): The Realities of Reporting Unethical Conduct Directed Toward Women Lawyers;
- Fall 2019: 58th Annual Garrett Corporate Counsel Institute: Lessons Learned from Bad Blood: Secrets and Lies in a Silicon Valley Startup;
- Spring 2019: ABA National Conference on Professional Responsibility: Harassment and Discrimination in the Rule 8.4(g) and #MeToo Era;
- Spring 2018: ABA National Conference on Professional Responsibility: Aggravating and Mitigating Factors in Attorney Discipline Cases;
- February 2016: National Organization of Bar Counsel: Breaking (it Down) Bad: The Science of Money Laundering;
- April 2016: Annual Garrett Corporate Counsel Institute: Ethics in the Corporate Setting;

Prior Employment:

Between 1989 and 2019 she was employed as a bar regulator at the Illinois Attorney Registration and Disciplinary Commission of the Supreme Court of Illinois (ARDC), where between 2010 and 2019 she served as Chief of Litigation and Professional Education. She investigated and prosecuted innumerable lawyer disciplinary cases including the lawyer-client improper sexual relations cases (see e.g. *In re Rinella,* 175 Ill.2d 504, 677 N.E.2d 909 (1997) and *In re Paul M. Weiss,* M.R. 2754, 2008PR00116 (11/17/2012)), as well as cases involving allegations of conflicts of interest, civility, conversion, billing fraud, and public corruption. Her job responsibilities at the ARDC included supervision and training of the litigation attorneys and staff as well as presenting workshops regarding professional responsibility and disciplinary law to various national and state bar association groups, law firms, government agencies, judges, and law schools. Ms. Muchman presented hundreds of different professional responsibility workshops on a state and national level often in the area of conflicts of interest. Those workshops also encompass many programs on ethical issues for government attorneys including prosecutors and criminal defense lawyers.

Prior to 1989 when she started her employment at the ARDC, Ms. Muchman litigated in the state and federal courts. Areas of practice included insurance litigation, civil rights, age discrimination, aviation defense work.

Bar Association experience:

Ms. Muchman has extensive experience in various bar association groups focusing on Professional Responsibility.

Ms. Muchman is currently serving a three-year appointment as a member of the American Bar Association (ABA) Standing Committee and Ethics and Professional Responsibility (SECPR). The Standing Committee on Ethics and Professional Responsibility has authority to advise and assist professional organizations and courts regarding the interpretation of statements of ethical standards of the professions such as the Model Rules of Professional Conduct and to express and publish its opinions on proper professional conduct. Between 2016 and 2021, Ms. Muchman served as the NOBC liaison to ABA Standing Committees including the Standing Committee on Professional Regulation, the Standing Committee on Ethics and Professional Responsibility and the ABA Professionalism Committee.

In 2025, Ms. Muchman was appointed as a member of the Editorial Board of the ABA/Bloomberg Law Lawyers' Manual on Professional Conduct.

Since 2018 Ms. Muchman has served the National Conference of Bar Examiners as a subject matter expert for the Multistate Professional Responsibility Exam. In that capacity she has drafted and edited questions for the MPRE on behalf of the NCBE related to the law of lawyering, legal malpractice, judicial ethics and all aspects of the Rules of Professional Conduct, including conflicts of interest.

For the year 2020-2021, Ms. Muchman was Immediate Past President of the National Organization of Bar Counsel (NOBC) and served the NOBC in numerous leadership roles since 2013.

Ms. Muchman served as Chair and Immediate past Chair of the ABA Government and Public Lawyers Division where commencing in 2012, she was an elected member-at-large to the Council and in 2018 was elected to the Board where she served until August 2024.

Between 2019 and 2024, she was a member of the ABA Working Group for Evaluation and Development of a Model Code of Conduct for Judicial Law Clerks.

Since 2019 she serves as an appointed member to the ABA Center for Professional Responsibility Conference Planning Committee. She has also served on the Planning Committee for the Association of Professional Responsibility Lawyers.

In 2019-2020, she served as a member of the Chicago Bar Association Task Force on the Sustainable Practice of Law & Innovation on the subcommittee of the Plain Language Ethics Rules.

In 2019-2021, she served as an *ex officio* representative on the Supreme Court Committee on Professional Responsibility.

Between 2009 and 2011 she served as the Vice-Chair, then Chair, of the Chicago Bar Association Committee on Professional Responsibility.

3

<u>Publications</u>:

In 2018, Ms. Muchman, with the assistance of a Northwestern law student, Alexander Bai, served as a chapter author to update the First Edition of the ABA Annotated Standards for Imposing Lawyer Sanctions which was published in Spring 2019 as the second edition. She co-authored with Daniel Linna, *Ethical Obligations to Protect Client Data when Building Artificial Intelligence Tools: Wigmore Meets AI*, The Professional Lawyer, Vol 27 No. 1 (Oct. 2020). Other publications include a quarterly column *Ethics Corner* in the ABA GPSLD *Pass it On.*

Ms. Muchman co-authored the course materials for the civil problem used in the Trial Advocacy Legal Ethics course at Northwestern.

Other articles on professional responsibility topics authored by Ms. Muchman include for the ABAGPSLD magazine: effective lawyer communications with clients; responsibilities of prosecutors; government lawyer conflicts under Rule 1.11, and on the anti-harassment and discrimination rule. For the ABA Business law section: an article on mixed purpose communications and attorney client privilege, business, or legal advice.

<u>Expert consulting</u>:
Ms. Muchman provides expert consulting on matters involving legal ethics and malpractice matters.

<u>Other information</u>:
In 2022 she served on the Sedona Conference Working Group 12-Trade Secrets, Ethics Brainstorming Group.

Other teaching experience includes courses at Chicago Kent College of Law where she taught intensive trial advocacy and a course she developed, Ethics and Advocacy. She coached the student trial team for a national ethics trial competition for two years resulting in a fourth place and a first-place finish. Teaching award: Adjunct Professor of the Year in 2013-2014.

She is a faculty member for the National Institute for Trial Advocacy (NITA) where she has worked on regional and national trial advocacy, and deposition programs, as well as various law firm training workshops, and has served as a team leader for the Midwest Regional Trial Program. She presents CLE programs for NITA on ethical issues in litigation.

In 2013 she was selected to participate as a fellow in the National Institute for Teaching Ethics and Professional Responsibility.

<u>Education and law license</u>:
She received her JD from DePaul University College of Law and her BA from the University of Illinois, Champaign/Urbana.

She is on active status and licensed to practice law in Illinois since 1981. She is on inactive status in Colorado.

# Appendix C

Appendix C

1.     Hawaii Subpoena (October 15, 2021 Department of the AG State of Hawaii subpoena to OptumRx, Inc.)

2.     Hawaii Confidentiality Agreement (May 18, 2022 confidentiality agreement between the Department of the AG State of Hawaii and OptumRx, Inc.)

3.     June 8, 2022 Production Letter (Hogan Lovells' production letter to Linda Singer and Paige Boggs in response to October 15, 2021 Hawaii Subpoena)

4.     September 1, 2022 Production Letter (Hogan Lovells' production letter to Linda Singer and Paige Boggs in response to October 15, 2021 Hawaii Subpoena)

5.     DC Letter Contract (December 1, 2020 letter contract between the DC AG and Motley Rice)

6.     DC Subpoena (December 28, 2020 Government of the DC AG subpoena to OptumRx, Inc.)

7.     DC Confidentiality Agreement (July 1, 2021 confidentiality agreement between the DC AG and OptumRx, Inc.)

8.     Confidentiality Agreement City of Chicago and OptumRx et al

9.     July 13, 2021 Production Letter (Hogan Lovells' production letter to Linda Singer and Paige Boggs in response to December 28, 2020 DC Subpoena)

10.    September 10, 2021 Production Letter (Hogan Lovells' production to Linda Singer and Paige Boggs in response to December 28, 2020 DC Subpoena)

11.    November 24, 2021 Production Letter (Hogan Lovells' production to Linda Singer and Paige Boggs in response to December 28, 2020 DC Subpoena)

12.    Factual summary covering Hawaii, D.C., and Chicago subpoenas.

13.    Redacted complaint in County of Summit, Ohio v. Express Scripts, Inc. et al., No. 1:23-op-45001 (N.D. Ohio Jan. 4, 2023)

14.    Complaints in City of Rochester v. Purdue Pharma L.P., et. al., Case No. 1:19-op-45853 DAP (originally filed in the U.S. District Court for the Western District of New York), County of Webb, Texas v. Purdue Pharma, L.P., et. al., Case No. 1:18-op-45175 DAP (originally filed in the U.S. District Court for the Southern District of Texas), City of Independence, Missouri v. Williams, et. al., Case No. 1:19-op-45371 DAP (originally filed in the U.S. District Court for the Eastern District of Missouri), and Lincoln County v. Richard S. Sackler, M.D., et.al., Case No. 1:20-op-45069 (originally filed in the U.S. District Court for the Eastern District of Missouri).

15.    Transcript of 2/6/19 proceedings of Motion to Disqualify in in re Nat'l Prescription Opiate Litigation 1:17-MD-2804-DAP, Doc. No. 1354

16.    2/6/19 Letter from US Attorneys re: Motion to Disqualify Carole Rendon, Case No. 1:17-MD-2804-DAP, Doc. No. 1342

17.    Complaint, ECF No. 1-1, *Utah et al. v. Express Scripts, Inc. et al.*, No. 2:25-cv-00088 (D. Utah).

18.    OptumRx, Inc.'s Petition for Writ of Mandamus, No. 24-3396 (6th Cir. May 7, 2024)

19.    Order Denying OptumRx's Motion to Disqualify Motley Rice in *In re National Prescription Opiate Litigation*, No. 17-md-02804 (N.D. Ohio Mar. 18, 2024)

20.    ABA Comm. on Ethics & Prof'l Resp., Formal Op. 509 (Feb. 28, 2024)

21.    Various legal research, including research cited in the expert report.

# Exhibit 1

LAW DEPARTMENT
CITY OF CHICAGO

IN THE MATTER OF                                    )
                                                    )
UNITED HEALTHCARE SERVICES, INC.,                   )
UNITEDHEALTHCARE INSURANCE                          )
COMPANY, UNITEDHEALTHCARE OF   )
ILLINOIS, INC., and OPTUMRX, INC.                   )
                                                    )
COPAY CLAWBACKS                                     )

## CONFIDENTIALITY AGREEMENT

The City of Chicago is conducting a confidential investigation into alleged violations

of § 2-25-090 of the Municipal Code of Chicago, including but not limited to potential acts

of consumer fraud, deceptive practices, and/or conduct constituting unlawful practices under

the Illinois Consumer Fraud and Deceptive Business Practices Act relating to prescription

drug copay clawbacks, ("Investigation") and has requested documents and information from

United HealthCare Services, Inc., UnitedHealthCare Insurance Company, UnitedHealthCare

of Illinois, Inc. and OptumRx, Inc. (collectively, "United"), some of which may be

confidential and/or proprietary. To preserve and maintain the confidentiality of certain

documents to be produced or made available for inspection and copying by United, the

parties have agreed as follows:

1.      When used in this Agreement, the word "documents" means all written

material, data maintained in electronic or digital format, and all other tangible items. Except

as otherwise indicated below, documents marked or otherwise designated by United as

"Confidential" or "Highly Confidential" that are or have been produced or made available for

inspection and copying by United, to the City of Chicago's attorneys, consultants, agents, or

experts, shall be given confidential treatment as described in this Agreement. United shall

Exhibit 1

mark as Confidential those documents that it reasonably and in good faith believes contain confidential or proprietary or otherwise sensitive non-public business information, information implicating an individual's legitimate expectation of privacy, or "protected health information" as defined in 45 C.F.R. §§ 160.103 and 164.501. United shall mark as "Highly Confidential" those documents that it reasonably and in good faith believes are so highly sensitive that disclosure to the public or a competitor could result in significant competitive or commercial disadvantage. (Together, those documents designated "Confidential" and "Highly Confidential" are considered "Confidential Documents").

2.    Both the Confidential Documents and the information contained therein shall be treated as confidential, shall not be disclosed except as provided in this Agreement, and shall not be made available to persons other than those described below. All information produced or made available for inspection and copying by United, including but not limited to information contained in documents or in correspondence between counsel, will be used solely in furtherance of the Investigation and any subsequent litigation brought by the City of Chicago against United that is directly related to this Investigation and will be used for no other purpose whatsoever without the prior written consent from United or by a court order or other applicable law. To the extent that the City of Chicago initiates litigation that is directly related to this Investigation following the Investigation, this Confidentiality Agreement will continue until the court enters a protective order that supersedes it.

3.    Documents designated "Confidential" and any information contained therein shall not be shown, disseminated or disclosed to any person other than the following persons, except upon the prior written consent of United or by a court order:

Exhibit 1

a.    The City of Chicago's Law Department and outside counsel in connection with the Investigation and any subsequent litigation directly related to the Investigation brought by the City of Chicago against United, namely Linda Singer, Mimi Liu, and Paige Boggs of Motley Rice LLC, and any lawyers, contractors, or paralegals working on this Investigation or any subsequent litigation directly related to the Investigation brought by the City of Chicago against United with Ms. Singer, Ms. Liu, and Ms. Boggs, with the exception that no attorney, contractor, or paralegal adverse to United in other matters will work on the Investigation or have access to Confidential Documents or attorney work product pertaining to the Investigation;

b.    City employees outside of the Law Department who have a need to know the information in furtherance of the Investigation;

c.    Experts and consultants retained by the City of Chicago in connection with this Investigation and any subsequent litigation directly related to the Investigation brought by the City of Chicago against United;

d.    Any person who authored, modified, sent, or received, a particular Confidential Document and who the City of Chicago interviews or conducts a sworn statement of as part of the Investigation;

e.    A third-party employed for the sole purpose of arranging for the copying or storage of the documents pursuant to this Agreement (i.e., a copy service).

Exhibit 1

4.      Access to documents designated "Highly Confidential" shall be limited to those persons listed in paragraphs 3(a), (c), (d), and (e), except upon the prior written consent of United or by a court order.

5.      Persons and entities described in any paragraphs 3(a) through 3(e), above, who receive any Confidential Documents or any information contained therein under the terms of this Agreement shall not further disseminate any such Confidential Documents or information contained therein, unless it is disseminated to another person or entity described in paragraph 3(a)-(e) above.

6.      All copies, whether digital or hard copy, of any Confidential Documents produced or made available for inspection and copying shall be subject to the terms of this Agreement.

7.      Before being given access to any of the Confidential Documents or any information contained therein, each person described in paragraphs 3(b)-(e) above who is neither a participant nor a counsel in the Investigation, shall be advised of the terms of this Agreement, shall be given a copy of this Agreement, and shall sign a document substantially similar to Exhibit A attached hereto, thereby acknowledging and agreeing to be bound by the terms of this Agreement.

8.      No Motley Rice LLC attorney, contractor, paralegal, or expert adverse to United in other matters shall have access to any Confidential Documents or information contained therein relating to this Investigation and his/her electronic access to such Documents and information shall be restricted by permissions and any hard copies of Confidential Documents will be maintained in such a way that persons adverse to United in another matter (including other Motley Rice attorneys, paralegals, contractors, or experts) cannot review or access the hard

Exhibit 1

copies unless otherwise agreed to by the parties or by court order. The City of Chicago and its

outside counsel in this Investigation shall not share, disclose, or discuss Confidential Documents

or the information contained therein with any Motley Rice attorneys, paralegals, contractors, or

experts adverse to United in another matter. For purposes of enforcement of this Agreement,

The City of Chicago's outside counsel submit themselves to the jurisdiction of the U.S. District

Court for the Northern District of Illinois or the Circuit Court of Cook County.

      9.    If the City of Chicago deems it necessary to use or disclose Confidential

Documents or any information contained therein in connection with any court submission, it

shall either first obtain the prior written consent of United or the City of Chicago's papers,

including but not limited to memoranda, affidavits, and exhibits that contain or reference

information contained in Confidential Documents, shall be filed with the Confidential

Documents and information redacted. Copies to the court and to counsel of record can be

unredacted, but shall note each place where the documents contain confidential information

subject to the protections of this Agreement.

      10.    In the event that United inadvertently produces or discloses any document or

information produced in this Investigation without intending to waive a claim that it is

confidential, such production or disclosure shall not be a waiver, in whole or in part, of a

claim of confidentiality as to any such document or information. United shall, promptly upon

discovery of its oversight, provide written notice of the error and substitute appropriately

designated documents. The City of Chicago shall confirm the designation of the specified

documents and information, as "Confidential," or "Highly Confidential" within ten (10) days

of receipt of United's notice and shall make reasonable efforts to retrieve such improperly

designated documents from persons not entitled to receive them and, upon receipt of the

Exhibit 1

substitute documents, shall sequester, return or destroy the improperly designated original production.

11.    If the City or any of its departments receives a request under the Illinois Freedom of Information Act ("FOIA"), subpoena, or court order, or has an obligation under other applicable law that it believes requires disclosure of a portion or all of the Confidential Documents, the City shall notify United upon receipt of such request, subpoena, order, or recognition of an obligation imposed by law as to afford United the opportunity to take steps to prevent disclosure. The City acknowledges that the Confidential Documents may be exempt from disclosure under Section 7(1)(g) of FOIA, 5 ILCS 140/7(1)(g), because they contain trade secrets or commercial or financial information, the disclosure of which would cause competitive harm to United. In addition, some data or materials may be exempt from disclosure under FOIA for other reasons. The City will use its best efforts to prevent the release of such information under FOIA; provided, however, that nothing in this Confidentiality Agreement shall be read to conflict with the City or any of its departments' duties to comply with the law, including FOIA. In the event of a dispute between United and the City as to whether a portion or all of the Confidential Documents must be disclosed, United and the City shall make a good faith attempt to resolve such dispute through negotiation. In any such negotiation, each party will provide a good-faith explanation regarding the basis of its belief as to why the Confidential Documents may or may not be held confidential. If the parties are unable to resolve the dispute, the City will not release the Confidential Documents until an order requiring the disclosure has been entered in a judicial proceeding in which United has been given the opportunity to intervene to demonstrate that the Confidential Documents in fact may be withheld, unless United provides its written consent to disclosure and/or fails to intervene in the judicial proceeding.

Exhibit 1

12.    By entering into this Agreement, the parties do not intend in any way to limit any protections provided to United information afforded by any applicable state or federal laws or regulations.

13.    This Agreement shall be binding upon the parties to this Investigation and their counsels of record, and all persons and entities signing a copy of the attached Exhibit A, and upon their attorneys, employees and agents. All parties so bound by this Agreement agree to promptly notify United in writing of any unauthorized use or disclosure of Confidential Documents or any information contained therein of which they become aware.

14.    Nothing in this Agreement constitutes a finding or admission that any Confidential Document is in fact confidential or otherwise not subject to disclosure. In the event of a dispute as to the propriety or correctness of the designation as a Confidential Document, the parties shall attempt to resolve the dispute by negotiation. In any such negotiation, each party will provide a good-faith explanation regarding the basis of its belief as to the confidentiality of the Confidential Document.

/ / /

Exhibit 1

Dated this 19th day of February, 2019.

Mimi Liu
MOTLEY RICE LLC
401 9th Street NW, Suite 1001
Washington, D.C. 20004
as Special Assistant Corporation Counsel


DORSEY & WHITNEY LLP

By
Michelle S. Grant (311170)
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402-1498
Telephone: (612) 340-2600
Facsimile: (612) 340-2868
grant.michelle@dorsey.com

Attorneys for United Healthcare Services,
Inc., UnitedHealthCare Insurance Company,
UnitedHealthCare of Illinois, Inc., and
OptumRx, Inc.

Exhibit 1

## EXHIBIT A

The undersigned hereby acknowledges that he/she has been advised of the terms of the Confidentiality Agreement, has been given a copy of the Confidentiality Agreement, and acknowledges and agrees to be bound by the terms of the Confidentiality Agreement.

Name: _____

Job Title: _____

Employer: _____

Business Address: _____

_____

_____

_____

Date: _____

Signature: _____

Exhibit 1

# Exhibit 2

## GOVERNMENT OF THE DISTRICT OF COLUMBIA
### Office of the Attorney General



## LETTER CONTRACT

December 1, 2020

Linda Singer
Motley Rice LLC
401 9th St. NW, Suite 1001
Washington, DC 20004

RE: Letter Contract Number DCCB-2021-F-0008
Outside Counsel for Pharmacy Benefit Managers
Litigation

Dear Ms. Singer:

This is a letter contract between the Office of the Attorney General for the District of Columbia and the law firm Motley Rice LLP, hereinafter referred to as "Contractor", wherein Contractor agrees to provide legal services on a contingency fee basis to assist in the investigation of and possible litigation against Pharmacy Benefit Managers for potential violations of District law, including the District's consumer protection and false claims act statutes, as described in the Statement of Work (Attachment 1).

(a)     This letter contract is contingency fee contract. The District's liability for payment to Contractor under the letter contract occurs only when Contractor obtains monetary recovery during performance of the letter contract and the proceeds are deposited into the appropriate District account.  The Contractor shall be entitled to receive expenses and a contingency fee of 12.5% of the net recovery if the matter is resolved pre complaint or15% of the net recovery if the matter is resolved after the filing of a complaint up to and including $999,000.00.  Net Recovery is defined as any settlement or judgment amount minus the actual costs incurred by Motley Rice, including payments for the time of any experts and contract attorneys engaged for document review.  Motley Rice will agree to first seek its usual and customary fees and costs from the targets of the investigation and/or the defendants before collecting a contingency fee.  The maximum liability under the letter contract is $999,000.00. If no recovery is realized and deposited to the District's account, Contractor shall receive no fee, compensation or reimbursement of costs and expenses.  In no event shall the amount paid under this letter contract or any extension thereof exceed (50%) of the total definitized contract amount.

2023-FOIA-01530-00000086

Letter Contract No. DCCB-2021-F-0008                                          Page 2 of 3
Outside Counsel for Pharmacy Benefit Managers Litigation

(b)   Contractor agrees to immediately begin performance of this letter contract under the Statement of Work, Attachment 1. Contractor agrees to timely submit to the Contracting Officer requested documents or information reasonably necessary to obtain Council of the District of Columbia (Council) approval of the definitized contract. Approval by the Council and award by the Contracting Officer are required to definitize the contingency-fee contract. Prior to Council approval of the definitized contract, no payments shall be due to Contractor.

(c)   The District intends to definitize a final contingency-fee contract within the period of 120 days from date of award of this letter contract, at which time this letter contract shall merge with the definitized contract. The parties hereby agree that the contingency fee shall not exceed 12.5% of the net recovery if the matter is resolved pre complaint; and 15% of the net recovery if the matter is resolved after the filing of a complaint against Pharmacy Benefit Managers plus agreed-upon reimbursable costs. Before expiration of the 120 days, the Contracting Officer may authorize an additional time period extension in accordance with 27 DCMR § 5028.1(e). If the District does not definitize the contingency-fee contract within 120 days of the date of award of this letter contract or any extension thereof, this letter contract is automatically terminated.

(d)   If for any reason the District and the Contractor are unable to definitize the letter contract within the period of the letter contract as specified, the letter contract is automatically cancelled without recourse or liability between the District and the Contractor.

Contractor shall perform under this letter contract pursuant to the following documents that are hereby incorporated by reference into this letter contract and listed in order of priority:

1)   The Letter Contract;
2)   Statement of Work (Attachment 1)
3)   Government of the District of Columbia Standard Contract Provisions for Use with Supplies and Services Contracts (July 2010) (available at www.ocp.dc.gov click on "Required Solicitation Attachments").
4)   Provision regarding Ethical Obligations and Legal Conflicts of Interest (Attachment 2)
5)   D.C. Bar Legal Ethics Committee Opinion No. 268 https://www.dcbar.org/bar-resources/legal- ethics/opinions/opinion268.cfm#.XHfvoFV57lA.email (Attachment 3)

SIGNED AND ACCEPTED FOR THE CONTRACTOR BY:

Linda Singer /AS                          12/1/2020
_____                  _____
Linda Singer                              Date
Motely Rice LLC

Exhibit 2

Letter Contract No. DCCB-2021-F-0008                                        Page 3 of 3
Outside Counsel for Pharmacy Benefit Managers Litigation


SIGNED AND ACCEPTED FOR THE DISTRICT OF COLUMBIA BY:

_____                    12/1/20
                                               _____
Gena Johnson                                    Date
Contracting Officer

Exhibit 2

Attachment 1 to Letter Contract DCCB-2021-F-0008
Pharmacy Benefit Managers Investigation

## STATEMENT OF WORK

1.    **SCOPE:**

The Office of the Attorney General for the District of Columbia engages the Contractor to assist the Public Advocacy Division with an investigation and potential litigation against Pharmacy Benefit Managers for violations of District law.

**OAG will retain sole authority at all times to direct the litigation in all respects, including but not limited to whether and when to initiate litigation, against whom actions will be taken, the claims to be brought in said litigation, approval and/or rejection of settlements and the amount and type of damages to be requested.**

2.    **DEFINITIONS/GLOSSARY**

These terms when used in this Contract have the following meanings:

2.1    **Attorney's fees** – Any fees recovered by the District for counsel's representation as part of any cause of action that provides a basis for such an award.

2.2    **Contractor** – the entity to whom this Contract is awarded.

2.3    **Gross Recovery** — the total recovery for the District as a result of Contractor's representation of the District whether by settlement, arbitration award, court judgment following trial or appeal, or otherwise. "Gross recovery" shall include, without limitation, the following: the present value of any monetary payments to be made to the District. "Gross recovery" may come from any source, including, but not limited to, adverse parties to the Action and/or their insurance carriers and/or any third party, whether or not a party to the Action.  Notwithstanding any other provision in this agreement, in no event will the District be required to pay legal fees out of any fund other than monies recovered in this litigation.

2.4    **OAG** -- The Office of the Attorney General for the District of Columbia. OAG represents the District of Columbia and other District agencies in litigation, including consumer protection litigation.  OAG has general charge and conduct of all legal business of the District and all suits initiated by and against the District and is responsible for protecting the public interest.

2.5    **Other Direct Costs** – all costs for goods and services necessary for the potential investigation and litigation against pharmacy benefit managers or any other potentially liable parties.

Exhibit 2

2023-FOIA-01530-00000089

Attachment 1 to Letter Contract DCCB-2021-F-0008
Pharmacy Benefit Managers Investigation

3.    **BACKGROUND**

Pharmacy Benefit Managers ("PBMs") and other third-party administrators of health
plans' prescription drug programs play an integral role in setting the prices paid for
prescription drugs. The District seeks outside counsel to conduct an investigation to
determine if the conduct of PBMs or related entities violate the District's consumer
protection or false claims act laws. If any violations of law are confirmed, outside counsel
will also assist with litigation concerning those violations.

4.    **REQUIREMENTS**

4.1    The Contractor shall perform legal services that include, but are not limited to the following:

4.1.1    Assist OAG with the investigation of potential violations of law by Pharmacy Benefit
Managers.

4.1.2    If violations of law are identified as a result of the investigation, conduct litigation
against Pharmacy Benefit Managers. Contractor shall assist in all phases of these
investigations and litigations, including:

      a.    Preparation of complaint(s), filing complaint(s), service of summons;

      b.    Responding to motions, including motions to dismiss;

      c.    Drafting motions, including drafting motions for summary judgment, other
dispositive motions, and any other appropriate motions on behalf of the District;

      d.    Drafting and responding to discovery requests propounded on the District or OAG;

      e.    Tracking documents obtained in discovery;

      f.    Coordinating litigation with other states and the federal government to promote,
to the extent beneficial, a unified approach to litigation;

      g.    Taking depositions, defending depositions, preparing witnesses for depositions;

      h.    Responding to motions for summary judgment or other dispositive pretrial
motions;

      i.    Consulting with experts necessary to analyze and develop the District's case;

      j.    Identifying experts to testify on behalf of the District;

      k.    Preparing expert witnesses for deposition or trial testimony;

      l.    Preparing legal arguments on motions practice;

      m.    Handling discovery disputes;

      n.    Representing the District in trial or any settlement negotiations;

      o.    Representing the District in responding to pretrial motions;

Exhibit 2

2023-FOIA-01530-00000090

Attachment 1 to Letter Contract DCCB-2021-F-0008
Pharmacy Benefit Managers Investigation

    p.  Representing the District in any appeal of any judgment or verdict rendered in the action, and if applicable, any remand from appeal.

**4.1.3**  Advise OAG on the conduct of the case and on strategy and tactics for each phase of the case.

**4.1.4**  **FOIA Assistance.**  Third parties may submit FOIA requests to OAG regarding this matter.  OAG will notify Contractor of the FOIA request and Contractor shall electronically provide, within five business days, all records responsive to the FOIA request.  In addition, Contractor shall make all records regarding this matter available for examination and review by OAG, upon request. Contractor shall be entitled to reimbursement of costs for searching and copying records as set forth in Standard Contract Provision No. 34, Freedom of Information Act.

**4.1.5**  Provide monthly or other regular status reports to the Contract Administrator.

**4.1.6**  Provide legal services, advice, and consultation to OAG for this litigation in a manner consistent with accepted standards of practice in the legal profession. The Attorney General shall have final authority over all aspects of this litigation. The litigation may be commenced, conducted, settled, approved and ended only with the express approval and signature of the Attorney General. The Attorney General, at his sole discretion, has the right to appoint a designated assistant ("designated assistant") to oversee the litigation, which appointment the Attorney General may modify at will.

**4.1.7**  Provide legal services to the Attorney General subject to the approval of the Attorney General for the purposes of seeking injunctive relief, monetary relief, and other relief against all entities in this litigation.

**4.1.8**  Coordinate the provision of legal services with the Attorney General or his designated assistant, other personnel of OAG, and such others as the Attorney General may appoint. All substantive pleadings, motions, briefs, and other material which may be filed with the court shall first be approved by the Attorney General and provided to his office in draft form in a reasonable and timely manner for review. Regular status meetings may be held as requested by the Attorney General or his designated assistant.

**4.1.9**  Communicate with District entities through OAG unless authorized by OAG to communicate directly with those entities.

**4.1.10**  Render services pursuant to this Contract as an independent contractor.  Neither Contractor nor any employee of Contractor shall be regarded as employed by, or as an employee of OAG.

**4.2**    **Direct Cost Limitations/Requirements**

    The Contractor shall provide notice and obtain approval from OAG prior to engaging expert witnesses or other consultants.

Page 3 of 8

Exhibit 2

2023-FOIA-01530-00000091

Attachment 1 to Letter Contract DCCB-2021-F-0008
Pharmacy Benefit Managers Investigation

**4.3    Key Personnel for the Contract are listed below:**

Paige Boggs, Attorney at Law
Motley Rice LLC
401 9th St. NW, Suite 1001
Washington, DC 20004
pboggs@motleyrice.com

**4.4    Kickoff Meeting**

The Contractor shall be available for an in-person kickoff meeting within seven (7)
business days from date of award.

**5.    INSURANCE**

A. GENERAL REQUIREMENTS. The Contractor at its sole expense shall procure and
maintain, during the entire period of performance under this contract, the types of
insurance specified below. The Contractor shall have its insurance broker or insurance
company submit a Certificate of Insurance to the CO giving evidence of the required
coverage prior to commencing performance under this contract. In no event shall any
work be performed until the required Certificates of Insurance signed by an authorized
representative of the insurer(s) have been provided to, and accepted by, the CO. All
insurance shall be written with financially responsible companies authorized to do
business in the District of Columbia or in the jurisdiction where the work is to be
performed, or by surplus lines insurers and have an A.M. Best Company rating of A- /
VII or higher. Should the Contractor decide to engage a subcontractor for segments of the
work under this contract, then, prior to commencement of work by the subcontractor, the
Contractor shall submit in writing the name and brief description of work to be performed
by the subcontractor on the Subcontractors Insurance Requirement Template provided by
the CA, to the Office of Risk Management (ORM). ORM will determine the insurance
requirements applicable to the subcontractor and promptly deliver such requirements in
writing to the Contractor and the CA. The Contractor must provide proof of the
subcontractor's required insurance to prior to commencement of work by the
subcontractor. If the Contractor decides to engage a subcontractor without requesting
from ORM specific insurance requirements for the subcontractor, such subcontractor
shall have the same insurance requirements as the Contractor.

All required policies except professional liability insurance shall contain a waiver of
subrogation provision in favor of the Government of the District of Columbia.

The Government of the District of Columbia shall be included in all policies required
hereunder to be maintained by the Contractor and its subcontractors (except for workers'
compensation, cyber liability and professional liability insurance) as an additional insured
for claims against The Government of the District of Columbia relating to this contract,
with the understanding that any affirmative obligation imposed upon the insured

Page 4 of 8

Exhibit 2

2023-FOIA-01530-00000092

Attachment 1 to Letter Contract DCCB-2021-F-0008
Pharmacy Benefit Managers Investigation

Contractor or its subcontractors (including without limitation the liability to pay premiums) shall be the sole obligation of the Contractor or its subcontractors, and not the additional insured. The additional insured status under the Contractor's and its subcontractors' Commercial General Liability insurance policies shall be effected using the ISO Additional Insured Endorsement form CG 20 10 11 85 (or CG 20 10 07 04 **and** CG 20 37 07 04) or such other endorsement or combination of endorsements providing coverage at least as broad and approved by the CO in writing. All of the Contractor's and its subcontractors' liability policies (except for workers' compensation, cyber liability and professional liability insurance) shall be endorsed using ISO form CG 20 01 04 13 or its equivalent so as to indicate that such policies provide primary coverage (without any right of contribution by any other insurance, reinsurance or self-insurance, including any deductible or retention, maintained by an Additional Insured) for all claims against the additional insured arising out of the performance of this Statement of Work by the Contractor or its subcontractors, or anyone for whom the Contractor or its subcontractors may be liable. These policies shall include a separation of insureds clause applicable to the additional insured.

If the Contractor and/or its subcontractors maintain broader coverage and/or higher limits than the minimums shown below, the District requires and shall be entitled to the broader coverage and/or the higher limits maintained by the Grantee and subcontractors.

1. Commercial General Liability Insurance ("CGL") - The Contractor shall provide evidence satisfactory to the CO with respect to the services performed that it carries a CGL policy, written on an occurrence (not claims-made) basis, on Insurance Services Office, Inc. ("ISO") form CG 00 01 04 13 (or another occurrence-based form with coverage at least as broad and approved by the CO in writing), covering liability for all ongoing and completed operations of the Contractor, including ongoing and completed operations under all subcontracts, and covering claims for bodily injury, and death of any persons, injury to or destruction of property, including loss of use resulting therefrom, personal and advertising injury, and including coverage for liability arising out of an Insured Contract (including the tort liability of another assumed in a contract) and acts of terrorism (whether caused by a foreign or domestic source). Such coverage shall have limits of liability of not less than $1,000,000 each occurrence, a $2,000,000 general aggregate (including a per location or per project aggregate limit endorsement, if applicable) limit, and a $1,000,000 personal and advertising injury limit.

OAG should collect, review for accuracy and maintain all warranties for goods and services.

2. Automobile Liability Insurance - The Contractor shall provide evidence satisfactory to the CO of commercial (business) automobile liability insurance written on ISO form CA 00 01 10 13 (or another form with coverage at least as broad and approved by the CO in writing) including coverage for all owned, hired, borrowed and non-owned vehicles and equipment used by the Contractor, with minimum per accident limits equal to the greater of (i) the limits set forth in the Contractor's commercial

Exhibit 2

2023-FOIA-01530-00000093

Attachment 1 to Letter Contract DCCB-2021-F-0008
Pharmacy Benefit Managers Investigation

automobile liability policy or (ii) $1,000,000 per occurrence combined single limit for bodily injury and property damage.

3. Workers' Compensation Insurance - The Contractor shall provide evidence satisfactory to the CO of Workers' Compensation insurance in accordance with the statutory mandates of the District of Columbia or the jurisdiction in which the contract is performed.

   Employer's Liability Insurance - The Contractor shall provide evidence satisfactory to the CO of employer's liability insurance as follows: $500,000 per accident for injury; $500,000 per employee for disease; and $500,000 for policy disease limit.

   All insurance required by this paragraph 3 shall include a waiver of subrogation endorsement for the benefit of Government of the District of Columbia.

4. Cyber Liability Insurance - The Contractor shall provide evidence satisfactory to the Contracting Officer of Cyber Liability Insurance, with limits not less than $5,000,000 per occurrence or claim, $5,000,000 aggregate. Coverage shall be sufficiently broad to respond to the duties and obligations as is undertaken by Contractor in this agreement and shall include, but not limited to, claims involving infringement of intellectual property, including but not limited to infringement of copyright, trademark, trade dress, invasion of privacy violations, information theft, damage to or destruction of electronic information, release of private information, alteration of electronic information, extortion and network security. The policy shall provide coverage for breach response costs as well as regulatory fines and penalties as well as credit monitoring expenses with limits sufficient to respond to these obligations.

5. Professional Liability Insurance (Errors & Omissions) - The Contractor shall provide Professional Liability Insurance (Errors and Omissions) to cover liability resulting from any error or omission in the performance of professional services under this Contract. The policy shall provide limits of $5,000,000 per claim or per occurrence for each wrongful act and $5,000,000 annual aggregate. The Contractor warrants that any applicable retroactive date precedes the date the Contractor first performed any professional services for the Government of the District of Columbia and that continuous coverage will be maintained or an extended reporting period will be exercised for a period of at least ten years after the completion of the professional services. In the unlikely event the Contractor dissolves its limited liability company during that ten year period, the Contractor agrees to purchase tail coverage for two years post-dissolution to the extent available in the insurance market.

6. Commercial Umbrella or Excess Liability - The Contractor shall provide evidence satisfactory to the CO of commercial umbrella or excess liability insurance with minimum limits equal to the greater of (i) the limits set forth in the Contractor's

Exhibit 2

2023-FOIA-01530-00000094

Attachment 1 to Letter Contract DCCB-2021-F-0008
Pharmacy Benefit Managers Investigation

umbrella or excess liability policy or (ii) $15,000,000 per occurrence and $15,000,000 in the annual aggregate, following the form and in excess of General Liability, Employer's Liability and Automobile Liability policies. All of these liability coverages must be scheduled under the umbrella and/or excess policy. The insurance required under this paragraph shall be written in a form that annually reinstates all required limits. Coverage shall be primary to any insurance, self-insurance or reinsurance maintained by the District and the "other insurance" provision must be amended in accordance with this requirement and principles of vertical exhaustion.

B. PRIMARY AND NONCONTRIBUTORY INSURANCE
The insurance required herein shall be primary to and will not seek contribution from any other insurance, reinsurance or self-insurance including any deductible or retention, maintained by the Government of the District of Columbia.

C. DURATION. Except for professional liability insurance, which has specific extended coverage set out in paragraph 5 above the Contractor shall carry all required insurance until all contract work is accepted by the District of Columbia and shall carry listed coverages for ten years for construction projects following final acceptance of the work performed under this contract and two years for non-construction related contracts.

D. LIABILITY. These are the required minimum insurance requirements established by the District of Columbia. However, the required minimum insurance requirements provided above will not in any way limit the contractor's liability under this contract.

E. CONTRACTOR'S PROPERTY. Contractor and subcontractors are solely responsible for any loss or damage to their personal property, including but not limited to tools and equipment, scaffolding and temporary structures, rented machinery, or owned and leased equipment. A waiver of subrogation shall apply in favor of the District of Columbia.

F. MEASURE OF PAYMENT. The District shall not make any separate measure or payment for the cost of insurance and bonds. The Contractor shall include all of the costs of insurance and bonds in the contract price.

G. NOTIFICATION.   The Contractor shall provide the CO with thirty (30) days prior written notice in the event of coverage and/or limit changes or if the policy is canceled prior to the expiration date shown on the certificate and ten (10) days prior written notice in the event of non-payment of premium. The Contractor will also provide the CO with an updated Certificate of Insurance should its insurance coverages renew during the contract.

H. CERTIFICATES OF INSURANCE. The Contractor shall submit certificates of insurance giving evidence of the required coverage as specified in this section prior to commencing work. Certificates of insurance must reference the corresponding contract number. Evidence of insurance shall be submitted to:

Page 7 of 8

Exhibit 2

2023-FOIA-01530-00000095

Attachment 1 to Letter Contract DCCB-2021-F-0008
Pharmacy Benefit Managers Investigation

### The Government of the District of Columbia

### And mailed to the attention of:

Gena Johnson
400 6th Street NW
Washington, DC 20001
202-247-6448
Gena.johnson@dc.gov

The CO may request and the Contractor shall promptly deliver updated certificates of insurance, endorsements indicating the required coverages, and/or certified copies of the insurance policies. If the insurance initially obtained by the Contractor expires prior to completion of the contract, renewal certificates of insurance and additional insured and other endorsements shall be furnished to the CO within five working days following expiration of all such initial insurance. For all coverage required to be maintained after completion, an additional certificate of insurance evidencing such coverage shall be submitted to the CO on an annual basis as the coverage is renewed (or replaced).

I.   DISCLOSURE OF INFORMATION.   The Contractor agrees that the District may disclose the name and contact information of its insurers to any third party which presents a claim against the District for any damages or claims resulting from or arising out of work performed by the Contractor, its agents, employees, servants or subcontractors in the performance of this contract.

J.   CARRIER RATINGS.   All Contractor's and its subcontractors' insurance required in connection with this contract shall be written by insurance companies with an A.M. Best Insurance Guide rating of at least A- VII (or the equivalent by any other rating agency).

Exhibit 2

2023-FOIA-01530-00000096

Attachment 2 to Letter Contract – DCCB-2021-F-0008
Pharmacy Benefits Managers Litigation                                         Page 1 of 2

## 1.    ETHICAL OBLIGATIONS AND LEGAL CONFLICTS OF INTEREST

1.1    An attorney-client relationship will exist between the District and any attorney who performs work under the contract, as well as between the District and the firm of any attorney who performs work under the contract.  The D.C. Rules of Professional Conduct (RPC) and the ethical rules of any other jurisdiction in which work is performed are binding on the Contractor.  The parties agree that the District may have a contractual cause of action based on violation of such rules, in addition to any other remedies available.

1.2    In addition to the prohibitions contained in the RPC and the ethical rules of any other jurisdiction in which work is performed, the Contractor agrees that it shall recognize that in the performance of the contract it may receive certain information submitted to the District government on a proprietary basis by third parties, information which relates to potential or actual claims against the District government, or information which relates to matters in dispute or litigation.  Unless the District consents to a particular disclosure, the Contractor shall use such information exclusively in the performance of the contract and shall forever hold inviolate and protect from disclosure all such information, except disclosures required by applicable law or court order. The Contractor also agrees that, to the extent it is permitted to disclose such information, it will make such disclosures only to those individuals who need to know such information in order to perform required tasks in their official capacity and will restrict access to such information to such individuals.

1.3    Before any contractor can be retained to perform legal services under the contract, on behalf of the District government, the Attorney General for the District of Columbia must review and waive all actual or potential direct and indirect conflicts of interest pursuant to RPC 1.6, 1.7, 1.8, 1.9 and 1.10.  After notice of its selection, each prospective contractor shall provide the Attorney General with the following: (1) a written statement that there exists no Rule 1.7(a) direct conflict of interest regarding the work to be performed under the contract; (2) a written description of all actual or potential conflicts of interest regarding the work to be performed under the contract that require waiver pursuant to Rule 1.7(b) because the contractor represents another client in a matter adverse to any of the following: (i) the District government agency or instrumentality to be represented under the contract; (ii) the District government as a whole; or (iii) any other agency or instrumentality of the District government (for this purpose, under D.C. Bar Legal Ethics Committee Opinion No. 268, a representation of a private client against a discrete government agency or instrumentality can have government-wide implications and thus constitute a representation adverse to the government as a whole pursuant to the RPC); and (3) a written description of all representations of clients who are or will be adverse to the District government with regard to the work to be performed under the contract, whether or not such representations are related to the matter for which the work is to be performed under the contract.

Exhibit 2

2023-FOIA-01530-00000097

Attachment 2 to Letter Contract – DCCB-2021-F-0008
Pharmacy Benefits Managers Litigation                                Page 2 of 2

1.4     The Attorney General generally does not grant prospective conflict of interest waivers,
        except in certain *pro bono* matters. Thus, in addition to the prohibitions contained in
        the RPC and the ethical rules of any other jurisdiction in which work is performed
        under the contract, without the consent of the Attorney General, the Contractor shall not
        represent any party other than the District in any disputes, negotiations, proceedings or
        litigation adverse to any agency or instrumentality of the District government or the
        District government as a whole, including, but not limited to, matters related to the
        work to be performed under the Contract. The Contractor shall notify the Attorney
        General immediately, in writing, of any potential conflicts of interest (as defined in the
        RPC) that arise during the period that the Contractor is performing work under the
        contract. The Attorney General makes every attempt to be reasonable in deciding
        whether or not to consent to a conflict of interest and usually makes this decision
        promptly after receiving notice and sufficient information regarding the conflict. If the
        Attorney General does not waive a conflict of interest, the Contractor shall undertake
        immediate action to eliminate the source of any such conflict of interest.

1.5     Before any contractor can be retained pursuant to the contract, the Attorney General for
        the District of Columbia must review all actual, direct and potential conflicts of interest
        on behalf of the District government in light of D.C. Bar Rules of Professional Conduct
        ("RPC") 1.6, 1.7, 1.8, 1.9 and 1.10. Each prospective contractor shall provide the
        Attorney General with written notice of all actual or potential direct and indirect
        conflicts of interest in which the Contractor represents (or may represent) another client
        with interests adverse to the District government agency to be represented as well as
        against the District government as a whole. For this purpose, under D.C. Bar Legal
        Ethics Committee Opinion No. 268, attached as Attachment 2 hereto, a representation
        of a private client against a discrete government agency can have government-wide
        implications and thus qualify under the RPC as being against the government as a
        whole, including the individual agency that the private firm represents. In that situation,
        the private firm would be required to notify the Attorney General of the existence of a
        conflict under RPC 1.7 and obtain consent to such representation and waiver of the
        conflict. The Attorney General makes every attempt to be reasonable in deciding
        whether or not to consent to a conflict and usually makes this decision promptly after
        receiving notice of the conflict.

Exhibit 2

2023-FOIA-01530-00000098

**Ethics Opinion 268**

## Conflict of Interest Issues Where Private Lawyers Provide Volunteer Legal Assistance to the D.C. Corporation Counsel; Reconsideration of Opinion 92

Under the D.C. Rules of Professional Conduct, a lawyer may give volunteer legal assistance to the D.C. Corporation Counsel and continue simultaneously to represent private clients against the City and its agencies, as long as the requirements of Rule 1.7 are met. Under Rule 1.7(b)(1), a lawyer who wishes to represent a private client against the same City government client that she is representing while working for the Corporation Counsel on an unrelated matter, may do so if she obtains the informed consent of both her private client and her City government client. Similarly, the lawyer may agree to volunteer her services t o represent the same City government client that she or her firm is opposing on behalf of a private client in an unrelated matter, if both clients consent after full disclosure. Client notification and consent are not required, however, where the lawyer is not opposing her own City government client but some other agency of the City that is not her client.

The City government client is not always the City as a whole, but may be more narrowly defined as one of the City's constituent agencies. The identity of the government client for conflict of interest purposes will be established in the first instance between the lawyer and responsible government officials in accordance with the general precepts of client autonomy embodied in Rule 1.2. In agreeing to undertake a particular representation, the lawyer must take steps to recognize and respect the reasonable expectation of her other clients, protected by Rule 1.7, that they will receive a conflict-free representation.

Even if Rule 1.7(b)(1) does not apply, because the lawyer's government client is not considered the same government entity she is opposing on behalf of private parties, Rule 1.7(b)(2)-(4) may require that the lawyer obtain client consent if her representation of one client will be or is likely to be "adversely affected" by her representation of the other, or if the independence of her professional judgment will be or is likely to be adversely affected by her responsibilities to third parties or by her own personal interests.

**Applicable Rules**

- Rule 1.2 (Scope of Representation)
- Rule 1.7 (Conflict of Interest: General Rule)

**Inquiry**

The Committee has been asked to reconsider several conclusions of D.C. Bar Opinion 92 (1980) ("Propriety of Private Attorneys Handling Municipal Cases on a Pro Bono Basis"). Opinion 92 examined the ethical propriety, under the D.C. Code of Professional Responsibility, of a program in which "private attorneys acting on a pro bono basis would assist the City in managing its severely crowded civil docket."[1] **(/bar-resources/legal-ethics/opinions/opinion268.cfm#footnote1)** The Committee opined in Opinion 92 that the program would be ethically permissible as long as certain conditions were met. The inquirer has asked the Committee to reconsider the continuing validity of two of those conditions, given the intervening adoption in 1991 of the D.C. Rules of Professional Conduct.[2] **(/bar-resources/legal-ethics/opinions/opinion268.cfm#footnote2)** The two conditions in question are as follows:

Exhibit 2

2023-FOIA-01530-00000099

1. A lawyer or firm performing volunteer representational work for the City or any of its agencies may simultaneously represent a private party against the City or any of its agencies only with full disclosure to and consent of both the City and the private party; and.

2. Under no circumstances may a lawyer or firm volunteer to represent a particular agency of the City government while at the same time handling a private matter involving the same agency, or another matter that is or appears to be "closely related," even with client consent.

## Summary of Conclusions

For reasons discussed more fully in Part I below, the Committee believes that the conclusion in paragraph 2 above is no longer mandated under the Rules of Professional Conduct. Thus a lawyer may represent a particular City government agency in a matter at the same time she is opposing that agency on behalf of a private client in an unrelated matter, as long as she makes full disclosure to and obtains the consent of both the City government agency and the private client. See Rule 1.7(b)(1) and 1.7(c). Moreover, as explained in Part II below, we disagree with the assumption of Opinion 92 that the entire City and all of its constituent agencies must always and necessarily be considered the lawyer's client for conflict of interest purposes. Thus, a lawyer may under certain circumstances perform services for a particular City agency client without having to notify and obtain the consent of private clients that she is representing against another City agency that is not considered the same client. Nevertheless, even if Rule 1.7(b)(1) does not apply because the lawyer is not opposing her own client, she may be required by Rule 1.7(b)(2)-(4) to notify and seek the consent of one or both clients if her representation of one would substantially interfere with her representation of the other, or if her independent judgment in either client's behalf would be adversely affected by her responsibilities to a third party or by her own personal interests.

## Discussion

### I. Prohibited Representation of Private Parties Against Particular City Agencies or in Particular Matters

Opinion 92 imposed an absolute prohibition against a lawyer's representing a private party against the same particular City agency for which she is performing volunteer services, or in a matter "closely related" to the one she is handling for the City. This absolute prohibition was derived from the "appearance of impropriety" standard of Canon 9 rather than the "conflict of interest" rules of Canon 5. The "appearance" standard was dropped entirely from the Rules of Professional Conduct, and the conflict of interest rules provide that conflicts may generally be waived by the client. See Rule 1.7(b) and (c). Under the current rules, the only conflict that cannot be relieved by client consent is the one that arises where a lawyer seeks to take "adverse" positions on behalf of two different clients in the same matter. See Rule 1.7(a). We therefore conclude that the absolute prohibition on opposing one's own City agency client set forth in paragraph 2 above is no longer applicable.

While a conflict under Rule 1.7(b)(1) would arise if the volunteer lawyer attempted to represent a private client against the City in one matter at the same time she (or one of her partners) was representing the City for the Corporation Counsel in another matter, since the lawyer would in effect be opposing her own client, that conflict could in most circumstances be cured by making full disclosure to both affected clients and obtaining their consent. Thus, a lawyer may represent a private party against a City government agency while simultaneously representing that same City agency in an unrelated matter, as long as both the private client and the agency client are informed of the existence and nature of the lawyer's conflict and do not object to the continued representation. See Rule 1.7(b)(1) & (c). See also Rule 1.7(b)(2)-(4). A lawyer may not, however, represent both the City and a private client in the same matter if they are adverse to each other in that matter, even if both clients consent. See Rule 1.7(a).

The fact that the lawyer is volunteering her services to the City, as opposed to serving under a paid retainer, is irrelevant to these conclusions, as it is to the conclusions reached in the remainder of this opinion.

Exhibit 2

2023-FOIA-01530-00000100

## II. Conflicts of Interest Where Volunteer Services Are Performed for the City or One of Its Agencies

We now address the holding of Opinion 92 based on the then-applicable conflict of interest rules, described in numbered paragraph 1 above. Opinion 92 construed the conflict of interest provisions of the former Code, derived from Canon 5, to permit a lawyer to participate in the Corporation Counsel's volunteer program "notwithstanding his or her involvement in other matters affecting the City," as long as two conditions were met: first, it must be "obvious" that the lawyer can adequately represent "both the interests of the City and his or her other private clients;" and, second, "each affected client must consent to the multiple representation after full disclosure."

### A. Defining the Client for Conflict of Interest Purposes

Before turning to an analysis of how the current conflict of interest rules apply in this situation, we must deal with one important threshold issue, involving an unexamined assumption made by the drafters of Opinion 92 about the identity of the City government client. That assumption is that the client of the volunteer lawyer working for the Corporation Counsel is always and necessarily "the City" as a whole rather than one or more of the City's constituent agencies.[3] (/bar-resources/legal-ethics/opinions/opinion268.cfm#footnote3) This definition gives the conflict rules a considerably broader application and effect than they would have if the City government client were more narrowly defined. Under Rule 1.7(b)(1), a lawyer may not take a position in a matter on behalf of one client that is adverse to a position taken in the same matter by another client (not represented by her) unless she obtains consent from both clients.[4] (/bar-resources/legal-ethics/opinions/opinion268.cfm#footnote4) If the client of the volunteer lawyer is the City as a whole, as opposed to one or more of its constituent agencies, Rule 1.7(b)(1) would require the lawyer to obtain consent to the City representation from each and every one of the private clients that she is currently representing against the City or any of its agencies, and from the City to each and every adverse private representation the lawyer may currently be involved in against it or any of its agencies, without regard to whether there is any real possibility that the substantive concerns animating the conflicts rules are implicated.[5] (/bar-resources/legal-ethics/opinions/opinion268.cfm#footnote5)

Concerned that the breadth of this definition of the City government client will effectively discourage, if not preclude, private law firms from volunteering to assist the Corporation Counsel, the inquirer has asked the Committee to consider whether the volunteer lawyer's client may be defined as a particular City agency as opposed to the City as a whole, so as to ameliorate the sweeping requirement of notice and consent imposed by Rule 1.7(b)(1) read in the light of Opinion 92. We agree with the inquirer that the definition of the City government client contained in Opinion 92 is too broad, and that the City government client may sometimes be defined as narrowly as a single agency. As discussed more fully below, we also believe that the identity of the City government client depends upon a number of discrete considerations and must be decided on a case-by-case basis.

Simply as a matter of common sense it seems apparent that the client of the volunteer lawyer will not always be the entire City, but may sometimes be a smaller part of it. Much like a large modern corporation, the District of Columbia government is a complex and many-faceted entity that sometimes acts through its individual constituent parts (like the subsidiaries of a corporation) and sometimes acts as a single entity, depending upon the particular facts and circumstances. Sometimes a legal matter or issue is relevant only to a single City agency and is of no substantial interest to other agencies or the City as a whole. Sometimes a matter or issue directly affects or is otherwise significant to a number of agencies or the overall City government. In some situations the broad set of interests at stake will be apparent at the outset; in others the broader concerns may emerge during the course of the representation.

Whatever general principles about client identity in the government context can be drawn from our common sense analysis of the governmental interests implicated by particular cases, at bottom

Exhibit 2

2023-FOIA-01530-00000101

the identity of the City government client (like the identity of the corporate client) is not primarily a question of legal ethics. The identity of the government (or corporate) client for all ethical purposes is established in the first instance between the lawyer and responsible public (or corporate) officials in accordance with the general precepts of client autonomy embodied in Rule 1.2.[6] (/bar-resources/legal-ethics/opinions/opinion268.cfm#footnote6) Cf. ABA Formal Opinion 95-390 ("Conflicts of 6 Interest in the Corporate Family Context") (a corporate client may specify, when engaging a lawyer, whether or not "the corporate client expects some or all of its affiliates to be treated as clients for purposes of Rule 1.7").

The ethics rules provide at least one important limitation on what a lawyer can agree to with a client under Rule 1.2, and that is her other clients' right to be protected from conflicts of interest under Rule 1.7. In agreeing to represent a particular government client, a lawyer must take into account the countervailing rights of her other clients whose interests may be adversely affected by this new representation to know of and object to it—just as she must consider the similar rights of the new government client to know of and be able to object to any conflicting existing representations. In working with officials who are authorized to speak for the government client to define the scope of the representation (and hence the identity of the government client for conflict of interest purposes), the lawyer may defer to the government client's wishes only as long as she is able to fulfill her basic responsibilities to her other clients under Rule 1.7, including in particular her obligation not to take a position adverse to them on behalf of another client without their consent. This is the basic right secured to every client by Rule 1.7(b)(1).

The lawyer may not, by agreeing to a narrow definition of the government client, seek to defeat the reasonable expectation of her other clients, arising from and protected by Rule 1.7(b), that they will get a conflict-free representation from their lawyer. Accordingly, the volunteer lawyer must assure herself that the definition of the government client ultimately arrived at in discussions with authorized government officials both recognizes and respects her private clients' right to object when their lawyer proposes to represent interests directly adverse to their own. Her government client has the same right to object to any potentially conflicting private representations.

Thus, we believe that the lawyer who wishes to perform volunteer work for the Corporation Counsel's Office has an obligation to work with that office to develop a clear understanding of the scope of her representation of the City, and to make certain that the agreed upon definition of the government client is a reasonable one in light of all the facts and circumstances, including in particular each of her clients' right to know about, and to give or withhold consent to, her representation of adverse interests.

Ideally, the identity of the government client should be specifically agreed upon between the volunteer lawyer and the government officials who are authorized to speak for the client at the outset of the representation, and committed to writing. In those instances where the identity of the client is not clearly defined, it may be inferred from the reasonable understandings and expectations of the lawyer and those officials. These in turn may be gleaned from such functional considerations as the organizational structure of the City and the extent to which its constituent parts are related in form and function, and from the facts and circumstances of the particular matter at issue in the representation—including the general importance of the matter to the City as a whole and to other particular components whose programs or activities are not directly involved.

There may be situations in which it can be agreed at the outset that the volunteer lawyer will represent only a single City agency in a relatively discrete matter (e.g., a particular contract) or in a relatively discrete category of cases (e.g., child abuse and neglect cases). In such a case, the lawyer would be free to agree to take on a private representation in which she would be opposing another City agency on an unrelated matter, without having to notify or obtain the consent of either her existing government client or her new private client. That is the easiest case. Another fairly clear case is the one in which the volunteer lawyer represents a City agency in a matter that plainly

Exhibit 2

has City-wide impact or public importance, so that it can fairly be said to implicate the interests of the City generally. In such a case, it would be unreasonable not to regard the lawyer's client as the City as a whole, and she therefore could not undertake a private representation against any City agency without informing and obtaining the consent of the City and, subsequently, the private client. There are dozens of permutations on these basic scenarios, in which the general City-wide interest is sometimes clear and sometimes not so clear. However, the mere fact that a matter is captioned "X v. District of Columbia" is not dispositive of the identity of the government client. Rather, as noted previously, the answer depends upon the reasonable understanding reached between the volunteer lawyer and responsible public officials based upon all relevant facts and circumstances. Of course, as with all representations, the lawyer must be alert to the need to deal with any conflicts that may arise during the course of the representation.[7] **(/bar-resources/legal-ethics/opinions/opinion268.cfm#footnote7)**

The Corporation Counsel—as chief legal officer for the District and controller of its litigation—asserts that he has legal responsibility for determining the identity of the City government client for purposes of the conflict of interest rules. The Corporation Counsel has indicated his intention to issue guidelines for dealing with conflict issues posed by the volunteer program, that will address the identity of the client and the circumstances in which the District will waive any potential conflicts. We expect that these guidelines, when issued, will be useful to volunteer lawyers not only in determining what kinds of legal assistance they may give to the Corporation Counsel without creating a conflict with their existing private representations, but also in determining the scope of any conflicts. The guidelines may also be useful in determining what new private clients or matters a lawyer may subsequently take on in light of her responsibilities to her City government client(s).

In summary, we conclude that the Rules of Professional Conduct do not identify the City government client, and for the most part provide only general guidance for the lawyer and responsible government officials in reaching an understanding in this regard. The one clear limitation on the lawyer in this context derived from the ethics rules is her other clients' reasonable expectation that they will be allowed to object to their lawyer's representation of interests that would impinge upon her ability to zealously represent their own. Thus we believe that the private lawyer who wishes to perform volunteer work for the Corporation Counsel's office must work with that office to develop a clear understanding of the scope of her representation of the City, and hence the identity of the government client for conflicts purposes, and must take steps to protect all of her clients' right to know about and withhold consent to their lawyer's representation of interests that are adverse to their own.

**B. Applicable Conflict of Interest Rules**
Assuming that the relevant City government client has been identified, it remains to explain how the current conflict of interest rules apply in this situation.

**1. Direct Conflicts Under Rule 1.7(b)(1)**
As noted, Rule 1.7(b)(1) prohibits a lawyer from taking a position on behalf of one client that is directly adverse to a position taken by another client in the same matter (represented of course in this matter by another lawyer) without the consent of both clients. *See* note 4, *supra.* Thus, if a lawyer wishes to undertake a volunteer representation of a particular City agency that she or her firm is already opposing on behalf of a private client, the lawyer may do so only if she informs both the private client and the new City agency client of the "existence and nature of the possible conflict and the possible adverse consequences of such representation," and they give their consent.[8] **(/bar-resources/legal-ethics/opinions/opinion268.cfm#footnote8)** Rule 1.7(c)(1). The conflicts of each lawyer in a firm are imputed to all other lawyers in the firm. Rule 1.10.

For example, if a volunteer lawyer is considering taking on a matter for the Corporation Counsel that involves defense of a suit brought against the Mayor and/or the City Council, or a suit

Exhibit 2

attacking some City-wide program or regulation (so that the client must be deemed to be the City as a whole), the lawyer must make full disclosure to and seek consent from each of her firm's private clients who have matters pending against the City or any of its agencies. She must also inform the Corporation Counsel of any conflicting private representations being pursued by her or by other lawyers in her firm. Conversely, if a volunteer lawyer is working on a City-wide matter and is then asked to represent a private party against the City or one of its agencies, she must inform the Corporation Counsel and seek his consent. Consent must also be 8 obtained from the new client.

On the other hand, Rule 1.7(b)(1) does not apply, and client notification and consent are not required, if a lawyer is not opposing her own City government client but some other agency of the City that is not her client. For example, if a lawyer hired to defend a program or action of a particular City agency, such as the Housing Department, were representing only the Housing Department in this matter, she would be required to disclose the fact of her Housing Department representation and seek consent from those of her firm's private clients who had matters pending against the Housing Department or against the City as a whole.[9] (/bar-resources/legal-ethics/opinions/opinion268.cfm#footnote9) But she would not be required to disclose her Housing Department representation to private clients who had matters pending against other particular City agencies whose functions were unrelated to the Housing Department and that otherwise had no interest in the issues involved in the Housing Department representation and would be unaffected by its outcome.

Thus, in a case where a lawyer is representing the City as a whole, she is obliged to obtain the City's consent before opposing one of its constituent agencies, as well as the consent of any of her private clients who have interests adverse to the City (or, of course, the particular agency she would be representing). Similarly, if the lawyer is representing a private client against the City as a whole, she must obtain the private client's consent before undertaking any City government representation, even one involving a discrete agency program with no functional or programmatic relationship to the City-wide matter she is otherwise involved in. The only situation in which the lawyer may cabin her conflict and avoid having to conduct a broad canvass of all clients with City-related business is where both her public and her private representations involve discrete agency programs with no City-wide implications.

## 2. Indirect Conflicts Under Rule 1.7(b)(2)-(4)

Even if Rule 1.7(b)(1) does not apply because the lawyer's City government client is not considered to be the same City client that she is opposing, her representation of a City agency may still raise an "indirect" conflict of interest under subsections (2) through (4) of Rule 1.7(b) if it "interferes in some substantial way with the representation of another" client. D.C. Bar Opinion 265 (1996) ("Positional Conflicts"). This would as a practical matter result in the same need to determine that both clients could be adequately served, and then to make full disclosure to and obtain the consent of "each affected client" to the multiple representation. Under Subsections (2) and (3) of Rule 1.7(b), if the lawyer believes that her representation of the City agency "will be or is likely to be adversely affected" by her representation of a private client, or vice versa, the lawyer must obtain the consent of the affected client or clients. Under subsection (4), client consent must be obtained if the lawyer believes that the independence of her professional judgment on behalf of a client "will be or reasonably may be adversely affected" by her responsibilities to a third party or by her own personal interests.

In contrast to the situation involving a direct conflict under Rule 1.7(b)(1), where disclosure and informed consent are mandatory once it is apparent that the lawyer will be opposing her own client, a lawyer has some discretion in deciding whether an indirect conflict under Rule 1.7(b)(2)-(4) exists. Whether a particular volunteer representation will "adversely affect" the lawyer's representation of another client (or vice versa) depends upon the particular facts and circumstances and is in the first instance essentially a matter for the lawyer to decide. Likewise,

Exhibit 2

the existence of a conflict arising from the lawyer's responsibilities to third parties or her own personal interests is primarily a question of fact. The lawyer may decide that she should make disclosure to and seek consent from one client but need not do so from the other.

The "adverse effect" inquiry under subsections (2) through (4) is primarily a functional one, generally involving both the relative importance of the representation to the respective clients or to their lawyers and the directness of the adverseness between them. It may require inquiry into the nature of the issues, the amount of money at stake, and the likelihood that either client would otherwise be substantially and foreseeably affected by the outcome of the other's matter. Sometimes, the "adverse effect" inquiry will also involve the particular role the volunteer lawyer is expected to play in the matter, and the "intensity and duration" of her relationship with the lawyers she is opposing. *Cf.* Formal Opinion 1996-3 of the Committee on Professional and Judicial Ethics of The Association of the Bar of the City of New York (1996)(conflicts of interest where one lawyer represents another lawyer).

Without attempting to exhaust the kinds of situations that would give rise to an adverse effect under Rule 1.7(b)(2)-(4), we offer the following examples to illustrate the kinds of circumstances that in this Committee's view could require a lawyer to obtain consent from one or both clients under these provisions. 1) A volunteer lawyer whose firm is handling a matter for private clients against one City agency, and who is subsequently asked by the Corporation Counsel to defend another City agency in a matter whose outcome will have a substantial and foreseeable impact on the outcome of the firm's private clients' matter, may be required to obtain one or both clients' consent. 2) A volunteer lawyer who represents one City agency and wishes to make certain arguments about that agency's authority that are inconsistent with arguments she is making on behalf of a private client against another City agency in an unrelated matter, may be required to obtain consent from one or both clients if the success of her arguments on behalf of one client "will, in some foreseeable and ascertainable sense, adversely effect the lawyer's effectiveness on behalf of the other" client. *See* Opinion 265, *supra*. 3) A volunteer lawyer performing work for one City agency who wishes to take a leading role representing a private party in a controversial matter involving another City agency should anticipate having to obtain consent from both clients if she believes it likely that one representation will have an adverse effect on the independence of her professional judgment or her credibility in the other. 4) A volunteer lawyer who works closely and for extended periods of time with full-time Corporation Counsel lawyers, or is closely supervised by Corporation Counsel lawyers, may find it difficult to exercise independent professional judgment in opposing the same lawyers with whom she is working or who are supervising her, and in such a situation she may decide that she should not accept a private representation in which she would be opposing her colleagues, without notifying and seeking the consent of both the Corporation Counsel and her private client.[10] **(/bar-resources/legal-ethics/opinions/opinion268.cfm#footnote10)**

The above examples are not intended to be exhaustive, but merely to suggest the possibilities for "indirect" conflicts to develop in the context of a volunteer program such as the one described in Opinion 92.

**Conclusion**
The conclusion of Opinion 92 that, under the former Code of Professional Responsibility, a lawyer may never oppose a City agency that she is also representing on behalf of another client in an unrelated matter, is no longer mandated by the Rules of Professional Conduct. Under Rule 1.7(b)(1), a lawyer may oppose her own City government client on behalf of a private client in an unrelated matter as long as she makes clear the nature of the conflict to both clients and obtains their consent.

Moreover, we believe that in certain limited situations a lawyer may represent a City agency without having to notify or obtain the consent of private clients that she is representing against

Exhibit 2

2023-FOIA-01530-00000105

other discrete City agencies. Opinion 92's apparent assumption that the client of the Corporation Counsel lawyer is always and necessarily the City as a whole is incorrect, and in any event has no foundation in the ethics rules. The rules contemplate that the identity of the City government client for conflict of interest purposes will be decided on a case-by-case basis between the lawyer and responsible government officials, taking into account the reasonable expectation of the lawyer's other clients that they will receive a conflict-free representation. Their decision will generally be based on functional considerations derived from the structure and relationship of the government entities involved and from the facts and circumstances of the particular matter at issue in the representation. Even if the lawyer would not be opposing her own client, she may be required by Rule 1.7(b)(2)-(4) to obtain client consent if her representation of one client would interfere in some substantial way with her representation of the other, or if the independence of her judgment in either client's behalf would be compromised by her responsibilities to or interests in a third party or by her own personal interests, including her personal and professional relationships with the lawyers on the other side.

October 1996

---

1. Under the program described in Opinion 92, private law firms were encouraged to donate the services of attorneys to assist the Corporation Counsel in a variety of legal matters, generally on a part-time basis. This program reportedly yielded little by way of relief for the Corporation Counsel's Office, at least in part because of the conditions on lawyer participation (particularly the requirement of obtaining waivers from other clients) set forth in Opinion 92. In 1992, a second and more formal effort was made to encourage lawyers from private firms to volunteer their services to the City, this time by granting them a special dispensation from the imputation rule. The amendments enacted in that year to Rule 1.10 and 1.11 provided that conflicts resulting from one lawyer's voluntary service to the Corporation Counsel need not be imputed to all other lawyers in her firm. See Rule 1.10(e) and Comment [19]; Rule 1.11(h) and Comments [12] and [13]. (The 1992 amendments to Rules 1.10 and 1.11 were made permanent in 1994 and extended to the D.C. Financial Control Board in 1996). According to the commentary to Rule 1.10, this special dispensation from the imputation rule depends upon the volunteer lawyer's working full-time for the Corporation Counsel (there must be a "temporary cessation" of a volunteer lawyer's practice with the firm, "so that during that period the lawyer's activities which involve the practice of law are devoted fully to assisting the Office of the Corporation Counsel"). Thus, when a private lawyer is detailed full-time to the Corporation Counsel's Office under the so-called "Rule 1.10 program," her firm will not be regarded as representing the City, and will not need to alert and obtain consent from those of its clients who "might reasonably consider the representation of its interests to be adversely affected" by the firm's representation of the City. See Comment [7] to Rule 1.7. (It follows by necessary implication that where a lawyer is volunteering for the City on a less than full-time basis, or does not otherwise meet the requirements of a "Rule 1.10 detail," the conflicts resulting from her government service are imputed to all lawyers in her firm." We understand that the Rule 1.10 program has attracted few volunteers, and has accordingly provided no more benefit for the Corporation Counsel's Office than did the pre-1992 part-time details discussed in Opinion 92.

2. Amendments to the Rules issued by the D.C. Court of Appeals on October 16, 1996, make a number of revisions to the text and commentary of Rule 1.7, none of which affect the conclusions of this opinion. We would note, however, the extensive attention paid in new Comments [13]-[18] to conflicts of interest where the client is a "corporation, partnership, trade organization or other organization-type client." While not directly applicable to situations in which the client is a governmental entity, cf. Comment [7] to Rule 1.13, we believe this discussion may provide a useful supplement to the discussion of conflicts under Rule 1.7(b)(2)-(4) in Part II B(2), infra.

Exhibit 2

2023-FOIA-01530-00000106

3. Opinion 92 does not say in so many words that the client of the volunteer lawyer is always and necessarily the entire City for Canon 5 conflict of interest purposes. Nevertheless, this has been the generally accepted interpretation of the opinion since its issuance more than 16 years ago, and there appears to be little support in the text for a contrary position. Moreover, the fact that the absolute bar under the "appearance" standard of Canon 9 is clearly applicable only to representations involving particular City agencies if further evidence that the drafters of Opinion 92 intended a very broad definition of the City client for conflict of interest purposes.

4. Where a conflict arises under Rule 1.7(b)(1) because the lawyer is opposing her own client on behalf of another client, both clients are presumed to be "potentially affected" under Rule 1.7(c)(1) and both must therefore consent to the representation after full disclosure.

5. Opinion 92 advises a firm wishing to participate in the Corporation Counsel's volunteer program to "send a standardized letter to all clients identified as having present or potential future dealings with the City, describing the program and explaining in general how the judgment of the firm's attorneys might or might not be affected by the firm's participation in the program." This suggests an even broader application for the condition, requiring the lawyer to obtain consent from clients with present or potential City business without regard to whether the lawyer or her firm is actually representing the client in connection with that City business. We see no basis in the current rules for such an expansive reading of the conflict of interest rules. Even in a case when the entire City is considered the lawyer's client, consent must be obtained only from clients who the lawyer is currently representing against the City (or one of its agencies) or those who have actually asked her so to represent them.

6. We do not regard the definition of the government client contained in Rule 1.6(i) ("the client of the government lawyer is the agency that employs the lawyer") as dispositive for conflict of interest purposes. And, there is no indication that this or any other a priori definition of the government client was intended to apply in this context in the otherwise thorough consideration of the "government lawyer" issue by the Sims Committee in 1988. See Report by the District of Columbia Bar Special Committee on Government Lawyers and the Model Rules of Professional Conduct (1989).

7.The provisions of Rule 1.7(d) (1996 amendment) govern conflicts arising after the representation commences that are "not reasonably foreseeable at the outset of a representation." As we read this provision, it subjects such unforeseeable late-arising conflicts to the provisions of Rule 1.7(b)(2) through (4) only, and not to those of Rule 1.7(b)(1).

8. The government client can generally decide what information it needs or wants about the volunteer lawyer's potentially conflicting representations, in the context of deciding its own identity. Thus, the process of self-definition functions for the government client as a way of consenting to the volunteer lawyer's conflicting private representations to which it would be entitled to object if it chose to define its identity more broadly. In this fashion, the government client may decide that it has no interest in knowing about any conflicts that might otherwise be imputed to the volunteer lawyer under Rule 1.10 by virtue of representations by other lawyers in her firm.

9. Given the decision-making structure of government entities, we believe that the conflicts of the City are necessarily attributed to its constituent parts, and that the conflicts of the constituent parts of the City are necessarily attributed to the City as a whole—though the conflicts of one of the City's constituent agencies may or may not be attributed to other City agencies.

10. Because this conflict is in the nature of a personal conflict, as opposed to one derived from the lawyer's representation of another client, we doubt that it would be imputed to other lawyers in the firm. See ABA Formal Opinion 96-400 ("Job Negotiations with Adverse Firm or Party") (Rule 1.10 "cannot be construed so broadly as to require that all lawyers in a firm be presumed to share their colleague's personal interest in joining the opposing firm in a matter," though each lawyer must

Exhibit 2

individually evaluate whether his "'responsibilities to . . . a third person'—i.e., his colleague—or his own interest in his colleague's interest, may materially limit the representation.")

Exhibit 2

2023-FOIA-01530-00000108

# Exhibit 3

  CT Corporation

**Service of Process Transmittal**
12/30/2020
CT Log Number 538820101

TO:  Rebecca Thompson
UnitedHealth Group Incorporated (111504190770700600)
9900 Bren Rd E Ste 300W, MN008-T502
Minnetonka, MN 55343-9693

RE:  **Process Served in District of Columbia**

FOR:  OptumRx, Inc.  (Domestic State: CA)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | RE: Office of Consumer Protection // To: OptumRx, Inc. |
| **DOCUMENT(S) SERVED:** | - |
| **COURT/AGENCY:** | None Specified<br>Case # None Specified |
| **NATURE OF ACTION:** | Subpoena - Business records |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Washington, DC |
| **DATE AND HOUR OF SERVICE:** | By Certified Mail on 12/30/2020 postmarked on 12/28/2020 |
| **JURISDICTION SERVED :** | District of Columbia |
| **APPEARANCE OR ANSWER DUE:** | None Specified |
| **ATTORNEY(S) / SENDER(S):** | None Specified |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 12/31/2020, Expected Purge Date: 01/30/2021<br><br>Image SOP<br><br>Email Notification,  Administrative Assistant  legalmail@uhg.com |
| **REGISTERED AGENT ADDRESS:** | C T Corporation System<br>1015 15th Street, NW<br>Suite 1000<br>Washington, DC 20005<br>877-564-7529<br>MajorAccountTeam2@wolterskluwer.com |

The information contained in this Transmittal is provided by CT for quick reference only. It does not constitute a legal opinion, and should not otherwise be relied on, as to the nature of action, the amount of damages, the answer date, or any other information contained in the included documents. The recipient(s) of this form is responsible for reviewing and interpreting the included documents and taking appropriate action, including consulting with its legal and other advisors as necessary. CT disclaims all liability for the information contained in this form, including for any omissions or inaccuracies that may be contained therein.

Page 1 of  1 / EC

Exhibit 3



ATTORNEYS AT LAW

**CERTIFIED MAIL®**

7016 3010 0000 2493 7076

FIRST-CLASS

PITNEY BOWES

US POSTAGE

02 1P
0002114238      DEC 28 2020
$ 007.20⁰
MAILED FROM ZIP CODE 20004

401 9th St. NW, Suite 1001
Washington, DC 20004

ADDRESS SERVICE REQUESTED



OptumRx, Inc.
c/o CT Corporation System, Registered Agent
1015 15th St. NW
Suite 1000
Washington, D.C. 20005

Exhibit 3



**GOVERNMENT OF THE DISTRICT OF COLUMBIA**
OFFICE OF THE ATTORNEY GENERAL



**Karl A. Racine**
**Attorney General**

**Office of Consumer Protection**

**SUBPOENA**

In the Matter of                                    **DEMAND FOR PRODUCTION**
OptumRx, Inc.                                       **OF DOCUMENTS**

To:          OptumRx, Inc.

Serve On:    CT Corporation System, Registered Agent
             1015 15th St. NW
             Suite 1000
             Washington, D.C. 20005

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

        The Office of the Attorney General for the District of Columbia is investigating whether
OptumRx, Inc. may have violated one or more of the provisions of the District of Columbia
Consumer Protection Procedures Act, D.C. Code § 28-3901, *et seq.*, in connection with the
negotiation of prescription drug rebates and the administration of prescription drug benefits.

        Pursuant to D.C. Code § 28-3910, and by the authority vested in the Attorney General for
the District of Columbia, you are hereby required to produce the documents and information
requested below, on or before January 27, 2021, to the attention of:

             Linda Singer
             Motley Rice LLC
             401 9th St. NW, Suite 1001
             Washington, DC 20004

        Questions regarding this subpoena should be directed to Assistant Attorney General
Wendy J. Weinberg at 202-724-1342, wendy.weinberg@dc.gov.

Exhibit 3

## INSTRUCTIONS

A.    In each instance in which a document is produced in response to a Request, the current
      version should be produced together with all earlier versions, or predecessor documents
      serving the same function during the relevant time period, even though the title of earlier
      documents may differ from current versions, as well as the time period that each version
      was used by You.

B.    The Subpoena calls for all described documents in your possession, custody or control
      without regard to the person or persons by whom or for whom the documents were
      prepared (*e.g.*, your company employees, contractors, vendors, distributors, service
      providers, competitors, or others).

C.    These Requests specifically include production of electronically stored information
      ("ESI").

   1.    General Instructions. A cover letter will accompany each production, identifying
         each piece of media (hard drive, thumb drive, DVD, CD, or FTP), the production
         date, production volume, and the Bates range of the production. Data will be
         produced on hard drive, thumb drive, DVD, CD, or FTP. Label all media with the
         following:

         a.    Case number
         b.    Production date
         c.    Production volume
         d.    Bates range
         e.    Media volume number (1 of X, 2 of X, etc.), if applicable.

   2.    Production Format for Electronically Stored Information. Production of all ESI is
         requested in either original native file format or as searchable image files, using (
         production numbering as described below. Before being produced, all parent-level
         email and loose-file (non-email) ESI should be de-duplicated across all custodians
         and shared network drives based on MD5 hash value. Individual email
         attachments should not be separately de-duplicated. All ESI should be produced
         with a metadata field listing all custodians where duplicate documents were
         found. For ESI production in image format, if any documents cannot be
         reasonably be converted to readable images, the information should be produced
         in native format or some other reasonably usable format, and image production
         should include a placeholder image for each such unconverted or unreadable
         document setting forth the original filename and extension.

   3.    Production of Email. If produced in native format, email should be produced as
         individual, parent level, HTML files, and attachments to emails should
         sequentially follow their parent emails and be produced in native format as
         separate files. If produced in searchable image format, parent emails and their
         attachments should be produced as separate, contiguous documents.

2

Exhibit 3

4.    <u>Production of Spreadsheets</u>. Spreadsheets should be produced in native format if stored in that manner, and each native file should be named with a document production number as described below. If a spreadsheet contains privileged information, you may produce it as imaged ESI, with the privileged information redacted, provided that You make reasonable efforts in applying page layout settings to maximize document readability. Images of spreadsheets that contain multiple worksheets should be produced with worksheet names indicated in a header or footer. To the extent that print-outs or images of all or part of a spreadsheet were also maintained in the ordinary course of business in static form (*e.g.*, as a pdf attachment), those documents should be produced as images to the extent such production is not duplicative.

5.    <u>Production of Database Information</u>. Relevant information from a database should be produced as a report or data table, either in a static image format or in a popular database application, such as an Microsoft Access database.

6.    <u>Production of ESI Commentary and Tracked Changes</u>. Microsoft Word, Microsoft Excel, and similar file formats that provide for comments or tracked changes should be produced in a manner in which all comments and tracked changes are preserved, accessible, and viewable in their original color format. Such production may be in native format.

7.    <u>Production of Paper Documents</u>. Scanned paper document production must have natural, logical document breaks and should include, where available, copies of file folders, envelopes, or labels or other identifying marks on the containers in which the documents were maintained. All scanned paper documents should be produced with OCR text in a corresponding TXT file.

8.    <u>Image Production Format</u>. Searchable images should be produced as separate documents in either single-page Group IV TIFF format or multi-page PDF format, at least 300 DPI resolution, with corresponding TXT files. Imaged ESI should maintain all color properties, and scanned paper images should provide color when content of the document contains more than one color.

9.    <u>Document Production Numbering</u>. Each page of all images produced (whether hard-copy documents or ESI) must be clearly labeled with an indelible, legible, unique Bates number identifier electronically "burned" onto the image. Reasonable steps shall be taken to place the Bates number or confidentiality designation at a location that does not obscure any content from the source document. There shall be no other branding placed on the document image, except to identify redactions due to privilege. To the extent possible, documents and ESI shall be Bates numbered consecutively, maintaining all parent/child relationships as well as the order of the parent emails and corresponding attachments.

3

Exhibit 3

10.   <u>Load Files and Metadata</u>. All native format and searchable image format
      production must include one or more CSV or Summation load files that associate
      each document and its Bates number with its corresponding TXT file, and that
      include the following original and processed metadata fields:

For all imaged documents (ESI and scanned):

> BegDoc
> EndDoc
> ParentID
> AttachmentIDs
> BegAttach
> EndAttach

For all ESI (native and imaged):

> FileName
> Extension
> Author
> DateCreated
> TimeCreated
> DateLastMod
> TimeLastMod
> MD5Hash
> Custodian
> DupCustodians

For all email:

> MailTo
> MailFrom
> CC
> BCC
> Subject
> DateAndTimeSent
> DateAndTimeReceived
> TimeZone
> IntMsgID
> Conversation
> ConversationIndex
> ParentID
> AttachmentIDs
> BegAttach
> EndAttach

4

Exhibit 3

If production in the requested form is not reasonably available or practical, office personnel at the undersigned law firm are available to discuss compatible alternatives.

11. <u>Production Load Files</u>. Two Load/Unitization files shall accompany all productions. All productions containing images must include an image load file that is in .LOG or .OPT format. For any productions containing native files, the metadata .DAT file should contain a NATIVELINK field that contains the path/link to each native file generated during production. The native files should be named with their corresponding bates numbers. All productions should include a metadata load file (.DAT file) containing all agreed upon metadata production fields and the delimiters should be standard Concordance delimiters:

    a.    Column Delimiter        (020)
    b.    Field Delimiter:  þ    (254)
    c.    New Line Delimiter:  ®    (174)
    d.    Multi-Entry Delimiter: ;    (059)

The following ASCII delimiters are also acceptable:

    e.    Column Delimiter:    ^    (094)
    f.    Field Delimiter:  |    (124)
    g.    New Line Delimiter:  ~    (126)
    h.    Multi-Entry Delimiter: ;    (059)

The first line of the .DAT file must contain the field names to each corresponding metadata field. The name of the data load file should mirror the name of the delivery volume and the volume names should be consecutive. If foreign language/Unicode text exists, the .DAT file shall contain the appropriate encoding to enable preservation of the document's original language.

12. <u>Searchable Files.</u>  (.TXT). Document level, searchable text files shall be provided for all production documents and be maintained in separate TEXT directories. All text files should be named with their corresponding bates numbers. The metadata .DAT file should contain a TEXTPATH field that contains the path/link to each corresponding text file generated during production. If foreign language/Unicode text exists, the .TXT files shall contain the appropriate encoding to enable preservation of the document's original language.

13. <u>Privileged Documents.</u>  If any responsive document is withheld under any claim of privilege, provide a detailed privilege log that contains at least the following information for each document that you have withheld:

    a.    the name of each author, writer, sender, creator, or initiator of such document;
    b.    the name of each recipient, addressee, or party for whom such document was intended;

Exhibit 3

      c.     the date of such document, or an estimate thereof if no date appears on the
document;

      d.     the general subject matter of the document; and

      e.     the claimed grounds for withholding the document, including—but not
limited to—the nature of any claimed privilege and grounds in support.

14.    <u>Duty to Preserve Documents.</u>  All documents and/or other data which relate to the
subject matter or requests of this subpoena must be preserved. Any destruction
involving such documents must cease, even if it is your normal or routine course of
business to delete or destroy such documents or data and even if you believe such
documents or data are privileged or otherwise need not be produced.

15.    <u>Duty to Supplement.</u>  All document requests are continuing in nature so as to require
the supplementary production if you obtain further responsive documents or
information. You are also required to amend your responses to the requests
contained within this subpoena if you discover that the previous response was
incorrect or incomplete.

16.    <u>Certification.</u>  The person to whom the Subpoena is directed or, if it is directed to an
entity, any person having knowledge of the facts and circumstances relating to the
production, must certify that the response to this Subpoena is true and complete, and
that all documents produced were records of regularly conducted business activity.
This certification must be made on the form declaration included with this
Subpoena.

17.    <u>Notice of Rights.</u>  Any person to whom a subpoena has been issued under the
Consumer Protection Procedures Act, D.C. Code § 28-3901, *et seq.* may exercise
the privileges enjoyed by all witnesses, including moving to quash or modify the
subpoena in the Superior Court of the District of Columbia on grounds including:
(1) the Attorney General failed to follow or satisfy the procedures set forth in this
section for the issuance of a subpoena; or (2) any grounds that exist under statute or
common law for quashing or modifying a subpoena. In the case of refusal to obey a
subpoena issued under this section, the Attorney General may petition the Superior
Court of the District of Columbia for an order requiring compliance. Any failure to
obey the order of the court may be treated by the court as contempt.

## DEFINITIONS

A.    "All" shall be construed to include the collective as well as the singular and shall mean
"each," "any," and "every."

B.    "Any" shall be construed to mean "any and all."

C.    "Benefits Consultant" shall mean any organization providing advisory services pertaining
to the pharmacy benefit of a health insurance product or the administration of such a
benefit.

Exhibit 3

D.    "Communications" shall mean and refer to any exchange of information by any means of
transmissions, sending or receipt of information of any kind by or through any means
including, but not limited to, verbal expression, gesture, writings, documents, language
(machine, foreign, or otherwise) of any kind, computer electronics, email, SMS, MMS or
other "text" messages, messages on "social networking" sites (including, but not limited
to, Facebook, Google+, MySpace and Twitter), shared applications from cell phones,
"smartphones," netbooks and laptops, sound, radio, or video signals, telecommunication,
telephone, teletype, facsimile, telegram, microfilm or by any other means. It also
includes, without limitation, all originals and copies of inquiries, discussions,
conversations, correspondence, negotiations, agreements, understandings, meetings,
notices, requests, responses, demands, complaints, press, publicity or trade releases and
the like that are provided by you or to you by others.

E.    "Document(s)" shall mean any writing or any other tangible thing, whether printed,
recorded (in audio, video, electronically or by any other means), reproduced by any
process, or written or produced by hand, including, but not limited to, letters,
memoranda, notes, opinions, books, reports, studies, agreements, statements,
communications (including inter-company and intra-company communications),
correspondence, telegrams, email, instant messages, chat logs, SMS, MMS or other
"text" messages, posted information, messages, chat logs on "social networking" sites
(including, but not limited to, Facebook, Google+, MySpace and Twitter), logs,
bookkeeping entries, summaries or records of personal conversations, diaries, calendars,
telephone messages and logs, forecasts, photographs, images, tape recordings, models,
statistical statements, graphs, laboratory and engineering reports, notebooks, charts,
plans, drawings, minutes, bylaws, resolutions, records of conferences, expressions or
statements of policy, lists of persons attending meetings or conferences, lists of clients or
customers or suppliers, reports or summaries of interviews, opinions or reports of
negotiations, brochures, pamphlets, advertisements, circulars, trade letters, press releases,
drafts of any document and revisions of drafts of any document, and any other similar
paper or record. The terms also include a copy of a document where the copy is not
exactly the same as the original. The terms also include emails and other documents
made or stored in electronic form, whether kept on computers, computer tapes, disks or
drives, including Cloud storage, of any type, or other media upon which information may
be recorded.

F.    "Identify" means:

1.    When used in connection with a person, provide that person's name, current
residential address and telephone number, job title, and current business address
and telephone number.  (If current information is not available, provide last-
known address and telephone number.)

2.    When used in connection with a Document, provide the nature of the Document,
its title, physical description, date, author, its current location, and identification
of the current custodian.

7

Exhibit 3

3.    When used in connection with an oral communication, provide the nature of that communication, the parties to it, the date, place and substance of that communication, and the identification of any document concerning it.

G.    "Including" is used merely to emphasize that a request for certain types of documents or information should not be construed as limiting the request in any way.

H.    "Manufacturer(s)" shall mean a manufacturer of prescription drugs.

I.    "Payer(s)" shall mean any organization that pays or insures health or medical expenses on behalf of beneficiaries or recipients including an employer (self-insured), a third-party administrator or administrative-services only health insurer (for themselves or on behalf of their clients), or a health insurance company.

J.    "Payment(s)" shall mean any transfer of money, goods, or services You received directly or indirectly from any Manufacturer. It includes, but is not limited to, statutory rebate payments, supplemental rebate payments, other rebate payments, research and development, administrative fees, distribution fees, service fees (rebate or non-rebate related), procurement fees, data access fees, chargeback fees, promotional payments, cash product discounts, sales volume related payments of any type not described above, and non-sales volume related payments of any type not described above.

K.    "Pharmacy benefit manager(s)" or "PBM(s)" shall mean any organization that administers prescription drug benefits on behalf of a Payer.

L.    "Relating to" shall mean directly or indirectly mentioning or describing, concerning, referring to, regarding, evidencing, setting forth, identifying, memorializing, created in connection with or as a result of, commenting on, embodying, evaluating, analyzing, tracking, reflecting or constituting, in whole or in part, a stated subject matter.

M.    "You" or "Your" refers to the person(s) or business entity(s) to whom this Subpoena is directed as reflected on the first page. With respect to corporations or other business entities, these terms also shall be deemed to include all owners, officers, agents and employees thereof, and any predecessor, successor, parent, subsidiary, division, d/b/a and affiliated companies or other entities.

## RELEVANT TIME PERIOD

The relevant time period, unless otherwise indicated in a specific request, is from January 1, 2010 to the present. The time limits should not be construed as date limits; for example, if a policy or document in effect during the relevant time period was created before the relevant time period, then documents dating back to the starting date of the policy must be produced.

8

Exhibit 3

## REQUESTS FOR DOCUMENTS AND INFORMATION

These requests are limited to documents and information relating to the District of Columbia, including, but not limited to, documents and information that may be national or regional in scope that apply to the District of Columbia.

1. Produce all Documents sufficient to Identify the ten Manufacturers from which You have directly or indirectly received the largest Payments (as determined by the total dollar amount of Payments) per year from 2010-2020. Per the definitions listed above, the term Payments includes, but is not limited to, statutory rebate payments, supplemental rebate payments, other rebate payments, research and development, administrative fees, distribution fees, service fees (rebate or non-rebate related), procurement fees, data access fees, chargeback fees, promotional payments, cash product discounts, sales volume related payments of any type not described above, and non-sales volume related payments of any type not described above. Include the following in Your response:

   a. The name of the Manufacturer making Payments; and
   b. The total amount per year of the Payments.

   *In lieu of providing actual documents, You may provide a narrative response containing the requested information.*

2. Produce all Documents sufficient to Identify the Payments made by each Manufacturer identified in response to Request 1 per year from 2010-2020. Aggregate payments of the same type per year. For example, all administrative fees for 2010 can be combined as one Payment. Include the following for each Payment in Your response:

   a. A description of the Payment (*e.g.*, statutory rebate payments, supplemental rebate payments, other rebate payments, research and development, administrative fees, distribution fees, service fees (rebate or non-rebate related), procurement fees, data access fees, chargeback fees, promotional payments, cash product discounts, sales volume related payments of any type not described above, and non-sales volume related payments of any type not described above);
   b. The amount of each Payment;
   c. A description of any service You performed relating to the Payment;
   d. A description of any product or information You sold relating to the Payment;
   e. The name of the Payer or any other entity or individual with whom You shared any portion of the Payment;
   f. The amount of the Payment You shared with a Payer or any other entity or individual; and
   g. The amount of the Payment You retained.

   *In lieu of providing actual documents, You may provide a narrative response containing the requested information.*

9

Exhibit 3

3.  Produce all Documents reflecting or related to the negotiation of the Payments identified in Your response to Request 2.

4.  Produce all Communications with Manufacturers related to formulary coverage for any prescription drug for which You received Payments.

5.  Produce all financial and medical analyses related to the inclusion or exclusion of prescription drugs for which You received Payments.

6.  Produce all Documents sufficient to Identify the gross amount You paid to the Manufacturers identified in response to Request 1 per year from 2010-2020 for prescription drugs.

    *In lieu of providing actual documents, You may provide a narrative response containing the requested information.*

7.  Produce all Documents sufficient to Identify all direct or indirect Payments (*e.g.*, product based, volume based, or other Payments) You made to any Benefits Consultant working on behalf of a Payer, including:

    a.  The name of the Benefits Consultant;
    b.  The name of the Payer for whom the Benefits Consultant worked;
    c.  The date of the Payment;
    d.  The amount of the Payment; and
    e.  A description of the Payment (*e.g.*, product based, volume based, or other Payments).

    *In lieu of providing actual documents, You may provide a narrative response containing the requested information.*

8.  Produce all Documents reflecting or related to direct or indirect Payments for Humira and every insulin product (including branded and authorized generics).

9.  Produce all Documents sufficient to Identify all direct or indirect Payments You received relating to Humira and every insulin product (including branded and authorized generics). Include in Your response, for each Payment:

    a.  The date of the Payment;
    b.  The time period which the Payment relates to;
    c.  The name of the Manufacturer making the Payment;
    d.  The amount of the Payment;
    e.  A description the Payment (*e.g.*, statutory rebate payments, supplemental rebate payments, other rebate payments, research and development, administrative fees, distribution fees, service fees (rebate or non-rebate related), procurement fees, data access fees, chargeback fees, promotional payments, cash product discounts,

10

Exhibit 3

sales volume related payments of any type not described above, and non-sales volume related payments of any type not described above);

    f.    The name of the prescription drug relating to the Payment;

    g.    The list price for the prescription drug relating to the Payment;

    h.    The gross amount You paid for the prescription drug;

    i.    The number of units of the prescription drug You purchased relating to the Payment;

    j.    A description of any service You performed relating to the Payment;

    k.    The name of the Payer or any other entity or individual with whom You shared any portion of the Payment;

    l.    The amount of the Payment You shared with a Payer or any other entity or individual; and

    m.    The amount of the Payment You retained.

    n.    Beneficiary cost sharing requirement (fixed copayment, coinsurance)

    o.    Amount paid by the beneficiary

    p.    Total Amount paid to the pharmacy (including dispensing fee)

    q.    Post-purchase price adjustment of the prescription drug sale price

    r.    Other price agreements or guarantees related to the prescription drug.

*In lieu of providing actual documents, You may provide a narrative response containing the requested information.*

10.    Produce all agreements and Documents reflecting or related to agreements with Manufacturers or any entity or individual affiliated with any Manufacturer related to Payments.

11.    Produce all Documents sufficient to Identify all departments and individuals involved in negotiations or agreement with Manufactures related to the purchase, coverage, promotion or sale of prescription drugs, including, but not limited to, the following:

    a.    the name of each department or individual;

    b.    the date each department was formed and (if applicable) dissolved;

    c.    the title(s) each individual has or had;

    d.    the name of the department(s) for which each individual works or worked

    e.    the relevant duties and responsibilities each individual has or had;

    f.    the dates of employment for each individual; and

    g.    the last known contact information for each individual who no longer works for You.

*In lieu of providing actual documents, You may provide a narrative response containing the requested information.*

12.    Produce all Documents reflecting or related to Communications relating to negotiations or agreements relating to Payments, including the target level of Payments or the impact of Payment levels on your Profits, or the value of any Payments to Your revenue or profits.

11

Exhibit 3

13.    Produce the personnel files for each individual identified in Your response to Request 11 including, but not limited to, any performance evaluations and disciplinary actions.

14.    Produce all Documents reflecting or related to Your projections or analyses relating to: (a) the value of Payments; (b) whether and how Payments are passed on to consumers (c) how Payments impact Your profitability; (d) how Payments impact Your bargaining power in negotiations with Manufacturers and/or Payers; (e) the impact or practice of classifying Payments in certain ways (*e.g.*, classifying a Payment as a rebate rather than a fee or vice-versa); and/or (f) the relationship between Payments and list prices.

15.    Produce all Documents reflecting or related to the results of any audit (including both internal and third-party audits) relating to Your practices involving Payments, including, but not limited to, Your classification of any fees or rebates.

16.    Produce all Documents You relied upon when testifying before Congress about the pricing of prescription drugs.

17.    Produce all Documents relating to legislation or proposed legislation that could impact the Payments You receive, including, but not limited to, the proposed elimination of the safe harbor provision in 42 CFR 1001.952(h).

18.    Produce all Documents relating to any research or study You commissioned that examines Payments made to pharmacy benefit managers from Manufacturers.

19.    Produce all Documents reflecting or relating to any complaints or concerns You received relating to Your practices involving Payments, including, but not limited to, any complaints You received from Manufacturers, Payers, whistleblowers, and consumers.

20.    Produce all Documents sufficient to Identify all lawsuits filed against You relating to Your practices involving Payments, including, but not limited to, any lawsuits that allege You overcharged Payers and/or consumers for prescription drugs and/or that there is a relationship between the Payments You receive and the increase in list price of prescription drugs.

       *In lieu of providing actual documents, You may provide a narrative response containing the requested information.*

21.    Produce all Documents produced in any government investigation or any litigation relating to Your practices involving Payments.

22.    Produce all settlement agreements or judgments relating to Your practices involving Payments.

Exhibit 3

Dated: December 28, 2020                    KARL A. RACINE
                                            Attorney General for the District of Columbia


                          Issued:     _Jimmy Rock_____
                                      JIMMY ROCK
                                      Assistant Deputy Attorney General
                                      Public Advocacy Division

                                      BENJAMIN M. WISEMAN
                                      Director, Office of Consumer Protection
                                      Public Advocacy Division

                                      WENDY J. WEINBERG
                                      Assistant Attorney General
                                      Office of Consumer Protection
                                      Public Advocacy Division
                                      Office of the Attorney General
                                      400 Sixth Street, N.W., 10th Floor
                                      Washington, D.C. 20001
                                      (202) 724-1342 | wendy.weinberg@dc.gov


13

Exhibit 3

## FORM OF CERTIFICATE OF COMPLIANCE

I/We have knowledge of the facts and circumstances relating to the production of the information and documents required by the Subpoena to OptumRx, Inc. I/We do hereby certify that all information and documents required by the Subpoena that are in the possession, custody, or control of OptumRx, Inc. have been submitted to the designated representative named therein or to the District of Columbia Office of Attorney General.

If any information or documentary material otherwise responsive to this Subpoena has been withheld on the basis of objection or privilege, these objections or claims of privilege have been stated in lieu of production.

Signature: _____

Title: _____

SWORN TO before me this _____ day of _____ 2021.

_____
NOTARY PUBLIC

14

Exhibit 3

# Exhibit 4

## **CONFIDENTIALITY AGREEMENT**

IT IS HEREBY AGREED BY AND BETWEEN the Office of the Attorney General for the District of Columbia ("OAG"), and OptumRx, Inc. ("OptumRx" or "the Company"), through their respective counsel, that:

1.     This Confidentiality Agreement is being entered into in connection with an investigation being conducted by the OAG and OAG outside counsel ("Investigation"), and the production of any documents or information by OptumRx in response to a subpoena issued by OAG dated December 28, 2020 in connection with the Investigation (the "Subpoena"). Neither OptumRx nor OAG waives any objections it has to the Subpoena or the response to the Subpoena by entering into this Confidentiality Agreement. This Agreement shall be binding upon OAG and OptumRx ("parties," referred to singularly as a "Party"), undersigned OAG outside counsel and OptumRx outside counsel, and all persons and entities signing a copy of the Addendum Regarding Undertaking of Confidentiality attached at Exhibit A ("Addendum").

2.     "Confidential Information" means any documentary and/or tangible information of any type, kind or character that contains (a) information of a personal nature where the public disclosure thereof would constitute a clearly unwarranted invasion of personal privacy; or (b) trade secret or commercial or financial information, to the extent disclosure would result in substantial harm to the competitive position of the Company. To designate a document or information as "Confidential Information," OptumRx shall stamp or place the word "Confidential" on the document or item of information produced to OAG. All copies, whether digital or hard copy, of any "Confidential Information" produced or made available for inspection and copying shall be subject to the terms of this Agreement. Any interview, deposition or testimony of OptumRx in connection with the Investigation shall presumptively be treated as Confidential Information and subject to this Agreement for a period of 15 days after a transcript is received by counsel for the parties. At or before the end of such 15-day period, by written notification to undersigned counsel, OptumRx may designate any portion(s) of the interview, deposition, or testimony as "Confidential Information." If OptumRx fails to designate any portion of the interview, deposition, or testimony

Exhibit 4

as "Confidential Information," after the expiration of the 15-day period, that portion(s) shall be treated as non-confidential.    In designating documents or information as "Confidential Information," OptumRx will make such designation only as to those documents and information that it in good faith believes contain Confidential Information.  The OAG, OAG outside counsel, and all persons and entities signing a copy of the Addendum agree to use Confidential Information solely in connection with the Investigation and any litigation that may arise therefrom, not to use Confidential Information in connection with any other matter, and not to disclose any Confidential Information to any party or the public, except as provided by this Agreement provided that the OAG agree with the designation.  OAG outside counsel further agrees not to rely on Confidential Material in pursuing information or claims in any other matters outside of its representation of the OAG.

3.      This Agreement shall not preclude any Party from bringing before a court of competent jurisdiction, at any time, the question of whether any particular information is properly designated as "Confidential Information."  In its request for relief from the Court, the Party disputing the designation of any information shall identify the information that it believes is not properly designated.  The Party asserting the proprietary of any designation has the burden to defend the designation.   Prior to bringing any motion, the Parties shall meet and confer in good faith to attempt to resolve the dispute.  If the dispute cannot be resolved, the Parties shall treat the information consistent with its designation until a ruling by the court.  In the event litigation stems from this Investigation, the Parties will meet and confer at the appropriate time regarding a protective order that will supersede this Agreement.  In the event the Parties cannot agree on a protective order, it shall be OptumRx's duty to seek a protective order.

4.      In addition to any applicable protections provided to such materials under D.C. Code § 2-534(a) or other applicable law, OAG and undersigned OAG outside counsel may disclose Confidential Information only as follows:

(a)    to employees, interns, and staff of the OAG;

(b)    to agents, consultants, or experts of the OAG, who are

Exhibit 4

bound by this agreement and who agree to be bound by the terms of this agreement by signing the Addendum;

(c)  other law enforcement agencies provided they agree in writing to be bound and comply with this agreement;

(d)    to any witness in the investigation (not to include disclosures to expert witnesses of the OAG, which are covered under Section 4(b)), during an interview by the OAG or during transcribed or otherwise recorded proceedings conducted by the OAG, as long as the OAG reasonably believes that disclosure is necessary to further the investigation;

(e)    to any person identified as having received, or who is otherwise known to have received, the document or information;

(f)    if the Company first gives written consent to such disclosure;

(g)    any person who, at the time of the disclosures, is either employed by OptumRx or retained by OptumRx in connection with this investigation;

(h)    if the information was obtained independently of the Company even if such information was also produced by the Company, unless that information was obtained from a source known by OAG and/or OAG outside counsel to be bound by a confidentiality obligation to the Company.

Exhibit 4

(i)   Motley Rice LLC attorneys (other than undersigned OAG outside counsel), paralegals, contractors, staff, or experts working on behalf of OAG in connection with the Investigation who agree to be bound by the terms of this Agreement by signing the Addendum.

5.      With respect to the disclosures authorized by paragraph 4(d) or 4(e), the OAG shall not permit the person or the person's counsel to retain a copy of the Confidential Information unless the OAG reasonably believes that retention is necessary to further the investigation and the person has signed the Addendum.

6.      With respect to the disclosures authorized by paragraph 4(i), the OAG and OAG outside counsel shall not share, disclose, or discuss Confidential Information with any Motley Rice LLC attorney, paralegal, contractor, or staff who is not a member of the firm's Public Client practice group, and shall limit access to Confidential Information to members of that practice group.  The OAG and OAG outside counsel are agreeing to this term solely for purposes of the investigation stage and are not consenting to or agreeing to waive any right to object to this or any similar term in any stipulated protective order following litigation.

7.      Any document or information that may contain Confidential Information that has been inadvertently produced without being designated as Confidential Information shall not be a waiver, in whole or in part, of a claim of confidentiality as to any such document or information. OptumRx may designate the inadvertently produced document or information as "Confidential Information" by written notice to OAG within a reasonable time following discovery of the inadvertent production.  Unless the OAG challenges the designation pursuant to paragraph 3, the OAG shall confirm the designation of the Confidential Information within ten (10) days of receipt of notice from OptumRx, and shall make reasonable efforts to retrieve such improperly designated documents from persons not entitled to receive them.

Exhibit 4

8.     The OAG and/or OAG outside counsel shall not attach documents or information designated as "Confidential Information" to any filing with a court or administrative tribunal ("OAG filing") unless OAG and/or OAG outside counsel complies with one of the following provisions:

(i)     resolves any dispute with OptumRx regarding designation of such documents or information as "Confidential Information;"

(ii)     files the documents or information designated "Confidential Information" with a court or administrative tribunal conditionally under seal; following the OAG filing, the confidentiality or non-confidentiality of documents or information will be determined by the terms of a protective order entered in the case either by stipulation or order, or by the absence of any such order (i.e. if OptumRx takes no action to seek a protective order within ten (10) days of the OAG filing, the documents or information attached to the OAG filing will be deemed non-confidential); or

(iii)     notifies OptumRx at least ten (10) days in advance that OAG or OAG outside counsel intends to attach materials designated "Confidential Information" in the OAG filing, provided that OAG or OAG outside counsel shall not attach such documents or information designated "Confidential Information" until either:

(a)     the court or administrative tribunal rules on OptumRx's request for a protective order or in camera treatment in favor of disclosure of the documents or information designated Confidential Information; or

(b)     OptumRx has not sought such order within

Exhibit 4

the ten (10) day period of time which OAG or OAG outside
counsel provided to OptumRx for it to seek such order.

9.      In the event that the OAG receives a written request from a person or entity for
Confidential Information under District of Columbia Freedom of Information Act, D.C. Code §§
2-531 through 2-540, and the OAG determines in good faith that disclosure of Confidential
Information is required, the OAG  will provide 10 business days advance notice before any
production in response to such a request so that the Company is afforded an opportunity to obtain
a court order prohibiting or limiting such disclosure and/or requiring the recipient(s) of such
Confidential Information to take steps to maintain the confidentiality thereof.  During the pendency
of this Investigation the OAG agrees that it will, pursuant to § 2-534(a) of the Freedom of
Information Act, deny public inspection of the records the Company produces in response to the
Subpoena.  Both during and after the pendency of the investigation, the OAG will also deny
inspection of any Confidential Information to the extent authorized by the District of Columbia's
Freedom of Information Act. To the extent the OAG disagrees with the designation of documents
or information as Confidential Information and determines in good faith that it must be disclosed
under the District of Columbia Freedom of Information Act, OAG will provide the Company with
at least 10 business days advance notice of the production.

10.     If any person or entity possessing designated Confidential Information is
subpoenaed in another civil action or civil proceeding or served with a document demand or other
civil legal process that requests production of designated Confidential Information ("civil
process"), and the OAG determines in good faith that the Confidential Information must be
disclosed , the OAG  shall, to the extent permitted by law, court rule, and court order, inform
OptumRx within 15 days of receiving notice of the civil process.  Any notice to OptumRx shall be
made to: John Kokkinen, Senior Associate General Counsel – Optum Litigation, via electronic
mail at john.kokkinen@optum.com, and to Michelle Kisloff, Hogan Lovells, via electronic mail
at michelle.kisloff@hoganlovells.com.

Exhibit 4

11.    If documents or information subject to a claim of attorney-client privilege or work product immunity or any other privilege or immunity are inadvertently produced, such production shall in no way prejudice or otherwise constitute a waiver of, or estoppel as to, any claim of privilege or work-product immunity for such documents or information as provided under applicable law, including Federal Rule of Evidence 502, DC Superior Court Civil Rule 25(b)(5)(C), or any other District of Columbia or State counterpart or similar rule.  If OptumRx has inadvertently produced documents or information subject to a claim of immunity or privilege, the Parties shall follow the so-called "clawback" provisions of Federal Rule of Civil Procedure 26(b)(5)(B), DC Superior Court Civil Rule 26(b)(5)(B),  or any other District of Columbia or State counterpart or similar rule.

12.    At the conclusion of the Investigation, or the final conclusion of all litigation in connection with the Investigation, if any is initiated, upon written request, all documents produced by the Company, including all Confidential Information, shall be promptly returned to the Company or destroyed.  The OAG shall not be required to return or destroy copies of documents marked as "Confidential" that are not readily accessible, such as copies on computer system backup tapes or in email archives. In addition, upon written request, OAG shall notify persons pursuant to paragraphs 4(b), (c), (d), (e), (f), or (i) of the Company's request under this subsection. At the Company's request, OAG shall confirm that it has complied with its obligation under this subsection.

13. Nothing contained in this Agreement shall alter or limit the obligations of the OAG under District of Columbia law, including the District of Columbia's Freedom of Information Act, D.C. Code to §§ 2-531 *et seq.* Nothing in this Agreement shall be construed to waive applicable protections under D.C. Code § 2-534(a) for any materials produced in response to the Subpoena, regardless of whether such materials are designated "Confidential Information."

14. This Agreement shall apply to all documents and information produced pursuant to this Investigation, including any amendments to the Subpoena.

Dated: 7/1/2021

Exhibit 4

OptumRx

By:

Attorneys for the Company

Counsel for OptumRx

By:

Michelle Kisloff
Hogan Lovells US LLP

Office of the Attorney General for the
District of Columbia

/s/ Benjamin Wiseman
Benjamin Wiseman, Director
Office of Consumer Protection
Public Advocacy Division

Counsel for the Attorney General for the
District of Columbia

By:

/s/ Linda Singer
Linda Singer
Motley Rice LLC

/s/ Paige Boggs
Paige Boggs
Motley Rice LLC

Exhibit 4

OptumRx

By:

_____

Attorneys for the Company


Counsel for OptumRx

By:

_____

Michelle Kisloff
Hogan Lovells US LLP


Office of the Attorney General for the District of Columbia

_____

Benjamin Wiseman, Director
Office of Consumer Protection
Public Advocacy Division


Counsel for the Attorney General for the District of Columbia

By:

_____

Linda Singer
Motley Rice LLC


_____

Paige Boggs
Motley Rice LLC


Exhibit 4

## ADDENDUM REGARDING
## UNDERTAKING OF CONFIDENTIALITY

By signing this acknowledgement, I certify that I have read the Confidentiality Agreement to which this acknowledgement is attached ("Agreement") in its entirety, I fully understand the obligations under the Agreement, and I hereby agree that _____ [insert name of person or entity] will be bound by its terms to the extent permitted by law.

DATE:_____

NAME: _____

SIGNATURE: _____

Exhibit 4

# Exhibit 5



Hogan Lovells US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004-1109
T  +1 202-637-5600
F  +1 202-637-5910
www.hoganlovells.com

July 13, 2021

**BY ELECTRONIC MAIL AND SECURE FILE TRANSFER**

Wendy J. Weinberg
Assistant Attorney General
Office of Consumer Protection
Public Advocacy Division
Office of the Attorney General
400 Sixth Street, NW, 10th Floor
Washington, DC 20001

Linda Singer
Paige Boggs
Motley Rice LLC
401 9th St. NW, Suite 1001
Washington, DC 20004

**Re:      Subpoena to OptumRx, Inc. Dated December 28, 2020**

Dear Wendy, Linda and Paige:

With this letter and accompanying document, which will be provided via a secure link, OptumRx, Inc. (hereinafter "Optum," or "the Company") makes its first production in response to the Subpoena dated December 28, 2020, as clarified by our various telephone calls (the "Subpoena").  For ease of reference,  this  production  has  been  Bates-numbered  OPTUM1220_0000001  – OPTUM1220_0000002.

This production includes information responsive to Request 1.  Per our telephone and email communications  on February 5 and February 26, 2021, the enclosed document provides, by year, for 2016-2020, the total rebates associated with prescriptions filled at pharmacies in the District of Columbia for the ten manufacturers from whom Optum has received the largest such rebates.

*          *          *

The enclosed document contains or constitutes confidential business information, records, and/or trade secrets of Optum and we have branded it "CONFIDENTIAL" and are producing it pursuant to our July 1, 2021 Confidentiality Agreement with the Office of the Attorney General for the District of Columbia.

Hogan Lovells US LLP is a limited liability partnership registered in the District of Columbia.  "Hogan Lovells" is an international legal practice that includes Hogan Lovells US LLP and Hogan Lovells International LLP, with offices in:  Alicante  Amsterdam  Baltimore  Beijing  Brussels  Caracas  Colorado Springs  Denver  Dubai  Dusseldorf  Frankfurt  Hamburg  Hanoi  Ho Chi Minh City  Hong Kong  Houston  Johannesburg  London  Los Angeles  Luxembourg  Madrid  Mexico City  Miami  Milan  Minneapolis  Monterrey  Moscow  Munich  New York  Northern Virginia  Paris  Perth  Philadelphia  Rio de Janeiro  Rome  San Francisco  São Paulo  Shanghai  Silicon Valley  Singapore  Sydney  Tokyo  Ulaanbaatar  Warsaw  Washington DC  Associated offices: Budapest  Jakarta  Shanghai FTZ  Zagreb.  Business Service Centers:  Johannesburg  Louisville.  Legal Service Center: Birmingham.  For more information see www.hoganlovells.com

Exhibit 5

July 13, 2021

The submission of the enclosed materials does not waive, nor is it intended to waive, any rights, privileges, or immunities of Optum with respect to this matter, including any applicable attorney-client privilege, protection provided under the work-product doctrine, or other privilege or immunity that may exist.  In the event of any inadvertent production of privileged materials, Optum requests that the government refrain from reviewing such materials and return the same promptly to Optum.  Moreover, to the extent that non-responsive documents, pages, or information have been produced inadvertently, Optum does not agree to any expansion of the scope of your request.  Optum expressly reserves any applicable privileges and immunities to which it is entitled under the law.

Please call me if you have any questions about any aspect of this letter or the enclosed document.


Sincerely,

/s/

Michelle A. Kisloff
Partner
Michelle.kisloff@hoganlovells.com
D 202-637-6631

cc:     Allison J. Caplis

2

Exhibit 5

# Exhibit 6

 CT Corporation

**Service of Process Transmittal**
10/19/2021
CT Log Number 540445785

TO:     Rebecca Thompson
        UnitedHealth Group Incorporated (111504190770700600)
        9900 Bren Rd E Ste 300W, MN008-T502
        Minnetonka, MN 55343-9693

RE:     **Process Served in Hawaii**

FOR:    OptumRx, Inc.  (Domestic State: CA)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | IN RE INVESTIGATION OF: OPTUMRX, INC. vs. OPTUMRX, INC. |
| **DOCUMENT(S) SERVED:** | -- |
| **COURT/AGENCY:** | None Specified<br>Case # 2021052 |
| **NATURE OF ACTION:** | Subpoena - Business records |
| **ON WHOM PROCESS WAS SERVED:** | The Corporation Company, Inc., Honolulu, HI |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 10/19/2021 at 15:16 |
| **JURISDICTION SERVED :** | Hawaii |
| **APPEARANCE OR ANSWER DUE:** | None Specified |
| **ATTORNEY(S) / SENDER(S):** | None Specified |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 10/20/2021, Expected Purge Date: 11/19/2021 |
| | Image SOP |
| | Email Notification,  Administrative Assistant  legalmail@uhg.com |
| **REGISTERED AGENT ADDRESS:** | The Corporation Company, Inc.<br>1136 Union Mall<br>Suite 301<br>Honolulu, HI 96813 |
| | 877-564-7529<br>MajorAccountTeam2@wolterskluwer.com |

The information contained in this Transmittal is provided by CT for quick reference only. It does not constitute a legal opinion, and should not otherwise be relied on, as to the nature of action, the amount of damages, the answer date, or any other information contained in the included documents. The recipient(s) of this form is responsible for reviewing and interpreting the included documents and taking appropriate action, including consulting with its legal and other advisors as necessary. CT disclaims all liability for the information contained in this form, including for any omissions or inaccuracies that may be contained therein.

Page 1 of  1 / NS

Exhibit 6



**PLEASE NOTE:**

**SERVICE TAKEN FOR:**

## OPTUMRX, INC.

Exhibit 6

Wolters Kluwer

# DEPARTMENT OF THE ATTORNEY GENERAL
## STATE OF HAWAIʻI

| | |
|---|---|
| **IN RE INVESTIGATION OF:** | **SUBPOENA DUCES TECUM** |
| | **AG Subpoena No. 2 0 2 1 - 0 5 2** |
| **OPTUMRX, INC.** | |

## SUBPOENA DUCES TECUM

TO:    OPTUMRX, INC.
        c/o The Corporation Company, Inc.
        1136 Union Mall, STE 301
        Honolulu, HI 96813

      **YOU ARE HEREBY COMMANDED,** pursuant to the laws of the State of Hawaiʻi, including Haw. Rev. Stat. §§ 28-2.5, 480-18, and 661-22, to deliver and turn over to the Department of the Attorney General, State of Hawaiʻi, all documents and information requested in Attachment A in accordance with the instructions and definitions contained therein within thirty (30) days after service of this Subpoena. You may deliver the documents and information to Hawaiʻi Special Deputy Attorney General Linda Singer, Motley Rice LLC, 401 9th Street NW, Suite 1001, Washington, DC 20004.

      **TAKE NOTICE** that the Attorney General deems the documents requested by this Subpoena to be relevant and material to an investigation and inquiry undertaken in the public interest.

      **TAKE FURTHER NOTICE that you are to continue and/or immediately implement a litigation hold** preserving all documents relating to the subject matter hereof, as set forth in Attachment A, but not limited to the specific documents demanded therein. (Additional subpoenas may follow.)

      **TAKE FURTHER NOTICE** that Your disobedience of this Subpoena, by failing to deliver the documents and information requested in the attached Schedule on the date, time, and place stated above or on any agreed upon adjourned date or time, may subject You to penalties and other lawful punishment.

      **YOU ARE HEREBY REQUESTED** not to disclose the existence of this Subpoena while this investigation is pending. Disclosure of this Subpoena may impede a confidential investigation being conducted by the Attorney General.

Exhibit 6

OBEDIENCE to this subpoena may be enforced by the Circuit Court of the First Circuit.

DATED:        Honolulu, Hawaii on the 15th day of October, 2021

[ X ]    If this box is checked, it may not be
         necessary to appear in person. To make
         other arrangements, please call

                              for _____
                                        ATTORNEY GENERAL
                                        STATE OF HAWAII

Contact Person: Deputy Attorney General David D. Day
Telephone Number: (808) 586-1346

2

Exhibit 6

RETURN OF SERVICE

Received this subpoena at _____ on _____ and

on _____ at _____ ,

I served it on the within named by delivering a copy_____ .

Dated _____

_____
Signature of Serving Officer

**RECIPIENT'S RIGHTS**

You have been served with an investigative subpoena issued by the Attorney
General of the State of Hawaii in accordance with section 28-2.5, Hawaii Revised Statutes,
to appear at the time and place specified, to give sworn testimony, and, if indicated, to
bring certain materials with you. Attendance is required only in the county in which the
subpoena is served or such other place as may be agreed upon by you and the issuing
authority. If the subpoena is served in a county other than that in which you reside, are
employed or transact business, the Department of the Attorney General shall bear the
expense of travel as provided by the rules of the court.

If you disobey this subpoena, the Attorney General may apply to the circuit court in
the county in which you reside or are located to compel obedience. Prior to the date on
which you are commanded to appear, you may move the circuit court to quash or modify
the subpoena if compliance would be unreasonable or oppressive or violate any privilege
you may be entitled to exercise in a court proceeding.

3

Exhibit 6

## ATTACHMENT "A"

## INSTRUCTIONS

A.    In each instance in which a document is produced in response to a Request, the current version should be produced together with all earlier versions, or predecessor documents serving the same function during the relevant time period, even though the title of earlier documents may differ from current versions, as well as the time period that each version was used by You.

B.    The Subpoena Duces Tecum calls for all described documents in your possession, custody or control without regard to the person or persons by whom or for whom the documents were prepared (*e.g.*, your company employees, contractors, vendors, distributors, service providers, competitors, or others).

C.    These Requests specifically include production of electronically stored information ("ESI").

    1.    <u>General Instructions</u>. A cover letter will accompany each production, identifying each piece of media (hard drive, thumb drive, DVD, CD, or FTP), the production date, production volume, and the Bates range of the production. Data will be produced on hard drive, thumb drive, DVD, CD, or FTP. Label all media with the following:

        a.    Case number
        b.    Production date
        c.    Production volume
        d.    Bates range
        e.    Media volume number (1 of X, 2 of X, etc.), if applicable.

    2.    <u>Production Format for Electronically Stored Information</u>. Production of all ESI is requested in either original native file format or as searchable image files, using production numbering as described below. Before being produced, all parent-level email and loose-file (non-email) ESI should be de-duplicated across all custodians and shared network drives based on MD5 hash value. Individual email attachments should not be separately de-duplicated. All ESI should be produced with a metadata field listing all custodians where duplicate documents were found. For ESI production in image format, if any documents cannot be reasonably be converted to readable images, the information should be produced in native format or some other reasonably usable format, and image production should include a placeholder image for each such unconverted or unreadable document setting forth the original filename and extension.

    3.    <u>Production of Email</u>. If produced in native format, email should be produced as individual, parent level, HTML files, and attachments to emails should

4

Exhibit 6

sequentially follow their parent emails and be produced in native format as separate files. If produced in searchable image format, parent emails and their attachments should be produced as separate, contiguous documents.

4.    Production of Spreadsheets. Spreadsheets should be produced in native format if stored in that manner, and each native file should be named with a document production number as described below. If a spreadsheet contains privileged information, you may produce it as imaged ESI, with the privileged information redacted, provided that You make reasonable efforts in applying page layout settings to maximize document readability. Images of spreadsheets that contain multiple worksheets should be produced with worksheet names indicated in a header or footer. To the extent that print-outs or images of all or part of a spreadsheet were also maintained in the ordinary course of business in static form (*e.g.*, as a pdf attachment), those documents should be produced as images to the extent such production is not duplicative.

5.    Production of Database Information. Relevant information from a database should be produced as a report or data table, either in a static image format or in a popular database application, such as an Microsoft Access database.

6.    Production of ESI Commentary and Tracked Changes. Microsoft Word, Microsoft Excel, and similar file formats that provide for comments or tracked changes should be produced in a manner in which all comments and tracked changes are preserved, accessible, and viewable in their original color format. Such production may be in native format.

7.    Production of Paper Documents. Scanned paper document production must have natural, logical document breaks and should include, where available, copies of file folders, envelopes, or labels or other identifying marks on the containers in which the documents were maintained. All scanned paper documents should be produced with OCR text in a corresponding TXT file.

8.    Image Production Format. Searchable images should be produced as separate documents in either single-page Group IV TIFF format or multi-page PDF format, at least 300 DPI resolution, with corresponding TXT files. Imaged ESI should maintain all color properties, and scanned paper images should provide color when content of the document contains more than one color.

9.    Document Production Numbering. Each page of all images produced (whether hard-copy documents or ESI) must be clearly labeled with an indelible, legible, unique Bates number identifier electronically "burned" onto the image. Reasonable steps shall be taken to place the Bates number or confidentiality designation at a location that does not obscure any content from the source document. There shall be no other branding placed on the document image, except to identify redactions due to privilege. To the extent possible, documents

5

Exhibit 6

and ESI shall be Bates numbered consecutively, maintaining all parent/child relationships as well as the order of the parent emails and corresponding attachments.

10.  Load Files and Metadata. All native format and searchable image format production must include one or more CSV or Summation load files that associate each document and its Bates number with its corresponding TXT file, and that include the following original and processed metadata fields:

For all imaged documents (ESI and scanned):

> BegDoc
> EndDoc
> ParentID
> AttachmentIDs
> BegAttach
> EndAttach

For all ESI (native and imaged):

> FileName
> Extension
> Author
> DateCreated
> TimeCreated
> DateLastMod
> TimeLastMod
> MD5Hash
> Custodian
> DupCustodians

For all email:

> MailTo
> MailFrom
> CC
> BCC
> Subject
> DateAndTimeSent
> DateAndTimeReceived
> TimeZone
> IntMsgID
> Conversation
> ConversationIndex
> ParentID

6

Exhibit 6

> AttachmentIDs
> BegAttach
> EndAttach

If production in the requested form is not reasonably available or practical, office personnel at the undersigned law firm are available to discuss compatible alternatives.

11.   <u>Production Load Files</u>. Two Load/Unitization files shall accompany all productions. All productions containing images must include an image load file that is in .LOG or .OPT format. For any productions containing native files, the metadata .DAT file should contain a NATIVELINK field that contains the path/link to each native file generated during production. The native files should be named with their corresponding bates numbers. All productions should include a metadata load file (.DAT file) containing all agreed upon metadata production fields and the delimiters should be standard Concordance delimiters:

| | | | |
|---|---|---|---|
| a. | Column Delimiter: | (020) | |
| b. | Field Delimiter:   þ | (254) | |
| c. | New Line Delimiter: | ® | (174) |
| d. | Multi-Entry Delimiter: | ; | (059) |

The following ASCII delimiters are also acceptable:

| | | | |
|---|---|---|---|
| e. | Column Delimiter: ^ | (094) | |
| f. | Field Delimiter:   \| | (124) | |
| g. | New Line Delimiter: | ~ | (126) |
| h. | Multi-Entry Delimiter: | ; | (059) |

The first line of the .DAT file must contain the field names to each corresponding metadata field. The name of the data load file should mirror the name of the delivery volume and the volume names should be consecutive. If foreign language/Unicode text exists, the .DAT file shall contain the appropriate encoding to enable preservation of the document's original language.

12.   <u>Searchable Files.</u> (.TXT). Document level, searchable text files shall be provided for all production documents and be maintained in separate TEXT directories. All text files should be named with their corresponding bates numbers. The metadata .DAT file should contain a TEXTPATH field that contains the path/link to each corresponding text file generated during production. If foreign language/Unicode text exists, the .TXT files shall contain the appropriate encoding to enable preservation of the document's original language.

13.   <u>Privileged Documents.</u> If any responsive document is withheld under any claim of privilege, provide a detailed privilege log that contains at least the following information for each document that you have withheld:

7

Exhibit 6

      a.     the name of each author, writer, sender, creator, or initiator of such document;

      b.     the name of each recipient, addressee, or party for whom such document was intended;

      c.     the date of such document, or an estimate thereof if no date appears on the document;

      d.     the general subject matter of the document; and

      e.     the claimed grounds for withholding the document, including—but not limited to—the nature of any claimed privilege and grounds in support.

14.    <u>Duty to Preserve Documents.</u>  All documents and/or other data which relate to the subject matter or requests of this Subpoena Duces Tecum must be preserved. Any destruction involving such documents must cease, even if it is your normal or routine course of business to delete or destroy such documents or data and even if you believe such documents or data are privileged or otherwise need not be produced.

15.    <u>Duty to Supplement.</u>  All document requests are continuing in nature so as to require the supplementary production if you obtain further responsive documents or information. You are also required to amend your responses to the requests contained within this Subpoena Duces Tecum if you discover that the previous response was incorrect or incomplete.

## **DEFINITIONS**

A.    "All" shall be construed to include the collective as well as the singular and shall mean "each," "any," and "every."

B.    "Any" shall be construed to mean "any and all."

C.    "Benefits Consultant" shall mean any organization providing advisory services pertaining to the pharmacy benefit of a health insurance product or the administration of such a benefit.

D.    "Communications" shall mean and refer to any exchange of information by any means of transmissions, sending or receipt of information of any kind by or through any means including, but not limited to, verbal expression, gesture, writings, documents, language (machine, foreign, or otherwise) of any kind, computer electronics, email, SMS, MMS or other "text" messages, messages on "social networking" sites (including, but not limited to, Facebook, Google+, MySpace and Twitter), shared applications from cell phones, "smartphones," netbooks and laptops, sound, radio, or video signals, telecommunication, telephone, teletype, facsimile, telegram, microfilm or by any other means. It also includes, without limitation, all originals and copies of inquiries, discussions, conversations, correspondence, negotiations, agreements, understandings, meetings,

8

Exhibit 6

notices, requests, responses, demands, complaints, press, publicity or trade releases and
the like that are provided by you or to you by others.

E.    "Document(s)" shall mean any writing or any other tangible thing, whether printed,
      recorded (in audio, video, electronically or by any other means), reproduced by any
      process, or written or produced by hand, including, but not limited to, letters,
      memoranda, notes, opinions, books, reports, studies, agreements, statements,
      communications (including inter-company and intra-company communications),
      correspondence, telegrams, email, instant messages, chat logs, SMS, MMS or other
      "text" messages, posted information, messages, chat logs on "social networking" sites
      (including, but not limited to, Facebook, Google+, MySpace and Twitter), logs,
      bookkeeping entries, summaries or records of personal conversations, diaries, calendars,
      telephone messages and logs, forecasts, photographs, images, tape recordings, models,
      statistical statements, graphs, laboratory and engineering reports, notebooks, charts,
      plans, drawings, minutes, bylaws, resolutions, records of conferences, expressions or
      statements of policy, lists of persons attending meetings or conferences, lists of clients or
      customers or suppliers, reports or summaries of interviews, opinions or reports of
      negotiations, brochures, pamphlets, advertisements, circulars, trade letters, press releases,
      drafts of any document and revisions of drafts of any document, and any other similar
      paper or record. The terms also include a copy of a document where the copy is not
      exactly the same as the original. The terms also include emails and other documents
      made or stored in electronic form, whether kept on computers, computer tapes, disks or
      drives, including Cloud storage, of any type, or other media upon which information may
      be recorded.

F.    "Hawaiʻi state program" includes the Hawaii Employer-Union Health Benefits Trust
      Fund and Hawaii's Medicaid program, known as Med-QUEST.

G.    "Identify" means:

      1.    When used in connection with a person, provide that person's name, current
            residential address and telephone number, job title, and current business address
            and telephone number.  (If current information is not available, provide last-
            known address and telephone number.)

      2.    When used in connection with a Document, provide the nature of the Document,
            its title, physical description, date, author, its current location, and identification
            of the current custodian.

      3.    When used in connection with an oral communication, provide the nature of that
            communication, the parties to it, the date, place and substance of that
            communication, and the identification of any document concerning it.

9

Exhibit 6

H.     "Including" is used merely to emphasize that a request for certain types of documents or information should not be construed as limiting the request in any way.

I.     "Manufacturer(s)" shall mean a manufacturer of prescription drugs.

J.     "Payer(s)" shall mean any organization that pays or insures health or medical expenses on behalf of beneficiaries or recipients including an employer (self-insured), a third-party administrator or administrative-services only health insurer (for themselves or on behalf of their clients), or a health insurance company.

K.     "Payment(s)" shall mean any transfer of money, goods, or services You received directly or indirectly from any Manufacturer. It includes, but is not limited to, statutory rebate payments, supplemental rebate payments, other rebate payments, research and development, administrative fees, distribution fees, service fees (rebate or non-rebate related), procurement fees, data access fees, chargeback fees, promotional payments, cash product discounts, sales volume related payments of any type not described above, and non-sales volume related payments of any type not described above.

L.     "Pharmacy benefit manager(s)" or "PBM(s)" shall mean any organization that administers prescription drug benefits on behalf of a Payer.

M.    "Relating to" shall mean directly or indirectly mentioning or describing, concerning, referring to, regarding, evidencing, setting forth, identifying, memorializing, created in connection with or as a result of, commenting on, embodying, evaluating, analyzing, tracking, reflecting or constituting, in whole or in part, a stated subject matter.

N.     "You" or "Your" refers to the person(s) or business entity(s) to whom this Subpoena Duces Tecum is directed as reflected on the first page. With respect to corporations or other business entities, these terms also shall be deemed to include all owners, officers, agents and employees thereof, and any predecessor, successor, parent, subsidiary, division, d/b/a and affiliated companies or other entities.

## RELEVANT TIME PERIOD

The relevant time period, unless otherwise indicated in a specific request, is from January 1, 2010 to the present. The time limits should not be construed as date limits; for example, if a policy or document in effect during the relevant time period was created before the relevant time period, then documents dating back to the starting date of the policy must be produced.

## REQUESTS FOR DOCUMENTS AND INFORMATION

These requests are limited to documents and information relating to Hawaiʻi, including, but not limited to, documents and information that may be national or regional in scope that apply to Hawaiʻi.

10

Exhibit 6

1.   Produce all Documents sufficient to Identify the ten Manufacturers from which You have
     directly or indirectly received the largest Payments (as determined by the total dollar
     amount of Payments) per year from 2010-2021. Per the definitions listed above, the term
     Payments includes, but is not limited to, statutory rebate payments, supplemental rebate
     payments, other rebate payments, research and development, administrative fees,
     distribution fees, service fees (rebate or non-rebate related), procurement fees, data access
     fees, chargeback fees, promotional payments, cash product discounts, sales volume
     related payments of any type not described above, and non-sales volume related
     payments of any type not described above. Include the following in Your response:

     a.   The name of the Manufacturer making Payments; and
     b.   The total amount per year of the Payments.

     *In lieu of providing actual documents, You may provide a narrative response containing
     the requested information.*

2.   Produce all Documents sufficient to Identify the Payments made by each Manufacturer
     identified in response to Request 1 per year from 2010-2021. Aggregate payments of the
     same type per year. For example, all administrative fees for 2010 can be combined as one
     Payment. Include the following for each Payment in Your response:

     a.   A description of the Payment (*e.g.*, statutory rebate payments, supplemental
          rebate payments, other rebate payments, research and development,
          administrative fees, distribution fees, service fees (rebate or non-rebate related),
          procurement fees, data access fees, chargeback fees, promotional payments, cash
          product discounts, sales volume related payments of any type not described
          above, and non-sales volume related payments of any type not described above);
     b.   The amount of each Payment;
     c.   A description of any service You performed relating to the Payment;
     d.   A description of any product or information You sold relating to the Payment
          (*e.g.*, name of medications and volume purchased);
     e.   The name of the Payer or any other entity or individual with whom You shared
          any portion of the Payment;
     f.   The amount of the Payment You shared with a Payer or any other entity or
          individual; and
     g.   The amount of the Payment You retained.

     *In lieu of providing actual documents, You may provide a narrative response containing
     the requested information.*

3.   For all Hawai'i state programs, produce documents sufficient to Identify the amount of
     Payments returned to the State or Medicaid managed care organization and the amount of
     Payments retained by You and a description of the Payments (*e.g.*, rebate, administrative
     fees).

11

Exhibit 6

*In lieu of providing actual documents, You may provide a narrative response containing the requested information.*

4.  Produce all Documents reflecting or related to the negotiation of the Payments identified in Your response to Request 2 and 3.

5.  Produce all Communications with Manufacturers related to formulary coverage for any prescription drug for which You received Payments.

6.  Produce all financial and medical analyses related to the inclusion or exclusion of prescription drugs for which You received Payments.

7.  Produce all Documents sufficient to Identify the gross amount paid for prescription drugs manufactured by the Manufacturers identified in response to Request 1 per year from 2010-2021 for prescription drugs.

    *In lieu of providing actual documents, You may provide a narrative response containing the requested information.*

8.  Produce all Documents sufficient to Identify all direct or indirect Payments (*e.g.*, product based, volume based, or other Payments) You made to any Benefits Consultant working on behalf of a Payer, including:

    a.  The name of the Benefits Consultant;
    b.  The name of the Payer for whom the Benefits Consultant worked;
    c.  The date of the Payment;
    d.  The amount of the Payment; and
    e.  A description of the Payment (*e.g.*, product based, volume based, or other Payments).

    *In lieu of providing actual documents, You may provide a narrative response containing the requested information.*

9.  Produce all Documents reflecting or related to direct or indirect Payments for Humira and every insulin product (including branded and authorized generics).

10. Produce all Documents sufficient to Identify all direct or indirect Payments You received relating to Humira and every insulin product (including branded and authorized generics). Include in Your response, for each Payment:

    a.  The date of the Payment;
    b.  The time period which the Payment relates to;
    c.  The name of the Hawai'i state program relating to the claim (if applicable);
    d.  The name of the Manufacturer making the Payment;
    e.  The amount of the Payment;

12

Exhibit 6

f.   A description the Payment (*e.g.*, statutory rebate payments, supplemental rebate payments, other rebate payments, research and development, administrative fees, distribution fees, service fees (rebate or non-rebate related), procurement fees, data access fees, chargeback fees, promotional payments, cash product discounts, sales volume related payments of any type not described above, and non-sales volume related payments of any type not described above);

g.   The name of the prescription drug relating to the Payment;

h.   The list price for the prescription drug relating to the Payment;

i.   The gross amount You paid for the prescription drug;

j.   The number of units of the prescription drug You purchased relating to the Payment;

k.   A description of any service You performed relating to the Payment;

l.   The name of the Payer or any other entity or individual with whom You shared any portion of the Payment;

m.   The amount of the Payment You shared with a Payer or any other entity or individual; and

n.   The amount of the Payment You retained.

o.   Beneficiary cost sharing requirement (fixed copayment, coinsurance)

p.   Amount paid by the beneficiary

q.   Total Amount paid to the pharmacy (including dispensing fee)

r.   Post-purchase price adjustment of the prescription drug sale price

s.   Other price agreements or guarantees related to the prescription drug.

*In lieu of providing actual documents, You may provide a narrative response containing the requested information.*

11.   Produce all price lists, including any maximum allowable cost lists, applicable to the prescription drugs identified in Your response to Request 10 that relate to any Hawai'i state program (*e.g.*, EUTF, Medicaid).

12.   Produce all agreements and Documents reflecting or related to agreements with Manufacturers or any entity or individual affiliated with any Manufacturer related to Payments.

13.   Produce all Documents sufficient to Identify all departments and individuals involved in negotiations or agreement with Manufactures related to the purchase, coverage, promotion or sale of prescription drugs, including, but not limited to, the following:

a.   the name of each department or individual;

b.   the date each department was formed and (if applicable) dissolved;

c.   the title(s) each individual has or had;

d.   the name of the department(s) for which each individual works or worked

e.   the relevant duties and responsibilities each individual has or had;

f.   the dates of employment for each individual; and

13

Exhibit 6

g.    the last known contact information for each individual who no longer works for You.

*In lieu of providing actual documents, You may provide a narrative response containing the requested information.*

14.    Produce all Documents reflecting or related to Communications relating to negotiations or agreements relating to Payments, including the target level of Payments or the impact of Payment levels on your Profits, or the value of any Payments to Your revenue or profits.

15.    Produce all Documents reflecting or related to Your projections or analyses relating to: (a) the value of Payments; (b) whether and how Payments are passed on to consumers (c) how Payments impact Your profitability; (d) how Payments impact Your bargaining power in negotiations with Manufacturers and/or Payers; (e) the impact or practice of classifying Payments in certain ways (*e.g.*, classifying a Payment as a rebate rather than a fee or vice-versa); and/or (f) the relationship between Payments and list prices.

16.    Produce all Documents reflecting or related to the results of any audit (including both internal and third-party audits) relating to Your practices involving Payments, including, but not limited to, Your classification of any fees or rebates.

17.    Produce all Documents You relied upon when testifying before Congress about the pricing of prescription drugs.

18.    Produce all Documents relating to legislation or proposed legislation that could impact the Payments You receive, including, but not limited to, the proposed elimination of the safe harbor provision in 42 CFR 1001.952(h).

19.    Produce all Documents relating to any research or study You commissioned that examines Payments made to pharmacy benefit managers from Manufacturers.

20.    Produce all Documents reflecting or relating to any complaints or concerns You received relating to Your practices involving Payments, including, but not limited to, any complaints You received from Manufacturers, Payers, whistleblowers, and consumers.

21.    Produce all Documents sufficient to Identify all lawsuits filed against You relating to Your practices involving Payments, including, but not limited to, any lawsuits that allege You overcharged Payers and/or consumers for prescription drugs and/or that there is a relationship between the Payments You receive and the increase in list price of prescription drugs.

*In lieu of providing actual documents, You may provide a narrative response containing the requested information.*

14

Exhibit 6

22.    Produce all Documents produced in any government investigation or any litigation
relating to Your practices involving Payments.

23.    Produce all settlement agreements or judgments relating to Your practices involving
Payments.

15

Exhibit 6

Exhibit 7

## CONFIDENTIALITY AGREEMENT

IT IS HEREBY AGREED BY AND BETWEEN the State of Hawaiʻi Department of the Attorney General ("State") and OptumRx, Inc. ("OptumRx" or "the Company"), through their respective counsel, that:

1.      This Confidentiality Agreement is being entered into in connection with an investigation being conducted by the State and the State's outside counsel into certain business practices related to the provision of pharmacy benefits management services ("Investigation"), and the production of any documents or information by OptumRx in response to a subpoena issued by the State dated October 15, 2021 in connection with the Investigation (the "Subpoena").  Neither OptumRx nor the State waives any objections it has to the Subpoena or the response to the Subpoena by entering into this Confidentiality Agreement.  This Agreement shall be binding upon the State and OptumRx ("Parties," referred to singularly as a "Party"), undersigned outside counsel for the State and OptumRx's outside counsel, and all persons and entities signing a copy of the Addendum Regarding Undertaking of Confidentiality attached at Exhibit A ("Addendum").

2.      "Confidential Information" means any documentary and/or tangible information of any type, kind or character that contains (a) information of a personal nature where the public disclosure thereof would constitute a clearly unwarranted invasion of personal privacy; or (b) trade secret or commercial or financial information, to the extent disclosure would result in substantial harm to the competitive position of the Company.  To designate a document or information as "Confidential Information," OptumRx shall stamp or place the word "Confidential" on the document or item of information produced to the State.  All copies, whether digital or hard copy, of any "Confidential Information" produced or made available for inspection and copying shall be subject to the terms of this Agreement.  Any interview, deposition or testimony of OptumRx in connection with the Investigation shall presumptively be treated as Confidential Information and subject to this Agreement for a period of 15 days after a transcript is received by counsel for the Parties.  At or before the end of such 15-day period, by written notification to undersigned counsel,

Exhibit 7

OptumRx may designate any portion(s) of the interview, deposition, or testimony as "Confidential Information." If OptumRx fails to designate any portion of the interview, deposition, or testimony as "Confidential Information," after the expiration of the 15-day period, that portion(s) shall be treated as non-confidential. In designating documents or information as "Confidential Information," OptumRx will make such designation only as to those documents and information that it in good faith believes contain Confidential Information. The State, the State's outside counsel, and all persons and entities signing a copy of the Addendum agree to use Confidential Information solely in connection with the Investigation and any litigation that may arise therefrom, not to use Confidential Information in connection with any other matter, and not to disclose any Confidential Information to any party or the public, except as provided by this Agreement, except as required by law or court order. The State's outside counsel further agrees not to rely on Confidential Information in pursuing information or claims in any other matters outside of its representation of the State.

3. This Agreement shall not preclude any Party from bringing before a court of competent jurisdiction, at any time, the question of whether any particular information is properly designated as "Confidential Information." In its request for relief from the Court, the Party disputing the designation of any information shall identify the information that it believes is not properly designated. The Party making the designation has the burden to defend the designation. Prior to bringing any motion, the Parties shall meet and confer in good faith to attempt to resolve the dispute. If the dispute cannot be resolved, the Parties shall treat the information consistent with its designation until a ruling by the court. In the event litigation stems from this Investigation, the Parties will meet and confer at the appropriate time regarding a protective order that will supersede this Agreement. In the event the Parties cannot agree on a protective order, it shall be OptumRx's duty to seek a protective order.

4. In addition to any applicable protections provided to such materials under Hawaiʻi Uniform Information Practices Act, HRS §§ 92F-13 and 14 or other applicable law, the State and undersigned outside counsel for the State may disclose Confidential Information only as follows:

2

Exhibit 7

(a)     to employees, interns, and staff of the State who are working on the Investigation;

(b)     to agents, consultants, or experts of the State, who are working on the Investigation and are bound by this agreement and who agree to be bound by the terms of this agreement by signing the Addendum;

(c)     other law enforcement agencies when an employee of the Hawaiʻi Department of the Attorney General determines it is appropriate to disclose Confidential Information to those agencies provided they agree in writing to be bound and comply with this Agreement;

(d)     to any witness in the Investigation (not to include disclosures to expert witnesses of the State, which are covered under Section 4(b)), during an interview by the State or during transcribed or otherwise recorded proceedings conducted by the State, as long as the State reasonably believes that disclosure is necessary to further the Investigation;

(e)     to any person identified as having received, or who is otherwise known to have received, the document or information;

(f)     if the Company first gives written consent to such disclosure;

(g)     any person who, at the time of the disclosures, is either employed by OptumRx or retained by OptumRx in connection with this Investigation;

(h)     if the information was obtained independently of the Company from a source that (1) does not request confidential treatment for the information and (2) the State believes in good-faith does not have a duty of confidentiality with respect to the information, whether arising from

3

Exhibit 7

contract or any other legal source;

(i)   Motley Rice LLC attorneys (other than the State's
undersigned outside counsel), paralegals, contractors, staff,
or experts working on behalf of the State in connection with
the Investigation who agree to be bound by the terms of this
Agreement by signing the Addendum.

5.   With respect to the disclosures authorized by paragraph 4(d) or 4(e), the State shall
not permit the person or the person's counsel to retain a copy of the Confidential Information
unless the State reasonably believes that retention is necessary to further the Investigation and the
person has signed the Addendum.

6.   With respect to the disclosures authorized by paragraph 4(i), the State and the
State's outside counsel shall not share, disclose, or discuss Confidential Information with any
Motley Rice LLC attorney, paralegal, contractor, or staff who is not a member of the firm's Public
Client practice group, and shall limit access to Confidential Information to members of that
practice group.  The State and the State's outside counsel are agreeing to this term solely for
purposes of the investigation stage and are not consenting to or agreeing to waive any right to
object to this or any similar term in any stipulated protective order in connection with litigation.

7.   Any document or information that may contain Confidential Information that has
been inadvertently produced without being designated as Confidential Information shall not be a
waiver, in whole or in part, of a claim of confidentiality as to any such document or information.
OptumRx may designate the inadvertently produced document or information as "Confidential
Information" by written notice to the State within a reasonable time following discovery of the
inadvertent production.  Unless the State challenges the designation pursuant to paragraph 3, the
State shall confirm the designation of the Confidential Information within ten (10) days of receipt
of notice from OptumRx, and shall make reasonable efforts to retrieve such improperly designated
documents from persons not entitled to receive them.

4

Exhibit 7

8. The State and/or the State's outside counsel shall not attach documents or information designated as "Confidential Information" to any filing with a court or administrative tribunal ("State filing") unless the State and/or the State's outside counsel complies with one of the following provisions:

  (a) resolves any dispute with OptumRx regarding designation of such documents or information as "Confidential Information;"

  (b) files the documents or information designated "Confidential Information" with a court or administrative tribunal conditionally under seal; following the State filing, the confidentiality or non-confidentiality of documents or information will be determined by the terms of a protective order entered in the case either by stipulation or order, or by the absence of any such order (i.e. if OptumRx takes no action to seek a protective order within ten (10) days of the State filing, the documents or information attached to the State filing will be deemed non-confidential); or

  (c) notifies OptumRx at least ten (10) days in advance that the State or the State's outside counsel intends to attach materials designated "Confidential Information" in the State filing, provided that the State or the State's outside counsel shall not attach such documents or information designated "Confidential Information" until either:

    i. the court or administrative tribunal rules on OptumRx's request for a protective order or in camera treatment in favor of disclosure of the documents or information designated Confidential Information; or

5

Exhibit 7

        ii.      OptumRx has not sought such order within the ten (10) day period of time which the State or the State's outside counsel provided to OptumRx for it to seek such order.

9.    In the event that the State receives a written request from a person or entity for Confidential Information under the Hawai'i Uniform Information Practices Act, HRS §§ 92F-1 *et seq.*, either during or after the pendency of the Investigation and the State determines in good faith that disclosure of Confidential Information is required and that no exemption reasonably applies, the State will provide ten (10) business days advance notice before any disclosure in response to such a request so that the Company is afforded an opportunity to obtain a court order prohibiting or limiting such disclosure and/or requiring the recipient(s) of such Confidential Information to take steps to maintain the confidentiality thereof.  Any notice to OptumRx under this paragraph or paragraph 10 shall be made to: John Kokkinen, Senior Associate General Counsel – Optum Litigation, via electronic mail at john.kokkinen@optum.com and to Allison Caplis, Hogan Lovells, via electronic mail at allison.caplis@hoganlovells.com.

10.    If any person or entity possessing designated Confidential Information is subpoenaed in another civil action or civil proceeding or served with a document demand or other civil legal process that requests production of designated Confidential Information ("civil process"), and the State determines in good faith that the Confidential Information must be disclosed, the State  shall, to the extent permitted by law, court rule, and court order, inform OptumRx within 15 days of receiving notice of the civil process.

11.    If documents or information subject to a claim of attorney-client privilege or work product immunity or any other privilege or immunity are inadvertently produced, such production shall in no way prejudice or otherwise constitute a waiver of, or estoppel as to, any claim of privilege or work-product immunity for such documents or information as provided under applicable law, including Federal Rule of Evidence 502 or any Hawai'i counterpart or similar rule.

6

Exhibit 7

If OptumRx has inadvertently produced documents or information subject to a claim of immunity or privilege, the Parties shall follow the so-called "clawback" provisions of Federal Rule of Civil Procedure 26(b)(5)(B) or any other Hawai'i counterpart or similar rule.

12.    At the conclusion of the investigation, or the final conclusion of all litigation if any is initiated, all documents produced by the Company, including all Confidential Information, shall be retained by the State pursuant to Hawai'i public records laws and policies, with the limitations of use of Confidential Information described in Paragraph 2 remaining in full effect.   All documents in the possession of Motley Rice that OptumRx produced and designated as "Confidential" during the course of this Investigation shall be returned to the State or OptumRx, or destroyed within 30 days, and Motley Rice shall so certify in writing.

13.    Nothing contained in this Agreement shall alter or limit the obligations of the State under Hawai'i law, including the Hawai'i Uniform Information Practices Act, HRS §§ 92F-1 *et seq*.

14.    This Agreement shall apply to all documents and information produced by the Company to the State pursuant to this Investigation, including any amendments to the Subpoena.

7

Exhibit 7

Dated: 05/18/2022

**OPTUM RX**

By: _____
    Attorneys for the Company


**STATE OF HAWAIʻI
DEPARTMENT OF THE ATTORNEY GENERAL**


Counsel for the State of Hawaiʻi Department of the Attorney General

By:


_____
Linda Singer
Motley Rice LLC


_____
Paige Boggs
Motley Rice LLC

8

Exhibit 7

Dated:

**OPTUM RX**

By: _____
      Attorneys for the Company

**STATE OF HAWAI'I**
**DEPARTMENT OF THE ATTORNEY GENERAL**

By:

_Mana Moriarty_

Mana Moriarty
Department of the Attorney General
State of Hawai'i
425 Queen St.
Honolulu, HI 96813
mana.moriarty@hawaii.gov

Counsel for the State of Hawai'i Department of the Attorney General

By:

_____
Linda Singer
Motley Rice LLC

_Paige Boggs_
Paige Boggs
Motley Rice LLC

9

Exhibit 7

**ADDENDUM REGARDING**

**UNDERTAKING OF CONFIDENTIALITY**

By signing this acknowledgement, I certify that I have read the Confidentiality Agreement to which this acknowledgement is attached ("Agreement") in its entirety, I fully understand the obligations under the Agreement, and I hereby agree that _____ [insert name of person or entity] will be bound by its terms to the extent permitted by law.

DATE:_____

NAME: _____

SIGNATURE: _____

Exhibit 7

# Exhibit 8



Hogan Lovells US LLP
Harbor East
100 International Drive
Suite 2000
Baltimore, MD 21202
T  +1 410 659 2700
F  +1 410 659 2701
www.hoganlovells.com

June 8, 2022

**BY ELECTRONIC MAIL AND SECURE FILE TRANSFER**

Mana Moriarty
Department of the Attorney General
State of Hawaiʻi
425 Queen St.
Honolulu, HI 96813

Linda Singer
Paige Boggs
Motley Rice LLC
401 9th St. NW, Suite 1001
Washington, DC 20004

Re:    **Subpoena to OptumRx, Inc. Dated October 15, 2021**

Dear Mana, Linda and Paige:

With this letter and accompanying document, OptumRx, Inc. (hereinafter "Optum," or "the Company") makes its first production in response to the Subpoena dated October, 15, 2021, as clarified by our various telephone calls (the "Subpoena").  Per our discussion with Paige on June 3, 2022, Optum is producing herein the documents that Optum previously produced to the Minnesota Attorney General's Office pursuant to a Civil Investigative Demand served upon OptumRx, Inc. in 2017.  These documents are branded with the same Bates-numbers as were provided to the Minnesota Attorney General's Office: Optum-MNAG-0000000001 - Optum-MNAG-0000068310.

*        *        *

The enclosed documents contain or constitute confidential business information, records, and/or trade secrets of Optum and are being produced in reliance on Paige's assertions during our June 3, 2022 discussion, that the State of Hawaiʻi will treat the documents previously produced to Minnesota as confidential pursuant to the State of Hawaiʻi's May 18, 2022 confidentiality agreement with Optum even if the confidentiality designations on the production images are worded slightly differently (e.g., "confidential" vs. "highly confidential").

The submission of the enclosed materials does not waive, nor is it intended to waive, any rights, privileges, or immunities of Optum with respect to this matter, including any applicable attorney-client privilege, protection provided under the work-product doctrine, or other privilege or immunity that may exist.  In the event of any inadvertent production of privileged materials, Optum requests that the government refrain from reviewing such materials and return the same promptly to Optum.  Moreover, to the extent that non-responsive documents, pages, or information have been produced inadvertently,

Hogan Lovells US LLP is a limited liability partnership registered in the District of Columbia.  "Hogan Lovells" is an international legal practice that includes Hogan Lovells US LLP and Hogan Lovells International LLP, with offices in:  Alicante  Amsterdam  Baltimore  Beijing  Birmingham  Boston  Brussels  Colorado Springs  Denver  Dubai  Dusseldorf  Frankfurt  Hamburg  Hanoi  Ho Chi Minh City  Hong Kong  Houston  Johannesburg  London  Los Angeles  Luxembourg  Madrid  Mexico City  Miami  Milan  Minneapolis  Monterrey  Munich  New York  Northern Virginia  Paris  Perth  Philadelphia  Rome  San Francisco  São Paulo  Shanghai  Silicon Valley  Singapore  Sydney  Tokyo  Warsaw  Washington, D.C.  Associated Offices:  Budapest  Jakarta  Riyadh  Shanghai FTZ  Ulaanbaatar.  Business Service Centers:  Johannesburg  Louisville.  Legal Services Center:  Berlin.  For more information see www.hoganlovells.com

Exhibit 8

- 2 -                                                                                              June 8, 2022

Optum does not agree to any expansion of the scope of your request.  Optum expressly reserves any applicable privileges and immunities to which it is entitled under the law.

Please call me if you have any questions about any aspect of this letter or the enclosed documents.

Sincerely,

*Allison J Caplis*

Allison J. Caplis
Counsel
allison.caplis@hoganlovells.com
D 410-659-2784

Exhibit 8

# Exhibit 9



Hogan Lovells US LLP
Harbor East
100 International Drive
Suite 2000
Baltimore, MD 21202
T  +1 410 659 2700
F  +1 410 659 2701
www.hoganlovells.com

September 1, 2022

**BY ELECTRONIC MAIL AND SECURE FILE TRANSFER**

Mana Moriarty
Department of the Attorney General
State of Hawaiʻi
425 Queen St.
Honolulu, HI 96813

Linda Singer
Paige Boggs
Motley Rice LLC
401 9th St. NW, Suite 1001
Washington, DC 20004

Re:    **Subpoena to OptumRx, Inc. Dated October 15, 2021**

Dear Mana, Linda and Paige:

With this letter and accompanying documents, OptumRx, Inc. (hereinafter "Optum," or "the Company") makes its second production in response to the Subpoena dated October 15, 2021, as clarified by our various telephone calls (the "Subpoena").  For ease of reference, this production has been labeled OPTUM1021_002 and has been Bates-numbered OPTUM1021_0000001-0000002.

This production includes a spreadsheet of the rebates, administrative fees, and price protection fees submitted by Optum to manufacturers of insulin products, and the amounts collected from those manufacturers, with respect to insulin prescriptions filled at pharmacies in the State of Hawaiʻi for which claims were submitted from Q1 2016 - Q3 2021.  This production also includes a spreadsheet of transaction level data with respect to insulin prescriptions filled at pharmacies in the State of Hawaiʻi for which claims were submitted from Q1 2016 - Q3 2021.[1]  Per our discussions, these spreadsheets do not include PHI; as such the transactions have been assigned scrambled claim numbers for ease of linking the two spreadsheets.[2]

\*        \*        \*

---

[1]    Per your request, we included the following fields in addition to Total Member Paid: (1) Flat Copay (CLT_FLAT_COPAY_AMT); (2) Co-insurance (CO_INSURANCE_AMT); and (3) Deductible (CLT_ATTRIB_TO_DED_AMT).  We note, however, that those more granular fields may not add up to the Total Member Paid in every instance.

[2]    As discussed, we are producing two separate spreadsheets as the requested data is maintained in different systems.

Hogan Lovells US LLP is a limited liability partnership registered in the District of Columbia.  "Hogan Lovells" is an international legal practice that includes Hogan Lovells US LLP and Hogan Lovells International LLP, with offices in:  Alicante  Amsterdam  Baltimore  Beijing  Birmingham  Boston  Brussels  Colorado Springs  Denver  Dubai  Dusseldorf  Frankfurt  Hamburg  Hanoi  Ho Chi Minh City  Hong Kong  Houston  Johannesburg  London  Los Angeles  Luxembourg  Madrid  Mexico City  Miami  Milan  Minneapolis  Monterrey  Munich  New York  Northern Virginia  Paris  Perth  Philadelphia  Rome  San Francisco  São Paulo  Shanghai  Silicon Valley  Singapore  Sydney  Tokyo  Warsaw  Washington, D.C.  Associated Offices:  Budapest  Jakarta  Riyadh  Shanghai FTZ  Ulaanbaatar.  Business Service Centers:  Johannesburg  Louisville.  Legal Services Center:  Berlin.  For more information see www.hoganlovells.com

Exhibit 9

September 1, 2022

The enclosed documents contain or constitute confidential business information, records, and/or trade secrets of Optum and we have branded them "CONFIDENTIAL" and are producing them pursuant to our May 18, 2022 Confidentiality Agreement with the State of Hawai'i Department of the Attorney General.

The submission of the enclosed materials does not waive, nor is it intended to waive, any rights, privileges, or immunities of Optum with respect to this matter, including any applicable attorney-client privilege, protection provided under the work-product doctrine, or other privilege or immunity that may exist. In the event of any inadvertent production of privileged materials, Optum requests that the government refrain from reviewing such materials and return the same promptly to Optum. Moreover, to the extent that non-responsive documents, pages, or information have been produced inadvertently, Optum does not agree to any expansion of the scope of your request. Optum expressly reserves any applicable privileges and immunities to which it is entitled under the law.

Please call me if you have any questions about any aspect of this letter or the enclosed documents.

Sincerely,

*Allison J Caplis*

Allison J. Caplis
Counsel
allison.caplis@hoganlovells.com
D 410-659-2784

Exhibit 9

# Exhibit B

to Declaration of Matthew Hooker

**GOVERNMENT OF THE DISTRICT OF COLUMBIA**
**Office of the Attorney General**



---

## LETTER CONTRACT

December 1, 2020

Linda Singer
Motley Rice LLC
401 9th St. NW, Suite 1001
Washington, DC 20004

RE: Letter Contract Number DCCB-2021-F-0008
Outside Counsel for Pharmacy Benefit Managers
Litigation

Dear Ms. Singer:

This is a letter contract between the Office of the Attorney General for the District of Columbia and the law firm Motley Rice LLP, hereinafter referred to as "Contractor", wherein Contractor agrees to provide legal services on a contingency fee basis to assist in the investigation of and possible litigation against Pharmacy Benefit Managers for potential violations of District law, including the District's consumer protection and false claims act statutes, as described in the Statement of Work (Attachment 1).

(a)    This letter contract is contingency fee contract. The District's liability for payment to Contractor under the letter contract occurs only when Contractor obtains monetary recovery during performance of the letter contract and the proceeds are deposited into the appropriate District account. The Contractor shall be entitled to receive expenses and a contingency fee of 12.5% of the net recovery if the matter is resolved pre complaint or 15% of the net recovery if the matter is resolved after the filing of a complaint up to and including $999,000.00. Net Recovery is defined as any settlement or judgment amount minus the actual costs incurred by Motley Rice, including payments for the time of any experts and contract attorneys engaged for document review. Motley Rice will agree to first seek its usual and customary fees and costs from the targets of the investigation and/or the defendants before collecting a contingency fee. The maximum liability under the letter contract is $999,000.00. If no recovery is realized and deposited to the District's account, Contractor shall receive no fee, compensation or reimbursement of costs and expenses. In no event shall the amount paid under this letter contract or any extension thereof exceed (50%) of the total definitized contract amount.

---

2023-FOIA-01530-00000086

Letter Contract No. DCCB-2021-F-0008                                            Page 2 of 3
Outside Counsel for Pharmacy Benefit Managers Litigation

(b)   Contractor agrees to immediately begin performance of this letter contract under the
      Statement of Work, Attachment 1. Contractor agrees to timely submit to the Contracting
      Officer requested documents or information reasonably necessary to obtain Council of
      the District of Columbia (Council) approval of the definitized contract. Approval by the
      Council and award by the Contracting Officer are required to definitize the contingency-
      fee contract. Prior to Council approval of the definitized contract, no payments shall be
      due to Contractor.

(c)   The District intends to definitize a final contingency-fee contract within the period of 120
      days from date of award of this letter contract, at which time this letter contract shall merge
      with the definitized contract. The parties hereby agree that the contingency fee shall not
      exceed 12.5% of the net recovery if the matter is resolved pre complaint; and 15% of the net
      recovery if the matter is resolved after the filing of a complaint against Pharmacy Benefit
      Managers plus agreed-upon reimbursable costs. Before expiration of the 120 days, the
      Contracting Officer may authorize an additional time period extension in accordance with 27
      DCMR § 5028.1(e). If the District does not definitize the contingency-fee contract within
      120 days of the date of award of this letter contract or any extension thereof, this letter
      contract is automatically terminated.

(d)   If for any reason the District and the Contractor are unable to definitize the letter
      contract within the period of the letter contract as specified, the letter contract is
      automatically cancelled without recourse or liability between the District and the
      Contractor.

Contractor shall perform under this letter contract pursuant to the following documents that
are hereby incorporated by reference into this letter contract and listed in order of priority:

1)   The Letter Contract;

2)   Statement of Work (Attachment 1)

3)   Government of the District of Columbia Standard Contract Provisions for Use with
     Supplies and Services Contracts (July 2010) (available at www.ocp.dc.gov click on
     "Required Solicitation Attachments").

4)   Provision regarding Ethical Obligations and Legal Conflicts of Interest (Attachment 2)

5)   D.C. Bar Legal Ethics Committee Opinion No. 268 https://www.dcbar.org/bar-
     resources/legal- ethics/opinions/opinion268.cfm#.XHfvoFV57lA.email (Attachment 3)

SIGNED AND ACCEPTED FOR THE CONTRACTOR BY:

*Linda Singer* /AS          **12/1/2020**

Linda Singer                                 Date
Motely Rice LLC

2023-FOIA-01530-00000087

Letter Contract No. DCCB-2021-F-0008                                                    Page 3 of 3
Outside Counsel for Pharmacy Benefit Managers Litigation

SIGNED AND ACCEPTED FOR THE DISTRICT OF COLUMBIA BY:

_____                    12/1/20
Gena Johnson                                          Date
Contracting Officer

Attachment 1 to Letter Contract DCCB-2021-F-0008
Pharmacy Benefit Managers Investigation

## STATEMENT OF WORK

**1.     SCOPE:**

The Office of the Attorney General for the District of Columbia engages the Contractor to assist the Public Advocacy Division with an investigation and potential litigation against Pharmacy Benefit Managers for violations of District law.

**OAG will retain sole authority at all times to direct the litigation in all respects, including but not limited to whether and when to initiate litigation, against whom actions will be taken, the claims to be brought in said litigation, approval and/or rejection of settlements and the amount and type of damages to be requested.**

**2.     DEFINITIONS/GLOSSARY**

These terms when used in this Contract have the following meanings:

**2.1     Attorney's fees** – Any fees recovered by the District for counsel's representation as part of any cause of action that provides a basis for such an award.

**2.2     Contractor** – the entity to whom this Contract is awarded.

**2.3     Gross Recovery** — the total recovery for the District as a result of Contractor's representation of the District whether by settlement, arbitration award, court judgment following trial or appeal, or otherwise. "Gross recovery" shall include, without limitation, the following: the present value of any monetary payments to be made to the District. "Gross recovery" may come from any source, including, but not limited to, adverse parties to the Action and/or their insurance carriers and/or any third party, whether or not a party to the Action.  Notwithstanding any other provision in this agreement, in no event will the District be required to pay legal fees out of any fund other than monies recovered in this litigation.

**2.4     OAG** -- The Office of the Attorney General for the District of Columbia. OAG represents the District of Columbia and other District agencies in litigation, including consumer protection litigation.  OAG has general charge and conduct of all legal business of the District and all suits initiated by and against the District and is responsible for protecting the public interest.

**2.5     Other Direct Costs** – all costs for goods and services necessary for the potential investigation and litigation against pharmacy benefit managers or any other potentially liable parties.

Page 1 of 8

Attachment 1 to Letter Contract DCCB-2021-F-0008
Pharmacy Benefit Managers Investigation

3.    **BACKGROUND**

Pharmacy Benefit Managers ("PBMs") and other third-party administrators of health
plans' prescription drug programs play an integral role in setting the prices paid for
prescription drugs. The District seeks outside counsel to conduct an investigation to
determine if the conduct of PBMs or related entities violate the District's consumer
protection or false claims act laws. If any violations of law are confirmed, outside counsel
will also assist with litigation concerning those violations.

4.    **REQUIREMENTS**

4.1    The Contractor shall perform legal services that include, but are not limited to the following:

4.1.1    Assist OAG with the investigation of potential violations of law by Pharmacy Benefit
Managers.

4.1.2    If violations of law are identified as a result of the investigation, conduct litigation
against Pharmacy Benefit Managers. Contractor shall assist in all phases of these
investigations and litigations, including:

   a.  Preparation of complaint(s), filing complaint(s), service of summons;

   b.  Responding to motions, including motions to dismiss;

   c.  Drafting motions, including drafting motions for summary judgment, other
       dispositive motions, and any other appropriate motions on behalf of the District;

   d.  Drafting and responding to discovery requests propounded on the District or OAG;

   e.  Tracking documents obtained in discovery;

   f.  Coordinating litigation with other states and the federal government to promote,
       to the extent beneficial, a unified approach to litigation;

   g.  Taking depositions, defending depositions, preparing witnesses for depositions;

   h.  Responding to motions for summary judgment or other dispositive pretrial
       motions;

   i.  Consulting with experts necessary to analyze and develop the District's case;

   j.  Identifying experts to testify on behalf of the District;

   k.  Preparing expert witnesses for deposition or trial testimony;

   l.  Preparing legal arguments on motions practice;

   m.  Handling discovery disputes;

   n.  Representing the District in trial or any settlement negotiations;

   o.  Representing the District in responding to pretrial motions;

2023-FOIA-01530-00000090

Attachment 1 to Letter Contract DCCB-2021-F-0008
Pharmacy Benefit Managers Investigation

       p.  Representing the District in any appeal of any judgment or verdict rendered in
the action, and if applicable, any remand from appeal.

**4.1.3**  Advise OAG on the conduct of the case and on strategy and tactics for each phase of the
case.

**4.1.4**  **FOIA Assistance.**  Third parties may submit FOIA requests to OAG regarding this
matter.  OAG will notify Contractor of the FOIA request and Contractor shall
electronically provide, within five business days, all records responsive to the FOIA
request.  In addition, Contractor shall make all records regarding this matter available for
examination and review by OAG, upon request. Contractor shall be entitled to
reimbursement of costs for searching and copying records as set forth in Standard
Contract Provision No. 34, Freedom of Information Act.

**4.1.5**  Provide monthly or other regular status reports to the Contract Administrator.

**4.1.6**  Provide legal services, advice, and consultation to OAG for this litigation in a manner
consistent with accepted standards of practice in the legal profession. The Attorney
General shall have final authority over all aspects of this litigation. The litigation may be
commenced, conducted, settled, approved and ended only with the express approval and
signature of the Attorney General. The Attorney General, at his sole discretion, has the
right to appoint a designated assistant ("designated assistant") to oversee the litigation,
which appointment the Attorney General may modify at will.

**4.1.7**  Provide legal services to the Attorney General subject to the approval of the Attorney
General for the purposes of seeking injunctive relief, monetary relief, and other relief
against all entities in this litigation.

**4.1.8**  Coordinate the provision of legal services with the Attorney General or his designated
assistant, other personnel of OAG, and such others as the Attorney General may appoint.
All substantive pleadings, motions, briefs, and other material which may be filed with the
court shall first be approved by the Attorney General and provided to his office in draft
form in a reasonable and timely manner for review. Regular status meetings may be held
as requested by the Attorney General or his designated assistant.

**4.1.9**  Communicate with District entities through OAG unless authorized by OAG to
communicate directly with those entities.

**4.1.10**  Render services pursuant to this Contract as an independent contractor.  Neither
Contractor nor any employee of Contractor shall be regarded as employed by, or as an
employee of OAG.

**4.2**     **Direct Cost Limitations/Requirements**

      The Contractor shall provide notice and obtain approval from OAG prior to engaging
expert witnesses or other consultants.

Page 3 of 8

Attachment 1 to Letter Contract DCCB-2021-F-0008
Pharmacy Benefit Managers Investigation

**4.3     Key Personnel for the Contract are listed below:**

Paige Boggs, Attorney at Law
Motley Rice LLC
401 9th St. NW, Suite 1001
Washington, DC 20004
pboggs@motleyrice.com

**4.4     Kickoff Meeting**

The Contractor shall be available for an in-person kickoff meeting within seven (7)
business days from date of award.

**5.     INSURANCE**

A. GENERAL REQUIREMENTS. The Contractor at its sole expense shall procure and
maintain, during the entire period of performance under this contract, the types of
insurance specified below. The Contractor shall have its insurance broker or insurance
company submit a Certificate of Insurance to the CO giving evidence of the required
coverage prior to commencing performance under this contract. In no event shall any
work be performed until the required Certificates of Insurance signed by an authorized
representative of the insurer(s) have been provided to, and accepted by, the CO. All
insurance shall be written with financially responsible companies authorized to do
business in the District of Columbia or in the jurisdiction where the work is to be
performed, or by surplus lines insurers and have an A.M. Best Company rating of A- /
VII or higher. Should the Contractor decide to engage a subcontractor for segments of the
work under this contract, then, prior to commencement of work by the subcontractor, the
Contractor shall submit in writing the name and brief description of work to be performed
by the subcontractor on the Subcontractors Insurance Requirement Template provided by
the CA, to the Office of Risk Management (ORM). ORM will determine the insurance
requirements applicable to the subcontractor and promptly deliver such requirements in
writing to the Contractor and the CA. The Contractor must provide proof of the
subcontractor's required insurance to prior to commencement of work by the
subcontractor. If the Contractor decides to engage a subcontractor without requesting
from ORM specific insurance requirements for the subcontractor, such subcontractor
shall have the same insurance requirements as the Contractor.

All required policies except professional liability insurance shall contain a waiver of
subrogation provision in favor of the Government of the District of Columbia.

The Government of the District of Columbia shall be included in all policies required
hereunder to be maintained by the Contractor and its subcontractors (except for workers'
compensation, cyber liability and professional liability insurance) as an additional insured
for claims against The Government of the District of Columbia relating to this contract,
with the understanding that any affirmative obligation imposed upon the insured

Page 4 of 8

2023-FOIA-01530-00000092

Attachment 1 to Letter Contract DCCB-2021-F-0008
Pharmacy Benefit Managers Investigation

Contractor or its subcontractors (including without limitation the liability to pay premiums) shall be the sole obligation of the Contractor or its subcontractors, and not the additional insured. The additional insured status under the Contractor's and its subcontractors' Commercial General Liability insurance policies shall be effected using the ISO Additional Insured Endorsement form CG 20 10 11 85 (or CG 20 10 07 04 **and** CG 20 37 07 04) or such other endorsement or combination of endorsements providing coverage at least as broad and approved by the CO in writing. All of the Contractor's and its subcontractors' liability policies (except for workers' compensation, cyber liability and professional liability insurance) shall be endorsed using ISO form CG 20 01 04 13 or its equivalent so as to indicate that such policies provide primary coverage (without any right of contribution by any other insurance, reinsurance or self-insurance, including any deductible or retention, maintained by an Additional Insured) for all claims against the additional insured arising out of the performance of this Statement of Work by the Contractor or its subcontractors, or anyone for whom the Contractor or its subcontractors may be liable. These policies shall include a separation of insureds clause applicable to the additional insured.

If the Contractor and/or its subcontractors maintain broader coverage and/or higher limits than the minimums shown below, the District requires and shall be entitled to the broader coverage and/or the higher limits maintained by the Grantee and subcontractors.

1. Commercial General Liability Insurance ("CGL") - The Contractor shall provide evidence satisfactory to the CO with respect to the services performed that it carries a CGL policy, written on an occurrence (not claims-made) basis, on Insurance Services Office, Inc. ("ISO") form CG 00 01 04 13 (or another occurrence-based form with coverage at least as broad and approved by the CO in writing), covering liability for all ongoing and completed operations of the Contractor, including ongoing and completed operations under all subcontracts, and covering claims for bodily injury, and death of any persons, injury to or destruction of property, including loss of use resulting therefrom, personal and advertising injury, and including coverage for liability arising out of an Insured Contract (including the tort liability of another assumed in a contract) and acts of terrorism (whether caused by a foreign or domestic source). Such coverage shall have limits of liability of not less than $1,000,000 each occurrence, a $2,000,000 general aggregate (including a per location or per project aggregate limit endorsement, if applicable) limit, and a $1,000,000 personal and advertising injury limit.

OAG should collect, review for accuracy and maintain all warranties for goods and services.

2. Automobile Liability Insurance - The Contractor shall provide evidence satisfactory to the CO of commercial (business) automobile liability insurance written on ISO form CA 00 01 10 13 (or another form with coverage at least as broad and approved by the CO in writing) including coverage for all owned, hired, borrowed and non-owned vehicles and equipment used by the Contractor, with minimum per accident limits equal to the greater of (i) the limits set forth in the Contractor's commercial

2023-FOIA-01530-00000093

Attachment 1 to Letter Contract DCCB-2021-F-0008
Pharmacy Benefit Managers Investigation

automobile liability policy or (ii) $1,000,000 per occurrence combined single limit for
bodily injury and property damage.

3.  Workers' Compensation Insurance - The Contractor shall provide evidence
satisfactory to the CO of Workers' Compensation insurance in accordance with the
statutory mandates of the District of Columbia or the jurisdiction in which the
contract is performed.

Employer's Liability Insurance - The Contractor shall provide evidence satisfactory
to the CO of employer's liability insurance as follows: $500,000 per accident for
injury; $500,000 per employee for disease; and $500,000 for policy disease limit.

All insurance required by this paragraph 3 shall include a waiver of subrogation
endorsement for the benefit of Government of the District of Columbia.

4.  Cyber Liability Insurance - The Contractor shall provide evidence satisfactory to the
Contracting Officer of Cyber Liability Insurance, with limits not less than $5,000,000
per occurrence or claim, $5,000,000 aggregate. Coverage shall be sufficiently broad
to respond to the duties and obligations as is undertaken by Contractor in this
agreement and shall include, but not limited to, claims involving infringement of
intellectual property, including but not limited to infringement of copyright,
trademark, trade dress, invasion of privacy violations, information theft, damage to or
destruction of electronic information, release of private information, alteration of
electronic information, extortion and network security. The policy shall provide
coverage for breach response costs as well as regulatory fines and penalties as well as
credit monitoring expenses with limits sufficient to respond to these obligations.

5.  Professional Liability Insurance (Errors & Omissions) - The Contractor shall provide
Professional Liability Insurance (Errors and Omissions) to cover liability resulting
from any error or omission in the performance of professional services under this
Contract. The policy shall provide limits of $5,000,000 per claim or per occurrence
for each wrongful act and $5,000,000 annual aggregate. The Contractor warrants that
any applicable retroactive date precedes the date the Contractor first performed any
professional services for the Government of the District of Columbia and that
continuous coverage will be maintained or an extended reporting period will be
exercised for a period of at least ten years after the completion of the professional
services. In the unlikely event the Contractor dissolves its limited liability company
during that ten year period, the Contractor agrees to purchase tail coverage for two
years post-dissolution to the extent available in the insurance market.

6.  Commercial Umbrella or Excess Liability - The Contractor shall provide evidence
satisfactory to the CO of commercial umbrella or excess liability insurance with
minimum limits equal to the greater of (i) the limits set forth in the Contractor's

Page 6 of 8

Attachment 1 to Letter Contract DCCB-2021-F-0008
Pharmacy Benefit Managers Investigation

umbrella or excess liability policy or (ii) $15,000,000 per occurrence and
$15,000,000 in the annual aggregate, following the form and in excess of General
Liability, Employer's Liability and Automobile Liability policies. All of these
liability coverages must be scheduled under the umbrella and/or excess policy. The
insurance required under this paragraph shall be written in a form that annually
reinstates all required limits. Coverage shall be primary to any insurance, self-
insurance or reinsurance maintained by the District and the "other insurance"
provision must be amended in accordance with this requirement and principles of
vertical exhaustion.

B.  PRIMARY AND NONCONTRIBUTORY INSURANCE
    The insurance required herein shall be primary to and will not seek contribution from any
    other insurance, reinsurance or self-insurance including any deductible or retention,
    maintained by the Government of the District of Columbia.

C.  DURATION.  Except for professional liability insurance, which has specific extended
    coverage set out in paragraph 5 above the Contractor shall carry all required insurance
    until all contract work is accepted by the District of Columbia and shall carry listed
    coverages for ten years for construction projects following final acceptance of the work
    performed under this contract and two years for non-construction related contracts.

D.  LIABILITY.  These are the required minimum insurance requirements established by the
    District of Columbia. However, the required minimum insurance requirements provided
    above will not in any way limit the contractor's liability under this contract.

E.  CONTRACTOR'S PROPERTY.  Contractor and subcontractors are solely responsible
    for any loss or damage to their personal property, including but not limited to tools and
    equipment, scaffolding and temporary structures, rented machinery, or owned and leased
    equipment. A waiver of subrogation shall apply in favor of the District of Columbia.

F.  MEASURE OF PAYMENT.  The District shall not make any separate measure or
    payment for the cost of insurance and bonds.  The Contractor shall include all of the costs
    of insurance and bonds in the contract price.

G.  NOTIFICATION.   The Contractor shall provide the CO with thirty (30) days prior
    written notice in the event of coverage and/or limit changes or if the policy is canceled
    prior to the expiration date shown on the certificate and ten (10) days prior written notice
    in the event of non-payment of premium. The Contractor will also provide the CO with
    an updated Certificate of Insurance should its insurance coverages renew during the
    contract.

H.  CERTIFICATES OF INSURANCE. The Contractor shall submit certificates of
    insurance giving evidence of the required coverage as specified in this section prior to
    commencing work.  Certificates of insurance must reference the corresponding contract
    number.  Evidence of insurance shall be submitted to:

Page 7 of 8

Attachment 1 to Letter Contract DCCB-2021-F-0008
Pharmacy Benefit Managers Investigation

### The Government of the District of Columbia

### And mailed to the attention of:

Gena Johnson
400 6th Street NW
Washington, DC 20001
202-247-6448
Gena.johnson@dc.gov

The CO may request and the Contractor shall promptly deliver updated certificates of
insurance, endorsements indicating the required coverages, and/or certified copies of the
insurance policies. If the insurance initially obtained by the Contractor expires prior to
completion of the contract, renewal certificates of insurance and additional insured and
other endorsements shall be furnished to the CO within five working days following
expiration of all such initial insurance. For all coverage required to be maintained after
completion, an additional certificate of insurance evidencing such coverage shall be
submitted to the CO on an annual basis as the coverage is renewed (or replaced).

I.   DISCLOSURE OF INFORMATION. The Contractor agrees that the District may
     disclose the name and contact information of its insurers to any third party which presents
     a claim against the District for any damages or claims resulting from or arising out of
     work performed by the Contractor, its agents, employees, servants or subcontractors in
     the performance of this contract.

J.   CARRIER RATINGS. All Contractor's and its subcontractors' insurance required in
     connection with this contract shall be written by insurance companies with an A.M. Best
     Insurance Guide rating of at least A- VII (or the equivalent by any other rating agency).

Page 8 of 8

Attachment 2 to Letter Contract – DCCB-2021-F-0008
Pharmacy Benefits Managers Litigation                                    Page 1 of 2

## 1.    ETHICAL OBLIGATIONS AND LEGAL CONFLICTS OF INTEREST

**1.1**    An attorney-client relationship will exist between the District and any attorney who
performs work under the contract, as well as between the District and the firm of any
attorney who performs work under the contract.  The D.C. Rules of Professional
Conduct (RPC) and the ethical rules of any other jurisdiction in which work is
performed are binding on the Contractor.  The parties agree that the District may have a
contractual cause of action based on violation of such rules, in addition to any other
remedies available.

**1.2**    In addition to the prohibitions contained in the RPC and the ethical rules of any other
jurisdiction in which work is performed, the Contractor agrees that it shall recognize
that in the performance of the contract it may receive certain information submitted to
the District government on a proprietary basis by third parties, information which
relates to potential or actual claims against the District government, or information
which relates to matters in dispute or litigation.  Unless the District consents to a
particular disclosure, the Contractor shall use such information exclusively in the
performance of the contract and shall forever hold inviolate and protect from disclosure
all such information, except disclosures required by applicable law or court order. The
Contractor also agrees that, to the extent it is permitted to disclose such information, it
will make such disclosures only to those individuals who need to know such
information in order to perform required tasks in their official capacity and will restrict
access to such information to such individuals.

**1.3**    Before any contractor can be retained to perform legal services under the contract, on
behalf of the District government, the Attorney General for the District of Columbia
must review and waive all actual or potential direct and indirect conflicts of interest
pursuant to RPC 1.6, 1.7, 1.8, 1.9 and 1.10.  After notice of its selection, each
prospective contractor shall provide the Attorney General with the following: (1) a
written statement that there exists no Rule 1.7(a) direct conflict of interest regarding the
work to be performed under the contract; (2) a written description of all actual or
potential conflicts of interest regarding the work to be performed under the contract that
require waiver pursuant to Rule 1.7(b) because the contractor represents another client
in a matter adverse to any of the following: (i) the District government agency or
instrumentality to be represented under the contract; (ii) the District government as a
whole; or (iii) any other agency or instrumentality of the District government (for this
purpose, under D.C. Bar Legal Ethics Committee Opinion No. 268, a representation of a
private client against a discrete government agency or instrumentality can have
government-wide implications and thus constitute a representation adverse to the
government as a whole pursuant to the RPC); and (3) a written description of all
representations of clients who are or will be adverse to the District government with
regard to the work to be performed under the contract, whether or not such
representations are related to the matter for which the work is to be performed under the
contract.

Attachment 2 to Letter Contract – DCCB-2021-F-0008
Pharmacy Benefits Managers Litigation                                    Page 2 of 2

1.4     The Attorney General generally does not grant prospective conflict of interest waivers,
        except in certain *pro bono* matters. Thus, in addition to the prohibitions contained in
        the RPC and the ethical rules of any other jurisdiction in which work is performed
        under the contract, without the consent of the Attorney General, the Contractor shall not
        represent any party other than the District in any disputes, negotiations, proceedings or
        litigation adverse to any agency or instrumentality of the District government or the
        District government as a whole, including, but not limited to, matters related to the
        work to be performed under the Contract. The Contractor shall notify the Attorney
        General immediately, in writing, of any potential conflicts of interest (as defined in the
        RPC) that arise during the period that the Contractor is performing work under the
        contract. The Attorney General makes every attempt to be reasonable in deciding
        whether or not to consent to a conflict of interest and usually makes this decision
        promptly after receiving notice and sufficient information regarding the conflict. If the
        Attorney General does not waive a conflict of interest, the Contractor shall undertake
        immediate action to eliminate the source of any such conflict of interest.

1.5     Before any contractor can be retained pursuant to the contract, the Attorney General for
        the District of Columbia must review all actual, direct and potential conflicts of interest
        on behalf of the District government in light of D.C. Bar Rules of Professional Conduct
        ("RPC") 1.6, 1.7, 1.8, 1.9 and 1.10. Each prospective contractor shall provide the
        Attorney General with written notice of all actual or potential direct and indirect
        conflicts of interest in which the Contractor represents (or may represent) another client
        with interests adverse to the District government agency to be represented as well as
        against the District government as a whole. For this purpose, under D.C. Bar Legal
        Ethics Committee Opinion No. 268, attached as Attachment 2 hereto, a representation
        of a private client against a discrete government agency can have government-wide
        implications and thus qualify under the RPC as being against the government as a
        whole, including the individual agency that the private firm represents. In that situation,
        the private firm would be required to notify the Attorney General of the existence of a
        conflict under RPC 1.7 and obtain consent to such representation and waiver of the
        conflict. The Attorney General makes every attempt to be reasonable in deciding
        whether or not to consent to a conflict and usually makes this decision promptly after
        receiving notice of the conflict.

Ethics Opinion 268

## Conflict of Interest Issues Where Private Lawyers Provide Volunteer Legal Assistance to the D.C. Corporation Counsel; Reconsideration of Opinion 92

Under the D.C. Rules of Professional Conduct, a lawyer may give volunteer legal assistance to the D.C. Corporation Counsel and continue simultaneously to represent private clients against the City and its agencies, as long as the requirements of Rule 1.7 are met. Under Rule 1.7(b)(1), a lawyer who wishes to represent a private client against the same City government client that she is representing while working for the Corporation Counsel on an unrelated matter, may do so if she obtains the informed consent of both her private client and her City government client. Similarly, the lawyer may agree to volunteer her services t o represent the same City government client that she or her firm is opposing on behalf of a private client in an unrelated matter, if both clients consent after full disclosure. Client notification and consent are not required, however, where the lawyer is not opposing her own City government client but some other agency of the City that is not her client.

The City government client is not always the City as a whole, but may be more narrowly defined as one of the City's constituent agencies. The identity of the government client for conflict of interest purposes will be established in the first instance between the lawyer and responsible government officials in accordance with the general precepts of client autonomy embodied in Rule 1.2. In agreeing to undertake a particular representation, the lawyer must take steps to recognize and respect the reasonable expectation of her other clients, protected by Rule 1.7, that they will receive a conflict-free representation.

Even if Rule 1.7(b)(1) does not apply, because the lawyer's government client is not considered the same government entity she is opposing on behalf of private parties, Rule 1.7(b)(2)-(4) may require that the lawyer obtain client consent if her representation of one client will be or is likely to be "adversely affected" by her representation of the other, or if the independence of her professional judgment will be or is likely to be adversely affected by her responsibilities to third parties or by her own personal interests.

### Applicable Rules

- Rule 1.2 (Scope of Representation)
- Rule 1.7 (Conflict of Interest: General Rule)

### Inquiry

The Committee has been asked to reconsider several conclusions of D.C. Bar Opinion 92 (1980) ("Propriety of Private Attorneys Handling Municipal Cases on a Pro Bono Basis"). Opinion 92 examined the ethical propriety, under the D.C. Code of Professional Responsibility, of a program in which "private attorneys acting on a pro bono basis would assist the City in managing its severely crowded civil docket."[1] (/bar-resources/legal-ethics/opinions/opinion268.cfm#footnote1) The Committee opined in Opinion 92 that the program would be ethically permissible as long as certain conditions were met. The inquirer has asked the Committee to reconsider the continuing validity of two of those conditions, given the intervening adoption in 1991 of the D.C. Rules of Professional Conduct.[2] (/bar-resources/legal-ethics/opinions/opinion268.cfm#footnote2) The two conditions in question are as follows:

2023-FOIA-01530-00000099

1. A lawyer or firm performing volunteer representational work for the City or any of its agencies may simultaneously represent a private party against the City or any of its agencies only with full disclosure to and consent of both the City and the private party; and.
2. Under no circumstances may a lawyer or firm volunteer to represent a particular agency of the City government while at the same time handling a private matter involving the same agency, or another matter that is or appears to be "closely related," even with client consent.

## Summary of Conclusions

For reasons discussed more fully in Part I below, the Committee believes that the conclusion in paragraph 2 above is no longer mandated under the Rules of Professional Conduct. Thus a lawyer may represent a particular City government agency in a matter at the same time she is opposing that agency on behalf of a private client in an unrelated matter, as long as she makes full disclosure to and obtains the consent of both the City government agency and the private client. *See* Rule 1.7(b)(1) and 1.7(c). Moreover, as explained in Part II below, we disagree with the assumption of Opinion 92 that the entire City and all of its constituent agencies must always and necessarily be considered the lawyer's client for conflict of interest purposes. Thus, a lawyer may under certain circumstances perform services for a particular City agency client without having to notify and obtain the consent of private clients that she is representing against another City agency that is not considered the same client. Nevertheless, even if Rule 1.7(b)(1) does not apply because the lawyer is not opposing her own client, she may be required by Rule 1.7(b)(2)-(4) to notify and seek the consent of one or both clients if her representation of one would substantially interfere with her representation of the other, or if her independent judgment in either client's behalf would be adversely affected by her responsibilities to a third party or by her own personal interests.

## Discussion

### I. Prohibited Representation of Private Parties Against Particular City Agencies or in Particular Matters

Opinion 92 imposed an absolute prohibition against a lawyer's representing a private party against the same particular City agency for which she is performing volunteer services, or in a matter "closely related" to the one she is handling for the City. This absolute prohibition was derived from the "appearance of impropriety" standard of Canon 9 rather than the "conflict of interest" rules of Canon 5. The "appearance" standard was dropped entirely from the Rules of Professional Conduct, and the conflict of interest rules provide that conflicts may generally be waived by the client. *See* Rule 1.7(b) and (c). Under the current rules, the only conflict that cannot be relieved by client consent is the one that arises where a lawyer seeks to take "adverse" positions on behalf of two different clients *in the same matter. See* Rule 1.7(a). We therefore conclude that the absolute prohibition on opposing one's own City agency client set forth in paragraph 2 above is no longer applicable.

While a conflict under Rule 1.7(b)(1) would arise if the volunteer lawyer attempted to represent a private client against the City in one matter at the same time she (or one of her partners) was representing the City for the Corporation Counsel in another matter, since the lawyer would in effect be opposing her own client, that conflict could in most circumstances be cured by making full disclosure to both affected clients and obtaining their consent. Thus, a lawyer may represent a private party against a City government agency while simultaneously representing that same City agency in an unrelated matter, as long as both the private client and the agency client are informed of the existence and nature of the lawyer's conflict and do not object to the continued representation. *See* Rule 1.7(b)(1) & (c). *See also* Rule 1.7(b)(2)-(4). A lawyer may not, however, represent both the City and a private client in the same matter if they are adverse to each other in that matter, even if both clients consent. *See* Rule 1.7(a).

The fact that the lawyer is volunteering her services to the City, as opposed to serving under a paid retainer, is irrelevant to these conclusions, as it is to the conclusions reached in the remainder of this opinion.

2023-FOIA-01530-00000100

## II. Conflicts of Interest Where Volunteer Services Are Performed for the City or One of Its Agencies

We now address the holding of Opinion 92 based on the then-applicable conflict of interest rules, described in numbered paragraph 1 above. Opinion 92 construed the conflict of interest provisions of the former Code, derived from Canon 5, to permit a lawyer to participate in the Corporation Counsel's volunteer program "notwithstanding his or her involvement in other matters affecting the City," as long as two conditions were met: first, it must be "obvious" that the lawyer can adequately represent "both the interests of the City and his or her other private clients;" and, second, "each affected client must consent to the multiple representation after full disclosure."

### A. Defining the Client for Conflict of Interest Purposes

Before turning to an analysis of how the current conflict of interest rules apply in this situation, we must deal with one important threshold issue, involving an unexamined assumption made by the drafters of Opinion 92 about the identity of the City government client. That assumption is that the client of the volunteer lawyer working for the Corporation Counsel is always and necessarily "the City" as a whole rather than one or more of the City's constituent agencies.[3] **(/bar-resources/legal-ethics/opinions/opinion268.cfm#footnote3)** This definition of the government client gives the conflict rules a considerably broader application and effect than they would have if the City government client were more narrowly defined. Under Rule 1.7(b)(1), a lawyer may not take a position in a matter on behalf of one client that is adverse to a position taken in the same matter by another client (not represented by her) unless she obtains consent from both clients.[4] **(/bar-resources/legal-ethics/opinions/opinion268.cfm#footnote4)** If the client of the volunteer lawyer is the City as a whole, as opposed to one or more of its constituent agencies, Rule 1.7(b)(1) would require the lawyer to obtain consent to the City representation from each and every one of the private clients that she is currently representing against the City or any of its agencies, and from the City to each and every adverse private representation the lawyer may currently be involved in against it or any of its agencies, without regard to whether there is any real possibility that the substantive concerns animating the conflicts rules are implicated.[5] **(/bar-resources/legal-ethics/opinions/opinion268.cfm#footnote5)**

Concerned that the breadth of this definition of the City government client will effectively discourage, if not preclude, private law firms from volunteering to assist the Corporation Counsel, the inquirer has asked the Committee to consider whether the volunteer lawyer's client may be defined as a particular City agency as opposed to the City as a whole, so as to ameliorate the sweeping requirement of notice and consent imposed by Rule 1.7(b)(1) read in the light of Opinion 92. We agree with the inquirer that the definition of the City government client contained in Opinion 92 is too broad, and that the City government client may sometimes be defined as narrowly as a single agency. As discussed more fully below, we also believe that the identity of the City government client depends upon a number of discrete considerations and must be decided on a case-by-case basis.

Simply as a matter of common sense it seems apparent that the client of the volunteer lawyer will not always be the entire City, but may sometimes be a smaller part of it. Much like a large modern corporation, the District of Columbia government is a complex and many-faceted entity that sometimes acts through its individual constituent parts (like the subsidiaries of a corporation) and sometimes acts as a single entity, depending upon the particular facts and circumstances. Sometimes a legal matter or issue is relevant only to a single City agency and is of no substantial interest to other agencies or the City as a whole. Sometimes a matter or issue directly affects or is otherwise significant to a number of agencies or the overall City government. In some situations the broad set of interests at stake will be apparent at the outset; in others the broader concerns may emerge during the course of the representation.

Whatever general principles about client identity in the government context can be drawn from our common sense analysis of the governmental interests implicated by particular cases, at bottom

the identity of the City government client (like the identity of the corporate client) is not primarily a question of legal ethics. The identity of the government (or corporate) client for all ethical purposes is established in the first instance between the lawyer and responsible public (or corporate) officials in accordance with the general precepts of client autonomy embodied in Rule 1.2.[6] (/bar-resources/legal-ethics/opinions/opinion268.cfm#footnote6) Cf. ABA Formal Opinion 95-390 ("Conflicts of 6 Interest in the Corporate Family Context") (a corporate client may specify, when engaging a lawyer, whether or not "the corporate client expects some or all of its affiliates to be treated as clients for purposes of Rule 1.7").

The ethics rules provide at least one important limitation on what a lawyer can agree to with a client under Rule 1.2, and that is her other clients' right to be protected from conflicts of interest under Rule 1.7. In agreeing to represent a particular government client, a lawyer must take into account the countervailing rights of her other clients whose interests may be adversely affected by this new representation to know of and object to it—just as she must consider the similar rights of the new government client to know of and be able to object to any conflicting existing representations. In working with officials who are authorized to speak for the government client to define the scope of the representation (and hence the identity of the government client for conflict of interest purposes), the lawyer may defer to the government client's wishes only as long as she is able to fulfill her basic responsibilities to her other clients under Rule 1.7, including in particular her obligation not to take a position adverse to them on behalf of another client without their consent. This is the basic right secured to every client by Rule 1.7(b)(1).

The lawyer may not, by agreeing to a narrow definition of the government client, seek to defeat the reasonable expectation of her other clients, arising from and protected by Rule 1.7(b), that they will get a conflict-free representation from their lawyer. Accordingly, the volunteer lawyer must assure herself that the definition of the government client ultimately arrived at in discussions with authorized government officials both recognizes and respects her private clients' right to object when their lawyer proposes to represent interests directly adverse to their own. Her government client has the same right to object to any potentially conflicting private representations.

Thus, we believe that the lawyer who wishes to perform volunteer work for the Corporation Counsel's Office has an obligation to work with that office to develop a clear understanding of the scope of her representation of the City, and to make certain that the agreed upon definition of the government client is a reasonable one in light of all the facts and circumstances, including in particular each of her clients' right to know about, and to give or withhold consent to, her representation of adverse interests.

Ideally, the identity of the government client should be specifically agreed upon between the volunteer lawyer and the government officials who are authorized to speak for the client at the outset of the representation, and committed to writing. In those instances where the identity of the client is not clearly defined, it may be inferred from the reasonable understandings and expectations of the lawyer and those officials. These in turn may be gleaned from such functional considerations as the organizational structure of the City and the extent to which its constituent parts are related in form and function, and from the facts and circumstances of the particular matter at issue in the representation—including the general importance of the matter to the City as a whole and to other particular components whose programs or activities are not directly involved.

There may be situations in which it can be agreed at the outset that the volunteer lawyer will represent only a single City agency in a relatively discrete matter (e.g., a particular contract) or in a relatively discrete category of cases (e.g., child abuse and neglect cases). In such a case, the lawyer would be free to agree to take on a private representation in which she would be opposing another City agency on an unrelated matter, without having to notify or obtain the consent of either her existing government client or her new private client. That is the easiest case. Another fairly clear case is the one in which the volunteer lawyer represents a City agency in a matter that plainly

has City-wide impact or public importance, so that it can fairly be said to implicate the interests of
the City generally. In such a case, it would be unreasonable not to regard the lawyer's client as the
City as a whole, and she therefore could not undertake a private representation against any City
agency without informing and obtaining the consent of the City and, subsequently, the private
client. There are dozens of permutations on these basic scenarios, in which the general City-wide
interest is sometimes clear and sometimes not so clear. However, the mere fact that a matter is
captioned "X v. District of Columbia" is not dispositive of the identity of the government client.
Rather, as noted previously, the answer depends upon the reasonable understanding reached
between the volunteer lawyer and responsible public officials based upon all relevant facts and
circumstances. Of course, as with all representations, the lawyer must be alert to the need to deal
with any conflicts that may arise during the course of the representation.[7] **(/bar-resources/legal-
ethics/opinions/opinion268.cfm#footnote7)**

The Corporation Counsel—as chief legal officer for the District and controller of its
litigation—asserts that he has legal responsibility for determining the identity of the City
government client for purposes of the conflict of interest rules. The Corporation Counsel has
indicated his intention to issue guidelines for dealing with conflict issues posed by the volunteer
program, that will address the identity of the client and the circumstances in which the District will
waive any potential conflicts. We expect that these guidelines, when issued, will be useful to
volunteer lawyers not only in determining what kinds of legal assistance they may give to the
Corporation Counsel without creating a conflict with their existing private representations, but also
in determining the scope of any conflicts. The guidelines may also be useful in determining what
new private clients or matters a lawyer may subsequently take on in light of her responsibilities to
her City government client(s).

In summary, we conclude that the Rules of Professional Conduct do not identify the City
government client, and for the most part provide only general guidance for the lawyer and
responsible government officials in reaching an understanding in this regard. The one clear
limitation on the lawyer in this context derived from the ethics rules is her other clients' reasonable
expectation that they will be allowed to object to their lawyer's representation of interests that
would impinge upon her ability to zealously represent their own. Thus we believe that the private
lawyer who wishes to perform volunteer work for the Corporation Counsel's office must work with
that office to develop a clear understanding of the scope of her representation of the City, and
hence the identity of the government client for conflicts purposes, and must take steps to protect all
of her clients' right to know about and withhold consent to their lawyer's representation of interests
that are adverse to their own.

**B. Applicable Conflict of Interest Rules**
Assuming that the relevant City government client has been identified, it remains to explain how
the current conflict of interest rules apply in this situation.

**1. Direct Conflicts Under Rule 1.7(b)(1)**
As noted, Rule 1.7(b)(1) prohibits a lawyer from taking a position on behalf of one client that is
directly adverse to a position taken by another client in the same matter (represented of course in
this matter by another lawyer) without the consent of both clients. *See* note 4, *supra*. Thus, if a
lawyer wishes to undertake a volunteer representation of a particular City agency that she or her
firm is already opposing on behalf of a private client, the lawyer may do so only if she informs both
the private client and the new City agency client of the "existence and nature of the possible
conflict and the possible adverse consequences of such representation," and they give their
consent.[8] **(/bar-resources/legal-ethics/opinions/opinion268.cfm#footnote8)** Rule 1.7(c)(1). The
conflicts of each lawyer in a firm are imputed to all other lawyers in the firm. Rule 1.10.

For example, if a volunteer lawyer is considering taking on a matter for the Corporation Counsel
that involves defense of a suit brought against the Mayor and/or the City Council, or a suit

attacking some City-wide program or regulation (so that the client must be deemed to be the City as a whole), the lawyer must make full disclosure to and seek consent from each of her firm's private clients who have matters pending against the City or any of its agencies. She must also inform the Corporation Counsel of any conflicting private representations being pursued by her or by other lawyers in her firm. Conversely, if a volunteer lawyer is working on a City-wide matter and is then asked to represent a private party against the City or one of its agencies, she must inform the Corporation Counsel and seek his consent. Consent must also be 8 obtained from the new client.

On the other hand, Rule 1.7(b)(1) does not apply, and client notification and consent are not required, if a lawyer is not opposing her own City government client but some other agency of the City that is not her client. For example, if a lawyer hired to defend a program or action of a particular City agency, such as the Housing Department, were representing only the Housing Department in this matter, she would be required to disclose the fact of her Housing Department representation and seek consent from those of her firm's private clients who had matters pending against the Housing Department or against the City as a whole.[9] (/bar-resources/legal-ethics/opinions/opinion268.cfm#footnote9) But she would not be required to disclose her Housing Department representation to private clients who had matters pending against other particular City agencies whose functions were unrelated to the Housing Department and that otherwise had no interest in the issues involved in the Housing Department representation and would be unaffected by its outcome.

Thus, in a case where a lawyer is representing the City as a whole, she is obliged to obtain the City's consent before opposing one of its constituent agencies, as well as the consent of any of her private clients who have interests adverse to the City (or, of course, the particular agency she would be representing). Similarly, if the lawyer is representing a private client against the City as a whole, she must obtain the private client's consent before undertaking any City government representation, even one involving a discrete agency program with no functional or programmatic relationship to the City-wide matter she is otherwise involved in. The only situation in which the lawyer may cabin her conflict and avoid having to conduct a broad canvass of all clients with City-related business is where both her public and her private representations involve discrete agency programs with no City-wide implications.

## 2. Indirect Conflicts Under Rule 1.7(b)(2)-(4)
Even if Rule 1.7(b)(1) does not apply because the lawyer's City government client is not considered to be the same City client that she is opposing, her representation of a City agency may still raise an "indirect" conflict of interest under subsections (2) through (4) of Rule 1.7(b) if it "interferes in some substantial way with the representation of another" client. D.C. Bar Opinion 265 (1996) ("Positional Conflicts"). This would as a practical matter result in the same need to determine that both clients could be adequately served, and then to make full disclosure to and obtain the consent of "each affected client" to the multiple representation. Under Subsections (2) and (3) of Rule 1.7(b), if the lawyer believes that her representation of the City agency "will be or is likely to be adversely affected" by her representation of a private client, or vice versa, the lawyer must obtain the consent of the affected client or clients. Under subsection (4), client consent must be obtained if the lawyer believes that the independence of her professional judgment on behalf of a client "will be or reasonably may be adversely affected" by her responsibilities to a third party or by her own personal interests.

In contrast to the situation involving a direct conflict under Rule 1.7(b)(1), where disclosure and informed consent are mandatory once it is apparent that the lawyer will be opposing her own client, a lawyer has some discretion in deciding whether an indirect conflict under Rule 1.7(b)(2)-(4) exists. Whether a particular volunteer representation will "adversely affect" the lawyer's representation of another client (or vice versa) depends upon the particular facts and circumstances and is in the first instance essentially a matter for the lawyer to decide. Likewise,

the existence of a conflict arising from the lawyer's responsibilities to third parties or her own
personal interests is primarily a question of fact. The lawyer may decide that she should make
disclosure to and seek consent from one client but need not do so from the other.

The "adverse effect" inquiry under subsections (2) through (4) is primarily a functional one,
generally involving both the relative importance of the representation to the respective clients or to
their lawyers and the directness of the adverseness between them. It may require inquiry into the
nature of the issues, the amount of money at stake, and the likelihood that either client would
otherwise be substantially and foreseeably affected by the outcome of the other's matter.
Sometimes, the "adverse effect" inquiry will also involve the particular role the volunteer lawyer is
expected to play in the matter, and the "intensity and duration" of her relationship with the lawyers
she is opposing. Cf. Formal Opinion 1996-3 of the Committee on Professional and Judicial Ethics
of The Association of the Bar of the City of New York (1996)(conflicts of interest where one lawyer
represents another lawyer).

Without attempting to exhaust the kinds of situations that would give rise to an adverse effect
under Rule 1.7(b)(2)-(4), we offer the following examples to illustrate the kinds of circumstances
that in this Committee's view could require a lawyer to obtain consent from one or both clients
under these provisions. 1) A volunteer lawyer whose firm is handling a matter for private clients
against one City agency, and who is subsequently asked by the Corporation Counsel to defend
another City agency in a matter whose outcome will have a substantial and foreseeable impact on
the outcome of the firm's private clients' matter, may be required to obtain one or both clients'
consent. 2) A volunteer lawyer who represents one City agency and wishes to make certain
arguments about that agency's authority that are inconsistent with arguments she is making on
behalf of a private client against another City agency in an unrelated matter, may be required to
obtain consent from one or both clients if the success of her arguments on behalf of one client "will,
in some foreseeable and ascertainable sense, adversely effect the lawyer's effectiveness on behalf
of the other" client. See Opinion 265, supra. 3) A volunteer lawyer performing work for one City
agency who wishes to take a leading role representing a private party in a controversial matter
involving another City agency should anticipate having to obtain consent from both clients if she
believes it likely that one representation will have an adverse effect on the independence of her
professional judgment or her credibility in the other. 4) A volunteer lawyer who works closely and
for extended periods of time with full-time Corporation Counsel lawyers, or is closely supervised by
Corporation Counsel lawyers, may find it difficult to exercise independent professional judgment in
opposing the same lawyers with whom she is working or who are supervising her, and in such a
situation she may decide that she should not accept a private representation in which she would
be opposing her colleagues, without notifying and seeking the consent of both the Corporation
Counsel and her private client.[10] **(/bar-resources/legal-
ethics/opinions/opinion268.cfm#footnote10)**

The above examples are not intended to be exhaustive, but merely to suggest the possibilities
for "indirect" conflicts to develop in the context of a volunteer program such as the one described in
Opinion 92.

**Conclusion**
The conclusion of Opinion 92 that, under the former Code of Professional Responsibility, a lawyer
may never oppose a City agency that she is also representing on behalf of another client in an
unrelated matter, is no longer mandated by the Rules of Professional Conduct. Under Rule 1.7(b)
(1), a lawyer may oppose her own City government client on behalf of a private client in an
unrelated matter as long as she makes clear the nature of the conflict to both clients and obtains
their consent.

Moreover, we believe that in certain limited situations a lawyer may represent a City agency
without having to notify or obtain the consent of private clients that she is representing against

other discrete City agencies. Opinion 92's apparent assumption that the client of the Corporation Counsel lawyer is always and necessarily the City as a whole is incorrect, and in any event has no foundation in the ethics rules. The rules contemplate that the identity of the City government client for conflict of interest purposes will be decided on a case-by-case basis between the lawyer and responsible government officials, taking into account the reasonable expectation of the lawyer's other clients that they will receive a conflict-free representation. Their decision will generally be based on functional considerations derived from the structure and relationship of the government entities involved and from the facts and circumstances of the particular matter at issue in the representation. Even if the lawyer would not be opposing her own client, she may be required by Rule 1.7(b)(2)-(4) to obtain client consent if her representation of one client would interfere in some substantial way with her representation of the other, or if the independence of her judgment in either client's behalf would be compromised by her responsibilities to or interests in a third party or by her own personal interests, including her personal and professional relationships with the lawyers on the other side.

October 1996

1. Under the program described in Opinion 92, private law firms were encouraged to donate the services of attorneys to assist the Corporation Counsel in a variety of legal matters, generally on a part-time basis. This program reportedly yielded little by way of relief for the Corporation Counsel's Office, at least in part because of the conditions on lawyer participation (particularly the requirement of obtaining waivers from other clients) set forth in Opinion 92. In 1992, a second and more formal effort was made to encourage lawyers from private firms to volunteer their services to the City, this time by granting them a special dispensation from the imputation rule. The amendments enacted in that year to Rule 1.10 and 1.11 provided that conflicts resulting from one lawyer's voluntary service to the Corporation Counsel need not be imputed to all other lawyers in her firm. See Rule 1.10(e) and Comment [19]; Rule 1.11(h) and Comments [12] and [13]. (The 1992 amendments to Rules 1.10 and 1.11 were permanent in 1994 and extended to the D.C. Financial Control Board in 1996). According to the commentary to Rule 1.10, this special dispensation from the imputation rule depends upon the volunteer lawyer's working full-time for the Corporation Counsel (there must be a "temporary cessation" of a volunteer lawyer's practice with the firm, "so that during that period the lawyer's activities which involve the practice of law are devoted fully to assisting the Office of the Corporation Counsel"). Thus, when a private lawyer is detailed full-time to the Corporation Counsel's Office under the so-called "Rule 1.10 program," her firm will not be regarded as representing the City, and will not need to alert and obtain consent from those of its clients who "might reasonably consider the representation of its interests to be adversely affected" by the firm's representation of the City. See Comment [7] to Rule 1.7. (It follows by necessary implication that where a lawyer is volunteering for the City on a less than full-time basis, or does not otherwise meet the requirements of a "Rule 1.10 detail," the conflicts resulting from her government service are imputed to all lawyers in her firm." We understand that the Rule 1.10 program has attracted few volunteers, and has accordingly provided no more benefit for the Corporation Counsel's Office than did the pre-1992 part-time details discussed in Opinion 92.

2. Amendments to the Rules issued by the D.C. Court of Appeals on October 16, 1996, make a number of revisions to the text and commentary of Rule 1.7, none of which affect the conclusions of this opinion. We would note, however, the extensive attention paid in new Comments [13]-[18] to conflicts of interest where the client is a "corporation, partnership, trade organization or other organization-type client." While not directly applicable to situations in which the client is a governmental entity, cf. Comment [7] to Rule 1.13, we believe this discussion may provide a useful supplement to the discussion of conflicts under Rule 1.7(b)(2)-(4) in Part II B(2), infra.

3. Opinion 92 does not say in so many words that the client of the volunteer lawyer is always and necessarily the entire City for Canon 5 conflict of interest purposes. Nevertheless, this has been the generally accepted interpretation of the opinion since its issuance more than 16 years ago, and there appears to be little support in the text for a contrary position. Moreover, the fact that the absolute bar under the "appearance" standard of Canon 9 is clearly applicable only to representations involving particular City agencies if further evidence that the drafters of Opinion 92 intended a very broad definition of the City client for conflict of interest purposes.

4. Where a conflict arises under Rule 1.7(b)(1) because the lawyer is opposing her own client on behalf of another client, both clients are presumed to be "potentially affected" under Rule 1.7(c)(1) and both must therefore consent to the representation after full disclosure.

5. Opinion 92 advises a firm wishing to participate in the Corporation Counsel's volunteer program to "send a standardized letter to all clients identified as having present or potential future dealings with the City, describing the program and explaining in general how the judgment of the firm's attorneys might or might not be affected by the firm's participation in the program." This suggests an even broader application for the condition, requiring the lawyer to obtain consent from clients with present or potential City business without regard to whether the lawyer or her firm is actually representing the client in connection with that City business. We see no basis in the current rules for such an expansive reading of the conflict of interest rules. Even in a case when the entire City is considered the lawyer's client, consent must be obtained only from clients who the lawyer is currently representing against the City (or one of its agencies) or those who have actually asked her so to represent them.

6. We do not regard the definition of the government client contained in Rule 1.6(i) ("the client of the government lawyer is the agency that employs the lawyer") as dispositive for conflict of interest purposes. And, there is no indication that this or any other a priori definition of the government client was intended to apply in this context in the otherwise thorough consideration of the "government lawyer" issue by the Sims Committee in 1988. See Report by the District of Columbia Bar Special Committee on Government Lawyers and the Model Rules of Professional Conduct (1989).

7.The provisions of Rule 1.7(d) (1996 amendment) govern conflicts arising after the representation commences that are "not reasonably foreseeable at the outset of a representation." As we read this provision, it subjects such unforeseeable late-arising conflicts to the provisions of Rule 1.7(b)(2) through (4) only, and not to those of Rule 1.7(b)(1).

8. The government client can generally decide what information it needs or wants about the volunteer lawyer's potentially conflicting representations, in the context of deciding its own identity. Thus, the process of self-definition functions for the government client as a way of consenting to the volunteer lawyer's conflicting private representations to which it would be entitled to object if it chose to define its identity more broadly. In this fashion, the government client may decide that it has no interest in knowing about any conflicts that might otherwise be imputed to the volunteer lawyer under Rule 1.10 by virtue of representations by other lawyers in her firm.

9. Given the decision-making structure of government entities, we believe that the conflicts of the City are necessarily attributed to its constituent parts, and that the conflicts of the constituent parts of the City are necessarily attributed to the City as a whole—though the conflicts of one of the City's constituent agencies may or may not be attributed to other City agencies.

10. Because this conflict is in the nature of a personal conflict, as opposed to one derived from the lawyer's representation of another client, we doubt that it would be imputed to other lawyers in the firm. See ABA Formal Opinion 96-400 ("Job Negotiations with Adverse Firm or Party") (Rule 1.10 "cannot be construed so broadly as to require that all lawyers in a firm be presumed to share their colleague's personal interest in joining the opposing firm in a matter," though each lawyer must

individually evaluate whether his "'responsibilities to . . . a third person'—i.e., his colleague—or his
own interest in his colleague's interest, may materially limit the representation.")

2023-FOIA-01530-00000108

# Exhibit C

to Declaration of Matthew Hooker



FIRST-CLASS

$ 007.20°
US POSTAGE
DEC 28 2020
PITNEY BOWES
02 1P
0002114238
0001
MAILED FROM ZIP CODE 20004

CERTIFIED MAIL®

7016 3010 0000 2493 7076



**MotleyRice**® LLC

ATTORNEYS AT LAW

401 9th St. NW, Suite 1001
Washington, DC 20004

ADDRESS SERVICE REQUESTED



OptumRx, Inc.
c/o CT Corporation System, Registered Agent
1015 15th St. NW
Suite 1000
Washington, D.C. 20005

## GOVERNMENT OF THE DISTRICT OF COLUMBIA
### OFFICE OF THE ATTORNEY GENERAL



**Karl A. Racine**
**Attorney General**

**Office of Consumer Protection**

**SUBPOENA**

In the Matter of                    **DEMAND FOR PRODUCTION**
OptumRx, Inc.                       **OF DOCUMENTS**

To:         OptumRx, Inc.

Serve On:   CT Corporation System, Registered Agent
            1015 15th St. NW
            Suite 1000
            Washington, D.C. 20005

*************************************************************************

    The Office of the Attorney General for the District of Columbia is investigating whether
OptumRx, Inc. may have violated one or more of the provisions of the District of Columbia
Consumer Protection Procedures Act, D.C. Code § 28-3901, *et seq.*, in connection with the
negotiation of prescription drug rebates and the administration of prescription drug benefits.

    Pursuant to D.C. Code § 28-3910, and by the authority vested in the Attorney General for
the District of Columbia, you are hereby required to produce the documents and information
requested below, on or before January 27, 2021, to the attention of:

            Linda Singer
            Motley Rice LLC
            401 9th St. NW, Suite 1001
            Washington, DC 20004

    Questions regarding this subpoena should be directed to Assistant Attorney General
Wendy J. Weinberg at 202-724-1342, wendy.weinberg@dc.gov.

## INSTRUCTIONS

A.   In each instance in which a document is produced in response to a Request, the current
     version should be produced together with all earlier versions, or predecessor documents
     serving the same function during the relevant time period, even though the title of earlier
     documents may differ from current versions, as well as the time period that each version
     was used by You.

B.   The Subpoena calls for all described documents in your possession, custody or control
     without regard to the person or persons by whom or for whom the documents were
     prepared (*e.g.*, your company employees, contractors, vendors, distributors, service
     providers, competitors, or others).

C.   These Requests specifically include production of electronically stored information
     ("ESI").

     1.   General Instructions. A cover letter will accompany each production, identifying
          each piece of media (hard drive, thumb drive, DVD, CD, or FTP), the production
          date, production volume, and the Bates range of the production. Data will be
          produced on hard drive, thumb drive, DVD, CD, or FTP. Label all media with the
          following:

          a.   Case number
          b.   Production date
          c.   Production volume
          d.   Bates range
          e.   Media volume number (1 of X, 2 of X, etc.), if applicable.

     2.   Production Format for Electronically Stored Information. Production of all ESI is
          requested in either original native file format or as searchable image files, using
          production numbering as described below. Before being produced, all parent-level
          email and loose-file (non-email) ESI should be de-duplicated across all custodians
          and shared network drives based on MD5 hash value. Individual email
          attachments should not be separately de-duplicated. All ESI should be produced
          with a metadata field listing all custodians where duplicate documents were
          found. For ESI production in image format, if any documents cannot be
          reasonably be converted to readable images, the information should be produced
          in native format or some other reasonably usable format, and image production
          should include a placeholder image for each such unconverted or unreadable
          document setting forth the original filename and extension.

     3.   Production of Email. If produced in native format, email should be produced as
          individual, parent level, HTML files, and attachments to emails should
          sequentially follow their parent emails and be produced in native format as
          separate files. If produced in searchable image format, parent emails and their
          attachments should be produced as separate, contiguous documents.

2

4.    Production of Spreadsheets. Spreadsheets should be produced in native format if stored in that manner, and each native file should be named with a document production number as described below. If a spreadsheet contains privileged information, you may produce it as imaged ESI, with the privileged information redacted, provided that You make reasonable efforts in applying page layout settings to maximize document readability. Images of spreadsheets that contain multiple worksheets should be produced with worksheet names indicated in a header or footer. To the extent that print-outs or images of all or part of a spreadsheet were also maintained in the ordinary course of business in static form (*e.g.*, as a pdf attachment), those documents should be produced as images to the extent such production is not duplicative.

5.    Production of Database Information. Relevant information from a database should be produced as a report or data table, either in a static image format or in a popular database application, such as an Microsoft Access database.

6.    Production of ESI Commentary and Tracked Changes. Microsoft Word, Microsoft Excel, and similar file formats that provide for comments or tracked changes should be produced in a manner in which all comments and tracked changes are preserved, accessible, and viewable in their original color format. Such production may be in native format.

7.    Production of Paper Documents. Scanned paper document production must have natural, logical document breaks and should include, where available, copies of file folders, envelopes, or labels or other identifying marks on the containers in which the documents were maintained. All scanned paper documents should be produced with OCR text in a corresponding TXT file.

8.    Image Production Format. Searchable images should be produced as separate documents in either single-page Group IV TIFF format or multi-page PDF format, at least 300 DPI resolution, with corresponding TXT files. Imaged ESI should maintain all color properties, and scanned paper images should provide color when content of the document contains more than one color.

9.    Document Production Numbering. Each page of all images produced (whether hard-copy documents or ESI) must be clearly labeled with an indelible, legible, unique Bates number identifier electronically "burned" onto the image. Reasonable steps shall be taken to place the Bates number or confidentiality designation at a location that does not obscure any content from the source document. There shall be no other branding placed on the document image, except to identify redactions due to privilege. To the extent possible, documents and ESI shall be Bates numbered consecutively, maintaining all parent/child relationships as well as the order of the parent emails and corresponding attachments.

10.   <u>Load Files and Metadata</u>. All native format and searchable image format
      production must include one or more CSV or Summation load files that associate
      each document and its Bates number with its corresponding TXT file, and that
      include the following original and processed metadata fields:

For all imaged documents (ESI and scanned):

        BegDoc
        EndDoc
        ParentID
        AttachmentIDs
        BegAttach
        EndAttach

For all ESI (native and imaged):

        FileName
        Extension
        Author
        DateCreated
        TimeCreated
        DateLastMod
        TimeLastMod
        MD5Hash
        Custodian
        DupCustodians

For all email:

        MailTo
        MailFrom
        CC
        BCC
        Subject
        DateAndTimeSent
        DateAndTimeReceived
        TimeZone
        IntMsgID
        Conversation
        ConversationIndex
        ParentID
        AttachmentIDs
        BegAttach
        EndAttach

4

If production in the requested form is not reasonably available or practical, office personnel at the undersigned law firm are available to discuss compatible alternatives.

11.  Production Load Files. Two Load/Unitization files shall accompany all productions. All productions containing images must include an image load file that is in .LOG or .OPT format. For any productions containing native files, the metadata .DAT file should contain a NATIVELINK field that contains the path/link to each native file generated during production. The native files should be named with their corresponding bates numbers. All productions should include a metadata load file (.DAT file) containing all agreed upon metadata production fields and the delimiters should be standard Concordance delimiters:

    a.  Column Delimiter:          (020)
    b.  Field Delimiter:  þ      (254)
    c.  New Line Delimiter:   ®    (174)
    d.  Multi-Entry Delimiter: ;      (059)

The following ASCII delimiters are also acceptable:

    e.  Column Delimiter:      ^    (094)
    f.  Field Delimiter:  |    (124)
    g.  New Line Delimiter:   ~    (126)
    h.  Multi-Entry Delimiter: ;      (059)

The first line of the .DAT file must contain the field names to each corresponding metadata field. The name of the data load file should mirror the name of the delivery volume and the volume names should be consecutive. If foreign language/Unicode text exists, the .DAT file shall contain the appropriate encoding to enable preservation of the document's original language.

12.  Searchable Files.  (.TXT). Document level, searchable text files shall be provided for all production documents and be maintained in separate TEXT directories. All text files should be named with their corresponding bates numbers. The metadata .DAT file should contain a TEXTPATH field that contains the path/link to each corresponding text file generated during production. If foreign language/Unicode text exists, the .TXT files shall contain the appropriate encoding to enable preservation of the document's original language.

13.  Privileged Documents.  If any responsive document is withheld under any claim of privilege, provide a detailed privilege log that contains at least the following information for each document that you have withheld:

    a.  the name of each author, writer, sender, creator, or initiator of such document;
    b.  the name of each recipient, addressee, or party for whom such document was intended;

    c.    the date of such document, or an estimate thereof if no date appears on the
document;

    d.    the general subject matter of the document; and

    e.    the claimed grounds for withholding the document, including—but not
limited to—the nature of any claimed privilege and grounds in support.

14. <u>Duty to Preserve Documents.</u>  All documents and/or other data which relate to the
subject matter or requests of this subpoena must be preserved. Any destruction
involving such documents must cease, even if it is your normal or routine course of
business to delete or destroy such documents or data and even if you believe such
documents or data are privileged or otherwise need not be produced.

15. <u>Duty to Supplement.</u>  All document requests are continuing in nature so as to require
the supplementary production if you obtain further responsive documents or
information. You are also required to amend your responses to the requests
contained within this subpoena if you discover that the previous response was
incorrect or incomplete.

16. <u>Certification.</u>  The person to whom the Subpoena is directed or, if it is directed to an
entity, any person having knowledge of the facts and circumstances relating to the
production, must certify that the response to this Subpoena is true and complete, and
that all documents produced were records of regularly conducted business activity.
This certification must be made on the form declaration included with this
Subpoena.

17. <u>Notice of Rights.</u>  Any person to whom a subpoena has been issued under the
Consumer Protection Procedures Act, D.C. Code § 28-3901, *et seq.* may exercise
the privileges enjoyed by all witnesses, including moving to quash or modify the
subpoena in the Superior Court of the District of Columbia on grounds including:
(1) the Attorney General failed to follow or satisfy the procedures set forth in this
section for the issuance of a subpoena; or (2) any grounds that exist under statute or
common law for quashing or modifying a subpoena. In the case of refusal to obey a
subpoena issued under this section, the Attorney General may petition the Superior
Court of the District of Columbia for an order requiring compliance. Any failure to
obey the order of the court may be treated by the court as contempt.

## DEFINITIONS

A.    "All" shall be construed to include the collective as well as the singular and shall mean
"each," "any," and "every."

B.    "Any" shall be construed to mean "any and all."

C.    "Benefits Consultant" shall mean any organization providing advisory services pertaining
to the pharmacy benefit of a health insurance product or the administration of such a
benefit.

6

D.    "Communications" shall mean and refer to any exchange of information by any means of transmissions, sending or receipt of information of any kind by or through any means including, but not limited to, verbal expression, gesture, writings, documents, language (machine, foreign, or otherwise) of any kind, computer electronics, email, SMS, MMS or other "text" messages, messages on "social networking" sites (including, but not limited to, Facebook, Google+, MySpace and Twitter), shared applications from cell phones, "smartphones," netbooks and laptops, sound, radio, or video signals, telecommunication, telephone, teletype, facsimile, telegram, microfilm or by any other means. It also includes, without limitation, all originals and copies of inquiries, discussions, conversations, correspondence, negotiations, agreements, understandings, meetings, notices, requests, responses, demands, complaints, press, publicity or trade releases and the like that are provided by you or to you by others.

E.    "Document(s)" shall mean any writing or any other tangible thing, whether printed, recorded (in audio, video, electronically or by any other means), reproduced by any process, or written or produced by hand, including, but not limited to, letters, memoranda, notes, opinions, books, reports, studies, agreements, statements, communications (including inter-company and intra-company communications), correspondence, telegrams, email, instant messages, chat logs, SMS, MMS or other "text" messages, posted information, messages, chat logs on "social networking" sites (including, but not limited to, Facebook, Google+, MySpace and Twitter), logs, bookkeeping entries, summaries or records of personal conversations, diaries, calendars, telephone messages and logs, forecasts, photographs, images, tape recordings, models, statistical statements, graphs, laboratory and engineering reports, notebooks, charts, plans, drawings, minutes, bylaws, resolutions, records of conferences, expressions or statements of policy, lists of persons attending meetings or conferences, lists of clients or customers or suppliers, reports or summaries of interviews, opinions or reports of negotiations, brochures, pamphlets, advertisements, circulars, trade letters, press releases, drafts of any document and revisions of drafts of any document, and any other similar paper or record. The terms also include a copy of a document where the copy is not exactly the same as the original. The terms also include emails and other documents made or stored in electronic form, whether kept on computers, computer tapes, disks or drives, including Cloud storage, of any type, or other media upon which information may be recorded.

F.    "Identify" means:

    1.    When used in connection with a person, provide that person's name, current residential address and telephone number, job title, and current business address and telephone number. (If current information is not available, provide last-known address and telephone number.)

    2.    When used in connection with a Document, provide the nature of the Document, its title, physical description, date, author, its current location, and identification of the current custodian.

7

3.   When used in connection with an oral communication, provide the nature of that communication, the parties to it, the date, place and substance of that communication, and the identification of any document concerning it.

G.   "Including" is used merely to emphasize that a request for certain types of documents or information should not be construed as limiting the request in any way.

H.   "Manufacturer(s)" shall mean a manufacturer of prescription drugs.

I.   "Payer(s)" shall mean any organization that pays or insures health or medical expenses on behalf of beneficiaries or recipients including an employer (self-insured), a third-party administrator or administrative-services only health insurer (for themselves or on behalf of their clients), or a health insurance company.

J.   "Payment(s)" shall mean any transfer of money, goods, or services You received directly or indirectly from any Manufacturer. It includes, but is not limited to, statutory rebate payments, supplemental rebate payments, other rebate payments, research and development, administrative fees, distribution fees, service fees (rebate or non-rebate related), procurement fees, data access fees, chargeback fees, promotional payments, cash product discounts, sales volume related payments of any type not described above, and non-sales volume related payments of any type not described above.

K.   "Pharmacy benefit manager(s)" or "PBM(s)" shall mean any organization that administers prescription drug benefits on behalf of a Payer.

L.   "Relating to" shall mean directly or indirectly mentioning or describing, concerning, referring to, regarding, evidencing, setting forth, identifying, memorializing, created in connection with or as a result of, commenting on, embodying, evaluating, analyzing, tracking, reflecting or constituting, in whole or in part, a stated subject matter.

M.   "You" or "Your" refers to the person(s) or business entity(s) to whom this Subpoena is directed as reflected on the first page. With respect to corporations or other business entities, these terms also shall be deemed to include all owners, officers, agents and employees thereof, and any predecessor, successor, parent, subsidiary, division, d/b/a and affiliated companies or other entities.

## RELEVANT TIME PERIOD

The relevant time period, unless otherwise indicated in a specific request, is from January 1, 2010 to the present. The time limits should not be construed as date limits; for example, if a policy or document in effect during the relevant time period was created before the relevant time period, then documents dating back to the starting date of the policy must be produced.

8

## REQUESTS FOR DOCUMENTS AND INFORMATION

These requests are limited to documents and information relating to the District of Columbia, including, but not limited to, documents and information that may be national or regional in scope that apply to the District of Columbia.

1.  Produce all Documents sufficient to Identify the ten Manufacturers from which You have directly or indirectly received the largest Payments (as determined by the total dollar amount of Payments) per year from 2010-2020. Per the definitions listed above, the term Payments includes, but is not limited to, statutory rebate payments, supplemental rebate payments, other rebate payments, research and development, administrative fees, distribution fees, service fees (rebate or non-rebate related), procurement fees, data access fees, chargeback fees, promotional payments, cash product discounts, sales volume related payments of any type not described above, and non-sales volume related payments of any type not described above. Include the following in Your response:

    a.  The name of the Manufacturer making Payments; and
    b.  The total amount per year of the Payments.

    *In lieu of providing actual documents, You may provide a narrative response containing the requested information.*

2.  Produce all Documents sufficient to Identify the Payments made by each Manufacturer identified in response to Request 1 per year from 2010-2020. Aggregate payments of the same type per year. For example, all administrative fees for 2010 can be combined as one Payment. Include the following for each Payment in Your response:

    a.  A description of the Payment (*e.g.*, statutory rebate payments, supplemental rebate payments, other rebate payments, research and development, administrative fees, distribution fees, service fees (rebate or non-rebate related), procurement fees, data access fees, chargeback fees, promotional payments, cash product discounts, sales volume related payments of any type not described above, and non-sales volume related payments of any type not described above);
    b.  The amount of each Payment;
    c.  A description of any service You performed relating to the Payment;
    d.  A description of any product or information You sold relating to the Payment;
    e.  The name of the Payer or any other entity or individual with whom You shared any portion of the Payment;
    f.  The amount of the Payment You shared with a Payer or any other entity or individual; and
    g.  The amount of the Payment You retained.

    *In lieu of providing actual documents, You may provide a narrative response containing the requested information.*

9

3. Produce all Documents reflecting or related to the negotiation of the Payments identified in Your response to Request 2.

4. Produce all Communications with Manufacturers related to formulary coverage for any prescription drug for which You received Payments.

5. Produce all financial and medical analyses related to the inclusion or exclusion of prescription drugs for which You received Payments.

6. Produce all Documents sufficient to Identify the gross amount You paid to the Manufacturers identified in response to Request 1 per year from 2010-2020 for prescription drugs.

   *In lieu of providing actual documents, You may provide a narrative response containing the requested information.*

7. Produce all Documents sufficient to Identify all direct or indirect Payments (*e.g.*, product based, volume based, or other Payments) You made to any Benefits Consultant working on behalf of a Payer, including:

   a. The name of the Benefits Consultant;
   b. The name of the Payer for whom the Benefits Consultant worked;
   c. The date of the Payment;
   d. The amount of the Payment; and
   e. A description of the Payment (*e.g.*, product based, volume based, or other Payments).

   *In lieu of providing actual documents, You may provide a narrative response containing the requested information.*

8. Produce all Documents reflecting or related to direct or indirect Payments for Humira and every insulin product (including branded and authorized generics).

9. Produce all Documents sufficient to Identify all direct or indirect Payments You received relating to Humira and every insulin product (including branded and authorized generics). Include in Your response, for each Payment:

   a. The date of the Payment;
   b. The time period which the Payment relates to;
   c. The name of the Manufacturer making the Payment;
   d. The amount of the Payment;
   e. A description the Payment (*e.g.*, statutory rebate payments, supplemental rebate payments, other rebate payments, research and development, administrative fees, distribution fees, service fees (rebate or non-rebate related), procurement fees, data access fees, chargeback fees, promotional payments, cash product discounts,

sales volume related payments of any type not described above, and non-sales
volume related payments of any type not described above);

f.    The name of the prescription drug relating to the Payment;

g.    The list price for the prescription drug relating to the Payment;

h.    The gross amount You paid for the prescription drug;

i.    The number of units of the prescription drug You purchased relating to the
Payment;

j.    A description of any service You performed relating to the Payment;

k.    The name of the Payer or any other entity or individual with whom You shared
any portion of the Payment;

l.    The amount of the Payment You shared with a Payer or any other entity or
individual; and

m.    The amount of the Payment You retained.

n.    Beneficiary cost sharing requirement (fixed copayment, coinsurance)

o.    Amount paid by the beneficiary

p.    Total Amount paid to the pharmacy (including dispensing fee)

q.    Post-purchase price adjustment of the prescription drug sale price

r.    Other price agreements or guarantees related to the prescription drug.

*In lieu of providing actual documents, You may provide a narrative response containing
the requested information.*

10.    Produce all agreements and Documents reflecting or related to agreements with
Manufacturers or any entity or individual affiliated with any Manufacturer related to
Payments.

11.    Produce all Documents sufficient to Identify all departments and individuals involved in
negotiations or agreement with Manufactures related to the purchase, coverage,
promotion or sale of prescription drugs, including, but not limited to, the following:

a.    the name of each department or individual;

b.    the date each department was formed and (if applicable) dissolved;

c.    the title(s) each individual has or had;

d.    the name of the department(s) for which each individual works or worked

e.    the relevant duties and responsibilities each individual has or had;

f.    the dates of employment for each individual; and

g.    the last known contact information for each individual who no longer works for
You.

*In lieu of providing actual documents, You may provide a narrative response containing
the requested information.*

12.    Produce all Documents reflecting or related to Communications relating to negotiations
or agreements relating to Payments, including the target level of Payments or the impact
of Payment levels on your Profits, or the value of any Payments to Your revenue or
profits.

11

13.   Produce the personnel files for each individual identified in Your response to Request 11 including, but not limited to, any performance evaluations and disciplinary actions.

14.   Produce all Documents reflecting or related to Your projections or analyses relating to: (a) the value of Payments; (b) whether and how Payments are passed on to consumers (c) how Payments impact Your profitability; (d) how Payments impact Your bargaining power in negotiations with Manufacturers and/or Payers; (e) the impact or practice of classifying Payments in certain ways (*e.g.*, classifying a Payment as a rebate rather than a fee or vice-versa); and/or (f) the relationship between Payments and list prices.

15.   Produce all Documents reflecting or related to the results of any audit (including both internal and third-party audits) relating to Your practices involving Payments, including, but not limited to, Your classification of any fees or rebates.

16.   Produce all Documents You relied upon when testifying before Congress about the pricing of prescription drugs.

17.   Produce all Documents relating to legislation or proposed legislation that could impact the Payments You receive, including, but not limited to, the proposed elimination of the safe harbor provision in 42 CFR 1001.952(h).

18.   Produce all Documents relating to any research or study You commissioned that examines Payments made to pharmacy benefit managers from Manufacturers.

19.   Produce all Documents reflecting or relating to any complaints or concerns You received relating to Your practices involving Payments, including, but not limited to, any complaints You received from Manufacturers, Payers, whistleblowers, and consumers.

20.   Produce all Documents sufficient to Identify all lawsuits filed against You relating to Your practices involving Payments, including, but not limited to, any lawsuits that allege You overcharged Payers and/or consumers for prescription drugs and/or that there is a relationship between the Payments You receive and the increase in list price of prescription drugs.

      *In lieu of providing actual documents, You may provide a narrative response containing the requested information.*

21.   Produce all Documents produced in any government investigation or any litigation relating to Your practices involving Payments.

22.   Produce all settlement agreements or judgments relating to Your practices involving Payments.

Dated: December 28, 2020

KARL A. RACINE
Attorney General for the District of Columbia

Issued: *Jimmy Rock*

JIMMY ROCK
Assistant Deputy Attorney General
Public Advocacy Division

BENJAMIN M. WISEMAN
Director, Office of Consumer Protection
Public Advocacy Division

WENDY J. WEINBERG
Assistant Attorney General
Office of Consumer Protection
Public Advocacy Division
Office of the Attorney General
400 Sixth Street, N.W., 10th Floor
Washington, D.C. 20001
(202) 724-1342 | wendy.weinberg@dc.gov

13

## FORM OF CERTIFICATE OF
## COMPLIANCE

       I/We have knowledge of the facts and circumstances relating to the production of the information and documents required by the Subpoena to OptumRx, Inc. I/We do hereby certify that all information and documents required by the Subpoena that are in the possession, custody, or control of OptumRx, Inc. have been submitted to the designated representative named therein or to the District of Columbia Office of Attorney General.

       If any information or documentary material otherwise responsive to this Subpoena has been withheld on the basis of objection or privilege, these objections or claims of privilege have been stated in lieu of production.

Signature: _____

Title: _____

SWORN TO before me this _____day of _____2021.

_____
NOTARY PUBLIC

14

# Exhibit D

to Declaration of Matthew Hooker

## CONFIDENTIALITY AGREEMENT

IT IS HEREBY AGREED BY AND BETWEEN the Office of the Attorney General for the District of Columbia ("OAG"), and OptumRx, Inc. ("OptumRx" or "the Company"), through their respective counsel, that:

1.      This Confidentiality Agreement is being entered into in connection with an investigation being conducted by the OAG and OAG outside counsel ("Investigation"), and the production of any documents or information by OptumRx in response to a subpoena issued by OAG dated December 28, 2020 in connection with the Investigation (the "Subpoena").  Neither OptumRx nor OAG waives any objections it has to the Subpoena or the response to the Subpoena by entering into this Confidentiality Agreement.  This Agreement shall be binding upon OAG and OptumRx ("parties," referred to singularly as a "Party"), undersigned OAG outside counsel and OptumRx outside counsel, and all persons and entities signing a copy of the Addendum Regarding Undertaking of Confidentiality attached at Exhibit A ("Addendum").

2.      "Confidential Information" means any documentary and/or tangible information of any type, kind or character that contains (a) information of a personal nature where the public disclosure thereof would constitute a clearly unwarranted invasion of personal privacy; or (b) trade secret or commercial or financial information, to the extent disclosure would result in substantial harm to the competitive position of the Company.  To designate a document or information as "Confidential Information," OptumRx shall stamp or place the word "Confidential" on the document or item of information produced to OAG.  All copies, whether digital or hard copy, of any "Confidential Information" produced or made available for inspection and copying shall be subject to the terms of this Agreement.  Any interview, deposition or testimony of OptumRx in connection with the Investigation shall presumptively be treated as Confidential Information and subject to this Agreement for a period of 15 days after a transcript is received by counsel for the parties.  At or before the end of such 15-day period, by written notification to undersigned counsel, OptumRx may designate any portion(s) of the interview, deposition, or testimony as "Confidential Information."  If OptumRx fails to designate any portion of the interview, deposition, or testimony

as "Confidential Information," after the expiration of the 15-day period, that portion(s) shall be treated as non-confidential.    In designating documents or information as "Confidential Information," OptumRx will make such designation only as to those documents and information that it in good faith believes contain Confidential Information.  The OAG, OAG outside counsel, and all persons and entities signing a copy of the Addendum agree to use Confidential Information solely in connection with the Investigation and any litigation that may arise therefrom, not to use Confidential Information in connection with any other matter, and not to disclose any Confidential Information to any party or the public, except as provided by this Agreement provided that the OAG agree with the designation.  OAG outside counsel further agrees not to rely on Confidential Material in pursuing information or claims in any other matters outside of its representation of the OAG.

3.    This Agreement shall not preclude any Party from bringing before a court of competent jurisdiction, at any time, the question of whether any particular information is properly designated as "Confidential Information."   In its request for relief from the Court, the Party disputing the designation of any information shall identify the information that it believes is not properly designated.  The Party asserting the proprietary of any designation has the burden to defend the designation.   Prior to bringing any motion, the Parties shall meet and confer in good faith to attempt to resolve the dispute.  If the dispute cannot be resolved, the Parties shall treat the information consistent with its designation until a ruling by the court.  In the event litigation stems from this Investigation, the Parties will meet and confer at the appropriate time regarding a protective order that will supersede this Agreement.  In the event the Parties cannot agree on a protective order, it shall be OptumRx's duty to seek a protective order.

4.    In addition to any applicable protections provided to such materials under D.C. Code § 2-534(a) or other applicable law, OAG and undersigned OAG outside counsel may disclose Confidential Information only as follows:

(a)    to employees, interns, and staff of the OAG;

(b)    to agents, consultants, or experts of the OAG, who are

bound by this agreement and who agree to be bound by the terms of
this agreement by signing the Addendum;

(c)  other law enforcement agencies provided they agree in
writing to be bound and comply with this agreement;

(d)  to any witness in the investigation (not to include
disclosures to expert witnesses of the OAG, which are covered
under Section 4(b)), during an interview by the OAG or during
transcribed or otherwise recorded proceedings conducted by the
OAG, as long as the OAG reasonably believes that disclosure is
necessary to further the investigation;

(e)  to any person identified as having received, or who is
otherwise known to have received, the document or information;

(f)  if the Company first gives written consent to such
disclosure;

(g)  any person who, at the time of the disclosures, is either
employed by OptumRx or retained by OptumRx in connection with
this investigation;

(h)  if the information was obtained independently of the
Company even if such information was also produced by the
Company, unless that information was obtained from a source
known by OAG and/or OAG outside counsel to be bound by a
confidentiality obligation to the Company.

(i)   Motley Rice LLC attorneys (other than undersigned OAG outside counsel), paralegals, contractors, staff, or experts working on behalf of OAG in connection with the Investigation who agree to be bound by the terms of this Agreement by signing the Addendum.

5.      With respect to the disclosures authorized by paragraph 4(d) or 4(e), the OAG shall not permit the person or the person's counsel to retain a copy of the Confidential Information unless the OAG reasonably believes that retention is necessary to further the investigation and the person has signed the Addendum.

6.      With respect to the disclosures authorized by paragraph 4(i), the OAG and OAG outside counsel shall not share, disclose, or discuss Confidential Information with any Motley Rice LLC attorney, paralegal, contractor, or staff who is not a member of the firm's Public Client practice group, and shall limit access to Confidential Information to members of that practice group.  The OAG and OAG outside counsel are agreeing to this term solely for purposes of the investigation stage and are not consenting to or agreeing to waive any right to object to this or any similar term in any stipulated protective order following litigation.

7.      Any document or information that may contain Confidential Information that has been inadvertently produced without being designated as Confidential Information shall not be a waiver, in whole or in part, of a claim of confidentiality as to any such document or information. OptumRx may designate the inadvertently produced document or information as "Confidential Information" by written notice to OAG within a reasonable time following discovery of the inadvertent production.  Unless the OAG challenges the designation pursuant to paragraph 3, the OAG shall confirm the designation of the Confidential Information within ten (10) days of receipt of notice from OptumRx, and shall make reasonable efforts to retrieve such improperly designated documents from persons not entitled to receive them.

8.    The OAG and/or OAG outside counsel shall not attach documents or information designated as "Confidential Information" to any filing with a court or administrative tribunal ("OAG filing") unless OAG and/or OAG outside counsel complies with one of the following provisions:

(i)    resolves any dispute with OptumRx regarding designation of such documents or information as "Confidential Information;"

(ii)    files the documents or information designated "Confidential Information" with a court or administrative tribunal conditionally under seal; following the OAG filing, the confidentiality or non-confidentiality of documents or information will be determined by the terms of a protective order entered in the case either by stipulation or order, or by the absence of any such order (i.e. if OptumRx takes no action to seek a protective order within ten (10) days of the OAG filing, the documents or information attached to the OAG filing will be deemed non-confidential); or

(iii)    notifies OptumRx at least ten (10) days in advance that OAG or OAG outside counsel intends to attach materials designated "Confidential Information" in the OAG filing, provided that OAG or OAG outside counsel shall not attach such documents or information designated "Confidential Information" until either:

(a)    the court or administrative tribunal rules on OptumRx's request for a protective order or in camera treatment in favor of disclosure of the documents or information designated Confidential Information; or

(b)    OptumRx has not sought such order within

the ten (10) day period of time which OAG or OAG outside
counsel provided to OptumRx for it to seek such order.

9.    In the event that the OAG receives a written request from a person or entity for
Confidential Information under District of Columbia Freedom of Information Act, D.C. Code §§
2-531 through 2-540, and the OAG determines in good faith that disclosure of Confidential
Information is required, the OAG  will provide 10 business days advance notice before any
production in response to such a request so that the Company is afforded an opportunity to obtain
a court order prohibiting or limiting such disclosure and/or requiring the recipient(s) of such
Confidential Information to take steps to maintain the confidentiality thereof.  During the pendency
of this Investigation the OAG agrees that it will, pursuant to § 2-534(a) of the Freedom of
Information Act, deny public inspection of the records the Company produces in response to the
Subpoena.  Both during and after the pendency of the investigation, the OAG will also deny
inspection of any Confidential Information to the extent authorized by the District of Columbia's
Freedom of Information Act. To the extent the OAG disagrees with the designation of documents
or information as Confidential Information and determines in good faith that it must be disclosed
under the District of Columbia Freedom of Information Act, OAG will provide the Company with
at least 10 business days advance notice of the production.

10.    If any person or entity possessing designated Confidential Information is
subpoenaed in another civil action or civil proceeding or served with a document demand or other
civil legal process that requests production of designated Confidential Information ("civil
process"), and the OAG determines in good faith that the Confidential Information must be
disclosed , the OAG  shall, to the extent permitted by law, court rule, and court order, inform
OptumRx within 15 days of receiving notice of the civil process.  Any notice to OptumRx shall be
made to: John Kokkinen, Senior Associate General Counsel – Optum Litigation, via electronic
mail at john.kokkinen@optum.com, and to Michelle Kisloff, Hogan Lovells, via electronic mail
at michelle.kisloff@hoganlovells.com.

11.    If documents or information subject to a claim of attorney-client privilege or work product immunity or any other privilege or immunity are inadvertently produced, such production shall in no way prejudice or otherwise constitute a waiver of, or estoppel as to, any claim of privilege or work-product immunity for such documents or information as provided under applicable law, including Federal Rule of Evidence 502, DC Superior Court Civil Rule 25(b)(5)(C), or any other District of Columbia or State counterpart or similar rule.  If OptumRx has inadvertently produced documents or information subject to a claim of immunity or privilege, the Parties shall follow the so-called "clawback" provisions of Federal Rule of Civil Procedure 26(b)(5)(B), DC Superior Court Civil Rule 26(b)(5)(B),  or any other District of Columbia or State counterpart or similar rule.

12.    At the conclusion of the Investigation, or the final conclusion of all litigation in connection with the Investigation, if any is initiated, upon written request, all documents produced by the Company, including all Confidential Information, shall be promptly returned to the Company or destroyed.  The OAG shall not be required to return or destroy copies of documents marked as "Confidential" that are not readily accessible, such as copies on computer system backup tapes or in email archives. In addition, upon written request, OAG shall notify persons pursuant to paragraphs 4(b), (c), (d), (e), (f), or (i) of the Company's request under this subsection. At the Company's request, OAG shall confirm that it has complied with its obligation under this subsection.

13. Nothing contained in this Agreement shall alter or limit the obligations of the OAG under District of Columbia law, including the District of Columbia's Freedom of Information Act, D.C. Code to §§ 2-531 *et seq.* Nothing in this Agreement shall be construed to waive applicable protections under D.C. Code § 2-534(a) for any materials produced in response to the Subpoena, regardless of whether such materials are designated "Confidential Information."

14. This Agreement shall apply to all documents and information produced pursuant to this Investigation, including any amendments to the Subpoena.

Dated: 7/1/2021

OptumRx

By:

_____
John Kokkinen
Attorneys for the Company


Counsel for OptumRx

By:

_____
Michelle Kisloff
Hogan Lovells US LLP


Office of the Attorney General for the
District of Columbia

/s/ Benjamin Wiseman
_____
Benjamin Wiseman, Director
Office of Consumer Protection
Public Advocacy Division


Counsel for the Attorney General for the
District of Columbia

By:

/s/ Linda Singer
_____
Linda Singer
Motley Rice LLC

/s/ Paige Boggs
_____
Paige Boggs
Motley Rice LLC

OptumRx

By:

_____

Attorneys for the Company


Counsel for OptumRx

By:

_____

Michelle Kisloff
Hogan Lovells US LLP


Office of the Attorney General for the District of Columbia

_____

Benjamin Wiseman, Director
Office of Consumer Protection
Public Advocacy Division


Counsel for the Attorney General for the District of Columbia

By:

_____

Linda Singer
Motley Rice LLC


_____

Paige Boggs
Motley Rice LLC

## ADDENDUM REGARDING

## UNDERTAKING OF CONFIDENTIALITY

By signing this acknowledgement, I certify that I have read the Confidentiality Agreement to
which this acknowledgement is attached ("Agreement") in its entirety, I fully understand the
obligations      under      the      Agreement,      and      I      hereby      agree      that
_____ [insert name of person or entity] will be
bound by its terms to the extent permitted by law.


DATE:_____


NAME: _____


SIGNATURE: _____

# Exhibit E

to Declaration of Matthew Hooker



Hogan Lovells US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004-1109
T  +1 202-637-5600
F  +1 202-637-5910
www.hoganlovells.com

July 13, 2021

**BY ELECTRONIC MAIL AND SECURE FILE TRANSFER**

Wendy J. Weinberg
Assistant Attorney General
Office of Consumer Protection
Public Advocacy Division
Office of the Attorney General
400 Sixth Street, NW, 10th Floor
Washington, DC 20001

Linda Singer
Paige Boggs
Motley Rice LLC
401 9th St. NW, Suite 1001
Washington, DC 20004

**Re:      Subpoena to OptumRx, Inc. Dated December 28, 2020**

Dear Wendy, Linda and Paige:

With this letter and accompanying document, which will be provided via a secure link, OptumRx, Inc. (hereinafter "Optum," or "the Company") makes its first production in response to the Subpoena dated December 28, 2020, as clarified by our various telephone calls (the "Subpoena").  For ease of reference, this production has been Bates-numbered OPTUM1220_0000001 – OPTUM1220_0000002.

This production includes information responsive to Request 1.  Per our telephone and email communications  on February 5 and February 26, 2021, the enclosed document provides, by year, for 2016-2020, the total rebates associated with prescriptions filled at pharmacies in the District of Columbia for the ten manufacturers from whom Optum has received the largest such rebates.

*        *        *

The enclosed document contains or constitutes confidential business information, records, and/or trade secrets of Optum and we have branded it "CONFIDENTIAL" and are producing it pursuant to our July 1, 2021 Confidentiality Agreement with the Office of the Attorney General for the District of Columbia.

Hogan Lovells US LLP is a limited liability partnership registered in the District of Columbia.  "Hogan Lovells" is an international legal practice that includes Hogan Lovells US LLP and Hogan Lovells International LLP, with offices in:  Alicante  Amsterdam  Baltimore  Beijing  Brussels  Caracas  Colorado Springs  Denver  Dubai  Dusseldorf  Frankfurt  Hamburg  Hanoi  Ho Chi Minh City  Hong Kong  Houston  Johannesburg  London  Los Angeles  Luxembourg  Madrid  Mexico City  Miami  Milan  Minneapolis  Monterrey  Moscow  Munich  New York  Northern Virginia  Paris  Perth  Philadelphia  Rio de Janeiro  Rome  San Francisco  São Paulo  Shanghai  Silicon Valley  Singapore  Sydney  Tokyo  Ulaanbaatar  Warsaw  Washington DC  Associated offices: Budapest  Jakarta  Shanghai FTZ  Zagreb.  Business Service Centers:  Johannesburg  Louisville.  Legal Service Center: Birmingham.  For more information see www.hoganlovells.com

July 13, 2021

The submission of the enclosed materials does not waive, nor is it intended to waive, any rights, privileges, or immunities of Optum with respect to this matter, including any applicable attorney-client privilege, protection provided under the work-product doctrine, or other privilege or immunity that may exist.  In the event of any inadvertent production of privileged materials, Optum requests that the government refrain from reviewing such materials and return the same promptly to Optum. Moreover, to the extent that non-responsive documents, pages, or information have been produced inadvertently, Optum does not agree to any expansion of the scope of your request.  Optum expressly reserves any applicable privileges and immunities to which it is entitled under the law.

Please call me if you have any questions about any aspect of this letter or the enclosed document.


Sincerely,

/s/

Michelle A. Kisloff
Partner
Michelle.kisloff@hoganlovells.com
D 202-637-6631

cc:     Allison J. Caplis

2

# Exhibit F

to Declaration of Matthew Hooker



Hogan Lovells US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004-1109
T  +1 202-637-5600
F  +1 202-637-5910
www.hoganlovells.com

September 10, 2021

**BY ELECTRONIC MAIL AND SECURE FILE TRANSFER**

Wendy J. Weinberg
Assistant Attorney General
Office of Consumer Protection
Public Advocacy Division
Office of the Attorney General
400 Sixth Street, NW, 10th Floor
Washington, DC 20001

Linda Singer
Paige Boggs
Motley Rice LLC
401 9th St. NW, Suite 1001
Washington, DC 20004

**Re:    Subpoena to OptumRx, Inc. Dated December 28, 2020**

Dear Wendy, Linda and Paige:

With this letter and accompanying document, OptumRx, Inc. (hereinafter "Optum," or "the Company") makes its second production in response to the Subpoena dated December 28, 2020, as clarified by our various telephone calls (the "Subpoena"). Per our discussion with Paige on August 19, 2021, in response to Requests 12 and 14 1/, Optum is producing herein the documents that Optum previously produced to the Minnesota Attorney General's Office pursuant to a Civil Investigative Demand served upon OptumRx, Inc. in 2017. These documents are branded with the same Bates-numbers as were provided to the Minnesota Attorney General's Office: Optum-MNAG-0000000001 - Optum-MNAG-0000068310.

\*        \*        \*

The enclosed documents contain or constitute confidential business information, records, and/or trade secrets of Optum and are being produced in reliance on Paige's email of September 2, 2021, memorializing our discussion of earlier that day, that "the District will treat the documents previously

---

1/        Please note that certain documents may be responsive to more than one Request.

Hogan Lovells US LLP is a limited liability partnership registered in the District of Columbia. "Hogan Lovells" is an international legal practice that includes Hogan Lovells US LLP and Hogan Lovells International LLP, with offices in: Alicante Amsterdam Baltimore Beijing Brussels Caracas Colorado Springs Denver Dubai Dusseldorf Frankfurt Hamburg Hanoi Ho Chi Minh City Hong Kong Houston Johannesburg London Los Angeles Luxembourg Madrid Mexico City Miami Milan Minneapolis Monterrey Moscow Munich New York Northern Virginia Paris Perth Philadelphia Rio de Janeiro Rome San Francisco São Paulo Shanghai Silicon Valley Singapore Sydney Tokyo Ulaanbaatar Warsaw Washington DC Associated offices: Budapest Jakarta Shanghai FTZ Zagreb. Business Service Centers: Johannesburg Louisville. Legal Service Center: Birmingham. For more information see www.hoganlovells.com

September 10, 2021

produced to Minnesota as confidential pursuant to the District's [July 1, 20201] confidentiality agreement with OptumRx even if the confidentiality designations [on the production images] are worded slightly differently (e.g., 'confidential' vs. 'high confidential')."

The submission of the enclosed materials does not waive, nor is it intended to waive, any rights, privileges, or immunities of Optum with respect to this matter, including any applicable attorney-client privilege, protection provided under the work-product doctrine, or other privilege or immunity that may exist.  In the event of any inadvertent production of privileged materials, Optum requests that the government refrain from reviewing such materials and return the same promptly to Optum. Moreover, to the extent that non-responsive documents, pages, or information have been produced inadvertently, Optum does not agree to any expansion of the scope of your request.  Optum expressly reserves any applicable privileges and immunities to which it is entitled under the law.

Please call me if you have any questions about any aspect of this letter or the enclosed documents.


Sincerely,

/s/   *Michelle A. Kisloff*

Michelle A. Kisloff
Partner
Michelle.kisloff@hoganlovells.com
D 202-637-6631

cc:    Allison J. Caplis

2

# Exhibit G

to Declaration of Matthew Hooker



Hogan Lovells US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004-1109
T  +1 202-637-5600
F  +1 202-637-5910
www.hoganlovells.com

November 24, 2021

**BY ELECTRONIC MAIL AND SECURE FILE TRANSFER**

Wendy J. Weinberg
Assistant Attorney General
Office of Consumer Protection
Public Advocacy Division
Office of the Attorney General
400 Sixth Street, NW, 10th Floor
Washington, DC 20001

Linda Singer
Paige Boggs
Motley Rice LLC
401 9th St. NW, Suite 1001
Washington, DC 20004

**Re:    Subpoena to OptumRx, Inc. Dated December 28, 2020**

Dear Wendy, Linda and Paige:

With this letter and accompanying documents, OptumRx, Inc. (hereinafter "Optum," or "the Company") makes its third production in response to the Subpoena dated December 28, 2020, as clarified by our various telephone calls (the "Subpoena").  For ease of reference, this production has been labeled OPTUM1220_003, and has been Bates-numbered OPTUM1220_0000003 – OPTUM1220_0000004.

This production includes information responsive to Requests 2 and 9, as modified by your email of August 4, 2021, and our subsequent telephone and email communications.  Specifically, this production includes a spreadsheet of the rebates, administrative fees, and price protection fees submitted by Optum to manufacturers of insulin products, and the amounts collected from those manufacturers, with respect to insulin prescriptions filled at pharmacies in the District of Columbia for 2016-2020.  This production also includes a spreadsheet of transaction level data with respect to insulin prescriptions filled at pharmacies in the District of Columbia for 2016-2020.  Per our

Hogan Lovells US LLP is a limited liability partnership registered in the District of Columbia.  "Hogan Lovells" is an international legal practice that includes Hogan Lovells US LLP and Hogan Lovells International LLP, with offices in:  Alicante  Amsterdam  Baltimore  Beijing  Brussels  Caracas  Colorado Springs  Denver  Dubai  Dusseldorf  Frankfurt  Hamburg  Hanoi  Ho Chi Minh City  Hong Kong  Houston  Johannesburg  London  Los Angeles  Luxembourg  Madrid  Mexico City  Miami  Milan  Minneapolis  Monterrey  Moscow  Munich  New York  Northern Virginia  Paris  Perth  Philadelphia  Rio de Janeiro  Rome  San Francisco  São Paulo  Shanghai  Silicon Valley  Singapore  Sydney  Tokyo  Ulaanbaatar  Warsaw  Washington DC  Associated offices: Budapest  Jakarta  Shanghai FTZ  Zagreb.  Business Service Centers:  Johannesburg  Louisville.  Legal Service Center: Birmingham.  For more information see www.hoganlovells.com

November 24, 2021

discussions, these spreadsheets do not include PHI; as such the transactions have been assigned scrambled claim numbers for ease of linking the two spreadsheets.[1]

*        *        *

The enclosed document contains or constitutes confidential business information, records, and/or trade secrets of Optum and we have branded it "CONFIDENTIAL" and are producing it pursuant to our July 1, 2021 Confidentiality Agreement with the Office of the Attorney General for the District of Columbia.

The submission of the enclosed materials does not waive, nor is it intended to waive, any rights, privileges, or immunities of Optum with respect to this matter, including any applicable attorney-client privilege, protection provided under the work-product doctrine, or other privilege or immunity that may exist.  In the event of any inadvertent production of privileged materials, Optum requests that the government refrain from reviewing such materials and return the same promptly to Optum. Moreover, to the extent that non-responsive documents, pages, or information have been produced inadvertently, Optum does not agree to any expansion of the scope of your request.  Optum expressly reserves any applicable privileges and immunities to which it is entitled under the law.

Please call me if you have any questions about any aspect of this letter or the enclosed document.


Sincerely,

/s/

Michelle A. Kisloff
Partner
Michelle.kisloff@hoganlovells.com
D 202-637-6631

cc:      Allison J. Caplis

---

[1]      As discussed, we are producing two separate spreadsheets as the requested data is maintained in two different systems.

# Exhibit H

to Declaration of Matthew Hooker

# STATE OF HAWAII

## AGREEMENT FOR SPECIAL DEPUTY ATTORNEY GENERAL SERVICES

This Agreement, executed on the respective dates indicated below, is effective as of ___April 29___, 2021 between the Department of the Attorney General, State of Hawaii (hereinafter "STATE"), by the Attorney General (hereinafter also referred to as "DIRECTOR"), whose address is _____ 425 Queen Street, 3rd Floor, Honolulu, Hawaii 96813 _____ and Motley Rice LLC, a ___ limited liability company _____

(hereinafter referred to as "CONTRACTOR"), under the laws of the State of _____ South Carolina ____,

by _____ Linda Singer _____ whose business address and taxpayer Identification
(*its managing partner or authorized designee*)
number are as follows: _____ 401 9th St. NW, Suite 1001, Washington, D.C. 20004

Federal ID# 75-3051732 _____. The member(s) of the firm primarily responsible for this

Agreement shall be Linda Singer.

## RECITALS

    A.    The STATE desires to retain and engage the CONTRACTOR to provide the services described in this Agreement and its attachments, and the CONTRACTOR agrees to provide said services.

    B.    The authority of the STATE to enter into this Agreement for Special Deputy Attorney General is HRS § 28-8.3.

    C.    Money is available to fund this Agreement pursuant to:

(1) _____ N/A _____ or (2) _____ N/A _____
        (*identify state sources*)                   (*identify federal sources*)
or both, in the following amounts: State $ ___ N/A ___ Federal $ ___ N/A ___

    NOW, THEREFORE, in consideration of the promises contained in this Agreement, the STATE and the CONTRACTOR agree as follows:

    1.    Scope of Services.    The CONTRACTOR shall, in a proper and satisfactory manner as determined by the STATE, provide all the services set forth in Attachment 1, which is hereby made a part of this Agreement.

2.    Time of Performance.    The time of performance for this Agreement is contained in Attachment 2, which is hereby made a part of this Agreement.

3.    Compensation.    The CONTRACTOR shall be compensated for services rendered and costs incurred under this Agreement in a total amount not to exceed _____N/A_____ DOLLARS ($ N/A ), including taxes, according to the Compensation and Payment Schedule set forth in Attachment 3, which is hereby made a part of this Agreement. As provided hereafter, the hourly rate of the principal attorney, the maximum fees and costs payable under this Agreement, and the amount of errors and omission insurance required of the law firm are as follows:

| | |
|---|---|
| Hourly rate: | $ N/A |
| Maximum fee cap: | $ N/A |
| Maximum cost cap: | $ N/A |
| Errors & omission insurance: | $10 million |

4.    Standards of Conduct Declaration.    The Standards of Conduct Declaration by the CONTRACTOR is attached hereto and made a part of this Agreement.

5.    Other Terms and Conditions. The General Conditions and any Special Conditions are attached hereto and made a part of this Agreement. In the event of a conflict between the General Conditions and the Special Conditions, the Special Conditions shall control.

IN VIEW OF THE ABOVE, the parties execute this Agreement by their signatures, on the dates below, to be effective as of the date first above written.

**STATE**

By _____
        CLARE E. CONNORS
        ATTORNEY GENERAL

Date    4/29/2021

**CONTRACTOR**

By _____
Print Name Linda Singer
Title Member

Date    4/15/21

**APPROVED AS TO FORM**

_____
Deputy Attorney General, State of Hawaii

*Evidence of authority of the CONTRACTOR's representative to sign this Agreement for the CONTRACTOR must be attached.

819081.1

Form SDAG(1)(08/08)Ad



## CONTRACTOR'S ACKNOWLEDGMENT

~~STATE~~ District OF _Columbia_ )
) ss.
COUNTY OF _____ )

On this _15th_ day of _April_, 2021, before me personally appeared _Linda Singer_, to me known, who being by me duly sworn, did say that he/she/they is/are the _member_ of _Motley Rice LLC_, the CONTRACTOR named in the foregoing instrument, and that he/she/they is/are authorized to sign said instrument on behalf of the CONTRACTOR, and acknowledges that he/she/they executed said instrument as the free act and deed of the CONTRACTOR.

(NOTARY SEAL)

KELLI RENEE YOUNG
NOTARY PUBLIC DISTRICT OF COLUMBIA
My Commission Expires October 14, 2022

_____
(Signature)

_Kelli Young_
(Print Name)
Notary Public, State of _Washington, DC_
My commission expires: _October 14, 2022_

Doc. Date: _4/15/21_                     #Pages: _2_
Notary Name: _____          Circuit
Doc. Description: _Agreement for special Deputy Attorney General Services_

_____
Notary Signature

NOTARY CERTIFICATION

819081.1                         3                        Form SDAG(1)(03/09)



# CERTIFICATE OF EXEMPTION FROM CIVIL SERVICE

1.  **By Heads of Departments or Agencies as Delegated by the Director of Human Resources Development ("DHRD").[1]**

Pursuant to a delegation of the authority by the Director of Human Resources Development, I certify that the services provided under this Contract, and the person(s) providing the services under this Contract are exempt from the civil service, pursuant to §76-16, Hawaii Revised Statutes (HRS).

_(Signature)_

Clare E. Connors
_(Print Name)_

Attorney General
_(Print Title)_

4/20/2021
_(Date)_

---

[1]This part of the form may be used by all department heads and others to whom the Director of Human Resources Development (DHRD) has delegated authority to certify §76-16, HRS, civil service exemptions. The specific paragraph(s) of §76-16, HRS, upon which an exemption is based should be noted in the contract file. **NOTE:** Authority to certify exemptions under §§ 76-16(2), 76-16(12), and 76-16(15), HRS, has not been delegated; only the Director of DHRD may certify §§76-16(2), 76-16(12), and 76-16(15) exemptions.

2.  **By the Director of DHRD, State of Hawaii.**

I certify that the services to be provided under this Contract, and the person(s) providing the services under this Contract are exempt from the civil service, pursuant to §76-16, Hawaii Revised Statutes (HRS).

_(Signature)_                                          _(Date)_

_(Print Name)_

_(Print Title, if designee of the Director of DHRD)_

Form SDAG(1)(03/09)



**CONTRACTOR'S
STANDARDS OF CONDUCT DECLARATION**

For the purposes of this declaration:

"Agency" means and includes the State, the legislature and its committees, all executive departments, boards, commissions, committees, bureaus, offices; and all independent commissions and other establishments of the state government but excluding the courts.

"Controlling interest" means an interest in a business or other undertaking which is sufficient in fact to control, whether the interest is greater or less than fifty per cent (50%).

"Employee" means any nominated, appointed, or elected officer or employee of the State, including members of boards, commissions, and committees, and employees under contract to the State or of the constitutional convention, but excluding legislators, delegates to the constitutional convention, justices, and judges. (Section 84-3, HRS).

On behalf of <u>Motley Rice LLC</u>, CONTRACTOR, the undersigned does declare as follows:

1.  CONTRACTOR  ☐ is*  ☑ is not a legislator or an employee or a business in which a legislator or an employee has a controlling interest. (Section 84-15(a), HRS).

2.  CONTRACTOR has not been represented or assisted personally in the matter by an individual who has been an employee of the agency awarding this Contract within the preceding two years and who participated while so employed in the matter with which the Contract is directly concerned.(Section 84-15(b), HRS).

3.  CONTRACTOR has not been assisted or represented by a legislator or employee for a fee or other compensation to obtain this Contract and will not be assisted or represented by a legislator or employee for a fee or other compensation in the performance of this Contract, if the legislator or employee had been involved in the development or award of the Contract. (Section 84-14(d), HRS).

4.  CONTRACTOR has not been represented on matters related to this Contract, for a fee or other consideration by an individual who, within the past twelve (12) months, has been an agency employee, or in the case of the Legislature, a legislator, and participated while an employee or legislator on matters related to this Contract. (Section 84-18(b) and (c), HRS).

*Reminder to Agency: If the "is" block is checked and if the Contract involves goods or services of a value in excess of $10,000, the Contract must be awarded by competitive sealed bidding under section 103D-302, HRS, or a competitive sealed proposal under section 103D-303, HRS. Otherwise, the Agency may not award the Contract unless it posts a notice of its intent to award it and files a copy of the notice with the State Ethics Commission. (Section 84-15(a), HRS)

Form SDAG(1)(03/09)

CONTRACTOR understands that the Contract to which this document is attached is voidable on behalf of the STATE if this Contract was entered into in violation of any provision of chapter 84, Hawaii Revised Statutes, commonly referred to as the Code of Ethics, including the provisions which are the source of the declarations above. Additionally, any fee, compensation, gift, or profit received by any person as a result of a violation of the Code of Ethics may be recovered by the STATE.

CONTRACTOR

By _____
                    *(signature)*

Print Name _____Linda Singer_____

Print Title _____Member_____

Name of Contractor __Motley Rice LLC__

Date ____4/15/21_____

Attachment 1

## SCOPE OF SERVICES

I.    The Two Phases of CONTRACTOR's Duties and Responsibilities

Work under this contract, and the CONTRACTOR's responsibilities thereunder, shall proceed in two phases: Phase 1 (Investigation) and, if the Attorney General is her sole and absolute discretion to proceed with litigation, Phase 2 (Litigation).

1.    Phase 1: Investigation

The STATE retains CONTRACTOR to represent the Department of the Attorney General ("Department") in an investigation into the billing practices of pharmacy benefit managers ("PBMs") that have contracts with, or that provide services affecting, the Hawai'i Employer-Union Health Benefits Trust Fund ("EUTF") and the State's Med-QUEST Division ("Med-QUEST"), which administers the State's Medicaid program. The temporal scope of such investigation shall extend back in time until at least 2014. With respect to each PBM investigated, CONTRACTOR shall investigate, at a minimum, (1) whether the PBM is properly crediting moneys that may be payable to the State or a managed care organization ("MCO") for rebates for prescription drugs; and (2) whether the PBMs are properly charging the State or MCOs for prescription drugs by (a) maintaining pricing discount and dispensing fee guarantees, (b) properly classifying generic and brand-name drugs, and (c) timely adjusting pricing lists. With respect to PBMs that have contracts with the EUTF, CONTRACTOR shall investigate whether the PBMs are complying with their contractual obligations regarding their billing practices for services rendered.

When performing the investigation, CONTRACTOR agrees to take all reasonable steps to minimize any burdens upon EUTF and Med-QUEST in seeking information and data. CONTRACTOR understands that any Medicaid or other information provided that may contain protected health information or personally identifiable information is subject to 42 C.F.R. § 431, Subpart F, and the Health Insurance Portability and Accountability Act of 1996, Public Law 104-191 ("HIPAA"), as amended, and its implementing regulations at 45 C.F.R. parts 160 and 164.

At the conclusion of the investigation, CONTRACTOR shall submit a report to the Attorney General of Hawai'i, as an attorney-client privilege/work-product communication, which shall set forth, at a minimum: (1) the facts or data considered in formulating the report; (2) a complete statement of investigative findings and the bases of such findings; (3) an analysis of the propriety of the PBMs' billing practices, including whether a given PBM has violated the Hawai'i False Claims Act (HRS § 661-21 *et seq.*), the Hawai'i Unfair and Deceptive Trade Practices Act (Chapter 480, HRS), or breached any contract with a State agency; and (4) a recommendation on whether or not to proceed with civil litigation against any

PBM. If CONTRACTOR recommends proceeding with litigation, the report shall identify the potential parties, claims, and range of monetary recoveries, and a proposed litigation plan of how CONTRACTOR would proceed with discovery and litigating the claims, taking into account the need to minimize any burdens upon the EUTF and Med-QUEST, to the extent possible.

The Attorney General shall have the sole and absolute discretion to determine whether or not to authorize CONTRACTOR to proceed with litigation, including the scope of such litigation.

If the Attorney General decides NOT to authorize CONTRACTOR to proceed with litigation (Phase 2), then this agreement shall terminate immediately, with no payment whatsoever to CONTRACTOR.

If the Attorney General authorizes CONTRACTOR to proceed with litigation, then Phase 2 shall come into effect.

2.    Phase 2: Litigation

If the Attorney General authorizes CONTRACTOR to proceed with litigation, CONTRACTOR shall proceed with the prosecution of any authorized claims, which may include claims for damages, penalties, injunctive relief, interest, attorneys' fees and costs, and any other appropriate relief (the "Litigation"). CONTRACTOR is authorized and directed to assist the STATE in making such claims for the State of Hawai'i, and to prosecute such claims through assessment, enforcement, collection, the defense against appeals and collateral proceedings, and all necessary and reasonable appeals as the STATE shall direct, and to enforce all judgments and settlements as shall be obtained. CONTRACTOR shall provide all legal services that are reasonably necessary for such representation and assistance, including without limitation, the preparation and filing of all claims, pleadings, responses, motions, petitions, memoranda, briefs, notices, and other documents. CONTRACTOR shall also conduct discovery, negotiations, and provide representation at all hearings, depositions, trials, appeals, and other appearances as may be required in said actions. CONTRACTOR shall be responsible for all filing fees and costs, including for service of process and other documents and the fees of court reporters and transcriptionists. In the event that a defendant declares bankruptcy at any time prior to final payment to the State of moneys owed by that defendant, CONTRACTOR shall also provide representation in bankruptcy proceedings, or contract with bankruptcy counsel, as may be necessary. CONTRACTOR agrees to perform such other duties or undertake such other activities as may be necessary even if such duties or activities are not expressly set forth in this Scope of Services, when required by a court as part of the litigation or appeals of such claims, or as directed by the Attorney General.

///

///

///

II.    Provisions that Govern Phase II, If Authorized

    1.    Attorney General Has Final Authority

The Attorney General shall have final authority over all aspects of the Litigation.  If the
Attorney General authorizes CONTRACTOR to proceed with litigation, the Litigation can
only be commenced, conducted, settled, approved, and ended with the express approval
and signature of the Attorney General.  The Attorney General at her sole discretion has the
right to appoint a designated deputy ("designated deputy") to oversee the Litigation, which
appointment the Attorney General may modify at will.  The Attorney General must approve
in advance all aspects of this Litigation and shall be included in any settlement discussions.
CONTRACTOR shall confer with the Attorney General as early as practicable in any
settlement negotiation process.

    2.    Coordination of Legal Services

If the Attorney General authorizes CONTRACTOR to proceed with litigation,
CONTRACTOR shall coordinate the provision of the legal services with the Attorney
General or his designated deputy, other personnel of the Department of the Attorney
General, and such others as the Attorney General may appoint as counsel.  All pleadings,
motions, briefs, and other material which may be filed with the court shall first be
approved by the Attorney General and provided to his office in draft form in a reasonable
and timely manner for review.  Regular status meetings shall be held as requested by the
Attorney General.

    3.    Document Review and Discovery

CONTRACTOR shall advance all costs and expenses and provide all necessary
personnel in order to comply with any discovery request made by anyone related to this
Litigation.  This includes but is not limited to:

a.    Working directly with State personnel who may be tasked with responding to
discovery requests;

b.    Gathering, reviewing, analyzing, and storing paper documents to determine if
they should be produced to opposing parties;

c.    Gathering, reviewing, and analyzing relevant information contained in electronic
form in order to comply with e-discovery requests or the discovery of
electronically stored information;

d.    Creating electronic databases designed to extract and convert data files in order to
facilitate the automated and manual analysis of documents;

e.    Preparing production, privilege, and redaction logs; and

f.    Implementing processes to address the inadvertent disclosure of privileged
information.

Form SDAG(1)(03/09)

4.      Communication to State Entities

Except as provided in Paragraph 3.a. above, CONTRACTOR shall communicate with
state entities through the Department of the Attorney General unless otherwise authorized
by the Attorney General.

5.      Outside Assistance

CONTRACTOR shall, with the prior written approval of the Attorney General, retain
other attorneys, consultants, experts, and investigators (collectively referred to as
"Professionals"), as necessary, to diligently prosecute the claims and causes of action
hereunder.  Additionally, it may be necessary for CONTRACTOR to retain special
outside counsel to assist on matters.  STATE agrees that CONTRACTOR may, with the
approval of the Attorney General, retain such special outside counsel to assist
CONTRACTOR when CONTRACTOR deems such assistance to be reasonably
necessary.  Any fees or costs due to outside counsel and other Professionals resulting
from representing the STATE in this matter shall be the sole responsibility of
CONTRACTOR.

6.      Key Person Requirement

In providing services under Phase 2 of this Agreement, CONTRACTOR shall associate
itself with a local law firm approved by the Attorney General, and shall utilize the
services of those persons identified in its response to the Notice to Attorney Interested in
Providing Legal Services on Behalf of the State of Hawaii.  Contractor may change the
firm it is associated with and the particular individuals assigned to this matter only with
the consent of the Attorney General.

7.      Communication with the Attorney General

CONTRACTOR agrees to consult in advance, by telephone, electronic means, or in
writing, with the Attorney General promptly on all matters that may be precedential,
controversial, of particular public interest, or otherwise noteworthy or important, and to
keep the Attorney General fully informed at all times.

CONTRACTOR shall give timely written notice to the Attorney General of any and all of
the following legal events in this Litigation:

1.      Pleadings
2.      Dispositive motions
3.      Hearings
4.      Rulings
5.      Trials
6.      Settlement negotiations
7.      Appeals or Notice of Appeals
8.      Briefs filed by any party or entity
9.      Appellate arguments or decisions
10.     Enforcement efforts

819081.1
A1-4                                    Form SDAG(1)(03/09)

CONTRACTOR agrees to meet with Attorney General's office personnel when and where requested by the Attorney General in furtherance of this Litigation.

Attachment 2

# TIME OF PERFORMANCE

The CONTRACTOR shall begin performance on the effective date of this Agreement. With respect to Phase 1, the CONTRACTOR shall submit to the Attorney General the report referenced in Section I.1 of the Scope of Services within twelve (12) months of the effective date of this Agreement. Upon request, extensions of time to submit the report may be granted by the STATE in writing.

If the Attorney General authorizes Phase II, CONTRACTOR shall provide the services described in this Agreement until the complete, full and final completion or resolution of the suit or suits CONTRACTOR prepares and files on the State of Hawaii's behalf, and all matters related to them, including appeals (as provided in Section 1.2 of the Scope of Services).



Attachment 3

## COMPENSATION AND PAYMENT SCHEDULE

The following provisions shall apply to all compensation and reimbursements under this Agreement.

If the Attorney General does not authorize CONTRACTOR to proceed with litigation at the conclusion of Phase 1, CONTRACTOR agrees and expressly acknowledges that the STATE owes CONTRACTOR no monetary payment of any kind for any work performed or costs expended.

The following terms govern if the Attorney General authorizes the CONTRACTOR to proceed with litigation (Phase 2).

1.  This is a contingent fee case. CONTRACTOR shall receive no compensation for any services rendered unless the State of Hawaii recovers civil penalties, compensatory or punitive damages, attorneys' fees, and/or other monetary relief in connection with this Litigation. If the State receives such a recovery, CONTRACTOR will be compensated for its services as follows:

    a.  The costs and expenses necessary for conducting this Litigation, as defined by this Agreement, shall initially be advanced by CONTRACTOR and shall be deducted from the Litigation's gross or total recovery, if any, before any further distribution is made;

    b.  Of the monies remaining from any settlement or recovery after deduction of costs and expenses, CONTRACTOR shall receive a contingent fee of twenty percent (20%) from the first $10 million of net proceeds of any judgment or settlement received from each target/defendant, and eighteen percent (18%) from any net proceeds of any judgment or settlement in excess of $10 million received from each target/defendant.

2.  CONTRACTOR shall be paid its contingent fee solely out of any proceeds received as a result of a settlement or judgment in this Litigation. All settlement or judgment proceeds shall be paid by or on behalf of the defendant(s) to the Department of the Attorney General, which shall distribute them or have them distributed.

3.  CONTRACTOR shall advance all costs, expenses, and disbursements, including but not limited to costs for service of process, expert witness fees and costs, deposition costs, and costs of document review and production. CONTRACTOR's agreement to advance all Litigation expenses and costs, as well as its agreement to defer claiming entitlement to moneys owed, while any and all Litigation (including appeals and enforcement actions) is pending, has been taken into consideration in establishing the fee schedule above.

4.  CONTRACTOR shall be reimbursed for its expenses and costs solely from the Litigation's gross recovery as approved by the Attorney General for certain reasonable expenses and costs enumerated below. Proper documentation by receipts or otherwise shall be submitted

Form SDAG(1)(03/09)

with all invoices and all documentation shall be retained by CONTRACTOR for a least one full year following this Agreement's termination. All expenses must be itemized, and no reimbursement may be applied for or requested for "miscellaneous" listings. The Attorney General in her sole discretion may decline to reimburse CONTRACTOR for improperly documented, unnecessary, or unreasonable costs or expenses.

5.    The STATE will not pay for attorney or paralegal time spent performing clerical tasks, such as filing, indexing, or page numbering.

6.    Reimbursable expenses.

    a.    Extraordinary expenses. Unless prior written approval of the ATTORNEY GENERAL is obtained, the STATE shall have no obligation to reimburse CONTRACTOR for any extraordinary expenses incurred by CONTRACTOR, including without limitation, expenses for investigative services, computer litigation support services, videotaping of depositions, meals (other than meals in connection with travel as discussed in Paragraph 13), and services of experts and consultants which exceed $25,000 per expert or consultant.

    b.    Ordinary expenses. Expenses, such as the following, incurred by CONTRACTOR will be eligible for reimbursement from the STATE at actual cost, provided that written substantiation or verification (such as invoices and billings, and the taxpayer identification number of the entity to which payment was made) is submitted by CONTRACTOR and the expenses are deemed reasonable and necessary by the STATE:

        (1)    Depositions and transcripts;

        (2)    Long-distance telephone calls;

        (3)    Postage;

        (4)    Photo copying;

        (5)    Outside messenger service; or

        (6)    Outgoing faxes.

In addition, Contractor will be entitled to reimbursement for those costs and expenses set forth in the "General Conditions", Paragraph 13.

7.    No State obligation to pay. Notwithstanding any other provision of this Agreement, the STATE shall have no duty to pay CONTRACTOR, nor any of its attorneys, legal assistants, paralegals, and any other staff, nor any other person performing services on behalf of CONTRACTOR, unless the requirements described in this Compensation and Payment Schedule are first met to the STATE's satisfaction. The STATE will not be required to pay for any services it determines to be unreasonable, unnecessary, or duplicative.

Form SDAG(1)(03/09)



# GENERAL CONDITIONS FOR AGREEMENT FOR SPECIAL DEPUTY ATTORNEY GENERAL SERVICES

## TABLE OF CONTENTS

Page(s)

1. Coordination with and Reporting to the State................................................................. 1

2. Relationship of Parties:  Independent Contractor Status and Responsibilities, Including Tax Responsibilities................................................................. 1

3. Personnel Requirements................................................................................................. 2

4. Errors and Omissions Insurance and Indemnity ............................................................ 2

5. Nondiscrimination........................................................................................................... 3

6. Conflicts of Interest........................................................................................................ 3

7. Subcontracts and Assignments ..................................................................................... 3

8. Cost of Litigation ........................................................................................................... 4

9. STATE's Right to Offset.................................................................................................. 4

10. Disputes......................................................................................................................... 5

11. Termination, Generally .................................................................................................. 5

12. Termination by Contractor.............................................................................................. 5

13. Costs and Expenses...................................................................................................... 5

14. Payment Procedures:  Final Payment; Tax Clearance ................................................. 5

15. Federal Funds................................................................................................................ 6

16. Modification of Agreement.............................................................................................. 6

17. Confidentiality of Material .............................................................................................. 7

18. Publicity ......................................................................................................................... 7

Page(s)

19.    Records Retention ........................................................................................ 7

20.    Antitrust Claims ........................................................................................... 7

21.    Governing Law ............................................................................................. 8

22.    Compliance with Laws ................................................................................. 8

23.    Conflict between General Conditions and Procurement Rules ....................... 8

24.    Entire Agreement ......................................................................................... 8

25.    Severability ................................................................................................. 8

26.    Waiver .......................................................................................................... 8

27.    Notices ......................................................................................................... 8

28.    Ethics of Attorneys ...................................................................................... 9

29.    Campaign Contributions ............................................................................... 9

30.    Confidentiality of Personal Information ........................................................ 9

GC-ii

GENERAL CONDITIONS

1.    Coordination with and Reporting to the State.  The DIRECTOR, by letter or in the Scope
      of Services, may designate a member of the DIRECTOR's staff to coordinate the services
      to be provided by the CONTRACTOR in order to complete the performance required in
      the Agreement.  The CONTRACTOR shall maintain communications with the person so
      designated at all stages of the CONTRACTOR's work, and submit to that person for
      resolution any questions which may arise as to the performance of this Agreement.  The
      CONTRCTOR shall make periodic status reports to the DIRECTOR every three (3)
      months or at such other times as may be reasonably requested by the DIRECTOR.  If the
      DIRECTOR does not designate a member of the DIRECTOR's staff to coordinate this
      Agreement, the DIRECTOR will be the coordinator of services.

2.    Relationship of Parties:  Independent Contractor Status and Responsibilities, Including
      Tax Responsibilities.

      a.    In the performance of services required under this Agreement, the
            CONTRACTOR is an "independent contractor" with the authority and
            responsibility to control and direct the performance and details of the work and
            services required under this Agreement; however, the STATE shall have a general
            right to inspect work in progress to determine whether, in the STATE's opinion,
            the services are being performed by the CONTRACTOR in compliance with this
            Agreement.  Unless otherwise provided by special condition, it is understood that
            the STATE does not agree to use the CONTRACTOR exclusively, and that the
            CONTRACTOR is free to contract to provide services to other individuals or
            entities while under contract with the STATE.

      b.    The CONTRACTOR and the CONTRACTOR's employees and agents are not by
            reason of this Agreement, agents or employees of the State for any purpose, and
            the CONTRCTOR and the CONTRACTOR's employees and agents shall not be
            entitled to claim or receive from the State any vacation, sick leave, retirement,
            workers' compensation, unemployment insurance, or other benefits provided to
            state employees.

      c.    The CONTRACTOR shall be responsible for the accuracy, completeness, and
            adequacy of the CONTRACTOR's performance under this Agreement.
            Furthermore, the CONTRACTOR intentionally, voluntarily, and knowingly
            assumes the sole and entire liability to the CONTRACTOR's employees and
            agents, and to any individual not a party to this Agreement, for all loss, damage,
            or injury caused by the CONTRACTOR, or the CONTRACTOR's employees or
            agents in the course of their employment.

      d.    The CONTRACTOR shall be responsible for payment of all applicable federal,
            state, and county taxes and fees which may become due and owing by the
            CONTRACTOR by reason of this Agreement, including but not limited to (i)
            income taxes, (ii) employment related fees, assessments, and taxes, and (iii)

general excise taxes. The CONTRACTOR also is responsible for obtaining all licenses, permits, and certificates that may be required in order to perform this Agreement.

e.  The CONTRACTOR, if subject to the tax imposed by section 237-9, HRS, shall obtain a general excise tax license from the Department of Taxation, State of Hawaii, in accordance with section 237-9, HRS, and shall comply with all requirements thereof. The CONTRACTOR shall obtain a tax clearance certificate from the Director of Taxation, State of Hawaii, and the Internal Revenue Service, showing that all delinquent taxes, if any, levied or accrued against the CONTRACTOR have been paid and submit the same to the STATE prior to commencing any performance under this Agreement. The CONTRACTOR shall also be solely responsible for meeting all requirements necessary to obtain the tax clearance certificate required for final payment under sections 103-53 and 103D-328, HRS, and paragraph 14 of these General Conditions.

f.  The CONTRACTOR is responsible for securing all employee-related insurance coverage for the CONTRACTOR and the CONTRACTOR's employees and agents that is or may be required by law, and for payment of all premiums, costs, and other liabilities associated with securing the insurance coverage.

3.  Personnel Requirements.

a.  The CONTRACTOR shall secure, at the CONTRACTOR's own expense, all personnel required to perform this Agreement.

b.  The CONTRACTOR shall ensure that the CONTRACTOR's employees or agents are experienced and fully qualified to engage in the activities and perform the services required under this Agreement, and that all applicable licensing and operating requirements imposed or required under federal, state, or county law, and all applicable accreditation and other standards of quality generally accepted in the field of the activities of such employees and agents are complied with.

c.  The CONTRACTOR shall promptly inform the STATE when any personnel assigned to this project leaves the employment of the CONTRACTOR, whereupon the STATE may enter into separate new agreements with any former personnel of CONTRACTOR to work on this project.

4.  Errors and Omissions Insurance and Indemnity. The CONTRACTOR shall obtain and keep in force throughout the term of this Agreement a standard professional liability insurance policy that covers claims resulting from errors or omission in providing legal services under this Agreement. The policy shall provide a minimum aggregate coverage in the amount of at least FIVE MILLION AND NO/100 DOLLARS ($5,000,000.00), subject to applicable deductibles, unless otherwise justified by CONTRACTOR and approved by the STATE. In such instance, the CONTRACTOR shall justify to the satisfaction of the STATE a coverage amount appropriate to the legal services provided

in this Agreement. Any amount less than $5,000,000 shall be set forth as a special condition. Upon request, the CONTRACTOR shall provide the State proof of such insurance policy. In addition, and to the extent not covered by the insurance policy (for example, claims exceeding the coverage limits, or claims within the CONTRACTOR's self insured retention), the CONTRACTOR agrees to defend and indemnify the State, the contracting agency, and their officers, employees, and agents from and against all liability, loss, damages, costs and expenses, including all attorneys' fees, and all claims, suits, and demands therefor, arising out of or resulting from the acts or omissions of the CONTRACTOR or the CONTRACTOR's employees, officers, agents, or subcontractors under this Agreement; provided, however, that no obligation to defend or indemnify the State shall have the effect of (i) rendering inapplicable (in whole or in part) any professional liability insurance maintained by the CONTRACTOR, (ii) extending any statute of limitations governing any claim arising from the CONTRACTOR's acts or omissions, or (iii) waiving any claims or defenses that CONTRACTOR may have against the State or any other party.

5.    Nondiscrimination. No person performing work under this Agreement, including any subcontractor, employee, or agent of the CONTRCTOR, shall engage in any discrimination that is prohibited by any applicable federal, state, or county law.

6.    Conflicts of Interest.

       a.    With regard to the CONTRACTOR's current clients, CONTRACTOR hereby discloses on Exhibit 1, attached hereto, a list of such clients who have interests adverse to the STATE in pending administrative actions or litigation and the nature of those interests, if any. The execution of the Agreement by the STATE constitutes the STATE's consent to the CONTRACTOR's representation identified in Exhibit 1, but such consent is limited to the extent the representation is identified and disclosed.

       b.    With regard to potential clients whom the CONTRACTOR wishes to represent during the duration of this Agreement who have interests adverse to the STATE in then pending administrative actions or litigation, the CONTRACTOR agrees to consult with the STATE prior to representing the clients. Following consultation, the STATE shall grant or withhold its consent to the proposed representation.

7.    Subcontracts and Assignments. The CONTRACTOR shall not assign or subcontract any of the CONTRACTOR's duties, obligations, or interests under this Agreement and no such assignment or subcontract shall be effective unless (i) the CONTRACTOR obtains the prior written consent of the STATE and (ii) the CONTRACTOR's assignee or subcontractor submits to the STATE a tax clearance certificate from the Director of Taxation State of Hawaii, showing that all delinquent taxes, if any, levied or accrued under state law against the CONTRACTOR's assignee or subcontractor have been paid. Additionally, no assignment by the CONTRACTOR of the CONTRACTOR's right to compensation under this Agreement shall be effective unless and until the assignment is approved by the Comptroller of the State of Hawaii, as provided in section 40-58, HRS.

    a.    Recognition of a successor in interest. When in the best interest of the STATE, a successor in interest may be recognized in an assignment agreement in which the STATE, the CONTRACTOR and the assignee or transferee (hereinafter referred to as the "Assignee") agree that:

        (1)    The Assignee assumes all of the CONTRACTOR's obligations;

        (2)    The CONTRACTOR remains liable for all obligations under this Agreement but waives all rights under this Agreement as against the STATE; and

        (3)    The CONTRACTOR shall continue to furnish, and the Assignee shall also furnish, all required insurance.

    b.    Change of Name. When the CONTRACTOR asks to change the name in which it holds this Agreement with the STATE, the DIRECTOR or the DIRECTOR's designee shall, upon receipt of a document satisfactory to the DIRECTOR or the DIRECTOR's designee indicating such change of name (for example, an amendment to the CONTRACTOR's articles of incorporation), enter into an amendment of this Agreement with the CONTRACTOR to effect such a change of name. The amendment to this Agreement changing the CONTRACTOR's name shall specifically indicate that no other terms and conditions of this Agreement are thereby changed.

    c.    Reports. All assignment contracts and amendments to this Agreement effecting changes of the CONTRACTOR's name or novation hereunder shall be reported to the chief procurement officer as defined in section 103D-203(a), HRS, within thirty days of the date that the assignment contract or amendment becomes effective.

8.    Cost of Litigation. In case the STATE shall, without any fault on its part, be made a party to any litigation commenced by or against the CONTRACTOR in connection with this Agreement, the CONTRACTOR shall pay all costs and expenses incurred by or imposed on the STATE, including reasonable attorneys' fees.

9.    STATE's Right to Offset. The STATE may offset against any monies or other obligations the STATE owes to the CONTRACTOR under this Agreement, any amounts owed to the State of Hawaii by the CONTRACTOR under this Agreement or any other agreements or pursuant to any law or other obligation owed to the State of Hawaii by the CONTRACTOR, including, without limitation, the payment of any taxes or levies of any kind or nature. The STATE will notify the CONTRACTOR in writing of any offset and the nature of such offset. For purposes of this paragraph, amounts owed to the State of Hawaii shall not include debts or obligations which have been liquidated, agreed to by the CONTRACTOR, and are covered by an installment payment or other settlement plan approved by the State of Hawaii, provided, however, that the CONTRACTOR shall be

                        GC-4

entitled to such exclusion only to the extent that the CONTRACTOR is current with, and not delinquent on, any payments or obligations owed to the State of Hawaii under such payment or other settlement plan.

10. <u>Disputes</u>. Disputes shall be resolved in accordance with section 103D-703, HRS, and chapter 3-126, Hawaii Administrative Rules ("the Procurement Rules"), chapter 126, as the same may be amended from time to time.

11. <u>Termination, Generally</u>. This Agreement may be terminated at the option of the STATE upon ten (10) days written notice to the CONTRACTOR. If the STATE elects to terminate, the CONTRACTOR shall be entitled to reasonable payment as determined by the STATE for satisfactory services rendered under the Agreement up to the time of termination.

12. <u>Termination by Contractor</u>. The CONTRACTOR may withdraw from this Agreement with the consent to the STATE. Any such withdrawal must comply with the ethics standards applicable to the practice of law. The STATE's consent shall not be withheld unreasonably. The STATE and the CONTRACTOR, upon the CONTRACTOR's withdrawal, will determine whether payment is due to the CONTRACTOR.

13. <u>Costs and Expenses</u>. Any reimbursement due the CONTRACTOR for per diem and transportation expenses under this Agreement shall be subject to chapter 3-123 (Cost Principles) of the Procurement Rules and the following guidelines:

    a.    Reimbursement for air transportation shall be for actual cost or coach class air fare, whichever is less.

    b.    Reimbursement for ground transportation costs shall not exceed the actual cost of renting an intermediate-size vehicle.

    c.    Unless prior written approval of the DIRECTOR is obtained, reimbursement for subsistence allowance (i.e., hotel and meals, etc.) shall not exceed the applicable daily authorized rates for interisland or out-of-state travel that are set forth in the current Governor's Executive Order authorizing adjustments in salaries and benefits for state officers and employees in the executive branch who are excluded from collective bargaining coverage.

    d.    If travel is undertaken for more than one client, the CONTRACTOR shall be reimbursed only the STATE's share of all subsistence and transportation costs. The STATE will compensate for time spent in transit only if work is done for the STATE during such transit.

14. <u>Payment Procedures: Final Payment; Tax Clearance</u>.

    a.    <u>Original invoices required</u>. All payments under this Agreement shall be made only upon submission by the CONTRACTOR of original invoices specifying the

amount due and certifying that services requested under the Agreement have been performed by the CONTRACTOR according to the Agreement.

b.   Subject to available funds.  Such payments are subject to availability of funds and allotment by the Director of Finance in accordance with chapter 37, HRS. Further, all payments shall be made in accordance with and subject to chapter 40, HRS.

c.   Prompt payment.

(1)   Any money, other than retainage, paid to the CONTRACTOR shall be dispersed to subcontractors within ten days after receipt of the money in accordance with the terms of the subcontract; provided that the subcontractor has met all the terms and conditions of the subcontract and there are no bona fide disputes; and

(2)   Upon final payment to the CONTRACTOR, full payment to the subcontractor, including retainage, shall be made within ten days after receipt of the money; provided that there are no bona fide disputes over the subcontractor's performance under the subcontract.

d.   Final payment.  Final payment under this Agreement shall be subject to sections 103-53 and 103D-328, HRS, which require a tax clearance from the Director of Taxation, State of Hawaii, showing that all delinquent taxes, if any, levied or accrued under state law against the CONTRACTOR have been paid.

15.   Federal Funds.  If this Agreement is payable in whole or in part from federal funds, CONTRACTOR agrees that, as to the portion of the compensation under this Agreement to be payable from federal funds, the CONTRACTOR shall be paid only from such funds received from the federal government, and shall not be paid from any other funds. Failure of the STATE to receive anticipated federal funds shall not be considered a breach by the STATE or an excuse for nonperformance by the CONTRACTOR.

16.   Modification of Agreement.

a.   In writing.  Any modification, alteration, amendment, change, or extension of any term, provision, or condition of this Agreement permitted by this Agreement shall be made by written amendment to this Agreement, signed by the CONTRACTOR and the STATE.

b.   No oral modification.  No oral modification, alteration, amendment, change, or extension of any term, provision or condition of this Agreement shall be permitted.

c.   Tax clearance.  The STATE may, at its discretion, require the CONTRACTOR to submit to the STATE, prior to the STATE's approval of any modification,

alteration, amendment, change, or extension of any term, provision, or condition
of this Agreement, a tax clearance from the Director of Taxation, State of Hawaii,
showing that all delinquent taxes, if any, levied or accrued under state law against
the CONTRACTOR have been paid.

17.    Confidentiality of Material.

   a.    All material given to or made available to the CONTRACTOR by virtue of this
         Agreement, which is identified as proprietary or confidential information, will be
         safeguarded by the CONTRACTOR and shall not be disclosed to any individual
         or organization without the prior written approval of the STATE.

   b.    All information, data, or other material provided by the CONTRACTOR to the
         STATE shall be subject to the Uniform Information Practices Act, chapter 92F,
         HRS.

18.    Publicity.  The CONTRACTOR shall not refer to the STATE, or any office, agency, or
       officer thereof, or any State employee, including the DIRECTOR, or to the services or
       goods, or both, provided under this Agreement, in any of the CONTRACTOR's
       brochures, advertisements, or other publicity of the CONTRACTOR.  All media contacts
       with the CONTRACTOR about the subject matter of this Agreement shall be referred to
       the DIRECTOR or the DIRECTOR's designee.

19.    Records Retention.

   a.    Upon any termination of this Contract or as otherwise required by applicable law,
         CONTRACTOR shall, pursuant to chapter 487R, HRS, destroy all copies (paper
         or electronic form) of personal information received from the STATE.

   b.    The CONTRACTOR and any subcontractors shall maintain the files, books, and
         records, that relate to the Contract, including any personal information created or
         received by the CONTRACTOR on behalf of the STATE, and any cost or pricing
         data, for at least seven (7) years after the date of final payment under the Contract.
         The personal information shall continue to be confidential and shall only be
         disclosed as permitted or required by law.  After the seven (7) year, or other
         retention period as required by law has ended, the files, books, and records that
         contain personal information shall be destroyed pursuant to chapter 487R, HRS,
         or returned to the STATE at the request of the STATE.

20.    Antitrust Claims.  The STATE and the CONTRACTOR recognize that in actual
       economic practice, overcharges resulting from antitrust violations are in fact usually
       borne by the purchaser.  Therefore, the CONTRACTOR hereby assigns to the STATE
       any and all claims for overcharges as to goods and materials purchased in connection
       with this Agreement, except as to overcharges which result from violations commencing
       after the price is established under this Agreement and which were not passed on to the
       STATE under an escalation clause.

21. <u>Governing Law</u>. The validity of this Agreement and any of its terms or provisions, as well as the rights and duties of the parties to this Agreement, shall be governed by the laws of the State of Hawaii. Any action at law or in equity to enforce or interpret the provisions of this Agreement shall be brought in a state court of competent jurisdiction in Honolulu, Hawaii.

22. <u>Compliance with Laws</u>. The CONTRACTOR shall comply with all federal, state, and county laws, ordinances, codes, rules, and regulations, as the same may be amended from time to time, that in any way affect the CONTRACTOR's performance of this Agreement.

23. <u>Conflict between General Conditions and Procurement Rules</u>. In the event of a conflict between the General Conditions and the Procurement Rules, the Procurement Rules in effect on the date this Agreement became effective shall control.

24. <u>Entire Agreement</u>. This Agreement sets forth all of the agreements, conditions, understandings, promises, warranties, and representations between the STATE and the CONTRACTOR relative to this Agreement. This Agreement supersedes all prior agreements, conditions, understandings, promises, warranties, and representations, which shall have no further force or effect. There are no agreements, conditions, understandings, promises, warranties, or representations oral or written, express or implied, between the STATE and the CONTRACTOR other than as set forth or as referred to herein.

25. <u>Severability</u>. In the event that any provision of this Agreement is declared invalid or unenforceable by a court, such invalidity or unenforceability shall not affect the validity or enforceability of the remaining terms of this Agreement.

26. <u>Waiver</u>. The failure of the STATE to insist upon the strict compliance with any term, provision, or condition of this Agreement shall not constitute or be deemed to constitute a waiver or relinquishment of the STATE's right to enforce the same in accordance with this Agreement. The fact that the STATE specifically refers to one provision of the Procurement Rules or one section of the Hawaii Revised Statutes, and does not include other provisions or statutory sections in this Agreement shall not constitute a waiver or relinquishment of the STATE's rights or the CONTRACTOR's obligations under the Procurement Rules or statutes.

27. <u>Notices</u>. Any written notice required to be given by a party to this Agreement shall be (a) delivered personally, or (b) sent by United States first class mail, postage prepaid. Notice to the STATE shall be sent to the DIRECTOR at the DIRECTOR's address as indicated in the Agreement. Notice to the CONTRACTOR shall be sent to the CONTRACTOR at the CONTRACTOR's address as indicated in the Agreement. A notice shall be deemed to have been received three (3) days after mailing or at the time of actual receipt, whichever is earlier. The CONTRACTOR is responsible for notifying the STATE in writing of any change of address.

Form SDAG(1)(03/09)

28.    Ethics of Attorneys.  CONTRACTOR shall abide by and perform the CONTRACTOR's
duties under and pursuant to this Agreement in accordance with the ethics of the legal
profession and all federal, state, and municipal laws, regulations, and ordinances
regulating the practice of law.

29.    Campaign Contributions.  The CONTRACTOR is hereby notified of the applicability of
section 11-355, HRS, which states that campaign contributions are prohibited from
specified state or county government contractors during the terms of their contracts if the
contractors are paid with funds appropriated by a legislative body.

30.    Confidentiality of Personal Information.

a.    Definitions.

"Personal information" means an individual's first name or first initial and last
name in combination with any one or more of the following data elements, when
either name or data elements are not encrypted:

(1)    Social security number;

(2)    Driver's license number or Hawaii identification card number; or

(3)    Account number, credit or debit card number, access code, or password
that would permit access to an individual's financial information.

Personal information does not include publicly available information that is
lawfully made available to the general public from federal, state, or local
government records.

"Technological safeguards" means the technology and the policy and procedures
for use of the technology to protect and control access to personal information.

b.    Confidentiality of Material.

(1)    All material given to or made available to the CONTRACTOR by the
STATE by virtue of this Contract which is identified as personal
information, shall be safeguarded by the CONTRACTOR and shall not be
disclosed without prior written approval of the STATE.

(2)    CONTRACTOR agrees not to retain, use, or disclose personal information
for any purpose other than as permitted or required by this Contract.

(3)      CONTRACTOR agrees to implement appropriate "technological safeguards" that are acceptable to the STATE to reduce the risk of unauthorized access to personal information.

(4)      CONTRACTOR shall report to the STATE in a prompt and complete manner any security breaches involving personal information.

(5)      CONTRACTOR agrees to mitigate, to the extent practicable, any harmful effect that is known to CONTRACTOR because of a use or disclosure of personal information by CONTRACTOR in violation of the requirements of this paragraph.

(6)      CONTRACTOR shall complete and retain a log of all disclosures made of personal information received from the STATE, or personal information created or received by CONTRACTOR on behalf of the STATE.

c.      Security Awareness Training and Confidentiality Agreements.

(1)      CONTRACTOR certifies that all of its employees who will have access to the personal information have completed training on security awareness topics relating to protecting personal information.

(2)      CONTRACTOR certifies that confidentiality agreements have been signed by all of its employees who will have access to the personal information acknowledging that:

      (A)      The personal information collected, used, or maintained by the CONTRACTOR will be treated as confidential;

      (B)      Access to the personal information will be allowed only as necessary to perform the Contract; and

      (C)      Use of the personal information will be restricted to uses consistent with the services subject to this Contract.

d.      Termination for Cause.  In addition to any other remedies provided for by this Contract, if the STATE learns of a material breach by CONTRACTOR of this paragraph by CONTRACTOR, the STATE may at its sole discretion:

(1)      Provide an opportunity for the CONTRACTOR to cure the breach or end the violation; or

(2)      Immediately terminate this Contract.

Form SDAG(1)(03/09)

In either instance, the CONTRACTOR and the STATE shall follow chapter 487N, HRS, with respect to notification of a security breach of personal information.

e.    Records Retention.

(1)    Upon any termination of this Contract, or as otherwise required by applicable law, CONTRACTOR shall, pursuant to chapter 487R, HRS destroy all copies (paper or electronic form) of personal information received from the STATE.

(2)    The CONTRACTOR and any subcontractors shall maintain the files, books, and records, that relate to the Contract, including any personal information created or received by the CONTRACTOR on behalf of the STATE, and any cost or pricing data, for at least seven (7) years after the date of final payment under the Contract. The personal information shall continue to be confidential and shall only be disclosed as permitted or required by law. After the seven (7) year, or other retention period as required by law has ended, the files, books, and records that contain personal information shall be destroyed pursuant to chapter 487R, HRS, or returned to the STATE at the request of the STATE.



www.motleyrice.com

"I will stand for my client's rights.
I am a trial lawyer."
—Ron Motley (1944–2013)

401 9th St. NW, Suite 1001
Washington, DC 20004
o. 202.232.5504   f. 202.384.9622

**Linda Singer**
*Licensed in DC, NY*
direct: 202.386.9626
lsinger@motleyrice.com

## Exhibit 1

Motley Rice certifies that it is not representing any clients who have interests adverse to the State of Hawai'i in pending administrative actions or litigation.

Motley Rice is representing the District of Columbia, which is not adverse to the State of Hawai'i, in a similar investigation of pharmaceutical benefit managers relating to prescription drug rebates.

Linda Singer
Motley Rice, LLC
Member

**MOTLEY RICE LLC**

**Written Consent in Lieu of a Special Meeting of the Managers**

The undersigned, being all of the Managers of Motley Rice LLC, a manager-managed South Carolina limited liability company, do hereby adopt the following resolutions, this action in lieu of a special meeting of the Managers for such purpose:

RESOLVED, that Motley Rice LLC is and shall be authorized to enter into the attached State Of Hawaii Agreement For Special Deputy Attorney General Services ("Agreement") with the Department of the Attorney General, State of Hawaii.

FURTHER RESOLVED, that the person whose name, title and signature appears below is duly authorized, empowered and directed to execute and deliver the Agreement on behalf of Motley Rice LLC and that such execution shall be solely effective to bind Motley Rice LLC under the terms thereof.

| Name | Title | Actual Signature |
|------|-------|------------------|
| Linda J. Singer | Member Attorney | |

Executed and effective as of April ___, 2021.

Joseph F. Rice

**MOTLEY RICE LLC**

**Written Consent in Lieu of a Special Meeting of the Managers**

The undersigned, being all of the Managers of Motley Rice LLC, a manager-managed South Carolina limited liability company, do hereby adopt the following resolutions, this action in lieu of a special meeting of the Managers for such purpose:

RESOLVED, that Motley Rice LLC is and shall be authorized to enter into the attached State Of Hawaii Agreement For Special Deputy Attorney General Services ("Agreement") with the Department of the Attorney General, State of Hawaii.

FURTHER RESOLVED, that the person whose name, title and signature appears below is duly authorized, empowered and directed to execute and deliver the Agreement on behalf of Motley Rice LLC and that such execution shall be solely effective to bind Motley Rice LLC under the terms thereof.

| Name | Title | Actual Signature |
|------|-------|------------------|
| Linda J. Singer | Member Attorney | |

Executed and effective as of April 19, 2021.

Joseph F. Rice



**STATE OF HAWAII**
**STATE PROCUREMENT OFFICE**

# CERTIFICATE OF VENDOR COMPLIANCE

This document presents the compliance status of the vendor identified below on the issue date with respect to certificates required from the Hawaii Department of Taxation (DOTAX), the Internal Revenue Service, the Hawaii Department of Labor and Industrial Relations (DLIR), and the Hawaii Department of Commerce and Consumer

**Vendor Name:**     **Motley Rice LLC**

**Issue Date:**       **03/04/2021**

**Status:**          **Compliant**

Hawaii Tax#:
New Hawaii Tax#:
FEIN/SSN#:          XX-XXX1732
UI#:                No record
DCCA FILE#:

**Status of Compliance for this Vendor on issue date:**

| Form | Department(s) | Status |
|------|---------------|--------|
| A-6 | Hawaii Department of Taxation | Compliant |
| | Internal Revenue Service | Compliant |
| COGS | Hawaii Department of Commerce & Consumer Affairs | Exempt |
| LIR27 | Hawaii Department of Labor & Industrial Relations | Compliant |

**Status Legend:**

| Status | Description |
|--------|-------------|
| Exempt | The entity is exempt from this requirement |
| Compliant | The entity is compliant with this requirement or the entity is in agreement with agency and actively working towards compliance |
| Pending | The entity is compliant with DLIR requirement |
| Submitted | The entity has applied for the certificate but it is awaiting approval |
| Not Compliant | The entity is not in compliance with the requirement and should contact the issuing agency for more information |



**STATE OF HAWAII**

# SUPPLEMENTAL CONTRACT  NO.  1

## TO CONTRACT  Special DAG Contract w/ Motley Rice LLC, effective April 29, 2021

*(Insert contract number or other identifying information)*

This Supplemental Contract No. _____ 1 _____, executed on the respective dates
indicated below, is effective as of _____ April 29 _____ , \_\_\_ 2021 \_\_\_ , between the
_____ Department of the Attorney General _____ , State of Hawaii ,
*(Insert name of state department, agency, board or commission)*
("STATE"), by its _____ Attorney General _____ ,
*(Insert title of state officer executing contract)*
(hereafter also referred to as the HEAD OF THE PURCHASING AGENCY or designee ("HOPA")),
whose address is _____ 425 Queen Street, 3rd Floor, Honolulu, Hawaii, 96813 _____ , and
_____ Motley Rice LLC _____
_____ ("CONTRACTOR"),
a _____ limited liability company _____
*(Insert corporation, partnership, joint venture, sole proprietorship, or other legal form of the CONTRACTOR)*
under the laws of the State of _____ South Carolina _____ , whose business address and federal
and state taxpayer identification numbers are as follows: _____
\_\_\_\_\_ 401 9th Street NW, Suite 1001, Washington DC, 20004; Federal ID # 75-3051732 \_\_\_\_\_

## RECITALS

A.    WHEREAS, the STATE and the CONTRACTOR entered into Contract
_____ Special DAG Contract w/ Motley Rice LLC, effective April 29, 2021 _____
*(Insert contract number or other identifying information)*
dated \_\_\_\_ April 29 \_\_\_ , \_\_ 2021 \_\_ , which was amended by Supplemental Contract  No(s). _____
dated _____ , \_\_\_\_\_ , which was amended by Supplemental Contract  No(s). _____
dated _____ , \_\_\_\_\_ , which was amended by Supplemental Contract  No(s). _____
dated _____ , \_\_\_\_\_ (hereafter collectively referred to as "Contract "), whereby the
CONTRACTOR agreed to provide the goods or services, or both, described in the Contract; and

B.    WHEREAS, the parties now desire to amend the Contract.
NOW, THEREFORE, the STATE and the CONTRACTOR mutually agree to
amend the Contract as follows:  (Check Applicable box(es))

☐  Amend the SCOPE OF SERVICES according to the terms set forth in Attachment-S1,
which is made a part of the Contract.

☐  Amend the COMPENSATION AND PAYMENT SCHEDULE according to the terms
set forth in Attachment-S2, which is made a part of the Contract.

☑  Amend the TIME OF PERFORMANCE according to the terms set forth in
Attachment-S3, which is made a part of the Contract.

☐  Amend the SPECIAL CONDITIONS according to the terms set forth in
Attachment-S6 SUPPLEMENTAL SPECIAL CONDITIONS, which is made a part of
the Contract.

☐  Recognize the CONTRACTOR'S change of name.
FROM: _____
_____
_____
_____

TO: _____

_____

_____

_____

As set forth in the documents attached hereto as Exhibit _____ , and incorporated herein.

A tax clearance certificate from the State of Hawaii ☐ is ☑ is not required to be submitted to the STATE prior to commencing any performance under this Supplemental Contract.

A tax clearance certificate from the Internal Revenue Service ☐ is ☑ is not required to be submitted to the STATE prior to commencing any performance under this Supplemental Contract.

The entire Contract, as amended herein, shall remain in full force and effect.

IN VIEW OF THE ABOVE, the parties execute this Contract by their signatures, on the dates below, to be effective as of the date first above written.

FUNDING AGENCY: (if other than

contracting agency)

By _____

          Signature

PRINT NAME: _____

DIRECTOR OF _____

DATE: _____

CORPORATE SEAL
(If available)

**STATE**

_Valentttttrr_

(Signature)

Holly T. Shikada

(Print Name)

Attorney General, State of Hawaii

(Print Title)

Apr 29, 2022

(Date)

**CONTRACTOR**

Motley Rice LLC

(Name of Contractor)

_Joseph Rice_

(Signature)

JOSEPH F. RICE

(Print Name)

MANAGER         *

(Print Title)

4/28/22

(Date)

**APPROVED AS TO FORM:**

_Mana Moriarty_

_____

Deputy Attorney General

* Evidence of authority of the CONTRACTOR'S representative to sign this Contract for the CONTRACTOR must be attached.

Attachment-S3



## STATE OF HAWAII

## TIME OF PERFORMANCE

The contractor's time of performance with respect to Phase I is extended. CONTRACTOR shall submit to the Attorney General the report referenced in Section I.1 of the original Scope of Services on or before April 28, 2023.

Form SDAG(1)(03/09)



# STATE OF HAWAII

## CONTRACTOR'S
## STANDARDS OF CONDUCT DECLARATION

For the purposes of this declaration:

"Agency" means and includes the State, the legislature and its committees, all executive departments, boards, commissions, committees, bureaus, offices; and all independent commissions and other establishments of the state government but excluding the courts.

"Controlling interest" means an interest in a business or other undertaking which is sufficient in fact to control, whether the interest is greater or less than fifty per cent (50%).

"Employee" means any nominated, appointed, or elected officer or employee of the State, including members of boards, commissions, and committees, and employees under contract to the State or of the constitutional convention, but excluding legislators, delegates to the constitutional convention, justices, and judges.  (Section 84-3, HRS).

On behalf of ___Motley Rice LLC___ , CONTRACTOR, the undersigned does declare as follows:

1.  CONTRACTOR  ☐ is*  ☑ is not a legislator or an employee or a business in which a legislator or an employee has a controlling interest. (Section 84-15(a), HRS).

2.  CONTRACTOR has not been represented or assisted personally in the matter by an individual who has been an employee of the agency awarding this Contract within the preceding two years and who participated while so employed in the matter with which the Contract is directly concerned.(Section 84-15(b), HRS).

3.  CONTRACTOR has not been assisted or represented by a legislator or employee for a fee or other compensation to obtain this Contract and will not be assisted or represented by a legislator or employee for a fee or other compensation in the performance of this Contract, if the legislator or employee had been involved in the development or award of the Contract.  (Section 84-14(d), HRS).

4.  CONTRACTOR has not been represented on matters related to this Contract, for a fee or other consideration by an individual who, within the past twelve (12) months, has been an agency employee, or in the case of the Legislature, a legislator, and participated while an employee or legislator on matters related to this Contract.  (Section 84-18(b) and (c), HRS).

*Reminder to Agency:  If the "is" block is checked and if the Contract involves goods or services of a value in excess of $10,000, the Contract must be awarded by competitive sealed bidding under section 103D-302, HRS, or a competitive sealed proposal under section 103D-303, HRS. Otherwise, the Agency may not award the Contract unless it posts a notice of its intent to award it and files a copy of the notice with the State Ethics Commission. (Section 84-15(a), HRS).

Form SDAG(1)(03/09)

CONTRACTOR understands that the Contract to which this document is attached is voidable on behalf of the STATE if this Contract was entered into in violation of any provision of chapter 84, Hawaii Revised Statutes, commonly referred to as the Code of Ethics, including the provisions which are the source of the declarations above. Additionally, any fee, compensation, gift, or profit received by any person as a result of a violation of the Code of Ethics may be recovered by the STATE.

CONTRACTOR

By _Joseph F. Rice_
    (signature)

Print Name  JOSEPH  F.  RICE

Print Title  MANAGER

Name of Contractor  _____ Motley Rice LLC _____

Date  4|28|22



### STATE OF HAWAII

### CONTRACTOR'S ACKNOWLEDGMENT

STATE OF _____ SOUTH CAROLINA )

COUNTY OF _____ CHARLESTON _____ ) ss.

On this __28th__ day of __April__, 2022, before me personally appeared __Joseph F. Rice__, to me known, who being by me duly sworn, did say that he/she/they is/are the __Manager__ of __Motley Rice LLC__, the CONTRACTOR named in the foregoing instrument, and that he/she/they is/are authorized to sign said instrument on behalf of the CONTRACTOR, and acknowledges that he/she/they executed said instrument as the free act and deed of the CONTRACTOR.

(NOTARY SEAL)

_____
(Signature)

Gwendolyn Worthington
(Print Name)

Notary Public, State of __South Carolina__

My commission expires: __1 3 2029__

GWENDOLYN WORTHINGTON
Notary Public, State of South Carolina
My Commission Expires 1/3/2029

Doc. Date: __April 28, 2022__        #Pages: __5__

Notary Name: __Gwendolyn Worthington__        _____ Circuit

Doc. Description: __Supplemental Contract No. 1 to Contract Special DAG__
__Contract w/Motley Rice LLC, effective April 29, 2021.__

_____        __4/28/22__

Notary Signature        Date

NOTARY CERTIFICATION

Form SDAG(1)(03/09)

# Exhibit I

to Declaration of Matthew Hooker

## DEPARTMENT OF THE ATTORNEY GENERAL
## STATE OF HAWAI'I

| | |
|---|---|
| **IN RE INVESTIGATION OF:** | **SUBPOENA DUCES TECUM** |
| | **AG Subpoena No. 2 0 2 1 - 0 5 2** |
| **OPTUMRX, INC.** | |

## SUBPOENA DUCES TECUM

TO:   OPTUMRX, INC.
      c/o The Corporation Company, Inc.
      1136 Union Mall, STE 301
      Honolulu, HI 96813

**YOU ARE HEREBY COMMANDED,** pursuant to the laws of the State of Hawai'i, including Haw. Rev. Stat. §§ 28-2.5, 480-18, and 661-22, to deliver and turn over to the Department of the Attorney General, State of Hawai'i, all documents and information requested in Attachment A in accordance with the instructions and definitions contained therein within thirty (30) days after service of this Subpoena. You may deliver the documents and information to Hawai'i Special Deputy Attorney General Linda Singer, Motley Rice LLC, 401 9th Street NW, Suite 1001, Washington, DC 20004.

**TAKE NOTICE** that the Attorney General deems the documents requested by this Subpoena to be relevant and material to an investigation and inquiry undertaken in the public interest.

**TAKE FURTHER NOTICE that you are to continue and/or immediately implement a litigation hold** preserving all documents relating to the subject matter hereof, as set forth in Attachment A, but not limited to the specific documents demanded therein. (Additional subpoenas may follow.)

**TAKE FURTHER NOTICE** that Your disobedience of this Subpoena, by failing to deliver the documents and information requested in the attached Schedule on the date, time, and place stated above or on any agreed upon adjourned date or time, may subject You to penalties and other lawful punishment.

**YOU ARE HEREBY REQUESTED** not to disclose the existence of this Subpoena while this investigation is pending. Disclosure of this Subpoena may impede a confidential investigation being conducted by the Attorney General.

OBEDIENCE to this subpoena may be enforced by the Circuit Court of the First Circuit.

DATED:        Honolulu, Hawaii on the 15th  day of October, 2021

[ X ]    If this box is checked, it may not be
         necessary to appear in person. To make
         other arrangements, please call

                                    for    _Holly J. Shikada_____
                                                ATTORNEY GENERAL
                                                STATE OF HAWAII

Contact Person: Deputy Attorney General David D. Day
Telephone Number: (808) 586-1346

2

RETURN OF SERVICE

Received this subpoena at _____ on _____ and

on _____at _____ ,

I served it on the within named by delivering a copy_____.

Dated _____

_____
Signature of Serving Officer

**RECIPIENT'S RIGHTS**

     **You have been served with an investigative subpoena issued by the Attorney General of the State of Hawaii in accordance with section 28-2.5, Hawaii Revised Statutes, to appear at the time and place specified, to give sworn testimony, and, if indicated, to bring certain materials with you. Attendance is required only in the county in which the subpoena is served or such other place as may be agreed upon by you and the issuing authority. If the subpoena is served in a county other than that in which you reside, are employed or transact business, the Department of the Attorney General shall bear the expense of travel as provided by the rules of the court.**

     **If you disobey this subpoena, the Attorney General may apply to the circuit court in the county in which you reside or are located to compel obedience. Prior to the date on which you are commanded to appear, you may move the circuit court to quash or modify the subpoena if compliance would be unreasonable or oppressive or violate any privilege you may be entitled to exercise in a court proceeding.**

3

## ATTACHMENT "A"

## INSTRUCTIONS

A.    In each instance in which a document is produced in response to a Request, the current version should be produced together with all earlier versions, or predecessor documents serving the same function during the relevant time period, even though the title of earlier documents may differ from current versions, as well as the time period that each version was used by You.

B.    The Subpoena Duces Tecum calls for all described documents in your possession, custody or control without regard to the person or persons by whom or for whom the documents were prepared (*e.g.*, your company employees, contractors, vendors, distributors, service providers, competitors, or others).

C.    These Requests specifically include production of electronically stored information ("ESI").

    1.    General Instructions. A cover letter will accompany each production, identifying each piece of media (hard drive, thumb drive, DVD, CD, or FTP), the production date, production volume, and the Bates range of the production. Data will be produced on hard drive, thumb drive, DVD, CD, or FTP. Label all media with the following:

        a.    Case number
        b.    Production date
        c.    Production volume
        d.    Bates range
        e.    Media volume number (1 of X, 2 of X, etc.), if applicable.

    2.    Production Format for Electronically Stored Information. Production of all ESI is requested in either original native file format or as searchable image files, using production numbering as described below. Before being produced, all parent-level email and loose-file (non-email) ESI should be de-duplicated across all custodians and shared network drives based on MD5 hash value. Individual email attachments should not be separately de-duplicated. All ESI should be produced with a metadata field listing all custodians where duplicate documents were found. For ESI production in image format, if any documents cannot be reasonably be converted to readable images, the information should be produced in native format or some other reasonably usable format, and image production should include a placeholder image for each such unconverted or unreadable document setting forth the original filename and extension.

    3.    Production of Email. If produced in native format, email should be produced as individual, parent level, HTML files, and attachments to emails should

4

sequentially follow their parent emails and be produced in native format as
separate files. If produced in searchable image format, parent emails and their
attachments should be produced as separate, contiguous documents.

4.    <u>Production of Spreadsheets</u>. Spreadsheets should be produced in native format if
stored in that manner, and each native file should be named with a document
production number as described below. If a spreadsheet contains privileged
information, you may produce it as imaged ESI, with the privileged information
redacted, provided that You make reasonable efforts in applying page layout
settings to maximize document readability. Images of spreadsheets that contain
multiple worksheets should be produced with worksheet names indicated in a
header or footer. To the extent that print-outs or images of all or part of a
spreadsheet were also maintained in the ordinary course of business in static form
(*e.g.*, as a pdf attachment), those documents should be produced as images to the
extent such production is not duplicative.

5.    <u>Production of Database Information</u>. Relevant information from a database should
be produced as a report or data table, either in a static image format or in a
popular database application, such as an Microsoft Access database.

6.    <u>Production of ESI Commentary and Tracked Changes</u>. Microsoft Word,
Microsoft Excel, and similar file formats that provide for comments or tracked
changes should be produced in a manner in which all comments and tracked
changes are preserved, accessible, and viewable in their original color format.
Such production may be in native format.

7.    <u>Production of Paper Documents</u>. Scanned paper document production must have
natural, logical document breaks and should include, where available, copies of
file folders, envelopes, or labels or other identifying marks on the containers in
which the documents were maintained. All scanned paper documents should be
produced with OCR text in a corresponding TXT file.

8.    <u>Image Production Format</u>. Searchable images should be produced as separate
documents in either single-page Group IV TIFF format or multi-page PDF format,
at least 300 DPI resolution, with corresponding TXT files. Imaged ESI should
maintain all color properties, and scanned paper images should provide color
when content of the document contains more than one color.

9.    <u>Document Production Numbering</u>. Each page of all images produced (whether
hard-copy documents or ESI) must be clearly labeled with an indelible, legible,
unique Bates number identifier electronically "burned" onto the image.
Reasonable steps shall be taken to place the Bates number or confidentiality
designation at a location that does not obscure any content from the source
document. There shall be no other branding placed on the document image,
except to identify redactions due to privilege. To the extent possible, documents

5

and ESI shall be Bates numbered consecutively, maintaining all parent/child relationships as well as the order of the parent emails and corresponding attachments.

10. Load Files and Metadata. All native format and searchable image format production must include one or more CSV or Summation load files that associate each document and its Bates number with its corresponding TXT file, and that include the following original and processed metadata fields:

For all imaged documents (ESI and scanned):

>BegDoc
>EndDoc
>ParentID
>AttachmentIDs
>BegAttach
>EndAttach

For all ESI (native and imaged):

>FileName
>Extension
>Author
>DateCreated
>TimeCreated
>DateLastMod
>TimeLastMod
>MD5Hash
>Custodian
>DupCustodians

For all email:

>MailTo
>MailFrom
>CC
>BCC
>Subject
>DateAndTimeSent
>DateAndTimeReceived
>TimeZone
>IntMsgID
>Conversation
>ConversationIndex
>ParentID

6

> AttachmentIDs
> BegAttach
> EndAttach

If production in the requested form is not reasonably available or practical, office personnel at the undersigned law firm are available to discuss compatible alternatives.

11. <u>Production Load Files</u>. Two Load/Unitization files shall accompany all productions. All productions containing images must include an image load file that is in .LOG or .OPT format. For any productions containing native files, the metadata .DAT file should contain a NATIVELINK field that contains the path/link to each native file generated during production. The native files should be named with their corresponding bates numbers. All productions should include a metadata load file (.DAT file) containing all agreed upon metadata production fields and the delimiters should be standard Concordance delimiters:

| | | | |
|---|---|---|---|
| a. | Column Delimiter: | (020) | |
| b. | Field Delimiter:    þ | (254) | |
| c. | New Line Delimiter: | ® | (174) |
| d. | Multi-Entry Delimiter: | ; | (059) |

The following ASCII delimiters are also acceptable:

| | | | |
|---|---|---|---|
| e. | Column Delimiter: ^ | (094) | |
| f. | Field Delimiter:    \| | (124) | |
| g. | New Line Delimiter: | ~ | (126) |
| h. | Multi-Entry Delimiter: | ; | (059) |

The first line of the .DAT file must contain the field names to each corresponding metadata field. The name of the data load file should mirror the name of the delivery volume and the volume names should be consecutive. If foreign language/Unicode text exists, the .DAT file shall contain the appropriate encoding to enable preservation of the document's original language.

12. <u>Searchable Files.</u> (.TXT). Document level, searchable text files shall be provided for all production documents and be maintained in separate TEXT directories. All text files should be named with their corresponding bates numbers. The metadata .DAT file should contain a TEXTPATH field that contains the path/link to each corresponding text file generated during production. If foreign language/Unicode text exists, the .TXT files shall contain the appropriate encoding to enable preservation of the document's original language.

13. <u>Privileged Documents.</u> If any responsive document is withheld under any claim of privilege, provide a detailed privilege log that contains at least the following information for each document that you have withheld:

7

    a.      the name of each author, writer, sender, creator, or initiator of such document;

    b.      the name of each recipient, addressee, or party for whom such document was intended;

    c.      the date of such document, or an estimate thereof if no date appears on the document;

    d.      the general subject matter of the document; and

    e.      the claimed grounds for withholding the document, including—but not limited to—the nature of any claimed privilege and grounds in support.

14.    <u>Duty to Preserve Documents.</u>  All documents and/or other data which relate to the subject matter or requests of this Subpoena Duces Tecum must be preserved. Any destruction involving such documents must cease, even if it is your normal or routine course of business to delete or destroy such documents or data and even if you believe such documents or data are privileged or otherwise need not be produced.

15.    <u>Duty to Supplement.</u>  All document requests are continuing in nature so as to require the supplementary production if you obtain further responsive documents or information. You are also required to amend your responses to the requests contained within this Subpoena Duces Tecum if you discover that the previous response was incorrect or incomplete.

## DEFINITIONS

A.    "All" shall be construed to include the collective as well as the singular and shall mean "each," "any," and "every."

B.    "Any" shall be construed to mean "any and all."

C.    "Benefits Consultant" shall mean any organization providing advisory services pertaining to the pharmacy benefit of a health insurance product or the administration of such a benefit.

D.    "Communications" shall mean and refer to any exchange of information by any means of transmissions, sending or receipt of information of any kind by or through any means including, but not limited to, verbal expression, gesture, writings, documents, language (machine, foreign, or otherwise) of any kind, computer electronics, email, SMS, MMS or other "text" messages, messages on "social networking" sites (including, but not limited to, Facebook, Google+, MySpace and Twitter), shared applications from cell phones, "smartphones," netbooks and laptops, sound, radio, or video signals, telecommunication, telephone, teletype, facsimile, telegram, microfilm or by any other means. It also includes, without limitation, all originals and copies of inquiries, discussions, conversations, correspondence, negotiations, agreements, understandings, meetings,

8

notices, requests, responses, demands, complaints, press, publicity or trade releases and
the like that are provided by you or to you by others.

E.  "Document(s)" shall mean any writing or any other tangible thing, whether printed,
recorded (in audio, video, electronically or by any other means), reproduced by any
process, or written or produced by hand, including, but not limited to, letters,
memoranda, notes, opinions, books, reports, studies, agreements, statements,
communications (including inter-company and intra-company communications),
correspondence, telegrams, email, instant messages, chat logs, SMS, MMS or other
"text" messages, posted information, messages, chat logs on "social networking" sites
(including, but not limited to, Facebook, Google+, MySpace and Twitter), logs,
bookkeeping entries, summaries or records of personal conversations, diaries, calendars,
telephone messages and logs, forecasts, photographs, images, tape recordings, models,
statistical statements, graphs, laboratory and engineering reports, notebooks, charts,
plans, drawings, minutes, bylaws, resolutions, records of conferences, expressions or
statements of policy, lists of persons attending meetings or conferences, lists of clients or
customers or suppliers, reports or summaries of interviews, opinions or reports of
negotiations, brochures, pamphlets, advertisements, circulars, trade letters, press releases,
drafts of any document and revisions of drafts of any document, and any other similar
paper or record. The terms also include a copy of a document where the copy is not
exactly the same as the original. The terms also include emails and other documents
made or stored in electronic form, whether kept on computers, computer tapes, disks or
drives, including Cloud storage, of any type, or other media upon which information may
be recorded.

F.  "Hawai'i state program" includes the Hawaii Employer-Union Health Benefits Trust
Fund and Hawaii's Medicaid program, known as Med-QUEST.

G.  "Identify" means:

   1.  When used in connection with a person, provide that person's name, current
   residential address and telephone number, job title, and current business address
   and telephone number.  (If current information is not available, provide last-
   known address and telephone number.)

   2.  When used in connection with a Document, provide the nature of the Document,
   its title, physical description, date, author, its current location, and identification
   of the current custodian.

   3.  When used in connection with an oral communication, provide the nature of that
   communication, the parties to it, the date, place and substance of that
   communication, and the identification of any document concerning it.

9

H.    "Including" is used merely to emphasize that a request for certain types of documents or information should not be construed as limiting the request in any way.

I.    "Manufacturer(s)" shall mean a manufacturer of prescription drugs.

J.    "Payer(s)" shall mean any organization that pays or insures health or medical expenses on behalf of beneficiaries or recipients including an employer (self-insured), a third-party administrator or administrative-services only health insurer (for themselves or on behalf of their clients), or a health insurance company.

K.    "Payment(s)" shall mean any transfer of money, goods, or services You received directly or indirectly from any Manufacturer. It includes, but is not limited to, statutory rebate payments, supplemental rebate payments, other rebate payments, research and development, administrative fees, distribution fees, service fees (rebate or non-rebate related), procurement fees, data access fees, chargeback fees, promotional payments, cash product discounts, sales volume related payments of any type not described above, and non-sales volume related payments of any type not described above.

L.    "Pharmacy benefit manager(s)" or "PBM(s)" shall mean any organization that administers prescription drug benefits on behalf of a Payer.

M.    "Relating to" shall mean directly or indirectly mentioning or describing, concerning, referring to, regarding, evidencing, setting forth, identifying, memorializing, created in connection with or as a result of, commenting on, embodying, evaluating, analyzing, tracking, reflecting or constituting, in whole or in part, a stated subject matter.

N.    "You" or "Your" refers to the person(s) or business entity(s) to whom this Subpoena Duces Tecum is directed as reflected on the first page. With respect to corporations or other business entities, these terms also shall be deemed to include all owners, officers, agents and employees thereof, and any predecessor, successor, parent, subsidiary, division, d/b/a and affiliated companies or other entities.

## RELEVANT TIME PERIOD

The relevant time period, unless otherwise indicated in a specific request, is from January 1, 2010 to the present. The time limits should not be construed as date limits; for example, if a policy or document in effect during the relevant time period was created before the relevant time period, then documents dating back to the starting date of the policy must be produced.

## REQUESTS FOR DOCUMENTS AND INFORMATION

These requests are limited to documents and information relating to Hawaiʻi, including, but not limited to, documents and information that may be national or regional in scope that apply to Hawaiʻi.

10

1.    Produce all Documents sufficient to Identify the ten Manufacturers from which You have
      directly or indirectly received the largest Payments (as determined by the total dollar
      amount of Payments) per year from 2010-2021. Per the definitions listed above, the term
      Payments includes, but is not limited to, statutory rebate payments, supplemental rebate
      payments, other rebate payments, research and development, administrative fees,
      distribution fees, service fees (rebate or non-rebate related), procurement fees, data access
      fees, chargeback fees, promotional payments, cash product discounts, sales volume
      related payments of any type not described above, and non-sales volume related
      payments of any type not described above. Include the following in Your response:

      a.    The name of the Manufacturer making Payments; and
      b.    The total amount per year of the Payments.

      *In lieu of providing actual documents, You may provide a narrative response containing
      the requested information.*

2.    Produce all Documents sufficient to Identify the Payments made by each Manufacturer
      identified in response to Request 1 per year from 2010-2021. Aggregate payments of the
      same type per year. For example, all administrative fees for 2010 can be combined as one
      Payment. Include the following for each Payment in Your response:

      a.    A description of the Payment (*e.g.*, statutory rebate payments, supplemental
            rebate payments, other rebate payments, research and development,
            administrative fees, distribution fees, service fees (rebate or non-rebate related),
            procurement fees, data access fees, chargeback fees, promotional payments, cash
            product discounts, sales volume related payments of any type not described
            above, and non-sales volume related payments of any type not described above);
      b.    The amount of each Payment;
      c.    A description of any service You performed relating to the Payment;
      d.    A description of any product or information You sold relating to the Payment
            (*e.g.*, name of medications and volume purchased);
      e.    The name of the Payer or any other entity or individual with whom You shared
            any portion of the Payment;
      f.    The amount of the Payment You shared with a Payer or any other entity or
            individual; and
      g.    The amount of the Payment You retained.

      *In lieu of providing actual documents, You may provide a narrative response containing
      the requested information.*

3.    For all Hawai'i state programs, produce documents sufficient to Identify the amount of
      Payments returned to the State or Medicaid managed care organization and the amount of
      Payments retained by You and a description of the Payments (*e.g.*, rebate, administrative
      fees).

11

*In lieu of providing actual documents, You may provide a narrative response containing the requested information.*

4.  Produce all Documents reflecting or related to the negotiation of the Payments identified in Your response to Request 2 and 3.

5.  Produce all Communications with Manufacturers related to formulary coverage for any prescription drug for which You received Payments.

6.  Produce all financial and medical analyses related to the inclusion or exclusion of prescription drugs for which You received Payments.

7.  Produce all Documents sufficient to Identify the gross amount paid for prescription drugs manufactured by the Manufacturers identified in response to Request 1 per year from 2010-2021 for prescription drugs.

    *In lieu of providing actual documents, You may provide a narrative response containing the requested information.*

8.  Produce all Documents sufficient to Identify all direct or indirect Payments (*e.g.*, product based, volume based, or other Payments) You made to any Benefits Consultant working on behalf of a Payer, including:

    a.  The name of the Benefits Consultant;
    b.  The name of the Payer for whom the Benefits Consultant worked;
    c.  The date of the Payment;
    d.  The amount of the Payment; and
    e.  A description of the Payment (*e.g.*, product based, volume based, or other Payments).

    *In lieu of providing actual documents, You may provide a narrative response containing the requested information.*

9.  Produce all Documents reflecting or related to direct or indirect Payments for Humira and every insulin product (including branded and authorized generics).

10. Produce all Documents sufficient to Identify all direct or indirect Payments You received relating to Humira and every insulin product (including branded and authorized generics). Include in Your response, for each Payment:

    a.  The date of the Payment;
    b.  The time period which the Payment relates to;
    c.  The name of the Hawaiʻi state program relating to the claim (if applicable);
    d.  The name of the Manufacturer making the Payment;
    e.  The amount of the Payment;

12

299 of 461

f.      A description the Payment (*e.g.*, statutory rebate payments, supplemental rebate payments, other rebate payments, research and development, administrative fees, distribution fees, service fees (rebate or non-rebate related), procurement fees, data access fees, chargeback fees, promotional payments, cash product discounts, sales volume related payments of any type not described above, and non-sales volume related payments of any type not described above);

g.     The name of the prescription drug relating to the Payment;

h.     The list price for the prescription drug relating to the Payment;

i.      The gross amount You paid for the prescription drug;

j.      The number of units of the prescription drug You purchased relating to the Payment;

k.     A description of any service You performed relating to the Payment;

l.      The name of the Payer or any other entity or individual with whom You shared any portion of the Payment;

m.    The amount of the Payment You shared with a Payer or any other entity or individual; and

n.     The amount of the Payment You retained.

o.     Beneficiary cost sharing requirement (fixed copayment, coinsurance)

p.     Amount paid by the beneficiary

q.     Total Amount paid to the pharmacy (including dispensing fee)

r.      Post-purchase price adjustment of the prescription drug sale price

s.     Other price agreements or guarantees related to the prescription drug.

*In lieu of providing actual documents, You may provide a narrative response containing the requested information.*

11.    Produce all price lists, including any maximum allowable cost lists, applicable to the prescription drugs identified in Your response to Request 10 that relate to any Hawai'i state program (*e.g.*, EUTF, Medicaid).

12.    Produce all agreements and Documents reflecting or related to agreements with Manufacturers or any entity or individual affiliated with any Manufacturer related to Payments.

13.    Produce all Documents sufficient to Identify all departments and individuals involved in negotiations or agreement with Manufactures related to the purchase, coverage, promotion or sale of prescription drugs, including, but not limited to, the following:

a.     the name of each department or individual;

b.     the date each department was formed and (if applicable) dissolved;

c.     the title(s) each individual has or had;

d.     the name of the department(s) for which each individual works or worked

e.     the relevant duties and responsibilities each individual has or had;

f.     the dates of employment for each individual; and

13

g.    the last known contact information for each individual who no longer works for
You.

*In lieu of providing actual documents, You may provide a narrative response containing
the requested information.*

14.    Produce all Documents reflecting or related to Communications relating to negotiations
or agreements relating to Payments, including the target level of Payments or the impact
of Payment levels on your Profits, or the value of any Payments to Your revenue or
profits.

15.    Produce all Documents reflecting or related to Your projections or analyses relating to:
(a) the value of Payments; (b) whether and how Payments are passed on to consumers (c)
how Payments impact Your profitability; (d) how Payments impact Your bargaining
power in negotiations with Manufacturers and/or Payers; (e) the impact or practice of
classifying Payments in certain ways (*e.g.*, classifying a Payment as a rebate rather than a
fee or vice-versa); and/or (f) the relationship between Payments and list prices.

16.    Produce all Documents reflecting or related to the results of any audit (including both
internal and third-party audits) relating to Your practices involving Payments, including,
but not limited to, Your classification of any fees or rebates.

17.    Produce all Documents You relied upon when testifying before Congress about the
pricing of prescription drugs.

18.    Produce all Documents relating to legislation or proposed legislation that could impact
the Payments You receive, including, but not limited to, the proposed elimination of the
safe harbor provision in 42 CFR 1001.952(h).

19.    Produce all Documents relating to any research or study You commissioned that
examines Payments made to pharmacy benefit managers from Manufacturers.

20.    Produce all Documents reflecting or relating to any complaints or concerns You received
relating to Your practices involving Payments, including, but not limited to, any
complaints You received from Manufacturers, Payers, whistleblowers, and consumers.

21.    Produce all Documents sufficient to Identify all lawsuits filed against You relating to
Your practices involving Payments, including, but not limited to, any lawsuits that allege
You overcharged Payers and/or consumers for prescription drugs and/or that there is a
relationship between the Payments You receive and the increase in list price of
prescription drugs.

*In lieu of providing actual documents, You may provide a narrative response containing
the requested information.*

14

22.    Produce all Documents produced in any government investigation or any litigation relating to Your practices involving Payments.

23.    Produce all settlement agreements or judgments relating to Your practices involving Payments.

# Exhibit J

to Declaration of Matthew Hooker

# <u>CONFIDENTIALITY AGREEMENT</u>

IT IS HEREBY AGREED BY AND BETWEEN the State of Hawaiʻi Department of the
Attorney General ("State") and OptumRx, Inc. ("OptumRx" or "the Company"), through their
respective counsel, that:

1.      This Confidentiality Agreement is being entered into in connection with an
investigation being conducted by the State and the State's outside counsel into certain business
practices related to the provision of pharmacy benefits management services ("Investigation"), and
the production of any documents or information by OptumRx in response to a subpoena issued by
the State dated October 15, 2021 in connection with the Investigation (the "Subpoena").  Neither
OptumRx nor the State waives any objections it has to the Subpoena or the response to the
Subpoena by entering into this Confidentiality Agreement.  This Agreement shall be binding upon
the State and OptumRx ("Parties," referred to singularly as a "Party"), undersigned outside counsel
for the State and OptumRx's outside counsel, and all persons and entities signing a copy of the
Addendum Regarding Undertaking of Confidentiality attached at Exhibit A ("Addendum").

2.      "Confidential Information" means any documentary and/or tangible information of
any type, kind or character that contains (a) information of a personal nature where the public
disclosure thereof would constitute a clearly unwarranted invasion of personal privacy; or (b) trade
secret or commercial or financial information, to the extent disclosure would result in substantial
harm to the competitive position of the Company.  To designate a document or information as
"Confidential Information," OptumRx shall stamp or place the word "Confidential" on the
document or item of information produced to the State.  All copies, whether digital or hard copy,
of any "Confidential Information" produced or made available for inspection and copying shall be
subject to the terms of this Agreement.  Any interview, deposition or testimony of OptumRx in
connection with the Investigation shall presumptively be treated as Confidential Information and
subject to this Agreement for a period of 15 days after a transcript is received by counsel for the
Parties.  At or before the end of such 15-day period, by written notification to undersigned counsel,

OptumRx may designate any portion(s) of the interview, deposition, or testimony as "Confidential Information." If OptumRx fails to designate any portion of the interview, deposition, or testimony as "Confidential Information," after the expiration of the 15-day period, that portion(s) shall be treated as non-confidential. In designating documents or information as "Confidential Information," OptumRx will make such designation only as to those documents and information that it in good faith believes contain Confidential Information. The State, the State's outside counsel, and all persons and entities signing a copy of the Addendum agree to use Confidential Information solely in connection with the Investigation and any litigation that may arise therefrom, not to use Confidential Information in connection with any other matter, and not to disclose any Confidential Information to any party or the public, except as provided by this Agreement, except as required by law or court order. The State's outside counsel further agrees not to rely on Confidential Information in pursuing information or claims in any other matters outside of its representation of the State.

3.      This Agreement shall not preclude any Party from bringing before a court of competent jurisdiction, at any time, the question of whether any particular information is properly designated as "Confidential Information." In its request for relief from the Court, the Party disputing the designation of any information shall identify the information that it believes is not properly designated. The Party making the designation has the burden to defend the designation. Prior to bringing any motion, the Parties shall meet and confer in good faith to attempt to resolve the dispute. If the dispute cannot be resolved, the Parties shall treat the information consistent with its designation until a ruling by the court. In the event litigation stems from this Investigation, the Parties will meet and confer at the appropriate time regarding a protective order that will supersede this Agreement. In the event the Parties cannot agree on a protective order, it shall be OptumRx's duty to seek a protective order.

4.      In addition to any applicable protections provided to such materials under Hawaiʻi Uniform Information Practices Act, HRS §§ 92F-13 and 14 or other applicable law, the State and undersigned outside counsel for the State may disclose Confidential Information only as follows:

2

(a)    to employees, interns, and staff of the State who are working on the Investigation;

(b)    to agents, consultants, or experts of the State, who are working on the Investigation and are bound by this agreement and who agree to be bound by the terms of this agreement by signing the Addendum;

(c)    other law enforcement agencies when an employee of the Hawaiʻi Department of the Attorney General determines it is appropriate to disclose Confidential Information to those agencies provided they agree in writing to be bound and comply with this Agreement;

(d)    to any witness in the Investigation (not to include disclosures to expert witnesses of the State, which are covered under Section 4(b)), during an interview by the State or during transcribed or otherwise recorded proceedings conducted by the State, as long as the State reasonably believes that disclosure is necessary to further the Investigation;

(e)    to any person identified as having received, or who is otherwise known to have received, the document or information;

(f)    if the Company first gives written consent to such disclosure;

(g)    any person who, at the time of the disclosures, is either employed by OptumRx or retained by OptumRx in connection with this Investigation;

(h)    if the information was obtained independently of the Company from a source that (1) does not request confidential treatment for the information and (2) the State believes in good-faith does not have a duty of confidentiality with respect to the information, whether arising from

3

contract or any other legal source;

(i)     Motley Rice LLC attorneys (other than the State's undersigned outside counsel), paralegals, contractors, staff, or experts working on behalf of the State in connection with the Investigation who agree to be bound by the terms of this Agreement by signing the Addendum.

5.      With respect to the disclosures authorized by paragraph 4(d) or 4(e), the State shall not permit the person or the person's counsel to retain a copy of the Confidential Information unless the State reasonably believes that retention is necessary to further the Investigation and the person has signed the Addendum.

6.      With respect to the disclosures authorized by paragraph 4(i), the State and the State's outside counsel shall not share, disclose, or discuss Confidential Information with any Motley Rice LLC attorney, paralegal, contractor, or staff who is not a member of the firm's Public Client practice group, and shall limit access to Confidential Information to members of that practice group.  The State and the State's outside counsel are agreeing to this term solely for purposes of the investigation stage and are not consenting to or agreeing to waive any right to object to this or any similar term in any stipulated protective order in connection with litigation.

7.      Any document or information that may contain Confidential Information that has been inadvertently produced without being designated as Confidential Information shall not be a waiver, in whole or in part, of a claim of confidentiality as to any such document or information. OptumRx may designate the inadvertently produced document or information as "Confidential Information" by written notice to the State within a reasonable time following discovery of the inadvertent production.  Unless the State challenges the designation pursuant to paragraph 3, the State shall confirm the designation of the Confidential Information within ten (10) days of receipt of notice from OptumRx, and shall make reasonable efforts to retrieve such improperly designated documents from persons not entitled to receive them.

4

8.     The State and/or the State's outside counsel shall not attach documents or information designated as "Confidential Information" to any filing with a court or administrative tribunal ("State filing") unless the State and/or the State's outside counsel complies with one of the following provisions:

      (a)    resolves any dispute with OptumRx regarding designation of such documents or information as "Confidential Information;"

      (b)    files the documents or information designated "Confidential Information" with a court or administrative tribunal conditionally under seal; following the State filing, the confidentiality or non-confidentiality of documents or information will be determined by the terms of a protective order entered in the case either by stipulation or order, or by the absence of any such order (i.e. if OptumRx takes no action to seek a protective order within ten (10) days of the State filing, the documents or information attached to the State filing will be deemed non-confidential); or

      (c)    notifies OptumRx at least ten (10) days in advance that the State or the State's outside counsel intends to attach materials designated "Confidential Information" in the State filing, provided that the State or the State's outside counsel shall not attach such documents or information designated "Confidential Information" until either:

            i.    the court or administrative tribunal rules on OptumRx's request for a protective order or in camera treatment in favor of disclosure of the documents or information designated Confidential Information; or

5

ii.      OptumRx has not sought such order within the ten (10) day period of time which the State or the State's outside counsel provided to OptumRx for it to seek such order.

9.      In the event that the State receives a written request from a person or entity for Confidential Information under the Hawaiʻi Uniform Information Practices Act, HRS §§ 92F-1 *et seq.*, either during or after the pendency of the Investigation and the State determines in good faith that disclosure of Confidential Information is required and that no exemption reasonably applies, the State will provide ten (10) business days advance notice before any disclosure in response to such a request so that the Company is afforded an opportunity to obtain a court order prohibiting or limiting such disclosure and/or requiring the recipient(s) of such Confidential Information to take steps to maintain the confidentiality thereof.  Any notice to OptumRx under this paragraph or paragraph 10 shall be made to: John Kokkinen, Senior Associate General Counsel – Optum Litigation, via electronic mail at john.kokkinen@optum.com and to Allison Caplis, Hogan Lovells, via electronic mail at allison.caplis@hoganlovells.com.

10.      If any person or entity possessing designated Confidential Information is subpoenaed in another civil action or civil proceeding or served with a document demand or other civil legal process that requests production of designated Confidential Information ("civil process"), and the State determines in good faith that the Confidential Information must be disclosed, the State  shall, to the extent permitted by law, court rule, and court order, inform OptumRx within 15 days of receiving notice of the civil process.

11.      If documents or information subject to a claim of attorney-client privilege or work product immunity or any other privilege or immunity are inadvertently produced, such production shall in no way prejudice or otherwise constitute a waiver of, or estoppel as to, any claim of privilege or work-product immunity for such documents or information as provided under applicable law, including Federal Rule of Evidence 502 or any Hawaiʻi counterpart or similar rule.

If OptumRx has inadvertently produced documents or information subject to a claim of immunity or privilege, the Parties shall follow the so-called "clawback" provisions of Federal Rule of Civil Procedure 26(b)(5)(B) or any other Hawaiʻi counterpart or similar rule.

12.    At the conclusion of the investigation, or the final conclusion of all litigation if any is initiated, all documents produced by the Company, including all Confidential Information, shall be retained by the State pursuant to Hawaiʻi public records laws and policies, with the limitations of use of Confidential Information described in Paragraph 2 remaining in full effect.   All documents in the possession of Motley Rice that OptumRx produced and designated as "Confidential" during the course of this Investigation shall be returned to the State or OptumRx, or destroyed within 30 days, and Motley Rice shall so certify in writing.

13.    Nothing contained in this Agreement shall alter or limit the obligations of the State under Hawaiʻi law, including the Hawaiʻi Uniform Information Practices Act, HRS §§ 92F-1 *et seq*.

14.    This Agreement shall apply to all documents and information produced by the Company to the State pursuant to this Investigation, including any amendments to the Subpoena.

Dated: 05/18/2022

**OPTUM RX**

By: _____
         Attorneys for the Company

**STATE OF HAWAIʻI**
**DEPARTMENT OF THE ATTORNEY GENERAL**

Counsel for the State of Hawaiʻi Department of the Attorney General

By:

_____

Linda Singer
Motley Rice LLC

_____

Paige Boggs
Motley Rice LLC

8

Dated:

**OPTUM RX**

By: _____
      Attorneys for the Company

**STATE OF HAWAIʻI**
**DEPARTMENT OF THE ATTORNEY GENERAL**

By:

Mana Moriarty
Department of the Attorney General
State of Hawaiʻi
425 Queen St.
Honolulu, HI 96813
mana.moriarty@hawaii.gov

Counsel for the State of Hawaiʻi Department of the Attorney General

By: _____

Linda Singer
Motley Rice LLC

_____

Paige Boggs
Motley Rice LLC

9

**ADDENDUM REGARDING**

**UNDERTAKING OF CONFIDENTIALITY**

By signing this acknowledgement, I certify that I have read the Confidentiality Agreement to which this acknowledgement is attached ("Agreement") in its entirety, I fully understand the obligations under the Agreement, and I hereby agree that _____ [insert name of person or entity] will be bound by its terms to the extent permitted by law.

DATE:_____

NAME: _____

SIGNATURE: _____

# Exhibit K

to Declaration of Matthew Hooker



Hogan Lovells US LLP
Harbor East
100 International Drive
Suite 2000
Baltimore, MD 21202
T  +1 410 659 2700
F  +1 410 659 2701
www.hoganlovells.com

June 8, 2022

**BY ELECTRONIC MAIL AND SECURE FILE TRANSFER**

Mana Moriarty
Department of the Attorney General
State of Hawaiʻi
425 Queen St.
Honolulu, HI 96813

Linda Singer
Paige Boggs
Motley Rice LLC
401 9th St. NW, Suite 1001
Washington, DC 20004

   Re:    **Subpoena to OptumRx, Inc. Dated October 15, 2021**

Dear Mana, Linda and Paige:

With this letter and accompanying document, OptumRx, Inc. (hereinafter "Optum," or "the Company") makes its first production in response to the Subpoena dated October, 15, 2021, as clarified by our various telephone calls (the "Subpoena").  Per our discussion with Paige on June 3, 2022, Optum is producing herein the documents that Optum previously produced to the Minnesota Attorney General's Office pursuant to a Civil Investigative Demand served upon OptumRx, Inc. in 2017.  These documents are branded with the same Bates-numbers as were provided to the Minnesota Attorney General's Office: Optum-MNAG-0000000001 - Optum-MNAG-0000068310.

                                    *        *        *

The enclosed documents contain or constitute confidential business information, records, and/or trade secrets of Optum and are being produced in reliance on Paige's assertions during our June 3, 2022 discussion, that the State of Hawaiʻi will treat the documents previously produced to Minnesota as confidential pursuant to the State of Hawaiʻi's May 18, 2022 confidentiality agreement with Optum even if the confidentiality designations on the production images are worded slightly differently (e.g., "confidential" vs. "highly confidential").

The submission of the enclosed materials does not waive, nor is it intended to waive, any rights, privileges, or immunities of Optum with respect to this matter, including any applicable attorney-client privilege, protection provided under the work-product doctrine, or other privilege or immunity that may exist.  In the event of any inadvertent production of privileged materials, Optum requests that the government refrain from reviewing such materials and return the same promptly to Optum.  Moreover, to the extent that non-responsive documents, pages, or information have been produced inadvertently,

Hogan Lovells US LLP is a limited liability partnership registered in the District of Columbia.  "Hogan Lovells" is an international legal practice that includes Hogan Lovells US LLP and Hogan Lovells International LLP, with offices in:  Alicante  Amsterdam  Baltimore  Beijing  Birmingham  Boston  Brussels  Colorado Springs  Denver  Dubai  Dusseldorf  Frankfurt  Hamburg  Hanoi  Ho Chi Minh City  Hong Kong  Houston  Johannesburg  London  Los Angeles  Luxembourg  Madrid  Mexico City  Miami  Milan  Minneapolis  Monterrey  Munich  New York  Northern Virginia  Paris  Perth  Philadelphia  Rome  San Francisco  São Paulo  Shanghai  Silicon Valley  Singapore  Sydney  Tokyo  Warsaw  Washington, D.C.  Associated Offices:  Budapest  Jakarta  Riyadh  Shanghai FTZ  Ulaanbaatar.  Business Service Centers:  Johannesburg  Louisville.  Legal Services Center:  Berlin.  For more information see www.hoganlovells.com

- 2 -                                                                June 8, 2022

Optum does not agree to any expansion of the scope of your request.  Optum expressly reserves any applicable privileges and immunities to which it is entitled under the law.

Please call me if you have any questions about any aspect of this letter or the enclosed documents.

Sincerely,

*Allison J Caplis*

Allison J. Caplis
Counsel
allison.caplis@hoganlovells.com
D 410-659-2784

# Exhibit L

to Declaration of Matthew Hooker



Hogan Lovells US LLP
Harbor East
100 International Drive
Suite 2000
Baltimore, MD 21202
T  +1 410 659 2700
F  +1 410 659 2701
www.hoganlovells.com

September 1, 2022

**BY ELECTRONIC MAIL AND SECURE FILE TRANSFER**

Mana Moriarty
Department of the Attorney General
State of Hawai'i
425 Queen St.
Honolulu, HI 96813

Linda Singer
Paige Boggs
Motley Rice LLC
401 9th St. NW, Suite 1001
Washington, DC 20004

Re:    **Subpoena to OptumRx, Inc. Dated October 15, 2021**

Dear Mana, Linda and Paige:

With this letter and accompanying documents, OptumRx, Inc. (hereinafter "Optum," or "the Company") makes its second production in response to the Subpoena dated October 15, 2021, as clarified by our various telephone calls (the "Subpoena"). For ease of reference, this production has been labeled OPTUM1021_002 and has been Bates-numbered OPTUM1021_0000001-0000002.

This production includes a spreadsheet of the rebates, administrative fees, and price protection fees submitted by Optum to manufacturers of insulin products, and the amounts collected from those manufacturers, with respect to insulin prescriptions filled at pharmacies in the State of Hawai'i for which claims were submitted from Q1 2016 - Q3 2021. This production also includes a spreadsheet of transaction level data with respect to insulin prescriptions filled at pharmacies in the State of Hawai'i for which claims were submitted from Q1 2016 - Q3 2021.[1] Per our discussions, these spreadsheets do not include PHI; as such the transactions have been assigned scrambled claim numbers for ease of linking the two spreadsheets.[2]

\*        \*        \*

---

[1]    Per your request, we included the following fields in addition to Total Member Paid: (1) Flat Copay (CLT_FLAT_COPAY_AMT); (2) Co-insurance (CO_INSURANCE_AMT); and (3) Deductible (CLT_ATTRIB_TO_DED_AMT). We note, however, that those more granular fields may not add up to the Total Member Paid in every instance.

[2]    As discussed, we are producing two separate spreadsheets as the requested data is maintained in different systems.

Hogan Lovells US LLP is a limited liability partnership registered in the District of Columbia. "Hogan Lovells" is an international legal practice that includes Hogan Lovells US LLP and Hogan Lovells International LLP, with offices in: Alicante Amsterdam Baltimore Beijing Birmingham Boston Brussels Colorado Springs Denver Dubai Dusseldorf Frankfurt Hamburg Hanoi Ho Chi Minh City Hong Kong Houston Johannesburg London Los Angeles Luxembourg Madrid Mexico City Miami Milan Minneapolis Monterrey Munich New York Northern Virginia Paris Perth Philadelphia Rome San Francisco São Paulo Shanghai Silicon Valley Singapore Sydney Tokyo Warsaw Washington, D.C. Associated Offices: Budapest Jakarta Riyadh Shanghai FTZ Ulaanbaatar. Business Service Centers: Johannesburg Louisville. Legal Services Center: Berlin. For more information see www.hoganlovells.com

- 2 -                                                            September 1, 2022

The enclosed documents contain or constitute confidential business information, records, and/or trade secrets of Optum and we have branded them "CONFIDENTIAL" and are producing them pursuant to our May 18, 2022 Confidentiality Agreement with the State of Hawai'i Department of the Attorney General.

The submission of the enclosed materials does not waive, nor is it intended to waive, any rights, privileges, or immunities of Optum with respect to this matter, including any applicable attorney-client privilege, protection provided under the work-product doctrine, or other privilege or immunity that may exist.  In the event of any inadvertent production of privileged materials, Optum requests that the government refrain from reviewing such materials and return the same promptly to Optum.  Moreover, to the extent that non-responsive documents, pages, or information have been produced inadvertently, Optum does not agree to any expansion of the scope of your request.  Optum expressly reserves any applicable privileges and immunities to which it is entitled under the law.

Please call me if you have any questions about any aspect of this letter or the enclosed documents.

Sincerely,

Allison J Caplis

Allison J. Caplis
Counsel
allison.caplis@hoganlovells.com
D 410-659-2784

# Exhibit M

to Declaration of Matthew Hooker

## CITY OF CHICAGO
## DEPARTMENT OF LAW

**IN THE MATTER OF OPTUMRX, INC.**

**INVESTIGATIVE SUBPOENA**

**COPAY CLAWBACKS**

TO:    OPTUMRX, INC.
       c/o CT Corporation System
       208 S LaSalle St., Suite 814
       Chicago, IL 60604

GREETINGS:

This INVESTIGATIVE SUBPOENA is issued pursuant to § 2-25-090(e) and § 1-22-050 of the Municipal Code of Chicago ("MCC") because it appears to the Corporation Counsel that certain entities have engaged in, are engaging in, or are about to engage in an act or practice that is in violation of § 2-25-090, which may include, but is not limited to, the following conduct:

Engaging in any act of consumer fraud or deceptive practice while conducting any trade or business in the city relating to copay clawbacks, instances where a consumer's deductible, coinsurance, copay, or any combination thereof would exceed the cash price that a consumer not utilizing insurance would pay for the same prescription, and/or gag clauses, as further defined and described herein, in violation of MCC § 2-25-090(a); and

Engaging in any conduct constituting an unlawful practice under the Illinois Consumer Fraud and Deceptive Business Practices Act relating to copay clawbacks, instances where a consumer's deductible, coinsurance, copay, or any combination thereof would exceed the cash price that a consumer not utilizing insurance would pay for the same prescription, and/or gag clauses, as further defined and described herein, in violation of MCC § 2-25-090(a).

**YOU ARE REQUIRED BY LAW TO PRODUCE** at the City of Chicago Department of Law, Affirmative Litigation Division, 121 North LaSalle Street, Suite 600, Chicago, Illinois 60602, Attention: Jane Elinor Notz, any time prior to December 14, 2018 at 10:00 a.m., all documents and information within your possession or control described in this Investigative Subpoena.

**YOU ARE FURTHER REQUIRED BY LAW** to certify that all of the documentary material required by this Investigative Subpoena and in your possession, custody, or control has been produced and made available to the Corporation Counsel, pursuant to MCC § 1-22-050, and to provide with your production a completed certificate in substantially the form attached as Exhibit "A."

**NOTE: THESE DOCUMENTS ARE OR MAY BE PHYSICAL EVIDENCE**

**NOTE: YOU HAVE A RIGHT TO BE ASSISTED BY COUNSEL**

THE MUNICIPAL CODE OF CHICAGO PROVIDES AS FOLLOWS:

MCC 1-22-050(j)(2) <u>Petition to modify or set aside subpoena</u>.

      (A)    Any person who has received a subpoena issued under subsection (a) may file, in the circuit court of any county within which such person resides, is found, or transacts business, and serve upon the corporation counsel a petition for an order of the court to modify or set aside such subpoena. In the case of a petition addressed to an express demand for any product of discovery, a petition to modify or set aside such demand may be brought only in the circuit court of the county in which the proceeding in which such discovery was obtained is or was last pending. Any petition under this subparagraph (A) must be filed:

        (i)   within 20 days after the date of service of the subpoena, or at any time before the return date specified in the subpoena, whichever date is earlier, or
        (ii)  within such longer period as may be prescribed in writing by the corporation counsel.

      (B)    The petition shall specify each ground upon which the petitioner relies in seeking relief under subparagraph (A), and may be based upon any failure of the subpoena to comply with the provisions of this section or upon any constitutional or other legal right or privilege of such person. During the pendency of the petition in the court, the court may stay, as it deems proper, the running of the time allowed for compliance with the subpoena, in whole or in part, except that the person filing the petition shall comply with any portion of the subpoena not sought to be modified or set aside.

## **INSTRUCTIONS**

A.     If any document, report, study, memorandum or other written material or information is withheld or not identified under claim of privilege, furnish a list identifying each document or requested information together with the following information (as relevant): date, author, sender, recipient, persons to whom copies were furnished or information provided, together with their job titles, subject matter of the document, the basis for the privilege, and the paragraph or paragraphs of the Request(s) to which the document or information is responsive.

B.     In each instance in which a document is produced in response to a Request, the current version should be produced together with all earlier versions, or predecessor documents serving the same function during the relevant time period, even though the title of earlier documents may differ from current versions.

C.     The Investigative Subpoena calls for all described documents in your possession, custody or control without regard to the person or persons by whom or for whom the documents

were prepared (e.g., your company employees, contractors, vendors, distributors, service providers, competitors, or others).

D.    The following procedures shall apply to the production, inspection and copying of documents:

    1.    You shall produce original, complete documents.  Documents shall be produced in the order that the documents are maintained in your files, in original folders, with the folder's original file tabs.

        a.    Any documents produced in response to this Investigative Subpoena should be provided as a Group 4 compression single-page "TIFF" image that reflects how the source document would have appeared if printed out to a printer attached to a computer viewing the file.  Extracted text will be included in the manner provided herein.  To the extent that extracted text does not exist, these images will be processed through Optical Character Recognition ("OCR") so that they are fully searchable.  Extracted text and OCR should be provided in separate document level text files.  "Load files" shall be produced to accompany the images and shall facilitate the use of the litigation support database systems to review the produced images.

        b.    <u>Document Unitization</u>.  Each page of a document shall be electronically converted into an image as described above.  If a document is more than one page, the unitization of the document and any attachments and/or affixed notes shall be maintained as it existed in the original when creating the image file and appropriately designated in the load files.  The corresponding parent/attachment relationships, to the extent possible, shall be provided in the load files furnished with each production.

        c.    <u>Bates Numbering</u>.  Each page of a produced document shall have a legible, unique page identifier ("Bates Number") electronically branded onto the image at a location that does not obliterate, conceal, or interfere with any information from the source document.  To ensure that the Bates Numbers do not obscure portions of the documents, the images may be proportionally reduced to create a larger margin in which the Bates Number may be branded.  There shall be no other legend or stamp placed on the document image, except those sections of a document that are redacted to eliminate material protected from disclosure by the attorney-client or work product privileges shall have the legend "REDACTED" placed in the location where the redaction(s) occurred or shall otherwise note the location and/or location of the information for which such protections are claimed.

        d.    <u>File Naming Conventions</u>.  Each document image file shall be named with the unique Bates Number of the page of the document in the case of

3

single-page TIFFs, followed by the extension "TIF". Each document shall
be named with a unique document identifier. Attachments shall have their
own unique document identifiers.

e.  Production Media. The documents should be produced on CD-ROM,
DVD, external hard drive (with standard Windows PC compatible
interface), (the "Production Media"). Each piece of Production Media
shall identify a production number corresponding to the production
"wave" the documents on the Production Media are associated with (e.g.,
"V001", "V002"), as well as the volume of the material in that production
wave (e.g., "V001", "V002"). For example, if the first production wave
comprises document images on three hard drives, you shall label each hard
drive in the following manner: "V001-001", "V001-002", "V001-003".
Additional information that shall be identified on the physical Production
Media shall include: (1) text referencing that it was produced in response
to this Investigative Subpoena, (2) your name, (3) the production date, and
(4) the Bates Number range of the materials contained on the Production
Media.

f.  Objective Coding/Extracted Meta Data. You shall produce with each
production of documents extracted metadata for each document (the
"Objective Coding") included in the load file. The data file shall include
the fields and type of content set forth in the **SPECIAL
INSTRUCTIONS FOR ELECTRONICALLY STORED MATERIAL**
section. Objective Coding shall be labeled and produced on Production
Media in accordance with the provisions set forth above.

g.  Native format for Excel and databases. To the extent that such documents
exist in Excel or some other spreadsheet, produce the document in Excel.
To the extent that the document constitutes a database, produce the
document in Access.

2.  All attachments to responsive documents shall be produced attached to the
responsive documents.

3.  No portion of any documents will be masked and the entire document shall be
produced.

4.  The documents shall be produced at the location set forth or at such other
locations as counsel agree.

5.  Documents shall be available on reasonable notice for inspection and copying
after initial production throughout the term of the investigation or litigation. The
documents shall be maintained in the order in which it was produced.

4

6.      You shall label each group of documents and interrogatories in the following
        manner: Response to Request No. 1; Response to Request No. 2, etc., and
        identify the Bates Number range for the corresponding documents that are
        responsive or written responses.

7.      Provide a key to all abbreviations used in the documents, providing a method of
        identifying all documents requiring use of the key.

8.      If you obtain information or documents responsive to any request after you have
        submitted your written responses or production, you should supplement your
        responses and/or production with any new and or different information and/or
        documents that become available to you.

## **DEFINITIONS**

A.      "All" shall be construed to include the collective as well as the singular and shall mean
        "each," "any," and "every."

B.      "Any" shall be construed to mean "any and all."

C.      "Chicago consumer(s)" shall mean any individual residing in Chicago.

D.      "Communications" shall mean and refer to any exchange of information by any means of
        transmissions, sending or receipt of information of any kind by or through any means
        including, but not limited to, verbal expression, gesture, writings, documents, language
        (machine, foreign, or otherwise) of any kind, computer electronics, email, SMS, MMS or
        other "text" messages, messages on "social networking" sites (including, but not limited
        to, Facebook, Google+, MySpace and Twitter), shared applications from cell phones,
        "smartphones," netbooks and laptops, sound, radio, or video signals, telecommunication,
        telephone, teletype, facsimile, telegram, microfilm or by any other means. It also
        includes, without limitation, all originals and copies of inquiries, discussions,
        conversations, correspondence, negotiations, agreements, understandings, meetings,
        notices, requests, responses, demands, complaints, press, publicity or trade releases and
        the like that are provided by you or to you by others.

E.      "Copay clawback" shall mean instances where there is a positive difference between the
        copay paid by the consumer and the price the relevant third party payor negotiated for a
        particular prescription that is retained by you or the relevant third party payor.

F.      "Document(s)" shall mean any writing or any other tangible thing, whether printed,
        recorded (in audio, video, electronically or by any other means), reproduced by any
        process, or written or produced by hand, including, but not limited to, letters,
        memoranda, notes, opinions, books, reports, studies, agreements, statements,
        communications (including inter-company and intra-company communications),
        correspondence, telegrams, email, instant messages, chat logs, SMS, MMS or other

5

"text" messages, posted information, messages, chat logs on "social networking" sites
(including, but not limited to, Facebook, Google+, MySpace and Twitter), logs,
bookkeeping entries, summaries or records of personal conversations, diaries, calendars,
telephone messages and logs, forecasts, photographs, images, tape recordings, models,
statistical statements, graphs, laboratory and engineering reports, notebooks, charts,
plans, drawings, minutes, bylaws, resolutions, records of conferences, expressions or
statements of policy, lists of persons attending meetings or conferences, lists of clients or
customers or suppliers, reports or summaries of interviews, opinions or reports of
negotiations, brochures, pamphlets, advertisements, circulars, trade letters, press releases,
drafts of any document and revisions of drafts of any document, and any other similar
paper or record.  The terms also include a copy of a document where the copy is not
exactly the same as the original.  The terms also include emails and other documents
made or stored in electronic form, whether kept on computers, computer tapes, disks or
drives, including Cloud storage, of any type, or other media upon which information may
be recorded.

G.    "Employee" includes, but is not limited to, all current or former salaried employees,
hourly employees, independent contractors, and individuals performing work as
temporary employees.

H.    "Gag clauses" shall mean any limitation on pharmacies and/or their employees: (a) telling
consumers that prescription drug transactions contain copay clawbacks; (b) informing
consumers that they might save money by paying for a prescription drug in cash rather
than using insurance; (c) notifying consumers that another cheaper option exists; or (d)
posting cash prices.

I.    "Including" is used merely to emphasize that a request for certain types of documents or
information should not be construed as limiting the request in any way.

J.    "Negotiated price" shall mean the price the relevant third party payor negotiated for a
particular prescription.

K.    "Person" means any natural person or such person's legal representative; any partnership,
domestic or foreign corporation, or limited liability company; any company, trust,
business entity, or association; and any agent, employee, salesman, partner, officer,
director, member, stockholder, associate, or trustee.

L.    "Pharmacy benefit manager(s)" or "PBM(s)" shall mean any organization that contracts
with third party payors to provide pharmacy benefits or pharmacy administrative services
to Chicago consumers.

M.    "Pharmacy Reimbursement Overpayment Program" shall mean the Pharmacy
Reimbursement Overpayment Program that you referenced in your May 5, 2016 email to
reporter Lee Zurik from Fox 8 News in New Orleans, available at
http://www.fox8live.com/story/31927914/zurik-unitedoptum-defends-prescription-
overpayment-program/.

6

N.      "Relating to" shall mean directly or indirectly mentioning or describing, concerning, referring to, regarding, evidencing, setting forth, identifying, memorializing, created in connection with or as a result of, commenting on, embodying, evaluating, analyzing, tracking, reflecting or constituting, in whole or in part, a stated subject matter.

O.      "Third party payor" shall mean any organization that pays or insures health or medical expenses on behalf of beneficiaries or recipients, such as commercial insurance companies and self-insured employers.

P.      "You" or "your" refers to the person(s) or business entity(s) to whom this Investigative Subpoena is directed as reflected on the first page. With respect to corporations or other business entities, these terms also shall be deemed to include all owners, officers, agents and employees thereof, and any predecessor, successor, parent, subsidiary, division, d/b/a and affiliated companies or other entities. It also includes Catamaran Corporation. To the extent documents for Catamaran Corporation are not in your custody or control, identify the person who does have custody and control of such documents.

## SPECIAL INSTRUCTIONS

Electronic documents should be produced in accordance with the following instructions:

A.      Single page TIFFs at a 300 DPI resolution which are named for the Bates Number of the page. There should NOT be more than 1000 images per folder.

B.      Document level text files containing OCR or extracted text named with the Bates Number of the first page of the document.

C.      Data load file containing all of the metadata fields (both system and application – see list below) from the original Native documents – .dat for Concordance.

D.      The Concordance .dat file of extracted metadata should be delimited with the Concordance default characters – ASCII 020 for the comma character and ASCII 254 for the quote character. The use of commas and quotes as delimiters is not acceptable.

E.      The database field name should be included in the first line of the metadata file listed in the order they appear in the file.

F.      An image load file for Concordance – such as .opt.

G.      For electronic documents created in Excel (spreadsheets) or Access (databases), provide those documents in Native format.

H.      For all documents produced, provide the following:

| Field # | Field Name | Format | Description |
|---------|-----------|--------|-------------|

7

| Field # | Field Name | Format | Description |
|---|---|---|---|
| 1 | BEGDOCNO | Text | Image key of first page of document |
| 2 | ENDDOCNO | Text | Image key of last page of document |
| 3 | BEGATTACH | Text | For emails/attachments ONLY:  Image key of the first page of the parent email.  Please DO NOT populate these fields for emails with no attachments. |
| 4 | ENDATTACH | Text | For emails/attachments ONLY:  Image key of the last page of the last attachment.  Please DO NOT populate these fields for emails with no attachments. |
| 5 | CUSTODIAN | Text | Custodian from whom documents were collected |
| 6 | AUTHOR | Text | Email "From" data or user/author name from electronic files |
| 7 | RECIPIENT | Text | Email "To" data (semi-colon delimited, if multiple entries) |
| 8 | CC | Text | Email "CC" data (semi-colon delimited, if multiple entries) |
| 9 | BCC | Text | Email "BCC" data (semi-colon delimited, if multiple entries) |
| 10 | MAILSUBJECT | Text | Email subject.  This value should be populated down to any children/attachments of the parent email. |
| 11 | MAILDATE | MM/DD/YYYY | Email date sent.  This value should be populated down to any children/attachments of the parent email. |
| 12 | MAILTIME | HH:MM:SS | Email time sent, in military time.  This value should be populated down to any children/attachments of the parent email. |
| 13 | ATTACHMENTS | Text | Semi-colon delimited list of the **original file names** of any attachments to an email |
| 14 | FILENAME | Text | For emails:  Mail subject<br>For attachments and e-files:  File name from source media |

| Field # | Field Name | Format | Description |
|---------|-----------|--------|-------------|
| 15 | HASH_VALUE | Text | Hash value generated for purposes of de-duplication if performed |

## RELEVANT TIME PERIOD

The relevant time period, unless otherwise indicated in a specific request, is from January 1, 2012 to the present. The time limits should not be construed as date limits; for example, if a policy or document in effect during the relevant time period was created before the relevant time period, then documents dating back to the starting date of the policy must be produced.

## DOCUMENTS AND INFORMATION TO BE PROVIDED

These requests are limited to documents and information relating to transactions involving Chicago consumers, including but not limited to documents and information that may be national or regional in scope that apply to Chicago consumers, among other consumers.

1.    Produce all contracts with third party payors whose beneficiaries include Chicago consumers that contain any provision, term, or information relating to copay clawbacks, instances where a consumer's deductible, coinsurance, copay, or any combination thereof would exceed the cash price that a consumer not utilizing insurance would pay for the same prescription, and/or gag clauses.

2.    Produce all communications with third party payors whose beneficiaries include Chicago consumers relating to copay clawbacks, instances where a consumer's deductible, coinsurance, copay, or any combination thereof would exceed the cash price that a consumer not utilizing insurance would pay for the same prescription, and/or gag clauses.

3.    Produce all contracts with Cigna Corporation, Cigna Health and Life Insurance Company, Cigna HealthCare of Illinois, Inc., United HealthCare Services, Inc., United HealthCare Insurance Company, UnitedHealthCare of Illinois, Inc., and any of their relevant parent corporations, subsidiaries, or affiliates relating to the administration or management of pharmacy benefit services for Chicago consumers.

4.    Produce all contracts with any pharmacy with which you have contracted to fill prescriptions for Chicago consumers that contain any provision, term, or information relating to copay clawbacks, instances where a consumer's deductible, coinsurance, copay, or any combination thereof would exceed the cash price that a consumer not utilizing insurance would pay for the same prescription, and/or gag clauses.

5.    Produce all communications with any pharmacy with which you have contracted to fill prescriptions for Chicago consumers relating to copay clawbacks, instances where a consumer's deductible, coinsurance, copay, or any combination thereof would exceed the cash price that a consumer not utilizing insurance would pay for the same prescription, and/or gag clauses.

9

6.     Produce all documents relating to Chicago consumers' obligation to pay a deductible, coinsurance, or copay relating to the prescription drug plans you manage, including, but not limited to, any document that defines those terms and any document relating to the price Chicago consumers are entitled to pay for prescription drugs.

7.     Produce all documents provided to Chicago consumers relating to copay clawbacks, instances where a consumer's deductible, coinsurance, copay, or any combination thereof would exceed the cash price that a consumer not utilizing insurance would pay for the same prescription, and/or gag clauses.

8.     Produce all manuals, policies, procedures, or guidelines relating to copay clawbacks, instances where a consumer's deductible, coinsurance, copay, or any combination thereof would exceed the cash price that a consumer not utilizing insurance would pay for the same prescription, and/or gag clauses, including but not limited to any drafts or amendments.

9.     Produce all internal and/or external memos, press releases, presentations, talking points, reports, and/or analyses relating to copay clawbacks, instances where a consumer's deductible, coinsurance, copay, or any combination thereof would exceed the cash price that a consumer not utilizing insurance would pay for the same prescription, and/or gag clauses.

10.    Produce all documents relating to your Pharmacy Reimbursement Overpayment Program.

11.    Produce all complaints or questions from any person relating to copay clawbacks, instances where a consumer's deductible, coinsurance, copay, or any combination thereof would exceed the cash price that a consumer not utilizing insurance would pay for the same prescription, and/or gag clauses submitted by consumers, pharmacies, or third party payors and any documents relating to how those complaints or questions were addressed.

12.    Produce all documents relating to communications with any third party relating to copay clawbacks, instances where a consumer's deductible, coinsurance, copay, or any combination thereof would exceed the cash price that a consumer not utilizing insurance would pay for the same prescription, and/or gag clauses.  Third parties include but are not limited to lobbyists, government agencies, consultants, and trade groups, including but not limited to any National, Illinois, or Chicago pharmacy, insurance, and/or PBM associations.

13.    Produce all documents and information previously produced in response to any other government investigation relating to copay clawbacks, instances where a consumer's deductible, coinsurance, copay, or any combination thereof would exceed the cash price that a consumer not utilizing insurance would pay for the same prescription, and/or gag clauses.

10

14.   Produce all deposition transcripts of your current or former employees and agents relating
      to copay clawbacks, instances where a consumer's deductible, coinsurance, copay, or any
      combination thereof would exceed the cash price that a consumer not utilizing insurance
      would pay for the same prescription, and/or gag clauses.

15.   For all claims relating to Chicago consumers that were subject to a copay clawback or
      where the consumer's deductible, coinsurance, copay, or any combination thereof would
      exceed the cash price that a consumer not utilizing insurance would pay for the same
      prescription, produce either documents sufficient to show or state:

      a.    The transaction number or any other number that can identify the specific
            transaction;
      b.    The date the prescription was filled;
      c.    The identity of the pharmacy filling the prescription, indicated by National
            Provider Identifier (NPI);
      d.    The name of the drug prescribed, indicated by National Drug Code (NDC);
      e.    The quantity filled;
      f.    The cash price of the prescription that an uninsured person would pay for the
            same prescription at the same pharmacy on the same date;
      g.    The wholesale acquisition cost (WAC) for the same prescription on the same
            date;
      h.    The average wholesale price (AWP) for the same prescription on the same date;
      i.    The maximum allowable cost (MAC) for the same prescription on the same date;
      j.    The negotiated price for the prescription on that date;
      k.    The amount of any payment paid by the Chicago consumer, and the breakdown
            of the payment (e.g. amount of copay or coinsurance, deductible, coupon, etc.);
      l.    The amount of any payment paid to the third party payor; and
      m.    The amount of any payment received from the third party payor.

11

Dated this 8th day of November, 2018.

EDWARD N. SISKEL
Corporation Counsel
of the City of Chicago

By: _____
JANE ELINOR NOTZ
Deputy Corporation Counsel
ELIE T. ZENNER
Assistant Corporation Counsel
Affirmative Litigation Division
City of Chicago Department of Law
121 North LaSalle Street
City Hall – Room 600
Chicago, Illinois 60602
Tel: (312) 744-0200
jane.notz@cityofchicago.org

## EXHIBIT "A"
## CERTIFICATE OF COMPLIANCE

| | |
|---|---|
| **IN THE MATTER OF OPTUMRX, INC.** | **INVESTIGATIVE SUBPOENA** |

NOW COMES _____ *(person having knowledge of the facts and circumstances relating to the production),* who after first being duly sworn deposes and says:

1.    That the deponent is the _____ of _____ and in his or her capacity as _____ has knowledge of the facts and circumstances relating to _____'s production of documentary material.

2.    That on the ____ day of the month of _____ of the year 201_, the deponent was provided the subpoena served on _____ in connection with above-entitled investigation, calling for the production of records of _____.

4.    That the deponent certifies that all of the documentary material requested by the subpoena and in the possession, custody, or control of _____ has been produced and made available to the Corporation Counsel.

Executed on: _____        _____
            *(Date)*                        *(Signature of Deponent)*


_____
                            (Printed Name of Deponent)

**SUBSCRIBED AND SWORN** to before me by
_____ this ____ day of _____, 201_.


_____
**NOTARY PUBLIC** in and for the
County of _____, State of _____

# Exhibit N

to Declaration of Matthew Hooker

LAW DEPARTMENT
CITY OF CHICAGO

| | |
|---|---|
| IN THE MATTER OF | ) |
| | ) |
| UNITED HEALTHCARE SERVICES, INC., | ) |
| UNITEDHEALTHCARE INSURANCE | ) |
| COMPANY, UNITEDHEALTHCARE OF | ) |
| ILLINOIS, INC., and OPTUMRX, INC. | ) |
| | ) |
| COPAY CLAWBACKS | ) |

## CONFIDENTIALITY AGREEMENT

The City of Chicago is conducting a confidential investigation into alleged violations

of § 2-25-090 of the Municipal Code of Chicago, including but not limited to potential acts

of consumer fraud, deceptive practices, and/or conduct constituting unlawful practices under

the Illinois Consumer Fraud and Deceptive Business Practices Act relating to prescription

drug copay clawbacks, ("Investigation") and has requested documents and information from

United HealthCare Services, Inc., UnitedHealthCare Insurance Company, UnitedHealthCare

of Illinois, Inc. and OptumRx, Inc. (collectively, "United"), some of which may be

confidential and/or proprietary. To preserve and maintain the confidentiality of certain

documents to be produced or made available for inspection and copying by United, the

parties have agreed as follows:

1.    When used in this Agreement, the word "documents" means all written

material, data maintained in electronic or digital format, and all other tangible items. Except

as otherwise indicated below, documents marked or otherwise designated by United as

"Confidential" or "Highly Confidential" that are or have been produced or made available for

inspection and copying by United, to the City of Chicago's attorneys, consultants, agents, or

experts, shall be given confidential treatment as described in this Agreement. United shall

mark as Confidential those documents that it reasonably and in good faith believes contain

confidential or proprietary or otherwise sensitive non-public business information, information

implicating an individual's legitimate expectation of privacy, or "protected health information"

as defined in 45 C.F.R. §§ 160.103 and 164.501. United shall mark as "Highly Confidential"

those documents that it reasonably and in good faith believes are so highly sensitive that

disclosure to the public or a competitor could result in significant competitive or commercial

disadvantage. (Together, those documents designated "Confidential" and "Highly

Confidential" are considered "Confidential Documents").

      2.      Both the Confidential Documents and the information contained therein shall be

treated as confidential, shall not be disclosed except as provided in this Agreement, and shall not

be made available to persons other than those described below. All information produced or

made available for inspection and copying by United, including but not limited to information

contained in documents or in correspondence between counsel, will be used solely in furtherance

of the Investigation and any subsequent litigation brought by the City of Chicago against United

that is directly related to this Investigation and will be used for no other purpose whatsoever

without the prior written consent from United or by a court order or other applicable law. To

the extent that the City of Chicago initiates litigation that is directly related to this Investigation

following the Investigation, this Confidentiality Agreement will continue until the court enters a

protective order that supersedes it.

      3.      Documents designated "Confidential" and any information contained therein shall

not be shown, disseminated or disclosed to any person other than the following persons, except

upon the prior written consent of United or by a court order:

a.    The City of Chicago's Law Department and outside counsel in connection with the Investigation and any subsequent litigation directly related to the Investigation brought by the City of Chicago against United, namely Linda Singer, Mimi Liu, and Paige Boggs of Motley Rice LLC, and any lawyers, contractors, or paralegals working on this Investigation or any subsequent litigation directly related to the Investigation brought by the City of Chicago against United with Ms. Singer, Ms. Liu, and Ms. Boggs, with the exception that no attorney, contractor, or paralegal adverse to United in other matters will work on the Investigation or have access to Confidential Documents or attorney work product pertaining to the Investigation;

b.    City employees outside of the Law Department who have a need to know the information in furtherance of the Investigation;

c.    Experts and consultants retained by the City of Chicago in connection with this Investigation and any subsequent litigation directly related to the Investigation brought by the City of Chicago against United;

d.    Any person who authored, modified, sent, or received, a particular Confidential Document and who the City of Chicago interviews or conducts a sworn statement of as part of the Investigation;

e.    A third-party employed for the sole purpose of arranging for the copying or storage of the documents pursuant to this Agreement (i.e., a copy service).

4.      Access to documents designated "Highly Confidential" shall be limited to those
persons listed in paragraphs 3(a), (c), (d), and (e), except upon the prior written consent of
United or by a court order.

5.      Persons and entities described in any paragraphs 3(a) through 3(e), above, who
receive any Confidential Documents or any information contained therein under the terms of
this Agreement shall not further disseminate any such Confidential Documents or information
contained therein, unless it is disseminated to another person or entity described in paragraph
3(a)-(e) above.

6.      All copies, whether digital or hard copy, of any Confidential Documents
produced or made available for inspection and copying shall be subject to the terms of this
Agreement.

7.      Before being given access to any of the Confidential Documents or any
information contained therein, each person described in paragraphs 3(b)-(e) above who is
neither a participant nor a counsel in the Investigation, shall be advised of the terms of this
Agreement, shall be given a copy of this Agreement, and shall sign a document substantially
similar to Exhibit A attached hereto, thereby acknowledging and agreeing to be bound by the
terms of this Agreement.

8.      No Motley Rice LLC attorney, contractor, paralegal, or expert adverse to United
in other matters shall have access to any Confidential Documents or information contained
therein relating to this Investigation and his/her electronic access to such Documents and
information shall be restricted by permissions and any hard copies of Confidential Documents
will be maintained in such a way that persons adverse to United in another matter (including
other Motley Rice attorneys, paralegals, contractors, or experts) cannot review or access the hard

copies unless otherwise agreed to by the parties or by court order. The City of Chicago and its

outside counsel in this Investigation shall not share, disclose, or discuss Confidential Documents

or the information contained therein with any Motley Rice attorneys, paralegals, contractors, or

experts adverse to United in another matter. For purposes of enforcement of this Agreement,

The City of Chicago's outside counsel submit themselves to the jurisdiction of the U.S. District

Court for the Northern District of Illinois or the Circuit Court of Cook County.

      9.     If the City of Chicago deems it necessary to use or disclose Confidential

Documents or any information contained therein in connection with any court submission, it

shall either first obtain the prior written consent of United or the City of Chicago's papers,

including but not limited to memoranda, affidavits, and exhibits that contain or reference

information contained in Confidential Documents, shall be filed with the Confidential

Documents and information redacted. Copies to the court and to counsel of record can be

unredacted, but shall note each place where the documents contain confidential information

subject to the protections of this Agreement.

      10.    In the event that United inadvertently produces or discloses any document or

information produced in this Investigation without intending to waive a claim that it is

confidential, such production or disclosure shall not be a waiver, in whole or in part, of a

claim of confidentiality as to any such document or information. United shall, promptly upon

discovery of its oversight, provide written notice of the error and substitute appropriately

designated documents. The City of Chicago shall confirm the designation of the specified

documents and information, as "Confidential," or "Highly Confidential" within ten (10) days

of receipt of United's notice and shall make reasonable efforts to retrieve such improperly

designated documents from persons not entitled to receive them and, upon receipt of the

substitute documents, shall sequester, return or destroy the improperly designated original

production.

11.     If the City or any of its departments receives a request under the Illinois Freedom

of Information Act ("FOIA"), subpoena, or court order, or has an obligation under other

applicable law that it believes requires disclosure of a portion or all of the Confidential

Documents, the City shall notify United upon receipt of such request, subpoena, order, or

recognition of an obligation imposed by law as to afford United the opportunity to take steps to

prevent disclosure. The City acknowledges  that the Confidential Documents may be exempt

from disclosure under Section 7(1)(g) of FOIA, 5 ILCS 140/7(1)(g), because they contain trade

secrets or commercial or financial information, the disclosure of which would cause competitive

harm to United. In addition, some data or materials may be exempt from disclosure under FOIA

for other reasons. The City will use its best efforts to prevent the release of such information

under FOIA; provided, however, that nothing in this Confidentiality Agreement shall be read to

conflict with the City or any of its departments' duties to comply with the law, including FOIA.

In the event of a dispute between United and the City as to whether a portion or all of the

Confidential Documents must be disclosed, United and the City shall make a good faith attempt

to resolve such dispute through negotiation.  In any such negotiation, each party will provide a

good-faith explanation regarding the basis of its belief as to why the Confidential Documents

may or may not be held confidential.  If the parties are unable to resolve the dispute, the City will

not release the Confidential Documents until an order requiring the disclosure has been entered

in a judicial proceeding in which United has been given the opportunity to intervene to

demonstrate that the Confidential Documents in fact may be withheld, unless United provides its

written consent to disclosure and/or fails to intervene in the judicial proceeding.

12.     By entering into this Agreement, the parties do not intend in any way to limit any protections provided to United information afforded by any applicable state or federal laws or regulations.

13.     This Agreement shall be binding upon the parties to this Investigation and their counsels of record, and all persons and entities signing a copy of the attached Exhibit A, and upon their attorneys, employees and agents. All parties so bound by this Agreement agree to promptly notify United in writing of any unauthorized use or disclosure of Confidential Documents or any information contained therein of which they become aware.

14.     Nothing in this Agreement constitutes a finding or admission that any Confidential Document is in fact confidential or otherwise not subject to disclosure. In the event of a dispute as to the propriety or correctness of the designation as a Confidential Document, the parties shall attempt to resolve the dispute by negotiation. In any such negotiation, each party will provide a good-faith explanation regarding the basis of its belief as to the confidentiality of the Confidential Document.

/ / /

Dated this 19th day of February, 2019.

Mimi Liu
MOTLEY RICE LLC
401 9th Street NW, Suite 1001
Washington, D.C. 20004
as Special Assistant Corporation Counsel

DORSEY & WHITNEY LLP

By Michelle Grant
Michelle S. Grant (311170)
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402-1498
Telephone:  (612) 340-2600
Facsimile:  (612) 340-2868
grant.michelle@dorsey.com

Attorneys for United Healthcare Services,
Inc., UnitedHealthCare Insurance Company,
UnitedHealthCare of Illinois, Inc., and
OptumRx, Inc.

## EXHIBIT A

The undersigned hereby acknowledges that he/she has been advised of the terms of
the Confidentiality Agreement, has been given a copy of the Confidentiality Agreement, and
acknowledges and agrees to be bound by the terms of the Confidentiality Agreement.

Name: _____

Job Title: _____

Employer: _____

Business Address: _____

_____

_____

_____

Date: _____

Signature: _____

# Exhibit O

to Declaration of Matthew Hooker

RECEIVED

05/07/2024

KELLY L. STEPHENS, Clerk

**CASE NO.** _24-3396_ _____

---

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

-------------------

In re OptumRx, Inc.
*Petitioner-Defendant*

-------------------

From the United States District Court
Northern District of Ohio, Eastern Division, Case No. 17-MD-2804

-------------------

**PETITION FOR WRIT OF MANDAMUS**

---

Brian D. Boone
**ALSTON & BIRD LLP**
Vantage South End
1120 South Tryon Street
Suite 300
Charlotte, NC 28203
Tel.: (704) 444-1000
brian.boone@alston.com

William H. Jordan
D. Andrew Hatchett
**ALSTON & BIRD LLP**
One Atlantic Center
1201 West Peachtree Street NW
Suite 4900
Atlanta, GA 30309
Tel.: (404) 881-7000
bill.jordan@alston.com
andrew.hatchett@alston.com

*Attorneys for Petitioner-Defendant OptumRx, Inc.*

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations
# and Financial Interest

Sixth Circuit
Case Number: _____          Case Name: In re OptumRx, Inc. _____

Name of counsel:  Alston & Bird LLP _____

Pursuant to 6th Cir. R. 26.1,  OptumRx, Inc. _____
                                                    *Name of Party*
makes the following disclosure:

1.      Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the
        identity of the parent corporation or affiliate and the relationship between it and the named
        party:

> Yes. UnitedHealth Group Incorporated is the ultimate parent of OptumRx, Inc. UnitedHealth
> Group Incorporated is a publicly traded corporation.

2.      Is there a publicly owned corporation, not a party to the appeal, that has a financial interest
        in the outcome?  If yes, list the identity of such corporation and the nature of the financial
        interest:

> Yes. UnitedHealth Group Incorporated is the ultimate parent of OptumRx, Inc. UnitedHealth
> Group Incorporated is a publicly traded corporation.

---

CERTIFICATE OF SERVICE

I certify that on _____ May 7, 2024 _____ the foregoing document was served on all
parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not,
by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Brian D. Boone _____
Alston & Bird LLP _____
_____

---

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs,
immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

**6th Cir. R. 26.1**
**DISCLOSURE OF CORPORATE AFFILIATIONS**
**AND FINANCIAL INTEREST**

(a)  **Parties Required to Make Disclosure**.  With the exception of the United States government or agencies thereof or a state government or agencies or political subdivisions thereof, all parties and amici curiae to a civil or bankruptcy case, agency review proceeding, or original proceedings, and all corporate defendants in a criminal case shall file a corporate affiliate/financial interest disclosure statement.  A negative report is required except in the case of individual criminal defendants.

(b)  **Financial Interest to Be Disclosed.**

(1)  Whenever a corporation that is a party to an appeal, or which appears as amicus curiae, is a subsidiary or affiliate of any publicly owned corporation not named in the appeal, counsel for the corporation that is a party or amicus shall advise the clerk in the manner provided by subdivision (c) of this rule of the identity of the parent corporation or affiliate and the relationship between it and the corporation that is a party or amicus to the appeal.  A corporation shall be considered an affiliate of a publicly owned corporation for purposes of this rule if it controls, is controlled by, or is under common control with a publicly owned corporation.

(2) Whenever, by reason of insurance, a franchise agreement, or indemnity agreement, a publicly owned corporation or its affiliate, not a party to the appeal, nor an amicus, has a substantial financial interest in the outcome of litigation, counsel for the party or amicus whose interest is aligned with that of the publicly owned corporation or its affiliate shall advise the clerk in the manner provided by subdivision (c) of this rule of the identity of the publicly owned corporation and the nature of its or its affiliate's substantial financial interest in the outcome of the litigation.

(c)  **Form and Time of Disclosure**.  The disclosure statement shall be made on a form provided by the clerk and filed with the brief of a party or amicus or upon filing a motion, response, petition, or answer in this Court, whichever first occurs.

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES .................................................................... iii

PETITION ........................................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................ 1

ISSUE PRESENTED .......................................................................... 9

STATEMENT ...................................................................................... 9

STANDARD OF REVIEW ................................................................. 17

REASONS THE WRIT SHOULD ISSUE ........................................... 19

    I.     OPTUMRX HAS NO OTHER MEANS FOR OBTAINING RELIEF FROM THE DISTRICT COURT'S EGREGIOUSLY WRONG DECISION. ........................................................ 20

    II.    OPTUMRX'S RIGHT TO THE WRIT IS CLEAR AND INDISPUTABLE. ........................................................... 21

         A.    The District Court nullified Rule 1.11(c). ................. 21

             1.   Through its government investigations, Motley Rice received confidential government information about OptumRx. ..................................... 22

             2.   Motley Rice could use the information to OptumRx's material disadvantage. ................. 28

             3.   Even the District Court suggested that without its erroneous "discovery" exception to Rule 1.11(c), Motley Rice should be disqualified. ................ 29

         B.    The District Court's ruling bears other marks of an abuse of discretion. ..................................................... 30

    III.   THE WRIT IS VITAL TO PRESERVING A LONGSTANDING CHECK ON THE ABUSE OF GOVERNMENT POWER. .......................................... 32

CONCLUSION ....................................................................................................34

CERTIFICATE OF COMPLIANCE......................................................................36

CERTIFICATE OF SERVICE ..............................................................................37

# TABLE OF AUTHORITIES

**Page(s)**

<span style="font-variant: small-caps;">**Cases**</span>

*Allied Realty of St. Paul, Inc. v. Exchange National Bank of Chicago*,
    283 F. Supp. 464 (D. Minn. 1968) .......................................................................30

*Cheney v. United States Dist. Ct. for D.C.*,
    542 U.S. 367 (2004) .............................................................................17, 21, 32

*Courier-Journal v. Marshall*,
    828 F.2d 361 (6th Cir. 1987) .............................................................................25

*Dana Corp. v. Blue Cross & Blue Shield Mut. of N. Ohio*,
    900 F.2d 882 (6th Cir. 1990) .............................................................................18

*Davis v. S. Bell Tel. & Tel. Co.*,
    149 F.R.D. 666 (S.D. Fla. 1993) .......................................................................30

*Firestone Tire & Rubber Co. v. Risjord*,
    449 U.S. 368 (1981) ...........................................................................................20

*Gen. Mill Supply Co. v. SCA Servs., Inc.*,
    697 F.2d 704 (6th Cir. 1982) .......................................................................17, 18

*General Motors Corp. v. City of New York*,
    501 F.2d 639 (2d Cir. 1974) ..................................................................30, 33, 34

*Gordon v. Dadante*,
    2009 WL 2732827 (N.D. Ohio Aug. 26, 2009) ............................................7, 18

*Hilo Metals Co. v. Learner Co.*,
    258 F. Supp. 23 (D. Haw. 1966) .......................................................................30

*In re Am. Airlines, Inc.*,
    972 F.2d 605 (5th Cir. 1992) .......................................................................18, 19

*In re Am. Cable Publ'ns, Inc.*,
    768 F.2d 1194 (10th Cir. 1985) ...................................................................18, 19

*In re Dresser Indus., Inc.*,
    972 F.2d 540 (5th Cir. 1992) .............................................................................18

*In re Mechem*,
  880 F.2d 872 (6th Cir. 1989) ...............................................................18

*In re Nat'l Prescription Opiate Litig.*,
  2019 WL 1274555 (N.D. Ohio Mar. 20, 2019)...............................5, 27

*In re Nat'l Prescription Opiate Litig.*,
  2019 WL 7482137 (6th Cir. Oct. 10, 2019) .........................................3

*In re Nat'l Prescription Opiate Litig.*,
  956 F.3d 838 (6th Cir. 2020) ..........................................................2, 3

*In re United States*,
  32 F.4th 584 (6th Cir. 2022) .............................................................32

*Kronberg v. LaRouche*,
  2010 WL 1443934 (E.D. Va. Apr. 9, 2010) .......................................26

*Richardson-Merrell, Inc. v. Koller*,
  472 U.S. 424 (1985).........................................................................18

*Seattle Times Co. v. Rhinehart*,
  467 U.S. 20 (1984)...........................................................................25

*United States v. Bertoli*,
  994 F.2d 1002 (3d Cir. 1993) ...........................................................33

*United States v. Villaspring Health Care Ctr., Inc.*,
  2011 WL 5330790 (E.D. Ky. Nov. 7, 2011) .................................24, 26

**RULES**

Federal Rule of Appellate Procedure 21(a) .................................................1

Ohio Rule of Professional Conduct 1.11(c)......................................passim

**STATUTES AND REGULATIONS**

5 U.S.C. § 552.........................................................................................25

5 C.F.R. § 2635.703(b) ...........................................................................24

28 U.S.C. § 1651.....................................................................................1

iv

5 Ill. Comp. Stat. 140/7(g) ....................................................................22

D.C. Code § 2-534(a)(1) ......................................................................22

Haw. Rev. Stat. § 480-18(j) ................................................................22

**OTHER AUTHORITIES**

ABA Comm. on Ethics & Prof'l Resp., Formal Op. 509 (Feb. 28, 2024) .......passim

Alison Frankel, *Opioids Judge Won't Oust Motley Rice But Casts Cloud Over 'Public Client' Business*, Reuters (Mar. 19, 2024) ....................................33

Editorial Board, *Double Dipping in Opioid Lawsuits*, Wall St. J. (Jan. 1, 2024) .......................................................................8

Editorial Board, *The Tort Bar's Legal Double Dipping*, Wall St. J. (Dec. 9, 2022) ......................................................................2

N.Y. State Bar Ass'n Comm. on Prof'l Ethics Op. 1169 (2019) .............................26

N.Y. State Bar Ass'n Comm. on Prof'l Ethics Op. 1187 (2020) ............................26

Neb. Ethics Advisory Op. for Lawyers No. 22-01 ...................................................26

O.H. Skinner, *States Hiring Outside Lawyers Need to Ask Who Else They Represent*, Bloomberg Law (Jan. 23, 2024) ........................................................8

*Public Client Litigation Area*, Motley Rice, https://www.motleyrice.com/public-client (last visited Apr. 10, 2024) ............33

Shalina Chatlani, *Taxpayers Were Overcharged for Patient Meds. Then Came the Lawyers.*, N.Y. Times (Mar. 21, 2024) ................................................8

## PETITION

OptumRx, Inc. petitions under 28 U.S.C. § 1651 and Federal Rule of Appellate Procedure 21(a) for a writ of mandamus ordering the District Court to disqualify Motley Rice LLC and its attorneys from all pending and future lawsuits against OptumRx in *In re National Prescription Opiate Litigation*, No. 17-MD-2804 (N.D. Ohio).

## INTRODUCTION AND SUMMARY OF ARGUMENT

With increasing regularity, State Attorneys General and local governments are deputizing private lawyers as Special Assistant Attorneys General to investigate businesses. The arrangement allows state and local governments to transfer litigation risk to private lawyers while preserving those governments' ability to seek damages in cases they would not otherwise pursue. The private lawyers, in turn, get to cloak themselves in government power, which allows them to secure pre-litigation discovery and pursue claims on a contingency-fee basis without facing the corresponding limits on personal financial benefits that normally apply to full-time government prosecutors.

Some private lawyers go further. They take the information gained from their government investigations and use it in separate *private* contingency-fee litigation for their and their clients' financial benefit. That represents a grave abuse of

1

government power. The Rules of Professional Conduct—here, Ohio Rule of Professional Conduct 1.11(c)—prohibit the practice:

> A lawyer having information that the lawyer knows is confidential government information about a person acquired when the lawyer was a public officer or employee, may not represent a private client whose interests are adverse to that person in a matter in which the information could be used to the material disadvantage of that person.

And yet despite that longstanding ethical prohibition, there has been a rise in what the Wall Street Journal dubbed "unholy alliance[s]" between private lawyers and state prosecutors.[1]

In the proceedings below, the District Court acknowledged those ethical concerns but ultimately nullified Rule 1.11(c) to cleanse plaintiffs' firm Motley Rice from its ongoing violations of the Rule. In doing so, it distorted and disregarded the law.

Not long ago, this Court granted mandamus relief to other defendants in the opioid MDL because the District Court disregarded the Federal Rules' requirements. In granting that relief, the Court emphasized that "[t]he rule of law applies in multidistrict litigation under 28 U.S.C. § 1407 just as it does in any individual case." *In re Nat'l Prescription Opiate Litig.*, 956 F.3d 838, 841 (6th Cir. 2020). "Within

---

[1] Editorial Board, *The Tort Bar's Legal Double Dipping*, Wall St. J. (Dec. 9, 2022), https://www.wsj.com/articles/the-tort-bars-legal-double-dipping-illinois-insulin-attorney-general-plaintiff-attorneys-11669127620.

the limits of those rules, of course, an MDL court has broad discretion," but "[w]hat an MDL court may not do . . . is distort or disregard the rules of law applicable to each of those cases." *Id.*[2]

For years, OptumRx watched the opioid MDL from the sidelines; it was not an active litigant in the MDL. But then in December 2022, the District Court "turned its focus to resolving claims made against the PBMs." R.5362, PageID #633140. The court designated four bellwether cases against pharmacy benefits managers (PBMs) OptumRx and Express Scripts and other non-PBM companies from the same corporate families. Of the more-than 3,000 cases in the MDL, OptumRx and Express Scripts are defendants in only 84.

Motley Rice has represented plaintiffs in opioid lawsuits against *other defendants* since the beginning of the MDL, but it did not begin representing plaintiffs in opioid litigation against OptumRx until late 2022/early 2023. Those representations violated Rule 1.11(c) from the start because Motley Rice previously investigated OptumRx as government lawyers for Hawaii, the District of Columbia, and the City of Chicago. Through that government service, Motley Rice obtained confidential information about OptumRx that the firm could use to OptumRx's

---

[2] That was not the first time that the Court expressed concern about proceedings in the opioid MDL. *See In re Nat'l Prescription Opiate Litig.*, 2019 WL 7482137 (6th Cir. Oct. 10, 2019).

material disadvantage in opioid litigation. That violates Rule 1.11(c), so OptumRx moved to disqualify Motley Rice from the MDL cases against OptumRx.

The District Court acknowledged that Motley Rice was a "public officer" in those government investigations because the firm "served government subpoenas" on OptumRx and "gained access to information pursuant to governmental authority." R.5362, PageID #633142. It also agreed that Motley Rice was representing "private client[s]" in the MDL. *Id.* at PageID #633142–633143. The court also recognized that Motley Rice's conduct "pose[d] a serious 'risk that power or discretion vested in [Motley Rice] might be used for the special benefit of [their private] client,' or create a conflict of interest." *Id.* at PageID #633159. The District Court agreed that Motley Rice "needs to adhere to all the same rules to which government lawyers are subject" and warned "Motley Rice and all other law firms [to] carefully take this into account going forward." *Id.* at PageID #633144. The court even said that it "frown[ed] on" Motley Rice's actions. *Id.* at PageID #633159.

Yet despite those findings and warnings, the District Court gave Motley Rice a pass, concluding that the firm had not *technically* violated Rule 1.11(c) based on the purportedly "unique facts of this case." *Id.* at PageID #633143 (n.9). In reaching that conclusion, the court (i) disregarded Rule 1.11(c)'s language and years of authority interpreting the Rule, (ii) abandoned the court's own earlier decision applying the Rule to disqualify a defense lawyer in the MDL on far less egregious

facts,[3] (iii) purported to remedy Motley Rice's ethical violations by ordering OptumRx to produce into the MDL the documents that it had produced in the Motley Rice-led government investigations, and (iv) distorted the record about the timing of OptumRx's motion.

The District Court also hollowed out Rule 1.11(c)'s definition of "confidential government information," ruling that *any* information subject to civil discovery cannot be "confidential government information." *Id.* at PageID #633146. The District Court did so in the face of a recent ABA opinion and numerous precedents concluding otherwise. The court then purported to cleanse Motley Rice of its ethical violations by ordering OptumRx to produce into the MDL all the documents that OptumRx had produced in the Motley Rice-led government investigations. *Id.* at PageID #633149; *see also id.* at PageID #633159 ("[W]ere it not for the standing Repository obligations . . . , the Court's discussion and analysis in this Order might have been different."). To our knowledge, no other court has tried to cleanse a law firm's ethical violations by ordering a party to produce discovery.

In ruling as it did, the court did not just create a "Motley Rice" exception to the ethics rules. Virtually any information or document that a government investigator can gather with a subpoena—even a grand jury subpoena—is subject to

---

[3] *In re Nat'l Prescription Opiate Litig.*, 2019 WL 1274555 (N.D. Ohio Mar. 20, 2019).

civil discovery in private litigation. As a result, the District Court's approach to Rule 1.11(c) would make the Rule a dead letter: The Rule would almost never prevent government lawyers armed with information obtained through government service from entering private practice and suing the targets of their government investigations.[4]

This Court should issue a writ of mandamus to undo the District Court's decision. The circumstances satisfy all three requirements for a writ:

*First*, OptumRx has no other means for attaining relief. Waiting until after final judgment to appeal would subject OptumRx to the ongoing prejudice of Motley Rice's involvement throughout the proceedings.

*Second*, the District Court's ruling is egregiously wrong and a clear abuse of discretion. According to OptumRx's experts below, including a member of the ABA ethics committee that issued the recent ABA opinion, Motley Rice's ethical violations are not a "close call." R.5300-2, PageID #628141; *see also* R.5341-2, PageID #630306 ("There can be no more obvious violation of Rule 1.11(c) . . . ."). Although the District Court purported to cabin its ruling to the "unique facts of this

---

[4] The District Court also justified its decision on the grounds that disqualifying Motley Rice would "deprive all litigants that are suing PBMs of Motley Rice's considerable experience with complex litigation generally and this MDL specifically." *Id.* at PageID #633158. But Motley Rice is only one of more than a dozen firms representing plaintiffs in MDL opioid cases against OptumRx, most or all of whom have been involved in the opioid MDL alongside Motley Rice for years.

case" (*id.* at PageID #633143 (n.9)), the legal principle that it adopted would nullify the Rule across all cases.

*Third*, the issue is of great public importance. "'Although a party's right to counsel of her choice is important, it is secondary in importance to preserving the integrity of the judicial process, maintaining the public confidence in the legal system and enforcing the ethical standards of professional conduct.'" *Gordon v. Dadante*, 2009 WL 2732827, at *6 (N.D. Ohio Aug. 26, 2009) (collecting cases) (citation omitted). "The paramount concern must be the preservation of public trust both in the scrupulous administration of justice and in the integrity of the bar." *Id.* For that reason, a court should "not weigh the circumstances with hair-splitting nicety but, in the proper exercise of its supervisory power over the members of the bar and with a view of preventing the appearance of impropriety . . . resolve all doubts in favor of disqualification." *Id.* If left to continue, Motley Rice's and other law firms' abuse of their partnerships with state and local governments will undermine public confidence in both government investigations and the judicial system. The District Court "frown[ed]" on that business model but did nothing to stop it. R.5362, PageID #633159.

OptumRx's petition comes at a moment when others have begun sounding the same alarm. The Wall Street Journal recently again decried the practice, explaining that "[t]his double dipping would break the rules of professional conduct in nearly

7

any industry, but it's an open scandal in the tort business."[5] Earlier this year, a former Arizona Solicitor General used this case to highlight "the problem that arises when government lawyers outsource enforcement to outside trial lawyers: ethics and conflicts of interest."[6] And in March, the New York Times published an investigation detailing ethical concerns about "powerful private lawyers who used their political connections to go after millions of dollars in contingency fees" on behalf of governments.[7]

*      *      *

Instead of resolving its doubts in favor of disqualification, the District Court crafted an exception to Rule 1.11(c) that gives Motley Rice and other firms license to continue practices long understood to violate the ethics rules. Worse, the District Court's order will encourage the very behavior that Rule 1.11(c) was designed to prohibit—using government power for private gain. This Court should correct the District Court's manifest abuse of discretion and should confirm that government

---

[5] Editorial Board, *Double Dipping in Opioid Lawsuits*, Wall St. J. (Jan. 1, 2024), https://www.wsj.com/articles/double-dipping-in-opioid-lawsuits-optumrx-motley-rice-6dab5dcb.

[6] O.H. Skinner, *States Hiring Outside Lawyers Need to Ask Who Else They Represent*, Bloomberg Law (Jan. 23, 2024), https://news.bloomberglaw.com/us-law-week/states-hiring-outside-lawyers-need-to-ask-who-else-they-represent.

[7] Shalina Chatlani, *Taxpayers Were Overcharged for Patient Meds. Then Came the Lawyers.*, N.Y. Times (Mar. 21, 2024), https://www.nytimes.com/2024/03/21/us/centene-health-care-fraud.html.

lawyers may not use what they learn from government service to benefit themselves or their private clients.

## ISSUE PRESENTED

Whether the Court should issue a writ of mandamus ordering the District Court to disqualify Motley Rice and its attorneys from representing plaintiffs suing OptumRx in the opioid MDL.

## STATEMENT

OptumRx is a PBM. PBMs contract with health plans and third-party payers to administer prescription drug benefits. PBMs were not involved in the first opioid lawsuits that led to the formation of this MDL in December 2017. But in 2018 and 2019, some plaintiffs (not represented by Motley Rice) filed or amended complaints to allege claims against certain PBMs, including OptumRx.

In September 2018, Motley Rice (which had not yet sued OptumRx in opioid litigation) began representing Chicago as "Special Assistant Corporation Counsel" to investigate OptumRx relating to copay clawbacks. R.5320-4, PageID #629111. As part of that investigation, Chicago issued an investigative subpoena to OptumRx in November 2018, demanding information about various aspects of OptumRx's business, including contracts with pharmacies and certain clients. R.5276-16. Under a confidentiality agreement—executed by Mimi Liu of Motley Rice as Chicago's

Special Assistant Corporation Counsel (R.5276-17)—OptumRx produced confidential material to Motley Rice. R.5276-3.

In December 2020, the District of Columbia appointed Motley Rice's Linda Singer to lead "the investigation of and possible litigation against" OptumRx for possible violations of consumer protection laws and the False Claims Act. R.5276-10. Motley Rice served an investigative subpoena on OptumRx regarding "the negotiation of prescription drug rebates and the administration of prescription drug benefits," directing OptumRx to produce its confidential documents to Linda Singer at Motley Rice. R.5276-11, PageID #625685. OptumRx again negotiated a confidentiality agreement preventing Motley Rice from using the confidential information that its lawyers obtained through the D.C. subpoena outside of the firm's work for D.C. R.5276-12, PageID #625700–625701 (¶ 2). OptumRx produced to Motley Rice more than 68,000 pages of unredacted, commercially sensitive documents and data. R.5276-13; R.5276-14; R.5276-15; R.5276-2, PageID #625580–625581 (¶¶ 12–15); R.5276-4, PageID #625587 (¶¶ 7–9). Those productions contained confidential documents covering wide swaths of OptumRx's business operations, including charters, policies, and other materials from OptumRx's business strategy and formulary placement committees as well as emails relating to those and other aspects of OptumRx's business. R.5276-2, PageID #625579 (¶ 7); R.5276-4, PageID #625587 (¶¶ 7–8). They also included certain of

10

OptumRx's rebate-related and transaction data. R.5276-13; R.5276-15; R.5276-2, PageID #625580 (¶¶ 12, 14). Most of the information that OptumRx produced is not available to the public and is among OptumRx's most commercially sensitive material. R.5276-2, PageID #625581 (¶ 15); R.5276-4, PageID #625587 (¶ 9).

Then in April 2021, Motley Rice (which still did not represent any plaintiff in an opioid lawsuit against OptumRx) accepted an appointment from the Hawaii Attorney General to serve as a Special Deputy Attorney General. R.5276-5. Linda Singer and Joe Rice signed the engagement agreement on Motley Rice's behalf. *Id.* In October 2021, the Hawaii Attorney General issued an investigative subpoena to OptumRx demanding documents and communications relating to various aspects of OptumRx's business, including formulary development, rebate negotiations with pharmaceutical manufacturers, and financial information relating to OptumRx's contractual relationships with pharmaceutical manufacturers. R.5276-6. The subpoena directed OptumRx to deliver the documents to "Special Deputy Attorney General Linda Singer, Motley Rice LLC." *Id.* at PageID #625627.

OptumRx again negotiated a confidentiality agreement prohibiting Motley Rice from relying "on Confidential Material in pursuing information or claims in any other matters outside of its representation of the [Hawaii] OAG." R.5276-7, PageID #625643–625644 (¶ 2). Relying on that agreement, OptumRx produced to Motley Rice the 68,000 pages of unredacted, commercially sensitive documents that

11

it had produced to D.C., along with commercially sensitive data. R.5276-8; R.5276-9; R.5276-2, PageID #625579–625580 (¶¶ 7–9); R.5276-4, PageID #625587 (¶¶ 7–9).

Until December 2022, Motley Rice had never sued OptumRx in opioid litigation. But when it became clear that Motley Rice was representing opioid plaintiffs in litigation against OptumRx, OptumRx promptly notified the District Court that it intended to move to disqualify Motley Rice. R.5362, PageID #633137. At a status conference in March 2023, the court agreed with OptumRx that any disqualification motion should wait for a specific bellwether case. *Id.*

In October 2023, the District Court identified four bellwether cases against the PBMs, and Motley Rice and several other firms confirmed that they would lead those representations. The theories that Motley Rice now presses against OptumRx relate to many of the same aspects of OptumRx's business that the firm investigated as government lawyers. For instance, the City of Rochester alleges that the formularies and clinical programs that OptumRx offered its clients should have included additional limits on opioid prescriptions and that the PBMs have been "colluding with Purdue Pharma and other opioid manufacturers to increase opioid sales through favorable placement on national formularies in exchange for rebates and fees." R.5346-1, PageID #630364–630365 (¶ 3); *see also, e.g.*, *id.* at PageID #630365–630366, 630377, 630441 (¶¶ 4, 36, 252). The information that Motley

Rice obtained through its government investigations into OptumRx relates to, among other things, OptumRx's rebate negotiations with manufacturers and formulary offerings to its clients.

Consistent with the District Court's scheduling order (R.5268), OptumRx moved in December 2023 to disqualify Motley Rice from representing the bellwether plaintiffs against OptumRx under Ohio Rule of Professional Conduct 1.11(c):

> Except as law may otherwise expressly permit, a lawyer having information that the lawyer knows is confidential government information about a person acquired when the lawyer was a public officer or employee, may not represent a private client whose interests are adverse to that person in a matter in which the information could be used to the material disadvantage of that person. As used in this rule, the term "confidential government information" means information that has been obtained under governmental authority and that, at the time this rule is applied, the government is prohibited by law from disclosing to the public or has a legal privilege not to disclose and that is not otherwise available to the public.

The District Court held a hearing in February 2024. At the hearing, the court expressed skepticism about Motley Rice's arguments, particularly its arguments that it had not served as public officers in the investigations and are not representing private clients in the opioid MDL. *E.g.*, R.5312, PageID #628212 (18:6–11) ("I can't understand why you [Motley Rice] don't see that there is a difference between . . . your firm's work for these three entities and your work for all of your other clients,

13

and particularly the . . . four bellwether clients that you're representing."), PageID #628200–628201 (6:25–7:1) ("no question that they [Motley Rice attorneys] were performing public functions"), PageID #628210–628211 (16:11–13, 17:20–22) (recognizing that Motley Rice served as a "public lawyer" for Hawaii and engaged in a "standard private representation" in the bellwether litigations). After the hearing, the court granted Motley Rice leave to file a sur-reply, which rehashed Motley Rice's earlier arguments. R.5320, R.5320-1.

Shortly afterwards, the American Bar Association's Standing Committee on Ethics and Professional Responsibility issued Formal Opinion 509 discussing Model Rule of Professional Conduct 1.11(c), which is largely identical to Ohio's Rule 1.11(c). *See* ABA Comm. on Ethics & Prof'l Resp., Formal Op. 509 (Feb. 28, 2024).[8] In the opinion, the ABA Committee explained that private-practice attorneys qualify as public officials when they accept "special" government appointments and that public entities like the bellwether plaintiffs qualify as "private clients" when a law firm represents them in private practice. *Id.* at 9–10. The Committee also reiterated that information obtained by governments that "the government is legally prohibited from disclosing to the public" qualifies as "confidential government information" under the Rule:

---

[8] *See* R.5338-1; also available at https://www.americanbar.org/content/dam/aba/administrative/professional_responsibility/ethics-opinions/aba-formal-opinion-509.pdf.

> Rule 1.11(c) does not apply to all information obtained
> under government authority, but only to information that,
> at the time the Rule is applied, the government is legally
> prohibited from disclosing to the public or has a legal
> privilege not to disclose if the information is not otherwise
> publicly available. Whether government information is
> publicly available—e.g., whether it can be obtained
> through routine discovery—will be a question of fact. So
> is the question of whether the information "could be used
> to [the person's] material disadvantage."

*Id.* at 5 (footnotes omitted). As the Committee made clear in the opinion, whether information "can be obtained through routine discovery" is about whether information can be obtained by the public *from the government*, not from private parties in civil litigation.

Motley Rice filed a notice of supplemental authority, mischaracterizing the language "can be obtained through routine discovery" to argue that the investigation documents that OptumRx produced were not confidential government information because Motley Rice could get them through civil discovery. R.5338, PageID #630255. In response, OptumRx and its experts explained that the ABA's opinion confirms that the "routine discovery" language does not apply to information produced under a protective order or confidentiality agreement. The experts (including a member of the ABA Committee that issued the opinion) explained that Motley Rice's "interpretation would render the Rule meaningless" and that "[r]outine discovery does *not* include information subject to a protective order, such as proprietary or trade secret information, nor does it include information produced

15

pursuant to Confidentiality Agreements signed by government lawyers." R.5341-2, PageID #630310. They highlighted the many precedents favorably cited in the ABA opinion in which courts disqualified lawyers even though the information obtained as government lawyers could have been later obtained through civil discovery. *Id.* at PageID #630310–630311.

The District Court denied OptumRx's motion.[9] R.5362. In its order, the court confirmed that Motley Rice acted as a public officer when it investigated OptumRx on behalf of Hawaii, D.C., and Chicago and that the firm gained access to information about OptumRx using government authority. The court also agreed that Motley Rice is now representing the MDL bellwether plaintiffs as "private clients" under the Rule. *Id.* at PageID #633141–633144. The District Court claimed to be "very uncomfortable with the malleability of this quasi-government-employment configuration" under which "Motley Rice attempts to act simultaneously as a public employee and not a public employee, as fits its need." *Id.* at PageID #633144.

And yet despite all that, the District Court spared Motley Rice from disqualification. Distorting the procedural history, the court faulted OptumRx for not raising disqualification years ago—even though Motley Rice wasn't representing any opioid plaintiff against OptumRx until December 2022 at the

---

[9] OptumRx's co-defendant Express Scripts joined OptumRx's motion to disqualify, but the District Court concluded that Express Scripts had joined too late. R.5351; R.5362, Page ID #633131 n.1.

earliest and even though no party had raised the timing of OptumRx's motion in more than 100 pages of briefing or at the hearing. The court then misconstrued ABA Formal Opinion 509 to conclude that the documents that OptumRx produced to Motley Rice in the government investigations did not constitute "confidential government information" under Rule 1.11(c) because they could be obtained through "routine discovery" and should have been produced to all plaintiffs' counsel under two previous MDL discovery rulings—"DR-22" and "DR-2." *Id.* at PageID #633148–633149.

## STANDARD OF REVIEW

The Court "may exercise its power to issue [a] writ" if it finds that the District Court committed a "clear abuse of discretion." *Cheney v. United States Dist. Ct. for D.C.*, 542 U.S. 367, 380 (2004) (quoting *Bankers Life & Cas. Co. v. Holland*, 346 U.S. 379, 383 (1953)). To obtain a writ, a party must satisfy three conditions: (1) the party "[must] have no other adequate means to attain the relief he desires," (2) the party must show "that [his] right to issuance of the writ is 'clear and indisputable,'" and (3) the issuing court "must be satisfied that the writ is appropriate under the circumstances." *Id.* at 380–81 (brackets in original) (citations omitted).

Although disqualification motions are reviewed generally for an abuse of discretion, this Court reviews *de novo* a district court's interpretation of an ethical rule. *Gen. Mill Supply Co. v. SCA Servs., Inc.*, 697 F.2d 704, 711 (6th Cir. 1982)

17

(holding in disqualification case that it is "appropriate to attack the ethical problem *de novo* rather than as review of a discretionary decision"); *accord In re Dresser Indus., Inc.*, 972 F.2d 540, 543 (5th Cir. 1992). It reviews the district court's findings of fact for clear error. *Dana Corp. v. Blue Cross & Blue Shield Mut. of N. Ohio*, 900 F.2d 882, 889 (6th Cir. 1990). Because "[t]he paramount concern must be the preservation of public trust both in the scrupulous administration of justice and in the integrity of the bar," a court should "not weigh the circumstances with hair-splitting nicety but, in the proper exercise of its supervisory power over the members of the bar and with a view of preventing the appearance of impropriety . . . resolve all doubts in favor of disqualification." *Gordon*, 2009 WL 2732827, at *6.

The Supreme Court has confirmed that a party may seek relief from an erroneous ruling on a motion to disqualify counsel through a writ of mandamus. *Richardson-Merrell, Inc. v. Koller*, 472 U.S. 424, 435 (1985) (citing *Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. 368, 378 n.13 (1981)). Circuit courts agree that *Koller* "recognize[d] that a writ of mandamus . . . remains a proper means to consider an attorney disqualification order on an interlocutory basis." *In re Am. Cable Publ'ns, Inc.*, 768 F.2d 1194, 1195 (10th Cir. 1985); *accord In re Mechem*, 880 F.2d 872, 874 (6th Cir. 1989); *In re Am. Airlines, Inc.*, 972 F.2d 605, 608 (5th Cir. 1992).

*In re American Airlines* illustrates the principle. There, the Fifth Circuit issued a writ of mandamus requiring disqualification of counsel on less egregious facts than exist here. The appellate court agreed that the petitioner had "demonstrated the absence of an adequate alternative to mandamus review." 972 F.2d at 609. The court explained that "the nature and size of this litigation would seem to preclude effective appellate review upon final judgment." *Id.* The court also agreed that the dispute "raise[d] several questions pertaining to the proper interpretation of ethical standards in disqualification cases" and that "attorneys and clients throughout [the state] need the benefit of this Court's guidance on this issue of grave importance." *Id.* The court also reasoned that review was appropriate because the disqualification issue "was not a mere discretionary one but rather turns on legal questions appropriate for appellate review." *Id.* (citation omitted). The court held that the petitioner's right to reversal was clear and indisputable and "therefore issue[d] a writ of mandamus directing the district court to vacate its order." *Id.* at 628; *see also In re Am. Cable*, 768 F.2d at 1195 (granting mandamus writ to disqualify counsel).

## <u>REASONS THE WRIT SHOULD ISSUE</u>

This Court should issue a writ of mandamus because the District Court's order refusing to disqualify Motley Rice renders Rule 1.11(c) a nullity and encourages government lawyers to exploit their government service to benefit themselves and their private clients.

19

## I.   OPTUMRX HAS NO OTHER MEANS FOR OBTAINING RELIEF FROM THE DISTRICT COURT'S EGREGIOUSLY WRONG DECISION.

Unless this Court grants the writ now, OptumRx's "opportunity for meaningful review will perish." *Firestone Tire*, 449 U.S. at 377. For years, Motley Rice has had access to confidential information about OptumRx that the firm collected through its government service. If Motley Rice continues representing opioid plaintiffs against OptumRx in the MDL, it can drive the litigation strategy against OptumRx with that confidential information as a roadmap. And the cases have only just begun. The District Court selected the PBM bellwethers in October 2023. Motions to dismiss are pending, and discovery is in its early stages. With most of the litigation still to come, the specter of Motley Rice's continued unethical conduct looms large.

If this Court does not grant relief *now*, it will be *never*. OptumRx will have no meaningful remedy after a final appeal because the only way to cleanse the proceedings of Motley Rice's involvement would be to order the parties to start the litigation over from the beginning. But in such a sprawling case, a do-over would be virtually impossible.

## II. OPTUMRX'S RIGHT TO THE WRIT IS CLEAR AND INDISPUTABLE.

In denying OptumRx's motion, the District Court crafted an exception to Rule 1.11(c) that undermines the Rule—all to avoid disqualifying Motley Rice. OptumRx's right to the writ is "clear and indisputable." *Cheney*, 542 U.S. at 381.

### A. The District Court nullified Rule 1.11(c).

The District Court correctly held that Motley Rice was a "public officer" under Rule 1.11(c) when it investigated OptumRx on behalf of Hawaii, D.C., and Chicago and that the bellwether plaintiffs in this MDL are Motley Rice's "private clients" under Rule 1.11(c). R.5362, PageID #633141–633144. But it erred when it concluded that the documents that OptumRx produced to Motley Rice in the government investigations did not qualify as "confidential government information" because they could be obtained through "routine discovery" in the MDL. *Id.* at PageID #633148–633149. The court also erred when it concluded that Motley Rice could not use the information to OptumRx's material disadvantage in the MDL because—under the court's rewriting of its previous discovery orders—OptumRx should have produced those documents to all plaintiffs' counsel immediately after producing them to Motley Rice in the investigations. *Id.* at PageID #633149. Those holdings create an exception that swallows Rule 1.11(c) and flies in the face of the Rule's text and purpose—preventing government lawyers from using confidential

21

information gained through their government service for their or their private clients' gain.

### 1. Through its government investigations, Motley Rice received confidential government information about OptumRx.

Rule 1.11(c) defines "confidential government information" as "information that has been obtained under governmental authority and that, at the time this rule is applied, the government is prohibited by law from disclosing to the public or has a legal privilege not to disclose and that is not otherwise available to the public." The information that Motley Rice gathered by investigating OptumRx is confidential government information under Rule 1.11(c) because each "government is prohibited by law from disclosing [it] to the public" and the information "is not otherwise available to the public."[10] Ohio R. Prof'l Conduct 1.11(c).

*First*, each jurisdiction is prohibited by law and confidentiality agreements from disclosing to the public the information and documents OptumRx produced in the Motley Rice investigations. *E.g.*, Haw. Rev. Stat. § 480-18(j); D.C. Code § 2-534(a)(1); 5 Ill. Comp. Stat. 140/7(g). For example, the Hawaii confidentiality agreement limits Motley Rice's disclosure of confidential information to certain state and Motley Rice employees (R.5276-7, PageID #625644–625646 (¶ 4)) and

---

[10] As the District Court acknowledged, the information was also obtained "*pursuant to governmental authority*." R.5362, PageID #633142; *see* Ohio R. Prof'l Conduct 1.11(c).

requires that they use that information "solely in connection with the Investigation and any litigation that may arise therefrom" (*id.* at PageID #625643–625644 (¶ 2)). It also prohibits the use of the information "in connection with any other matter" and the disclosure of the information "to any party or the public." *Id.* Motley Rice also agreed "not to rely on Confidential Information in pursuing information or claims in any other matters outside of its representation of the State." *Id.* The D.C. and Chicago agreements include similar language. R.5276-12, PageID #625701– 625703, 625704–625705 (¶¶ 4, 8–10); R.5276-17, PageID #625735–625737, 625738–625739 (¶¶ 3–4, 9, 11).

*Second*, the documents and information produced are not "otherwise available to the public." Ohio R. Prof'l Conduct 1.11(c). In response to various government subpoenas, OptumRx produced—directly to Motley Rice—a wide range of proprietary and competitively sensitive information that is not publicly available, including information about its formulary development, business strategies, negotiations, and rebate agreements with pharmaceutical manufacturers, and closely guarded financial data. The documents that OptumRx produced are "confidential internal or commercially sensitive documents" that "cover[] various aspect of OptumRx's business operations." R.5300-1, PageID #628122 (¶ 14). They are "highly confidential and commercially sensitive to OptumRx and are not available to the public." *Id.* at PageID #628128 (¶ 16). That is precisely the kind of information

that Rule 1.11(c) covers. *E.g.*, R.5276-18, PageID #625767–625775; *United States v. Villaspring Health Care Ctr., Inc.*, 2011 WL 5330790, at *6 (E.D. Ky. Nov. 7, 2011) (disqualifying lawyer under Kentucky's identical Rule 1.11(c) because "strategic insights, such as [the disqualified lawyer's] knowledge of the strengths and weaknesses of the evidence compiled against [the investigated company]," constituted confidential government information).

Ignoring Rule 1.11(c)'s text and those facts, the District Court turned ABA Formal Opinion 509 on its head to absolve Motley Rice from its continuing ethical violations. In that opinion, the ABA explained that "[w]hether government information is publicly available—e.g., whether it can be obtained through routine discovery—will be a question of fact." ABA Formal Op. 509 at 4. Cherry-picking two words ("routine discovery"), the District Court ruled that any information subject to civil discovery does not qualify as confidential government information. That was clear error. The ABA was referring to whether information can be obtained by the public *from the government*, not from private parties in civil litigation.

In its opinion, the ABA explained that the "conceptualization of 'confidential government information' [in Rule 1.11(c)] is analogous to the definition of 'nonpublic information' in 5 C.F.R. § 2635.703(b)," which "defines 'nonpublic information' as information that an employee obtains due to Federal employment and that he knows or reasonably should know: '(1) Is routinely exempt from

disclosure under 5 U.S.C. 552 [FOIA] or is protected from disclosure by statute, Executive order or regulation; (2) Is designated as confidential by an agency; or (3) has not actually been disseminated to the general public and is not authorized to be made available to the public on request.'" ABA Formal Op. at 4 n.13. It is undisputed that the information that OptumRx produced to Motley Rice is exempt from FOIA disclosure and that the confidentiality agreements prohibit Motley Rice from making the information public.

Beyond that, the word "routine" does not encompass documents produced under a protective order or confidentiality agreement. Rather, it means generally available to the public and not subject to confidential treatment.[11] Under the District Court's reading, "routine discovery" would encompass everything—save perhaps the nuclear codes—and the District Court never explained what would qualify as "non-routine" discovery. Since *everything* would be "available to the public" under the District Court's reading of Rule 1.11(c), *nothing* would be confidential government information. Government attorneys (and not just specially appointed ones) could investigate any party they choose and later sue those parties on behalf

---

[11] Of course, documents are not "public" simply because they are produced in civil discovery. *See, e.g.*, *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 33 (1984) (materials obtained through civil discovery are not "a traditionally public source of information"); *Courier-Journal v. Marshall*, 828 F.2d 361, 364 (6th Cir. 1987) ("pretrial discovery . . . ordinarily proceeds as a private interchange between the parties, the fruits of which are not presumptively public").

of private clients. They could cite the District Court's opinion to argue that there is no Rule 1.11(c) violation because all the information they received while working for the government—and the legal strategies they developed with that information in hand—is subject to "routine discovery" in civil litigation.

That is not what Rule 1.11(c) or Formal Opinion 509 says. The Rule contains no "civil discovery" exception, and in its opinion, the ABA cited to numerous cases in which courts have disqualified counsel for having access to information that parties could obtain through discovery. *E.g.*, *id.* at 4 n.8–9, 5 n.11–12, 5 n.14, 6 n.15, 7 n.25, 9 n.27; *see Villaspring*, 2011 WL 5330790, at *6 ("strategic insights" from "interviewing [the] facility's former employees"); *Kronberg v. LaRouche*, 2010 WL 1443934, at *4 (E.D. Va. Apr. 9, 2010) ("structure" of the business and "the role of other individuals" who worked for the business); N.Y. State Bar Ass'n Comm. on Prof'l Ethics Op. 1187 (2020) ("information [a lawyer, also a police officer,] acquired that was non-public employment reviews of non-public discipline of police officers"); N.Y. State Bar Ass'n Comm. on Prof'l Ethics Op. 1169 (2019) ("information [a government lawyer] acquired as a Town Supervisor"); Neb. Ethics Advisory Op. for Lawyers No. 22-01 ("information [a government lawyer acquired] from a state-run database with information about individuals' financial status and past earnings"). Indeed, earlier in the MDL, the District Court disqualified a defendant's lawyer who, in former government service, had access to "information

26

concern[ing] the inadequate staffing levels, funding deficiencies, strategies, initiatives, operations, and allocation of resources"—all information that would have been obtainable through civil discovery. *In re Nat'l Prescription Opiate Litig.*, 2019 WL 1274555, at *4–5.

As OptumRx's experts explained, the District Court's approach to Rule 1.11(c)—urged by Motley Rice below—"would render the Rule meaningless" because "recipients of investigatory subpoenas would have no protection from that sort of government overreach if government lawyers could simply avoid Rule 1.11(c) altogether by merely requesting the information through discovery in a later case." R.5341-2, PageID #630312. In plain terms, the legal principle that the District Court adopted—that information obtained by government lawyers does not satisfy Rule 1.11(c) if it could later be (re)obtained in civil discovery—would eliminate a longstanding safeguard against abuse of government power.[12]

---

[12] The District Court also ignored other confidential information about OptumRx that Motley Rice gathered, focusing only on specific documents that OptumRx had produced. OptumRx wasn't the only subpoena recipient in those investigations. R.5288, PageID #626066; R.5288-4, PageID #626673 (¶ 18). Any other confidential information about OptumRx that Motley Rice obtained or created during its investigations qualifies as confidential government information under the Rule. The District Court said nothing about any of that.

## 2. Motley Rice could use the information to OptumRx's material disadvantage.

Motley Rice did what few government lawyers would consider doing: It began representing private plaintiffs in lawsuits against the very parties it had investigated using government power—and on related issues. Under Rule 1.11(c), the question is whether the information that Motley Rice obtained as government lawyers "*could* be used to the material disadvantage of [OptumRx]." Given the overlap between the bellwether plaintiffs' claims and the confidential government information that Motley Rice received, the answer is yes—and obviously so.

The produced information includes thousands of documents that describe OptumRx's work relating to opioids and opioid manufacturers, such as rebate agreements with manufacturers, documents relating to OptumRx's formulary development, and detailed rebate data relating to opioid manufacturers. R.5300-1, PageID #628121–628122 (¶ 13); R.5276-2, PageID #625579–625581 (¶¶ 7–9, 12–15); R.5276-3, PageID #625583 (¶¶ 7–8); R.5276-4, PageID #625587 (¶¶ 7–9). It also includes a wide range of documents (not specific to a particular drug) that provide insight into how OptumRx's business operates, such as emails from OptumRx employees' rebate negotiations with drug manufacturers, slide decks analyzing OptumRx's rebate initiatives and organization goals, and documents outlining OptumRx's pricing strategies and approach to contracting with manufacturers. R.5300-1, PageID #628122–628128 (¶ 15).

28

Those documents gave Motley Rice special access to information about the very aspects of OptumRx's business that Motley Rice now challenges for the bellwether plaintiffs. They allege that OptumRx colluded with drug manufacturers to "flood the market" with opioids because drug manufacturers paid rebates to OptumRx in exchange for favorable placement of their opioids on OptumRx's formularies. Armed with OptumRx's confidential information, Motley Rice can litigate those theories with a roadmap that the firm would not have *but for* its role in investigating OptumRx as government attorneys. Motley Rice can develop legal theories, craft search terms, shape discovery requests, identify custodians and witnesses, and drive expert strategy.

> **3.    Even the District Court suggested that without its erroneous "discovery" exception to Rule 1.11(c), Motley Rice should be disqualified.**

The District Court acknowledged that but for its decision to require OptumRx to produce into the MDL the documents it produced in the Motley Rice-led government investigations, it might have reached a different outcome: "[W]ere it not for the standing Repository obligations . . . , the Court's discussion and analysis in this Order might have been different." R.5362, PageID #633159. That proves the court's abuse of discretion. Rule 1.11(c) has never turned on what future discovery in civil litigation might look like. In concluding otherwise, the District Court jettisoned the Rule.

**B.    The District Court's ruling bears other marks of an abuse of discretion.**

Other aspects of the District Court's order confirm the court's abuse of discretion.

*First*, the court ignored the long-standing body of case law showing that Motley Rice's conduct violates Rule 1.11(c) and instead seized on an unpublished, rarely cited, and easily distinguishable opinion from the Southern District of Florida. R.5362, PageID #633147 (citing *Davis v. S. Bell Tel. & Tel. Co.*, 149 F.R.D. 666, 674 (S.D. Fla. 1993)). The court did not discuss or even mention *General Motors Corp. v. City of New York*, 501 F.2d 639 (2d Cir. 1974), *Allied Realty of St. Paul, Inc. v. Exchange National Bank of Chicago*, 283 F. Supp. 464 (D. Minn. 1968), or *Hilo Metals Co. v. Learner Co.*, 258 F. Supp. 23 (D. Haw. 1966)—all of which explain the ethical problems that arise when government lawyers attempt to leverage their knowledge in related private litigation.

*Second*, the District Court improperly "weigh[ed]" the timing of OptumRx's motion, suggesting that OptumRx should have raised its disqualification motion as early as 2018. R.5362, PageID #633138–633140. But Motley Rice did not make that argument in briefing or at oral argument. And for good reason: It did not represent any MDL plaintiff suing OptumRx until December 2022 at the earliest. Before then, there was no case in which OptumRx could have sought Motley Rice's disqualification. For all OptumRx knew, Motley Rice intended to comply with its

30

ethical obligations and the confidentiality agreements that it signed. When it became clear that Motley Rice intended to litigate against OptumRx in the opioid MDL (notwithstanding Rule 1.11(c) and the signed confidentiality agreements), OptumRx promptly raised the ethical issue to the District Court. The District Court clearly abused its discretion by considering a supposed timing concern that no party raised and that had no factual basis in the record.

*Third*, the District Court improperly considered yet another irrelevant issue— OptumRx's document production obligations in the MDL. In concluding that OptumRx could not be materially disadvantaged by Motley Rice's continued representation of opioid plaintiffs in the MDL, the District Court cited its own "broad" discovery rulings, which it explained were "important procedures to promote the coordination and consolidation of the[] knotty cases" in the MDL— suggesting an "MDL exception" to the ethics rules. *Id.* at PageID #633149–633153. But those earlier discovery rulings—which are highly irregular even on their own terms—require reproduction into the MDL only of documents previously produced in any "government investigation . . . *regarding the marketing, sales, distribution or dispensing of Opioids*." R.2576, PageID #412971 (emphasis added). In other words, the obligation covers only documents produced in "opioid-related" investigations (R.3291, PageID #493105) or in an "opioid-related forum" (R.3699, PageID #510922). Motley Rice conceded that the Hawaii, D.C., and Chicago investigations

31

were not opioid related even as OptumRx produced information about opioids, insulin, and other drugs. R.5300, PageID #628109–628110; R.5341, PageID #630291–630293. The District Court nevertheless retroactively expanded its rulings to cover all opioid-related materials no matter how untethered the underlying proceeding or investigation is to opioids. R.5362, PageID #633149–633155. That the District Court saved Motley Rice by forcing OptumRx to produce discovery in the MDL is remarkable. No court has ever done that before.[13]

## III. THE WRIT IS VITAL TO PRESERVING A LONGSTANDING CHECK ON THE ABUSE OF GOVERNMENT POWER.

A writ of mandamus requiring disqualification of Motley Rice is not merely "appropriate under the circumstances." *Cheney*, 542 U.S. at 381. It is crucial to preserving the continued vitality of a longstanding ethical rule that protects litigants from exploitation by government lawyers.

Mandamus relief is appropriate "for questions of unusual importance necessary to the economical and efficient administration of justice or important issues of first impression." *In re United States*, 32 F.4th 584, 597 (6th Cir. 2022) (citation omitted). It is difficult to imagine a question of more "unusual importance"

---

[13] OptumRx was not in active litigation in the MDL until late 2022 and was not party to the proceedings that yielded the discovery rulings in question. But even if it had been, Motley Rice received confidential government information from OptumRx before OptumRx could have ever produced the same information in the MDL. The District Court ignored that reality.

to the administration of justice than whether the ethical rules permit Motley Rice's conduct.

Motley Rice's violation of Rule 1.11(c) is not a mere foot fault; it is central to the firm's business model. Motley Rice's website touts the firm's role as both an investigator and private plaintiff, advertising that its "Public Client practice is dedicated to supporting public entities in investigations and litigation" and has "the resources and experience in complex litigation and resolutions to assist government lawyers."[14] In the wake of the District Court's holding that Motley Rice is a "public officer" when appointed by state attorneys general but represents "private clients" in its private practice, Joe Rice commented that Motley Rice would "have to make adjustments" to its practice and "discuss it with [its] ethics advisers and . . . with AGs."[15]

Mandamus is also appropriate "to further supervisory and instructional goals, and where issues are unsettled and important." *United States v. Bertoli*, 994 F.2d 1002, 1014 (3d Cir. 1993). Guidance like the Second Circuit provided years ago in *General Motors* is needed here. There, the Second Circuit reversed a district court

[14] *Public Client Litigation Area*, Motley Rice, https://www.motleyrice.com/public-client (last visited Apr. 10, 2024).

[15] Alison Frankel, *Opioids Judge Won't Oust Motley Rice But Casts Cloud Over 'Public Client' Business*, Reuters (Mar. 19, 2024), https://www.reuters.com/legal/government/column-opioids-judge-wont-oust-motley-rice-casts-cloud-over-public-client-2024-03-19/.

and disqualified a plaintiffs' lawyer in a contingency-fee antitrust suit by the City of New York against General Motors because the lawyer had previously investigated GM in similar matters as a DOJ attorney. 501 F.2d at 648–52. Writing for the court, Judge Kaufman rejected the argument that disqualification was unnecessary because the lawyer remained on the same side of the matter: "[T]here lurks great potential for lucrative returns in following into private practice the course already charted with the aid of governmental resources." *Id.* at 650.

Judge Kaufman's wisdom applies with the same force today as it did fifty years ago. Indeed, it underpins Rule 1.11(c). The District Court's decision would confine that wisdom to the dustbin of history. This Court should prevent that result.

## CONCLUSION

The Court should grant the writ and order the District Court to disqualify Motley Rice and its attorneys from participating in any pending or future MDL opioid cases involving OptumRx.

May 7, 2024.

Respectfully submitted,

 */s/ Brian D. Boone*
Brian D. Boone
ALSTON & BIRD LLP
Vantage South End
1120 South Tryon Street, Suite 300
Charlotte, NC 28203
Tel.: (704) 444-1000
brian.boone@alston.com

34

William H. Jordan
D. Andrew Hatchett
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street NW, Suite 4900
Atlanta, GA 30309
Tel.: (404) 881-7000
bill.jordan@alston.com
andrew.hatchett@alston.com

*Attorneys for Petitioner-Defendant*
*OptumRx, Inc.*

## <u>CERTIFICATE OF COMPLIANCE</u>

This petition complies with the type-volume limitations of Fed. R. App. P. 21(d)(1) because it contains fewer than 7,800 words, excluding the accompanying documents required by Rule 21(a)(2)(C).

This petition complies with the requirements of Fed. R. App. P. 32(c)(2) and Fed. R. App. P. 32(a) because it has been prepared using Microsoft Word for Microsoft 365 in Times New Roman, 14-point font.

 

 

       */s/ Brian D. Boone*
       Brian D. Boone

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 7, 2024, the foregoing was filed electronically with the Clerk of Court using the Court's CM/ECF system.

I further certify that on May 7, 2024, a copy of the foregoing was served upon the District Court and on Plaintiffs' Counsel by email. A paper copy will be mailed to the District Court on May 7, 2024.


_/s/ Brian D. Boone_
Brian D. Boone

## DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

| R. No. | Description | PageID# |
|---|---|---|
| R. 71 | Transcript of January 9, 2018 Proceedings | 459–479 |
| R. 854 | Transcript of August 2, 2018 Status Conference Proceedings | 20302–20335 |
| R. 2576 | Discovery Ruling No. 22 | 412968–412971 |
| R. 2590 | Memorandum Opinion Certifying Negotiation Class | 413578–413617 |
| R. 3291 | Order Regarding Requested Modifications to Discovery Ruling No. 22 | 493104–493108 |
| R. 3699 | Order Setting Deadlines Re: Discovery Ruling No. 22 | 510919–510930 |
| R. 5268 | Order Resolving Disputes Regarding Proposed CMO | 625500–625508 |
| R. 5276 | OptumRx, Inc.'s Motion to Disqualify Motley Rice | 625549–625551 |
| R. 5276-1 | Memorandum Supporting OptumRx, Inc.'s Motion to Disqualify Motley Rice | 625552–625577 |
| R. 5276-2 | Declaration of Allison J. Caplis in Support of OptumRx, Inc.'s Motion to Disqualify Motley Rice | 625578–625581 |
| R. 5276-3 | Declaration of Michelle S. Grant in Support of OptumRx, Inc.'s Motion to Disqualify Motley Rice | 625582–625583 |
| R. 5276-4 | Declaration of Matthew P. Hooker in Support of OptumRx, Inc.'s Motion to Disqualify Motley Rice | 625584–625587 |
| R. 5276-5 | Exhibit A to Declaration of Matthew Hooker (Hawaii engagement agreement) | 625588–625625 |
| R. 5276-6 | Exhibit B to Declaration of Matthew Hooker (Hawaii subpoena) | 625626–625641 |
| R. 5276-7 | Exhibit C to Declaration of Matthew Hooker (Hawaii confidentiality agreement) | 625642–625652 |
| R. 5276-8 | Exhibit D to Declaration of Matthew Hooker (June 8, 2022 Hawaii production letter) | 625653–625655 |
| R. 5276-9 | Exhibit E to Declaration of Matthew Hooker (September 1, 2022 Hawaii production letter) | 625656–625658 |

| R. No. | Description | PageID# |
|---|---|---|
| R. 5276-10 | Exhibit F to Declaration of Matthew Hooker (D.C. engagement letter) | 625659–625682 |
| R. 5276-11 | Exhibit G to Declaration of Matthew Hooker (D.C. subpoena) | 625683–625698 |
| R. 5276-12 | Exhibit H to Declaration of Matthew Hooker (D.C. confidentiality agreement) | 625699–625709 |
| R. 5276-13 | Exhibit I to Declaration of Matthew Hooker (July 13, 2021 D.C. production letter) | 625710–625712 |
| R. 5276-14 | Exhibit J to Declaration of Matthew Hooker (September 10, 2021 D.C. production letter) | 625713–625715 |
| R. 5276-15 | Exhibit K to Declaration of Matthew Hooker (November 24, 2021 D.C. production letter) | 625716–625718 |
| R. 5276-16 | Exhibit L to Declaration of Matthew Hooker (Chicago subpoena) | 625719–625732 |
| R. 5276-17 | Exhibit M to Declaration of Matthew Hooker (Chicago confidentiality agreement) | 625733–625742 |
| R. 5276-18 | Exhibit N (Part 1 of 2) to Declaration of Matthew Hooker (Expert Report of Wendy J. Muchman and Sari Montgomery) | 625743–625795 |
| R. 5276-19 | Exhibit N (Part 2 of 2) to Declaration of Matthew Hooker (Expert Report of Wendy J. Muchman and Sari Montgomery) | 625796–625893 |
| R. 5276-20 | Proposed Order Disqualifying Motley Rice | 625894 |
| R. 5288 | Plaintiffs' and PEC's Joint Memorandum of Law in Opposition to OptumRx, Inc.'s Motion to Disqualify Motley Rice | 626063–626084 |
| R. 5288-1 | Exhibit A to Plaintiff's and PEC's Opposition | 626085–626086 |
| R. 5288-2 | Exhibit B to Plaintiff's and PEC's Opposition | 626087–626463 |
| R. 5288-3 | Exhibit C to Plaintiff's and PEC's Opposition | 626464–626666 |
| R. 5288-4 | Exhibit D to Plaintiff's and PEC's Opposition | 626667–626712 |
| R. 5288-5 | Exhibit E to Plaintiff's and PEC's Opposition | 626713–626754 |
| R. 5288-6 | Unsworn Declaration of Elizabeth Paige Boggs | 626755–626761 |
| R. 5300 | Reply Brief Supporting OptumRx, Inc.'s Motion to Disqualify Motley Rice | 628099–628117 |
| R. 5300-1 | Supplemental Declaration of Matthew P. Hooker in Support of OptumRx, Inc.'s Motion to Disqualify Motley Rice | 628118–628130 |

| R. No. | Description | PageID# |
|---|---|---|
| R. 5300-2 | Exhibit A to Supplemental Declaration of Matthew Hooker (Supplemental Expert Report of Wendy J. Muchman and Sari Montgomery) | 628131–628141 |
| R. 5302 | Plaintiffs' and PEC's Joint Notice of Filing Sworn but Otherwise Identical Declaration of Elizabeth Paige Boggs | 628161–628162 |
| R. 5302-1 | Sworn Declaration of Elizabeth Paige Boggs | 628163–628169 |
| R. 5312 | Transcript of February 12, 2024 Motion Hearing Proceedings | 628195–628245 |
| R. 5320 | Plaintiffs' and PEC's Joint Request for Leave to File Sur-Reply and Declarations in Opposition to OptumRx's Motion to Disqualify Motley Rice | 629083–629085 |
| R. 5320-1 | Proposed Plaintiffs' and PEC's Sur-Reply in Opposition to OptumRx's Motion to Disqualify Motley Rice | 629086–629099 |
| R. 5320-2 | Declaration of Wendy J. Weinberg | 629100–629101 |
| R. 5320-3 | Declaration of John H. Price | 629102–629105 |
| R. 5320-4 | Declaration of Stephen J. Kane (with exhibits) | 629106–629124 |
| R. 5320-5 | Expert Declaration of Nathan M. Crystal in Opposition to OptumRx's Motion to Disqualify Motley Rice | 629125–629155 |
| R. 5320-6 | Supplemental Declaration of Elizabeth Paige Boggs (with exhibits) | 629156–629200 |
| R. 5322 | OptumRx, Inc.'s Motion for Reconsideration or, Alternatively, for Leave to File Response to Plaintiffs' and PEC's Sur-Reply | 629322–629331 |
| R. 5322-1 | Exhibit A to OptumRx, Inc.'s Motion for Reconsideration or, Alternatively, for Leave to File Response to Plaintiffs' and PEC's Sur-Reply (February 12, 2024 email from Linda Singer) | 629332–629333 |
| R. 5337 | Transcript of February 28, 2024 Status Conference | 630233–630253 |
| R. 5338 | Plaintiffs' and PEC's Joint Request for Leave to File Supplemental Authority Related to OptumRx's Motion to Disqualify Motley Rice | 630254–630257 |

| R. No. | Description | PageID# |
|---|---|---|
| R. 5338-1 | Exhibit A to Plaintiffs' and PEC's Joint Request for Leave to File Supplemental Authority Related to OptumRx's Motion to Disqualify Motley Rice (Formal Opinion 509 of the American Bar Association Standing Committee on Ethics and Professional Responsibility) | 630258–630268 |
| R. 5339 | OptumRx, Inc.'s Consent Motion for Extension of Time and to Exceed Page Limitations for its Response to Plaintiffs' and PEC's Sur-Reply Regarding OptumRx, Inc.'s Motion to Disqualify Motley Rice | 630269–630272 |
| R. 5341 | Response to Plaintiffs' and PEC's Sur-Reply Regarding OptumRx, Inc.'s Motion to Disqualify Motley Rice | 630278–630301 |
| R. 5341-1 | Second Supplemental Declaration of Matthew P. Hooker Supporting OptumRx, Inc.'s Motion to Disqualify Motley Rice | 630302–630304 |
| R. 5341-2 | Exhibit A to 2nd Supplemental Declaration of Matthew Hooker (Second Supplemental Expert Report of Wendy J. Muchman and Sari Montgomery) | 630305–630326 |
| R. 5341-3 | Supplemental Declaration of Allison J. Caplis Supporting OptumRx, Inc.'s Motion to Disqualify Motley Rice | 630327–630331 |
| R. 5341-4 | Supplemental Declaration of Michelle S. Grant Supporting OptumRx, Inc.'s Motion to Disqualify Motley Rice | 630332–630334 |
| R. 5346-1 | Exhibit 1 to Notice of Filing Redacted Supplemental and Amended Complaints (Plaintiff the City of Rochester, New York's Supplemental and Amended Allegations to be Added to the Verified Complaint and Jury Demand) | 630356–630663 |
| R. 5351 | Express Scripts' Motion for Leave to File Brief Regarding Newly Discovered Evidence in Support of OptumRx's Motion to Disqualify Motley Rice, and to Join OptumRx's Motion | 633073–633074 |

| R. No. | Description | PageID# |
|--------|-------------|---------|
| R. 5351-1 | Express Scripts' Brief Regarding Newly Discovered Evidence in Support of OptumRx's Motion to Disqualify Motley Rice | 633075–633079 |
| R. 5351-2 | Declaration of Sage R. Vanden Heuvel | 633080–633081 |
| R. 5351-3 | Exhibit A to Declaration of Sage R. Vanden Heuvel | 633082–633098 |
| R. 5360 | Plaintiffs' and PEC's Response to Express Scripts' Proposed Brief in Support of OptumRx's Motion to Disqualify Motley Rice | 633120– 633125 |
| R. 5361 | Notice of Filing Exhibit K to Plaintiffs' and PEC's Response to Express Scripts' Proposed Brief in Support of OptumRx's Motion to Disqualify Motley Rice | 633126– 633127 |
| R. 5361-1 | Exhibit K to Plaintiffs' and PEC's Response to Express Scripts' Proposed Brief in Support of OptumRx's Motion to Disqualify Motley Rice | 633128– 633130 |
| R. 5362 | Order Denying OptumRx's Motion to Disqualify Motley Rice | 633131–633159 |

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION** | ) ) ) | **MDL 2804** |
| | ) | **Case No. 1:17-md-2804** |
| **THIS DOCUMENT RELATES TO:** | ) ) | |
| | ) | **Judge Dan Aaron Polster** |
| *All PBM Cases* | ) ) | |
| | ) ) | **ORDER DENYING OPTUMRX'S MOTION TO DISQUALIFY MOTLEY RICE** |

Before the Court is a motion filed by OptumRx, a Pharmacy Benefit Manager ("PBM") defendant, to disqualify plaintiff law firm Motley Rice. Docket no. 5276. The parties provided the Court with numerous briefs on the issue, as well as expert opinions, and the Court held oral argument.[1] Having considered carefully the important issues raised, the Court now concludes the motion must be **DENIED**. The Court's reasoning is set forth below.

---

[1] The parties' submissions include: OptumRx's motion (docket no. 5276); opinions from OptumRx ethics experts Sari W. Montgomery and Wendy J. Muchman (docket no. 5276-18); Motley Rice's response (docket no. 5288); OptumRx's reply (docket no. 5300); supplemental expert opinions from OptumRx's experts (docket no. 5300-2); Motley Rice's surreply (docket no. 5320-1); opinions from Motley Rice ethics expert Nathan M. Crystal (docket no. 5320-5); OptumRx's motion for reconsideration (docket no. 5322); Motley Rice's submission of supplemental authority (docket no. 5338-1); OptumRx's response to the surreply (docket no. 5341); second supplemental expert opinions from OptumRx's experts (docket no. 5341-2); Express Scripts' submission of additional evidence in support of OptumRx's motion; (docket no. 5351); and Motley Rice's response to Express Scripts' submission (docket no. 5360). The Court also received oral argument on the motion. *See* docket no. 5312 (Hrg. Tr.).

Regarding docket no. 5351, although the Court granted leave to file and has considered Express Scripts' new evidence, Express Scripts' request to join OptumRx's disqualification motion is **denied** as untimely. *See* docket no. 5268 at 1 ("If either PBM defendant chooses to file a motion to disqualify plaintiffs' counsel, it must do so no later than 12:00PM on Friday, December 15, 2023."). Express Scripts has possessed for many years the evidence it now cites as the basis for seeking disqualification, and wholly ignores in its motion the Court's three-month-old deadline.

**Factual Background**

On April 8, 2013, long before this Opioid MDL was constituted, the City of Chicago retained Linda Singer, then of the law firm of Cohen Milstein, as "Special Assistant Corporation Counsel . . . to represent it in the investigation and litigation of potential claims regarding fraudulent marketing of opioid drugs" ("Chicago Opioid Investigation"). Surreply Exh. C (docket no 5320-4 at 17).

Four and a half years later, the Judicial Panel on Multidistrict Litigation formed the Opioid MDL on December 5, 2017. On January 4, 2018, the Court appointed Joseph F. ("Joe") Rice, of the law firm Motley Rice, as co-lead counsel for the Plaintiffs' Executive Committee ("PEC"). *See* docket no. 37. OptumRx became a defendant in the opioid litigation three weeks later, on January 25, 2018. *See* docket no. 5196-1 (OptumRx acknowledging that the first opioid lawsuit filed against it was *County of Webb v. Purdue Pharma, L.P.,* case no. 1:18-op-45175). *County of Webb*—which was recently selected as an MDL bellwether case—was transferred into the MDL on February 12, 2018. *See* Conditional Transfer Order Eight (docket no. 126). Brian D. Boone, counsel for OptumRx, noticed his appearance on April 30, 2018. *See* Notice of Appearance (docket no. 350).

On September 6, 2018, the City of Chicago retained Motley Rice as "Special Assistant Corporation Counsel . . . to represent it in the investigation and litigation of potential claims" relating to copay clawbacks. Surreply Exh. A (docket no. 5320-4 at 6). This "Chicago Copay Investigation" was a separate matter from the "Chicago Opioid Investigation" mentioned above.[2] However, at about this time, Ms. Singer transferred from Cohen Milstein to Motley Rice, and

---

[2] The Chicago Opioid Investigation included the opioid-related conduct of many different defendants, including PBMs. The Chicago Copay Investigation related specifically to PBM conduct.

retained her City of Chicago client. Therefore, on September 13, 2018, Motley Rice assumed representation of the City of Chicago in the Chicago Opioid Investigation, as well. *See* Surreply Exh. B (docket no. 5320-4 at 12).

On November 8, 2018, Motley Rice served a subpoena on OptumRx, seeking documents related to the Chicago Copay Investigation. *See* Motion Exh. L (docket no. 5276-16). On February 19, 2019, OptumRx, the City of Chicago, and Motley Rice entered into a confidentiality agreement regarding Investigation documents produced by OptumRx. *See* Motion Exh. M (docket no. 5276-17). The agreement provides, in relevant part:

> All information produced or made available for inspection and copying by [OptumRx], including but not limited to information contained in documents or in correspondence between counsel, will be used solely in furtherance of the Investigation and any subsequent litigation brought by the City of Chicago against [OptumRx] that is directly related to this Investigation and will be used for no other purpose whatsoever without the prior written consent from [OptumRx] or by a court order or other applicable law.

*Id.* at 3.

On December 1, 2020, Motley Rice entered into a contract with Washington D.C. to "assist in the investigation of and possible litigation against Pharmacy Benefits Managers for potential violations of District Law" related to the PBMs' "integral role in setting the prices paid for prescription drugs." Motion Exh. F at 2, 6 (docket no. 5276-10). On December 28, 2020, Motley Rice served a subpoena on OptumRx seeking documents related to that "D.C. Price Investigation." *See* Motion Exh. G (docket no. 5276-11). On July 1, 2021, OptumRx, the District of Columbia, and Motley Rice entered into a confidentiality agreement regarding Investigation documents produced by OptumRx. *See* Motion Exh. H. (docket no. 5276-12). The agreement provides, in relevant part:

> The OAG, OAG outside counsel, and all persons and entities signing a copy of the Addendum agree to use Confidential Information solely in connection with the Investigation and any litigation that may arise therefrom, not to use Confidential

3

> Information in connection with any other matter, and not to disclose any
> Confidential Information to any party or the public, except as provided by this
> Agreement provided that the OAG agree with the designation. OAG outside
> counsel further agrees not to rely on Confidential Material in pursuing information
> or claims in any other matters outside of its representation of the OAG.

*Id.* at 3.

On April 29, 2021, Motley Rice entered into an "Agreement For Special Deputy Attorney General Services" with the State of Hawaii to assist in its investigation into "the billing practices of pharmacy benefits managers," including OptumRx and others, "that provide services" in the State. Motion Exh. A at 2 (docket no. 5276-5). On October 15, 2021, Motley Rice served a subpoena on OptumRx on behalf of the State seeking documents related to that "Hawaii Billing Investigation." *See* Motion Exh. B (docket no. 5276-6). On May 18, 2022, OptumRx, the State of Hawaii, and Motley Rice entered into a confidentiality agreement regarding Investigation documents to be produced by OptumRx. *See* Motion Exh. C. (docket no. 5276-7). The agreement provides, in relevant part:

> The State, the State's outside counsel, and all persons and entities signing a copy
> of the Addendum agree to use Confidential Information solely in connection with
> the Investigation and any litigation that may arise therefrom, not to use Confidential
> Information in connection with any other matter, and not to disclose any
> Confidential Information to any party or the public, except as provided by this
> Agreement, except as required by law or court order. The State's outside counsel
> further agrees not to rely on Confidential Information in pursuing information or
> claims in any other matters outside of its representation of the State.

*Id.* at 3.

Motley Rice asserts that, despite the titles conferred upon it by Chicago, Washington, D.C., and Hawaii in their retainer agreements—such as "Special Assistant Corporation Counsel" and "Special Deputy Attorney General Services"—the agreements are clear that Motley Rice was: (1) an independent contractor, (2) not an agent or employee of the governmental entity, and (3) subject to the governmental entity's control in performing the civil investigation. *See* Surreply at 2

(describing Hawaii agreement). Motley Rice asserts that, "regardless of the label, Motley Rice was retained and acted as *private counsel for a public client*." *Id.* (emphasis in original). But it is clear that, by virtue of these titles and positions, Motley Rice was able to wield some level of **government** authority. It served pre-litigation government investigative subpoenas and received documents in response on behalf of its government clients.

OptumRx now contends that Motley Rice, through its work for the governments of Chicago, Washington D.C., and Hawaii in their separate Investigations, obtained "confidential government information" about OptumRx that could be used to OptumRx's material disadvantage in the Opioid MDL. OptumRx seeks "to disqualify the law firm Motley Rice and its attorneys from participating in any pending or future proceedings involving OptumRx or its parents or affiliates." Motion at 1 (docket no. 5276). OptumRx asserts disqualification is necessary to protect the information it produced to Motley Rice in response to the government subpoenas. As explained below, however, disqualifying Motley Rice will not protect that information, which is otherwise discoverable and which OptumRx should have already produced in the MDL.

**Legal Standard**

This Court has the inherent authority to disqualify counsel in order to preserve the integrity of the adversary process and maintain the respectability of the profession. *See Gordon v. Dadante*, 2009 WL 2732827, at *5 (N.D. Ohio Aug. 26, 2009). The "moving party bears the burden of establishing the need for disqualification." *Id.* (quoting *Nilavar v. Mercy Health Sys.*, 143 F.Supp.2d 909, 912 (S.D. Ohio 2001)).

This MDL Court has previously addressed a motion for disqualification of counsel, and stated as follows:

5

"Motions to disqualify are viewed with 'disfavor' and disqualification is considered a 'drastic measure which courts should hesitate to impose except when absolutely necessary.'" *In re Valley-Vulcan Mold Co.*, 237 B.R. 322, 337 (B.A.P. 6th Cir. 1999), *aff'd*, 5 F. App'x 396 (6th Cir. 2001) (quoting *Alexander v. Primerica Holdings, Inc.*, 822 F.Supp. 1099, 1114 (D.N.J.1993)). "The United States Court of Appeals for the Sixth Circuit now looks to the codified Rules of Professional Conduct for guidance in determining whether an attorney should be disqualified from representing a client based on a conflict of interest." *O'Brien v. Brunner*, No. 2:15-CV-2803, 2016 WL 1059683, at *3 (S.D. Ohio Mar. 17, 2016) (internal quotations omitted). In other words, a Court should not disqualify a party's chosen counsel absent, at the very least, a showing by the movant that the attorney violated an ethics rule. Absent a violation, the appearance of impropriety cannot, by itself, be the sole ground to disqualify an attorney. *See id.* (finding that the appearance of impropriety standard, which still applies to the disqualification of a judicial officer, "does not exist in order to remove a litigant's chosen counsel.").

*In re Nat'l Prescription Opiate Litig.*, 2019 WL 1274555, at *2 (N.D. Ohio Mar. 20, 2019).

"A violation of the Rules of Professional Conduct may, but does not always, require disqualification." *Seaman Corp. v. Zurich Am. Ins. Co.*, 643 F. Supp. 3d 790, 795 (N.D. Ohio 2022) (citing *SST Castings, Inc. v. Amana Appliances, Inc.*, 250 F. Supp. 2d 863, 865 (S.D. Ohio 2002) ("a violation of the rules of professional ethics does not automatically necessitate disqualification of an attorney"), and *Centimark Corp. v. Brown Sprinkler Serv., Inc.*, 620 N.E.2d 134, 137 (11th Dist. 1993) ("a violation of the Code of Professional Responsibility alone should not result in a disqualification, unless disqualification is found to be absolutely necessary")).

"Even though 'motions to disqualify may be legitimate and necessary under certain circumstances,' courts view them 'with extreme caution for they can be misused as techniques of harassment.'" *Id.* (quoting *SST Castings*, 250 F.Supp.2d at 865–66; and citing *Kitchen v. Aristech Chem.*, 769 F.Supp. 254, 256 (S.D. Ohio 1991) (noting that "the ability to deny one's opponent the services of his chosen counsel is a potent weapon")). "Thus, courts are 'sensitive to the competing public interests of requiring professional conduct by an attorney and of permitting a

party to retain counsel of [its] choice.'" *Id.* (quoting *O'Brien*, 2016 WL 1059683, at *2); *see also SST Castings*, 250 F.Supp.2d at 866 (explaining "Ohio courts have held that a litigant's right to 'select counsel of choice should be limited only when representation poses a significant risk of a violation of the Canons of the Code of Professional Responsibility'") (internal quotations omitted).

**Timing**

OptumRx filed its motion to disqualify on December 15, 2023, but the issue was on the Court's radar much earlier. In December of 2022, the Court stated its intention to set PBM bellwether cases. OptumRx wrote a letter to the Court on March 10, 2023, urging the Court to limit the scope of any such case and also arguing that: (1) "the [entire MDL] PEC [made up of 21 law firms] has an intractable conflict that prevents it from spearheading litigation against Express Scripts and OptumRx;" and (2) "[t]he Cicala Law Firm and Motley Rice have irreconcilable ethical conflicts that prevent them from pressing claims against OptumRx." Letter from Brian Boone at 5. OptumRx wrote that it "reserves its right to—and intends to—move to disqualify" all of these law firms. *Id.* at 5, 7.

The Court scheduled a status conference on March 22, 2023 to discuss, among other things, how and when the disqualification issue should be addressed. OptumRx argued that disqualification should only be raised in the context of a specific bellwether case—not in the abstract, or "MDL-wide." Plaintiffs' position was that disqualification should be presented to the Court as quickly as possible, so the parties could select bellwether cases that were not affected by the potential disqualification. OptumRx's position won, and briefing and argument was deferred until after the bellwether cases were selected. OptumRx ultimately filed its motion seeking disqualification only of Motley Rice, and not of any of the other law firms mentioned in its letter.

The Court now notes that none of the four PBM bellwether cases come from Motley Rice's inventory.[3] It is unclear, then, why OptumRx believed it needed to wait to file its disqualification motion, if it always intended to move to disqualify Motley Rice as MDL co-lead counsel for all PBM cases, and even though Motley Rice is not named counsel for any bellwether PBM plaintiff.

If OptumRx always intended to move to disqualify Motley Rice as MDL co-lead counsel, then the Court finds the timing of OptumRx's motion somewhat troubling. OptumRx notes it filed its motion "at the earliest possible time *in the bellwether litigations*." Motion at 4 n.3 (emphasis added). That is true. In the March 22, 2023 status conference, the Court agreed with OptumRx and expressly deferred considering, in any way, OptumRx's potential disqualification motion outside the context of a specific bellwether case, which had at that time not yet been selected. However, OptumRx does not explain its failure to raise the issue prior to March of 2023.[4]

And OptumRx certainly knew how to timely raise the issue; indeed, it acted much more quickly in a virtually identical context in other litigation. Specifically, in June of 2022, OptumRx received an investigative subpoena from the Illinois Attorney General ("AG") seeking information about insulin pricing. *See* Mar. 10, 2023 Letter from Brian Boone, Exh. 1 at 3.[5] The Illinois

---

[3] The four PBM bellwether cases, listed here, show plaintiffs are represented by a combination of eight different private law firms (including four PEC firms and the Cicala firm); but none of those firms are Motley Rice: (1) *City of Rochester, NY v. Purdue Pharma, L.P.*, case no. 19-op-45853 ("Track 12"), (2) *Lincoln County, MO v. Richard Sackler, M.D.*, case no. 20-op-45069 ("Track 13"); *City of Independence, MO v. Williams*, case no. 19-op-45371 ("Track 14"); and *County of Webb, TX v. Purdue Pharma, L.P.*, case no. 18-op-45175 ("Track 15"). Motley Rice does represent other plaintiffs against OptumRx, *see, e.g., County of Summit, Ohio v. Express Scripts, Inc.*, case no. 23-op-45001. But OptumRx is not asking for disqualification of Motley Rice only in those PBM cases where it represents the plaintiff; it seeks disqualification of Motley Rice in its role as MDL co-lead counsel, an issue that could have been teed up at least a year ago and possibly over four years ago.

[4] As explained further below, the Court is not concerned with the time between: (1) when OptumRx first raised the issue with the Court (March 2023), and (2) when the motion was filed (December 2023). The Court is aware it permitted OptumRx to defer filing its motion until bellwether cases were selected. The Court is concerned, however, about the five-year period between: (1) when OptumRx first became aware of the potential conflict (February 2018), and (2) when it first raised the issue with the Court (March 2023).

[5] This Exhibit 1 is a memorandum filed by OptumRx in support of disqualification of (among others) lawyers from the Cicala Law Firm in Illinois state court litigation.

subpoena directed OptumRx to produce documents to a lawyer whom OptumRx believed had virtually identical conflicts to those it now asserts against Motley Rice in the present motion. *Id.* After receiving the subpoena—but before responding to it—OptumRx alerted the Illinois AG to the potential conflicts. *Id.* at 6. No informal resolution was reached on the issue, so the Illinois AG filed a petition for enforcement of the subpoena. *Id.* OptumRx then moved to disqualify the allegedly conflicted lawyers from enforcing the subpoena. *Id.* To repeat, OptumRx moved for disqualification ***before it even responded to the subpoena***. The Illinois AG voluntarily dismissed the petition, mooting the issue. *See People v. OptumRx, Inc.*, Dec. 15, 2022 Dismissal Order; *see also* Mar. 10, 2023 Ltr. at 6.

In this case, OptumRx became aware that Joe Rice and his firm, Motley Rice, had been designated co-lead counsel at least as early as February 12, 2018, when the first case against OptumRx was transferred into the MDL. OptumRx was also undoubtedly aware that Motley Rice was a part of the MDL PEC when OptumRx's counsel sat across the table from Joe Rice during several negotiations held before this Court on December 5, 2018, February 13, 2019, and June 18, 2019.[6] As noted above, these Opioid MDL meetings were occurring at the same time that OptumRx received the subpoena in the Chicago Copay Investigation (November 18, 2018) and negotiated its confidentiality agreement (February 19, 2019).

Nothing before this Court suggests OptumRx even attempted to oppose Motley Rice being retained as outside counsel for the Chicago, Washington D.C., or Hawaii Investigations mentioned above, or to challenge the subpoenas issued by Motley Rice on those governmental entities' behalf—as it did for the substantively identical Illinois AG investigation. Instead, OptumRx

---

[6] These negotiations resulted in the PBMs agreeing to voluntarily offer formularies that complied with the 2016 guidelines promulgated by the Centers for Disease Control and Prevention ("CDC") for prescribing opioids for chronic pain. *See* docket no. 1848.

9

produced documents in response to those investigations. Indeed, not only did OptumRx ***not*** raise potential conflicts with the governments of Chicago, Washington D.C., or Hawaii, it also did not raise potential conflicts with this Court until March 2023—more than four years after it could have raised its concerns, and then only after the Court had turned its focus to resolving claims made against the PBMs.[7]

Because of the gravity and import of OptumRx's motion against Motley Rice, the Court addresses below in full the merits of OptumRx's assertions. However, given that disqualification is a "potent weapon" that can be deployed strategically, and in light of the timeline described above, the Court examines the motion with "extreme caution." *See SST Castings*, 250 F. Supp. 2d at 865–66 (motions to disqualify counsel "should be viewed with extreme caution for they can be misused as techniques of harassment.") (quoting *Freeman v. Chicago Musical Instrument Co.*, 689 F.2d 715, 722 (7th Cir.1982)). Ohio Rule of Professional Conduct 1.11, upon which OptumRx bases its present motion, requires a balancing of interests, and the timing of OptumRx's motion weighs on that balance.

**Analysis**

OptumRx moves to disqualify Motley Rice under Ohio Rule of Professional Conduct 1.11(c). This Rule provides:

> Except as law may otherwise expressly permit, a lawyer having information that the lawyer ***knows*** is confidential government information about a person acquired when the lawyer was a public officer or employee, may not represent a private client

---

[7] The Court notes that the other PBM defendant in the PBM bellwether cases, Express Scripts, was identically situated to OptumRx throughout all of these background events, but did not file its own disqualification motion at all. Express Scripts did seek to join OptumRx's Motion very late in the briefing, but this request is denied. *See* footnote 1.

whose interests are adverse to that person in a matter in which the information could be used to the material disadvantage of that person.

Ohio R. Prof. Conduct 1.11(c) (emphasis in original). Rule 1.11 "represents a balancing of interests" between: (a) the government's ability to obtain representation from qualified attorneys, while (b) mitigating the risk that a lawyer could abuse governmental authority such that "unfair advantage could accrue to [another] client by reason of access to confidential government information about the client's adversary obtainable *only* through the lawyer's government service." Ohio R. Prof. Conduct 1.11, Cmt. 4 (emphasis added). If the rule is interpreted too broadly, it could discourage qualified lawyers from entering government service. If interpreted too narrowly, it could incentivize abuses of governmental power and erode public trust in the government.

The Court examines below whether and how this Rule applies in the circumstances of this case. In particular, the Court addresses: (a) whether Motley Rice was a "public officer or employee" when it helped Chicago, Washington D.C., and Hawaii with their Investigations; (b) whether Motley Rice obtained "confidential government information" about OptumRx through those Investigations; and (c) whether Motley Rice could use any such information to the "material disadvantage" of OptumRx.

### A.    Public Officer or Employee

The parties dispute whether Motley Rice was a "public officer or employee" when it was retained by the governments of Chicago, Washington D.C., and Hawaii to conduct investigations into OptumRx. The parties also dispute whether the public-entity clients Motley Rice represents in the MDL are "private clients" for the purposes of Rule 1.11(c). The Court agrees with OptumRx on both points.

11

Motley Rice argues it was not an agent or employee of any of the three governments, while conducting their respective Investigations, because the retainer agreements it entered with those entities state it was an independent contractor, subject to the governmental entity's control. *See* Surreply at 2 (describing Hawaii agreement). In support, Motley Rice identifies specific language in its retainer agreement with Hawaii: "[Motley Rice attorneys] are not by reason of this Agreement, agents or employees of the State for any purpose." *Id.*

This argument elevates form over substance, glossing over the role Motley Rice really played and the powers it deployed. The language of the retainer agreement cannot change what Motley Rice actually did. The unavoidable fact is that, when Motley Rice **served government subpoenas** and received documents in response—even if it was acting on behalf of those governmental entities under a contingent fee, independent contractor agreement—it had been granted authority to wield the power of the government. In that way, Motley Rice was acting as a public officer. Whether Motley Rice was technically a public officer or employee, under the strict legal definition used by the hiring governmental entity or the terms of its contract, cannot alter the reality that Motley Rice gained access to information **pursuant to governmental authority**. Thus, the Court agrees with OptumRx that Motley Rice was acting as a public officer or employee.

Motley Rice further asserts its MDL clients, like Summit County, are public government entities, and therefore not "private clients." Motley Rice is wrong. Motley Rice's MDL clients are both public government entities **and** private clients. Comment 4 to Rule 1.11 is clear that whether a client is a public or private **entity** is immaterial to whether it is a private **client**. The Comment states that, "where the successive clients are a government agency and another client, **public or private**, the risk exists that power or discretion vested in that agency might be used for the special benefit of the other client." Ohio R. Prof. Conduct 1.11, Cmt. 4 (emphasis added). In other words,

a public entity may be a law firm's private client. Further, ABA Formal Opinion 509, which discusses Rule 1.11, is clear that the dispositive question in determining whether a client is a "private client" is the client's entitlement, *vel non*, to use confidential government information the client's lawyer obtained elsewhere:

> [T]here is no less need to protect against the misuse of confidential government information on behalf of a public entity that differs from the one to whom the information belongs and that is not entitled to use the information.
>
> Accordingly, a lawyer who served as a public officer or employee, and who obtained confidential government information about a person while working for the government, would be subject to the Rule when the lawyer, in private employment, represents **any client** that is not entitled to use the information.

ABA Opinion at 9 (emphasis added) (docket no. 5338-1).

Put simply, Motley Rice represents public government entities in this MDL in its private practice. The Rule is concerned with (for example) Motley Rice misusing confidential information it obtained during its Chicago Copay Investigation on behalf of its MDL client, Summit County. Summit County is a public entity, but it is a "private client" for the purpose of the Rule.[8] And because Summit County is not Chicago, it is normally not entitled to benefit from confidential information Chicago's lawyers gained during official pursuit of their Chicago Investigation, even though Summit County and Chicago are both public entities.[9]

---

[8] The Court understands that one of the dual purposes of Rule 1.11 is to ensure governments can retain qualified legal representation. The Court further recognizes that a broad ruling—that the types of representations engaged in by Motley Rice's Public Client practice constitute public employment—will impose some deterrence against this type of public service. The Court concludes, however, that the appropriate balance is still maintained. Lawyers wishing to enter this type of quasi-governmental arrangement and use governmental authority will have to be circumspect with how they wield that power and the conflicts such power might create. And, as described in the sections that follow, the Court takes a narrower view of the remaining issues.

[9] As explained below, however, under the unique facts of this case, the Court's "MDL Repository Orders" created a mechanism that provided all MDL plaintiffs, including Summit County, access to "documents previously produced pursuant to any civil investigation" that are "relevant to the claims in this MDL proceeding." CMO-1 at 15 (¶ 9.k.ii.).

The two roles Motley Rice has played for Chicago—public "Special Assistant Corporation Counsel" and also private MDL Counsel—are overlapping but different. The Court is very uncomfortable with the malleability of this quasi-government-employment configuration. With this arrangement, Motley Rice attempts to act simultaneously as a public employee and not a public employee, as fits its need. If private outside counsel, like Motley Rice, intends to enter agreements where it has the power to wield (and potentially abuse) government power, then it needs to adhere to all the same rules to which government lawyers are subject. Motley Rice and all other law firms should carefully take this into account going forward.

All of that said, the Court concludes that disqualification of Motley Rice is unnecessary and inappropriate in the circumstances of this case, for the reasons discussed below.

### B.     Confidential Government Information

A lawyer is in breach of Rule 1.11(c) only if the "lawyer ha[s] information that the lawyer **knows** is confidential government information." Ohio R. Prof. Conduct 1.11(c) (emphasis in original). The Rule defines "confidential government information" as "information that has been obtained under governmental authority and that, at the time this rule is applied, the government is prohibited by law from disclosing to the public or has a legal privilege not to disclose and that is not otherwise available to the public." *Id.*

ABA Formal Opinion 509 sheds some light on what it means for information to be "not otherwise available to the public." As an initial matter, "Rule 1.11(c) does not apply to all information obtained under government authority." ABA Opinion at 4. Rather, "[w]hether government information is publicly available—*e.g.*, whether it can be obtained through **routine discovery**—will be a question of fact." *Id.* (emphasis added).

14

OptumRx's experts define "routine discovery" to exclude all the documents OptumRx produced in response to the government Investigation subpoenas. These experts assert that "[t]he plain language meaning of 'routine' is 'unremarkable' or 'conventional.' Routine discovery does not include information subject to a protective order, such as proprietary or trade secret information, nor does it include information produced pursuant to Confidentiality Agreements signed by government lawyers." Second supp. report at 5 (docket no. 5341-2).

But these experts provide no support for the proposition that "routine discovery" does not or cannot encompass confidential information produced under a protective order. In fact, in this Court's experience, production of confidential information under a protective order happens in more civil cases than not—it is routine. Perhaps recognizing the weakness of their definition, the experts add the word "nonconfidential" to the ABA Opinion's plain text. *See id.* at 7 ("the fact that the PEC may request in discovery the same information OptumRx produced in the government investigations does not automatically transform OptumRx's confidential information into ***nonconfidential* routine discovery**.") (emphasis added).

The Court rejects the experts' unsupported definition. To the contrary, Federal Rule of Civil Procedure 26(b)(1) defines "the scope of discovery" that is allowed in every case, which is the most natural understanding of "routine discovery." In other words, discovery that is within the normal scope set forth in Rule 26 is "routine discovery;" and discovery that is beyond the normal scope of the Rule is not "routine discovery." With that understanding, Rule 26(b)(1) defines the routine scope of discovery in civil litigation as follows:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the

15

importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

Fed. R. Civ. P. 26(b)(1).

Rule 26 only **prevents** discovery of information that is privileged or subject to protection as trial-preparation material. *See, e.g.,* Fed. R. Civ. P. 26(b)(3)(A) ("Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative"); 26(b)(4)(B-D) (precluding discovery of certain materials related to experts). Rule 26 also **limits** discovery in several ways, but those limits may be overcome in certain non-routine circumstances, pursuant to judicial discretion.

Notably, confidential information is not among the limitations to the Rule. Instead, Rule 26 provides a mechanism for the Court to protect a party's trade secret or other confidential information that is otherwise subject to routine discovery. *See* Fed. R. Civ. P. 26(c)(1)(G) ("A party or any person from whom discovery is sought may move for a protective order. . . . The court may, for good cause, issue an order . . . requiring that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specified way."). It is clear, therefore, that information considered confidential by a party is nonetheless subject to "routine" discovery and may be protected, as required, by party agreement or at the Court's discretion, pursuant to Rule 26(c). A protective order or confidentiality agreement does not make discovery non-routine, it just protects the information from public view until the information becomes part of a trial record. Moreover, it is common knowledge that information produced in discovery and marked by the owner as "confidential" often is not. *See, e.g., In re Nat'l Prescription Opiate Litig.*, 927 F.3d 919 (6th Cir. 2019) (ruling that great swaths of information marked confidential by defendants must be unredacted and removed from under seal). Whether an attorney

is in breach of Rule 1.11(c) cannot depend simply on whether they received information *marked* as confidential; it must actually *be* "confidential government information."

In conformity with this analysis, at least one Federal District Court has concluded that responses to a state civil investigation demand ("CID") are subject to compulsory discovery, concluding: "the CID materials at issue in the instant case were 'otherwise available' within the meaning of rule 1.11(e) and . . . the materials therefore do not constitute confidential information for purposes of rule 1.11(b)." *Davis v. S. Bell Tel. & Tel. Co.*, 149 F.R.D. 666, 674 (S.D. Fla. 1993).

The new evidence submitted by Express Scripts also supports the Court's analysis. Express Scripts identifies "a document subpoena served on Express Scripts by the City of Chicago on November 25, 2013, in the matter of *In re Chronic Opioid Therapy Marketing Practices*." Express Scripts Motion at 2 (docket no. 5351-1). The subpoena was served on behalf of Chicago by Linda Singer, appointed as Special Assistant Corporation counsel for the City. "Express Scripts collected and produced confidential documents and information to Ms. Singer in response to this Subpoena. These documents were designated 'Confidential' and included contracts with Purdue and meeting minutes for Express Scripts' Pharmacy & Therapeutics Committee relating to prescription opioids." *Id.* at 2–3.

On April 11, 2018, this Court ordered that all documents previously produced in *City of Chicago v. Purdue Pharma L.P.*, Case No. 14-CV-04361 (N.D. Ill.) "shall be deemed produced to all Plaintiffs in MDL 2804 and shall be made immediately available to the PEC by any parties or counsel in possession of same." CMO-1 at 15 (¶ 9.k.i.) (docket no. 232). The City of Chicago produced the subpoenaed Express Scripts documents into the MDL Repository on June 8, 2018. *See* Opposition to Express Scripts Motion at 2 (docket no. 5360). Neither Express Scripts nor the

City of Chicago objected to the subpoenaed documents being produced into the MDL. The Court can only conclude that neither party believed those documents contained any "confidential government information," even though they were marked "confidential."

In contrast, governments can and do obtain information that is certainly *not* routinely discoverable. "This includes information obtained pursuant to a grand jury subpoena, a search warrant, a regulatory subpoena, or other government power." ABA Opinion at 4; *cf. Davis*, 149 F.R.D. at 674-75 (suggesting that, if the State of Florida's hired outside counsel had seen grand jury materials, disqualification might have been appropriate, but there was no evidence this had occurred). Motley Rice's expert also identifies other types of government information not routinely discoverable under the federal rules: "information obtained by government lawyers in criminal investigations, . . . grand jury proceedings, . . . national security information, . . . [and] information obtained . . . through informal contacts." Crystal Rpt. at 11. Further, governments maintain information that is subject to a recognized legal privilege, such as the attorney-client privilege or the work product doctrine, that is not routinely discoverable.

The Court cannot conclude that the subject of a government investigation can turn all its business information produced in response to a CID into "confidential government information" simply by designating it as confidential when they produce it. This is why the ABA Opinion explains that "[w]hether government information is publicly available—*e.g.*, whether it can be obtained through routine discovery—*will be a question of fact*." ABA Opinion at 4 (emphasis added).

Here, OptumRx asserts (or at least strongly implies) that *all* the information Motley Rice gathered under government subpoena qualifies as confidential government information. *See* Motion at 13. OptumRx paints with a broad brush and fails to distinguish between documents it

18

would produce in routine discovery (perhaps covered by a protective order) and other information that might legitimately be deemed true, confidential government information. On the facts presented, OptumRx fails to show Motley Rice obtained confidential government information, and therefore OptumRx fails to meet the "heavy burden" and "high standard of proof" required to disqualify counsel. *See In re Valley-Vulcan*, 237 B.R. at 337 ("[T]he party seeking disqualification must carry a 'heavy burden' and must meet a 'high standard of proof' before a lawyer is disqualified," because "[a]lthough a party has no right to specific counsel, 'a party's choice of counsel is entitled to substantial deference.'") (citations omitted).

### C.    Material Disadvantage

Motley Rice asserts its work on the Chicago, Washington D.C., and Hawaii Investigations cannot and did not cause any prejudice to OptumRx because, at all times, once OptumRx produced its responsive Investigation documents to Motley Rice, it was required to also produce the same documents into the MDL—thereby making those documents available to all plaintiffs' counsel. Thus, Motley Rice cannot now use any of the information it obtained from OptumRx during the Investigations to the material disadvantage of OptumRx; the information is (or should be) already known by other plaintiff firms.

The Court agrees.  To explain why, the Court sets forth the following chronicle.

### 1.    MDL Discovery Repository

The Opioid MDL is one of the most complicated collections of cases in history.  *See* Sara Randazzo, *Opioid-Addiction Litigation Heads to Complex Trial*, Wall Street Journal (Oct. 20, 2019) (the first Opioid MDL trial "is part of what has been called the largest and most complex

civil case in the nation's history"). Litigation in the MDL has been proceeding for over six years, and the Court has set forth important procedures to promote the coordination and consolidation of these knotty cases. These procedures place obligations on all parties in the MDL—both plaintiffs and defendants. For example, plaintiffs must submit fact sheets, and have had their cases dismissed with prejudice for failing to do so. *See* docket nos. 4985, 4986, and 5340. Defendants also have obligations. One of the longest-running and broadest is a standing obligation to produce documents and other discovery into the MDL Discovery Repository.

Specifically, on April 11, 2018, this Court entered its very first case management order ("CMO-1"). Docket no. 232. In CMO-1, the Court created the framework for what would come to be called the MDL Discovery Repository (or "MDL Repository"). The Court set forth a broad directive that "***all Defendants*** shall review documents previously produced pursuant to ***any*** civil investigation, litigation, and/or administrative action by federal (including Congressional), state, or local government entities involving the marketing or distribution of opioids and shall produce to the [MDL Repository] non-privileged documents ***relevant to the claims in this MDL proceeding***." CMO-1 at 15 (¶ 9.k.ii.) (emphasis added). CMO-1 applied (and continues to apply) to "all cases;" thus, its requirements unambiguously obligate OptumRx.

During the years following issuance of CMO-1, in a series of orders and discovery rulings,[10] the Court clarified and expanded the scope of the MDL Repository requirement. First, Special Master Cohen clarified that the MDL Repository obligation was intended to be ***comprehensive***. *See* Discovery Ruling No. 2 ("DR-2") at 6 (docket no. 693) ("The [] language in CMO-1 was meant to be comprehensive."). Although DR-2 allowed that "defendants need not

---

[10] Formal discovery rulings made by the Special Master are deemed orders of the Court. *See* docket no. 69 at 4–5 ("Absent timely objection, the orders, findings, reports, rulings, and recommendations of the Special Masters shall be deemed approved, accepted, and ordered by the Court, unless the Court explicitly provides otherwise.").

produce discovery of prior productions made in cases, such as patent litigation, that only tangentially address[] marketing and distribution of opioids," the Ruling made clear that, "[i]f a defendant produced discovery in *any* prior litigation that involved the marketing or distribution of opioids, that discovery must be produced in the MDL." *Id.* at 6 (emphasis in original).

The Special Master went on to order "*every* defendant to produce to plaintiffs . . . a list of *every* prior production in *any* earlier litigation, investigation, or administrative action that *touches upon* the marketing or distribution of opioids, *without exception*." *Id.* at 7 (emphasis in original).[11]

Later, Special Master Cohen issued Discovery Ruling No. 22 ("DR-22"). Docket no. 2576. In DR-22, the Special Master ruled that the obligation of all defendants to produce documents into the MDL Repository is *"ongoing"*—it was not limited only to documents previously produced as of the date of CMO-1.[12] *See id.* at 4. DR-22 also extended the obligation beyond only "marketing or distribution of opioids," stating the requirement applied as well to information "regarding the marketing, sales, distribution, or dispensing of Opioids or Opioid Products." *Id.*

After DR-22 expanded and clarified the MDL Repository obligation, the United States Department of Justice ("DOJ") sought an amendment to clarify that the broad scope of the requirements did not apply to pending or ongoing federal government investigations, or non-public federal government hearings. Agreeing with the DOJ, the Special Master amended DR-22 to carve out those two specific circumstances related to the *federal* government. *See* docket no. 2712. Notably, the DR-22 amendment expressly did not carve out any state or local government

---

[11] Special Master Cohen later amended DR-2 on other grounds. *See* Discovery Ruling Three (docket no. 762). Objections to the two discovery rulings were deemed moot or otherwise overruled by the Court. *See* docket no. 868.

[12] In DR-22, the Special Master also more explicitly defined the types and categories of documents that must be produced into the MDL Repository. For example, CMO-1 required production of "documents previously produced pursuant to any civil investigation, litigation, and/or administrative action by federal (including Congressional), state, or local government entities." CMO-1 at 15. DR-22 expanded that to include production of "all sworn statements, testimony, video-taped testimony, written responses and discovery, expert reports, and other documents and discovery that [a defendant] produce[s] in any court case, government investigation, or government hearing." DR-22 at 4.

investigations. *See id.* at 2 n.1 ("No State Attorney General has asked to limit production in the MDL of discovery provided by Defendants responsive to CIDs; moreover, defendants have, in fact, produced such discovery in the MDL."). Further, the Special Master added additional provisions to the basic MDL Repository obligation, including the following:

> Nothing in this Order shall preclude Plaintiffs from requesting from Defendants any document that they produce or disclose in any criminal or civil action filed by a governmental entity, even if the same document was previously provided by the Defendant to the government entity during the course of a government investigation.

*Id.* at 3. This provision made clear that production of documents in response to a government investigation does not inoculate those documents from routine discovery.

Finally, the Special Master reemphasized what was first stated in CMO-1: the obligations imposed by the MDL Repository orders extend to any discovery "relevant to the claims in this MDL proceeding." *Id.* at 2; CMO-1 at 15. Thus, to the extent the claims in the MDL have evolved, so too have the defendants' obligations related to the MDL Repository.

DR-22 and its DOJ amendment nominally applied only to "Track Two Cases," which created confusion among MDL defendants regarding the reach of the rulings' applicability to other bellwether tracks or cases. To alleviate the confusion, the Court clarified that "Discovery Ruling No. 22 **shall** apply to **all** defendants in **all** MDL cases." Docket no. 3178 at 2 (emphasis added).[13]

---

[13] There is no question that the Court has the authority under the MDL Statute to create broadly applicable discovery rulings to "promote the just and efficient conduct of such actions." 28 U.S.C. § 1407. *See also In re Nat'l Prescription Opiate Litig.*, 956 F.3d 838, 841 (6th Cir. 2020) ("An MDL court has broad discretion to create efficiencies and avoid duplication—of both effort and expenditure—across cases within the MDL."); *In re Korean Air Lines Co., Ltd.*, 642 F.3d 685, 700 (9th Cir. 2011) ("In discretionary matters going to the phasing, timing, and coordination of the cases, the power of the MDL court is at its peak.").

The caption of Court's MDL Repository Order, docket no. 3178, unfortunately contained a typo, indicating that—despite the plain text of the order itself—it was only applicable to "Track One-B Cases" rather than "All Cases." This typo was identified and corrected in the Special Master's order refusing to vacate DR-22. *See* docket no. 3291 at 1 n.2. The Court later overruled an objection by the pharmacy defendants and upheld the Special Master's order declining to vacate DR-22. *See* docket no. 3333.

Finally, in a ruling on a motion to compel discovery and for sanctions, the Special Master clarified, yet again, that the scope of the discovery obligation under CMO-1 and DR-22 encompasses *any* litigation where a defendants' conduct at issue, and the documents produced therein, relate to the opioid-related claims in the MDL.[14] *See* docket no. 3700 at 5–8 (finding "not even colorable" defendant's argument that shareholder lawsuits regarding "potential governance failures and/or potential corporate mismanagement" premised upon the failure "to flag and stop the diversion of opioid prescriptions" did not relate to claims in the MDL).

As noted earlier, OptumRx has been a defendant in this MDL since February 12, 2018. Thus, all of the Repository Orders[15] discussed above have long imposed their obligations on OptumRx (and also Express Scripts and every other defendant).

### 2. OptumRx's MDL Repository Obligation

OptumRx asserts that, if the MDL Repository obligation applies to any document produced in any litigation, investigation, or public hearing that is relevant to the claims in this MDL proceeding, then it would "effectively require defendants to review every document they have ever produced in any legal proceeding to assess its potential relevance to this case." Response to Surreply at 12. That is basically correct. This ongoing requirement has applied to all MDL defendants for years, and as far as the Court knows, all other defendants have met it (although

---

[14] Certain defendants also challenged the scope of DR-22 when they argued they should not be required to produce to the MDL Repository discovery produced in non-MDL litigation in non-bellwether states. The Court rejected this narrow reading of DR-22, as well. *See* docket no. 3667, *objection overruled and SM ruling affirmed* docket no. 3711.

[15] The following documents thus comprise the "Repository Orders": CMO-1 (docket no. 232); DR-2 (docket no. 698); DR-3 (docket no. 762); DR-22 (docket no. 2576); DOJ Amendment to DR-22 (docket no. 2712); Repository Order (docket no. 3178); *Nunc Pro Tunc* Modification to DR-22 (docket no. 3291), *affirmed-in-part and reversed-in-part* (docket no. 3333); FL Dispensing Data Order (docket no. 3667), *affirmed* (docket no 3711); and Sanctions Order (docket no. 3700).

sometimes after objection). The requirement is authorized by the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 26(e)(1)(B) ("A party who has made a disclosure under Rule 26(a)—or who has responded to an interrogatory, request for production, or request for admission—must supplement or correct its disclosure or response . . . as ordered by the Court.").

Thus, since the inception of this MDL, OptumRx has been obligated to "review documents previously produced . . . involving the marketing or distribution or opioids." CMO-1 at 15. It has been obligated to produce to plaintiffs a list of *every* prior production that "touches upon the marketing or distribution of opioids." DR-2 at 7 (emphasis added). And it has been required to examine *all* non-MDL discovery productions to determine whether they: (1) "only tangentially address[] marketing and distribution of opioids," and so need not be re-produced into the MDL, *see* DR-2 at 6; or instead (2) "relate to core issues in this MDL," or are "relevant to the claims in this MDL proceeding," and so must be re-produced into the MDL, *see* Sanctions Order at 6 and CMO-1 at 15. Finally, OptumRx is required not to read its obligations narrowly, but instead deem them "comprehensive." *See* DR-2 at 6.

Here, OptumRx concedes that the prior productions it made in response to the Chicago, Washington D.C., and Hawaii Investigations relate to core issues in this MDL, and are relevant to claims in this MDL proceeding. *See* Motion at 5 ("The production contained OptumRx's confidential internal documents, ***including documents relating to opioid*** and non-opioid medications, covering wide swaths of OptumRx's business operations.") (emphasis added); Reply at 2 ("the subpoenaed information ***does include thousands of pages of material about opioids*** and opioid manufacturers.") (emphasis added). OptumRx ***may*** have been able to argue, at the time it responded to the Investigations, that its productions only tangentially addressed opioids and so need not be re-produced into the MDL pursuant to the MDL Repository Orders. But, given the

concessions above, that position is no longer tenable. Those prior productions are plainly relevant to the claims in this MDL proceeding and must be re-produced into the MDL Repository in their entirety. Indeed, regardless of what OptumRx believed about the substance of those investigations, their existence should have been provided to Plaintiffs pursuant to DR-2 and DR-22, since they at least "touched upon" the marketing or distribution of opioids. *See* DR-2 at 7 ("The Special Master now **ORDERS** *every* defendant to produce to plaintiffs, on or before July 10, 2018, a list of *every* prior production in *any* earlier litigation, investigation, or administrative action that touches upon the marketing or distribution of opioids, *without exception*.") (emphasis in original); DR-22 at 4 (stating the obligations were "ongoing"). At that time, Plaintiffs could have litigated whether the productions were tangential to or relevant to their opioid claims in the MDL. OptumRx's failure to comply with DR-2 deprived Plaintiffs of that opportunity.

Because OptumRx now *knows* (and has for some time) that the documents it produced in the government Investigations relate to the claims in this MDL, they are and have been required to re-produce them into the MDL, pursuant to the Court's Repository Orders. (The same is true for Express Scripts.)  And as explained below, because OptumRx should have already produced those documents into the MDL, thereby making them available for all plaintiffs, there can be no material disadvantage to OptumRx arising from Motley Rice's service as MDL co-lead counsel.

### 3.      Material Disadvantage

To be plain: OptumRx is required (and has been required) to re-produce into the MDL Repository the documents it produced in response to the subpoenas issued in the Chicago Copay Investigation, the D.C. Price Investigation, and the Hawaii Billing Investigation.

OptumRx asserts that the confidentiality agreements Motley Rice entered into on behalf of its government clients prevent the use of those documents in other matters, including the Opioid MDL. But the confidentiality agreements neither convert OptumRx's confidential documents into confidential government information (as described above), nor prevent their use in the Opioid MDL. The Chicago and Hawaii confidentiality agreements each contain language expressly permitting the documents' use pursuant to a court order. *See* Motion Exh. M (docket no. 5276-17 at 3) ("information "will be used for no other purpose whatsoever without . . . a court order"); Motion Exh. C. (docket no. 5276-7 at 3) (parties agree "not to disclose any Confidential Information . . . except as required by . . . court order").

The D.C. Price Investigation confidentiality agreement does not contain the "court order" exception. But the parties' briefs show the documents OptumRx produced to Washington, D.C. were the same documents it produced to Hawaii. *See* Response at 4 ("Optum also produced the same documents concerning insulin pricing [to D.C.] that it previously had produced to the Minnesota Attorney General, and later produced to Hawaii") (citations omitted); Response to Surreply at 13 (discussing "the Minnesota Attorney General documents (that were produced to Hawaii and D.C. subject to confidentiality provisions)").

The MDL Repository Orders require OptumRx to produce the Investigation documents in the MDL, where all other plaintiffs' attorneys can use them. It is obvious that Motley Rice's possession and knowledge of the Investigation documents cannot, by itself, cause a material disadvantage to OptumRx, when every other plaintiff's attorney also has them. No further analysis is necessary.[16]

---

[16] OptumRx's experts miss the import of DR-22. They state that "Plaintiffs' argument that DR-22 requires Defendants to produce documents previously produced pursuant to government subpoena is *inaccurate*." 1st Supplemental Rpt. at 8 (emphasis added). In fact, that is precisely what DR-22 requires defendants to do. The experts also opine that "confidential government information produced under DR-22 does not lose its status as confidential—

26

## D.    The Court's Prior Ruling

OptumRx notes that this Court earlier entered an order disqualifying a defense attorney pursuant to Rule 1.11(c). OptumRx argues that the same logic the Court used then, requires disqualification of Motley Rice now. Before concluding, the Court explains why this is incorrect.

In the earlier situation, a former U.S. Attorney, while still in her position with the government, worked closely with the Track One bellwether plaintiffs on an opioid task force, the entire goal of which was to *prevent* diversion of opioids. In task force meetings, the plaintiffs voluntarily and informally shared nonpublic government information with the U.S. Attorney. After leaving the U.S. Attorney's Office, the lawyer took a position in private practice representing one of the Track One bellwether defendants, which was accused of *promoting* diversion of opioids.

There are significant factual differences between the prior situation and the present one. First, although the Court did not disqualify the former U.S. Attorney under Rule 1.11(a)—which prevents a government lawyer from "switching sides" in the same matter—there was enough of a concern about "side switching" that it was the primary basis on which plaintiffs moved to disqualify the attorney.[17] There is no side-switching element to the present motion.  Second, the prior situation presented unique public policy issues—that is, even the appearance of side-switching risked ongoing friction between federal and local government officials. Those issues are entirely absent here.  Third, as it related to Rule 1.11(c) (the rule upon which the Court ultimately based its decision), there was simply no doubt that the former U.S. Attorney had obtained

---

that information can be designated as such under the protective orders that govern the MDL." *Id.* This misses the point. The Court's existing protective order, docket no. 441, will of course appropriately protect the Investigation documents from public scrutiny once re-produced in the MDL. What re-production of Investigative documents into the MDL Repository does, however, is make those documents available to all plaintiffs' counsel. The experts do not address this point at all.

[17] The Court ultimately concluded that the opioid task force and the opioid MDL were not the same matter within the context of Rule 1.11, and thus disqualification under Rule 1.11(a) was inappropriate.

confidential government information. *See* docket no. 1458-1. As discussed above, OptumRx has not shown Motley Rice obtained confidential government information.

Finally, the Court only disqualified the former U.S. Attorney (and her firm) from the Track One case—a single case among thousands of MDL cases. The Court expressly did not disqualify the attorney "from serving in a leadership capacity in the Opioid MDL or participating in any trial involving claims by other cities and counties." Docket no. 1458 at 11. In the present case, Motley Rice is co-lead counsel for the PEC and has a role, in that capacity, in every single case in the MDL. OptumRx asks this Court to deprive all litigants that are suing PBMs of Motley Rice's considerable experience with complex litigation generally and this MDL specifically. *See* docket no. 34 at 8–9 (appointing Joe Rice as co-lead counsel of the PEC in January 2018 and listing more than 40 prior MDLs in which he served in a leadership role).

A litigant's right to counsel of their choice, including MDL co-lead counsel, should only be limited in exceptional circumstances. *See SST Castings, Inc.*, 250 F. Supp. at 866 ("a litigant's right to 'select counsel of choice should be limited only when representation poses a significant risk of a violation of the Canons of the Code of Professional Responsibility.'") (citations omitted); *In re Valley-Vulcan*, 237 B.R. at 337 ("disqualification is considered a 'drastic measure which courts should hesitate to impose except when absolutely necessary.'"). In the prior situation, plaintiffs carried their heavy burden of showing disqualification of the defense attorney was necessary. OptumRx has not carried its burden of showing that necessity here.

**Conclusion**

There is room for blame on both sides in the present disagreement. OptumRx had an opportunity to raise the disqualification issue long ago. Further, OptumRx has not been meeting

28

its MDL Repository obligations *in full* for some time, even after being repeatedly reminded and asked to do so by plaintiffs. The Court frowns on this continued recalcitrance and will brook it no further; and warns OptumRx against pursuing this approach generally as discovery goes forward.

At the same time, Motley Rice's successive and simultaneous work representing private clients, and also wearing the mantle of authority of a public entity, poses a serious "risk … that power or discretion vested in [Motley Rice] might be used for the special benefit of [their private] client," or create a conflict of interest. Rule 1.11(c), Cmts. 4, 5. The Court frowns on this activity as well, and warns firms against taking this risk in the future. There is a real difference between a law firm's representation of a governmental entity as a private client and a law firm's wielding the authority of that government. The facts happen to work in favor of Motley Rice in this case: were it not for the standing Repository obligations, and the nature of the Investigation materials OptumRx produced, the Court's discussion and analysis in this Order might have been different.

The Court realizes this issue feels deeply personal to both sides. With this Order, the Court seeks to strike all of the necessary balances: Rule 1.11's balance between promoting government service and mitigating abuses of power; the balance between upholding the integrity of the profession and a party's right to its chosen counsel; and the balance between retaining important institutional MDL knowledge and the parties being able to work with each other collegially.

The Court ends by asking the parties to move past this issue and direct their energies toward reaching a resolution of their cases. For the reasons stated, OptumRx's Motion to Disqualify Motley Rice is **DENIED**.

       **IT IS SO ORDERED.**

                 **/s/ Dan Aaron Polster  March 18, 2024**
                 **DAN AARON POLSTER**
                 **UNITED STATES DISTRICT JUDGE**

**UNITED STATES COURT OF APPEALS**
FOR THE SIXTH CIRCUIT

| | 100 EAST FIFTH STREET, ROOM 540 | |
| Kelly L. Stephens | POTTER STEWART U.S. COURTHOUSE | Tel. (513) 564-7000 |
| Clerk | CINCINNATI, OHIO 45202-3988 | www.ca6.uscourts.gov |

Filed: May 07, 2024

Mr. Brian D. Boone
Alston & Bird
1120 S. Tryon Street
Suite 300
Charlotte, NC 28203-6818

Mr. William Herman Jordan
Alston & Bird
1201 W. Peachtree Street, N.E.
Suite 4900
Atlanta, GA 30309

Re: Case No. 24-3396, *In re: OptumRx, Inc.*
Originating Case No. 1:17-md-02804

Dear Counsel,

The petition for writ of mandamus or prohibition has been docketed as case number **24-3396** with the caption listed above. If you have not already done so, you must mail a copy of the petition to the lower court judge and counsel for all the other parties.

Counsel for petitioner must file an Appearance of Counsel form and, if not admitted, apply for admission to the 6th Circuit Bar by **May 21, 2024**. The forms are available on the court's website.

The district court judge to whom this petition refers has been served with this letter.

Sincerely yours,

s/Jill E Colyer for Amy E. Gigliotti
Case Management Specialist
Direct Dial No. 513-564-7012

cc: Ms. Sandy Opacich

# Exhibit P

to Declaration of Matthew Hooker

| | |
|---|---|
| **From:** | ECFnotice@mad.uscourts.gov |
| **Sent:** | Friday, October 18, 2024 5:38 PM |
| **To:** | CourtCopy@mad.uscourts.gov |
| **Subject:** | Activity in Case 1:24-cv-10525-PBS The City of Boston et al v. Express Scripts, Inc. et al Order on Motion to Disqualify Counsel |

**EXTERNAL SENDER – Proceed with caution**

---

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

United States District Court

District of Massachusetts

**Notice of Electronic Filing**

The following transaction was entered on 10/18/2024 at 5:38 PM EDT and filed on 10/18/2024

| | |
|---|---|
| **Case Name:** | The City of Boston et al v. Express Scripts, Inc. et al |
| **Case Number:** | 1:24-cv-10525-PBS |
| **Filer:** | |
| **Document Number:** | 94(No document attached) |

**Docket Text:**
**Judge Patti B. Saris: ELECTRONIC ORDER entered on OPTUM'S MOTION TO DISQUALIFY COUNSEL ( Dk [56]):**

**Optum seeks to disqualify Motley Rice under Massachusetts Rule of Professional Conduct 1.11(c) on the ground that Motley Rice previously represented Chicago, Washington D.C., and Hawaii in their opioid investigations (Dkt. [56]). Under Rule 1.11(c), a lawyer having information that the lawyer knows is confidential government information about a person acquired when the lawyer was a public officer or employee, may not represent a private client whose interests are adverse to that person in a matter in which the information could be used to the material disadvantage of that person. Mass. R. Prof. C. 1.11(c).**

**The MDL court denied a similar motion by Optum to disqualify Motley Rice under an identical Ohio Rule of Professional Conduct. See In re Natl Prescription Opiate Litig., No. 1:17-MD-2804, 2024 WL 3387288 (N.D. Ohio Mar. 18, 2024). I find the reasoning persuasive. Optum fails to demonstrate that it would suffer a material disadvantage since the MDL defendants were required to produce all documents previously produced in response to the Chicago,**

Washington D.C., and Hawaii opioid investigations into the MDL repository. See Id. at *14-15.
Therefore, because all Plaintiffs counsel can access this MDL repository, Optum faces no
material disadvantage from any access to documents Motley Rice gained by representing the
other government entities. Accordingly, this Court <u>DENIES</u> Optum's Motion to Disqualify
Counsel (Dkt. [56]).

(Geraldino-Karasek, Clarilde)


**1:24-cv-10525-PBS Notice has been electronically mailed to:**

Robert T. Naumes     robert@naumeslaw.com, christopher@naumeslaw.com

Vincent L. Greene     vgreene@motleyrice.com

Elizabeth Smith     esmith@motleyrice.com, kyoung@motleyrice.com

Adam N. Cederbaum     adam.cederbaum@cityofboston.gov

Christopher C. Naumes     christopher@naumeslaw.com, christopher-naumes-9387@ecf.pacerpro.com,
robert@naumeslaw.com

Patrick Daniel Curran     patrickcurran@quinnemanuel.com, anastaciacates@quinnemanuel.com, patrick-curran-quinn-
emanuel-urquhart-sullivan-llp-4901@ecf.pacerpro.com

Batool Raza     braza@bphc.org

Alexander S. Del Nido     alexdelnido@quinnemanuel.com

Dane R. Voris     dvoris@cooley.com, efiling-notice@ecf.pacerpro.com, efilingnotice@cooley.com

Zachary Hafer     zhafer@cooley.com, eFilingNotice@cooley.com, efiling-notice@ecf.pacerpro.com

Jonathan Gordon Cooper     jonathancooper@quinnemanuel.com

Michael John Lyle     mikelyle@quinnemanuel.com

Matthew Patrick McGuire     matt.mcguire@alston.com

Brian David Boone     brian.boone@alston.com

Christopher Michel     christophermichel@quinnemanuel.com

Matthew P. Hooker     matthew.hooker@alston.com

Frederick C. Baker     fbaker@motleyrice.com

Mimi Liu     mliu@motleyrice.com, cmarvin@motleyrice.com

**1:24-cv-10525-PBS Notice will not be electronically mailed to:**

Frederick C. Baker

Motley Rice LLC
28 Bridgeside Blvd
Mount Pleasant, SC 29464

# Exhibit Q

to Declaration of Matthew Hooker

FILED
Superior Court of California
County of Los Angeles

NOV 1 4 2024

David W. Slayton, Executive Officer/Clerk of Court
By: A. Rosas, Deputy

## People v. Express Scripts, Inc. (23STCV20886)

## ~~Tentative~~ Ruling Re: Motion to Disqualify

| | |
|---|---|
| **Date:** | **11/14/24** |
| **Time:** | **11:00 am** |
| **Moving Party:** | **OptumRX, Inc. ("OptumRX")** |
| **Opposing Party:** | **The People of the State of California ("People" or "Plaintiff")** |
| **Department:** | **11** |
| **Judge:** | **David S. Cunningham III** |

## ~~TENTATIVE~~ RULING

The Court denies OptumRX's motion to disqualify.

## BACKGROUND

OptumRX and the other "Defendants are Pharmacy Benefit Managers ('PBMs')." (7/18/24 Ruling Re: Motion to Stay Pending Appeal, p. 1.)[1] "They 'administer prescription-drug benefits for health-plan sponsors, including employers, government entities, and unions.' [Citation.]" (Ibid.) "'When a beneficiary of a prescription-drug plan goes to a pharmacy to fill a prescription, the pharmacy checks with a PBM to determine that person's coverage and copayment information.' [Citation.]" (Ibid.) "'[T]he PBM [then] reimburses the pharmacy for the prescription, less the amount of the beneficiary's copayment.' [Citation.]" (Ibid.) "'The prescription-drug plan, in turn, reimburses the PBM.' [Citation.]" (Ibid.)

"Plaintiff sued Defendants for their alleged contributions to the opioid crisis." (Ibid.) "Plaintiff claims Defendants created a public nuisance." (Ibid.)

Here, OptumRX moves to disqualify Plaintiff's co-counsel, Motley Rice LLC ("Motley Rice"), pursuant to the California Rules of Professional Conduct ("CRPC").

## DISCUSSION

The specific CRPC rule at issue is rule 1.11(c), which is a replica of rule 1.11(c) of the American Bar Association ("ABA") Model Rules of Professional Conduct ("MRPC"). Both rules state:

---

[1] The other Defendants are Express Scripts, Inc., Express Scripts Administrators, LLC, Medco Health Solutions, Inc., Express Scripts Pharmacy, Inc., UnitedHealth Group, Inc., OptumInsight, Inc., and OptumInsight Life Sciences, Inc.

Except as law may otherwise expressly permit, a lawyer who was a public official or employee and, during that employment, acquired information that the lawyer knows is confidential government information about a person, may not represent a private client whose interests are adverse to that person in a matter in which the information could be used to the material disadvantage of that person. As used in this rule, the term "confidential government information" means information that has been obtained under governmental authority, that, at the time this rule is applied, the government is prohibited by law from disclosing to the public, or has a legal privilege not to disclose, and that is not otherwise available to the public. A firm with which that lawyer is associated may undertake or continue representation in the matter only if the personally prohibited lawyer is timely screened from any participation in the matter and is apportioned no part of the fee therefrom.

(CRPC, rule 1.11(c); MRPC, rule 1.11(c).)

The plain language means that, "where a lawyer acquired 'confidential government information' about a person during the former employment [], the lawyer may not represent a private client whose interests are adverse to that person in a matter in which the information could be used to the material disadvantage of the person." (Tuft, et al., Cal. Practice Guide: Professional Responsibility and Liability (The Rutter Group December 2023 Update) ¶ 8:280.1.)

Four elements need to be established:

(1) the lawyer used to be "a public official or employee" (CRPC, rule 1.11(c));

(2) during the public employment, the lawyer "acquired information that the lawyer knows is confidential government information about a person" (ibid.);

(3) the lawyer is now attempting to "represent a private client whose interests are adverse to that person" – i.e., the person the "confidential government information" concerns (ibid.); and

(4) the current representation is "in a matter in which the [confidential government] information could be used to the disadvantage of that person." (Ibid.)

### *First Element*

Motley Rice represented the Hawaii Attorney General, the District of Columbia Attorney General, and Chicago, Illinois in investigative matters against OptumRX. (See Motion, pp. 6-8.) Government subpoenas were issued, and OptumRX produced documents to Motley Rice in response to the subpoenas. (See ibid.; see also Caplis Decl., ¶¶ 2-19; Grant Decl., ¶¶ 2-8.)

After the government investigations, OptumRX says Motley Rice used information from the documents to start filing opioid lawsuits against OptumRX on behalf of plaintiffs in jurisdictions around the country, including the People's action. (See Motion, pp. 8-9.)

2

OptumRX contends Motley Rice qualified as a public officer when Motley Rice represented Hawaii, the District of Columbia, and Chicago. (See id. at pp. 12-13.)

Plaintiff claims "Motley Rice was not a public official or employee[.]" (Opposition, p. 13; see also id. at p. 14.)

In reply, OptumRX cites ABA formal opinion 509. OptumRX asserts that a private law firm is a public officer if the firm accepts a special government appointment – e.g., if the firm becomes a special prosecutor. (See Reply, pp. 7-10.)

OptumRX filed an almost identical motion to disqualify in the opioid multidistrict litigation ("MDL") pending in Ohio. That motion concerned rule 1.11(c) of the Ohio Rules of Professional Conduct ("ORPC"). ORPC rule 1.11(c) effectively mirrors MRPC rule 1.11(c) and CRPC rule 1.11(c):

> Except as law may otherwise expressly permit, a lawyer having information that the lawyer *knows* is confidential government information about a person acquired when the lawyer was a public officer or employee, may not represent a private client whose interests are adverse to that person in a matter in which the information could be used to the material disadvantage of that person. As used in this rule, the term "confidential government information" means information that has been obtained under governmental authority and that, at the time this rule is applied, the government is prohibited by law from disclosing to the public or has a legal privilege not to disclose and that is not otherwise available to the public. A *firm* with which that lawyer is associated may undertake or continue representation in the matter only if the disqualified lawyer is timely *screened* from any participation in the matter and is apportioned no part of the fee therefrom.

(ORPC, rule 1.11(c), emphasis in original.)

Regarding the first element, the MDL court agreed with OptumRX:

> Motley Rice argues it was not an agent or employee of any of the three governments, while conducting their respective Investigations, because the retainer agreements it entered with those entities state it was an independent contractor, subject to the governmental entity's control. [Citation.] In support, Motley Rice identifies specific language in its retainer agreement with Hawaii: "[Motley Rice attorneys] are not by reason of this Agreement, agents or employees of the State for any purpose." [Citation.]
>
> This argument elevates form over substance, glossing over the role Motley Rice really played and the powers it deployed. The language of the retainer agreement cannot change what Motley Rice actually did. The unavoidable fact is that, when Motley Rice *served government subpoenas* and received documents in response – even if it was acting on behalf of those governmental entities under a contingent fee, independent contractor agreement – it had been granted authority to wield the

3

> power of the government. In that way, Motley Rice was acting as a public officer. Whether Motley Rice was technically a public officer or employee, under the strict legal definition used by the hiring governmental entity or the terms of its contract, cannot alter the reality that Motley Rice gained access to information *pursuant to governmental authority*. Thus, the Court agrees with OptumRx that Motley Rice was acting as a public officer or employee.

(In Re: Nat. Prescription Opiate Litig. (N.D. Ohio Mar. 18, 2024, No. 1:17-md-2804) 2024 WL 3387288, at *7, emphasis in original.)

Plaintiff contends the Court should reach the opposite conclusion because:

* "[e]ach government entity's retainer agreement specified that Motley Rice lawyers were independent contractors, not government employees, and/or that they worked only subject to the government entity's control" (Opposition, p. 13); and

* "[s]ubstantial authority holds that private lawyers retained by governments on a contingency-fee basis for civil investigations and litigation *are not* public officials or employees." (Ibid., emphasis in original; see also id. at p. 13 n.11 [citing cases]; id. at p. 14 [quoting ABA formal ethics opinion 97-409].)

The Court declines. The MDL court considered these exact arguments and rejected them. The Court tends to agree with the MDL court's analysis and with OptumRX's reply discussion of ABA formal opinion 509 versus ABA formal opinion 97-409. (See Reply, pp. 7-10.) If it were necessary to rule on this element, the Court would favor OptumRX's position.

However, it is not necessary. The Court finds that OptumRX's motion should be denied because OptumRX does not satisfy the second and fourth elements.[2][3]

### *Second Element*

OptumRX asserts that Motley Rice received confidential government information via the government investigations. (See Motion, p. 13; see also id. at p. 14.)

Plaintiff disagrees. The People contend OptumRX's documents do not constitute confidential government information because they "can be obtained through routine discovery[.]" (Opposition, p. 6; see also id. at 7-10.)

OptumRX claims Plaintiff's definition is overbroad and makes rule 1.11(c) a nullity:

---

[2] The MDL court agreed with OptumRX as to the first element but still denied OptumRX's motion. In May 2024, OptumRX sought writ relief from the Sixth Circuit Court of Appeals. On October 22, 2024, the Sixth Circuit denied the writ, agreeing with the MDL court's ruling on the fourth element. (See Notice of Supp. Authorities, Ex. A.)

[3] OptumRX lost another motion to disqualify in federal court in Massachusetts. The district court followed the MDL court's analysis. (See id. at Ex. B.)

4

Under Rule 1.11(c), "confidential government information" is information that (1) is "obtained under governmental authority;" (2) the government "is prohibited by law from disclosing to the public, or has a legal privilege not to disclose;" and (3) "is not otherwise available to the public." [Citation.] Motley Rice does not dispute that the first two requirements are met. As government investigators wielding state power, Motley Rice served subpoenas on OptumRx and obtained tens of thousands of pages of confidential information about OptumRx's business and product offerings. Moreover, Motley Rice is prohibited from disclosing that information to the public under the retainer agreements they executed with the governments [citations], the confidentiality agreements they executed with OptumRx [citations], and applicable state law [citations].

The only requirement in dispute is the third – whether the information is "otherwise available to the public." OptumRx is not claiming that the confidential status of information under Rule 1.11(c) turns on a confidentiality designation made by the producing party in a government investigation. Rather, OptumRx contends that whether information is "otherwise available to the public" under Rule 1.11(c) *cannot turn* on whether the information is subject to "routine discovery," where that term is defined as anything that a civil litigant could obtain through discovery. [Citation.] If that were the case, nothing could ever qualify as confidential government information, and Rule 1.11(c) would be written out of existence. Former government lawyers could erase their ethical violations by re-requesting copies of documents that they first learned about through their government work. Grand jury materials, search warrant information, regulatory information, and information obtained through formal or informal attorney interviews – the list goes on – is all discoverable in civil litigation from the party who produced it to the government. According to Motley Rice, that makes it all "publicly available." But that is not the law. [Citations.] Moreover, what is not "publicly available" by that standard? Motley Rice has had opportunity after opportunity in the MDL and in this lawsuit to answer that question. It has yet to do so.

(Reply, pp. 11-12, emphasis in original.)

To repeat, OptumRX produced documents to Motley Rice in response to the government subpoenas. The overarching question for the second element is whether Motley Rice acquired confidential government information by way of those productions. Rule 1.11(c) defines confidential government information as "information that has been obtained under governmental authority, that, at the time this rule is applied, the government is prohibited by law from disclosing to the public, or has a legal privilege not to disclose, and that is not otherwise available to the public." (CRPC, rule 1.11(c).) The acute question – the only definition factor being challenged now – is whether the acquired information is publicly available. It is a "question of fact[,]" and it depends on whether the information "can be obtained through routine discovery[.]" (ABA Formal Op., p. 4 [advising that, "[w]hether government information is publicly available – e.g., whether it can be obtained through routine discovery – will be a question of fact"].)

5

Notably, the MDL court held that OptumRX did not meet the burden of proof on this question. The MDL court found OptumRX's experts unavailing (see In Re: Nat. Prescription Opiate Litig., supra, 2024 WL 3387288, at *9), noted that, sometimes, documents marked confidential can be discovered (see id. at *9-*10), and found that OptumRX failed to differentiate between discoverable confidential documents and undiscoverable confidential documents. (See id. at *11.)

The Court agrees. OptumRX is relying on the same experts. (See Hooker Decl., Ex. P [attaching Montgomery and Muchman Expert Report].) Their report continues to "paint[] with a broad brush and fails to distinguish between documents [OptumRX] would produce in routine discovery (perhaps covered by a protective order) and other information that might legitimately be deemed true, confidential government information." (In Re: Nat. Prescription Opiate Litig., supra, 2024 WL 3387288, at *11; see also Hooker Decl., Ex. P, pp. 17-18, 30-35 [discussing complaint allegations, subpoenas, and confidentiality agreements, not specific documents].) The Court finds OptumRX's burden unsatisfied.

Two more points support this result. One, OptumRX's responses to the subpoenas seem analogous to responses to civil investigation demands ("CIDs"), which courts have held are "subject to compulsory discovery." (See, e.g., Davis v. Southern Bell Tel. & Tel. Co. (S.D. Fla. 1993) 149 F.R.D. 666, 674 [finding that the phone company's responses to Florida's CID requests were discoverable and, thus, were not confidential government information].) Two, the documents have already been produced – and Motley Rice and all MDL plaintiffs "can use them" – in the MDL. (In Re: Nat. Prescription Opiate Litig., supra, 2024 WL 3387288, at *15; see also id. at *14; Opposition, pp. 5, 9.) The fact that they have already been discovered establishes that they "can be obtained through routine discovery." (ABA Formal Op., p. 4.)[4]

OptumRX contends "Motley Rice's focus on OptumRX's *documents* is misleading" because rule 1.11(c) also covers strategic insights and mental roadmaps. (Reply, p. 13, emphasis in original; see also id. at p. 14.)

The Court disagrees. Instead of identifying a particular strategic insight or mental roadmap, OptumRX requests permission to depose Motley Rice's declarants to see if they have any non-documentary confidential government information. (See id. at p. 14 n.9.) This is an admission that the contention is speculative, vague, and amorphous.

For now, the Court is inclined to deny the deposition requests. A strategic insight or mental roadmap, assuming one exists, would most likely derive from the documents themselves, so it is doubtful that the depositions would reveal different confidential government information sufficient to change the outcome of the motion to disqualify.

### Third Element

The third element is uncontested. It is undisputed that Plaintiff is a private client with adverse interests. (See Reply, p. 7 n.3.)

---

[4] Discovery of documents covered by a protective order is routine. (See In Re: Nat. Prescription Opiate Litig., supra, 2024 WL 3387288, at *9.)

### *Fourth Element*

OptumRX argues that the confidential government information could be utilized against OptumRX
here (see id. at pp. 14-15) and that "[t]here is no way for Motley Rice lawyers to unlearn what they
learned" in the government investigations. (Id. at p. 16; see also Reply, pp. 15-17 [claiming certain
information "is not available through the MDL repository"].)

Plaintiff contends OptumRX fails to "show that Motley Rice's access" to the documents "could
cause [a] material disadvantage" to OptumRX. (Opposition, p. 10; see also id. at pp. 11-13.)

The MDL court reasoned that, because the information is available to all MDL plaintiffs,
OptumRX could not demonstrate a material disadvantage:

> To be plain: OptumRx is required (and has been required) to re-produce into the
> MDL Repository the documents it produced in response to the subpoenas issued in
> the Chicago Copay Investigation, the D.C. Price Investigation, and the Hawaii
> Billing Investigation.
>
> OptumRx asserts that the confidentiality agreements Motley Rice entered into on
> behalf of its government clients prevent the use of those documents in other matters,
> including the Opioid MDL. But the confidentiality agreements neither convert
> OptumRx's confidential documents into confidential government information (as
> described above), nor prevent their use in the Opioid MDL. The Chicago and
> Hawaii confidentiality agreements each contain language expressly permitting the
> documents' use pursuant to a court order. [Citations.]
>
> The D.C. Price Investigation confidentiality agreement does not contain the "court
> order" exception. But the parties' briefs show the documents OptumRx produced
> to Washington, D.C. were the same documents it produced to Hawaii. [Citations.]
>
> The MDL Repository Orders require OptumRx to produce the Investigation
> documents in the MDL, where all other plaintiffs' attorneys can use them. It is
> obvious that Motley Rice's possession and knowledge of the Investigation
> documents cannot, by itself, cause a material disadvantage to OptumRx, when
> every other plaintiff's attorney also has them. No further analysis is necessary.

(In Re: Nat. Prescription Opiate Litig., supra, 2024 WL 3387288, at *14-*15; see also id. at *15
n.16 ["OptumRx's experts miss the import of DR-22. They state that "Plaintiffs' argument that
DR-22 requires Defendants to produce documents previously produced pursuant to government
subpoena is *inaccurate*." [Citation.] In fact, that is precisely what DR-22 requires defendants to
do. The experts also opine that "confidential government information produced under DR-22 does
not lose its status as confidential – that information can be designated as such under the protective
orders that govern the MDL." [Citation.] This misses the point. The Court's existing protective
order, docket no. 441, will of course appropriately protect the Investigation documents from public
scrutiny once re-produced in the MDL. What re-production of Investigative documents into the

MDL Repository does, however, is make those documents available to all plaintiffs' counsel. The experts do not address this point at all."], emphasis in original.)

The Court finds the MDL court's analysis persuasive and dispositive as to the fourth element.[5] Motley Rice and County Counsel co-represent the People. (See Opposition, p. 11.) County Counsel signed the MDL protective order, giving the attorneys access to the documents "for use in this case." (Id. at p. 11 n.7.) Since County Counsel appear authorized to use the documents on Plaintiff's behalf, OptumRX cannot suffer a material disadvantage if Motley Rice uses them too.[6]

**Conclusion**

OptumRX's motion is denied.

It is so ordered.

Date:    11/14/24

Judge David S. Cunningham III
Los Angeles Superior Court

---

[5] Again, the Sixth Circuit and the Massachusetts federal court agreed with the MDL court's analysis. (See Notice of Supp. Authorities, Exs. A, B.)

[6] The Court anticipates that a similar protective order will be enacted in Plaintiff case.

# Exhibit R

to Declaration of Matthew Hooker

| | |
|---|---|
| **From:** | AG PUBLICRECORDS <ag.publicrecords@wyo.gov> |
| **Sent:** | Monday, February 10, 2025 10:54 AM |
| **To:** | Carter, Jalen |
| **Cc:** | Hoernlein, Michael |
| **Subject:** | Re: Wyoming Public Records Act Request to the State Attorney General |
| **Attachments:** | Special Asst. AG - Singer.pdf; Special Asst. AG - Boggs.pdf; Executed contract.pdf |

**EXTERNAL SENDER – Proceed with caution**

Hi Jalen,

We are in receipt of your public records request.  Attached are the responsive records to request #1.  We have no responsive records to request #2. For requests #3 and #4, any records that we may have that may fall under these requests are confidential under the attorney work product and/or attorney-client privileges and therefore will not be produced.  In addition, records related to an investigation fall under Wyo. Stat. Ann. § 16-4-203(b)(i) and accordingly will not be released.  Release of any investigation records (that do not already fall under the attorney work product and/or attorney-client privileges) would be contrary to the public interest for several reasons, including that the investigation is ongoing and could affect the investigation. We do not believe we have any records responsive to request #5, however, we are still searching and will let you know whether we have any records that are responsive to and that may be produced under request #5.  For request #6, please see the attached documents.  For request #7, other than the attached documents already produced, there are no other responsive records.

Thanks,
Megan

On Fri, Jan 24, 2025 at 9:13 AM Carter, Jalen <Jonathan.Carter@alston.com> wrote:

Good Afternoon:


Please find attached a public records request from Jalen Carter on behalf of Michael Hoernlein, who is copied. Please contact us with any questions.


Best,


Jalen

1

Jonathan Jalen Carter

Associate

**ALSTON & Bird**

1201 West Peachtree Street

Atlanta, GA 30309

+1 404-881-7144 (O)

Jonathan.Carter@alston.com

NOTICE: This e-mail message and all attachments may contain legally privileged and confidential information intended solely for the use of the addressee. If you are not the intended recipient, you are hereby notified that you may not read, copy, distribute or otherwise use this message or its attachments. If you have received this message in error, please notify the sender by email and delete all copies of the message immediately.

--
AG Public Records
Wyoming Attorney General's Office
2424 Pioneer Avenue, 3rd Floor
Cheyenne, WY 82002
(307) 777-6710
Attachments area

E-Mail to and from me, in connection with the transaction
of public business, is subject to the Wyoming Public Records
Act and may be disclosed to third parties.

## PROFESSIONAL SERVICES CONTRACT BETWEEN
## THE WYOMING ATTORNEY GENERAL'S OFFICE AND
## MOTLEY RICE LLC

1. **Parties.** The parties to this Contract are the Wyoming Attorney General's Office (Agency), whose address is: 109 State Capitol, Cheyenne, Wyoming 82002 and the Motley Rice, LLC (Contractor), whose address is: 401 9th St. NW, Suite 1001, Washington, D.C. 20004.

2. **Purpose of Contract.** The purpose of this Contract is to set forth the terms and conditions by which the Contractor shall represent the State of Wyoming in an investigation and litigation into the billing practices of pharmacy benefit managers (PBMs). Contractor shall be responsible for reviewing documents and drafting all appropriate pleadings, motions, and briefs, subject to the Agency's review and approval. Contractor will assist the Agency with investigating and prosecuting claims authorized by the Agency, which may include claims for damages, penalties, injunctive relief, interest, attorneys' fees and costs, and any other appropriate relief (the Litigation). Contractor is being retained under Wyo. Stat. Ann. § 9-1-603(b) which states that "[w]ith the approval of the governor the attorney general may retain qualified practicing attorneys to prosecute fee-generating suits for the state if expertise in a particular field is desirable." The Governor has provided his approval.

3. **Term of Contract.** This Contract is effective when all parties have executed it (Effective Date). The term of the Contract is from the Effective Date through the completion of the above-referenced Litigation unless sooner terminated pursuant to the provisions of this Contract.

4. **Payment.**

   A. This is a contingent fee case. Contractor shall receive no compensation for any services rendered unless the State of Wyoming recovers civil penalties, compensatory or punitive damages, attorneys' fees, and/or other monetary relief in connection with this Litigation. If the State receives such a recovery, Contractor will be compensated for its services as follows:

      (i) The costs and expenses necessary for conducting this Litigation shall initially be advanced by Contractor and shall be deducted from the Litigation's gross or total recovery, if any, before any further distribution is made unless such costs and expenses are paid separately through court order or by defendants in settlement;

      (ii) Of the monies remaining from any settlement or recovery after deduction of costs and expenses, Contractor shall receive a contingent fee of twenty percent (20%) from the first $10 million of net proceeds of any judgment or settlement received from each target/defendant, and eighteen percent (18%) from any net proceeds of any judgment or settlement in excess of $10 million received from each target/defendant. For avoidance of doubt,

the contingent fee applies to each settlement or judgment from each target or defendant.

**B.**    Contractor shall be paid its contingent fee solely out of any proceeds received as a result of a settlement or judgment in this Litigation. All settlement or judgment proceeds shall be paid by or on behalf of the defendant(s) to the State of Wyoming, which shall distribute them or have them distributed.

**C.**    Contractor shall advance all costs, expenses, and disbursements, including but not limited to costs for service of process, expert witness fees and costs, deposition costs, and costs of document review and production. Contractor's agreement to advance all Litigation expenses and costs, as well as its agreement to defer claiming entitlement to moneys owed, while any and all Litigation (including appeals and enforcement actions) is pending, has been taken into consideration in establishing the fee schedule above.

**D.**    Contractor shall be reimbursed for its expenses and costs solely from the Litigation's gross recovery as approved by the Agency for certain reasonable expenses and costs enumerated below. Proper documentation by receipts or otherwise shall be submitted with all invoices and all documentation shall be retained by Contractor for a least one (1) full year following this Contract's termination. All expenses must be itemized, and no reimbursement may be applied for or requested for "miscellaneous" listings. The Agency in its sole discretion may decline to reimburse Contractor for improperly documented, unnecessary, or unreasonable costs or expenses.

**E.**    The Agency will not pay for attorney or paralegal time spent performing clerical tasks, such as filing, indexing, or page numbering.

**F.**    Reimbursable expenses.

    **(i)**    Extraordinary expenses. Unless prior written approval of the Agency is obtained, the State shall have no obligation to reimburse Contractor for any extraordinary expenses incurred by Contractor, including without limitation, expenses for investigative services, computer litigation support services, videotaping of depositions, meals (other than meals in connection with travel as discussed below), and services of experts and consultants which exceed twenty-five thousand dollars ($25,000.00) per expert or consultant.

    **(ii)**    Ordinary expenses. Expenses, such as the following, incurred by Contractor will be eligible for reimbursement from the State at actual cost, provided that written substantiation or verification (such as invoices and billings, and the taxpayer identification number of the entity to which payment was made) is submitted by Contractor and the expenses are deemed reasonable and necessary by the State:

    **(1)**    Depositions and transcripts;

    **(2)**    Long-distance telephone calls;

    **(3)**    Postage;

    **(4)**    Photo copying;

    **(5)**    Outside messenger service; or

    **(6)**    Outgoing faxes.

In addition, Contractor will be entitled to reimbursement for the costs and expenses set forth below.

**G.**    Notwithstanding any other provision of this Contract, the State shall have no duty to pay Contractor, nor any of its attorneys, legal assistants, paralegals, and any other staff, nor any other person performing services on behalf of Contractor, unless the requirements described herein are first met to the State's reasonable satisfaction. The State will not be required to pay for any services it determines to be unreasonable, unnecessary, or duplicative.

**H.**    Costs and Expenses. Any reimbursement due the Contractor for travel and transportation expenses under this Contract shall be subject to the following guidelines:

    **(i)**    Air Travel. Agency agrees to reimburse the Contractor's air travel expenses related to the performance of this Contract. Air travel shall be reimbursed based on actual costs, supported by a copy of the original receipt with the invoice. Contractor must select the lowest airfare (fares available in the market at the time of booking, preferably well in advance of the trip to attain the lowest possible airfare). Contractor shall book economy class fares for all domestic travel. First class bookings are not reimbursable.

    **(ii)**    Car Rental. Agency agrees to reimburse the Contractor's reasonable car rental expenses related to the performance of this Contract. Car rental expenses shall be reimbursed at actual costs, supported by a copy of the original receipt with the invoice. Contractor must select the lowest rental rates for an appropriate vehicle.

    **(iii)**    Lodging and Meals. The Agency agrees to reimburse Contractor's reasonable lodging expenses related to the performance of this Contract. Lodging expenses shall be reimbursed at actual costs, supported by a copy of the original receipt with the invoice. The Contractor shall only invoice the Agency for the basic room rate, taxes, and lodging fees. The Agency is not responsible for incidentals or miscellaneous expenses charged to the room.

Incidental and miscellaneous expenses for which the Agency shall not be responsible include charges such as alcohol, internet, telephone charges, mini-bar, and movies. The Agency agrees to reimburse Contractor's reasonable meal expenses related to the performance of this Contract. Meal expenses shall be reimbursed based on actual costs, supported by a copy of the original receipt with the invoice.

    **(iv)**   If travel is undertaken for more than one client, the Contractor shall be reimbursed only the State's share of all travel and transportation costs.

    **(v)**   The State will compensate for time spent in transit only if work is done for the State during such transit.

**5.**   **Responsibilities of Contractor.**  The Contractor agrees to:

    **A.**   Perform professional legal services with the Agency for the State in connection with the above-referenced Litigation, as described in Section 2 above. Contractor shall be responsible for reviewing documents and drafting all appropriate pleadings, motions, and briefs, subject to the Agency's review and approval. Contractor will assist the Agency with investigating and prosecuting claims authorized by the Agency, which may include claims for damages, penalties, injunctive relief, interest, attorneys' fees and costs, and any other appropriate relief. Contractor is authorized and directed to assist the Agency in making such claims for the State of Wyoming, and to prosecute such claims through litigation, assessment, enforcement, collection, the defense against appeals and collateral proceedings, and all necessary and reasonable appeals as the Agency shall direct, and to enforce all judgments and settlements as shall be obtained. Contractor will notify the Agency of any settlement offers, and the Agency will decide whether to accept or reject any settlement. The Agency will maintain decision-making authority over the investigation and prosecution of all claims.

    **B.**   Contractor shall provide all legal services that are reasonably necessary for such representation and assistance, including without limitation, the preparation and filing of all claims, pleadings, responses, motions, petitions, memoranda, briefs, notices, and other documents. Contractor shall also conduct discovery, negotiations, and provide representation at all hearings, depositions, trials, appeals, and other appearances as may be required in said actions. Contractor shall be responsible for all filing fees and costs, including for service of process and other documents and the fees of court reporters and transcriptionists. In the event that a defendant declares bankruptcy at any time prior to final payment to the State of moneys owed by that defendant, Contractor shall also provide representation in bankruptcy proceedings, or contract with bankruptcy counsel, as may be necessary. Contractor agrees to perform such other duties or undertake such other activities as may be necessary even if such duties or activities are not expressly set forth in this Contract, when required by a court as part of the litigation or appeals of such claims, or as directed

by the Agency. Contractor shall also assist the Agency with all defensive discovery, including gathering, reviewing, and producing responsive documents and representing State employees in depositions.

**C.**    In performance of this Contract, exercise professional judgment in the prosecution of the legal action.

**D.**    Report to and direct all correspondence to Ryan Schelhaas, Chief Deputy Attorney General, and Cameron Geeting, Senior Assistant Attorney General, who shall act as the representatives of the Agency for the purposes of this Contract.

6.    **Responsibilities of Agency.**    The Agency agrees to:

**A.**    Cooperate with Contractor with respect to Contractor's performance of services hereunder and pay Contractor in accordance with Section 4 above.

7.    **Special Provisions.**

**A.**    **Conflicts of Interest.**

**(i)**    Contractor shall not, without the written consent of the Attorney General or her designee, represent any person or entity whose interests are adverse to the interests of the State of Wyoming in any matter that is related to the subject matter of this Contract.

**(ii)**    A breach of Section 7A(i) shall constitute cause for termination of this Contract in accordance with the termination provision of this Contract.

**(iii)**    After completion or termination of this Contract, Contractor may contract with persons or entities in any matter that is not substantially related to the matter for which services were provided under this Contract, even if the interest of such person or entity may be directly adverse to the State of Wyoming or its agencies. The consent given in this paragraph shall not apply to any matter where, as a result of the representation provided under this Contract, Contractor has obtained sensitive, proprietary or otherwise confidential information that could be used in such matter by such person or entity to the material disadvantage of the State of Wyoming or its agencies.

**B.**    **Kickbacks.**  Contractor certifies and warrants that no gratuities, kickbacks, or contingency fees were paid in connection with this Contract, nor were any fees, commissions, gifts, or other considerations made contingent upon the award of this Contract. If Contractor breaches or violates this warranty, Agency may, at its discretion, terminate this Contract without liability to the Agency, or deduct from the agreed upon price or consideration, or otherwise recover, the full amount of any commission, percentage, brokerage, or contingency fee.

C.    **No Finder's Fees.** No finder's fee, employment agency fee, or other such fee related to the procurement of this Contract, shall be paid by either party.

8.    **General Provisions.**

A.    **Amendments.** Any changes, modifications, revisions, or amendments to this Contract which are mutually agreed upon by the parties to this Contract shall be incorporated by written instrument, executed by all parties to this Contract.

B.    **Applicable Law, Rules of Construction, and Venue.** The construction, interpretation, and enforcement of this Contract shall be governed by the laws of the State of Wyoming, without regard to conflicts of law principles. The terms "hereof," "hereunder," "herein," and words of similar import, are intended to refer to this Contract as a whole and not to any particular provision or part. The Courts of the State of Wyoming shall have jurisdiction over this Contract and the parties. The venue shall be the First Judicial District, Laramie County, Wyoming.

C.    **Assignment Prohibited and Contract Shall Not be Used as Collateral.** Neither party shall assign or otherwise transfer any of the rights or delegate any of the duties set out in this Contract without the prior written consent of the other party. The Contractor shall not use this Contract, or any portion thereof, for collateral for any financial obligation without the prior written permission of the Agency.

D.    **Availability of Funds.** Each payment obligation of the Agency is conditioned upon the availability of government funds which are appropriated or allocated for the payment of this obligation and which may be limited for any reason including, but not limited to, congressional, legislative, gubernatorial, or administrative action. If funds are not allocated and available for continued performance of the Contract, the Contract may be terminated by the Agency at the end of the period for which the funds are available. The Agency shall notify the Contractor at the earliest possible time of the services which will or may be affected by a shortage of funds. No penalty shall accrue to the Agency in the event this provision is exercised, and the Agency shall not be obligated or liable for any future payments due or for any damages as a result of termination under this section.

E.    **Compliance with Laws.** The Contractor shall keep informed of and comply with all applicable federal, state, and local laws and regulations in the performance of this Contract.

F.    **Entirety of Contract.** This Contract, consisting of eleven (11) pages, represents the entire and integrated Contract between the parties and supersedes all prior negotiations, representations, and agreements, whether written or oral. In the event of a conflict or inconsistency between the language of this Contract and the language of any attachment or document incorporated by reference, the language of this Contract shall control.

G.   **Ethics.** Contractor shall keep informed of and comply with the Wyoming Ethics and Disclosure Act (Wyo. Stat. Ann. § 9-13-101, *et seq.*) and any and all ethical standards governing Contractor's profession.

H.   **Extensions.** Nothing in this Contract shall be interpreted or deemed to create an expectation that this Contract will be extended beyond the term described herein. Any extension of this Contract shall be initiated by the Agency and shall be accomplished through a written amendment between the parties entered into before the expiration of the original Contract or any valid amendment thereto, and shall be effective only after it is reduced to writing and executed by all parties to the Contract.

I.   **Force Majeure.** Neither party shall be liable for failure to perform under this Contract if such failure to perform arises out of causes beyond the control and without the fault or negligence of the nonperforming party. Such causes may include, but are not limited to, acts of God or the public enemy, fires, floods, epidemics, quarantine restrictions, freight embargoes, and unusually severe weather. This provision shall become effective only if the party failing to perform immediately notifies the other party of the extent and nature of the problem, limits delay in performance to that required by the event, and takes all reasonable steps to minimize delays.

J.   **Indemnification.** Contractor shall release, indemnify, and hold harmless the State, the Agency, and their officers, agents, and employees from any and all claims, suits, liabilities, court awards, damages, costs, reasonable attorneys' fees, and expenses arising out of Contractor's failure to perform any of Contractor's duties and obligations hereunder or in connection with the negligent performance of Contractor's duties or obligations, including, but not limited to, any claims, suits, liabilities, court awards, damages, costs, reasonable attorneys' fees, and expenses arising out of Contractor's negligence or other tortious conduct.

K.   **Independent Contractor.** The Contractor shall function as an independent contractor for the purposes of this Contract and shall not be considered an employee of the State of Wyoming for any purpose. Consistent with the express terms of this Contract, the Contractor shall be free from control or direction over the details of the performance of services under this Contract. The Contractor shall assume sole responsibility for any debts or liabilities that may be incurred by the Contractor in fulfilling the terms of this Contract and shall be solely responsible for the payment of all federal, state, and local taxes which may accrue because of this Contract. Nothing in this Contract shall be interpreted as authorizing the Contractor or its agents or employees to act as an agent or representative for or on behalf of the State of Wyoming or the Agency or to incur any obligation of any kind on behalf of the State of Wyoming or the Agency. The Contractor agrees that no health or hospitalization benefits, workers' compensation, unemployment insurance, or similar benefits available to State of Wyoming employees will inure to the benefit of the Contractor or the Contractor's agents or employees as a result of this Contract.

**L.**  **Nondiscrimination.** The Contractor shall comply with the Civil Rights Act of 1964, the Wyoming Fair Employment Practices Act (Wyo. Stat. §27-9-105, *et seq.*), the Americans with Disabilities Act (ADA), 42 U.S.C. §12101, *et seq.*, and the Age Discrimination Act of 1975 and/or any properly promulgated rules and regulations thereto and shall not discriminate against any individual on the grounds of age, sex, color, race, religion, national origin, or disability in connection with the performance under this Contract.

**M.**  **Notices.** All notices arising out of, or from, the provisions of this Contract shall be in writing either by regular mail or delivery in person at the addresses provided under this Contract.

**N.**  **Notice of Sale or Transfer.** The Contractor shall provide the Agency with notice of any sale, transfer, merger, or consolidation of the assets of the Contractor. Such notice shall be provided in accordance with the notices provision of this Contract and, when possible and lawful, in advance of the transaction. If the Agency determines that the sale, transfer, merger, or consolidation is not consistent with the continued satisfactory performance of the Contractor's obligations under this Contract, then the Agency may, at its discretion, terminate or renegotiate the Contract.

**O.**  **Prior Approval.** This Contract shall not be binding upon either party, no services shall be performed, and the Wyoming State Auditor shall not draw warrants for payment, until this Contract has been fully executed, approved as to form by the Office of the Attorney General, filed with and approved by A&I Procurement, and approved by the Governor of the State of Wyoming, or his designee, if required by Wyo. Stat. § 9-2-3204(b)(iv).

**P.**  **Insurance Requirements.**

  **(i)**  During the term of this Contract, the Contractor shall obtain and maintain, or ensure that each employee and subcontractor obtains and maintains, each type of insurance coverage specified in Insurance Coverage, below.

  **(ii)**  All policies shall be primary over any insurance or self-insurance program carried by the Contractor or the State of Wyoming.

  **(iii)**  Upon request, the Contractor shall provide confirmation of insurance to the Agency verifying each type of coverage required herein.

  **(iv)**  Contractor shall provide at least thirty (30) days advance written notice of any policy's cancellation to the Agency.

  **(v)**  In case of a breach of any provision relating to Insurance Requirements or Insurance Coverage, the Agency may, at the Agency's option, obtain and maintain, at the expense of the Contractor, such insurance in the name of the Contractor, or subcontractor, as the Agency may deem proper and may

deduct the cost of obtaining and maintaining such insurance from any sums which may be due or become due to the Contractor under this Contract.

**(vi)** All policies required by this Contract shall be issued by an insurance company with an A.M. Best (or equivalent) rating of A- VIII or better.

**(vii)** The Agency reserves the right to reject any policy issued by an insurance company that does not meet these requirements.

**Q.** **Insurance Coverage.** The Contractor shall obtain and maintain, or ensure that each employee and subcontractor obtains and maintains, the following insurance in accordance with the Insurance Requirements set forth above:

**(i)** Professional Liability or Errors and Omissions Liability Insurance. Professional liability insurance or errors and omissions liability insurance protecting against any and all claims arising from the Contractor's alleged or real professional errors, omissions, or mistakes in the performance of professional duties under this Contract, with minimum limits as follows:

(a) $1,000,000.00 each occurrence; and
(b) $1,000,000.00 general aggregate.

Contractor shall maintain continuously the insurance coverage required herein for a minimum of two (2) years following the termination of this Contract.

**R.** **Severability.** Should any portion of this Contract be judicially determined to be illegal or unenforceable, the remainder of the Contract shall continue in full force and effect, and the parties may renegotiate the terms affected by the severance.

**S.** **Sovereign Immunity and Limitations.** Pursuant to Wyo. Stat. Ann. § 1-39-104(a), the State of Wyoming and Agency expressly reserve sovereign immunity by entering into this Contract and specifically retain all immunities and defenses available to them as sovereigns. The parties acknowledge that the State of Wyoming has sovereign immunity and only the Wyoming Legislature has the power to waive sovereign immunity. Designations of venue, choice of law, enforcement actions, and similar provisions shall not be construed as a waiver of sovereign immunity. The parties agree that any ambiguity in this Contract shall not be strictly construed, either against or for either party, except that any ambiguity as to sovereign immunity shall be construed in favor of sovereign immunity.

**T.** **Taxes.** The Contractor shall pay all taxes and other such amounts Contractor is subject to under federal, state, and local law, including, but not limited to, federal and social security taxes, workers' compensation, unemployment insurance, and sales taxes.

**U.** **Termination of Contract.** This Contract may be terminated, without cause, by the Agency upon thirty (30) days written notice. This Contract may be terminated by

the Agency immediately for cause if the Contractor fails to perform in accordance with the terms of this Contract. If at any time during the performance of this Contract, in the opinion of the Agency, the work is not progressing satisfactorily or within the terms of this Contract, then, at the discretion of the Agency and after written notice to the Contractor, the Agency may terminate this Contract or any part of it. Contractor may terminate this Contract and its representation of Agency pursuant thereto as permitted by the Wyoming Rules of Professional Conduct in effect at the time of such termination.

V.     **Third-Party Beneficiary Rights.** The parties do not intend to create in any other individual or entity the status of third-party beneficiary, and this Contract shall not be construed so as to create such status.  The rights, duties, and obligations contained in this Contract shall operate only between the parties to this Contract and shall inure solely to the benefit of the parties to this Contract. The provisions of this Contract are intended only to assist the parties in determining and performing their obligations under this Contract.

W.     **Time is of the Essence.** Time is of the essence in all provisions of this Contract.

X.     **Titles Not Controlling.** Titles of sections and subsections are for reference only and shall not be used to construe the language in this Contract.

Y.     **Waiver.** The waiver of any breach of any term or condition in this Contract shall not be deemed a waiver of any prior or subsequent breach. Failure to object to a breach shall not constitute a waiver.

Z.     **Counterparts.** This Contract may be executed in counterparts. Each counterpart, when executed and delivered, shall be deemed an original and all counterparts together shall constitute one and the same Contract. Delivery by the Contractor of an originally signed counterpart of this Contract by facsimile or PDF shall be followed up immediately by delivery of the originally signed counterpart to the Agency.

**THE REMAINDER OF THIS PAGE WAS INTENTIONALLY LEFT BLANK.**

9. **Signatures.** The parties to this Contract, through their duly authorized representatives, have executed this Contract on the dates set out below, and certify that they have read, understood, and agreed to the terms and conditions of this Contract.

The Effective Date of this Contract is the date of the signature last affixed to this page.

**AGENCY:**
**WYOMING ATTORNEY GENERAL'S OFFICE**

_(signature)_ Bridget Hill                                      12/2/24
Bridget Hill, Attorney General                                 Date

**CONTRACTOR:**
**MOTLEY RICE LLC**

_(signature)_ Linda Singer / AS                               11/26/2024
Linda Singer, Attorney at Law                                  Date

**ATTORNEY GENERAL'S OFFICE:  APPROVAL AS TO FORM**

_(signature)_ #245002                                         11-20-2024
Tyler M. Renner, Senior Assistant Attorney General            Date



# *Office of the Attorney General*

| | | |
|---|---|---|
| **Governor**<br>Mark Gordon | Administrative Division<br>109 State Capitol<br>Cheyenne, Wyoming  82002<br>307-777-7841 Telephone<br>307-777-6869 Fax | **Chief Deputy Attorney General**<br>Ryan Schelhaas |
| **Attorney General**<br>Bridget Hill | | |

## APPOINTMENT OF
## SPECIAL ASSISTANT ATTORNEY GENERAL

I, Bridget Hill, Attorney General of the State of Wyoming, having deemed it necessary and pursuant to Wyo. Stat. Ann. § 9-1-608(b), do hereby appoint Paige Boggs of Motley Rice, LLC as a Special Assistant Attorney General.

The authority of said appointment and commission shall be expressly limited to representing the State of Wyoming in an investigation and litigation into the billing practices of pharmacy benefit managers.

This appointment is effective on the date set forth below and shall continue until solution of the matter or revoked in writing by me.

This appointment is limited to the above, and the appointee's services shall be coordinated by my Office.

DATED this 12ᵗʰ of December, 2024.

Bridget Hill
Attorney General



# *Office of the Attorney General*

| | | |
|---|---|---|
| **Governor** | Administrative Division | **Chief Deputy Attorney General** |
| Mark Gordon | 109 State Capitol | Ryan Schelhaas |
| | Cheyenne, Wyoming 82002 | |
| **Attorney General** | 307-777-7841 Telephone | |
| Bridget Hill | 307-777-6869 Fax | |

## APPOINTMENT OF
## SPECIAL ASSISTANT ATTORNEY GENERAL

I, Bridget Hill, Attorney General of the State of Wyoming, having deemed it necessary and pursuant to Wyo. Stat. Ann. § 9-1-608(b), do hereby appoint Linda Singer of Motley Rice, LLC as a Special Assistant Attorney General.

The authority of said appointment and commission shall be expressly limited to representing the State of Wyoming in an investigation and litigation into the billing practices of pharmacy benefit managers.

This appointment is effective on the date set forth below and shall continue until solution of the matter or revoked in writing by me.

This appointment is limited to the above, and the appointee's services shall be coordinated by my Office.

DATED this 12th of December, 2024.

Bridget Hill
Attorney General

# ALSTON & BIRD

Vantage South End
1200 South Tryon Street, Suite 300
Charlotte, NC 28203-6818
(704) 444-1000 | Fax: 704-444-1111

**Michael R. Hoernlein**                    Direct Dial: **704-444-1041**                    Email: **michael.hoernlein@alston.com**

## STATE OF WYOMING PUBLIC RECORDS ACT REQUEST TO
## THE OFFICE OF THE ATTORNEY GENERAL

Request Submitted to:    Assistant Attorney General Megan Pope
2320 Capitol Avenue
Cheyenne, WY
Phone: (307) 777-6710
Email: ag.publicrecords@wyo.gov

Date Requested:    1/24/2025

Request Submitted by:    Email

Requester Information:    Michael R. Hoernlein
Alston & Bird LLP
Vantage South End
1200 South Tryon Street, Suite 300
Charlotte, NC 28203
Office Phone: (704) 444-1041
Email:  michael.hoernlein@alston.com

To Whom It May Concern:

In accordance with the provisions of the State of Wyoming's Public Records Act, W.S. §16-4-201 *et seq.*, I request the following documents that are in the possession, custody, or control of the State of Wyoming:

1.    All agreements or contracts concerning the State of Wyoming's retention, engagement, or appointment of any outside lawyer or law firm in connection with any investigation or litigation related to pharmacy benefit management, pharmacy care services, pharmaceuticals (including but not limited to opioids), health care, Medicare, or Medicaid, including but not limited to any engagement letters, appointment letters, retention agreements, or contingency-fee agreements;

2.    Records sufficient to show all payments or disbursements made by the State of Wyoming to any outside lawyer or law firm in connection with any investigation or litigation related to pharmacy benefit management, pharmacy care services, pharmaceuticals (including but not limited to opioids), health care, Medicare, or Medicaid;

3.    All documents and information regarding OptumRx, Inc. that (a) the State of Wyoming has gathered or created in connection with any pre-litigation investigation into OptumRx,

Wyoming Public Records Act Request to the State Attorney General
January 24, 2025
Page 2

Inc. and (b) any outside lawyer or law firm has had access to by virtue of its
representation of or other service to the State of Wyoming;

4.      All communications regarding OptumRx, Inc. that the State of Wyoming has exchanged
with any outside lawyer or law firm;

5.      All communications regarding OptumRx or pharmacy benefit management that the State
of Wyoming has exchanged with the National Association of Attorneys General, the
Republican Association of Attorneys General, or the Democratic Attorneys General
Association;

6.      If not encompassed by the requests above, all documents related to the State of
Wyoming's appointment of any outside lawyer or law firm in connection with any
investigation or litigation related to pharmacy benefit management, pharmacy care
services, pharmaceuticals (including but not limited to opioids), health care, Medicare,
or Medicaid; and

7.      If not encompassed by the requests above, records sufficient to show any restrictions or
limitations on the State of Wyoming or any outside lawyer's or law firm's use of any
documents or information produced or collected in connection with any investigation or
litigation related to pharmacy benefit management, pharmacy care services,
pharmaceuticals (including but not limited to opioids), health care, Medicare, or
Medicaid.

The relevant time period is 2016 through the present. Please send electronic copies of the
requested documents to michael.hoernlein@alston.com in PDF format.

Thank you for your attention to this matter.

Sincerely,

Michael R. Hoernlein

# Exhibit S

to Declaration of Matthew Hooker

# NOTICE TO REQUESTER

TO:     Alston & Bird, LLP , c/o Michael R. Hoernlein, Esq., 1120 South Tryon Street, Suite 300, Charlotte, NC 28203-6818; michael.hoernlein@alston.com
            (Requester's name)

FROM:    State of Hawai'i, Department of the Attorney General, hawaiiag@hawaii.gov
            (Agency, and agency contact person's name, telephone number, mailing, & email address)

DATE THAT THE RECORD REQUEST WAS RECEIVED BY AGENCY: February 18, 2025

DATE OF THIS NOTICE: March 4, 2025

**GOVERNMENT RECORDS YOU REQUESTED** (attach copy of request or provide brief description below):
1. See attached letter dated February 18, 2025.
2.
3.
4.

**THIS NOTICE IS TO INFORM YOU THAT YOUR RECORD REQUEST:**

☐   **Will be granted in its entirety.**

☐ **Cannot be granted. Agency is unable to disclose the requested records for the following reason:**

     ☐     Agency does not maintain the records. (HRS § 92F-3)
           Other agency that is believed to maintain records: _____

     ☐     Agency needs further clarification or description of the records requested. Please contact the agency and provide the following information: _____

     ☐     Request requires agency to create a summary or compilation from records, but requested information is not readily retrievable. (HRS § 92F-11(c))

☐ **Will be granted in part and denied in part,   OR   ☒ Is denied in its entirety**
**Although the agency maintains the requested records, it is not disclosing all or part of them based on the exemptions provided in HRS § 92F-13 and/or § 92F-22 or other laws cited below.**
(Describe the portions of records that the agency will not disclose.)

| RECORDS OR INFORMATION WITHHELD | APPLICABLE STATUTES | AGENCY JUSTIFICATION |
|---|---|---|
| Requested report as detailed in request dated February 18, 2025 | Hawaii Revised Statutes Section 92F-13(2), (3), and (4). | See explanation below. |

The State of Hawaii, Department of the Attorney General (State) is in active litigation with OptumRx, who is being represented by requestor Alston & Bird. The requested document is a report created during the investigation of Alston & Bird's client, OptumRx, which led to the State filing its case against OptumRx.

We previously requested that Alston & Bird show that its request is distinct from disallowed discovery in the State's case against OptumRx. Alston & Bird claims it is not trying to circumvent the discovery process and that the requested record is "relevant to other cases that other plaintiffs are pursuing against OptumRx (and related entities) in other jurisdictions. Alston & Bird's carefully crafted statement is silent on the obvious – the requested record is relevant to the State's active litigation against OptumRx and the disclosure of such record is subject to the court's supervision.

As counsel for co-Defendant Caremark PCS Health, L.L.C. understands, the Circuit Court previously issued an order in State v. JUUL labs, Inc., et al., admonishing defendants for attempting to use UIPA to circumvent discovery and requiring compliance with the rules of civil procedure. This decision is consistent with the United States Supreme Court's decision in *NLRB v. Robbins Tire & Rubber Co.*, which rejected a Freedom of Information Act request in connection with an enforcement proceeding, which would "giv[e] a party litigant earlier and greater access" to information and noting that "FOIA was not intended to function as a private discovery tool." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 241-42 (1978) (emphasis in original).

Indeed, HRS §92F-13 exempts from disclosure records "pertaining to the prosecution or defense" of any judicial action to which the State may be a party "to the extent that such records would not be discoverable." and records protected from disclosure pursuant to state law.  As you know, your firm has consistently opposed the State's efforts to conduct discovery in the litigation, and discovery is currently stayed. Thus, on its face, your requests improperly seek discovery that is unavailable under state law.

Finally, the State notes that Alston & Bird requested a redacted version of the requested record. Due to the content of the report, such extensive redaction would lead to almost entire pages being redacted. We do not believe that the intent of the request was to receive almost entirely redacted pages. However, if you are requesting entirely redacted pages, then please resubmit your request with such clarification.

**REQUESTER'S RESPONSIBILITIES**:

You are required to (1) pay any lawful fees and costs assessed; (2) make any necessary arrangements with the agency to inspect, copy or receive copies as instructed below; and (3) provide the agency any additional information requested. **For questions about this notice or the records being sought, please ask the agency's contact person named at the top of this form.**  Also, please submit your payment, if any, to the agency at the address listed at the top of this form.  DO NOT SEND YOUR PAYMENT to the Office of Information Practices (OIP) unless you are requesting records directly from OIP.

If you do not comply with the requirements set forth in this notice within 20 business days after the postmark date of this notice or the date the agency makes the records available, you will be presumed to have abandoned your request and the agency shall have no further duty to process your request.  Once the agency begins to process your request, you may be liable for any fees and costs incurred.  If you wish to cancel or modify your request, you must advise the agency upon receipt of this notice.

**Please note that the Office of Information Practices (OIP) does <u>not</u> maintain the records of other agencies, and a requester must seek records directly from the agency it believes maintains the records.**  If the agency denies or fails to respond to your written request for records or if you have other questions regarding compliance with the UIPA, then you may contact OIP at (808) 586-1400, oip@hawaii.gov, or 250 South Hotel Street, Suite 107, Honolulu, Hawaii, 96813.

### METHOD & TIMING OF DISCLOSURE:

Records available for public access in their entireties must be disclosed within a reasonable time, not to exceed 10 business days from the date the request was received, or after receipt of any prepayment required.  Records not available in their entireties must be disclosed within 5 business days after this notice or after receipt of any prepayment required.  HAR § 2-71-13(c).  If incremental disclosure is authorized by HAR § 2-71-15, the first increment must be disclosed within 5 business days of this notice or after receipt of any prepayment required.

**Method of Disclosure:**
☐    Inspection at the following location:
☐    As requested, a copy of the record(s) will be provided in the following manner:

☐    Available for pick-up at the following location: _____
☐    Will be mailed to you.
☐    Will be transmitted to you by other means requested: _____

**Timing of Disclosure:**  All records, or the first increment if applicable, will be made available or provided to you:

☐    On _____, 20____.

☐    **After prepayment** of 50% of fees and 100% of costs, as estimated below.

**For incremental disclosures**, each subsequent increment will be disclosed within 20 business days after:

    ☐    The prior increment (if one prepayment of fees is required and received), or

    ☐    Receipt of each incremental prepayment, if prepayment for each increment is required.

    **Records will be disclosed in increments because the records are voluminous and the following extenuating circumstances exist**:

        ☐    Agency must consult with another person to determine whether the record is exempt from disclosure under HRS chapter 92F.

        ☐    Request requires extensive agency efforts to search, review, or segregate the records or otherwise prepare the records for inspection or copying.

        ☐    Agency requires additional time to respond to the request in order to avoid an unreasonable interference with its other statutory duties and functions.

        ☐    A natural disaster or other situation beyond agency's control prevents agency from responding to the request within 10 business days.

## ESTIMATED FEES & COSTS AND PAYMENT:

FEES:  For personal record requests under Part III of chapter 92F, HRS, the agency may charge you for its costs only, and fee waivers do not apply.

For public record requests under Part II of chapter 92F, HRS, the agency is authorized to charge you fees to search for, review, and segregate your request (even if a record is subsequently found to not exist or will not be disclosed in its entirety).  The agency must waive the first $30 in fees assessed for general requesters, OR in the alternative, the first $60 in fees when the agency finds that the request is made in the public interest. Only one waiver is provided for each request. *See* HAR §§ 2-71-19, -31 and -32.

COSTS:  For either personal or public record requests, the agency may charge you for the costs of copying and delivering records in response to your request, and other lawful fees and costs.

PREPAYMENT:  The agency may require prepayment of 50% of the total estimated fees and 100% of the total estimated costs prior to processing your request.  If a prepayment is required, the agency may wait to start any search for or review of the records until the prepayment is received by the agency.  Additionally, if you have outstanding fees or costs from previous requests, including abandoned requests, the agency may require prepayment of 100% of the unpaid balance from prior requests before it begins any search or review for the records you are now seeking.

**The following is an itemization of what you must pay, based on the estimated fees and costs that the agency will charge you and the applicable waiver amount that will be deducted:**

**For public record requests only:**

| | | | |
|---|---|---|---|
| **Fees**: | Search | Estimate of time to be spent:___ hours<br>($2.50 for each 15-minute period) | $ |
| | Review & segregation | Estimate of time to be spent: ____ hours<br>($5.00 for each 15-minute period) | $ |
| | Fees waived | ☐general ($30), **OR** ☐ public interest ($60)<br>(Only one waiver per request) | <$ ____> |
| | Other | Click or tap here to enter text.<br>(Pursuant to HAR §§ 2-71-19 & 2-71-31) | $ |

**Total Estimated Fees:**                                                                    $

<u>**For public or personal record requests**</u>

**Costs**: Copying               Estimate of # of pages to be copied: _____$
                                  (@  $ _____  per page, pursuant to HRS § 92-21)

         Delivery               Postage                                              $

         Other                  Click or tap here to enter text.                     $

**Total Estimated Costs:**                                                           $

**TOTAL ESTIMATED FEES AND COSTS from above:**                                       $

☐       **The estimated fees and costs above are for the first incremental disclosure only.   Additional fees
        and costs, and no further fee waivers, will apply to future incremental disclosures.**

☐       **PREPAYMENT IS REQUIRED** (50% of fees + 100% of costs, as estimated above)    $

☐       **UNPAID BALANCE FROM PRIOR REQUESTS** (100% must be paid before work begins)  $

# TOTAL AMOUNT DUE AT THIS TIME                                                      $

         Payment may be made by:  ☐  cash
                                  ☐  personal check payable to:  Click or tap here to enter text.
                                  ☐  other
         **Submit your payment to the agency at the address listed at the beginning of this form, including
         the name of the agency's contact person.**

# ALSTON & BIRD

Vantage South End
1120 South Tryon Street, Suite 300
Charlotte, NC 28203-6818
704-444-1000 | Fax: 704-444-1111

**Michael R. Hoernlein**                Direct Dial: **+1 704 444 1041**                Email: **michael.hoernlein@alston.com**


February 18, 2025


**BY EMAIL**

Department of the Attorney General
State of Hawaii
hawaiiag@hawaii.gov

      **Re:**    **Request for Public Records**

Dear Sir/Madam:

      I write in response to your February 11, 2025 Notice to Requester regarding my January 13, 2025 request for public records, in which you confirmed that the Department of the Attorney General "maintains the requested records" but declines to disclose them (other than certain documents responsive to Request #1 that had already been disclosed to another attorney at my firm in December 2023).

      As a threshold matter, my January 2025 request for public records is not an attempt to circumvent the discovery process in the ongoing civil litigation that the State of Hawaii is pursuing against OptumRx, Inc. (and related entities) in the U.S. District Court for the District of Hawaii. The publicly available documents that I'm seeking are relevant to other cases that other plaintiffs are pursing against OptumRx (and related entities) in other jurisdictions.

      You declined to provide relevant materials on several other grounds, including that (1) I did not include search terms, (2) the relevant time period spans approximately nine years, and (3) certain of the requests seek "all" documents in various categories. In addition, you estimate that the requirement prepayment for the requested documents "would well exceed $1 million" given the "enormity" of my request.

      To address the Department's concerns and to minimize the burden of locating, reviewing, and producing the full scope of information that I requested, I will limit my request to the following for now (subject to submitting additional requests in the future):

Alston & Bird LLP                                                                                    www.alston.com

Request for Public Records
February 18, 2025
Page 2

A copy of the report described in Section 1.1 of the Scope of Services (Attachment 1 to the Agreement for Special Deputy Attorney General Services, effective April 29, 2021, between the Department of the Attorney General for the State of Hawaii and Motley Rice LLC).

If you believe that any portion of the report is exempt from production, please produce a redacted version of the report and specifically identify the basis for the exemption.

Thank you for your attention to this request. If you have any questions about it, I'd be happy to discuss it.

Sincerely,

Michael R. Hoernlein