Bentley J. Tolk (6665)
Rodger M. Burge (8582)
**PARR BROWN GEE & LOVELESS**
101 South 200 East, Suite 700
Salt Lake City, UT 84111
T: (801) 532-7840
btolk@parrbrown.com
rburge@parrbrown.com

Matthew P. McGuire (admitted *pro hac vice*)
**ALSTON & BIRD LLP**
555 Fayetteville Street, Suite 600
Raleigh, NC 27601
T: (919) 862-2200
matt.mcguire@alston.com

*Attorneys for OptumRx, Inc.*

## THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

| | |
|---|---|
| STATE OF UTAH and DIVISION OF CONSUMER PROTECTION, <br><br> Plaintiffs, <br><br> v. <br><br> EXPRESS SCRIPTS, INC., et al., <br><br> Defendants. | **REPLY SUPPORTING OPTUMRX, INC.'S MOTION TO DISQUALIFY MOTLEY RICE** <br><br> **(ORAL ARGUMENT REQUESTED)** <br><br> Case No. 2:25-cv-00088-JNP-DBP <br><br> Chief District Judge Jill N. Parrish <br><br> Chief Magistrate Judge Dustin B. Pead |

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... iii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ........................................................................................................................ 2

I.    MOTLEY RICE'S ATTORNEYS WERE "PUBLIC OFFICERS OR EMPLOYEES." ............................................................................................. 2

II.   MOTLEY RICE'S DEFINITION OF "CONFIDENTIAL GOVERNMENT INFORMATION" WOULD RENDER RULE 1.11(c) A NULLITY. ................................ 5

     A.    D.C., Hawaii, and Chicago are prohibited from disclosing the information obtained about OptumRx through the investigations. ................................................. 6

     B.    The information is not "otherwise available to the public." .................................... 7

     C.    "Confidential government *information*" is not limited to *documents* ..................... 9

III.  THE STATE IS MOTLEY RICE'S "PRIVATE CLIENT." ........................................... 12

IV.   MOTLEY RICE COULD USE THE CONFIDENTIAL GOVERNMENT INFORMATION TO OPTUMRX'S MATERIAL DISADVANTAGE HERE. .............. 14

CONCLUSION ................................................................................................................... 17

REQUEST FOR ORAL ARGUMENT .............................................................................. 17

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Anne Arundel County v. Express Scripts, Inc.*,
  2025 WL 254807 (D. Md. Jan. 21, 2025) .......................................................................4, 13

*City of Chicago v. Purdue Pharma L.P.*,
  2015 WL 920719 (N.D. Ill. Mar. 2, 2015) ........................................................................4, 5

*Conant v. Robins, Kaplan, Miller & Ciresi, LLP*,
  603 N.W.2d 143 (Minn. Ct. App. 1999) ...........................................................................4, 5

*County of Santa Clara v. Super. Ct.*,
  235 P.3d 21 (Cal. 2010) ........................................................................................................5

*Davis v. S. Bell Tel. & Tel. Co.*,
  149 F.R.D. 666 (S.D. Fla. 1993) ..........................................................................................9

*State ex rel. Discover Fin. Servs., Inc. v. Nibert*,
  744 S.E.2d 625 (W. Va. 2013) ..............................................................................................4

*Doe v. Francis*,
  2006 WL 8444030 (N.D. Fla. May 8, 2006) ........................................................................5

*Gen. Motors Corp. v. New York*,
  501 F.2d 639 (2d Cir. 1974) ...............................................................................................17

*People ex rel. Harrison v. Express Scripts, Inc.* (*L.A. County I*),
  No. 23STCV20886 (Cal. Super. Ct. Nov. 14, 2024) ..................................................4, 11, 13

*Kronberg v. LaRouche*,
  2010 WL 1443934 (E.D. Va. Apr. 9, 2010) ............................................................10, 11, 14

*United States ex rel. Maxwell v. Kerr-McGree Oil & Gas Corp.*,
  540 F.3d 1180 (10th Cir. 2008) ............................................................................................8

*In re Nat'l Prescription Opiate Litig.*,
  2019 WL 1274555 (N.D. Ohio Mar. 20, 2019) ......................................................10, 12, 15

*In re Nat'l Prescription Opiate Litig.*,
  2024 WL 3387288 (N.D. Ohio Mar. 18, 2024) ........................................................4, 13, 14

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
    2006 WL 6846702 (E.D.N.Y. Aug. 7, 2006)..........................................................16

*People v. OptumRx, Inc.* (*L.A. County II*),
    2025 WL 2542288 (Cal. Ct. App. Sep. 4, 2025) ....................................................4

*Regan-Touhy v. Walgreen Co.*,
    526 F.3d 641 (10th Cir. 2008) ...............................................................................8

*Seattle Times Co. v. Rhinehart*,
    467 U.S. 20 (1984)..................................................................................................8

*State v. Lead Indus. Ass'n*,
    951 A.2d 428 (R.I. 2008) .......................................................................................4

*United States v. Huawei Techs. Co.*,
    2020 WL 903007 (E.D.N.Y. Feb. 25, 2020)..........................................................16

*United States v. Villaspring Health Care Center, Inc.*,
    2011 WL 5330790 (E.D. Ky. Nov. 7, 2011)..................................................10, 14

**Statutes**

5 Ill. Comp. Stat. 140/7(1)(g)..........................................................................................6

D.C. Code § 2-534(a)(1) ..................................................................................................6

Haw. Rev. Stat. § 480-18(j) .............................................................................................6

**Other Authorities**

ABA Comm. on Ethics & Prof. Resp., Formal Op. 97-409 (1997)..................................3

ABA Comm. on Ethics & Prof. Resp., Formal Op. 509 (2024) ...........................*passim*

Fed. R. Civ. P. 26(b)(1)...................................................................................................8

N.Y. State Bar Ass'n Comm. on Prof. Ethics, Op. 1187 (2020) ...................................15

Neb. Ethics Advisory Op. for Lawyers, Op. 22-01 (2022)............................................15

Utah R. Prof. Conduct 1.11(c) ...............................................................................*passim*

Utah R. Prof. Conduct 1.11, cmt. 4................................................................................12

## INTRODUCTION

Rule 1.11(c) prohibits a government lawyer from acquiring confidential government information about a party and then representing another client in a matter in which that lawyer could use the confidential government information to the party's material disadvantage. The Rule protects against the abuse of government power and prohibits lawyers from leveraging access to government information to enrich themselves or gain a strategic advantage for their private clients.

Yet that is what Motley Rice is doing. Motley Rice has built a business model premised on convincing governments to appoint the firm's lawyers as deputy attorneys general to investigate companies and then using the fruits of those investigations in private civil lawsuits against the same companies. That practice violates Utah's ethics rules. *See* ECF No. 58-3 (**Hooker Decl.**) Ex. A (**Montgomery/Muchman Rep.**) at 1–3, 18–40; 2nd Hooker Decl. Ex. A (**Montgomery/Muchman Suppl. Rep.**) at 1, 8–38.

Motley Rice does not dispute the facts. It does not deny that its lawyers served as deputized attorneys general for D.C., Hawaii, and Chicago. It does not deny that it used government power to obtain confidential information about OptumRx. It does not deny that it signed agreements acknowledging that the produced information was confidential and promising not to disclose or use it outside of the investigations. It does not deny that its investigations gave it strategic insights into OptumRx's operations. And it does not deny that the information its lawyers acquired as government investigators is relevant and helpful in litigating against OptumRx here.

Instead, Motley Rice tries to erase its ethical conflict by interpreting Rule 1.11(c) in a way that, if accepted, would write the Rule out of existence. Motley Rice contends that the information it obtained through the investigations it conducted is not "confidential government information"

1

because some (but not all) of that information can be obtained from OptumRx in "routine discovery" in civil litigation. ECF No. 74 (**Opp'n**) at 12–18. And for much the same reason, Motley Rice asserts that OptumRx cannot show any potential "material disadvantage" because other plaintiffs' counsel can access some (but not all) of that information in the MDL discovery repository. *Id*. at 20–23. Accepting those arguments would render Rule 1.11(c) a dead letter.

Consider a hypothetical: A Utah State Tax Commission lawyer has access to business tax returns as part of her job duties and in that role learns confidential information about TargetCo. If that lawyer later leaves the government and enters private practice, she cannot represent any client in a matter in which she could use that confidential information against TargetCo. That lawyer cannot later claim that her ethical violation evaporates because TargetCo's tax return might be discoverable in subsequent civil litigation. But that is precisely the rule that Motley Rice advocates.

As OptumRx's experts, including a member of the ABA's ethics committee have explained, "[w]e do not believe that this is a close call. There can be no more obvious violation of Rule 1.11(c) than Motley Rice's." Montgomery/Muchman Rep. at 51. OptumRx's interpretation of Rule 1.11(c) is consistent with the policies underlying the Rule, the case law, and on-point ethics opinions. Its motion is not "tactical" or "disguised harassment." Opp'n at 24–25. Rather, OptumRx is asking this Court to end a law firm's abuse of government power.

## **ARGUMENT**

### I. **MOTLEY RICE'S ATTORNEYS WERE "PUBLIC OFFICERS OR EMPLOYEES."**

Motley Rice first argues that its lawyers were not "public officers or employees" under Rule 1.11(c) when they investigated OptumRx on behalf of three governments. That argument is frivolous. ABA Formal Opinion 509 states unequivocally: "Rule 1.11(c) applies . . . to lawyers in

private practice who are appointed to be special prosecutors and continue to represent private clients." ABA Comm. on Ethics & Prof. Resp., Formal Op. 509 at 8 (2024).

Motley Rice's contrary argument—that its lawyers were "subject to the control and supervision of government attorneys and thus did not wield government authority," Opp'n at 11—gets it backward. It is precisely *because* they were subject to supervision and control of government lawyers that they were wielding government authority and not merely serving as private, outside lawyers. Motley Rice and its expert rely on ABA Formal Opinion 97-409—a nearly 30-year-old ethics opinion. *Id.*; *see* ECF No. 74-7 at 39–40. But that decades-old decision does not undermine OptumRx's position. In Formal Opinion 97-409, the ABA explicitly *left open* the question of whether a lawyer retained by the government under a special designation would be subject to Rule 1.11(c), even hinting that the commentary to the Rule suggested the answer was "yes." *See* ABA Comm. on Ethics & Prof. Resp., Formal Op. 97-409 at 5 n.4 (1997) ("Rule 1.11 applies by its terms only to lawyers who have served as 'public officer[s] or employees[s],' although the commentary suggests that this category may include lawyers who are 'specially retained' as well as those who are 'employed' by the government.").

ABA Formal Opinion 509 addresses the issue head on. But Motley Rice fails to mention (let alone distinguish) it.[1] In Formal Opinion 509, the ABA explained that Rule 1.11(c) applies to specially appointed lawyers. *See* ABA Formal Op. 509 at 8 ("Rule 1.11(c) applies . . . to lawyers in private practice who are appointed to be special prosecutors and continue to represent private clients."). And further, the ABA explained that the Rule broadly applies to *all* lawyers who acquire

---

[1] Motley Rice (and its expert) has consistently failed to address or distinguish Formal Opinion 509 on this issue in every brief to date across numerous cases, despite having ample opportunity to do so and despite citing to Formal Opinion 509 for other propositions.

confidential information while in government service, regardless of whether they "served in a representational capacity when they acquired the government information." *Id*. at 3.

Formal Opinion 509 promotes a practical, common-sense understanding of Rule 1.11(c). No one would agree that an Assistant United States Attorney or an Assistant Attorney General could investigate a company using government subpoenas and later sue that investigation target when they enter private practice. Motley Rice is no different here. *See also People ex rel. Harrison v. Express Scripts, Inc.* (*L.A. County I*), No. 23STCV20886, order at 3–4 (Cal. Super. Ct. Nov. 14, 2024);[2] *In re Nat'l Prescription Opiate Litig.*, 2024 WL 3387288, at *7 (N.D. Ohio Mar. 18, 2024); *Anne Arundel County v. Express Scripts, Inc.*, 2025 WL 254807, at *8 (D. Md. Jan. 21, 2025). Motley Rice's argument—that its retainer agreements with the governments described Motley Rice as an independent contractor and left control to the government entities—"elevates form over substance, glossing over the role Motley Rice really played and the powers it deployed" in the investigations. *In re Nat'l Prescription Opiate Litig.*, 2024 WL 3387288, at *7.

Motley Rice argues that its arrangements are more akin to "*ad hoc*" representations that fall outside Rule 1.11(c)'s ambit. Opp'n at 11. But Motley Rice primarily relies on inapposite authority. *Id.* at 11, 24 n.14. *Lead Industries Association* and *Nibert* involved the propriety of contingency-fee arrangements for outside counsel to governments in regular civil litigation. *State v. Lead Indus. Ass'n*, 951 A.2d 428, 474–80 (R.I. 2008); *State ex rel. Discover Fin. Servs., Inc. v. Nibert*, 744 S.E.2d 625, 634 (W. Va. 2013). *City of Chicago* and *Conant* considered whether the government could outsource certain authority to private attorneys and whether contingency-fee

---

[2] The same day the State filed its response brief, the California Court of Appeal affirmed *L.A. County I* in an unpublished decision addressing only "confidential government information." *People v. OptumRx, Inc.* (*L.A. County II*), 2025 WL 2542288 (Cal. Ct. App. Sep. 4, 2025).

compensation was allowed. *City of Chicago v. Purdue Pharma L.P.*, 2015 WL 920719, at *3–4 (N.D. Ill. Mar. 2, 2015); *Conant v. Robins, Kaplan, Miller & Ciresi, LLP*, 603 N.W.2d 143, 149 (Minn. Ct. App. 1999). Those cases say nothing about Rule 1.11(c) generally or about its implications for Motley Rice's conduct specifically.[3] And *Santa Clara* actually *emphasizes* that private contingency-fee attorneys are subject to the *same* heightened standards as public officers when hired by the government. *County of Santa Clara v. Super. Ct.*, 235 P.3d 21, 35 (Cal. 2010).

This Court should apply the prevailing standard under ABA Formal Opinion 509 and hold that Motley Rice was a "public officer or employee." It does not matter whether Motley Rice's retainer agreements with those governments designated Motley Rice as an independent contractor. It does not matter whether Motley Rice worked on a contingency-fee basis. The relevant question for the Court is: Did the firm exercise power bestowed on the government? The answer is yes, so Motley Rice is subject to Rule 1.11(c). *See also* Montgomery/Muchman Suppl. Rep. at 15–20.

## II. MOTLEY RICE'S DEFINITION OF "CONFIDENTIAL GOVERNMENT INFORMATION" WOULD RENDER RULE 1.11(c) A NULLITY.

Motley Rice argues that the information it obtained about OptumRx during the government investigations is not "confidential government information" because *some* of that information—the produced documents—is available through "routine discovery." Opp'n at 13. Motley Rice is wrong. Under the Rule, "confidential government information" is information that (1) is "obtained under governmental authority," (2) the government "is prohibited by law from disclosing to the public, or has a legal privilege not to disclose," and (3) "is not otherwise available to the public."

---

[3] Motley Rice also cites to another inapplicable case involving Florida's "successive" representation rule that is different from Utah's Rule 1.11(c). *Doe v. Francis*, 2006 WL 8444030, at *9–10 (N.D. Fla. May 8, 2006).

Utah R. Prof. Conduct 1.11(c). Motley Rice does not dispute that the first element is met. Instead, it improperly collapses the second and third elements and gets it wrong on both. Opp'n at 12–18.

> ### A.      D.C., Hawaii, and Chicago are prohibited from disclosing the information obtained about OptumRx through the investigations.

Confidential government information is information that "the government" is "prohibited by law from disclosing" *or* "has a legal privilege not to disclose." Utah R. Prof. Conduct 1.11(c). OptumRx's confidentiality agreements with D.C., Hawaii, and Chicago expressly prohibit those governments from disclosing the confidential information obtained through the investigations. *See* Hooker Decl. Ex. D ¶¶ 4, 8–10; Hooker Decl. Ex. J ¶¶ 2, 4; Hooker Decl. Ex. N ¶¶ 3–4, 9, 11. So too does state law. *See, e.g.*, Haw. Rev. Stat. § 480-18(j); D.C. Code § 2-534(a)(1); 5 Ill. Comp. Stat. 140/7(1)(g). That should end the analysis.

Motley Rice ignores those state laws prohibiting disclosure and argues that the confidentiality agreements do not control because they permit disclosure if ordered by a court. Opp'n at 14. But it is the *governments'* obligations that are relevant to that second element. Although the MDL court ordered *OptumRx* to reproduce the investigation documents into the MDL repository, it is undisputed that D.C., Hawaii, and Chicago—the "government[s]" under Rule 1.11(c)—remain bound by state law and the confidentiality agreements to treat the information as protected and confidential.[4] There is no law or court order rescinding those protections or requiring the government to disclose the information.

---

[4] As OptumRx pointed out, Wyoming and Hawaii recently *refused* to produce OptumRx investigation materials in response to public-records requests. Mot. at 17; Hooker Decl. Exs. R, S. Motley Rice dismisses OptumRx's arguments about how documents are treated under state public-records laws, Opp'n at 17, but the ABA and ethics experts point to those laws when analyzing whether information is protected from disclosure, *see* ABA Formal Op. 509 at 4 n.13;

**B.    The information is not "otherwise available to the public."**

Motley Rice next argues that the information it obtained about OptumRx is not "confidential government information" under Rule 1.11(c) because some of that information—the documents OptumRx produced—are "otherwise available to the public" by virtue of being obtainable through "routine discovery" in civil litigation. Opp'n at 10–16. Motley Rice draws its reference to "routine discovery" not from the text of Rule 1.11(c) but rather from a line in ABA Formal Opinion 509: "Whether government information is publicly available—e.g., whether it can be obtained through routine discovery—will be a question of fact." ABA Formal Op. 509 at 4.

The term "routine discovery" is not in Rule 1.11(c)'s text. Nor does Formal Opinion 509 explain what the ABA committee meant by it. If the phrase has any meaning, it must be limited to information produced in discovery that is *not* subject to confidentiality protections. Indeed, one of OptumRx's experts in this case is a member of the ABA committee that published Formal Opinion 509. As she explains, the term "routine discovery" does not apply to information produced under a protective order or confidentiality agreement. *See* Montgomery/Muchman Rep. at 29, 46 (explaining that materials produced "pursuant to a protective order" are "not 'routine' discovery material" and noting that the opioid MDL court "rel[ied] on only one word from the ABA opinion taken out of context, namely 'routine' discovery"); Montgomery/Muchman Suppl. Rep. at 20–28.

That understanding is consistent with common sense and the law on discovery. In no other context does "otherwise available to the public" mean "otherwise available to a limited group of attorneys who are subject to a protective order." Moreover, the mere act of production in civil

---

Montgomery/Muchman Rep. at 28. If governments cannot disclose investigatory materials in response to public-records request, the information is—by definition—prohibited from disclosure.

discovery—and particularly under a protective order—does not render a document publicly available. *E.g.*, *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 33 (1984); *United States ex rel. Maxwell v. Kerr-McGree Oil & Gas Corp.*, 540 F.3d 1180, 1185–86 (10th Cir. 2008).

Motley Rice dismisses *Seattle Times* as "merely" addressing "a court's power to enter protective orders." Opp'n at 18 n.9. But it is precisely that power that ensures that civil discovery does not draw confidential documents into the public domain. Under a discovery protective order, documents subject to its protections are *not* publicly available. Nor is OptumRx arguing, as Motley Rice suggests, that simply marking a document as confidential "*per se*" takes that document out of the ambit of discovery. Opp'n at 13. Quite the contrary. A document can be *both* discoverable and confidential. No one would argue that a person's medical records are publicly available. Yet those documents would undeniably be discoverable in a civil action by that person for injuries from a car accident. That is why protective orders exist—to protect confidential, yet discoverable, documents from public view. At no point has Motley Rice challenged the confidentiality of the information. Nor would it be proper for Motley Rice to use this litigation to collaterally challenge the confidentiality of information produced in a separate investigation.

The phrase "routine discovery" cannot mean what Motley Rice suggests—that all highly confidential business documents produced in response to government investigative subpoenas cease to be confidential government information if the same documents can be requested in civil discovery. Under that interpretation, virtually nothing that the government learns in an investigation would qualify as confidential government information. *See e.g.*, *Regan-Touhy v. Walgreen Co.*, 526 F.3d 641, 649 (10th Cir. 2008) (Gorsuch, J.) ("Under our rules, parties to civil litigation are given broad discovery privileges."); Fed. R. Civ. P. 26(b)(1) ("Parties may obtain

discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case.").

Motley Rice proposes an unduly narrow view of "confidential government information" that would be limited to things like "grand jury materials." Opp'n at 15, 18. But even grand jury materials are discoverable in civil litigation when the request is directed to the original producing party.[5] In sum, Motley Rice proposes a rule where virtually everything produced in response to government subpoenas would be deemed "otherwise available to the public" because it can be requested in a later civil action. That cannot be the rule. A definition of "otherwise available to the public" that includes documents *not* available to the public is contrary to Rule 1.11(c)'s plain text and common sense. OptumRx has provided unrebutted evidence that the documents and information are "highly confidential and commercially sensitive to OptumRx and are not available to the public." Hooker Decl. ¶ 9; *see also* ECF No. 58-1 (**Caplis Decl.**) ¶¶ 15, 16, 22. Inasmuch as they have been produced in discovery, they have been produced subject to protective orders and remain "not otherwise available to the public."

### C.    "Confidential government *information*" is not limited to *documents*.

Motley Rice invites this Court to make the same mistake that other courts have—to focus on only the *documents* that OptumRx produced and to ignore all other *information* about OptumRx that Motley Rice obtained. Opp'n at 14–16. That includes D.C.'s, Hawaii's, and Chicago's internal documents, the investigating attorneys' discussions regarding the investigations, and materials that

---

[5] Motley Rice also cites to a rarely cited outlier case from Florida for its broad "routine discovery" argument. *See* Opp'n at 13 (citing *Davis v. S. Bell Tel. & Tel. Co.*, 149 F.R.D. 666 (S.D. Fla. 1993)). That case is readily distinguishable. The lawyer in *Davis* filed the private litigation *before* assisting in a state investigation. *Davis*, 149 F.R.D. at 674. As a result, the then-applicable Florida rule—entitled "*Successive* Government and Private Employment"—did not apply. *Id.*

other sources produced in the investigations. Mot. at 15–18. None of that information is available in the MDL discovery repository—it is information not available even to OptumRx, let alone the public—so it is confidential government information even under Motley Rice's flawed definition.

That information represents, among other things, "strategic insights," including Motley Rice's "knowledge of the strengths and weaknesses of the evidence compiled against" OptumRx that the firm "may not now use . . . to benefit [its] client." *United States v. Villaspring Health Care Center, Inc.*, 2011 WL 5330790, at *6 (E.D. Ky. Nov. 7, 2011); *see also Kronberg v. LaRouche*, 2010 WL 1443934, at *4 (E.D. Va. Apr. 9, 2010) ("At the very least, Markham surely has a mental roadmap concerning LaRouche and his activities that was shaped at least in part by his access to confidential government information."). Even the MDL court recognized this distinction when disqualifying a defense lawyer. *See In re Nat'l Prescription Opiate Litig.*, 2019 WL 1274555, at *4–5 (N.D. Ohio Mar. 20, 2019) (disqualifying lawyer where nonpublic information obtained during government service related to the "heart" of the claims at issue and included "direct reports" from law enforcement agencies "conveyed primarily" through meetings, sidebars, and other "communications . . . shared in a spirit of confidence and trust").

Motley Rice's attempt to discount those other types of confidential government information is unpersuasive. It tries to distinguish authorities like *Villaspring* and *Kronberg*, Opp'n at 14–15, but it fails to address those courts' express consideration of non-documentary sources of information. Motley Rice argues that *Villaspring* is factually unanalogous as a "side-switching" case. Opp'n at 14–15. But the "side-switching" aspect of *Villaspring* was relevant only to the court's separate analysis under Rule 1.11(*a*). 2011 WL 5330790, at *4–6. Unlike Rule 1.11(a), Rule 1.11(c) applies regardless of whether there is side switching. Motley Rice also dismisses

*Kronberg* as irrelevant, claiming that the confidential government information there was grand jury information. Opp'n at 15. But *Kronberg* involved not only grand jury information but also other information stemming from the investigation and prosecution. 2010 WL 1443934, at *1–3. What's more, the court emphasized that even if *some* of the at-issue information had entered "the public record," not "*all* of the information that was confidential" had become public and "certain materials . . . remain redacted or classified . . . [so] at least some information constituting confidential government information during the 1980's prosecutions remains confidential government information today." *Id.* at *3. That reasoning is persuasive and directly relevant here.

Motley Rice tries to downplay the concrete examples of other types of confidential government information in this case, but its attempts fall flat. First, Motley Rice disregards any information gleaned from other investigation sources as "speculative, vague, and amorphous," claiming that OptumRx has not identified any "actual insights or mental roadmaps." Opp'n at 15–16. But the firm does not deny that it gathered information from other sources. Because the investigations were confidential (and remain shielded from public view), OptumRx has no way of knowing what precise information Motley Rice obtained from those sources. Second, Motley Rice points to *L.A. County I*'s speculation that a "strategic insight or mental roadmap, assuming one exists, would most likely derive from the documents themselves." *Id.* at 16 (quoting *L.A. County I*, order at 6). That assertion has no basis in the record, and even if true, it does not make those insights any less confidential or any more available to the public. And third, Motley Rice minimizes the meet-and-confers with OptumRx over confidentiality concerns, claiming that they "could not have presented any information independent of the documents," because these meetings were only about negotiating confidentiality agreements. *Id.* That too has no basis in the record and

minimizes the vital role that the meet-and-confer process plays in investigations and in developing litigation and investigation strategies. *E.g.*, Caplis Decl. ¶ 10; ECF No. 58-2 (**Grant Decl.**) ¶¶ 6–9. It also ignores those meetings' purpose—they were prompted by these same ethical concerns that OptumRx raised at the start of the investigations. *E.g.*, Caplis Decl. ¶¶ 5, 12–14, 20–22.

OptumRx's concrete examples of non-documentary confidential government information are not speculative, vague, or amorphous. And if there are some questions about the precise contours of that confidential government information, it is only because OptumRx cannot access the details of this information because it is *not publicly available*. The very nature of those types of information makes it impossible for OptumRx to say more. *See In re Nat'l Prescription Opiate Litig.,* 2019 WL 1274555, at *6 (disqualifying attorney while holding that there was "no need to know the[] details" of the "confidential, non-public information that was shared with" the government lawyer because what mattered was simply that it was not available to the public). To demand more specificity in that regard would impose an impossible burden on OptumRx.

## III.     THE STATE IS MOTLEY RICE'S "PRIVATE CLIENT."

Motley Rice next argues that the State is not the firm's "private client." Opp'n at 18–19. That elevates form over substance and ignores ABA Formal Opinion 509. A private client is "a client whom the lawyer represents in private practice, regardless of whether the client is a public entity or private individual or entity." ABA Formal Op. 509 at 1; *see id.* at 8 ("the term 'private client' . . . includes *public* entities and officials whom the lawyer represents in private practice"); Utah R. Prof. Conduct 1.11, cmt. 4 ("[W]here the successive clients are a government agency and another client, *public or private*, the risk exists that power or discretion vested in that agency might be used for the special benefit of the other client." (emphasis added)).

Motley Rice does not dispute that public entities like the State *can* be private clients under Rule 1.11(c), nor does Motley Rice make any attempt to explain away other courts' conclusion that the firm's government clients in opioid litigation are "private clients."[6] *See In re Nat'l Prescription Opiate Litig.*, 2024 WL 3387288, at *7–8; *Anne Arundel County*, 2025 WL 254807, at *9. Instead, Motley Rice seizes on one clause in Formal Opinion 509 to argue that its clients are "private clients" under Rule 1.11(c) only "if those clients are not legally entitled to employ the confidential information." Opp'n at 19 (quoting ABA Formal Op. 509 at 8–9). To Motley Rice, that means the State is not a "private client" because "Utah is legally entitled to access the information at issue." *Id.* at 19.

That is wrong. The State's "private client" status does not turn on access to documents but on the nature of the client and the representation. According to Motley Rice, *any* plaintiff that can access documents through the MDL repository cannot be a "private client" under Rule 1.11(c). By that logic, that would include *every* plaintiff in opioid litigation against OptumRx across the country. Motley Rice's position writes Rule 1.11(c)'s private-client requirement out of the Rule.

Motley Rice improperly conflates *access* to confidential government information with *entitlement to use* confidential government information. The firm acquired confidential information subject to confidentiality agreements that expressly prevent it from sharing that information with anyone else and from using that information in other matters. That some of the same documents may later be produced in the MDL does not legally entitle the State to use in this opioid lawsuit the confidential government information that Motley Rice acquired by wielding

---

[6] Motley Rice has abandoned this argument elsewhere. *See L.A. County*, order at 6 ("The third element is uncontested. It is undisputed that Plaintiff is a private client with adverse interests.").

government authority *in the investigations*. *See In re Nat'l Prescription Opiate Litig.*, 2024 WL 3387288, at *8 ("Put simply, Motley Rice represents public government entities in this MDL in its private practice. . . . Summit County is a public entity, but it is a 'private client' for the purpose of the Rule. And because Summit County is not Chicago, it is normally not entitled to benefit from confidential information Chicago's lawyers gained during official pursuit of their Chicago Investigation, even though Summit County and Chicago are both public entities."). Motley Rice's argument also fails to account for the fact that, as discussed above, the confidential government information is not limited to the documents in the MDL repository.

In representing the State here, Motley Rice is acting no differently from any other attorney representing a client in private civil litigation. The State is Motley Rice's "private client." *See* ABA Formal Op. 509 at 1; Montgomery/Muchman Suppl. Rep. at 14–15.

## IV.    MOTLEY RICE COULD USE THE CONFIDENTIAL GOVERNMENT INFORMATION TO OPTUMRX'S MATERIAL DISADVANTAGE HERE.

The "material disadvantage" standard focuses on what the lawyer knew when taking on the private representation, and whether the lawyer *could* use confidential government information to the investigated party's material disadvantage. Whether information could be used to the material disadvantage of the adverse party turns on whether the information is *relevant* to the private representation. *See* Mot. at 18–19. Without proposing any alternative, Motley Rice claims that the material disadvantage standard is "not one of simple relevancy." Opp'n at 22. Yet, before the MDL court's decision, the courts and ethics committees to consider the material-disadvantage standard all applied a simple relevance test. *E.g.*, *Kronberg*, 2010 WL 1443934, at *4 (material-disadvantage inquiry "requires the Court to engage in informed conjecture as to what information will become relevant as the case progresses"); *Villaspring*, 2011 WL 5330790, at *6 (finding

material disadvantage when the plaintiff "is now using that information to pursue the current action"); N.Y. State Bar Ass'n Comm. on Prof. Ethics, Op. 1187 at 3 (2020); (considering whether information could be used against a person "in plea negotiations or impeachment"); Neb. Ethics Advisory Op. for Lawyers, Op. 22-01 at 3150 (2022) (prohibiting representation when the information "could be used against an adverse party"). Indeed, in an earlier decision involving disqualification of a defense lawyer, even the MDL court applied the same test. *In re Nat'l Prescription Opiate Litig.*, 2019 WL 1274555, at *6 ("I have not asked the [Government] to share with me the details of the confidential, non-public information that was shared with Ms. Rendon through the Task Force process, as I have no need to know these details to render my decision. Nor is it necessary to try to determine whether Ms. Rendon has used any of this information in defending Endo, as Rule 1.11(c) prohibits representation when the information ***could*** be used to the material disadvantage of Cleveland or Cuyahoga County.").[7]

Motley Rice does not argue (nor can it) that the information that it obtained from the government investigations is *irrelevant* to this case. Indeed, Motley Rice does not dispute that those investigations focused on the same aspects of OptumRx's business that are at issue in this case—including formulary and clinical development, rebate negotiations, and client relationships. Instead, the firm claims that relevance is unimportant because the word "relevant" does not appear in Rule 1.11(c) and the "universe" of disqualifying confidential information is "a very small one." Opp'n at 19–20. But Rule 1.11(c) demands no quantitative analysis about "how much" of the

---

[7] In a footnote, Motley Rice claims without explanation that these decisions do not "connect[] relevancy with the material disadvantage standard." Opp'n at 22 n.10. Quite the contrary—the relevance of the information formed the basis for each court's material-disadvantage analysis.

information is relevant.[8] The test is far simpler: *Could* any of the confidential government information about a party be used to build a case against the adverse party? If so, the information could be used to that party's material disadvantage.

Motley Rice also wrongly argues that the material-disadvantage inquiry involves a comparison "to the position [the investigated party] would occupy if the plaintiffs had different counsel." Opp'n at 20 (quoting *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2006 WL 6846702, at *24 (E.D.N.Y. Aug. 7, 2006)). But the decision that Motley Rice cites does not support that proposition, which is ungrounded in Rule 1.11(c). It also contradicts Motley Rice's relevance argument.[9] In discussing material disadvantage, the court there repeatedly analyzed whether the confidential government information was "relevant to issues raised in this litigation." *In re Payment Card*, 2006 WL 6846702, at *24. Nor should this Court interpret that court's singular remark about how plaintiffs would fare with "different counsel" as a formulation of the material-disadvantage standard. No other court has relied on the case for that proposition. *See United States v. Huawei Techs. Co.*, 2020 WL 903007, at *3–5 (E.D.N.Y. Feb. 25, 2020) (citing *In re Payment Card* on other points).

Rule 1.11(c) is not concerned about what "any other attorney" could or could not have done. Opp'n at 21–22. Nor does access to discovery in the MDL provide "any other attorney" with the strategic foothold that Motley Rice has enjoyed against OptumRx since as early as 2018. The

---

[8] To be sure, relevance in this context is not to be confused with "relevance" for civil discovery purposes. The consideration under Rule 1.11(c), while simple, is more nuanced.

[9] *In re Payment Card* also refutes Motley Rice's argument that information subject to discovery is not confidential government information; the court there held that it could not conclude the information at issue was publicly available under Rule 1.11(c) because, "to the extent the information has been produced in litigation, it has been produced subject to protective orders that are still in effect." 2006 WL 6846702 at *23.

State's other counsel could not have independently developed the same "roadmap" for litigating against OptumRx that Motley Rice has had for *years* since first investigating OptumRx; the investigation documents were not produced into the MDL until March 2024. ECF No. 74-2; *see* Montgomery/Muchman Suppl. Rep. at 24–27. Motley Rice belabors the hardship that the State would suffer if it were represented by another firm yet also argues that any other firm has the same strategic foothold. *See* Opp'n at 25. Motley Rice cannot have it both ways. Motley Rice continues to minimize not only the development and continued existence of this strategic information but also the firm's "great potential for lucrative returns in following into private practice the course [it] already charted with the aid of governmental resources." *Gen. Motors Corp. v. New York*, 501 F.2d 639, 650 (2d Cir. 1974). Yet that is precisely what Rule 1.11(c) prohibits.

## CONCLUSION

Rule 1.11(c) exists to protect the sanctity of the government attorney role and to safeguard against potential abuses of power that could erode public trust. Motley Rice's ethical violations are egregious, and the public interest in disqualification far outweighs the State's interest in retaining the firm. This is not "a close call." This Court should uphold Rule 1.11(c)'s long-standing safeguards and disqualify Motley Rice.

## REQUEST FOR ORAL ARGUMENT

Under DUCivR 7-1(g), OptumRx respectfully requests oral argument on its motion to disqualify. Good cause exists for oral argument because of (1) the significant ethical issues raised in the motion and (2) the substantial prejudice to OptumRx that will result from Motley Rice's continued involvement in this litigation.

Dated this 2nd day of October, 2025.

PARR BROWN GEE & LOVELESS

 */s/ Bentley J. Tolk*
Bentley J. Tolk (6665)
Rodger M. Burge (8582)


ALSTON & BIRD LLP
Matthew P. McGuire (*pro hac vice*)

*Attorneys for OptumRx, Inc.*

## **CERTIFICATE OF SERVICE**

The undersigned certifies that on this 2nd day of October, 2025, the foregoing document was filed through the CM/ECF system and will be sent electronically to the registered participants on the Notice of Electronic Filing.

*/s/ Bentley J. Tolk*
Bentley J. Tolk