# EXHIBIT A

# UNITED STATES DISTRICT COURT

# DISTRICT OF UTAH

| | |
|---|---|
| STATE OF UTAH and DIVISION OF CONSUMER PROTECTION,<br><br>        Plaintiffs,<br><br>v.<br><br>EXPRESS SCRIPTS, INC., et al.,<br><br>        Defendants. | **SECOND DECLARATION OF MATTHEW P. HOOKER IN SUPPORT OF OPTUMRX, INC.'S MOTION TO DISQUALIFY MOTLEY RICE**<br><br>Case No. 2:25-cv-00088-JNP-DBP<br><br>District Judge Jill N. Parrish<br><br>Chief Magistrate Judge Dustin B. Pead |

## DECLARATION OF MATTHEW P. HOOKER

I, Matthew P. Hooker, declare as follows:

1.      I am over eighteen years old, of sound mind, and under no legal disability.

2.      I am a senior associate at Alston & Bird LLP.

3.      On June 31, 2025, I executed a declaration in support of Defendant OptumRx, Inc.'s Motion to Disqualify Motley Rice in the above-captioned action, ECF No. 58-3. I now submit this second declaration in further support of OptumRx's motion to disqualify.

4.      I have personal knowledge of the facts set forth in this declaration, and if called to testify in person about those facts, could competently do so under oath.

5.      Attached as **Exhibit A** is a copy of the Supplemental Expert Report and Opinion of Sari W. Montgomery and Wendy J. Muchman.


I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.


Dated: October 2, 2025

_____
                    Matthew P. Hooker

# Exhibit A

to Second Declaration of Matthew Hooker

## **ASSIGNMENT**

Since we issued our Expert Report, the State of Utah and the Division of Consumer Protection[1] submitted a filing that bears on our opinions. On July 4, 2025, the State filed a response to OptumRx's Motion to Disqualify which included the Expert Report of Lynn A. Baker, who responded to our earlier opinions concerning the scope and application of Rule 1.11(c).

Counsel for OptumRx has asked us to respond to the State's new submission. As we discuss further below, Motley Rice and its expert misconstrue and mischaracterize Rule 1.11(c) and our prior opinions. And although she mentions ABA Formal Opinion 509, Motley Rice's expert ignores the fact that it defines government lawyer and private client and that it is the most recent authority on the interpretation of Rule 1.11(c). The State's interpretation of Rule 1.11(c) would render the Rule inapplicable in almost all circumstances and create countless opportunities for government lawyers to abuse government power to enrich themselves and their private clients—which is precisely what Rule 1.11(c) seeks to avoid. Here, Motley Rice entered into contracts with the government to use government authority to investigate OptumRx, obtained information with government subpoenas, and agreed to protect the information OptumRx produced by signing broad Confidentiality Agreements. Then, after receiving confidential information about OptumRx, Motley Rice in its *private* capacity turned around and sued OptumRx in a case where the same information it obtained under government authority and pursuant to Confidentiality Agreements could be used to OptumRx's material disadvantage.

There can be no more obvious violation of Rule 1.11(c).

---

[1] Hereinafter referred to as "the State."

## ADDITIONAL MATERIALS REVIEWED

In addition to the materials reviewed for our original report, we reviewed the State's Opposition to OptumRx's Motion to Disqualify and the exhibits and attachments to it, including the Declarations of Elizabeth Smith, John Price, Wendy Weinberg, and Stephen Kane as well as the Expert Report of Lynn A. Baker. We also reviewed the Declaration of Matthew Hooker and exhibits R and S to that declaration. We also reviewed the California Court of Appeal's decision in *People v. OptumRx, Inc.*, No. B343828, 2025 WL 2542288 (Sept. 4, 2025).

## SUMMARY OF SUPPLEMENTAL OPINIONS

**The history of Rule 1.11 supports OptumRx's position that confidential government information encompasses the documents that OptumRx produced to Motley Rice pursuant to government subpoenas.**

The State's expert's proclamation that the history of Rule 1.11 is "one of continuous efforts to narrow and fine tune the scope of the Rule"[2] is incorrect. The 1983 version of Model Rule 1.11 first drafted by the Kutak Commission was proposed and promulgated to address only conflicts of interest relating to revolving-door lawyers (i.e., lawyers moving from government service to private practice)[3] and was titled "Successive Government and Private Employment."[4] That version included in the Model Rules for the first time a definition of confidential government information and the idea that such information should be protected to prevent "a lawyer's improper use of his or her official position."[5]

---

[2] Baker Report at p. 21 .

[3] Government Lawyers, Confidentiality, Conflicts, and ABA Model Rule 1.11(c), Wendy Muchman, *The Public Lawyer*, Summer 2024.

[4] The 1977 Kutak Commission recommended Rule was eventually approved with some modifications and adopted at the August 1983 ABA Annual Meeting. ART GARWIN, A LEGISLATIVE HISTORY: THE DEVELOPMENT OF THE ABA MODEL RULES OF PROFESSIONAL CONDUCT 1983-2013, at 277- 279 (2013).

[5] ART GARWIN, A LEGISLATIVE HISTORY: THE DEVELOPMENT OF THE ABA MODEL RULES OF PROFESSIONAL CONDUCT 1983-2013, at 279.

Similarly, the State's expert's assertion that the Ethics 2000 version of Rule 1.11 (adopted in 2002) "were primarily minor changes to its organization and form"[6] is also incorrect. As discussed in greater detail below, rather than narrowing the scope of Rule 1.11, the Ethics 2000 Commission specifically "recommended *expanding* the Rule's scope to address conflicts for [not only for former government lawyers but for lawyers] *currently and formerly* serving the government as well as those 'moving from one government agency to another.'"[7] (Emphasis supplied.)

Importantly, to understand Rule 1.11 requires recognition that different sections of the Rule accomplish different objectives. Thus, broad statements about the Rule's scope are misguided. The State's expert repeatedly conflates the various sections of the Rule, ignoring that ABA Model Rule 1.11 serves many different purposes relating to government lawyers.

OptumRx's disqualification motion is based only on Rule 1.11(c), the part of the Rule that protects third parties from misuse of confidential information acquired under government authority and does not relate to the conflict provisions of Rule 1.11(a), (b), (d), and (e). Thus, the cases construing those provisions cited by the State's expert are irrelevant, and her sweeping generalizations about the scope of Rule 1.11 are misleading, particularly when the statements are taken out of context and do not relate to subparagraph (c) of the Rule, which is the sole basis for OptumRx's motion.[8]

---

[6] Baker Report at p. 24.
[7] ABA Formal Op. 509 at p. 5; citing to ART GARWIN, A LEGISLATIVE HISTORY: THE DEVELOPMENT OF THE ABA MODEL RULES OF PROFESSIONAL CONDUCT 1983-2013, at 291.
[8] *See* Baker Report at pp.30-33.

**Rule 1.11(c) is intended to "limit the use of government authority to benefit a private person, either the lawyer herself or her future private client,"[9] which is precisely what Motley Rice is doing in this case.**

The State's expert argues that 1997 ABA Formal Opinion 409 stands for the proposition that Rule 1.11(c) does not apply to Motley Rice. However, Opinion 409 was, in fact, issued to clarify that, as of 1997, Rule 1.11 replaced Rules 1.9(a) and (b) as the conflict of interest rule applicable to government lawyers,[10] and did not address Rule 1.11(c) at all. Opinion 409 does, however, articulate the public policy behind Rule 1.11, which is to prevent the abuse of public office to further private ends,[11] which is exactly what Motley Rice is doing in this case.

**ABA Formal Opinion 509, issued in February 2024, directly addresses the definition of "private client."**

Formal Opinion 509 explicitly defines the term "private client" to include "*public* entities and officials whom the lawyer represents in private practice, if those clients are not legally entitled to employ the confidential information."[12] In this case, Motley Rice is representing the State, a public entity, through its private practice, and the State is not entitled to use the confidential government information Motley Rice obtained through government subpoenas in its role as government lawyers for the State of Hawai'i, the District of Columbia, and the City of Chicago. The State's expert's argument that Rule 1.11 "should not govern lawyers who are retained on an ad-hoc basis by a government entity as Motley Rice was by Hawai'i, DC and Chicago"[13] is not supported by any authority. That assertion is also incorrect as clarified in Formal Opinion 509, a fact ignored in her report which relies instead on an ABA opinion from 1997. Thus, under the most

---

[9] ABA Formal Op. 409, p. 11.
[10] ABA Formal Op. 409, p. 1.
[11] ABA Formal Op. 409, p. 12.
[12] ABA Formal Op. 509, pp. 8–9.
[13] Baker Report at p. 38.

recent and direct authority, the State is Motley Rice's "private client," and Motley Rice cannot use the confidential information it obtained in serving the government to benefit its private client.

> **Motley Rice is a public officer and employee for purposes of Rule 1.11 because it wielded government power through its investigations on behalf of Hawai'i, D.C., and Chicago. Whether they are paid as "independent contractors" makes no difference to the application of Rule 1.11.**

ABA Formal Opinion 509 makes clear that when a lawyer is serving as a public officer or employee, Rule 1.11 applies. "The objective of the Rule is to 'prevent the lawyer's improper use of his or her official position' and to protect others from the exploitation of confidential government information acquired by the lawyer while serving as a public officer or employee."[14] The term "public officer" used in the Rule does not distinguish between the capacity in which the lawyer is serving the government or the manner in which the lawyer is paid, rather it focuses on whether the lawyer uses government authority in obtaining the information.[15]

> **The information at issue is confidential government information.**

The State's expert criticizes our opinion as being incorrect on the origins of the definition of confidential government information, claiming that the time of adoption of the Rule in 1983 and the adoption of a relevant C.F.R. make our theory implausible. This is incorrect. Although the State's expert is correct that the C.F.R. cited in our original opinion was not enacted until 1992, after Rule 1.11's promulgation in 1983, it is clear that the definition in the C.F.R. was based upon earlier statutes, including, but not limited to, the 1948 Trade Secrets Act[16] (18 U.S.C. § 1905),

---

[14] ABA Formal Op. 509, p. 2 citing to Art Garwin, A Legislative History: The Development of the ABA Model Rules of Professional Conduct 1983-3013, 279 (2013).
[15] ABA Formal Op. 509, p .3.
[16] "Whoever, being an officer or employee of the United States or of any department or agency thereof, any person acting on behalf of the Federal Housing Finance Agency, or agent of the Department of Justice as defined in the Antitrust Civil Process Act (15 U.S.C. 1311-1314), or being an employee of a private sector organization who is or was assigned to an agency under chapter 37 of title 5, publishes, divulges, discloses, or makes known in any manner or to any extent not authorized by law any information coming to him in the course of his employment or official duties or by reason of any examination or investigation made by, or return, report or record made to or filed with, such

which also prohibited the use of nonpublic government information by former government lawyers.[17] Our opinion, as expressed in our original report, that "Federal regulations and statutes serve as the basis for the definition of 'confidential government information' in Rule 1.11(c), and that those regulations demonstrate that the materials produced by OptumRx are 'confidential government information' obtained through government authority,"[18] remains sound, and our assertion that the definition of confidential government information contained in Rule 1.11(c) was "borrowed from" and based on federal statutes and regulations is well founded.

Our original opinion also relies on a United States Supreme Court Opinion, *Food Marketing Institute v. Argus Leader Media*,[19] which explains how the word "confidential" under FOIA should be interpreted.[20] "Because the FOIA statute does not define the word 'confidential,' the Court relied on the word's ordinary meaning, 'private' or 'secret,' and further considered two factors, both of which are present here: first, that the party producing the information ordinarily

---

department or agency or officer or employee thereof, which information concerns or relates to the trade secrets, processes, operations, style of work, or apparatus, or to the identity, confidential statistical data, amount or source of any income, profits, losses, or expenditures of any person, firm, partnership, corporation, or association; or permits any income return or copy thereof or any book containing any abstract or particulars thereof to be seen or examined by any person except as provided by law; shall be fined under this title, or imprisoned not more than one year, or both; and shall be removed from office or employment." 18 USCA § 1905.

[17] See *https://www.ecfr.gov/current/title-5/chapter-XVI/subchapter-B/part-2635/subpart-G/section-2635.703* example 3; *See also* Simon's New York Rules of Professional Conduct Annotated, §1.11:31.

[18] Montgomery-Muchman Report at pp. 40-41.

[19] *Food Marketing Institute v. Argus Leader Media*, 139 S. Ct. 2356 (2019).

[20] Montgomery Muchman Report at p. 44, citing to Argus at 2363 (citations omitted) ("The term 'confidential' meant then, as it does now, 'private' or 'secret.' Webster's Seventh New Collegiate Dictionary 174 (1963). Contemporary dictionaries suggest two conditions that might be required for information communicated to another to be considered confidential. In one sense, information communicated to another remains confidential whenever it is customarily kept private, or at least closely held, by the person imparting it. *See, e.g.*, Webster's Third New International Dictionary 476 (1961) ('known only to a limited few' or 'not publicly disseminated'); Black's Law Dictionary 370 (rev. 4th ed. 1968) ('intended to be held in confidence or kept secret'). In another sense, information might be considered confidential only if the party receiving it provides some assurance that it will remain secret. See, *e.g.*, 1 Oxford Universal Dictionary Illustrated 367 (3d ed. 1961) ('spoken or written in confidence'); Webster's New World Dictionary 158 (1960) ('told in confidence')").

considers it private, and second, that the party receiving the information imparts some assurance that it will remain secret."[21]

Thus, the confidentiality agreements that were supposed to protect OptumRx's information when it was originally produced pursuant to government subpoenas, cannot be ignored. The fact that others now have the information is not determinative of the confidential nature of the information.[22]

**The State's expert's claim that "Courts have Consistently Held" that information obtainable through routine discovery requests is not "Confidential Government Information" is simply untrue.**

The two cases that the State's expert relies upon for this proposition are distinguishable and are not relevant to this case.

**Rule 5.6 is inapplicable to this case.**

The State's expert asserts that Rule 5.6 is relevant to this case because it prevents "one and done" representations.[23] Rule 5.6 has no application to this matter because it applies exclusively to restrictive covenants in partnership and settlement agreements, neither of which are at issue in OptumRx's Motion to Disqualify.

**OptumRx's well-founded disqualification motion seeks to promote an important policy concern and prevent the abuse of government authority.**

The longstanding policy concern of Rule 1.11 is to prevent misuse of government authority. While the State's expert discusses a "parties' choice of counsel," that is far from the only factor courts weigh in ruling on disqualification motions. While, of course, choice of counsel is one

---

[21] Baker refers to the reliance on this Supreme Court opinion a "distraction- an attempt to create and alternate universe." Baker report at p. 35. Notwithstanding Baker's characterization, the Supreme Court's definition is clear. supports the argument that the OptumRx materials are confidential, and cannot be dismissed as a mere "distraction."

[22] The Declaration of Elizabeth Smith has no bearing on this motion. Whether or not "publicly available information," was used in drafting the complaint does not solve the conflict that arises when Motley Rice, acting on behalf of the government, obtained confidential information, pursuant to subpoenas and confidentiality agreements, that could be used to the material disadvantage of OptumRx. (Decl. Elizabeth Smith ¶ 4, 7, 9, 10, 11, 12 & 15.)

[23] Baker Report at pp. 48-50.

consideration, "[c]ourts nonetheless are obligated to 'preserve the public's confidence in the judicial system.'"[24] "Courts are not required to analyze the circumstances with 'hair-splitting nicety.'"[25] "Rather, courts must find 'a balance between the client's free choice of counsel and the maintenance of the highest ethical and professional standards in the legal community.'"[26] OptumRx's disqualification motion is well-founded and based upon a violation Utah Rule of Professional Conduct 1.11(c).

## SUPPLEMENTAL OPINIONS

I.  **The history of Rule 1.11 supports OptumRx's position that confidential government information encompasses the documents that OptumRx produced to Motley Rice pursuant to government subpoenas.**

When a discussion draft of the Model Rules of Professional Conduct was first proposed to the ABA House of Delegates in January 1980, Model Rule 1.11 did not contain a provision protecting confidential government information of third parties obtained under government authority.[27] In August 1982, the definition of confidential government information was added to the draft of the Rule.[28] In August 1983, the ABA added the language, "obtained under government authority" and "which is not otherwise available to the public" to the definition of confidential government information.[29] Thus, the definition of confidential government information read: "as used in this rule, the term 'confidential government information' means information which <u>has been obtained under government authority and</u> which, at the time this rule is applied, the

---

[24] *Henry v. Shaool*, 2008 WL 11509453, *1 (D. Md. Aug. 12, 2008) (citations omitted).

[25] *Id.* (citations omitted.)

[26] *Id.* (citations omitted.)

[27] Discussion Draft Model Rules of Professional Conduct, January 30, 1980, pp. 34-35 (https://www.americanbar.org/content/dam/aba/administrative/professional_responsibility/kutak_1-80.pdf).

[28] Kutak August 1982, Report and Resolution 400 August 1982 (https://www.americanbar.org/content/dam/aba/administrative/professional_responsibility/kutak_8-82.pdf). The draft comments at that time note that "This Rule prevents a lawyer from exploiting public office for the advantage of a private client. It goes beyond the prohibition against representing clients with adverse interests stated in Rules 1.9 and 1.10."

[29] Report and Resolution 401 August 1983 (https://www.americanbar.org/content/dam/aba/administrative/professional_responsibility/kutak_8-83.pdf).

government is prohibited by law from disclosing to the public or has a legal privilege not to <u>disclose, and which is not otherwise not available to the public</u>."[30] As adopted, the 1983 Rule further provided: "Except as law may otherwise expressly permit, a lawyer <u>having information that the lawyer knows is confidential government information about a person acquired when the lawyer was a public officer or employee</u>, may not represent a private client whose interests are adverse to that person in a matter in which the information could be used to the material disadvantage of that person."[31]

This language reflects that Rule 1.11 was adopted at a time when the ABA was concerned about declining public confidence in the legal system after Watergate, a scandal of unequaled proportions. Unlike the majority of the Rules of Professional Conduct, which apply only to lawyers representing clients, Rule 1.11 applies to lawyers acting in a representative capacity *as well as* lawyers who are serving as government officials regardless of whether they are acting in a representative or non-representative capacity.[32] Understanding the development of the 1983 version of Rule 1.11 requires starting in the late 1970s and examining the impact of the Watergate scandal on the legal profession. Watergate prompted significant reform in the legal profession, so much so that "[f]or the first time, by the late 1970s, 100% of law schools offered a course on professional responsibility."[33] The changes to legal education also led to the eventual requirement of passing the Multistate Professional Responsibility Exam prior to admission to the bar in nearly every state. In an effort to restore confidence in government, in 1977 the Carter Administration placed a high priority on federal regulatory reform, which included addressing the serious

---

[30] Report and Resolution 401 August 1983, Rule 1.11(e)
(https://www.americanbar.org/content/dam/aba/administrative/professional_responsibility/kutak_8-83.pdf).
[31] Report and Resolution 401, p. 42. Rule 1.11(b)
(https://www.americanbar.org/content/dam/aba/administrative/professional_responsibility/kutak_8-83.pdf).
[32] ABA Formal Op. 509, p .4.
[33] Enron, Watergate and the Regulation of the Legal Profession, Arnold Rochvarg, 43 Washburn L.J. 61, 68 (Fall 2003).

problems of whether former government officials have an unfair advantage because of their prior government service and whether they would improperly use confidential information acquired in their government positions.[34]

### A.   The Kutak Commission

The Kutak Commission was created by the ABA in 1977 to craft the Model Rules of Professional Conduct to remedy issues within the then-existing Code of Professional Responsibility,[35] to "look at all facets of legal ethics,"[36] and "to respond to the public's negative view of lawyers in the aftermath of Watergate."[37]

"Given the criminal activities by lawyers and executives in the Nixon Administration, even before the conclusion of the Watergate affair, Congress began to consider mechanisms to improve ethics in government."[38]

### B.   The 1983 Rule

The State's expert broadly proclaims that the history of Rule 1.11 is "one of continuous efforts to narrow and fine tune the scope of the Rule."[39] This is incorrect. The 1983 version of Model Rule 1.11 first drafted by the Kutak Commission was proposed and promulgated to address only conflicts of interest relating to revolving door lawyers (i.e., lawyers moving from government service to private practice)[40] and was titled "Successive Government and Private Employment."[41]

---

[34] *See, e.g., id.* at 71.
[35] *See generally,* Thomas D. Morgan, *The Evolving Concept of Professional Responsibility,* 90 Harv. L. Rev. 702 (1977).
[36] William B. Spann, Jr., *The Legal Profession Needs a New Code of Ethics,* 2 B. Leader, Nov.-Dec. 1977, at 2,3.
[37] *See generally,* Thomas D. Morgan, *The Evolving Concept of Professional Responsibility,* 90 Harv. L. Rev. 702 (1977). *See also The Last Hurrah: The Kutak Commission and the End of Optimism,* 49 Creighton L.R. 689, 692 (2016).
[38] *See* The Ethics in Government Act of 1978, Stephen Charles Mixter, 1985 Duke L.J. 497, 497 (1985).
[39] Baker Report at p. 17.
[40] Government Lawyers, Confidentiality, Conflicts, and ABA Model Rule 1.11(c), Wendy Muchman, *The Public Lawyer,* Summer 2024.
[41] The 1977 Kutak Commission recommended Rule was eventually approved with some modifications and adopted at the August 1983 ABA Annual Meeting. ART GARWIN, A LEGISLATIVE HISTORY: THE DEVELOPMENT OF THE ABA MODEL RULES OF PROFESSIONAL CONDUCT 1983-2013, at 277–279 (2013).

That version included in the Model Rules for the first time, a definition of confidential government information, and the idea that such information should be protected to prevent "a lawyer's improper use of his or her official position."[42]

        C.      The Ethics 2000 Version of Model Rule 1.11

The State's expert asserts that the Ethics 2000 version of Rule 1.11 (adopted in 2002) contained only "minor changes" in the Rule's scope.[43] This is also incorrect. The Ethics 2000 Commission "recommended *expanding* the Rule's scope to address conflicts for lawyers [not only for former government lawyers but for lawyers] *currently and formerly* serving the government as well as those 'moving from one government agency to another.'"[44] (Emphasis supplied.) The retitle of the Rule in the Ethics 2000 version to "Special Conflicts of Interest for Former and Current Government Officers and Employees" reflects the *expansion* of the scope of the Rule, not the narrowing of its scope as repeatedly and incorrectly suggested by the State's expert.[45] "In its report to the ABA House of Delegates, the Ethics 2000 Commission explained, 'an *expanded* Rule 1.11…combines for the first time in a single rule a lawyer's duties when opposing a former client, and the special obligations of a government employee not to abuse the power of public office.'"[46] (Emphasis supplied.)

        D.      The Objectives of Rule 1.11

To understand Rule 1.11 requires recognition that different sections of the Rule accomplish different objectives. Thus, broad statements about the Rule's scope are misguided. The State's expert repeatedly conflates the various sections of the Rule, ignoring that ABA Model Rule 1.11

---

[42] ART GARWIN, A LEGISLATIVE HISTORY: THE DEVELOPMENT OF THE ABA MODEL RULES OF PROFESSIONAL CONDUCT 1983–2013, at 279.

[43] Baker Report at p. 21.

[44] ABA Formal Op. 509 at p. 5; citing to ART GARWIN, A LEGISLATIVE HISTORY: THE DEVELOPMENT OF THE ABA MODEL RULES OF PROFESSIONAL CONDUCT 1983-2013, at 291.

[45] *See* Baker Report, at pp. 18, 21.

[46] ABA Formal Op. 509 at p. 5.

serves many different purposes relating to government lawyers. It protects information related to the lawyer-client relationship and also confidential information of third parties obtained using government authority. "The Rule constrains how current and former lawyers can use confidential information, subjecting both to the restrictions of Rule 1.9(c) in the context of *client* information [i.e., information related to the lawyer's government client],"[47] as well as confidential information of *third parties* acquired under government authority. (Emphasis supplied.) In addition, certain subsections of the Rule address conflicts of interest for government lawyers. For example, "While the personal and substantial participation standard of Model Rule 1.11 is different than the standards set out under Model Rules 1.7 (current client) and 1.9 (former client), former government lawyers ([under]1.11(a)) are bound by 1.9(c) in evaluating conflict scenarios, and current government lawyers ([under]1.11(d)) are subject both to 1.7 and the entirety of 1.9."[48]

OptumRx's disqualification motion is based only on Rule 1.11(c), the part of the Rule that protects third parties from misuse of confidential information acquired under government authority and does not relate to the conflict provisions of Rule 1.11(a), (b), (d), and (e) noted above. Thus, cases construing those provisions are irrelevant to OptumRx's motion. The State's expert's sweeping generalizations about the scope of Rule 1.11 are misleading, particularly when the statements are taken out of context and do not relate to subparagraph (c) of the Rule, which is the sole basis for OptumRx's motion.[49]

Further, the State's expert incorrectly argues that Rule 1.11(c) requires use of confidential government information that "*would* 'materially disadvantage' the party seeking

---

[47] Government Lawyers, Confidentiality, Conflicts, and ABA Model Rule 1.11(c), Wendy Muchman, *The Public Lawyer* (July 2024); *see also, e.g.,* Douglas R. Richmond, *As the Revolving Door Turns: Government Lawyers Entering or Returning to Private Practice and Conflicts of Interest*, 65 St. Louis U. L.J. 325, 350 (2021).
[48] Government Lawyers, Confidentiality, Conflicts, and ABA Model Rule 1.11(c), Wendy Muchman, *The Public Lawyer*, p. 3.
[49] Supra fn. 11.

disqualification in the current litigation" (emphasis added).[50] As discussed in our original report, the Rule's plain text requires only that information "*could* be used to the material disadvantage of that person" (emphasis added).[51] Thus her argument adds a nonexistent burden to OptumRx's motion. She cites the case of *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*[52] arguing that the *Payment Card* case sets out a "helpful formulation of the [material disadvantage] test that can be used to determine whether the party seeking disqualification under Rule 1.11(c) would suffer any material disadvantage: does the attorney's access to the information put the opposing party 'at any material disadvantage *compared to the position it would occupy if the plaintiffs had different counsel*.'" This argument is incorrect. The analysis in that case focused largely on whether the matter was the same or substantially related, a side-switching conflict issue which is not the basis for OptumRx's motion. In fact, the *Payment Card* judge undertook a comprehensive analysis of the nature of the matters in which the attorney had been involved[53] and concluded that there could be no material disadvantage because there was nothing *relevant* in the information the lawyer had possessed given the differences in the litigation matters.[54] Given that in its role as government lawyers, Motley Rice's investigations into OptumRx involved the very same issues as the present litigation, as well as the magnitude of information that Motley Rice obtained in its investigations and the recency of the investigations, the *Payment Card* case adds nothing to this Court's analysis.

---

[50] Baker Report p. 31. (The *Payment Card* court undertook its analysis under the old disciplinary rule, DR 9-101(B) which analyzes side switching concerns for former government lawyers.)
[51] Montgomery Muchman Report p. 56.
[52] 2006 WL 6846702 (E.D.N.Y. Aug. 7, 2006).
[53] *Id.* at *24.
[54] *Id.*

## II.  Rule 1.11(c) is intended to "limit the use of government authority to benefit a private person, either the lawyer herself or her future private client," which is precisely what Motley Rice is doing in this case.

The State's expert quotes extensively from the 1997 ABA Formal Opinion 409 to support her argument that Rule 1.11(c) does not apply to Motley Rice, claiming that the firm's government service was "ad hoc" such that Motley Rice was not acting as a government lawyer.[55] However, the purpose of Formal Opinion 409 was to clarify that, as of 1997, Rule 1.11 replaced Rule 1.9(a) and (b) as the *conflict of interest rule* applicable to government lawyers.[56] The opinion makes clear that the rule is intended to "address the dangers associated with the use of public office to further private ends."[57] But that older opinion is not the most directly applicable to this case and does not support the State's expert's argument in any event because it does not define "private client," nor does it define who is a "public officer or employee." The State's expert fails to cite any authority that defines "private client" in the context of Rule 1.11—notwithstanding the existence of such authority (Formal Opinion 509), her discussion of that same authority in other sections of her report, and our original report's discussion of the applicability of recent authority directly on point.

## III.  ABA Formal Opinion 509, issued in February 2024, directly addresses the definition of "private client" and contradicts the State's expert's conclusion.

By contrast, ABA Formal Opinion 509 (Feb. 28, 2024) is *directly* on point. The Opinion was issued to clarify "ambiguity" about "the definition of private client."[58] It explains the definition of private client under Rule 1.11(c) "[as] appl[ying] in the very least to private persons and entities whom the lawyer represents in private practice, whether that practice follows government service or is concurrent with it."[59] The opinion goes on to cite to ABA Formal Opinion

---

[55] Baker Report at pp. 40-42, 45, 47, 54.
[56] ABA Formal Op. 1997-409 at p. 1.
[57] ABA Formal Op. 1997-409 at p. 12.
[58] ABA Formal Op. 2024-509 at p. 1.
[59] ABA Formal Op 509 at p. 8.

342 (1975), which explains that, "[i]f one underlying consideration is to avoid the situation where government lawyers may be tempted to handle assignments so as to encourage their own future employment in regard to those matters, the danger is a lawyer may attempt to derive undue financial benefit from fees in connection with subsequent employment…"[60] Formal Opinion 509 does not cite to Formal Opinion 97-409 because, as discussed above, Formal Opinion 97-409 addressed an entirely different aspect of Rule 1.11 that is irrelevant here.

Formal Opinion 509 explicitly defines the term "private client" to include "*public* entities and officials whom the lawyer represents in private practice, if those clients are not legally entitled to employ the confidential information."[61] Thus, in this case, the State is a *public entity* being represented by the *private law firm* (Motley Rice) that has been *retained by the public entity* to handle this matter. It is not an *ad hoc* appointment as repeatedly argued by plaintiff's expert. The State is Motley Rice's "private client" under Rule 1.11(c), and the State would not have been legally entitled to receive and "employ the confidential information" that Motley Rice gathered for other government entities while acting as government lawyers and wielding the power of the government.

## IV. Motley Rice's attorneys are public officers and employees for purposes of Rule 1.11 because they wielded government power through the investigations on behalf of Hawaii, D.C., and Chicago. Whether they are called "independent contractors" is irrelevant under Rule 1.11.

ABA Formal Opinion 509 makes clear that when a lawyer is serving as a public officer or employee, Rule 1.11 applies. Although it is directly on point, the State's expert ignores what the opinion has to say about that issue.[62] "The objective of Rule 1.11 is to 'prevent the lawyer's improper use of his or her official position' and to protect others from the exploitation of

---

[60] *Id.* citing to ABA Formal Op. 342 (1975).
[61] ABA Formal Op. 509 at pp. 8–9.
[62] *See* Baker Report at pp. 24, 31.

confidential government information, acquired by the lawyer while serving as a public officer or employee."[63] The term "public officer" does not distinguish between the capacity in which the lawyer is serving the government or the manner in which the lawyer is paid, rather it focuses on whether the lawyer uses government authority in obtaining the information.[64]

In the opioid MDL in Ohio, consistent with Formal Opinion 509, Judge Polster also rejected the argument that the manner in which the government lawyer is retained or paid is relevant. Judge Polster noted that Motley Rice's attempt to characterize itself as an "'independent contractor' elevates form over substance, glossing over the role Motley Rice really played and the powers it deployed."[65] Further, Judge Polster noted that the "language of the retainer agreement cannot change what Motley Rice actually did."[66] The court concluded that "[t]he unavoidable fact is that, when Motley Rice served government subpoenas and received documents in response— even if it was acting on behalf of those governmental entities under a contingent fee and/or independent contractor agreement—it had been granted authority to wield the power of the government."[67]

The State's expert characterizes Motley Rice's work as public officers or employees as "ad hoc" engagements, suggesting that Motley Rice, therefore, was not a public officer or employee under Rule 1.11(c). But again, she ignores Formal Opinion 509, which clearly explains that Rule 1.11(c) applies "irrespective of whether the lawyers served in a representational capacity [i.e., whether acting as a lawyer or nonlawyer]."[68] Likewise, the nature of the retention or the type of

---

[63] ABA Formal Op. 509 at p. 2 citing to Art Garwin, A Legislative History: The Development of the ABA Model Rules of Professional Conduct 1983-3013, 279 (2013).
[64] ABA Formal Op. 509, p. 3.
[65] Order Denying OptumRx's Motion to Disqualify Motley Rice at 12, ECF No. 5362, *In re Nat'l Prescription Opiate Litig.*, No. 1:17-md-02804 (N.D. Ohio Mar. 18, 2024).
[66] *Id.*
[67] *Id.*
[68] ABA Formal Op. 509 at p. 3.

fee does not change that Motley Rice was acting with government power and authority when it issued subpoenas on behalf of the government entities and compelled OptumRx to produce its most confidential and proprietary information. The State's expert criticizes OptumRx and its experts for not mentioning ABA Formal Opinion 97-409 but, on this topic, fails to even reference or discuss Formal Opinion 509, the most relevant and recent opinion that addresses this specific issue. Formal Opinion 509 completely undermines the State's expert's assertion that an "ad hoc" relationship changes Motley Rice's status as public officers or employees.[69]

To quote the State's expert, "'Ad hoc,' as used in legal discourse, means 'for this purpose.' … Motley Rice was being *retained to assist the government* for a specific and limited purpose." (Emphasis supplied).[70] That definition actually supports that Motley Rice was acting as a public officer or employee. Motley Rice is subject to Rule 1.11. Whether Motley Rice was retained to assist the government for a brief or extended time, whether the firm was working for the government on a part- or full-time basis, whether Motley Rice is a current or former public officer or employee, whether Motley Rice was an employee or independent contractor, and whether they were being paid on an hourly or contingent fee basis, Rule 1.11 is the applicable Rule, and the firm is bound by the Rule's restrictions related to conflicts and the use of confidential government information on behalf of Motley Rice's private clients.[71]

The declarations of government employees (John Price, John Kane, and Wendy Weinberg) also establish that Motley Rice was acting as public officers or employees under the authority and control of the government. For example, the retainer agreement between Hawai'i and Motley Rice

---

[69] Baker Report at p. 40: "Oddly, this ABA Opinion [97-409] is never mentioned by OptumRx in their discussions of Rule 1.11(c)." Neither OptumRx nor we mentioned ABA Opinion 97-409 because it is not applicable to the issues in this case. Opinion 97-409 was issued primarily to explain that "Rule 1.11 alone determines the *conflict of interest* obligations of a former government lawyer and that the provisions of Rule 1.9(a) and (b) do not apply." Op. at p. 2. That opinion does not at all address the application of Rule 1.11(c).
[70] Baker Report at p. 40, 41.
[71] ABA Op. 509 at p. 3, 8.

states, "The Attorney General shall have *sole and absolute discretion* to determine whether or not to authorize CONTRACTOR to proceed with litigation including the scope of the litigation."[72] (Emphasis supplied). The Attorney General shall have *final authority* over all aspects of the litigation, and the "litigation can only be commenced, conducted, settled, approved and ended with the *express approval* and signature of the Attorney General." (Emphasis supplied).[73] Motley Rice's contract with the Attorney General of D.C. likewise provides that "the Attorney General shall have *final authority* over all aspects of this litigation. The litigation may be commenced, conducted, settled, approved and ended only with the *express approval* and signature of the Attorney General." (Emphasis supplied). [74] Finally, all three of the applicable Motley Rice contracts with the City of Chicago provided "the City will *maintain control* of the investigation and make all key decisions, including whether and how to proceed with litigation, which claims to advance, which defendants to sue, what relief to seek and whether and on what terms to settle the litigation." (Emphasis supplied).[75] There can be no other interpretation of this language than Motley Rice was working *for and under the power and direction of* the government.

The term "public officer or employee" in Rule 1.11(c) encompasses *every* capacity in which the lawyer serves the government. In fact, it is not even necessary that the government utilizes the public officer or employee in their capacity as a lawyer.[76] Rule 1.11 governs all instances where the lawyer served the government "as a public officer or employee."[77] The point is that Motley Rice had access to confidential government information while working for the

---

[72] Declaration John Price ¶ 4.
[73] *Id.*
[74] Declaration of Wendy Weinberg ¶ 4.
[75] Declaration Stephen Kane ¶ 5; Stephen Kane Declaration Exhibit A ¶ 16; Stephen Kane Declaration Exhibit B ¶ 12; Stephen Kane Declaration Exhibit C ¶ 11.
[76] Rotunda, Dzienkowski, The Lawyers' Deskbook on Professional Responsibility American Bar Association Center for Professional Responsibility at §1.11-3(d) (2022).
[77] *Id.*

government, while serving on behalf of the government, and while wielding the power of the government. Motley Rice had access to this information long before the complaint in this case was drafted or any other plaintiffs' attorneys in this or related cases had access to the information.

The objective of the Rule is to "'prevent the lawyer's improper use of his or her official position' and to protect others from the exploitation of confidential government information . . . ."[78] As noted above, "The term 'private client' also includes *public* entities and officials whom the lawyer represents in private practice, if those clients are not legally entitled to employ the confidential information."[79] By drawing a distinction in the way counsel are paid as opposed to the power they exercise in their roles as government lawyers, the State's expert would have this court ignore government lawyers' important obligations to preserve the public trust. "As chief legal officers of the states, commonwealths, District of Columbia, and territories of the United States, the role of an attorney general is to serve as counselor to state government agencies and legislatures, and as a representative of the public interest."[80] The role of government lawyers is not to use the power of a government office to benefit themselves or future private clients.

In another attempt to confuse the issues, the State's expert mentions Texas Ethics Opinion 2022-693 as having "important implications for the current case."[81] That is incorrect. Any application of the Texas Rules of Professional Conduct to the facts of this case is misplaced. As an initial matter, even a cursory review of the Texas Rules of Professional Conduct[82] makes clear that

---

[78] ABA Formal Op. 509, p.2.

[79] ABA Formal Op. 509 at pp. 8–9.

[80] https://www.naag.org/attorneys-general/what-attorneys-general-do/ (last visited July 6 2024) (NAAG is the "National Association of Attorneys' General").

[81] Baker Report p.40.

[82] As just one example of the differences in the Texas Rules of Professional Conduct from the Model Rules, Model Rule 1.11 is addressed in "Texas Rule 1.10 (a) Except as law may otherwise expressly permit, a lawyer shall not represent a private client in connection with a matter in which the lawyer participated personally and substantially as a public officer or employee, unless the appropriate government agency consents after consultation. (b) No lawyer in a firm with which a lawyer subject to paragraph (a) is associated may knowingly undertake or continue representation

they differ significantly from the Utah Rules of Professional Conduct, which basically track the ABA's Model Rules.[83] Specifically, Texas Ethics Opinion 2022-693, cited by the State's expert, deals with conflict imputations of migratory lawyers and applies the Texas equivalent of the former-client conflict rule (M.R. 1.9).[84] As discussed above, Rule 1.9 is not at issue in this case, and the Texas Opinion has no bearing on Motley Rice's access to, and misuse of, confidential government information by virtue of its role as government lawyers.

## V.    The information at issue is confidential government information.

The State's expert argues that the information that Motley Rice obtained using the power of the government is not confidential government information and claims it is "routine" discovery. But she misapprehends the rule and the case law.[85]

---

in such a matter unless: (1) The lawyer subject to paragraph (a) is screened from any participation in the matter and is apportioned no part of the fee therefrom; and (2) written notice is given with reasonable promptness to the appropriate government agency. (c) Except as law may otherwise expressly permit, a lawyer having information that the lawyer knows or should know is confidential government information about a person or other legal entity acquired when the lawyer was a public officer or employee may not represent a private client whose interests are adverse to that person or legal entity. (d) After learning that a lawyer in the firm is subject to paragraph (c) with respect to a particular matter, a firm may undertake or continue representation in that matter only if that disqualified lawyer is screened from any participation in the matter and is apportioned no part of the fee therefrom. (e) Except as law may otherwise expressly permit, a lawyer serving as a public officer or employee shall not: (1) Participate in a matter involving a private client when the lawyer had represented that client in the same matter while in private practice or nongovernmental employment, unless under applicable law no one is, or by lawful delegation may be, authorized to act in the lawyer's stead in the matter; or (2) Negotiate for private employment with any person who is involved as a party or as attorney for a party in a matter in which the lawyer is participating personally and substantially. (f) As used in this rule, the term "matter" does not include regulation-making or rule-making proceedings or assignments, but includes: (1) Any adjudicatory proceeding, application, request for a ruling or other determination, contract, claim, controversy, investigation, charge accusation, arrest or other similar, particular transaction involving a specific party or parties; and (2) any other action or transaction covered by the conflict of interest rules of the appropriate government agency. (g) As used in this rule, the term "confidential government information" means information which has been obtained under governmental authority and which, at the time this rule is applied, the government is prohibited by law from disclosing to the public or has a legal privilege not to disclose, and which is not otherwise available to the public. (h) As used in this Rule, "Private Client" includes not only a private party but also a governmental agency if the lawyer is not a public officer or employee of that agency. (i) A lawyer who serves as a public officer or employee of one body politic after having served as a public officer of another body politic shall comply with paragraphs (a) and (c) as if the second body politic were a private client and with paragraph (e) as if the first body politic were a private client." See e.g. https://www.americanbar.org/groups/professional_responsibility/policy/rule_charts/ (last accessed July 10 2024).

[83] *See, e.g.,* https://www.americanbar.org/groups/professional_responsibility/policy/rule_charts/ (last accessed July 28,2025).

[84] *See, e.g.,* Texas Op. 2022-693 pp. 1–2.

[85] *See* Baker Report pp. 27-28, 35,36.

In our original expert report, we explained that the text of Rule 1.11(c) defines confidential government information as "information that has been obtained under governmental authority and which, at the time this Rule is applied, the government is prohibited by law from disclosing to the public or has a legal privilege not to disclose and which is not otherwise available to the public."[86] Obtaining information under government authority includes information produced pursuant to subpoena.[87]

Further, the concept of "not otherwise available to the public" is broadly defined, meaning "if the public cannot obtain this information then it meets this element."[88] Thus, for example, "if the information is available on the internet, or in public archives or upon request at a government agency [only then] does it not satisfy this element" and not qualify as confidential government information.[89] In addition, the protections of Rule 1.11(c) extend to information "obtained under government authority" even where a lawyer learned the information in a nonrepresentational capacity,[90] including situations in which "the lawyer did no work at all on a matter and came across the confidential government information by chance, or over lunch, or by overhearing a conversation involving other government lawyers…"[91]

Any understanding of the purpose that Rule 1.11(c) is intended to serve, or the breadth of confidential government information intended to be covered by the Rule, is incomplete without examining the foundation for the Rule's definition, which the State's expert fails to do. In our initial report, we explained that the concept of "confidential government information" as used in Rule 1.11(c) is based upon a federal regulations including 5 C.F.R. § 2635.703(b), entitled "Use

---

[86] Rule 1.11(c).
[87] ABA Comm on Ethics & Prof'l Responsibility, Formal Op. 509, p. 4; *See also* Montgomery-Muchman Report pp. 24–25.
[88] Simon's New York Rules of Professional Conduct Annotated §1.11:30 (July 2023 Update).
[89] Simon's New York Rules of Professional Conduct Annotated §1.11:30. (July 2023 Update).
[90] ABA Formal Op. 509 at p. 4. (citations omitted.)
[91] Simon's New York Rules of Professional Conduct Annotated §1.11:27 (July 2023 Update).

of Nonpublic Information," which has extensive protections for nonpublic information.[92] "In the wake of Watergate…, Congress passed the Ethics in Government Act of 1978"[93] which served as "the statutory basis for the promulgation of agency-wide ethics regulations and the genesis of the United States Office of Government Ethics (OGE)."[94]

Importantly, for purposes of this matter, the Ethics in Government Act of 1978 is a foundational part of Rule 1.11. "The personal and substantial participation requirement was imported into the Model Rules from the federal Ethics in Government Act of 1978." [95] In addition, the definition of a "matter" under Rule 1.11 is identical to the definition in the 1978 Ethics in Government Act.[96] With respect to the Rule's definition of confidential government information, just as the definitions of "personal and substantial" and "matter" derive from federal statutes and regulations that predate the 1983 Rule, so too does the idea of confidential government information. Although the State's expert is correct that the C.F.R. cited in our original opinion was not enacted until 1992, after Rule 1.11's promulgation in 1983, it is clear that the definition in the C.F.R. was based upon earlier statutes, including but not limited to, the 1948 Trade Secrets Act[97]

---

[92] *Supra* fn. 21.

[93] Getting to Know the Federal Executive Branch ethics Laws, A Primer Part 1, Jack McCall Jr., Jill E. McCook, 57 APR Tenn. B.J. 36, 37 (2021).

[94] *Id.*

[95] As the Revolving Door Turns: Government Lawyers Entering or Returning to Private Practice and Conflicts of Interest, Douglas R. Richmond, 65 St. Louis U. L. J. 325, 339 (2021) citing to 18 U.S.C. § 207(a)(1)(B) (2018).

[96] *See* PL 95-521, October 26, 1978, (The Ethics in Government Act of 1978) Sec. 501(a) Section 207 of Title 18 United States Code, is amended to read as follows:
Disqualification of former officers and employees, disqualification of partners of current officers and employees, … "in connection with any judicial or other proceeding, application, request for a ruling or other determination, contract, claim, controversy, investigation, charge, accusation, arrest or other particular matter involving a specific party or parties." *See* Rule 1.11(e). "As used in this Rule, the term 'matter' includes: (1) Any judicial or other proceeding, application, request for ruling or other determination, contract, claim, controversy, investigation, charge, accusation, arrest or other particular matter involving a specific party or parties, and (2) any other matter covered by the conflict of interest rules of the appropriate government agency."

[97] "Whoever, being an officer or employee of the United States or of any department or agency thereof, any person acting on behalf of the Federal Housing Finance Agency, or agent of the Department of Justice as defined in the Antitrust Civil Process Act (15 U.S.C. 1311-1314), or being an employee of a private sector organization who is or was assigned to an agency under chapter 37 of title 5, publishes, divulges, discloses, or makes known in any manner or to any extent not authorized by law any information coming to him in the course of his employment or official

(18 U.S.C. § 1905), which prohibited the use of nonpublic government information by former government lawyers.[98] Our opinion, as expressed in our original report, is that "Federal regulations and statutes serve as the basis for the definition of 'confidential government information' in Rule 1.11(c) and those regulations demonstrate that the materials produced by OptumRx are 'confidential government information' obtained through government authority."[99] Our assertion that the definition of confidential government information contained in Rule 1.11(c) was "borrowed from" and based on federal statutes and regulations is well founded.

In support of that proposition, we also referred to ABA Formal Opinion 509, which specifically identifies this conceptualization of "confidential government information" as analogous to the definition of "nonpublic information" in 5 C.F.R. § 2635.703(b) ("Use of nonpublic information"). This regulation provides that a federal government employee "*shall not* engage in a financial transaction using nonpublic information *or allow the improper use of nonpublic information to further his own private interest or that of another.*"[100] (Emphasis supplied.) Section 2635.703(b) defines "nonpublic information" as:

> [I]nformation that the employee knows or reasonably should know:
>
> (1) Is routinely exempt from disclosure under 5 U.S.C. 552 [FOIA] or otherwise protected from disclosure by statute, Executive Order or regulation;
>
> (2) Is designated as confidential by an agency; or

---

duties or by reason of any examination or investigation made by, or return, report or record made to or filed with, such department or agency or officer or employee thereof, which information concerns or relates to the trade secrets, processes, operations, style of work, or apparatus, or to the identity, confidential statistical data, amount or source of any income, profits, losses, or expenditures of any person, firm, partnership, corporation, or association; or permits any income return or copy thereof or any book containing any abstract or particulars thereof to be seen or examined by any person except as provided by law; shall be fined under this title, or imprisoned not more than one year, or both; and shall be removed from office or employment." 18 USCA § 1905.

[98] *See https://www.ecfr.gov/current/title-5/chapter-XVI/subchapter-B/part-2635/subpart-G/section-2635.703* example 3; *See also* Simon's New York Rules of Professional Conduct Annotated, §1.11:31.

[99] Montgomery-Muchman Report at pp. 40-45.

[100] ABA Comm. on Ethics & Prof'l Responsibility, Formal Ethics Opinion 509, (February 28, 2024) (p. 4, fn. 13) (citations omitted) (emphasis supplied).

> (3) Has not actually been disseminated to the general public and is
> not authorized to be made available to the public on request. [101]

The regulation incorporates into its definition the Freedom of Information Act ("FOIA"), which has nine exemptions and three exclusions, all of which illustrate the breadth of the concept of nonpublic information. As just one example, "'confidential government information' …is any information obtained by the government, pursuant to its authority, that the government is forbidden to disclose. Probably the quintessential example is financial information from income tax returns which is provided by taxpayers to the IRS and which must, by law, by kept confidential."[102]

In our original report, we also cited additional authority in support of the definition of confidential government information, namely, the United States Supreme Court's decision in *Food Marketing Institute v. Argus Leader Media*.[103] As originally explained, that case dictates that "confidential" under FOIA should be given its ordinary meaning, "private" or "secret," which means "the party producing the information considers it private and that the party receiving the information imparts some assurance that it will remain secret."[104] Thus, the confidentiality agreements that were supposed to protect OptumRx's information when it was *originally* produced pursuant to *government subpoenas*, cannot be ignored. The fact that others now have the information is not determinative of the confidential nature of the information. Rule 1.11(c) provides that information is confidential when "*at the time this Rule is applied*, the government is prohibited by law from disclosing [it] to the public."[105] Similarly, the fact that OptumRx was compelled to deposit the materials it produced in response to Motley Rice's actions as government

---

[101] 5 C.F.R. Sec. 2635.703(b).
[102] W. Bradley Wendel, *Professional Responsibility; Examples & Explanations*, (7th Ed. 2024); See Montgomery-Muchman Report at pp. 27–29, 32.
[103] *Food Marketing Institute v. Argus Leader Media*, 139 S. Ct. 2356 (2019).
[104] *Id.* at 2363 (citations omitted); *see* Montgomery-Muchman Report at pp. 44, 60.
[105] SCR 3.130 (1.11(c)) (emphasis supplied).

lawyers into a discovery repository available to all plaintiff's attorneys in the MDL does not transform those materials into being "publicly available."

The State's expert further criticizes our opinions by claiming that we did not review any of the subpoenaed documents at issue before rendering our opinion.[106] Reviewing the documents is unnecessary to render an opinion for several reasons. First, a comparison of the subpoenas' document requests with the State's allegations in its second amended complaint shows that Motley Rice could have used the produced documents, which were confidential at the time they were obtained, in this case. That other parties *now* have access to those documents does not change the *confidential* character of the documents at the time Motley Rice subpoenaed them while serving as public officers and employees, as evidenced by the Confidentiality Agreements mutually executed in each instance.

The State's second amended complaint significantly overlaps with the information Motley Rice demanded and obtained through the government subpoenas in the City of Chicago, DC OAG and Hawai'i investigations. For example, the Utah complaint includes the following allegations:

- "Defendants colluded with Purdue Pharma and other opioid manufacturers to increase opioid sales by giving opioids preferred placement on Defendants' national formularies in exchange for substantial rebates and fees. The rebates were conditioned on Defendants lowering the copay requirements and eliminating safety restrictions like prior authorization requirements and usage limits. To boost profits, Defendants willingly agreed. Moreover, Defendants actively collaborated with Purdue and other manufacturers to create, support, and propagate misleading marketing messages to alter perceptions of opioids and increase sales. Defendants shared their data with opioid manufacturers to help refine and target their opioid marketing strategies. Defendants partnered with manufacturers to study and develop data that would reinforce Purdue's and other manufacturers' deceptive messaging. And Defendants helped Purdue and other manufacturers draft and disseminate deceptive marketing materials to the public and prescribers." Utah Compl. ¶ 33-34.

---

[106] Baker Report at p. 33.

- "Through their unique combination of knowledge, power, and market position, Defendants had an extraordinary ability to control the supply of opioid pharmaceuticals in the United States and in Utah. . . ." Utah Compl ¶ 21.

- "Defendants colluded with Purdue Pharma and other opioid manufacturers to increase opioid sales by giving opioids preferred placement on Defendants' national formularies in exchange for substantial rebates and fees. The rebates were conditioned on Defendants lowering the copay requirements and eliminating safety restrictions like prior authorization requirements and usage limits. To boost profits, Defendants willingly agreed." Utah Compl. ¶ 33.

- "Express Scripts and Optum leverage their market power to require and receive incentives from manufacturers to keep certain drugs on and off their standard formularies." Utah Compl. ¶ 141.

- "Instead, Defendants provided manufacturers with preferred formulary status without restrictions and aided their marketing efforts even though Defendants knew that dangerous numbers of opioids were being used in Utah and the nation and were causing an unprecedented crisis of addiction, overdose, and death." Utah Compl. ¶ 162.

- "Defendants misrepresented to the public and their clients that their formularies and utilization management strategies were designed to protect public health and safety when, in reality, they were structured to maximize profits in collaboration with opioid manufacturers;" Utah Compl. ¶ 416(a).

- "Defendants represented to the public that they used their power, insight, and control over their national formularies to ensure safe prescribing and dispensing of drugs. They represented to their clients and the public that they made formulary decisions and used UM controls to restrict inappropriate dispensing and to promote safe and effective pain treatment. They represented further that they policed pharmacies within their networks to identify and address instances of over-prescribing and diversion. None of this turned out to be true." Utah Compl. ¶ 28-29.

- "Much of activity was not transparent to anyone, including payers who, in good faith, hired Defendants to manage their benefits. Defendants used their position to silently collude with manufacturers, prioritizing their own profits over public health, welfare, and safety." Utah Compl. ¶ 156.

- "Drug manufacturers compete for placement on PBMs' standard, national formularies (preferred placement results in higher demand, more use, and greater profits). Manufacturers often pay PBMs incentives to avoid pre-authorization and other UM tools that would slow the flow of drug use, for example, quantity limits, refill limits, and step edits." Utah Compl. ¶ 143.

The confidential documents that Motley Rice received relate to those allegations, including

rebate agreements, custodial documents negotiating drug rebates, and other documents related to

OptumRx's internal formulary and business processes. While some of those documents may not mention opioids specifically, they provide Motley Rice with a roadmap into OptumRx's inner workings and are relevant to the allegations against OptumRx in the current litigation. As such, it is foreseeable that Motley Rice could use the information they obtained through their role as government attorneys to the benefit of their private clients in this litigation, and to OptumRx's disadvantage. The abuse of government authority occurred when Motley Rice accepted the representation of the State in this case, knowing that it had previously obtained confidential government information subject to Confidentiality Agreements that could be used to OptumRx's material disadvantage. The fact that other parties now have the documents through discovery is irrelevant and does not cure Motley Rice's conflict.

A review of the documents themselves is unnecessary for us to render an opinion on the application of Rule 1.11(c). For an expert opinion to be admissible under FRCP 702, it needs to meet the following standards:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.[107]

---

[107] 28 USCA FRE 702 (Pub.L. 93-595, § 1, Jan. 2, 1975, 88 Stat. 1937; Apr. 17, 2000, eff. Dec. 1, 2000; Apr. 26, 2011, eff. Dec. 1, 2011; Apr. 24, 2023, eff. Dec. 1, 2023).

Recent amendments to Rule 702(d) emphasize that expert opinions must stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology.[108] Unlike the State's expert, in addition to teaching legal ethics, both of OptumRx's experts are lawyers with decades of practice in the field of professional responsibility. Both experts have reviewed files in hundreds of cases related to conflicts of interest and confidentiality of information,[109] and render their opinions based upon that and other relevant experience. OptumRx's experts also have experience as both consulting and testifying experts.[110] Reviewing the underlying documents themselves is unnecessary to render an opinion in this case because the manner in which Motley Rice came to possess the documents and information (and whether they are available to the public) is far more important than the substance of the documents themselves. Interestingly, although the State's expert criticizes us for not having reviewed the documents at issue, she also renders an opinion without having reviewed those same documents.[111]

## VI. The State's expert's claim that "Courts have consistently held" that information obtainable through routine discovery requests is not "Confidential Government Information" is inaccurate.

The State's expert makes a sweeping and misleading statement that "[c]ourts too have *consistently* held that government information that is obtainable through 'routine discovery requests' or 'normal discovery channels' is *not* 'confidential government information.'"[112] She cites only *two* cases: *Davis v. Southern Bell*, 149 F.R. D. 666 (S.D. Fla. 1993), and *In re Domestic Air Transportation Antitrust Litigation*, 142 F.R.D. 677 (N.D. Ga 1992). Neither is analogous to this case. As a threshold matter, the *Davis* decision from Florida was based on Rule 1.11(b) (then

---

[108] 28 USCA FRE 702, Advisory Committee Notes, 2023 Amendments.
[109] *See* Appendices A and B to Montgomery-Muchman Report.
[110] *Id.*
[111] Baker Report at pp.33.
[112] Baker Report p.36.

titled *Successive Government and Private Employment*)*,* which is not the rule at issue here and which was superseded in 2006.[113] In *Davis*, the court declined to disqualify the lawyer because the representation was not successive but joint, with the lawyer representing a private party and the government in parallel proceedings. The court held that Rule 1.11(b) applied "to successive but not joint representation."[114] In contrast, this is not a case of joint representation. In addition, the information in *Davis* was *not* produced pursuant to confidentiality agreements, whereas here, the information was produced pursuant to coercive government investigatory subpoenas and subject to mutually executed Confidentiality Agreements, a fact that the State's expert ignores.

And *In re Domestic Air Transportation Antitrust Litigation*, 142 F.R.D. 354 (N.D. Ga 1992), did not address any ethical rule. It merely considered whether transcripts of depositions in an antitrust investigation were discoverable in civil litigation. But as we explained in our original report, and as we discuss below, whether information may be discoverable later as a general matter is *not* the test for whether that information is "confidential government information" under Rule 1.11(c).

Thus, neither *Davis* nor the *Domestic Air Transportation Antitrust Litigation* case stand for the proposition that the proprietary materials OptumRx produced pursuant to government subpoena power *and* confidentiality agreements signed by Motley Rice on behalf of the government were "routine discovery" and not "confidential government information" under that Rule. Nor do those *two* outlier cases show that courts have "consistently" held anything. Neither

---

[113] The case cites a now superseded version of Rule 1.11, but the definition of confidential government information, which moved from former subdivision (e) to subdivision (c) remains the same. In addition, in 2006, along with other amendments, the title of the Rule was changed to Special Conflicts of Interest for Former and Current Government Officers and Employees, a change intended to reflect the content of the rule more accurately. *See* 2006 Changes to Florida Rules of Professional Conduct, 31 Nova L.R. 1, 14, Heather Perry Baxter (Fall 2006).
[114] *Davis v. Southern Bell*, 149 F.R.D. 666, 674.

case addressed Rule 1.11(c) or the scope of "confidential government information" under that Rule.

Here, Motley Rice, acting as government officers, signed confidentiality agreements before OptumRx produced the materials to the government. The time that Motley Rice accessed the materials as government lawyers is when the rule is "to be applied," not now, when others have the documents, as the State's expert argues. The confidentiality agreements provided that, as a condition of OptumRx's production, the parties agreed "not to use the Confidential Information in connection with any other matter, and not to disclose any Confidential Information to any party or the public, except as provided by this Agreement."[115] These confidentiality agreements that Motley Rice signed as government attorneys in multiple government investigations make it clear, as required under Rule 1.11(c), that in this case the material OptumRx produced to Motley Rice is information the government is "prohibited by law from disclosing to the public, or has a legal privilege not to disclose and which is not otherwise available to the public."[116] The information produced by OptumRx pursuant to government subpoenas is, therefore, by definition, "confidential government information."

Further, the test of whether information is confidential government information is not whether it is eventually discoverable. It is clear that, in situations where counsel was considered to have a conflict under Rule 1.11(c) or disqualified under the Rule, some of the information at issue would eventually be discoverable. For example, Rule 1.11(c) was applied to a part-time county attorney, disqualifying him from representing clients in family law matters where child support was at issue due to his access to a state-run database with information about individuals' financial status and past earnings where the information was considered confidential under statute,

---

[115] *See, e.g.,* Montgomery-Muchman Report, p. 24, 48.
[116] S.C.R. 3.130 (1.11(c)).

despite the fact that the information about financial status and earnings may well have ultimately been discoverable information in the subsequent family law matter.[117] Other ethics opinions have determined that government officer-lawyers who were aware of "unfavorable job reviews,"[118] which likewise may ultimately have been discoverable information, should be disqualified. Other common examples of information accepted as confidential government information which is ultimately discoverable include tax information and even materials that have been produced to a grand jury under subpoena.[119]

Further, this is not a case of "side-switching." The State's expert cites to side-switching cases using a Rule 1.11(a) analysis.[120] But side-switching and Rule 1.11(a) are irrelevant to whether Motley Rice should be disqualified under Rule 1.11(c). There are no allegations of "side-switching" in this motion. In its government service and its private representations, Motley Rice has been unequivocally adverse to OptumRx. As such, the State's expert's repeated references to "side-switching" and to cases involving that issue are misguided and misleading.

The State's expert also incorrectly describes Judge Polster's earlier ruling involving disqualification of a defense lawyer in *In re National Opiate Litigation*, 2019 WL 1274555 (N.D. Ohio 2019) as a case involving "side-switching."[121] In fact, Judge Polster found that the matter did *not* involve side-switching under Rule 1.11(a).[122] Rather, Judge Polster held "that Rule 1.11(a) is not implicated here. At its core, Rule 1.11(a) is a rule that prevents 'side-switching' when a government lawyer goes into private practice (or vice versa)."[123] In that case, Judge Polster disqualified the U.S. Attorney under Rule 1.11(c), not Rule 1.11(a), concluding it would be

---

[117] *See* Neb. Lawyers' Advisory Comm. Op. 22-01 (2022).
[118] *See* N.Y.S. Bar Ass'n Comm. on Prof'l Ethics Op. 1187 (2020).
[119] W. Bradley Wendel, *Professional Responsibility; Examples & Explanations*, at 259 (7th Ed. 2024).
[120] Baker Report at pp. 30-32.
[121] Baker Report at p. 42-43.
[122] *In re National Opiate Litigation,* 2019 WL 1274555, *3 (ND Ohio 2019).
[123] *Id.*

inappropriate for her to remain in the case given her knowledge of "confidential non-public information [that] may go to the heart of Plaintiffs' damages claims" [124] which, if used by defendants, "could materially prejudice" plaintiffs.[125] The basis for his disqualification in that case was Rule 1.11(c) and the nature of the confidential information the U.S. Attorney had obtained while working for the government investigating plaintiffs' claims. In his later ruling on OptumRx's disqualification motion, Judge Polster found the information at issue was not confidential since it was routine discovery available in the MDL repository. Yet, as discussed in our original report, routine discovery does *not* include information produced under or subject to a protective order or a confidentiality agreement, such as proprietary trade secret information or information produced pursuant to Confidentiality Agreements signed by government lawyers.[126] Plaintiff's expert notes that three other courts have also denied OptumRx's disqualification motion. However, these rulings misinterpreted Rule 1.11(c)'s legal import as well as the facts of the Motley Rice-led investigations and simply rely on the original ruling by Judge Polster. The information obtained in this case includes a wide range of proprietary and nonpublic information, including information related to formulary development, business strategies, rebate negotiations and financial data which are not available to the public.[127] The information was produced pursuant to signed confidentiality agreements, a fact which none of the three Court's orders to which the State's expert refers have addressed.

It is significant that Wyoming, which has retained Motley Rice as "Special Assistant Attorneys General" declined to produce investigative materials in response to a public-records

---

[124] *In re National Opiate Litigation,* 2019 WL 1274555, *5.
[124] *Id.*
[125] *Id.*
[126] Montgomery Muchman Report p. 42.
[127] Hooker Decl. ¶¶ 5–9.

request, claiming that "any records we have that may fall under these requests are confidential under the attorney work product and/or attorney-client privileges and therefore will not be produced[,]" or because producing those materials "would be contrary to the public interest for several reasons."[128] Likewise, Hawaii refused to produce information in response to a public-records request, claiming that the records are exempt from disclosure under the state's public records laws because "the disclosure is subject to the court's supervision," "such records would not be discoverable," and "the records are protected from disclosure under state law."[129] The fact that other government entities are denying *public records* requests supports our opinion that these materials are not routine discovery or publicly available and, therefore, constitute confidential government information.

The California Court of Appeal, in its recent ruling, discussed the concept that an attorney representing a private client "does not owe a broad duty to an opposing party to maintain that party's confidences."[130] While true, that is not the focus of this litigation. And while the exception contained in Rule 1.11(c) for confidential government information is *unique* in that it is the only provision in the Rules of Professional Conduct that protects confidential information of a third party, that does not make the exception "*narrow*."[131] Describing the provision as "narrow" disregards the critical function of Rule 1.11(c) which is to "'prevent the lawyer's improper use of his or her official position' and to protect others from exploitation of confidential government information, acquired by the lawyer while serving as a public officer or employee."[132] Other examples of "confidential government information" beyond grand jury information include tax

---

[128] Exh. R to Declaration of Matthew Hooker.
[129] Exh. S to Declaration of Matthew Hooker.
[130] *People v. OptumRx, Inc.*, No. B343828, 2025 WL 2542288, at *5 (Cal. Ct. App. Sept. 4, 2025).
[131] Id.
[132] *Id.* at *6 (quoting ABA Formal Ethics Op. 24-509).

returns.[133] Further, as noted above in this report, the United States Supreme Court has interpreted the word "confidential" in the context of a request for government information under the Freedom of Information Act to mean that "the party producing the information considers it private and that the party receiving the information imparts some assurance that it will remain secret."[134] While the exception might be limited in application, it is critical in its function. Limiting its application to grand jury materials is not consistent with the Rule's history or purpose, and we respectfully disagree with the California Court of Appeal's recent ruling.

### VII.    Contrary to the State's expert's assertions, Rule 5.6 is inapplicable to this case.

The State's expert incorrectly asserts that Rule 5.6 has some bearing on whether Motley Rice is violating Rule 1.11(c).[135] She attempts to tie together the policy concerns of Rules 1.11 and 5.6 by making an argument, taken totally out of context, about the "freedom of clients to choose a lawyer."[136] In fact, Rule 5.6 has no bearing on whether or not Motley Rice violated Rule 1.11(c). Her argument regarding the prohibition on "one and done representations" relies on Rule 5.6 but recites only a portion of the Rule.[137]

Utah Rule of Professional Conduct 5.6 provides:

A lawyer shall not participate in offering or making:

(a) a partnership, shareholder, operating, employment, or other similar type of agreement that restricts the right of a lawyer to practice after termination of the relationship, except an agreement concerning benefits upon retirement; or

(b) an agreement in which a restriction on the lawyer's right to practice is part of the settlement of a client controversy.[138]

---

[133] *Argus, Supra.* fn. 96.
[134] *Argus, Supra* fn. 97-98, pp. 23-24.
[135] Baker Report at p. 48-50.
[136] *Id.*
[137] *Id.* at p. 44.
[138] Utah Rule of Professional Conduct 5.6.

"Rule 5.6(a) prohibits employment agreements that are designed to prevent lawyers from competing with their former firms after they change jobs. These include promises not to practice within a particular geographic or substantive area, promises not to represent any of the firm's clients, and restrictions on client contact or use of client information."[139] "Financial disincentives for taking 'firm' clients violate Rule 5.6 if they are disguised as attempts to penalize competition."[140] The policy underlying Rule 5.6(a) and the Utah rule is identified in Comment 1: "An agreement restricting the right of lawyers to practice after leaving a firm not only limits their professional autonomy but also limits the freedom of clients to choose a lawyer."[141] Comment [2] of Utah Rule 5.6 explains that "Paragraph (b) prohibits a lawyer from agreeing not to represent other persons in connection with settling a claim on behalf of a client."[142]

Rule 5.6 relates solely to the enforceability of post-employment noncompetition agreements, or agreements in which a restriction on the lawyer's right to practice is part of the settlement of a client controversy, neither of which remotely resemble the facts underlying OptumRx's Motion to Disqualify.[143] The State's expert's reference to "freedom of clients to choose an attorney" is taken out of context and has no relevance to choice of counsel in conflict of interest scenarios. The State's expert fails to cite any authority for her argument because there is none. Rule 5.6 has absolutely no application to OptumRx's disqualification motion, which is based on Motley Rice's conflict of interest and access to confidential government information due to its government service, and does not relate to a restrictive covenant in a partnership or settlement agreement.

---

[139] Ellen J. Bennett, Helen W. Gunnarsson & Nancy G. Kisicki, Annotated Model Rules of Professional Conduct p. 610 (10th ed. 2023) (citations omitted).
[140] Ellen J. Bennett, Helen W. Gunnarsson & Nancy G. Kisicki, Annotated Model Rules of Professional Conduct p. 613 (10th ed. 2023) (citations omitted).
[141] ABA M.R. 5.6 cmt.1; Utah R.P.C. 5.6 cmt. 1.
[142] Utah R.P.C. 5.6 cmt. 2.
[143] *See* 28 A.L.R. 5th ¶ 908.

In an attempt to advance her argument, the State's expert speculates about a hypothetical scenario in which, *if* OptumRx had settled a case and included a provision in the settlement agreement that prohibited Motley Rice from suing OptumRx again, that provision would be barred under Rule 5.6. Whether or not that is true, those are not the facts in this matter. In this case, there is no settlement provision or other restrictive covenant at issue. If Motley Rice's representation violates the conflict rules, there is nothing about Rule 1.11(c) that requires, as the State's expert opines, that "Motley Rice 'must remain *potentially available* to represent other claimants against OptumRx.'"[144] OptumRx is not seeking to enforce a restrictive covenant from a partnership agreement nor is there a term in any settlement agreement (or any settlement at all) that relates to this disqualification motion. Although Rule 5.6 might frequently be an issue in settling multidistrict litigation where defendants wish to prohibit plaintiffs' lawyers from recruiting or representing future clients in claims against the same defendant(s), that has no bearing here. In this case, it is solely Motley Rice's conflict and violation of the Rules of Professional Conduct through its misuse of confidential government information that requires disqualification, rather than any improper attempt to contractually restrict Motley Rice from representing future clients. Rule 5.6 simply does not apply here, and the State's expert's reliance on it has no basis in fact or law.

## VIII. OptumRx's well-founded disqualification motion seeks to promote an important policy concern and prevent the abuse of government authority.

The longstanding policy concern of Rule 1.11 is to prevent misuse of government authority. As far back as 1975, ABA Formal Opinion 342 recognized the importance of these concerns: "If an underlying consideration is to avoid the situation where government lawyers may be tempted to handle assignments so as to encourage their own future employment in regard to those matters, the danger is that lawyers may attempt to derive undue financial benefit from fees in connection

---

[144] Baker Report at p. 49-50.

with subsequent employment…"[145] When Model Rule 1.11 was amended, Comment 4 was added expressly stating that "Unfair advantage could accrue to the other client by reason of access to confidential information about the client's adversary only available through the lawyer's government service."[146]

The State and its expert persistently raise the issue of "parties' choice of counsel" as if that were the only consideration in a disqualification motion. While, of course, choice of counsel is one consideration, district courts have "inherent authority to disqualify an attorney as a sanction for professionally unethical conduct."[147] That authority is "not unfettered,"[148] and courts should be hesitant to impose disqualification since it is a "drastic measure."[149] With that said, when "there is a reasonable possibility that some specifically identifiable impropriety actually occurred, and where the public interests in requiring professional conduct by an attorney outweighs the competing interests of allowing a party to retain his counsel of choice,"[150] disqualification is appropriate.

In light of its clear violation of Rule 1.11(c) Motley Rice must be disqualified.

## CONCLUSION

The policy concerns behind Rule 1.11(c) are as valid today as they were in 1983. Corporate defendants have the same right as any other litigant to prevent abuses of government power. Motley Rice was a public officer or employee when it wielded government power and investigated OptumRx on behalf of Hawaiʻi, D.C., and Chicago. It is now representing clients in its private capacity (i.e., private clients) in litigation seeking to financially benefit both themselves and their

---

[145] ABA Formal Opinion 509, citing to ABA Formal Op. 342 (1975).
[146] ABA Model Rule 1.11, cmt 4.
[147] *United States v. Villaspring Health Care Center, Inc*., et al., 2011 WL 5330790, *2.
[148] *Id.*
[149] *Id.*
[150] *Id.*

clients after spending years collecting confidential information about OptumRx using government power. That is exactly the harm that Rule 1.11(c) was promulgated to prevent—the abuse of government power. We do not believe that this is a close call. There can be no more obvious violation of Rule 1.11(c) than Motley Rice's.

Respectfully submitted,

/s/ Wendy J. Muchman

/s/ Sari W. Montgomery

Dated: October 2, 2025